Sonya D. Winner (Bar No. 200348)
swinner@cov.com
Nathan E. Shafroth (Bar No. 232505)
nshafroth@cov.com
Isaac D. Chaput (Bar No. 326923)
ichaput@cov.com
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091

Attorneys for Defendant
MCKESSON CORPORATION
*(Additional parties and counsel listed on signature page)*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> PURDUE PHARMA L.P., et al., <br><br> Defendants. | Civil Case No.: 3:18-CV-07591-CRB <br><br> **DISTRIBUTORS' NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT** <br><br> Date: June 19, 2020 <br> Time: 10:00 a.m. <br> Dept: Courtroom 6 <br> Judge: Honorable Charles R. Breyer |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION TO DISMISS .................................................. 1

I.  INTRODUCTION ...................................................................................... 1

II.  SUMMARY OF ARGUMENT ...................................................................... 2

III.  ARGUMENT ............................................................................................ 3

    A.  The City's RICO Claim Should Be Dismissed...................................... 3

        1.  The City Fails To Allege a Direct Injury Caused By Distributors. ............ 4

        2.  The City Fails To Allege Racketeering Activity by Distributors. .............. 8

    B.  The City's Public Nuisance Claim Should Be Dismissed as to Distributors........ 10

        1.  The MDL Court's Prior Rulings Do Not Apply Here. ............................ 10

        2.  Distribution Cannot Constitute a Public Nuisance Absent Knowingly False Promotion, Which Is Not Alleged as to Distributors. ........................................................................... 11

        3.  The City's Nuisance Claim Does Not Adequately Plead Causation. ....... 13

    C.  The City Is Not Entitled to Restitution from Distributors on its UCL Claim.................................................................................................... 15

IV.  CONCLUSION........................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*,
    228 F.3d 429 (3d Cir. 2000)...................................................................................7

*Aquilina v. Certain Underwriters at Lloyd's Syndicate #2003*,
    406 F. Supp. 3d 884 (D. Haw. 2019)....................................................................9

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*,
    241 F.3d 696 (9th Cir. 2001) ................................................................................7

*Ayres v. Gen. Motors Corp.*,
    234 F.3d 514 (11th Cir. 2000) ..............................................................................9

*Banga v. Experian Info. Sols.*,
    2010 WL 11531066 (N.D. Cal. March 8, 2010).................................................16

*Bhambra v. Ampco Sys. Parking*,
    2009 WL 10694587 (N.D. Cal. June 10, 2009) (Breyer, J.).................................8

*Chagby v. Target Corp.*,
    358 F. App'x 805 (9th Cir. 2009) .........................................................................9

*City of Cincinnati v. Beretta U.S.A. Corp.*,
    768 N.E.2d 1136 (Ohio 2002) ............................................................................10

*City of Modesto Redevelopment Agency v. Superior Court*,
    119 Cal. App. 4th 28 (2004) ...............................................................................11

*City of Philadelphia v. Beretta U.S.A., Corp.*,
    126 F. Supp. 2d 882 (E.D. Pa. 2000) .................................................................10

*City of San Diego v. U.S. Gypsum Co.*,
    30 Cal. App. 4th 575 (1994) ...............................................................................11

*County of Santa Clara v. Atl. Richfield Co.*,
    137 Cal. App. 4th 292 (2006) ........................................................................11, 12

*Detroit Bd. of Educ. v. Celotex Corp.*,
    493 N.W.2d 513 (Mich. Ct. App. 1992) ............................................................11

*District of Columbia v. Beretta*,
    872 A.2d 633 (D.C. 2005) ..................................................................................11

*Edwards v. Marin Park, Inc.*,
    356 F.3d 1058 (9th Cir. 2004) ..............................................................................8

*Fields v. Twitter, Inc.*,
  881 F.3d 739 (9th Cir. 2018) ................................................................................4

*In re Firearm Cases*,
  126 Cal. App. 4th 959 (2005) ...............................................................3, 11, 13

*In re First Alliance Mortg. Co.*,
  471 F.3d 977 (9th Cir. 2006) ........................................................................3, 15

*Gonzales v. Derrington*,
  56 Cal. 2d 130 (1961) ...........................................................................................14

*Harmoni Int'l Spice, Inc. v. Hume*,
  914 F.3d 648 (9th Cir. 2019) ..........................................................................3, 5

*Hemi Grp., LLC v. City of New York*,
  559 U.S. 1 (2010).............................................................................................3, 4, 5

*Holmes v. Secs. Inv'r Prot. Corp.*,
  503 U.S. 258 (1992)............................................................................................4, 7

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*,
  196 F.3d 818 (7th Cir. 1999) ..................................................................................7

*State of Delaware ex rel. Jennings v. Purdue Pharma L.P.*,
  2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019)...........................................11

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) .......................................................................................16

*Laborers Local 17 Health & Benefit Fund v. Phillip Morris*,
  191 F.3d 229 (2d Cir. 1999)....................................................................................7

*In re Lead Paint Litig.*,
  924 A.2d 484 (N.J. 2007).......................................................................................11

*Lopez v. McDonald's Corp.*,
  193 Cal. App. 3d 495 (1987) ...............................................................................15

*Lyons v. Philip Morris Inc.*,
  225 F.3d 909 (8th Cir. 2000) ..................................................................................7

*Martinez v. Pacific Bell*,
  225 Cal. App. 3d 1557 (1990) .......................................................................14, 15

*Miller v. Yokohama Tire Corp.*,
  358 F.3d 616 (9th Cir. 2004) ..................................................................................9

*In re Nat'l Prescription Opiate Litig.*,
  2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) ..........................................6, 7, 8

iv

*Or. Laborers-Emp'rs Health & Welfare Tr. Fund v. Philip Morris Inc.*,
    185 F.3d 957 (9th Cir. 1999) ........................................................................................4, 5

*Ozeran v. Jacobs*,
    798 F. App'x 120 (9th Cir. 2020) ..............................................................................6

*Pecot v. SF Deputy Sheriff's Ass'n*,
    2009 WL 585877 (N.D. Cal. Mar. 6, 2009) (Breyer, J.)..............................................9

*People v. ConAgra Grocery Prods.*,
    17 Cal. App. 5th 51 (2017) ..................................................................................12, 13

*Perry v. American Tobacco Co.*,
    324 F.3d 845 (6th Cir. 2003) ....................................................................................8

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) ..................................................................................15

*Regence Blueshield v. Philip Morris Inc.*,
    5 F. App'x 651 (9th Cir. 2001) ..................................................................................7

*Rezner v. Bayerische Hypo-Und Vereinsbank AG*,
    630 F.3d 866 (9th Cir. 2010) ............................................................................4, 5, 6

*Sanford v. MemberWorks, Inc.*,
    625 F.3d 550 (9th Cir. 2010) ....................................................................................8

*Seibels Bruce Grp., Inc. v. R.J. Reynolds Tobacco Co.*,
    1999 WL 760527 (N.D. Cal. Sept. 21, 1999) ............................................................8

*Serv. Emp. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*,
    249 F.3d 1068 (D.C. Cir. 2001).................................................................................7

*Sills v. Smith & Wesson Corp.*,
    2000 WL 33113806 (Del. Super. Ct. Dec. 1, 2000) ................................................11

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019).........................................................................................9

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ..................................................................................10

*People ex rel. Spitzer v. Sturm, Ruger & Co., Inc.*,
    761 N.Y.S.2d 192 (N.Y. App. Div. 2003) ................................................................11

*State v. Lead Indus. Ass'n, Inc.*,
    951 A.2d 428 (R.I. 2008)..........................................................................................10

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
    171 F.3d 912 (3d Cir. 1999)......................................................................................7

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) ...............................................................................................3, 8, 9

*Tex. Carpenters Health Benefit Fund v. Philip Morris Inc.*,
    199 F.3d 788 (5th Cir. 2000) ........................................................................................................7

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
    2019 WL 4581340 (N.D. Cal. Sept. 20, 2019) (Breyer, J.) ..........................................................9

**Statutes**

18 U.S.C. § 1961(1) ...............................................................................................................................6

18 U.S.C. § 1962(c) ...............................................................................................................................6

21 U.S.C. § 843(a) .................................................................................................................................8

Cal. Bus. & Prof. Code § 17203 .................................................................................................3, 15, 16

Cal. Civil Code § 3479...........................................................................................................................10

Cal. Civil Code § 3480...........................................................................................................................10

Ohio Rev. Code § 2307.71(A)(13) .........................................................................................................11

## NOTICE OF MOTION AND MOTION TO DISMISS

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on June 19, 2020, at 10:00 am, or as soon thereafter as available, in the courtroom of the Honorable Charles R. Breyer, located at 450 Golden Gate Avenue, Courtroom 6, 17th Floor, San Francisco, California 94102, Defendants AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation (collectively "Distributors") will and hereby do move for an order dismissing with prejudice the claims of Plaintiffs City and County San Francisco and City Attorney Dennis J. Herrera ("City") asserted in the First Amended Complaint ("Compl." or "Complaint").

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the pleadings and papers on file in this action, any other such matters of which the Court may take judicial notice, the arguments of counsel, and any other matter that the Court may properly consider.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

The Complaint alleges that the opioid crisis in San Francisco has its origins in a deceptive marketing campaign by opioid manufacturers, i.e., the "Marketing Defendants."  The City alleges that, "[t]hrough a massive marketing campaign premised on false and incomplete information, the Marketing Defendants engineered a dramatic shift in how and when opioids are prescribed by the medical community and used by patients." Compl. ¶ 8.  The objective of that marketing campaign, according to the Complaint, was to change the standard of care for prescribing opioids—to move from a regime in which doctors prescribed opioids as a last resort, at the lowest effective dose, "for the kind of severe pain associated with cancer or short-term post-operative pain," to guidelines that endorsed the use of opioids "for common chronic pain, including back pain and arthritis."  *Id.* ¶ 9.  The objective, in other words, was "to encourage the use of opioids to treat not just the relative few who suffer from acute post-surgical pain and end-stage cancer pain, but the masses who suffer from common chronic pain conditions." *Id.* ¶ 25.  The City alleges that the Marketing Defendants did this, knowing "that opioids were addictive and subject to abuse, and that their other claims regarding the risks, benefits, and superiority of opioids for long-term use were

untrue." *Id.* ¶ 9.  The resulting "increased volume of opioid prescribing" led to "skyrocketing addiction, overdose and death." *Id.* ¶ 14.

Importantly, however, the Complaint does not allege that Distributors (i) participated in the allegedly fraudulent marketing campaign; (ii) made misrepresentations to doctors or patients about the risks, benefits, or addictive properties of the FDA-approved medicines that they distribute to State-licensed pharmacies; (iii) knew of the marketing campaign's nine alleged "[f]alsehoods," *id.* at 72, or were aware of the campaign's eight "channels," *id.* ¶ 402; or (iv) knew that the new standard of care for prescribing opioids was the product of the campaign.  Instead, the City alleges a different theory against Distributors, that they "contributed substantially to the opioid crisis by … distributing … far greater quantities of prescription opioids than they kn[e]w could be necessary for legitimate medical uses, while failing to report, and to take steps to halt, suspicious orders." *Id.* ¶ 12.  But the notion that the increase in opioid prescriptions was inherently "suspicious" or "clearly excessive," *id.* ¶ 896, is inconsistent with the City's theory that the Marketing Defendants, by their pervasive and deceptive marketing campaign, caused a sea-change in the standard of care for prescribing opioids.  If, as the City alleges, San Francisco doctors wrote increasing numbers of prescriptions pursuant to the new standard of care and in good faith, then there was nothing "suspicious," from the standpoint of Distributors, about the increasing orders placed by San Francisco pharmacies to permit those prescriptions to be filled.  The City does not, and could not, allege that Distributors had the ability or—under California law—duty to second-guess the good-faith judgments of San Francisco doctors about the "medical needs" of their patients.[1]  This remains so even if those doctors' prescribing decisions were influenced by the Marketing Defendants' allegedly fraudulent marketing.

## II.   SUMMARY OF ARGUMENT

Against this backdrop, and as explained further below, each of the City's claims against Distributors fails as a matter of law:

---

[1] Significantly, the City also does not (and could not) allege that Distributors delivered prescription opioids to anyone in San Francisco other than pharmacies, hospitals, and other entities that were licensed to receive those medications and dispense them to patients in response to physician prescriptions.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**RICO.**  The RICO claim fails for the reasons identified in Defendants' joint motion to dismiss ("Joint MTD"), and because:  (i) the City's alleged injuries (public services expenditures) cannot be traced ***directly*** to Distributors' alleged predicate acts (alleged regulatory reporting failures), as the causal chain necessarily involves intervening conduct by doctors, pharmacists, patients, and at least two criminal acts by third and fourth parties, *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9–18 (2010); *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 650–51 (9th Cir. 2019), and (ii) the City's mail and wire fraud allegations are not pled as to Distributors with the requisite particularity under Fed. R. Civ. P. 9(b), *Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007).

**Nuisance.**  The City's public nuisance claim fails for two reasons.  First, the City does not and cannot establish that Distributors affirmatively promoted opioids for the long-term treatment of chronic pain with actual knowledge of their harmful effects.  Second, the City does not adequately plead that Distributors' conduct proximately caused a public nuisance.  *See In re Firearm Cases*, 126 Cal. App. 4th 959, 988 (2005).

**Restitution under the UCL.**  Although the City's UCL claim against Distributors should be dismissed outright for the reasons stated in the Joint MTD, the City's request for restitution under the UCL, at a minimum, fails as to Distributors.  UCL restitution is limited to "restor[ing] to a[] person … money … acquired by means of such unfair competition."  Cal. Bus. & Prof. Code § 17203.  *See In re First Alliance Mortg. Co.*, 471 F.3d 977, 996 (9th Cir. 2006).  Because Distributors could not have "acquired" money belonging to the City's residents "by means of" their purported regulatory violations, the City's claim for restitution on behalf of its residents fails as a matter of law.

## III.   ARGUMENT

### A.   The City's RICO Claim Should Be Dismissed.

For the reasons explained in the Joint MTD, the City's RICO claims should be dismissed for several reasons.  As explained herein, the RICO claims also fail as against Distributors because the Complaint does not adequately allege (i) that they proximately caused the City's claimed injuries or (ii) that each of them committed two or more predicate acts.

1

### 1.      The City Fails To Allege a Direct Injury Caused By Distributors.

The City's failure to plead that Distributors' purported racketeering activity was a **direct** cause of its alleged injuries forecloses its RICO claim under governing Ninth Circuit authority.

A plaintiff must allege that "a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'"  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)).  As the Ninth Circuit has held, a plaintiff must allege a "direct relation between the injury asserted and the injurious conduct alleged."  *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 873 (9th Cir. 2010); *see Or. Laborers-Emp'rs Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 961 (9th Cir. 1999) (RICO plaintiffs "who complain[] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [are] generally said to stand at too remote a distance to recover").  A link between a predicate act and an injury that is "too remote" or "purely contingent" will not suffice.  *Holmes*, 503 U.S. at 268, 271; *accord Hemi*, 559 U.S. at 10 (theories of causation cannot "go beyond the first step"); *Fields v. Twitter, Inc.*, 881 F.3d 739, 745 (9th Cir. 2018) (noting "the necessity and scope of the 'first step' limitation").  Thus, it is well-settled that proximate causation is absent where (i) "[m]ultiple steps … separate the alleged [conduct] from the asserted injury," and (ii) the plaintiff's "[t]heory of liability rests on the independent actions of third and even fourth parties."  *Hemi*, 559 U.S. at 15.

The City does not allege the required "direct causal connection" between Distributors' purported predicate acts and the City's claimed injury.  *Id.* at 17–18.  The City seeks damages allegedly resulting from "the opioid-addiction epidemic," including expenditures on health care, law enforcement services, and various other social services.  Compl. ¶¶ 71, 882–83.  But the Complaint contains no factual allegations suggesting that Distributors' purported predicate acts were the **direct** cause of the City's public services expenditures—nor could it.  The face of the Complaint makes clear that multiple steps—and the **criminal** conduct of at least third and fourth parties—stand between Distributors' alleged conduct and the City's alleged injury.

*Hemi* illustrates the point.  There, New York City sued an out-of-state tobacco seller for fraudulently failing to file legally mandated reports with the state (with which the city had an information-sharing agreement), which resulted in "lost tax revenue" to the city by hindering its ability to track down

customers who unlawfully failed to pay sales tax.  559 U.S. at 7.  The Supreme Court held that the city's "causal theory" was too "attenuated" in part because "the conduct directly responsible for the City's harm was the customers' failure to pay their taxes," not the retailer's failure to report its cigarette sales to the state.  *Id.* at 9, 11.  The Court had little trouble concluding that "the disconnect between the asserted injury and the alleged fraud" was too great to satisfy RICO's directness requirement.  *Id.* at 11.

Here, as in *Hemi*, "the conduct directly responsible for the City's harm" is the behavior of City residents who misused opioid medications.  *Id.*  Distributors' purported predicate acts cannot be said to affect the City in the first instance, but only after many intervening actions and events—including in every case (i) a prescribing doctor's decision regarding a patient's treatment, (ii) a pharmacist's decision to dispense a prescription, and (iii) a patient's or another individual's decision to misuse or divert a prescribed medication—that "move well beyond the first step."  *Id.* at 10.

Before the City could possibly be harmed as a result of diversion to persons who abused opioids, moreover, at least **two criminal acts** by third and fourth parties must occur.  First, the pills must be diverted to the illicit market—for example, by patients who sell or give away their medicines to third parties.  Second, the diverted prescription opioid pills must be used by a San Francisco resident or visitor for non-medical use.  Both acts are unlawful, and both necessarily take place **after** Distributors' role in the supply chain (shipping opioid pills to licensed pharmacies) has concluded.  The intervening, criminal conduct of these third and fourth parties further demonstrates the **indirect** nature of the City's alleged injuries.  *E.g.*, *Or. Laborers*, 185 F.3d at 965 ("the direct injury test … wisely limit[s] standing to sue to those situations where the chain of causation leading to damages is not complicated by the intervening agency of third parties"); *see Hemi*, 559 U.S. at 1, 11 (directness requirement not satisfied where alleged injury was contingent on non-parties' decisions "not to pay taxes they were legally obligated to pay").

The Ninth Circuit's decision in *Harmoni International Spice, Inc. v. Hume*, 914 F.3d 648 (9th Cir. 2019), confirms this conclusion.  There, defendants allegedly "submit[ted] fraudulent shipping documents to U.S. customs officials," which in turn "led to an increase in [defendants'] sales," and those increased sales, in turn, allegedly harmed plaintiff's business.  *Id.* at 650–51.  The Ninth Circuit deemed this chain of causation—which began with an alleged fraud perpetrated on the federal government—"too attenuated" to support RICO liability.  *Id.* at 651; *see also Rezner*, 630 F.3d at 874 (plaintiff could not establish RICO

"causation based on [the defendant's] fraud against the United States"; the "United States … was the immediate victim," not plaintiff); *Ozeran v. Jacobs*, 798 F. App'x 120, 122 (9th Cir. Feb. 18, 2020) (RICO claim failed as plaintiff was not "the *direct* victim of the alleged predicate acts of mail and wire fraud" (emphasis in original)).  Likewise here, there is no direct connection between Distributors' alleged failure to report "suspicious orders" to federal regulators and the City's injuries.  Distributors' reporting obligations do not run to the City, and the City's alleged injury, at most, "only indirectly resulted" from Distributors' alleged conduct.  *See Rezner*, 630 F.3d at 873.[2]

In concluding otherwise, the MDL court relied heavily on allegations, repeated in the City's Complaint, that the "Marketing Defendants made deceptive claims in promoting their opioids."  *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *5 (N.D. Ohio Dec. 19, 2018) (defining the wrongful "conduct"); *see, e.g.*, Compl. ¶¶ 8–9.  But, whatever its merit as to the Marketing Defendants, the allegation that the Marketing Defendants' fraudulent marketing campaign changed the standard of care and caused doctors to write, and patients to fill, "too many" opioid prescriptions cannot establish proximate causation ***as to Distributors***.  If, as the City alleges, the medical guidelines for treating chronic pain changed, such that doctors in good faith wrote an increasing number of opioid prescriptions based on their assessment of their patients' legitimate medical needs, then pharmacists cannot be faulted for filling those prescription, and (*a fortiori*) Distributors cannot be faulted for shipping the wholesale orders placed by those DEA-registered pharmacies.  The City does not, and cannot, allege that Distributors have either the ability or any duty to question the good-faith prescribing decisions of California doctors—even if those decisions were tainted by an allegedly fraudulent marketing campaign perpetrated by the Marketing Defendants.

---

[2] RICO imposes liability based *only* on the commission by defendants of enumerated "predicate acts," not simply for conduct that might otherwise be characterized as wrongful or tortious.  *See* 18 U.S.C. §§ 1961(1), 1962(c).  While the City suggests, for example, that Distributors' shipments of certain orders were wrongful, the City does not assert that driving trucks containing prescription medications to San Francisco pharmacies is a predicate act under RICO—nor could it.  Instead, the only predicate offenses potentially at issue here are Distributors' alleged failure to *report* certain "suspicious orders" to regulators. As explained in the Joint MTD, such alleged reporting failures would not qualify as RICO predicate acts even if they could be established.

The MDL court reduced the causal chain to a single link: "the excess opioids … distributed by [Distributors] were … diverted into an illicit, black market," which led in turn to increased municipal expenses. *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *5. But that shortening of the causal chain ignores the fact that cities like San Francisco cannot suffer any harm from the diversion of prescription opioids unless—sometime after a Distributor delivers the pills to a DEA-registered pharmacy—a doctor writes a prescription, a pharmacist fills the prescription, the patient (illegally) sells or gives the pills away or a thief (illegally) steals them, an end-user (illegally) ingests the pills, and the City incurs expense as a result of the end-users addiction or overdose. Under any reasonable construction of Ninth Circuit law, that causal chain—punctuated by at least two criminal acts—is impermissibly remote, indirect and attenuated.

The City's RICO claim also should be dismissed because it is "purely contingent," *Holmes*, 503 U.S. at 721, i.e., purely derivative of the physical injuries allegedly suffered by its residents. In the tobacco context, numerous courts, including the Ninth Circuit, dismissed RICO claims seeking to recover monies that governments and other third-party payors expended on the smoking-related healthcare costs of their residents, members, and insureds. *See Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 701–05 (9th Cir. 2001) (RICO plaintiff cannot recover costs stemming from "tobacco-related illnesses" as those "damages … are derivative of the injuries suffered by smokers"); *Or. Laborers*, 185 F.3d at 963–66 (similar).[3] Here, the City's alleged injuries are similarly derivative: "without injury to the

---

[3] *See also, e.g.*, *Serv. Emp. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1069, 1073 (D.C. Cir. 2001) (dismissing RICO claim); *Regence Blueshield v. Philip Morris Inc.*, 5 F. App'x 651, 652–53 (9th Cir. 2001) (same); *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 443–45 (3d Cir. 2000) (same); *Lyons v. Philip Morris Inc.*, 225 F.3d 909, 914–15 (8th Cir. 2000) (same); *Tex. Carpenters Health Benefit Fund v. Philip Morris Inc.*, 199 F.3d 788, 789–90 (5th Cir. 2000) (same); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 825–27 (7th Cir. 1999); *Laborers Local 17 Health & Benefit Fund v. Phillip Morris*, 191 F.3d 229, 239 (2d Cir. 1999) (same); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 932–34 (3d Cir. 1999) (same).

individual [opioid users], the [City] would not have suffered any damage." *See Seibels Bruce Grp., Inc. v. R.J. Reynolds Tobacco Co.*, 1999 WL 760527, at *3 (N.D. Cal. Sept. 21, 1999).[4]

### 2. The City Fails To Allege Racketeering Activity by Distributors.

The Complaint alleges, as RICO predicate acts, (i) mail and wire fraud, and (ii) violations of 21 U.S.C. § 843(a). Compl. ¶¶ 860, 863, 865. For the reasons explained in the Joint MTD, violations of 21 U.S.C. § 843(a) are not RICO predicate acts. *See* Joint MTD at 11–12. For the reasons explained below, the City's mail and wire fraud allegations are not pled as to Distributors with the requisite particularity. *See* Joint MTD at 13 (setting forth Rule 9(b) pleading standard for mail and wire fraud claims).

The Complaint contains hundreds of paragraphs detailing allegedly fraudulent statements by the *Marketing Defendants*. *See* Compl. ¶¶ 225–546 (detailing "The Marketing Defendants' Multi-Pronged Scheme to Change Prescriber Habits" by "Promot[ing] Multiple Falsehoods"). By comparison, while "the [C]omplaint is shot through with general allegations that 'defendants' engaged in fraudulent conduct," the City fails to identify even a single, discrete instance of fraud allegedly committed *by a Distributor*. *Swartz*, 476 F.3d at 765 (dismissing RICO claims against defendants for failure to "identify [with particularity] the role of each defendant in the alleged fraudulent scheme"); *see also Bhambra v. Ampco Sys. Parking*, 2009 WL 10694587, at *4 (N.D. Cal. June 10, 2009) (Breyer, J.) ("A RICO pleading must attribute specific conduct to each defendant in the scheme."). Nowhere, for instance, does the Complaint identify by date, speaker, and specific content even one alleged predicate act by each Distributor, as Rule 9(b) requires. *See, e.g.*, *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010) (dismissing RICO claim where plaintiffs "failed to allege any specific mailings" by defendants or the identity of "part[ies] to the alleged misrepresentations"); *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) (dismissing RICO claim where plaintiffs failed to allege "specific contents" of defendants' supposed

---

[4] The MDL court's contrary conclusion was based on a distinction involving unique facts in *Perry v. American Tobacco Co.*, 324 F.3d 845 (6th Cir. 2003). In *Perry*, the plaintiffs—individual subscribers of a health insurance plan—asserted claims that were even *more* remote than those of third-party payor plaintiffs in cases such as *Oregon Laborers*; as such, the MDL court was able to distinguish *Perry* as "a classic case of 'passed-on' economic injury" from a third-party payor "to [the] individual insurance plan subscribers in the form of higher insurance premiums," for which injury the subscribers could not sue. *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *6. In these proceedings, the Ninth Circuit's decision in *Oregon Laborers* is not susceptible to such a distinction.

misrepresentations); *Chagby v. Target Corp.*, 358 F. App'x 805, 808 (9th Cir. 2009) (dismissing RICO claim where plaintiffs "fail[ed] to identify the responsible parties, the exact nature of their involvement and how the mail and wires were used" and explaining that "[t]he mere inclusion of 'false' advertisements in the complaint" does not suffice); *Pecot v. SF Deputy Sheriff's Ass'n*, 2009 WL 585877, at *1 (N.D. Cal. Mar. 6, 2009) (Breyer, J.) (dismissing RICO claim as "plaintiffs do not allege with particularity when or how [defendants'] misrepresentation was made").

To be sure, the Complaint generically alleges that Defendants "fraudulently claim[ed] that they were complying with their" regulatory obligations.  Compl. ¶ 803.  That sort of "group pleading," however, is impermissible.  *See, e.g.*, *Swartz*, 476 F.3d at 764–65 ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together"; it "must, at a minimum, identify the role of each defendant in the alleged fraudulent scheme"); *Aquilina v. Certain Underwriters at Lloyd's Syndicate #2003*, 406 F. Supp. 3d 884, 901 (D. Haw. 2019) ("group pleading is improper under Rule 9(b)"); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig*., 2019 WL 4581340, at *6–8 (N.D. Cal. Sept. 20, 2019) (Breyer, J.) (similar).  Thus, under settled law, the City's generic and undifferentiated allegations of fraud by Distributors are insufficient.

The City's fraud theory against Distributors also fails as a matter of substantive law.  Statements of opinion about a company's legal compliance are not actionable in fraud.  *See Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 621 (9th Cir. 2004) ("fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law" (quoting Am. Jur. 2d of Fraud and Deceit § 97 (2001)); *see also Singh v. Cigna Corp.*, 918 F.3d 57, 60–64 (2d Cir. 2019) (statements by defendant affirming the importance of regulatory compliance and saying it had "established policies and procedures to comply with applicable [regulatory] requirements" were "textbook example[s] of 'puffery'" on which "a reasonable investor would not rely").  Equally, purported regulatory reporting failures—such as Distributors' alleged failure to report suspicious orders to DEA—cannot form the basis of a civil RICO claim.  *See Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 521–25 (11th Cir. 2000) (alleged failure to make required Safety Act reports to government not actionable under mail and wire fraud statutes).  Finally, allegations that Distributors participated in efforts to "pressure" federal agencies and to "lobby" Congress and State legislatures are immunized under the *Noerr-Pennington* doctrine and cannot serve as

racketeering predicate acts.  *See, e.g.*, *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 933–42 (9th Cir. 2006) (allegedly false statements made in the course of petitioning activity cannot serve as RICO predicate acts of mail or wire fraud).  For these additional reasons, the City has failed to identify two or more predicate acts of mail or wire fraud committed by each Distributor.

### B.    The City's Public Nuisance Claim Should Be Dismissed as to Distributors.

As described in the Joint MTD, the City's public nuisance claims are unprecedented under California law.  California courts never have extended a public nuisance cause of action to the mere distribution of a licensed lawful product—much less a product that is an FDA-approved medication, the distribution of which is triggered only when a DEA-registered, state-licensed doctor writes a prescription for the medication.  Even if California law would permit a nuisance claim against the Marketing Defendants who allegedly promoted their products for hazardous uses, it certainly does not recognize such a claim against Distributors, who are middlemen.  The Complaint does not allege that Distributors promoted opioids or made any misrepresentations to doctors or patients about the risks or benefits of opioid medications.

### 1.    The MDL Court's Prior Rulings Do Not Apply Here.

California public nuisance law is fundamentally different from the law applied by the MDL court in deciding prior motions.  First, the City alleges a ***statutory*** public nuisance arising under California Civil Code §§ 3479–3480, Compl. ¶¶ 887–88, not a ***common law*** public nuisance arising under Ohio, Florida, Montana, or Oklahoma law.  Additionally, the MDL court's principal ruling (as to Summit County, Ohio) was informed by the Ohio Supreme Court's decision in *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143–44 (Ohio 2002), which held, among other things, that the mere distribution of firearms could constitute a public nuisance under Ohio common law principles.  *City of Cincinnati* is contrary to the decisions in the majority of states that have addressed similar nuisance claims involving the distribution of guns and other lawful products,[5] and it stands in sharp contrast to the leading California

---

[5] *See also City of Philadelphia v. Beretta U.S.A., Corp.*, 126 F. Supp. 2d 882, 909 (E.D. Pa. 2000) (recognizing that "courts across the nation have begun to refine the types of cases amenable to a nuisance theory"); *State v. Lead Indus. Ass'n, Inc.*, 951 A.2d 428, 456 (R.I. 2008) ("The law of public nuisance

decision on that subject, *In re Firearm Cases*, 126 Cal. App. 4th 959, 988–92 (2005).  No California court has **ever** held that the mere distribution of a lawful product can constitute a public nuisance.  *See e.g.*, *County of Santa Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292, 309 (2006).

### 2. Distribution Cannot Constitute a Public Nuisance Absent Knowingly False Promotion, Which Is Not Alleged as to Distributors.

In cases involving asbestos, guns, and lead paint, California courts have recognized that permitting public nuisance liability to be imposed based solely on the distribution of a lawful product would so expand the cause of action for nuisance as to supersede products-liability law—i.e., would create "a monster that would devour in one gulp the entire law of tort."  *See City of San Diego v. U.S. Gypsum Co.*, 30 Cal. App. 4th 575, 586 (1994) (quoting *Tioga Pub. Sch. Dist. No. 15 v. U.S. Gypsum Co.,* 984 F.2d 915, 921 (8th Cir. 1993) (rejecting nuisance claim against asbestos manufacturer)); *see also In re Firearm Cases*, 126 Cal. App. 4th at 988 (rejecting nuisance claim against firearm manufacturers and distributors); *City of Modesto Redevelopment Agency v. Superior Court*, 119 Cal. App. 4th 28, 41–42 (2004) (holding that defendants who merely manufactured or distributed a chemical cleaning solvent could not be liable in nuisance).  The majority of courts across the country have come to the same conclusion.  *See* n.5, *supra*.  As explained in the Joint MTD, California law requires *affirmative* conduct that created, or assisted in the creation, of the nuisance.  Such affirmative conduct exists where the defendant *affirmatively promoted*

---

never before has been applied to products, however harmful."); *In re Lead Paint Litig.*, 924 A.2d 484, 505 (N.J. 2007) (rejecting public nuisance claim that would "permit these plaintiffs to supplant an ordinary product liability claim with a separate cause of action as to which there are apparently no bounds"); *District of Columbia v. Beretta*, 872 A.2d 633, 650–51 (D.C. 2005) (declining to adopt "a right of action for public nuisance applied to the manufacture and sale of guns generally, where an effect may be a proliferation of lawsuits not merely against these defendants but against other types of commercial enterprises … in order to address a myriad of societal problems" (alterations omitted)); *People ex rel. Spitzer v. Sturm, Ruger & Co., Inc.,* 761 N.Y.S.2d 192, 196 (N.Y. App. Div. 2003) ("[G]iving a green light to a common-law public nuisance cause of action today will … likely open the courthouse doors to a flood of limitless, similar theories of public nuisance … against a wide and varied array of other commercial and manufacturing enterprises and activities."); *Detroit Bd. of Educ. v. Celotex Corp.*, 493 N.W.2d 513, 521 (Mich. Ct. App. 1992) (holding "that manufacturers, sellers, or installers of defective products may not be held liable on a nuisance theory for injuries caused by the defect"); *State of Delaware ex rel. Jennings v. Purdue Pharma L.P.*, 2019 WL 446382, at *12 (Del. Super. Ct. Feb. 4, 2019) (recognizing that most jurisdictions "have refused to allow products-based public nuisance claims"); *Sills v. Smith & Wesson Corp.*, 2000 WL 33113806, at *7 (Del. Super. Ct. Dec. 1, 2000) ("Delaware has yet to recognize a cause of action for public nuisance based upon products."); *see also* Ohio Rev. Code § 2307.71(A)(13) (abrogating product-based public nuisance claims).

the product with **actual knowledge** of its harmful effects.  The City does not and cannot meet this standard as to Distributors.

**Promotion**.   Under California law, the only form of affirmative conduct that can give rise to liability for public nuisance is **promotion** for hazardous uses, not the **mere distribution** of a lawful, though hazardous, product.  Thus, in *County of Santa Clara v. Atlantic Richfield Co.*, 137 Cal. App. 4th 292, 310 (2006), the court permitted cities to sue manufacturers and distributors of lead paint for public nuisance because of their "**affirmative promotion of lead paint for interior use**, **not their mere** manufacture and **distribution of lead paint** or their failure to warn of its hazards."  *See also id.* at 306 (relying on allegations that defendants used a marketing campaign "concealing the dangers of lead, mounting a campaign against regulation of lead, and promoting lead paint for interior use even though defendants had known for nearly a century that such a use of lead paint was hazardous to human beings"); *People v. ConAgra Grocery Prods.*, 17 Cal. App. 5th 51, 93 (2017) (applying *Santa Clara* and holding that, "[i]f, on the other hand, defendants did **not** promote lead paint for interior residential use," they are not liable for public nuisance).

Here, the Complaint devotes nearly one hundred pages to allegations that the **Marketing Defendants** conducted a "massive marketing campaign premised on false and incomplete information" in order to "engineer[] a dramatic shift in how and when opioids are prescribed."  Compl. ¶¶ 8, 23, 25–27, 30–31, 191–546.  But it makes no such allegation relating to **Distributors**—no allegation that they paid "front groups" and "key opinion leaders," sponsored CMEs and speakers' bureaus, detailed doctors in their offices, funded publications, or advertised opioids.  *See supra* Introduction; Compl. ¶ 402.[6]  What California law requires to establish public nuisance liability, however, is affirmative conduct—beyond mere distribution of a hazardous product—and the City does not allege that.

**Actual Knowledge**.  As set forth in the Joint MTD, there cannot be the requisite affirmative conduct creating the nuisance unless the defendant acted with actual knowledge of the public health hazard its conduct would create.  *ConAgra*, 17 Cal. App. 5th at 83; *Atl. Richfield*, 137 Cal. App. 4th at 310.  And where, as in *ConAgra* and here, the product poses physical dangers, the requisite knowledge must be of

---

[6] The City's attempt to hold Distributors liable for the conduct of the Marketing Defendants on a conspiracy theory fails for the reasons described in Part II.B.4 of the Joint MTD.

the specific hazards of the particular use in question.  *See ConAgra*, 17 Cal. App. 5th at 85 (detailing allegations that lead paint manufacturers knew that "lower level use harmed children," "lead paint used on the interiors of homes would deteriorate," and "lead dust resulting from this deterioration would poison children and cause serious injury").

Here, the City does not and cannot allege that **Distributors** had actual knowledge that prescribing opioids in accordance with the prevailing standard of care—i.e., for the long-term treatment of chronic pain, as promoted by the Marketing Defendants' allegedly deceptive marketing campaign—would create a public health hazard.  Indeed, the City alleges that the marketing campaign fooled everyone—including doctors, state medical boards and continuing medical education sponsors, Compl. ¶¶ 8–9, 428–433, 449— into believing that opioids could and should be safely prescribed for chronic pain, *see, e.g.*, *id.* ¶ 26 ("The Marketing Defendants deliberately conceived these strategies to create, and in fact did create, an entirely new 'health care' narrative—one in which opioids are considered safe and effective for long-term use and pain is aggressively treated at all costs."); *id.* ¶¶ 8–9, 25–32, 428–33, 480–493, 541.  Tellingly, the City does not allege that **Distributors** had actual, contemporaneous knowledge that the prevailing medical orthodoxy supporting use of opioid medications for the long-term treatment of chronic pain was misguided or the product of deceptive promotion.

### 3.    The City's Nuisance Claim Does Not Adequately Plead Causation.

As explained in the Joint MTD, to state a claim for public nuisance the City must plead causation. The City does not adequately plead that Distributors' conduct proximately caused a public nuisance.

First, the City fails to plead a causal connection between any Distributor's alleged conduct and any instance of illegal diversion of opioid medications.  *In re Firearm Cases*, 126 Cal. App. 4th 959 (2005), is instructive.  There, plaintiffs alleged that "defendants market, distribute, promote, and design handguns in a manner that … creates a public nuisance."  *Id.* at 968.  The plaintiffs alleged that defendants distributed "guns to retail dealers that supplied the illegal black market with firearms," including sales to "'high-risk' retail dealers who were associated with large quantities of guns."  *Id.* at 968–69.  In rejecting the plaintiff's claims, the court emphasized that "[m]erely engaging in what plaintiffs deem to be a risky practice, without a connecting causative link to a threatened harm, is not a public nuisance."  *Id.* at 988. The court indicated the nature of that "connecting causative link" in noting the failure of the plaintiffs'

proof—their inability to establish a "causal connection between any conduct of the defendants and *any incident* of illegal acquisition of firearms or criminal acts or accidental injury by firearm." *Id*. at 988–89. Here, the City wholly fails to allege a connection between any Distributor's conduct and any actual incident of diversion.

Second, the Complaint purports to describe at length the nuisance-causing conduct—but it is not *Distributors'* conduct.  The City devotes hundreds of paragraphs to describing a campaign by "[t]he Marketing Defendants"—not Distributors—"to dramatically increase sales by convincing doctors to prescribe opioids not only for the kind of severe pain associated with cancer or short-term post-operative pain, but also for common chronic pain, including back pain and arthritis." Compl. ¶ 9.  This campaign, the City alleges, changed the standard of care for prescribing opioids:  "The Marketing Defendants deliberately conceived these strategies to create, *and in fact did create, an entirely new 'health care' narrative*—one in which opioids are considered safe and effective for long-term use and pain is aggressively treated at all costs."  *Id.* ¶ 26.  In this way, the City alleges, "the Marketing Defendants created a population of addicted patients who sought opioids at never-before-seen rates."  *Id.* ¶ 10.  The City does not allege that Distributors played any part in this marketing campaign or knew that its claims were false.

The City alleges instead that Distributors failed to monitor pharmacy orders and report and halt shipment of the "suspicious" orders, as allegedly required by DEA regulations.  But this allegation is insufficient to establish proximate cause.  *See Martinez v. Pacific Bell*, 225 Cal. App. 3d 1557, 1565 (1990) (Nuisance liability extends only "to damage which is proximately … caused by the defendant's conduct.").  In *Martinez*, the plaintiff sued a telephone company after he was twice assaulted and robbed by "undesireables" that he alleged were attracted by a public telephone in the vicinity.  225 Cal. App. 3d at 1560.  The court of appeal rejected his nuisance claim because "if there was a nuisance here, it was not the proximate cause of the robbery," *id*. at 1567; the attacks were "separate and intervening act[s]," *id*. at 1566.

Two cases principally relied on by *Martinez* further illustrate the point.  In *Gonzales v. Derrington*, 56 Cal. 2d 130 (1961), the plaintiffs sued a gasoline station for selling gasoline that was used to commit arson.  The sale was in violation of local law requiring the use of two-gallon closed containers.  The court

rejected the claim, holding that "there was no evidence that the violation of the municipal ordinance was a proximate cause of the resulting injuries and death." *Id.* at 133–34.  Similarly, in *Lopez v. McDonald's Corp.*, 193 Cal. App. 3d 495, 516–17 (1987), the plaintiff sued a restaurant for the actions of a neighbor who said he was going "hunting for humans" and then killed several restaurant patrons.  Rejecting the plaintiff's claim that the restaurant should have had a security guard, the court found no liability because "there was [no] causal nexus between [the restaurant's] nonfeasance, if any, and the resulting injuries." *Id.* at 517.  The court in *Martinez* reasoned that just as putting the gasoline in a two-gallon closed container would not have prevented the arson, and hiring an unarmed security guard to prevent theft would not have forestalled a terrorist, so too placing the public telephone in a different location would not have prevented the battery of the plaintiff in *Martinez*.

Similarly here, Distributors' shipments of FDA-approved medicines to DEA-registered pharmacies (and their alleged failure to report some portion of those orders to regulators as "suspicious") cannot be the legal cause of increased addiction and overdoses in the City.  According to the City's own allegations, the marketing campaign that created the new standard of care is what caused the increase in prescribing.  Moreover, the Complaint fails to identify even a single pharmacy order that any Distributor should have identified as intended for anything other than a legitimate medical purpose and reported as "suspicious"—in other words, not a single pharmacy order that reflected opioid prescriptions that were not written pursuant to the prevailing standard of care.  That failure is fatal to the City's claim.

### C.    The City Is Not Entitled to Restitution from Distributors on its UCL Claim.

For the reasons explained in the Joint MTD, the City's claim under the UCL should be dismissed.  At a minimum, the Court should dismiss the City's UCL claim for restitution from Distributors.

The City alleges that Distributors "received income, profits and other benefits that they would not have received if they had not engaged in UCL violations."  Compl. ¶ 919.  But remedies under the UCL "are narrowly limited."  *In re First Alliance Mortg. Co.*, 471 F.3d 977, 996 (9th Cir. 2006).  Specifically, restitution is limited to "restor[ing] to a[] person … money … acquired by means of such unfair competition."  Cal. Bus. & Prof. Code § 17203.  As such, "[r]estitution under the UCL … must be of a measurable amount ***to restore to the plaintiff what has been acquired by violations*** of the statute[]." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987 (9th Cir. 2015); *see also In re First Alliance*

*Mortg. Co.*, 471 F.3d at 996  ("Actual direct victims of unfair competition may obtain restitution [under the UCL]."); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003) (restitution under the UCL is limited to "return[ing] money ***obtained through*** an unfair business practice to those persons … from whom the property was taken").  Here, the Complaint does not allege that City residents paid any money to Distributors—let alone that they paid Distributors money because of their purported regulatory failures.

Nor could the City make this showing if it tried.  Multiple independent actors and events—including the prescription of a doctor and the dispensing decision of a pharmacist—stand between Distributors' alleged conduct and any sale of a prescription opioid by a licensed pharmacy to a consumer.  *See supra* Part III.A.1.  As wholesalers, Distributors have no direct contact at all with patients (or any other consumer) in the ordinary course of business, and the Complaint does not allege otherwise.  Distributors' alleged failures of due diligence relate to their dealings with pharmacies, not patients.  *See, e.g.*, Compl. ¶¶ 580, 590.  And their alleged failures to comply with regulations regarding "suspicious orders" is conduct addressed to regulators, not to the marketplace.  *See, e.g.*, *id.* ¶¶ 896, 913.  The City does not—and could not—allege that Distributors' purported regulatory failures had any effect on patients' decisions regarding whether or where to fill opioid prescriptions written by their doctors.  Because Distributors did not "acquire" money belonging to City residents "by means of" their purported regulatory violations, Cal. Bus. & Prof. Code § 17203, the City may not obtain restitution on their behalf, *see Banga v. Experian Info. Sols.*, 2010 WL 11531066, at *3 (N.D. Cal. March 8, 2010), *aff'd*, 473 F. App'x 699 (9th Cir. 2012) (restitution under the UCL unavailable where "[t]here is no evidence … that [defendant] caused plaintiff to lose money or property").

## IV.   CONCLUSION

For the foregoing reasons, and for the additional reasons set forth in the Joint MTD, the City's claims against Distributors should be dismissed with prejudice.

DATED:   April 17, 2020

Respectfully submitted,

By: */s/ Steven J. Boranian*
Steven J. Boranian
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
Telephone: (415) 543-8700
Facsimile: (415) 391-8269
sboranian@reedsmith.com

Sarah B. Johansen
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Telephone: (213) 457-8000
Facsimile: (213) 457-8080
sjohansen@reedsmith.com

*Attorneys for Defendant*
*AmerisourceBergen Drug Corporation*

By: */s/ Sonya D. Winner*
Sonya D. Winner (Bar No. 200348)
Nathan E. Shafroth (Bar No. 232505)
Isaac D. Chaput (Bar No. 326923)
Covington & Burling LLP
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091

*Attorneys for Defendant*
*McKesson Corporation*

By: */s/ Neelum J. Wadhwani*
Neelum J. Wadhwani (Bar No. 247948)
Enu A. Mainigi (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC  20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029
nwadhwani@wc.com
emainigi@wc.com

Edward W. Swanson, SBN 159859
August Gugelmann, SBN 240544
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010
ed@smllp.law
august@smllp.law

*Attorneys for Defendant*
*Cardinal Health, Inc.*

**ATTESTATION**

I, Sonya Winner, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

DATED:   April 17, 2020                     By:   */s/ Sonya D. Winner*
                                                  Sonya D. Winner