1  DENNIS J. HERRERA, State Bar # 139669
   City Attorney
2  RONALD P. FLYNN, State Bar # 184186
   Chief Deputy City Attorney
3  YVONNE R. MERE, State Bar # 173594
   Chief of Complex & Affirmative Litigation
4  OWEN J. CLEMENTS, State Bar # 141805
   SARA J. EISENBERG, State Bar # 269303
5  JAIME M. HULING DELAYE, State Bar # 270784
   Deputy City Attorneys
6  Fox Plaza
   1390 Market Street, Sixth Floor
7  San Francisco, CA 94102
   Telephone: 415.554.3597
8  jaime.hulingdelaye@sfcityatty.org

9  *Attorneys for Plaintiffs The City and County of San*
   *Francisco, California and The People of the State of*
10 *California, acting by and through San Francisco*
   *City Attorney Dennis J. Herrera*
11
   [Additional counsel appear on signature page.]
12

13                    UNITED STATES DISTRICT COURT
14                  NORTHERN DISTRICT OF CALIFORNIA
15                       SAN FRANCISCO DIVISION
16

17
   THE CITY AND COUNTY OF SAN            Case No. 3:18-cv-07591-CRB
18 FRANCISCO, CALIFORNIA and THE PEOPLE
   OF THE STATE OF CALIFORNIA, Acting by  **PLAINTIFFS' OMNIBUS OPPOSITION**
19 and through San Francisco City Attorney DENNIS **TO MOTIONS TO DISMISS FILED BY**
   J. HERRERA,                          **ALL DEFENDANTS (DKT. 169),**
20                                       **DISTRIBUTOR DEFENDANTS**
            Plaintiffs,                  **(DKT. 170), MANUFACTURER**
21                                       **DEFENDANTS (DKT. 171),**
        v.                               **WALGREENS (DKT. 169), AND ANDA**
22                                       **(DKT. 168)**
   PURDUE PHARMA L.P., et al.
23                                       Judge: Honorable Charles R. Breyer
            Defendants.
24

25

26

27

28

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 1

ARGUMENT ............................................................................................................ 8

I. The opioid epidemic is unquestionably a public nuisance, and the People have properly pled their nuisance claim. .................................................................... 8

    A. Defendants took affirmative steps that assisted in the creation of the nuisance with actual or constructive knowledge of the hazards presented. .......... 11

        1. Manufacturers falsely promoted opioids................................................. 11

        2. The People sufficiently allege that Defendants created a public nuisance through their distribution and dispensing of prescription opioids. ............................................................................................ 13

            a. To the extent "affirmative conduct" or knowledge is required, the People have sufficiently pled both. .......................... 13

            b. Defendants' "illegal sale of controlled substances" also subjects them to nuisance liability ............................................. 19

        3. Walgreens' dispensing practices provide an additional basis for nuisance liability. ............................................................................... 22

            a. Under the CSA, Walgreens is required to provide effective controls against diversion and to ensure that it dispenses only legitimate prescriptions. ....................................................... 23

            b. The People need not allege that Walgreens or its pharmacists knew particular prescriptions would be diverted................................................................................... 28

        4. Defendants' misconduct is not authorized by statute............................... 31

        5. The People properly plead causation. .................................................... 32

            a. The People properly plead factual causation. .............................. 32

            b. The People properly plead legal causation.................................. 34

            c. The People properly plead standing and traceability as to Walgreens. .................................................................... 38

II. The People state cognizable claims under all prongs of California's Unfair Competition Law. ................................................................................... 39

    A. The People state a claim under the "unlawful" prong of the UCL. ..................... 39

        1. The People properly allege Defendants' breach of their duties under the CSA as predicate violations for the UCL unlawful claim.................. 40

        2. The People adequately plead predicate FAL, RICO, and CLRA violations for their UCL unlawful claim.................................................. 43

    B. The People state a claim under the "unfair" prong of the UCL. .......................... 44

    C. The People state a claim under the "fraudulent" prong of the UCL and FAL. ................................................................................................. 45

    D. The People state viable FAL and UCL claims against the Manufacturer Defendants. ........................................................................................ 46

1. California's safe-harbor doctrine does not bar the People's UCL and FAL claims. ..................................................................... 46

2. The Manufacturer Defendants' statements were likely to deceive. ........... 47

3. The People properly allege that the Manufacturer Defendants' representations were false. ............................................................. 48

4. The People adequately allege the Manufacturer Defendants controlled key opinion leaders and other third parties. ........................... 48

E. The People adequately allege a UCL claim for restitution. .................................. 49

III. The People's state-law claims are not preempted by the Food Drug & Cosmetic Act or the Controlled Substances Act. ............................................................... 50

A. The MDL transferee court repeatedly considered and rejected Defendants' preemption arguments. ...................................................................... 50

B. The People's claims are not preempted by the Controlled Substances Act. ......... 51

C. The People's marketing claims are not preempted by the Food Drug & Cosmetic Act. ............................................................................................... 53

D. The People's claims against the Generic Manufacturers are not preempted because they participated in the overall scheme to fraudulently promote the use of prescription opioids. ............................................................................... 54

IV. The City pleads cognizable and strong RICO claims. ..................................... 56

A. The City has suffered cognizable injuries. ................................................. 56

1. The City seeks to recover for injuries to its business and property, not for its residents' personal injuries. ..................................... 57

2. *Canyon County* does not deprive the City of statutory standing. ............. 58

B. The City pleads its RICO mail and wire fraud claims with particularity. ............ 60

C. A felony violation of § 843(a)(4)(A) of the CSA is actionable racketeering under RICO § 1961(1)(D). .............................................................................. 62

D. Defendants conspired to create a market for opioids. ..................................... 63

E. Defendants' fraudulent scheme caused the City's injuries. ................................ 65

1. The City properly pleads factual causation. ............................................. 65

2. The City properly pleads legal causation. ................................................ 66

V. Plaintiffs' allegations of Anda's wrongful conduct are sufficiently particular, and Anda should not be dismissed from this action. ....................................................... 72

A. Plaintiffs specifically allege that Anda intentionally flooded San Francisco with dangerous opioids. ............................................................................. 73

B. Anda's critiques of Plaintiffs' factual allegations are without merit. ................... 74

CONCLUSION ............................................................................................... 76

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Adobe Sys. Inc. v. Blue Source Grp., Inc.*,
  125 F. Supp. 3d 945 (N.D. Cal. 2015) ................................................................. 75

*Andren v. Alere, Inc.*,
  207 F. Supp. 3d 1133 (S.D. Cal. 2016) ................................................................ 48

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ........................................................................................ 70, 72

*Arters v. Sandoz Inc.*,
  921 F. Supp. 2d 813 (S.D. Ohio 2013) ................................................................ 54

*Ash v. N. Am. Title Co.*,
  223 Cal. App. 4th 1258 (2014) ............................................................................ 36

*Ass'n of Washington Pub. Hosp. Districts v. Philip Morris Inc.*,
  241 F.3d 696 (9th Cir. 2001) ............................................................................... 71

*Ayres v. Gen. Motors Corp.*,
  234 F.3d 514 (11th Cir. 2000) ............................................................................. 61

*Backhaut v. Apple, Inc.*,
  74 F. Supp. 3d 1033 (N.D. Cal. 2014) ........................................................... 39, 42

*BCS Servs., Inc. v. Heartwood 88, LLC*,
  637 F.3d 750 (7th Cir. 2011) ............................................................................... 35

*Beavers-Gabriel v. Medtronic, Inc.*,
  No. CIV. 13-00686 JMS, 2015 WL 143944 (D. Haw. Jan. 9, 2015) ................... 54

*Beck Dev. Co. v. S. Pac. Transp. Co.*,
  44 Cal. App. 4th 1160 (1996) .............................................................................. 19

*Bhambra v. Ampco Sys. Parking*,
  No. C 08-05326 CRB, 2009 WL 10694587 (N.D. Cal. June 10, 2009) ............... 60

*Bias v. Wells Fargo & Co.*,
  942 F. Supp. 2d 915 (N.D. Cal. 2013) ........................................................... 45, 46

*Biber v. O'Brien*,
  32 P.2d 425 (Cal. Ct. App. 1934) ........................................................................ 19

*Bockrath v. Aldrich Chem. Co.*,
  21 Cal. 4th 71 (1999) .......................................................................................... 32

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008) ...................................................................................... 67, 69

*Broward County, Florida v. Purdue Pharma L.P., et al.*,
  No. 1:17-md-02804-DAP (N.D. Ohio Apr. 27, 2020) ........................................ 56

*Buckman v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001) ........................................................................ 50, 51, 52, 53

*California v. Purdue Pharma L.P.*,
  No. 30-2014-00725287-CU-BT-CXC (Cal. Super. Ct. Orange Cty. Feb. 13, 2018) ............... 33

*California v. Ross*,
  358 F. Supp. 3d 965 (N.D. Cal. 2019) ................................................................. 39

*Canyon County v. Syngenta Seeds, Inc.*,
519 F.3d 969 (9th Cir. 2008).................................................................. 58, 59, 69, 70

*Cappello v. Walmart Inc.*,
394 F. Supp. 3d 1015 (N.D. Cal. 2019) ................................................. 39, 44, 45

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ........................................................................... 41, 47

*Citizens for Odor Nuisance Abatement v. City of San Diego*,
8 Cal. App. 5th 350 (2017) ..................................................................... 32

*City of Cincinnati v. Beretta U.S.A. Corp.*,
768 N.E.2d 1136 (Ohio 2002) ................................................................ 14

*City of Los Angeles v. Wells Fargo & Co.*,
22 F. Supp. 3d 1047 (C.D. Cal. 2014) .................................................... 68

*City of Modesto Redevelopment Agency v. Superior Court*,
119 Cal. App. 4th 28 (2004) ....................................................... 10, 13, 17, 18

*City of Philadelphia v. Beretta U.S.A., Corp.*,
126 F. Supp. 2d 882 (E.D. Pa. 2000) ...................................................... 18

*City of San Diego v. U.S. Gypsum Co.*,
30 Cal. App. 4th 575 (1994) .................................................................... 18

*Clayworth v. Pfizer, Inc.*,
49 Cal. 4th 758 (2010) ............................................................................ 45

*Commonwealth v. Purdue Pharma, L.P.*,
2019 WL 5495866 (Mass. Super. Ct. Sept. 17, 2019) ........................... 34

*Concha v. London*,
62 F.3d 1493 (9th Cir. 1995).................................................................... 76

*County of Monroe, Michigan v. Purdue Pharma L.P., et al.*,
Case: No. 1:17-md-02804-DAP (N.D. Ohio Apr. 30, 2020) ................... 56

*County of San Diego v. San Diego NORML*,
165 Cal. App. 4th 798 (2008) ................................................................. 51

*Cty. of Del., Pa. v. Purdue Pharma, L.P.*,
No. CV-2017-8095 (C.P. Del. Cty., Pa. Mar. 13, 2020) ......................... 23

*Cty. of Santa Clara v. Atl. Richfield Co.*,
137 Cal. App. 4th 292 (2006) ....................................................... 10, 11, 12, 13

*D.C. v. Beretta, U.S.A., Corp.*,
872 A.2d 633 (D.C. App. 2005)............................................................... 18

*Davis v. HSBC Bank Nev., N.A.*,
691 F.3d 1152 (9th Cir. 2012).................................................................. 42

*Decarlo v. Costco Wholesale Corp.*,
No. 14-202, 2020 WL 1332539 (S.D. Cal. March 23, 2020) ................. 49

*Detroit Bd. of Educ. v. Celotex Corp.*,
493 N.W.2d 513 (Mich. App. 1992) ....................................................... 18

*Diaz v. Gates*,
420 F.3d 897 (9th Cir. 2005).................................................................... 57, 58

*Direct Sales Co. v. United States*,
   319 U.S. 703 (1943) ............................................................................ 36

*Ebeid ex rel. U.S. v. Lungwitz*,
   616 F.3d 993 (9th Cir. 2010) ............................................................ 60

*Elec. Indus. Serv. Bureau, Inc. v. Phila. Indem. Co.*,
   No. 18-CV-02345-EDL, 2018 WL 7286502 (N.D. Cal. July 11, 2018) ................................. 42

*Elmore v. Gorsky*,
   No. 2:12-CV-00347, 2012 WL 6569760 (S.D. Tex. Dec. 17, 2012) ......................... 54

*Est. of Saunders v. C.I.R.*,
   745 F.3d 953 (9th Cir. 2014) ............................................................ 31

*Fowler v. Wells Fargo Bank, N.A.*,
   No. 17-cv-02092, 2017 WL 3977385 (N.D. Cal. Sept. 11, 2017) ......................... 40

*Fuller v. First Franklin Fin. Corp.*,
   216 Cal. App. 4th 955 (2013) ............................................................ 49

*Garcia v. Kashi Co.*,
   43 F. Supp. 3d 1359 (S.D. Fla. 2014) ................................................ 44

*Geier v. American Honda Motor Co., Inc.*,
   529 U.S. 861 (2000) ............................................................................ 53

*Gibson v. World Savings and Loan Assn.*,
   103 Cal. App. 4th 1291 (2002) ............................................................ 40

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754, 769 (2011) .................................................................... 29

*Gonzales v. Raich*,
   545 U.S. 1 (2005) ................................................................................ 27

*Gonzalez v. Derrington*,
   56 Cal. 2d 130 (1961) ........................................................................ 38

*Gutierrez v. Carmax Auto Superstores Cal.*,
   19 Cal. App. 5th 1234 (2018) ............................................................ 40

*Gutierrez v. Wells Fargo Bank, NA*,
   704 F.3d 712 (9th Cir. 2012) ............................................................ 39

*Hadley v. Kellogg Sales Co.*,
   273 F. Supp. 3d 1052 (N.D. Cal. 2017) ............................................ 40

*Harmoni Int'l Spice, Inc. v. Hume*,
   914 F.3d 648 (9th Cir. 2019) ............................................................ 71

*Harmoni Int'l Spice, Inc. v. Wenxuan Bai*,
   2016 WL 9275400 (C.D. Cal. Nov. 14, 2016) .................................. 72

*Hartford Cas. Ins. Co. v. Swift Distrib., Inc.*,
   59 Cal. 4th 277 (2014) ...................................................................... 44

*Heckler v. Cmty. Health Svs. of Crawford Cty., Inc.*,
   467 U.S. 51 (1984) ............................................................................ 15

*Hemi Grp., LLC v. City of N.Y.*,
   559 U.S. 1 (2010) ............................................................................ 70

*Hewlett v. Squaw Valley Ski Corp.*,
54 Cal. App. 4th 499 (1997) ........................................................................ 40, 41

*Holiday CVS, L.L.C. v. Holder*,
839 F. Supp. 2d 145, 151 (D.D.C.), *vacated and remanded on other grounds*,
493 F. App'x 108 (D.C. Cir. 2012) ...................................................................... 24

*Holmes v. Security Protection Investor Corp.*,
503 U.S. 258 (1992) ........................................................................................ 67, 70

*Hoyem v. Manhattan Beach City Sch. Dist.*,
22 Cal. 3d 508, 585 P.2d 851 (1978) .................................................................. 34

Huntair, Inc. v. Gladstone,
774 F. Supp. 2d 1035 (N.D. Cal. 2011) .............................................................. 75

*Ileto v. Glock Inc.*,
349 F.3d 1191 (9th Cir. 2003)...................................................................... passim

*In re Anthem, Inc. Data Breach Lit.*,
162 F. Supp. 3d 953 (N.D. Cal. 2016) ................................................................ 45

*In re Aredia & Zometa Prod. Liab. Litig.*,
No. 3-06-0388, 2011 WL 2182824 (M.D. Tenn. June 3, 2011) ............................ 8

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*,
295 F. Supp. 3d 927 (N.D. Cal. 2018) ............................................................ 53, 61

*In re Ditropan XL Antitrust Litig.*,
529 F. Supp. 2d 1098 (N.D. Cal. 2007) ............................................................... 49

*In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*,
590 F. Supp. 2d 1282 (C.D. Cal. 2008) ............................................................... 62

*In re Firearm Cases*,
126 Cal. App. 4th 959 (2005) ............................................................... 17, 18, 37

*In re Lead Paint Litig.*,
924 A.2d 484 (N.J. 2007)...................................................................................... 18

*In re Nat'l Prescription Opiate Litig. (Muscogee)*,
No. 1:17-MD-02804, 2019 WL 2468267 (N.D. Ohio Apr. 1, 2019), *report and
recommendation adopted in part, rejected in part*,
No. 1:17-MD-2804, 2019 WL 3737023 (N.D. Ohio June 13, 2019)........................ 6, 19, 72, 75

*In re Nat'l Prescription Opiate Litig.*,
1:17-MD-2804, 2019 WL 4178591 (N.D. Ohio Sept. 3, 2019)................................ 5, 50, 51, 55

*In re Nat'l Prescription Opiate Litig.*,
2019 WL 4178617 (N.D. Ohio Sept. 3, 2019) ......................................................... 5

*In re Nat'l Prescription Opiate Litig.*,
No. 1:17-md-02804-DAP (N.D. Ohio. Mar. 21, 2019) ........................................ 54

*In re Nat'l Prescription Opiate Litig.*,
No. 1:17-MD-2804, 2020 WL 2090355 (N.D. Ohio Apr. 30, 2020)......................... 8

*In re Nat'l Prescription Opiate Litig. (Blackfeet)*,
No. 1:17-CV-02804, 2019 WL 2477416 (N.D. Ohio Apr. 1, 2019), *report and recommendation
adopted in relevant part*, No. 1:17-MD-2804, 2019 WL 3737023
(N.D. Ohio June 13, 2019) ................................................................................ passim

*In re Nat'l Prescription Opiate Litig. (Broward)*,
No. 18-OP-45332, 2020 WL 1986589 (N.D. Ohio Apr. 27, 2020) .............................. 4, 5, 8, 23

*In re Nat'l Prescription Opiate Litig. (West Boca)*,
No. 1:17-MD-2804, 2020 WL 1669655 (N.D. Ohio Apr. 3, 2020) ......................... 5, 44, 48, 72

*In re Nat'l Prescription Opiate Litig.*,
406 F. Supp. 3d 672 (N.D. Ohio 2019) ...................................................... 4, 8, 11, 33

*In re Nat'l Prescription Opiate Litig.*,
No. 1:17-MD-2804, 2019 WL 3917575 (N.D. Ohio Aug. 19, 2019) ................................ passim

*In re Nat'l Prescription Opiate Litig.*,
No. 1:17-MD-2804, 2019 WL 4279233 (N.D. Ohio Sept. 10, 2019) ............ 56, 57, 61, 62

*In re Nat'l Prescription Opiate Litig.*,
No. 1:18-OP-45090, 2018 WL 4895856 (N.D. Ohio Oct. 5, 2018),
*report and recommendation adopted in relevant part*, No. 1:17-MD-2804,
2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) ..................................................... passim

*In re Neurontin Mktg. & Sales Pracs. Litig.*,
712 F.3d 21 (1st Cir. 2013) ............................................................................ 64

*In re NJOY, Inc. Consumer Class Action Litig.*,
No. 14-428, 2015 WL 12732461 (C.D. Cal. May 27, 2015) ................................. 48

*In re Opioid Litigation*,
No. 400000/2017 (N.Y. Sup. Ct. Apr. 9, 2020) .................................................. 26

*In re Opioid Litigation*,
No. 400000/2017, 2018 WL 3115102 (N.Y. Sup. Ct. June 18, 2018) ................................ 19, 34

*In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*,
No. 14-1748, 2016 WL 861213 (N.D. Ill. Mar. 7, 2016) ........................................ 54

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009) .................................................................................. 45

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
No. MDL 2672 CRB (JSC), 2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) ..................... passim

*Jamison v. Bank of America, N.A.*,
194 F. Supp. 3d 1022 (E.D. Cal. 2016) ............................................................ 40

*Jones Total Health Care Pharmacy LLC & SND Health Care LLC v. Drug Enf't Admin.*,
881 F.3d 823 (11th Cir. 2018) ................................................................. 25, 26, 30

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ....................................................................... 46

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134 (2003) ............................................................................... 44

*Krueger v. Wyeth, Inc.*,
310 F.R.D. 468 (S.D. Cal. 2015) ...................................................................... 47

*Leonard v. City of Los Angeles*,
208 F. App'x 517 (9th Cir. 2006) .................................................................... 66

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .................................................................................... 38

*Lopez v. McDonald's Corp.*,
  193 Cal. App. 3d 495 (Ct. App. 1987) .................................................................... 38

*Louis Vuitton Malletier & Oakley, Inc. v. Veit*,
  211 F. Supp. 2d 567 (E.D. Pa. 2002) ..................................................................... 30

*Martin v. Tradewinds Beverage Co.*,
  2017 WL 6816608 (C.D. Cal. Sept. 5, 2017) .......................................................... 47

*Martinez v. Pac. Bell*,
  225 Cal. App. 3d 1557 (1990) .......................................................................... 36, 37

*Martinez v. Welk Group, Inc.*,
  907 F. Supp. 2d 1123 (S.D. Cal. 2012) ................................................................... 42

*Masters Pharm., Inc. v. DEA ("Masters II")*,
  861 F.3d 206 (D.C. Cir. 2017) ............................................................................... 21

*Masters Pharm., Inc. v. Drug Enforcement Admin.*,
  861 F.3d 206 (D.C. Cir. 2017) ............................................................................... 42

*McClellan v. I-Flow Corp.*,
  776 F.3d 1035 (9th Cir. 2015) ............................................................................... 53

*McKay v. Novartis Pharm. Corp.*,
  751 F.3d 694 (5th Cir. 2014) ................................................................................... 7

*Medicine Shoppe-Jonesborough v. Drug Enf't Admin.*,
  300 F. App'x 409 (6th Cir. 2008) ........................................................................... 25

*Mendoza v. Zirkle Fruit Co.*,
  301 F.3d 1163 (9th Cir. 2002) ......................................................................... 68, 69

*Miller v. Yokohama Tire Corp.*,
  358 F.3d 616 (9th Cir. 2004) ................................................................................. 61

*Mitchell v. Gonzalez*,
  54 Cal. 3d 1041 (Cal. 1991) .................................................................................. 38

*Monterey Bay Military Housing, LLC v. Ambac Assurance Corp.*,
  No. 17-CV-04992-BLF, 2018 WL 3439372 (N.D. Cal. July 17, 2018) ................... 64

*Moore v. Kayport Package Exp., Inc.*,
  885 F.2d 531 (9th Cir. 1989) ................................................................................. 56

*Moroccanoil, Inc. v. Groupon, Inc.*,
  278 F. Supp. 3d 1157 (C.D. Cal. 2017) .................................................................. 30

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ............................................................................... 69

*NorthBay Healthcare Grp. - Hosp. Div. v. Blue Shield of Ca. Life & Health Ins.*,
  342 F. Supp. 3d 980 (N.D. Cal. 2018) ................................................................... 42

*Odom v. Microsoft Corp.*,
  486 F.3d 541 (9th Cir. 2007) ................................................................................. 56

*Oki Semiconductor Co. v. Wells Fargo Bank, N.A.*,
  298 F.3d 768 (9th Cir. 2002) ................................................................................. 65

*Oregon Laborers-Employers Health & Welfare Tr. Fund v. Philip Morris Inc.*,
  185 F.3d 957 (9th Cir. 1999) ................................................................................. 71

*Ozeran v. Jacobs*,
  798 F. App'x 120 (9th Cir. 2020) ......................................................................... 71

*Pacific Shores Properties, LLC v. City of Newport Beach*,
  730 F.3d 1142 (9th Cir. 2013) ............................................................................ 34

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*,
  943 F.3d 1243 (9th Cir. 2019) ...................................................................... 68, 70

*Parkinson v. Novartis Pharmaceuticals Corp.*,
  5 F. Supp. 3d 1265 (D. Or. 2014) ......................................................................... 8

*People ex rel. Gallo v. Acuna*,
  14 Cal. 4th 1090 (1997) ........................................................................................ 9

*People ex rel. Spitzer v. Sturm, Ruger & Co., Inc.*,
  761 N.Y.S.2d 192 (N.Y. App. Div. 1st Dept. 2003) ........................................... 18

*People v. Casa Blanca Convalescent Homes, Inc.*,
  159 Cal. App. 3d 509 (1984) .............................................................................. 41

*People v. ConAgra Grocery Prods. Co.*,
  17 Cal. App. 5th 84 (2017) .......................................................................... passim

*People v. Lim*,
  18 Cal. 2d 872 (1941) ......................................................................................... 10

*People v. McKale*,
  25 Cal. 3d 626 (1979) ......................................................................................... 40

*People v. Roberts*,
  2 Cal. 4th 271, 826 P. 3d 274 (1992) ................................................................. 34

*Pradhan v. Citibank. N.A.*,
  No. 10–CV–03245–LHK, 2011 WL 90235 (N.D. Cal. Jan. 10, 2011) .................... 67

*Priest v. Sandoz, Inc.*,
  No. A-15-CV-00822-LY-ML, 2016 WL 11162903 (W.D. Tex. Dec. 29, 2016), *report and recommendation adopted*, 2017 WL 8896188 (W.D. Tex. Jan. 31, 2017) .............................. 54

*Rezner v. Bayerische Hypo-Und Vereinsbank AG*,
  630 F.3d 866 (9th Cir. 2010) .............................................................................. 71

*RJR Nabisco, Inc. v. European Cmty.*,
  136 S. Ct. 2090 (2016) .................................................................................. 57, 62

*Rose v. Bank of America, N.A.*,
  57 Cal. 4th 390 (2013) ....................................................................................... 40

*Rubenstein v. Neiman Marcus Grp. LLC*,
  687 Fed. App'x 564 (9th Cir. 2017) .................................................................... 76

*Rutherford v. Owens-Ill., Inc.*,
  16 Cal. 4th 953 (1997) ....................................................................................... 32

*S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
  72 Cal. App. 4th 861 (1999) .............................................................................. 48

*Saavedra v. Eli Lily & Co.*,
  No. 2:12-CV-9366-SVW-MAN, 2013 WL 6345442 (C.D. Cal. Feb. 26, 2013) ...... 47

*Salinas v. United States*,
  522 U.S. 52 (1997)................................................................................................ 64

*Samura v. Kaiser Foundation Health Plan, Inc.*,
  17 Cal. App. 4th 1284 (1993) ............................................................................... 42

*Schmuck v. United States*,
  489 U.S. 705 (1989).............................................................................................. 60

*Sebastian Brown Prods., LLC v. Muzooka, Inc.*,
  143 F. Supp. 3d 1026 (N.D. Cal. 2015) ............................................................... 75

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
  473 U.S. 479 (1985).............................................................................................. 56

*Shroyer v. New Cingular Wireless Servs., Inc.*,
  622 F.3d 1035 (9th Cir. 2010) .............................................................................. 42

*Sills v. Smith & Wesson Corp.*,
  No. 99C-09-283, 2000 WL 33113806 (Del. Super. Ct. Dec. 1, 2000) .................... 18

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) ................................................................................... 61

*Smith v. Wells Fargo Bank, N.A.*,
  135 Cal. App. 4th 1463 (2005) ............................................................................. 40

*Sosa v. DIRECTV, Inc.*,
  437 F.3d 923 (9th Cir. 2006)................................................................................. 61

*State ex rel. Morrisey v. AmerisourceBergen Drug Corp.*,
  No. 12-C-141, 2014 WL 12814021 (W. Va. Cir. Ct. Dec. 12, 2014)................ 19, 32

*State ex rel. Wilson v. Sup. Ct.*,
  227 Cal. App. 4th 579 (2014) ............................................................................... 33

*State v Purdue Pharma Inc.*,
  2018 WL 4566129 (N.H. Super. Ct. Sep. 18, 2018)........................................ 34, 68

*State v Purdue Pharma L.P.*,
  2018 WL 4468439 (Alaska Super. Ct. July 12, 2018) .......................................... 34

*State v Purdue Pharma L.P.*,
  2019 WL 1590064 (Ark. Cir. Apr. 05, 2019) ....................................................... 34

*State v Purdue Pharma L.P.*,
  2019 WL 2331282 (Tenn. Cir. Ct. Feb. 22, 2019)........................................... 34, 70

*State v Purdue Pharma L.P.*,
  2019 WL 3991963 (R.I. Super. Ct. Aug. 16, 2019) .............................................. 34

*State v Purdue Pharma LP*,
  2019 WL 4019929 (Okla. Dist. Ct. Aug. 26, 2019).............................................. 34

*State v. Lead Indus., Ass'n, Inc.*,
  951 A.2d 428 (R.I. 2008) ...................................................................................... 18

*Stengel v. Medtronic Inc.*,
  704 F.3d 1224 (9th Cir. 2013)............................................................................... 53

*Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*,
  720 F. Supp. 805 (N.D. Cal. 1989) ....................................................................... 40

*Swartz v. KPMG LLP*,
476 F.3d 756 (9th Cir. 2007)..................................................................... 75

*Tesoro Refining & Mktg. Co. LLC v. City of Long Beach*,
334 F. Supp. 3d 1031 (C.D. Cal. 2017) ........................................... 13, 17

*Thomas v. Bible*,
983 F.2d 152 (9th Cir. 1993)...................................................................... 7

*Tioga Pub. Sch. Dist. No. 15 of Williams Cty., State of N.D. v. U.S. Gypsum Co.*,
984 F.2d 915 (8th Cir. 1993)..................................................................... 18

*Troyk v. Farmers Group, Inc.*,
171 Cal. App. 4th 1305 (2009) ................................................................. 49

*United States ex rel. Swoben v. United Healthcare Ins. Co.*,
848 F.3d 1161 (9th Cir. 2016)................................................................... 72

*United States v. Ahmad*,
No. 4:15CV-181-JM, 2016 WL 11645908 (E.D. Ark. May 2, 2016), *aff'd sub nom. United States v. United Pain Care, Ltd.*, 747 F. App'x 439 (8th Cir. 2019)......................................... 26

*United States v. Appalachian Reg'l Healthcare, Inc.*,
246 F. Supp. 3d 1184 (E.D. Ky. 2017) ..................................................... 26

*United States v. Cap Quality Care, Inc.*,
486 F. Supp. 2d 47 (D. Maine 2007) ........................................................ 26

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2015)..................................................................... 63

*United States v. Clinical Leasing Serv., Inc.*,
925 F.2d 120 (5th Cir. 1991) .................................................................... 26

*United States v. Elliott*,
571 F.2d 880 (5th Cir. 1978)..................................................................... 64

*United States v. Grab Bag Distrib.*,
189 F. Supp. 2d 1072 (E.D. Cal. 2002) .................................................... 26

*United States v. Green Drugs*,
905 F.2d 694 (3rd Cir. 1990) .................................................................... 26

*United States v. Hayes*,
595 F.2d 258 (5th Cir. 1979)..................................................................... 25

*United States v. Hernandez*,
No. CR-14-0120, 2015 WL 4498084 (N.D. Cal. July 23, 2015).............. 64

*United States v. Little*,
59 F. Supp. 2d 177 (D. Mass. 1999) ......................................................... 26

*United States v. Moore*,
423 U.S. 122 (1975)...................................................................... 22, 27, 63

*United States v. Philip Morris USA, Inc.*,
449 F. Supp. 2d 1 (D.D.C. 2006) .............................................................. 64

*United States v. Ramos-Atondo*,
732 F.3d 1113 (9th Cir. 2013)................................................................... 30

*United States v. Robinson*,
No. 12-20319-CIV, 2012 WL 3984786 (S.D. Fla. Sept. 11, 2012) ........................................ 26

*United States v. Salman*,
618 Fed. App'x. 886 (9th Cir. 2015) .................................................................................... 30

*United States v. Stidham*,
938 F. Supp. 808 (S.D. Ala. 1996) ....................................................................................... 26

*United States v. United Healthcare Ins. Co.*,
848 F.3d 1161 (9th Cir. 2016) .............................................................................................. 75

*United States v. Yi*,
704 F.3d 800 (9th Cir. 2013) ................................................................................................ 30

*Van't Rood v. Cnty. of Santa Clara*,
113 Cal. App. 4th 549 (2003) ............................................................................................... 49

*Varjabedian v. City of Madera*,
20 Cal. 3d 285 (1977) ..................................................................................................... 31, 32

*West Boca Medical Center, Inc. v. AmerisourceBergen Drug Corporation, et al.*,
1:17-md-02804-DAP (N.D. Ohio Apr. 3, 2020) ................................................................... 56

*Williams v. Gerber Prod. Co.*,
552 F.3d 934 (9th Cir. 2008) ................................................................................................ 46

*Wyeth v. Levine*,
555 U.S. 555 (2009) .............................................................................................................. 51

**Statutes**

18 U.S.C. § 1961 ........................................................................................................................ 62

21 U.S.C. § 801(2) ..................................................................................................................... 15

21 U.S.C. § 812 .......................................................................................................................... 20

21 U.S.C. § 812(b)(2) ................................................................................................................ 15

21 U.S.C. § 822 ................................................................................................................ 4, 20, 25

21 U.S.C. § 823 .................................................................................................................... 15, 20

21 U.S.C. § 823(a) ..................................................................................................................... 31

21 U.S.C. § 823(e) ..................................................................................................................... 25

21 U.S.C. § 824 .......................................................................................................................... 20

21 U.S.C. § 824(d) ..................................................................................................................... 25

21 U.S.C. § 827 .......................................................................................................................... 63

21 U.S.C. § 841 ............................................................................................................... 20, 21, 22

21 U.S.C. § 841(a) ..................................................................................................................... 32

21 U.S.C. § 842 .................................................................................................................... 20, 21

21 U.S.C. § 843(d) ..................................................................................................................... 62

21 U.S.C. § 903 .......................................................................................................................... 51

28 U.S.C. § 1407(a) ..................................................................................................................... 6

Page

Cal. Bus. & Prof. Code § 17200 ............................................................... 32, 39

Cal. Bus. & Prof. Code § 17250 ................................................................... 40

Cal. Bus. & Prof. Code § 17500 ................................................................... 32

Cal. Bus. & Prof. Code § 4164(a) ................................................... 15, 21, 32

Cal. Bus. & Prof. Code § 4169 ..................................................................... 45

Cal. Bus. & Prof. Code § 4169.1 ................................................... 15, 21, 32

Cal. Bus. & Prof. Code § 4301(d)-(e) ........................................... 21, 32

Cal. Civ. Cod § 3482 ....................................................................................... 31

Cal. Civ. Code § 1770(a) ............................................................................. 43

Cal. Civ. Code § 3479 ........................................................................... passim

Cal. Civ. Code § 3480 ............................................................................... 9, 10

Cal. Health & Safety Code § 11153.5 ........................................ 15, 21, 32

Ohio Rev. Code Ann. § 2307.71(A)(13) .................................................. 18

**Rules**

Fed. R. Civ. P. 9(b) ...................................................... 6, 55, 60, 76

**Treatises**

6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1197 .................... 36

David F. Herr, *Annotated Manual for Complex Litigation* § 20.133 (4th ed. May 2019 Update) .. 6

Prosser and Keeton on Torts, § 41 (5th ed. 1984) .......................................... 32

Restatement (Second) of Torts § 821B ........................................... passim

Robert H. Klonoff, *Federal Multidistrict Litigation: in a Nutshell* 333 (W. Acad. Publ'g 2020) ... 7

**Other Authorities**

164 Cong. Rec. S 6159-06 ........................................................................ 63

970 U.S.C.C.A.N. 4566 ........................................................................... 63

Stanley A. Weigel, *The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts*, 78 F.R.D. 575 (J.P.M.L. 1978) ................... 6

**Regulatory Documents**

21 C.F.R. § 1301.71 ........................................................ 5, 24, 40

21 C.F.R. § 1301.71(a) ....................................................... passim

21 C.F.R. § 1301.74 ............................................................ passim

21 C.F.R. § 1301.74(b) ...................................................... 15, 32

21 C.F.R. § 1306.03 ................................................................ 25

21 C.F.R. § 1306.04 ............................................................ 23, 25

21 C.F.R. § 1306.04(a) ................................................ 15, 25, 32

*Bob's Pharmacy & Diabetic Supplies*,
74 Fed. Reg. 19599-03, 2009 WL 1137632 (D.E.A. Apr. 29, 2009) ....................................... 27

*ChipRx L.L.C d/b/a City Center Pharmacy*,
82 Fed. Reg. 51,433, 2017 WL 506930 (D.E.A. Nov. 6, 2017) ................................. 24

*E. Main St. Pharmacy*,
75 Fed. Reg. 66149-01 2010 WL 4218766 (D.E.A. Oct. 27, 2010) ................................... 25, 30

*Edge Pharmacy*,
81 Fed. Reg. 72092-03, 2016 WL 6083185 (D.E.A. Oct. 19, 2016) ........................................ 27

*Grider Drug 1 & Grider Drug 2*,
77 Fed. Reg. 44070-01, 2012 WL 3027634 (D.E.A. July 26, 2012) ...................................... 26

*Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 & 5195*,
77 Fed. Reg. 62316-01, 2012 WL 4832770 (D.E.A. Oct. 12, 2012) ....................................... 26

*Masters Pharm., Inc.* ("*Masters I*"),
80 Fed. Reg. 55418-01, 2015 WL 5320504 (D.E.A. Sept. 15, 2015) ....................................... 24

*Medic-Aid Pharmacy*,
55 Fed. Reg. 30,043, 1990 WL 328750 (D.E.A. July 24, 1990) ................................... 25, 30

*Medicine Shoppe-Jonesborough*,
73 Fed. Reg. 364-01, 2008 WL 34619 (D.E.A. Jan. 2, 2008) ........................................... 26, 27

*Ralph J. Bertolino Pharmacy, Inc.*,
55 Fed. Reg. 4729, 1990 WL 352775 (D.E.A. Feb. 9, 1990) ............................................ 26, 30

*Superior Pharmacy*,
81 Fed. Reg. 31310-01, 2016 WL 2866659 (D.E.A. May 18, 2016) ................................... 26, 30

*Townwood Pharmacy*,
63 Fed. Reg. 8477, 1998 WL 64863 (D.E.A. Feb. 19, 1998) .................................................. 26

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiffs the City and County of San Francisco ("San Francisco" or "the City") and the People of the State of California, acting by and through San Francisco City Attorney Dennis J. Herrera ("the People") (collectively, "Plaintiffs"), oppose Defendants'[1] motions to dismiss the First Amended Complaint ("FAC"; Dkt. 128). Defendants filed nine such motions, five of which assert purported failures to state claims upon which relief can be granted. Dkts. 167-71. This omnibus opposition addresses the arguments raised in all five of those motions. Plaintiffs respond to the personal jurisdiction motions in separate briefs, filed herewith.

\* \* \*

This case confronts the worst man-made epidemic in modern medical history: the misuse, abuse, and over-prescription of opioids. The crisis arose from the opioid manufacturers' deliberate and deceptive misinformation campaign to increase prescriptions and sales of opioids and was furthered by all Defendants' failure to adequately implement restrictions on opioid distribution and dispensing. For decades, these manufacturers, distributors, and pharmacy dispensers recklessly pursued profit over safety. In doing so, they created and contributed to an epidemic that has claimed hundreds of thousands of lives and a public nuisance that continues to ravage communities across the country, including in San Francisco.

San Francisco, like thousands of government entities around the country, brought suit to abate this ongoing nuisance and to redress past harms caused by the Defendants' misconduct. Through the FAC, the People assert three claims—one for public nuisance, one each under California's Unfair Competition Law ("UCL") and False Advertising Law ("FAL")—and the City asserts two claims under the Racketeer Influenced and Corrupt Organizations ("RICO") Act. *See* FAC at 1-3 (identifying which claims are asserted against which Defendants). Supporting these claims are *more than 800 paragraphs* (over 200 pages) of detailed factual allegations.

**Summary of the Allegations**

In broad strokes, the suit takes aim at two primary causes of the opioid crisis in San

---

[1] Capitalized terms and acronyms have the meanings ascribed in the FAC unless otherwise indicated.

Francisco: (1) a marketing scheme involving the false and deceptive marketing of prescription opioids, which was designed to dramatically increase the demand for and sale of opioids; and (2) a supply chain scheme, under which the various entities in the supply chain failed to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, and halt distribution and dispensing of suspicious orders until those suspicions could be resolved, thereby contributing to the oversupply of such drugs and fueling a supersaturated market, including an illegal secondary market. FAC ¶ 2.

With respect to the marketing scheme, Plaintiffs allege in detail that the Marketing Defendants sought to, and did, increase the demand for prescription opioids by aggressively promoting falsehoods about prescription opioids, including (i) that they present little risk of addiction, (ii) that any addiction could be easily managed, including through (iii) prescribing *more* opioids, and (iv) that alternative forms of pain relief like nonsteroidal anti-inflammatory drugs ("NSAIDs")—*e.g.*, ibuprofen—posed greater risks than opioids. *Id.* ¶¶ 228-400. Plaintiffs further allege that the Marketing Defendants advanced these falsehoods through multiple channels, including through seemingly independent front groups and paid Key Opinion Leaders, commissioned publications in popular and medical literature, and sales representatives targeting individual physicians, among many other means. *Id.* ¶¶ 401-515. These efforts were highly successful, dramatically expanded opioid prescribing and use, and contributed directly to the opioid epidemic and public nuisance nationwide and in San Francisco. *Id.* ¶¶ 222-24, 538-46.

The supply chain scheme was equally devastating. Plaintiffs allege that the Defendants[2] violated their statutory and common-law duties, by failing to design, implement, and/or enforce policies and procedures to identify, investigate, and (absent due diligence) halt orders and prescriptions the Defendants knew or should have known were suspicious, as they were legally required to do. *Id.* ¶¶ 33, 547-667. This failure enriched the Defendants at the expense of San

---

[2] All Defendants (including the manufacturers) were involved in the supply chain and had obligations to provide effective controls against diversion. *Id.* at ¶ 893. The wholesale distributors purchased opioids from the manufacturers and sold them to retail pharmacies, which in turn dispensed them to the public. Walgreens, which had 55.5% of the dispensing market share in San Francisco, is sued both as a wholesale distributor for its distribution activity through 2014 and for its past and ongoing retail dispensing. *Id.* ¶¶ 554, 894.

Franciscans and San Francisco, which was flooded with pills that significantly contributed to rising addiction, misuse, and overdose rates.

These schemes have caused great harm in San Francisco. According to CDC estimates, it is likely that about 10% of San Francisco's residents engaged and continue to engage in non-medical opioid use each year. *Id.* ¶ 51. Unsurprisingly, then, San Francisco's indicia of opioid morbidity—including, opioid-related hospitalizations, emergency room visits, and deaths—is significant and trending upwards. *Id.* ¶¶ 52-54. The death rates would be even higher but for the City's aggressive campaign to provide and administer naloxone (an opioid antagonist used to prevent overdose fatalities). *Id.* ¶¶ 55-56, 61-64. Indeed, in 2018 alone, San Francisco paramedics administered naloxone to 1,647 people, up from 980 two years earlier. *Id.* This type of response exemplifies the extraordinary steps the City has taken and costs it has incurred to combat the opioid epidemic. Other striking (but merely illustrative) examples include the City's replacement of the toilet grinders in the main library, which were destroyed by the volume of syringes flushed down the library toilets, as well as the purchase of specialized (and very expensive) mail-screening equipment to detect opioids being sent into San Francisco jails. *Id.* ¶¶ 57-58. In all, notwithstanding the City's limited budget, the City has spent (at least) tens of millions of dollars to address the "[t]he surge of opiate abuse and addiction," and much, much more (likely billions) will be needed moving forward to abate the nuisance Defendants have created. *Id.*

**Law of the Case**

This is merely a high-level summary of the FAC. Its degree of detail is unusual for any pleading and reflects the fact that this case has been part of an expansive MDL that has been litigated intensively for more than two years. In that time, the parties and the MDL transferee court have done an enormous amount of work. The transferee judge, the Honorable Dan Aaron Polster, designated a number of bellwether case tracks, the first of which—cases brought by Summit and Cuyahoga Counties in Ohio ("CT1")—was litigated all the way to the eve of trial. In connection with CT1 and other case tracks, the MDL transferee court issued hundreds of orders, including dozens of rulings on dispositive motions. As is relevant here, Judge Polster concluded:

**Public nuisance claims survived**: Nuisance claims brought under the laws of states, like California, that follow the Restatement (Second) of Torts' articulation of the common law of nuisance, are cognizable and survive both motions to dismiss and summary judgment. *In re Nat'l Prescription Opiate Litig.*, 406 F. Supp. 3d 672, 673 (N.D. Ohio 2019);[3] *see also In re Nat'l Prescription Opiate Litig. (Broward)*, No. 18-OP-45332, 2020 WL 1986589, at \*7 (N.D. Ohio Apr. 27, 2020) (finding that "the Court's previous analyses of nuisance law are applicable" under the laws of states that "follow[] the Restatement (Second) of Torts"). Indeed, a jury could conclude that the opioid crisis constitutes a public nuisance that "interfere[s] with public health and public safety interests." *In re Nat'l Prescription Opiate Litig.*, 406 F. Supp. 3d at 674. Allegations "that the nuisance arises from the Defendants' conduct, not harm from a legal product that they merely placed into the stream of commerce" are cognizable and well-pled under California nuisance law. *In re Nat'l Prescription Opiate Litig. (Blackfeet)*, No. 1:17-CV-02804, 2019 WL 2477416, at \*11-12, \*14 (N.D. Ohio Apr. 1, 2019) (applying Montana law but analyzing analogous California law), *report and recommendation adopted in relevant part*, No. 1:17-MD-2804, 2019 WL 3737023 (N.D. Ohio June 13, 2019).

**The federal Controlled Substances Act ("CSA") requires Defendants to provide effective controls against diversion**: "Section 1301.71 plainly requires [CSA] registrants to provide effective controls and procedures to guard against the diversion of controlled substances . . . ." *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 3917575, at \*8 (N.D. Ohio Aug. 19, 2019). Further, "as a matter of law, Section 1301.74 [of the CSA's implementing regulations] imposes a legal duty on [CSA] registrants to: (1) design and operate a system to disclose to the registrant suspicious orders; and (2) inform the DEA of suspicious orders when discovered by the registrant." *Id.* at \*7.[4] Moreover, "the CSA statutory and regulatory duties to maintain effective controls against diversion include[] a duty not to ship suspicious orders . . . unless due diligence reasonably dispels the suspicion." *Id.* at \*9.[5]

---

[3] All cited MDL orders were issued in CT1 unless otherwise indicated.

[4] Here, and throughout, citations are omitted and emphasis is added unless otherwise indicated.

[5] The CSA requires all entities that manufacture, distribute, and dispense controlled substances to register, *see* 21 U.S.C. § 822, and establishes duties on all registrants whether acting as wholesale

*Footnote continued on next page*

**Causation was established for public nuisance claims**: A jury could reasonably conclude that: (1) "the Manufacturers' misleading marketing activities resulted in a substantial increase in the supply of prescription opioids;" (2) "the increases in prescription opioids proximately caused harm to Plaintiffs;" (3) each manufacturer "failed to maintain effective controls against diversion;" (4) "the Distributors and Pharmacies [failed] to maintain effective controls against diversion;" and (5) each Defendants' conduct was "a substantial factor in producing the alleged harm suffered by Plaintiffs." *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 4178617, at *2-4 (N.D. Ohio Sept. 3, 2019).

**Consumer protection statutes were adequately pled**: Plaintiffs "sufficiently alleged unfair or deceptive acts against each of the Defendants" under Florida's consumer protection statute, which shares many characteristics with California's UCL. *In re Nat'l Prescription Opiate Litig. (West Boca)*, No. 1:17-MD-2804, 2020 WL 1669655, at *19-23 (N.D. Ohio Apr. 3, 2020); *In re Nat'l Prescription Opiate Litig. (Broward)*, 2020 WL 1986589, at *8-9. Plaintiffs "plausibly alleged that actions taken by each Defendant were objectively likely to deceive a reasonable person and caused [Plaintiff's] asserted injuries." *In re Nat'l Prescription Opiate Litig. (West Boca)*, 2020 WL 1669655, at *24. And Defendants did not demonstrate that their alleged conduct was shielded by Florida's "safe harbor" provision (which is similar to California's). *Id.* at *18.

**State law claims were not preempted**: Neither public nuisance nor consumer protection state-law claims were preempted because (1) claims against the manufacturers turned on a "massive marketing campaign based on false and misleading information," and not the adequacy of FDA-approved labeling; (2) no claim was based on fraud on the DEA or the FDA; and (3) the state-law claims would not impede the "DEA's ability to regulate and enforce" the CSA. *In re Nat'l Prescription Opiate Litig.*, 1:17-MD-2804, 2019 WL 4178591, at *2, *4-5, *12 (N.D. Ohio Sept. 3, 2019).

---

*Footnote continued from previous page*
distributors or as retail dispensers. *See* 21 C.F.R. § 1301.71. In granting Plaintiffs' Partial Motion for Summary Adjudication of Duties under the CSA, Judge Polster addressed only the question of the defendants' distribution duties, as those were the only claims before the court. Walgreens' additional duties as a dispenser are discussed at length in § I.A.3, *infra*.

1992508.1                                    - 5 -                OPPOSITION TO MOTIONS TO DISMISS FIRST
                                                                  AMENDED COMPLAINT; 3:18-CV-07591-CRB

**RICO claims were well-pled**: Plaintiffs pled cognizable predicate acts of racketeering, including CSA violations and mail/wire fraud, with sufficient particularity under Rule 9(b) for both the Supply Chain and Marketing Enterprises. *In re Nat'l Prescription Opiate Litig.*, No. 1:18-OP-45090, 2018 WL 4895856, at \*18-22 (N.D. Ohio Oct. 5, 2018), *report and recommendation adopted in relevant part*, No. 1:17-MD-2804, 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018). Plaintiffs also "sufficiently alleged proximate cause for their RICO claims" under Supreme Court precedent. *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at \*6. Finally, plaintiffs suffered cognizable injuries to "business or property" because those injuries "did not arise directly out of Plaintiffs' residents' personal injuries," *id.* at \*9, and, under both Sixth Circuit and Ninth Circuit law, sovereign entities can recover losses sustained as "marketplace participants" as well as damages that "go beyond the ordinary cost of providing [governmental] services and are attributable to the alleged injurious conduct of Defendants," *id.* at \*10.

**"Group pleading" arguments fail**: Similar allegations in MDL complaints provided "fair notice of the claims sufficient to permit the Defendants to understand and respond to them." *In re Nat'l Prescription Opiate Litig. (Muscogee)*, No. 1:17-MD-02804, 2019 WL 2468267, at \*13 (N.D. Ohio Apr. 1, 2019), *report and recommendation adopted in part, rejected in part*, No. 1:17-MD-2804, 2019 WL 3737023 (N.D. Ohio June 13, 2019).

Together, these rulings resolve the majority of the issues raised in Defendants' motions to dismiss the FAC. Defendants don't get a do-over.

Indeed, this Court already explained that it will not "review or alter any of" the "rulings [that] have already been entered in the MDL litigation." Dkt. 114 (Feb. 26, 2020 Hr'g Tr.) at 9:5-9. This is consistent with MDL best-practices and necessary to ensure the "just and efficient" resolution of this critical case. 28 U.S.C. § 1407(a). As many courts and commentators have noted, the "purpose and usefulness of transfer under Section 1407" would be "undermin[ed]" if "transferor judges were permitted to upset rulings of transferee judges" without good cause. David F. Herr, *Annotated Manual for Complex Litigation* § 20.133 (4th ed. May 2019 Update) (citing Stanley A. Weigel, *The Judicial Panel on Multidistrict Litigation, Transferor Courts and*

OPPOSITION TO MOTIONS TO DISMISS FIRST
AMENDED COMPLAINT; 3:18-CV-07591-CRB

1 *Transferee Courts*, 78 F.R.D. 575, 577 (J.P.M.L. 1978)); *McKay v. Novartis Pharm. Corp.*, 751
2 F.3d 694, 705 (5th Cir. 2014) ("The law of the case doctrine requires attention to the special
3 authority granted to the multidistrict transferee judge and ensures that transferor courts respect the
4 transferee court's decisions."). Accordingly, the preeminent treatise explains that "exceptions to
5 the law of the case principle should be especially rare in these circumstances, because refusal to
6 follow the previous ruling would result in the sort of piecemeal decision making that MDL
7 centralization is intended to avoid." 15 Charles Alan Wright & Arthur R. Miller, *Federal*
8 *Practice and Procedure* §3867 (4th ed. Aug. 2019 Update); *see also* Robert H. Klonoff, *Federal*
9 *Multidistrict Litigation: in a Nutshell* 333 (W. Acad. Publ'g 2020) ("Transferor courts should
10 deviate from rulings of transferee court only rarely.").

11 Thus, the law of the case doctrine, though discretionary, typically prevents transferor
12 courts from revisiting transferee rulings unless those rulings were "clearly erroneous" or there
13 was an "intervening change in the law" or fact. *Thomas v. Bible*, 983 F.2d 152, 155 (9th Cir.
14 1993). Neither circumstance is present here. As detailed throughout this opposition, Judge
15 Polster—who has become intimately familiar with the factual and legal nuances of this
16 complicated litigation—got his rulings exactly right. The facts alleged and claims asserted in the
17 FAC closely parallel those in the complaints upon which most of Judge Polster's rulings were
18 based. And while this Court is bound by California law and Ninth Circuit authority, nothing in
19 the relevant jurisprudence contradicts or otherwise undermines Judge Polster's applicable orders.

20 Defendants nevertheless urge the Court to disregard the MDL transferee court's rulings
21 because, according to Defendants, those orders were issued in a "different case." Dkt. 169 at 4.
22 This argument ignores the facts and mischaracterizes the law. As noted above, the vast majority
23 of the FAC's Defendant-focused factual allegations are drawn from the MDL complaints upon
24 which Judge Polster's rulings were based. The same is true for the City's RICO claims, which
25 are, in all material respects, identical to those that have already survived extensive motion
26 practice. In these circumstances, transferor courts regularly defer to applicable transferee court
27 rulings, even where—as here—those rulings technically issued under different bellwether case
28 captions. In *Parkinson v. Novartis Pharmaceuticals Corp.*, for example, a transferor court

"decline[d] to revisit" the transferee court's rulings on "the adequacy of Defendant's warnings" because doing so would "frustrate . . . the purpose of consolidation," even though the prior rulings were issued in different individual cases within the MDL. 5 F. Supp. 3d 1265, 1272 (D. Or. 2014); *In re Aredia & Zometa Prod. Liab. Litig.*, No. 3-06-0388, 2011 WL 2182824, at *5 (M.D. Tenn. June 3, 2011) (demonstrating that the relevant orders were issued in individual actions within the MDL).

The same result should follow here. Plaintiffs do not contend that the MDL transferee court's rulings are binding, but they are highly persuasive and should be respected and followed both because they are right and because ignoring them would undermine the objectives of multi-district litigation. Nothing in Defendants' remaining arguments—targeting certain elements of the UCL, FAL, and California nuisance law—warrants dismissal either. Defendants' motions should be denied.

## ARGUMENT

### I.    The opioid epidemic is unquestionably a public nuisance, and the People have properly pled their nuisance claim.

Defendants do not dispute that the opioid epidemic is a public nuisance. This is unsurprising, as the MDL transferee court has repeatedly held that allegations nearly identical to those asserted here are sufficient to state a claim for public nuisance under the laws of other states that—like California—follow the Restatement. *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, 406 F. Supp. 3d at 673; *In re Nat'l Prescription Opiate Litig. (Blackfeet)*, 2019 WL 2477416, at *11-12, *14; *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2020 WL 2090355, at § IV.C (N.D. Ohio Apr. 30, 2020); *In re Nat'l Prescription Opiate Litig. (Broward)*, 2020 WL 1986589, at *7.

The same result follows under California's nuisance law, which broadly defines a nuisance as "[a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses . . ., so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance." Cal. Civ. Code § 3479. As explained in the Restatement—which California has "essentially adopted," *Ileto v. Glock Inc.*,

349 F.3d 1191, 1210 n.24 (9th Cir. 2003), and upon which California courts regularly rely in

interpreting § 3479, *People ex rel. Gallo v. Acuna*, 14 Cal. 4th 1090, 1104-05 (1997)—"[a] public

nuisance is an unreasonable interference with a right common to the general public,"

Restatement (Second) of Torts § 821B. *See also* Cal. Civ. Code § 3480 ("A public nuisance is

one which affects at the same time an entire community or neighborhood, or any considerable

number of persons. . . .").

Circumstances that make such interference "unreasonable" include:

> (a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, *or*

> (b) whether the conduct is proscribed by statute, ordinance or administrative regulation, *or*

> (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Restatement (Second) of Torts § 821B(2). Neither Sections 3479 nor 3480, nor the Restatement,

require actual knowledge. Indeed, the statutes have no knowledge requirement at all. Rather,

actual or constructive knowledge is just one of many factors that may be used to establish

causation in a public nuisance action.

Although the People need only satisfy one of these disjunctive circumstances, they clearly

plead all three. They allege in detail how the opioid epidemic is "injurious to public health and

interfere[s] with the comfortable enjoyment of life and property of San Francisco's residents."

FAC ¶¶ 892, 1-20, 38-71. They also allege that Defendants fueled the opioid epidemic in San

Francisco—and thereby interfered with a public right—by, among other things, (1) falsely

promoting and marketing prescription opioids (as to the Marketing Defendants), and (2) failing to

design, implement, or enforce policies and procedures necessary to identify suspicious orders and

prescriptions, and stop distributing and dispensing those orders until the suspicions were

reasonably resolved (as to the Distributor Defendants, including Walgreens). *Id.* ¶¶ 222-680. As

the People further allege, and as demonstrated herein, this conduct is proscribed by both statute

and administrative regulation. *Id.* ¶¶ 547-96. This conduct has had an undeniably long-lasting

- 9 -

effect, and Defendants had every reason to know that it would, and indeed that it had.  *See, e.g.*, *id.* ¶¶ 38-71, 556, 571-77, 597-603, 631-55.  The opioid epidemic is a quintessential public nuisance, and the People's nuisance claim is well-pled.

Defendants nevertheless argue that they cannot be held liable for this public nuisance as a matter of law because, according to them, they (i) did not engage in affirmative conduct that assisted in the creation of the nuisance beyond the mere manufacture or distribution of the product or failure to warn of its hazards, and (ii) did not have actual knowledge of the hazard such conduct would create.  Dkts. 169 at 22; 170 at 10-12; 168 at 5-6 (citing *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 84, 91, 101 (2017); *Cty. of Santa Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292, 309-10 (2006)).  In short, Defendants attempt to import a scienter-like requirement that is found neither in the statute or the Restatement.  *Cf. People v. Lim*, 18 Cal. 2d 872, 880-881 (1941) (California nuisance law is defined by Cal. Civ. Code §§ 3479-80, not "the common law definitions of public nuisance").  Walgreens argues in addition that its dispensing conduct cannot give rise to a nuisance claim because it does not have dispensing "duties" under the CSA.  Dkt. 168 at 7-13.

These arguments fail for multiple reasons.  First, the only conduct that the People must show is that which significantly interferes with a public right, *or* is proscribed by law, *or* is continuing in nature.  Restatement (Second) of Torts § 821B; *Cf. Santa Clara*, 137 Cal. App. 4th at 305-06 (public nuisance found in lead paint case because "lead causes grave harm, is injurious to health, and interferes with the comfortable enjoyment of life and property").  Second, knowledge of the hazard is relevant only for claims based on conduct of a continuing nature, and even there, constructive knowledge is sufficient.  Restatement (Second) of Torts § 821B; *City of Modesto Redevelopment Agency v. Superior Court*, 119 Cal. App. 4th 28, 40 (2004) (allegations sufficient to show defendants "knew or should have known").  Third, nothing in the California Civil Code or Restatement requires that a defendant violate a legal "duty" to be held liable for a nuisance (although the People adequately allege that all Defendants violated their obligations under the CSA).

Regardless, even accepting Defendants' framework, the People's claim is properly pled.

**A.** **Defendants took affirmative steps that assisted in the creation of the nuisance with actual or constructive knowledge of the hazards presented.**

Even if the People were strictly limited to the third theory of public nuisance liability under the Restatement—the only theory where allegations of knowledge of the hazards are is arguably required—the FAC more than adequately alleges exactly that. *See* Restatement (Second) of Torts § 821B.

The People do not allege that Defendants merely placed opioids into the stream of commerce. Rather, the People's claims are based on (i) Manufacturer Defendants' false and deceptive promotion of opioids, and (ii) all Defendants' fueling of opioids overuse and illicit secondary opioid market, both of which were done with actual or constructive knowledge.

As the MDL transferee court recognized in evaluating substantially similar claims, the nuisance is a consequence of Defendants' *conduct* and not of the product itself. *See, e.g.*, *Nat'l Prescription Opiate Litig.*, 406 F. Supp. 3d at 675. Indeed, the MDL transferee court resolved this precise issue under California law, holding that under *ConAgra* and *Santa Clara*, allegations "that the nuisance arises from the Defendants' conduct, not harm from a legal product that they merely placed into the stream of commerce"—which are precisely the allegations contained in the FAC—were cognizable and well-pled. *In re Nat'l Prescription Opiate Litig. (Blackfeet)*, 2019 WL 2477416, at *11-12 (applying Montana law but analyzing California law because "the Montana legislature adopted the California nuisance statute at issue in *ConAgra* and *County of Santa Clara* and Montana courts look to California's construction of its statute for guidance"). In other words, because Defendants' conduct "is distinct from and far more egregious than simply producing a defective product or failing to warn of a defective product," the People's nuisance claim is not, as Defendants argue, simply "a products liability action 'in the guise of a nuisance action.'" *See Santa Clara*, 137 Cal. App. 4th at 309; *accord In re Nat'l Prescription Opiate Litig. (Blackfeet)*, 2019 WL 2477416, at *12 ("Plaintiff's nuisance claims are [not] in essence product liability claims.").

**1.** **Manufacturers falsely promoted opioids.**

Manufacturers aggressively promoted the use of opioids with false and deceptive

statements, including that: (i) the risk of addiction from chronic opioid therapy is low; (ii) to the extent there is a risk of addiction, it can be easily identified and managed; (iii) signs of addictive behavior are "pseudoaddiction," requiring more opioids; (iv) opioid withdrawal can be avoided by tapering; (v) opioid doses can be increased without limit or greater risks; (vi) long-term opioid use improves functioning; (vii) alternative forms of pain relief pose greater risks than opioids; and (viii) new formulations of certain opioids successfully deter abuse. *See, e.g.*, FAC ¶¶ 2, 7-10, 23, 25-32, 36-37, 59, 136, 143, 150, 164, 187, 191, 214-21, 225-345, 357, 359-60, 373-522, 538-44, 646, 649, 697-710, 721-22, 725, 729, 734-41, 762-76, 789-90, 892. As explained in greater detail below, Manufacturers' false promotion of opioids led to the oversupply of such drugs and fueled overuse and an illegal secondary market, both of which created or assisted in the creation of the opioid epidemic. *See also, e.g.*, FAC ¶¶ 7, 10-12, 18-20, 31, 40, 44-47, 51-59, 62-70, 283, 345, 522, 538-51, 580, 592, 649, 655, 668, 681-85, 688, 830, 837, 842, 849-50, 900.

As set forth above, a showing of actual or constructive knowledge is not required to establish public nuisance, however, California recognizes that a defendant may be held liable for public nuisance based on its affirmative and knowing promotion of a product for hazardous use. *See ConAgra*, 17 Cal. App. 5th at 84, 91, 101, 168 ("When a manufacturer promotes a product for a specific use that it knows will create a hazardous condition, public policy supports the use of California public nuisance law to require the manufacturer to remediate the hazards created by its conduct."); *Santa Clara*, 137 Cal. App. 4th at 310 ("[T]he fact that defendants were manufacturers and distributors of lead [does not] mean[] that they may not be held liable for their intentional promotion of the use of lead paint . . . with knowledge of the public health hazard that this use would create."); *In re Nat'l Prescription Opiate Litig. (Blackfeet)*, 2019 WL 2477416, at *11-12 (interpreting California law and finding that nearly-identical allegations of false opioid promotion were well-pled).

The FAC is replete with allegations that Manufacturers knew of the harmful effects of opioids, including that they were highly addictive, subject to abuse, and showed little benefit for the treatment of chronic pain. *See, e.g.*, FAC ¶¶ 9, 23-27, 176-80, 215-18, 226, 299, 318, 332, 337, 357, 375-79, 385-87, 395-96, 414, 454, 700, 710, 722, 729, 739, 762, 880. Accordingly, the

FAC sufficiently alleges that Manufacturers, with more than constructive knowledge of the specific hazards presented, took affirmative steps that assisted in the creation of the nuisance. *See ConAgra*, 17 Cal. App. 5th at 84, 91, 101, 168; *Santa Clara*, 137 Cal. App. 4th at 310.

### 2. The People sufficiently allege that Defendants created a public nuisance through their distribution and dispensing of prescription opioids.

#### a. To the extent "affirmative conduct" or knowledge is required, the People have sufficiently pled both.

Contrary to Distributors' arguments (Dkts. 170 at 12; 168 at 6), the affirmative conduct purportedly required to state a nuisance claim relating to a product is not limited to the knowing promotion of a hazardous use. *See, e.g.*, *Ileto*, 349 F.3d at 1198, 1201, 1211 n.26 (upholding a public nuisance claim against gun manufacturers and distributors based on conduct that created and promoted an illegal secondary market for guns); *City of Modesto*, 119 Cal. App. 4th at 40-41 ("[T]hose who create or assist in creating a system that causes hazardous wastes to be disposed of improperly . . . can be liable under the law of nuisance."); *Tesoro Refining & Mktg. Co. LLC v. City of Long Beach*, 334 F. Supp. 3d 1031, 1053 (C.D. Cal. 2017) (by alleging the defendants "negligent or intentional" failures led to environmental contamination, plaintiffs "adequately pleaded affirmative conduct").

*Ileto* is particularly apt here. 349 F.3d at 1194. There, the plaintiffs alleged that

> [a]lthough defendants knew about precautions they could have taken to decrease access by prohibited purchasers of their products, they "knowingly establish[ed], suppl[ied], and maintain[ed] an over-saturated firearms market that facilitates easy access for criminal purposes, including access by persons prohibited to purchase or possess firearms under state or federal law."

*Id*. at 1198; *see also id.* at 1199 (plaintiffs alleged "that defendants failed to take even minimal precautions to prevent or diminish the criminal market"). The plaintiffs further alleged that: (i) the defendants continued to engage in this conduct despite knowing "of the disastrous, continuing, and long-lasting effects of their conduct on the public," and (ii) the defendants' conduct "undermine[d] state and federal law restricting gun sales and possession and render[ed] enforcement of such laws difficult or impossible." *Id*.

Based on these allegations, the Ninth Circuit rejected the defendants' argument that the plaintiffs were asserting product liability claims in the guise of a nuisance action, stating that "[t]he California Supreme Court has never limited public nuisance suits in a manner that would prevent the claim alleged here." *Id.* at 1211 n.26; *see also id.* at 1201-02, 1213 n.29, 1214 ("[T]he nuisance claim rests on the defendants' actions in creating an illegal secondary market for guns by purposefully over-saturating the legal gun market in order to take advantage of re-sales to distributors that they know or should know will in turn sell to illegal buyers."). In support of its holding, the court favorably cited *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2002), the case on which the MDL transferee court relied in upholding nuisance claims in CT1, stating:

> We agree with the Ohio Supreme Court's conclusion "that under the Restatement's broad definition, a public nuisance action can be maintained for injuries caused by a product if the facts establish that the design, manufacturing, marketing, or sale of the product unreasonably interferes with a right common to the general public."

*Ileto*, 349 F.3d at 1214.[6] The court further noted that "although gun manufacturing is legal and the sale of guns is regulated by state and federal law, the distribution and marketing of guns in a way that creates and contributes to a danger to the public generally and to the plaintiffs in particular is not permitted under law." *Id.* at 1214-15.

The People's allegations are strikingly similar. Here, the People contend that Defendants knowingly oversupplied the opioid market and fueled an illegal secondary market through their failure to distribute and dispense opioids in a manner that would provide effective controls against diversion. Moreover, while the People allege that Defendants *actually knew* that the oversupply and diversion of opioids would create a public health hazard, knowledge can also be demonstrated by circumstantial evidence, and an inference of actual knowledge is permitted when the circumstances indicate that the defendant *must have known* of the hazard. *ConAgra*, 17 Cal. App. 5th at 84-85; *see also* Restatement (Second) of Torts § 821B (where the conduct is "continuing [in] nature or has produced a permanent or long-lasting effect," an "unreasonable

---

[6] Distributors argue that this Court cannot look to the MDL transferee court's public nuisance rulings precisely because it was informed by *City of Cincinnati*, which Distributors claim conflicts with California law. Dkt. 170 at 10-11. Clearly, the Ninth Circuit disagrees.

OPPOSITION TO MOTIONS TO DISMISS FIRST
AMENDED COMPLAINT; 3:18-CV-07591-CRB

interference" with a public right can be shown if "the actor knows *or has reason to know*" of the "significant effect upon the public right").

These circumstances are certainly present here. Numerous defendants were called out publicly in the press and investigated and fined by government regulators for their oversupply of the market and failure to prevent diversion. *See, e.g.*, FAC ¶¶ 576-78, 744-61. Moreover, as manufacturers, distributors, and/or dispensers of controlled substances, Defendants are regulated by and required to register under the CSA (as well as under various California statutes). *See, e.g.*, FAC ¶¶ 80, 85 n.56, 131-132, 135, 142, 149, 151, 159-161, 163, 166-70, 172-73, 548-49, 558-60, 564, 582-92, 599, 798-99, 864, 893-98. Defendants were therefore obligated to familiarize themselves with the legal requirements of the CSA and its implementing regulations. *Heckler v. Cmty. Health Svs. of Crawford Cty., Inc.*, 467 U.S. 51, 63 (1984) ("[T]hose who deal with the Government are expected to know the law.").

The CSA explicitly states that "[t]he illegal . . . manufacture, distribution, and . . . improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2). Furthermore, both the CSA (and its implementing regulations) and California statutes governing controlled substances require all Defendants to implement effective controls against diversion. *See, e.g.*, 21 U.S.C. § 823; 21 C.F.R. § 1301.71(a); 21 C.F.R. § 1301.74(b); 21 C.F.R. § 1306.04(a); Cal. Health & Safety Code § 11153.5; Cal. Bus. & Prof. Code §§ 4164(a), 4169.1, 4301(d)-(e); *see also, e.g.*, FAC ¶¶ 558-560, 582, 588, 893-897, 912-913.

Defendants were well aware of these obligations. *See, e.g.*, FAC ¶¶ 34, 561, 573-74, 576, 588, 598-603, 636, 673-74, 744, 746, 748. And all Defendants knew that the opioids they were distributing and/or dispensing had "a high potential for abuse" that could "lead to severe psychological or physical dependence," 21 U.S.C. § 812(b)(2); FAC ¶¶ 23, 85 n.56, 124, 126, 130, 132, 135, 142, 149, 161, 163, 180, 582, and thus knew that the diversion of opioids could, and likely would, create a public health hazard, *see, e.g.*, FAC ¶¶ 51, 59, 259, 375, 434-41, 555-56, 571, 580, 597-603, 631-55, 730-32, 880, 900.

Defendants internally acknowledged the risks and harms associated with diversion, *see,*

*e.g.*, *id.* ¶¶ 33, 591, 597-601, 643, 670-672, 675, 745, 749, and had actual knowledge that their opioids were being diverted. They were selling, distributing, and dispensing far greater quantities of prescription opioids than they knew could be necessary for legitimate medical uses. *See, e.g.*, *id.* ¶¶ 12, 33, 40, 45-49, 59, 69, 547, 555, 571, 580, 632, 634, 655-56, 664, 666-67. They also had distribution and dispensing data giving them virtually complete visibility about the ultimate destinations of the drugs they shipped, which they utilized to improve their marketing efforts and boost sales, but not to prevent diversion. *See, e.g.*, *id.* ¶¶ 48-49, 196, 226, 386, 505, 541, 555-56, 563, 567, 575, 593-94, 607, 620, 631-41, 647-51, 653, 799. And a number of Defendants were subject to investigations and enforcement actions, or parties to settlements, in which they were informed of diversion or sanctioned for their failures to prevent diversion. *See, e.g.*, *id.* ¶¶ 171, 571 n.206, 573-74, 576-77, 599, 642, 657-66, 669, 731, 733-41, 744-55, 760-61, 823.[7] The FAC therefore contains allegations through which it is reasonable to infer that all Defendants knew that their opioids were being diverted and must have known of the hazards associated with that diversion. *See ConAgra*, 17 Cal. App. 5th at 84-85.

Citing only five paragraphs of the FAC, Walgreens separately argues that the People's allegations of its knowledge are conclusory and do not demonstrate actual knowledge. Dkt. 168 at 6-7. A full and fair reading of the FAC shows otherwise. For example, despite repeated warnings and sanctions by regulators that it was not implementing effective controls against diversion, Walgreens continued to (i) distribute and dispense far greater quantities of opioids than it knew could be necessary for legitimate uses; (ii) ignore the extensive data in their possession demonstrating patterns and instances of improper distribution, prescribing, and use of opioids (despite using that same data for sales purposes); and (iii) implement policies and procedures that violated their dispensing duties. *See, e.g.*, FAC ¶¶ 33-34, 45, 47, 49(e)-(g), 552-78, 897.[8]

---

[7] Even though some of this diversion occurred outside of San Francisco, it is reasonable to infer that Defendants must have known that their nationwide practices were resulting in diversion throughout the country, including in San Francisco. *See, e.g.*, FAC ¶¶ 38-54, 59, 62-69, 571 n.206, 681-85. In addition, Defendants were well aware that diversion elsewhere could result in increased supply in San Francisco given that the illegal market is not restricted by political boundaries. *Id.* ¶¶ 46, 681-85.

[8] These are merely the relevant allegations that reference Walgreens by name. However, all the other allegations that reference the knowledge of all "Defendants" or of the "Distributor

*Footnote continued on next page*

Despite their knowledge, all Defendants took affirmative steps that not only permitted but encouraged the oversupply and diversion of opioids and fostered an illegal secondary market, in direct violation of their statutory and regulatory obligations.  Defendants actively sought to undermine and evade the regulation of opioids so they could keep pumping their opioids into communities across the country.  *See, e.g.*, FAC ¶¶ 2, 12, 20, 33, 36-37, 547, 570, 572-78, 604-30, 641-42, 647, 655-56, 660-61, 673-76, 680, 711-17, 730-31, 733-55, 760-61, 797-824.  They intentionally misled regulators and the public regarding their purported efforts to prevent diversion and their compliance with regulations.  *See, e.g.*, FAC ¶¶ 395, 652, 668-676, 680, 720-723, 728, 803-804, 814-815, 818, 868.  Additionally, knowing they would all benefit from the increased sales and impeded regulation of opioids, Defendants actively worked together and with others, through contractual agreements, meetings, and trade associations, to achieve those goals.  *See, e.g.*, FAC ¶¶ 403-412, 414-92, 497-502, 513, 604-30, 673-74, 697-717, 722, 730, 762-85, 797-825.

Through the extensive conduct discussed above, and in violation of their legal duties to implement effective controls to prevent diversion, Defendants knowingly oversupplied the opioids market and fueled an illicit secondary opioid market, both of which contributed to the opioid epidemic.  *See, e.g.*, FAC ¶¶ 7, 12, 20, 51-57, 62-70, 545-46, 557, 567, 580, 584, 592, 597, 659, 668, 681-85, 688, 751, 755, 760, 797, 807-08, 818, 877, 898, 900.  Accordingly, the FAC sufficiently alleges that Defendants, with actual knowledge of the specific hazards presented, took affirmative steps that assisted in the creation of the nuisance.  *See, e.g.*, *Ileto*, 349 F.3d at 1201, 1211 n.26; *City of Modesto*, 119 Cal. App. 4th at 40–41; *In re Firearm Cases*, 126 Cal. App. 4th 959, 988 (2005); *Tesoro*, 334 F. Supp. 3d at 1053.

None of the California cases cited by Distributors (Dkt. 170 at 11) hold otherwise.  In *Firearm*, for example, which Defendants dub the "leading" California case on this issue, the court dismissed nuisance claims against gun manufacturers and distributors on *summary judgment* because the plaintiffs presented no *evidence* of causation or that "any defendant had actual

---

*Footnote continued from previous page*
Defendants" also apply to Walgreens.  FAC at 1-2, ¶ 166.

knowledge that specific retailers were illegally supplying guns to the crime gun market or took any action to aid or encourage such activity." 126 Cal. App. 4th at 985-86, 989, 991-92. This was, of course, a fact-intensive inquiry, and the court was careful to distinguish other public nuisance cases that addressed such claims in the context of a motion to dismiss, noting that those cases were "not based on a party's inability to present evidence supporting the allegations in the complaint." *Id*. at 989.

Likewise, in *City of Modesto*, the court, in applying nuisance principles to a statutory action under the Polanco Act, held simply that a mere failure to warn did not create liability but confirmed that "those who t[ak]e affirmative steps . . . may be liable." 119 Cal. App. 4th at 33, 43. Finally, in *City of San Diego v. U.S. Gypsum Co.*, 30 Cal. App. 4th 575 (1994), the court dismissed San Diego's nuisance action as based solely on the city's theory that asbestos defendants placed a defective product into the stream of commerce. *Id*. at 584-87. For all the reasons explained above, these are not the claims the People have advanced here.

Distributors also cite a number of non-California cases that have rejected nuisance claims involving the distribution of guns or other lawful products. Dkt. 170 at 10-11, n.5.[9] Notably, only one of these cases (*Jennings*) involved controlled substances, and it was decided under Delaware law, which, unlike California, does not provide that the "illegal sale of controlled

---

[9] *See Tioga Pub. Sch. Dist. No. 15 of Williams Cty., State of N.D. v. U.S. Gypsum Co.*, 984 F.2d 915, 920–21 (8th Cir. 1993) (defendant lacked requisite control over nuisance and there was no "case law extending North Dakota's nuisance doctrine to cases involving the sale of goods"); *City of Philadelphia v. Beretta U.S.A., Corp.*, 126 F. Supp. 2d 882, 906-11 (E.D. Pa. 2000) (same but under Pennsylvania law); *State v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428, 453-55 (R.I. 2008) (plaintiff failed to allege requisite control or interference with a public right under Rhode Island law); *In re Lead Paint Litig.*, 924 A.2d 484, 501-05 (N.J. 2007) (New Jersey law; claim based on failure to warn and plaintiff failed to demonstrate requisite control, special injury, and the necessary link between defendant's conduct and the relevant health crisis); *D.C. v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 646-51 (D.C. App. 2005) (D.C. law; dismissed for, *inter alia*, lack of requisite control and causation); *People ex rel. Spitzer v. Sturm, Ruger & Co., Inc.*, 761 N.Y.S.2d 192, 201-02 (N.Y. App. Div. 1st Dept. 2003) (New York law; dismissed for, *inter alia*, remoteness and lack of causation); *Detroit Bd. of Educ. v. Celotex Corp.*, 493 N.W.2d 513, 520-22 (Mich. App. 1992) (Michigan law; claim fell within statutory definition of product liability claim and defendants lacked requisite control); *State ex rel. Jennings v. Purdue Pharma L.P.*, No. N18C-01-223, 2019 WL 446382, at *12–13 (Del. Super. Ct. Feb. 4, 2019) (plaintiff failed to allege requisite control and a public right under Delaware law); *Sills v. Smith & Wesson Corp.*, No. 99C-09-283, 2000 WL 33113806, at *7 (Del. Super. Ct. Dec. 1, 2000) (noting "Delaware has yet to recognize a cause of action for public nuisance based upon products"); Ohio Rev. Code Ann. § 2307.71(A)(13) (Ohio statute defining "product liability claim").

substances" is a nuisance, Cal. Civ. Code § 3479, and requires that a defendant controls the instrumentality of the nuisance, *compare Jennings*, 2019 WL 446382, at *13 (control required under Delaware nuisance law)), *with ConAgra*, 17 Cal. App. 5th at 164 ("Control is not required in California for a public nuisance action[.]").[10] Most other courts that have specifically addressed the issue in the context of *prescription opioids* have refused to dismiss public nuisance claims based on nearly identical allegations as those asserted in the present case. *In re Nat'l Prescription Opiate Litig. (Blackfeet)*, 2019 WL 2477416, at *11-12, *14 (applying Montana law, but looking to California law for interpretative guidance); *California v. Purdue Pharma L.P.,* No. 30-2014-00725287-CU-BT-CXC (Cal. Super. Ct. Orange Cty. Feb. 13, 2018) (California law); *In re Nat'l Prescription Opiate Litig (Muscogee)*, 2019 WL 2468267, at *29-30, *33 (Oklahoma law); *In re Opioid Litigation*, No. 400000/2017, 2018 WL 3115102, at *21-22 (N.Y. Sup. Ct. June 18, 2018) (New York law); *State ex rel. Morrisey v. AmerisourceBergen Drug Corp.*, No. 12-C-141, 2014 WL 12814021, at *3, *9 & n.10 (W. Va. Cir. Ct. Dec. 12, 2014) (West Virginia law).

### b. Defendants' "illegal sale of controlled substances" also subjects them to nuisance liability

The People have also sufficiently pled that Defendants created a nuisance because they engaged in the "illegal sale of controlled substances," which alone is sufficient to subject them to nuisance liability. *See* Cal. Civ. Code § 3479; *see also Beck Dev. Co. v. S. Pac. Transp. Co.*, 44 Cal. App. 4th 1160, 1207 (1996) ("[W]here the law expressly declares something to be a nuisance, then no inquiry beyond its existence need be made . . . ."); *Biber v. O'Brien*, 32 P.2d 425, 427 (Cal. Ct. App. 1934) ("[I]f an act or thing is done or maintained in violation of law it may constitute a nuisance."); Restatement (Second) of Torts § 821B(2) (conduct proscribed by statute or regulation establishes an unreasonable interference). These allegations alone state a cognizable public nuisance claim against all Defendants. Indeed, the MDL transferee court already ruled that all Defendants had obligations as distributors under the CSA to identify and not

---

[10] Even if control of the instrumentality were required under California law, that element would be satisfied here.

ship suspicious orders and that Walgreens also had dispensing obligations under the CSA. *In re Nat'l Prescription Opiate Litig.*, 2019 WL 3917575, at *7-9; *In re Nat'l Prescription Opiate Litig. (Blackfeet)*, 2019 WL 2477416, at *16-18. Defendants fail to address these rulings, much less offer reasons to eschew them.[11]

The CSA is a comprehensive statutory scheme enacted to combat drug abuse. Its purpose was to design a "closed system" for the supply of dangerous drugs and to control against the diversion of those drugs for non-medical use.[12] In order to prevent diversion, the CSA requires anyone who manufactures, distributes, or dispenses controlled substances to register with the DEA, the agency charged with its enforcement. 21 U.S.C. § 822. The DEA is required to grant registration only where doing so is consistent with the public interest. 21 U.S.C. § 823. It is unlawful for any person knowingly to manufacture, distribute, or dispense controlled substances except in accordance with the requirements of the CSA and its implementing regulations. 21 U.S.C. § 841; *see also* 21 U.S.C. § 842. Thus, in exchange for the privilege of trading in these dangerous substances, registrants must comply with statutory and regulatory requirements to protect individuals and communities from the predictable consequences of uncontrolled use of these drugs.

The CSA regulations require that *all* registrants "provide effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R. § 1301.71(a); *see also* 21 U.S.C. § 824. Consequently, both manufacturers and distributors must design and operate systems to identify suspicious orders (defined as orders of unusual size, frequency, or pattern),

---

[11] Defendants instead cite only their own (unsuccessful) arguments in the MDL for the proposition that "there is no obligation under the federal CSA or its implementing regulations to refuse to ship a 'suspicious order.'" Dkt. 169 at 30 n.28 (citing "MDL DE # 2159"). This self-serving citation is unavailing. To complete the record, however, the People similarly reference plaintiffs' MDL briefs regarding distribution duties under the CSA. *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, MDL Dkts. 1887-1, 2545 (N.D. Ohio), attached as Exhibits A and B to the Declaration of Elizabeth J. Cabraser.

[12] The statute and its regulations categorize controlled substances into "schedules" based on the degree of harm they pose to the community. 21 U.S.C. § 812. Schedule I drugs may not be prescribed or used for any purpose. Schedule II drugs are the most tightly controlled substances available by prescription, with Schedule III drugs the next most controlled. Nearly all prescription opioids, including oxycodone, hydrocodone, and hydromorphone, are currently categorized as Schedule II drugs; the remainder have generally been categorized as Schedule III. *See, e.g.*, FAC ¶¶ 23, 85.

report suspicious orders to the DEA, and to halt shipment of suspicious orders unless and until it

can be determined that such orders are unlikely to be diverted.  *See* 21 C.F.R. § 1301.74; *see also*

*In re Nat'l Prescription Opiate Litig.*, 2019 WL 3917575, at *7 (citing *Masters Pharm., Inc. v.*

*DEA ("Masters II")*, 861 F.3d 206, 212 (D.C. Cir. 2017)).  Indeed, in the MDL, Judge Polster

noted that he was "hard-pressed to think of a more basic requirement" than the requirement to

halt shipment of suspicious orders pending due diligence:

> How can a registrant freely ship suspicious orders and still comply
> with its duty to maintain controls against diversion?  It cannot.  It
> has a duty not to ship the order unless due diligence reasonably
> dispels the suspicion.

*In re Nat'l Prescription Opiate Litig.*, 2019 WL 3917575, at *7.[13]

Significantly, the failure to comply with the requirements of the CSA is not merely a

regulatory violation.  Under the CSA, it is a *crime* for any person knowingly to distribute or

dispense controlled substances other than in accordance with the requirements of the statutory

scheme, *see* 21 U.S.C. § 841, and distribution or dispensing by a registrant other than in

accordance with the law may subject the registrant to substantial civil penalties without regard to

knowledge or intent, *see* 21 U.S.C. § 842.

The People allege that all Defendants violated the CSA.  They did this by (i) either failing

to implement any Suspicious Order Monitoring ("SOM") system at all, designing and

implementing SOM systems that would not identify all or even most suspicious orders and/or

prescriptions despite the wealth of data available to them, or failing to adequately implement the

systems they created; (ii) shipping and dispensing suspicious orders without first conducting

sufficient due diligence to resolve such suspicions; and/or (iii) deliberately choosing not to report

suspicious orders and misleading regulators regarding the existence of suspicious.  *See, e.g.*,

FAC ¶¶ 12, 33-34, 36-37, 49, 171, 555, 564-66, 572-78, 580, 596, 608, 625, 627-30, 642, 644,

647, 654, 657-58, 664-65, 667, 669, 680, 714-16, 721, 730-31, 748-55, 800-04, 807, 814-15, 825,

869-70, 876, 880, 898.  Because the FAC adequately alleges that Defendants' sale, distribution,

---

[13] California law imposes similar obligations.  *See* Cal. Health & Safety Code § 11153.5; Cal.
Bus. & Prof. Code §§ 4164(a), 4169.1, 4301(d)-(e).

and dispensing of controlled substances was illegal under the CSA—and, separately,

unreasonably interfered with a public right—the People have alleged a claim for nuisance under

§ 3479.[14]

### 3. Walgreens' dispensing practices provide an additional basis for nuisance liability.

Uniquely among the Defendants, until 2014, Walgreens supplied prescription opioids to

the market in San Francisco in two different capacities: as a dispenser, selling opioids to

customers through its retail pharmacies, and as a wholesale distributor, acting as a middleman

between opioid manufacturers and Walgreens pharmacies.[15] FAC ¶¶ 552-78. In mid-2014,

Walgreens ceased its wholesale distribution, but continues to be the largest retail pharmacy in San

Francisco, now obtaining prescription opioids through the other Defendant Distributors to stock

the 57 retail stores it operates in the San Francisco. *Id.*

Walgreens' conduct as a distributor is addressed above. Its conduct as a dispenser also

subjects it to liability for public nuisance.[16] As alleged, Walgreens failed to adequately use its

own data, identify red flags, and investigate and halt dispensing as needed to curb the oversupply

of opioids and the fueling of an illicit market. FAC ¶¶ 562-78. This conduct was injurious to

health and unreasonably interfered with a right common to the general public.

Walgreens fails to address this basis for dispensing liability but seeks dismissal based

merely on its argument that there is no CSA violation. First, Walgreens argues that, as a retail

dispenser, it has no duties under the CSA to prevent opioid diversion because only individual

pharmacists have dispensing duties. Second, Walgreens argues that it cannot be liable for any

violation of the CSA by its pharmacists because, it contends, the People have failed adequately to

plead an appropriate level of *scienter*. While a CSA violation is not required to establish public

---

[14] That Defendants may be registrants under the CSA does not insulate them from liability for illegal drug trafficking. *See United States v. Moore*, 423 U.S. 122, 134 (1975) (rejecting argument that "registrants" cannot be prosecuted under § 841).

[15] Walgreens has, at relevant times, been registered as both distributors and dispensers under the CSA, with separate registrations for each of these activities.

[16] Walgreens also seeks dismissal on the grounds that the People purportedly lack standing and that have failed to plead sufficient "affirmative conduct." Those arguments are addressed above in §§ I.A.2.a, I.A.5.c.

nuisance, both of these arguments are wrong.

The People have adequately pled that Walgreens' liability arises from its *own* actions, which violated its *own* obligations as a pharmacy dispenser of opioids under the CSA, and the People are not required to identify particular violations of individual pharmacists to state a claim for relief. Accordingly, Judge Polster has repeatedly upheld dispensing claims against pharmacy chain defendants based on nearly identical allegations. *In re Nat'l Prescription Opiate Litig. (Broward)*, 2020 WL 1986589, at *6 (claims "against the Pharmacies as retail dispensers of opioid drugs" survived motion to dismiss); *In re Nat'l Prescription Opiate Litig. (Blackfeet),* 2019 WL 2477416, at *18 (same); *Cf. Cty. of Del., Pa. v. Purdue Pharma, L.P.*, No. CV-2017-8095 (C.P. Del. Cty., Pa. Mar. 13, 2020) (upholding claims based on allegations that "the Pharmacy Defendants owed Plaintiffs[] duties as both distributors and retailers based on statutory and common law") (attached as Exhibit C to the Cabraser Decl.). This Court should do the same.

>           a.      **Under the CSA, Walgreens is required to provide effective controls against diversion and to ensure that it dispenses only legitimate prescriptions.**

Walgreens argues that the CSA imposes dispensing duties only on pharmacists, and not on "pharmacies or pharmacy corporations." Dkt. 168 at 8-11. Walgreens is wrong. The CSA imposes two separate requirements on Walgreens in this context: (1) the duty, applicable to all registrants, to provide effective controls against diversion (21 C.F.R. § 1301.71(a)), and (2) the duty, applicable to pharmacists, pharmacies, and the owners that operate them, not to dispense illegitimate prescriptions (21 C.F.R. § 1306.04). Walgreens' argument is not only legally unsupported, but would also lead to the absurdity of Walgreens registering with the DEA for the privilege of dispensing opioids but without being required to maintain the closed system of supply the CSA was designed to ensure.

With respect to the first requirement, 21 C.F.R. § 1301.71(a) obligates registrants to provide effective controls against diversion. Just as distributors may not ship suspicious wholesale orders without performing due diligence, so too, dispensers may not fill suspicious prescription orders without investigating and clearing red flags. Practically speaking, no "controls and procedures to guard against . . . diversion," 21 C.F.R. § 1301.71(a), can be effective

if registrants are free to dispense prescriptions that are likely to be diverted.  *See Nat'l Prescription Opiate Litig.*, 2019 WL 3917575, at \*7; *Masters Pharm., Inc.* ("*Masters I*"), 80 Fed. Reg. 55418-01, 55477, 2015 WL 5320504 (D.E.A. Sept. 15, 2015).  Thus, Walgreens was required, not only as a distributor, *but also as a dispenser*, to provide effective controls against diversion and not to fill suspicious prescriptions without due diligence.

Walgreens all but ignores its obligations under § 1301.71, arguing in a footnote that, in the context of dispensing, "this regulation only imposes requirements for in-store physical security controls . . . ."  Dkt. 168 at 9 n.7.  But § 1301.71 contains no such limitation.  The first sentence of the regulation is unequivocal:  "*All* applicants and *registrants shall provide effective controls and procedures to guard against* theft and *diversion* of controlled substances."  21 C.F.R. § 1301.71(a); *see also Holiday CVS, L.L.C. v. Holder*, 839 F. Supp. 2d 145, 151 (D.D.C.), *vacated and remanded on other grounds*, 493 F. App'x 108 (D.C. Cir. 2012) ("[R]egistered pharmacies must 'provide effective controls and procedures to guard against theft and diversion of controlled substances.'").[17]  Walgreens' argument that the requirement to provide effective controls against diversion does not apply in the dispensing context is untenable.

Walgreens cites *ChipRx L.L.C d/b/a City Center Pharmacy*, 82 Fed Reg. 51,433, 51434, 2017 WL 506930 (D.E.A. Nov. 6, 2017), but that decision does not support the limitation on § 1301.71(a) that Walgreens seeks to impose.  In *ChipRx*, the DEA *upheld* the immediate suspension of a pharmacy's registration on multiple grounds.  Significantly, the Acting Administrator specifically cited § 824(d) and the "Registrant's *failure 'to maintain effective controls against diversion* or otherwise comply with the obligations of a registrant under' the CSA" in affirming the immediate suspension.  82 Fed. Reg. at 51437.  To be sure, much of the decision focuses on failures relating to theft and record-keeping, but that in no way suggests that a pharmacy's *only* obligations relate to in-store physical security, as Walgreens asserts.[18]

---

[17] For this reason, the fact that the obligations set forth in 21 C.F.R. § 1301.74 may apply only to manufacturers and distributors, as Defendants contend, *see* Dkt. 168 at 9, n.7, in no way supports the argument that the requirement to maintain effective controls against diversion set forth in § 1301.71 is similarly limited.

[18] Equally unpersuasive is Walgreens' argument that it need not maintain effective controls because doing so is not expressly listed among the factors the DEA considers before registering

*Footnote continued on next page*

Walgreens is a registrant with respect to dispensing. It has the obligation to provide effective controls against diversion. It has a wealth of information to allow it to detect diversion at the dispensing level, *see* FAC ¶¶ 554, 555, 556, 563, 571, it sets policies for its stores with respect to dispensing, *see id.* ¶¶ 565, 566, 574, 576, and it has failed to use its data and the policies it sets to provide controls against diversion. On the contrary, it has withheld relevant information about diversion from its stores and insisted that its pharmacists fill prescriptions in the face of indicia of diversion. *Id.* ¶¶ 567, 568, 574, 575, 577. No more is required to allege that Walgreens violated § 1301.71.

Separate and apart from its duties under § 1301.71, Walgreens must also ensure that the opioids it sells are dispensed only pursuant to legitimate prescriptions. 21 U.S.C. § 822; 21 C.F.R. §§ 1306.03, 1306.04. A prescription is legally valid only if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his [or her] professional practice."[19] 21 C.F.R. § 1306.04(a). This requires dispensers not to fill prescriptions until "red flags" indicative of diversion have been resolved. *See, e.g.*, *Medicine Shoppe-Jonesborough v. Drug Enf't Admin.*, 300 F. App'x 409 (6th Cir. 2008); *Medic-Aid Pharmacy*, 55 Fed. Reg. 30,043, 30,044, 1990 WL 328750 (D.E.A. July 24, 1990) ("[A] pharmacist is obligated to refuse to fill a prescription if he knows or has reason to know that the prescription was not written for a legitimate medical purpose."); *E. Main St. Pharmacy*, 75 Fed. Reg. 66149-01, 66164, 2010 WL 4218766 (D.E.A. Oct. 27, 2010) ("[W]hen prescriptions are clearly not issued for legitimate medical purposes, a pharmacist may not intentionally close his eyes and thereby avoid [actual] knowledge of the real purpose of the prescriptions.").[20]

_____

*Footnote continued from previous page*

pharmacies under 21 U.S.C. § 823(e). *See* Dkt. 168 at 9. Judge Polster rejected this argument, finding the CSA imposes duties through the DEA's implementing regulations and that § 1301.71 carries the full force and effect of law. *In re Nat'l Prescription Opiate Litig.*, 2019 WL 3917575, at *7-8. Indeed, the clarification, in 2016, that the DEA may immediately suspend *any* registration for failure to maintain effective controls against diversion, *see* 21 U.S.C. § 824(d), shows that Congress has ratified this pre-existing regulatory requirement.

[19] The legitimacy or validity of a prescription is distinct from the question of its medical necessity. *See Jones Total Health Care Pharmacy LLC & SND Health Care LLC v. Drug Enf't Admin.*, 881 F.3d 823, 832 (11th Cir. 2018) ("*Jones Total Health Care Pharmacy*"); *see also United States v. Hayes*, 595 F.2d 258, 261 n.6 (5th Cir. 1979).

[20] *See also Ralph J. Bertolino Pharmacy, Inc.*, 55 Fed. Reg. 4729, 4730, 1990 WL 352775

*Footnote continued on next page*

Walgreens contends that this requirement applies only to the individual pharmacists who work at its stores, and not to the pharmacies or to Walgreens itself, which dictates the dispensing policies and procedures followed by those pharmacists. Courts and the DEA have repeatedly rejected this argument. "[W]hen § 1306.04(a) states that the *person* knowingly filling the prescription is subject to penalties, it contemplates liability for corporate entities as well." *United States v. Appalachian Reg'l Healthcare, Inc.*, 246 F. Supp. 3d 1184, 1189 (E.D. Ky. 2017). Indeed, as the *Appalachian* court found, there is "nothing inconsistent about articulating the responsibilities of individual practitioners and pharmacists while simultaneously indicating that other entities may be subject to penalties for their role in issuing and filling invalid prescriptions." *Id.* at 1189-90; *see also Jones Total Health Care Pharmacy v. Drug Enf't Admin.*, 881 F.3d 823 (11th Cir. 2018); *United States v. Green Drugs*, 905 F.2d 694, 694-95 (3rd Cir. 1990) (affirming pharmacy liability for illegal dispensing); *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122-23 (5th Cir. 1991) (affirming liability for corporate operator of clinic that illegally distributed controlled substances); *United States v. Grab Bag Distrib.*, 189 F. Supp. 2d 1072, 1082 (E.D. Cal. 2002)).[21]

---

*Footnote continued from previous page*
(D.E.A. Feb. 9, 1990); *Townwood Pharmacy,* 63 Fed. Reg. 8477, 1998 WL 64863 (D.E.A. Feb. 19, 1998); *Grider Drug 1 & Grider Drug 2*, 77 Fed. Reg. 44070-01, 2012 WL 3027634 (D.E.A. July 26, 2012); *The Medicine Dropper*, 76 Fed. Reg. 20039, 2011 WL 1343276 (D.E.A. Apr. 11, 2011); *Medicine Shoppe-Jonesborough*, 73 Fed. Reg. 364-01, 2008 WL 34619 (D.E.A. Jan. 2, 2008); *Superior Pharmacy*, 81 Fed. Reg. 31310-01, 2016 WL 2866659 (D.E.A. May 18, 2016).

[21] *See also United States v. Cap Quality Care, Inc*., 486 F. Supp. 2d 47, 54 (D. Maine 2007); *United States v. Little*, 59 F. Supp. 2d 177, 186-8 (D. Mass. 1999); *United States v. Robinson*, No. 12-20319-CIV, 2012 WL 3984786 (S.D. Fla. Sept. 11, 2012); *United States v. Ahmad*, No. 4:15CV-181-JM, 2016 WL 11645908, at *3 (E.D. Ark. May 2, 2016), *aff'd sub nom. United States v. United Pain Care, Ltd.*, 747 F. App'x 439 (8th Cir. 2019); *United States v. Stidham*, 938 F. Supp. 808, 814 (S.D. Ala. 1996); *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 & 5195*, 77 Fed. Reg. 62316-01, 2012 WL 4832770 (D.E.A. Oct. 12, 2012). Because courts and the DEA have repeatedly found that the CSA imposes dispensing duties on pharmacies and their owners and operators, Walgreens' liability in this case is not in any sense vicarious. Rather than holding Walgreens liable for the violations of its subsidiaries or employees, the People seek to hold Walgreens liable for *its own* violations of *its own duties* under the CSA. For this reason, Walgreens' cases regarding vicarious liability, *see* Dkt. 168 at 13, are inapplicable. A recent decision granting summary judgment on dispensing claims in the New York State opioid litigation improperly relied on a vicarious liability theory the plaintiffs never invoked. *In re Opioid Litigation*, No. 400000/2017, NYSCEF Dkt. 5639 at 5 (N.Y. Sup. Ct. Apr. 9, 2020). The New York plaintiffs moved for reconsideration on May 8, 2020, and their motion is attached as Exhibit D to the Cabraser Declaration.

Walgreens' argument is not only contrary to law,[22] but illogical as well. In suggesting that it has no responsibilities under the CSA, Walgreens asks this Court to find that the "closed system" carefully crafted by Congress is not closed at all, and that a multi-billion dollar business that reaps massive profits by dispensing the majority of opioids in San Francisco bears no responsibility for its dispensing activity. This Court should reject such a radical view of the law. *See Gonzales v. Raich*, 545 U.S. 1, 12–13 (2005) ("The main objectives of the CSA were to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances."). As the Supreme Court has explained, when enacting the CSA, "Congress was particularly concerned with the diversion of drugs from legitimate channels to illegitimate channels." *United States v. Moore*, 423 U.S. 122, 135 (1975). This is especially true here because, as alleged in the FAC, it is Walgreens, not any individual pharmacist, that has the data needed to detect patterns of diversion, and it is Walgreens that sets the policies that determine how prescriptions are dispensed. *See, e.g.*, FAC ¶¶ 555-56, 565-68. It makes no sense to say that Walgreens, which is registered with the DEA as a dispenser, would have no obligations with respect to dispensing at its stores when it is Walgreens that runs the stores, sets the policies, and has the ability to ensure compliance.[23]

---

[22] The cases Walgreens cite do not support its argument. *See* Dkt. 168 at 10 (citing *Bob's Pharmacy & Diabetic Supplies*, 74 Fed.Reg. 19599-03, 19601, 2009 WL 1137632 (D.E.A. Apr. 29, 2009); *Edge Pharmacy*, 81 Fed. Reg. 72092-03, 72111, 2016 WL 6083185 (D.E.A. Oct. 19, 2016); *Medicine Shoppe-Jonesburg*, 73 Fed.Reg. at 381, 2008 WL 34619). While these cases focus on the acts of particular pharmacists, none conclude that pharmacies have no independent duties under the CSA or that their owners cannot be liable for the dispensing activities in their retail stores. In fact, the respondents in each of these cases were retail pharmacies whose registrations were revoked.

[23] Walgreens argues that imposing the CSA's requirements on the corporate parent would conflict with California law governing the exercise of the pharmacists' professional judgment. Dkt. 168 at 9-11. On the contrary, it is Walgreens that is alleged to have interfered with the pharmacists' professional judgment because it withheld available information relevant to the dispensing decision. The fact that a corporate parent would be required (1) to implement effective policies and procedures to guard against diversion, (2) to properly train its pharmacists to utilize available information to identify red flags and exercise due diligence to resolve them, and (3) to provide available information and enable rather than impede its pharmacists in the proper exercise of their professional judgment, in no way interferes with Cal. Bus. & Prof. Code § 733.

**b.      The People need not allege that Walgreens or its pharmacists knew particular prescriptions would be diverted.**

Walgreens finally argues the People have failed to plead a specific instance in which any pharmacist knowingly filled an illegitimate prescription.  Dkt. 168 at 11-13.  No such pleading is necessary.

To reiterate, the People's nuisance claim does *not* depend solely on violations of the CSA; Walgreens is liable for its conduct in creating a nuisance whether or not it illegally sold controlled substances.  Regardless, the People need not plead knowledge by individual pharmacists to plead that Walgreens' opioid sales were illegal under the CSA (and therefore that its conduct was "injurious to health" and "interfere[d] with the comfortable enjoyment of life or property").  Section 1301.71, which requires Walgreens to provide effective controls against diversion, contains no *scienter* requirement at all.  On the contrary, registrants—including Walgreens—are required, as a condition of their registration, to maintain effective controls.  As discussed above, the failure to do so, in itself, constitutes a violation.  The People allege that Walgreens systematically failed to provide such controls and failed to use its data to identify, investigate, and halt prescriptions with a high likelihood of diversion.  FAC ¶¶ 555-56, 563-78.  This conduct "is proscribed by statute" and constitutes an "illegal sale of controlled substances," thereby establishing a public nuisance.  Cal. Civ. Code § 3479; Restatement (Second) of Torts § 821B.

Section 1306.04, in contrast, does require that illegitimate prescriptions be "knowingly" filled.  But, because § 1306.04 imposes duties on Walgreens—as discussed above—it is *Walgreens'* knowledge that is relevant here, and the People have sufficiently pled that knowledge.  Specifically, the People allege that Walgreens is and was in possession of extensive data about the opioid prescriptions it filled at its stores.  From that data, Walgreens could have detected patterns that were suspicious and suggestive of improper prescribing and/or diversion.  *Id.* ¶¶ 563-78.  Rather than using this wealth of information to detect and prevent diversion, however, Walgreens used it to evaluate productivity and increase sales.  *Id.* ¶ 556.

Not only did Walgreens fail to make use of the data in its possession and to ensure that its pharmacies and pharmacists had access to information about "red-flag" prescribers and

prescriptions, Walgreens also put in place dispensing and compensation policies that actually *discouraged* its pharmacists from performing due diligence on suspicious prescriptions. In 2010, for example, Walgreens used oxycodone dispensing metrics to target the managers of retail pharmacies with comparatively low dispensing figures and then instructed those managers not to "turn away" customers. Similarly, in 2011, Walgreens implemented a sales initiative instructing pharmacists specifically to *increase* their Schedule II controlled substances business. FAC ¶ 575.

Walgreens' failure to comply with its legal obligations with respect to prescription opioids is well established: the DEA has penalized Walgreens on multiple occasions and over multiple years, *id.* ¶¶ 576, 577, demonstrating Walgreens was fully aware of both its obligations and its failures, which continued nevertheless. Even through today, Walgreens still has not implemented adequate safeguards to ensure that its retail pharmacies in San Francisco are not a conduit for diversion of opioids. *Id.* ¶ 578.

Moreover, because Walgreens has dispensing data from all of its stores, its knowledge is aggregate in nature. Thus, the People's claim does not turn on improper dispensing of individual prescriptions, but rather Walgreens' failure to identify aggregate *groups and patterns* of dispensing indicative of diversion. *See id.* ¶¶ 893-94. By failing to put adequate policies and procedures in place to determine which prescriptions carried indicia of diversion and then failing to prevent the filling of such prescriptions until the suspicions could be resolved, Walgreens itself runs afoul of the CSA. Walgreens' own knowledge is sufficient to establish its violation of the § 1306.04 standards.

Finally, Walgreens is wrong that the People have not alleged the necessary level of scienter to plead a violation of § 1306.04. Walgreens acknowledges that "willful blindness" is sufficient to establish that illegitimate prescriptions were "knowingly" filled, but mischaracterizes that standard. Dkt. 168 at 11. "Willful blindness" requires only that the defendant (1) subjectively believes that there is a "high probability that a fact exists" and (2) takes "deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). A defendant may be willfully blind when it fails to investigate "under circumstances where a reasonable person would make further inquiries." *United States v.*

*Salman*, 618 Fed. App'x. 886, 890 (9th Cir. 2015) (citing *United States v. Ramos-Atondo*, 732 F.3d 1113, 1119 (9th Cir. 2013); *United States v. Yi*, 704 F.3d 800, 804-05 (9th Cir. 2013)). Willful blindness is also inferred where the defendant has been notified of its violations but continues unlawful activities. *See Moroccanoil, Inc. v. Groupon, Inc.*, 278 F. Supp. 3d 1157, 1164-65 (C.D. Cal. 2017); *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 583 (E.D. Pa. 2002).

More specifically, in the context of the CSA, pharmacists and pharmacies have been deemed willfully blind and, therefore, liable, when—as Walgreens did here—they ignore high volumes of red-flag orders or other dispensing irregularities plainly present in their data. *See, e.g.*, *Medic-Aid Pharmacy*, 55 Fed. Reg. 30043-01, 30043-44 1990 WL 328750 (July 24, 1990); *Ralph J. Bertolino*, 55 Fed. Reg. 4729-01 1990 WL 352775; *Jones Total Health Care Pharm., LLC*, 881 F.3d 823, 832; *E. Main St. Pharmacy,* 75 Fed. Reg. 66149-01, 2010 WL 4218766 (D.E.A. Oct. 27, 2010).

*Superior Pharmacy*, 81 Fed. Reg. 31310-01, 2016 WL 2866659 (D.E.A. May 18, 2016), on which Walgreens relies, is not to the contrary. There, the Acting Administrator found that merely filling isolated "red flag" prescriptions might not be sufficient to establish willful blindness, but, critically, he also held that "where there are multiple red flags, none of which alone would establish the requisite scienter, the combination of red flags may well create a subjective belief that there is a high probability that a prescription lacks a legitimate medical purpose." *Id*. at 31, 355. He also recognized that failure to identify red flags and conduct due diligence were appropriate bases for revocation. *Id.*

The People have unquestionably alleged facts sufficient to show that Walgreens failed to implement policies and procedures to avoid diversion as required by §1301.71 and, in so doing, interfered with a public right. Nothing more is needed. However, the People have also sufficiently alleged Walgreens itself violated §1306.04 in that it was willfully blind to the sale of opioids from its stores for other than legitimate medical purposes as required by the CSA. The People allege that Walgreens' data showed indicia of diversion at Walgreens stores; that it used this data to increase its profitability, but failed to use the data to investigate or resolve any of the

red-flags; and that it actively discouraged its pharmacists from investigating. *See* FAC ¶¶ 555-56, 563-78. The People also allege that Walgreens was aware that the quantity of opioids it was dispensing was unreasonable, *see id.* ¶¶ 555-71, and that its own compliance officer advised the company not to document its noncompliance with the law, *id.* ¶ 576 (citing Walgreens' 2013 Settlement with the DEA, including the exhibits thereto). Walgreens continued to dispense significantly more opioids than it knew could be necessary for legitimate uses, continued to ignore the extensive data in its possession demonstrating patterns of diversion, and maintained policies that encouraged its pharmacists to ignore their dispensing duties, despite repeated warnings and sanctions by regulators. *Id.* ¶¶ 33-34, 45, 47, 49(e)-(g), 552-78, 897. The People's allegations about Walgreens' failure to act on the data it had in the face of a growing opioid crisis in San Francisco and across the country more than meets the pleading standard to establish violations of the CSA.

### 4. Defendants' misconduct is not authorized by statute.

In a footnote, Defendants claim that the People's public nuisance claim also fails under California Civil Code § 3482 "to the extent it seeks to hold Defendants liable for engaging in lawful activity, including marketing and distributing opioid products approved for long-term treatment of chronic pain as safe and effective for that indication." Dkt. 169 at 23 n.21. This argument has been waived. *Est. of Saunders v. C.I.R.*, 745 F.3d 953, 962 n.8 (9th Cir. 2014) ("Arguments raised only in footnotes, or only on reply, are generally deemed waived."). In any event, the People's public nuisance claims are not barred by § 3482. The California Supreme Court has circumscribed the exculpatory effect of § 3482, requiring that the relevant acts be "authorized by the express terms of the statute" or "by the plainest and most necessary implication under which the justification is made." *Varjabedian v. City of Madera*, 20 Cal. 3d 285, 291 (1977). *See also ConAgra*, 17 Cal. App. 5th at 114.

Here, Defendants fail to identify *any* statute that expressly authorizes them to (i) falsely and deceptively promote their opioids or (ii) distribute or dispense controlled substances without implementing effective controls against diversion. Nor could they, as the conduct at issue is expressly *prohibited* under both federal and California law. *See, e.g.*, 21 U.S.C. § 823(a)(1),

1   (b)(1); 21 U.S.C. § 841(a)(a); 21 C.F.R. § 1301.71(a); 21 C.F.R. § 1301.74(b); 21 C.F.R.

2   § 1306.04(a); Cal. Health & Safety Code § 11153.5; Cal. Bus. & Prof. Code § 4164(a); Cal. Bus.

3   & Prof. Code § 4169.1; Cal. Bus. & Prof. Code § 4301(d)-(e); Cal. Bus. & Prof. Code §§ 17200,

4   17500.[24]  To the extent Defendants rely on general statutory authority to manufacture, distribute,

5   dispense, or market opioids, such authority is not sufficient.  *Cf. Varjabedian*, 20 Cal. 3d at 292

6   (rejecting "theory that the general authorization of municipal construction of sewage plans

7   'expressly' sanctions the production of any particular level of odors within the meaning of section

8   3482"); *ConAgra*, 17 Cal. App. 5th at 114; *Citizens for Odor Nuisance Abatement v. City of San*

9   *Diego*, 8 Cal. App. 5th 350 at 359 n.8 (2017).

10              **5.      The People properly plead causation.**

11                     **a.      The People properly plead factual causation.**

12          Under California law, the factual causation element in nuisance claims "is satisfied if the

13  conduct of a defendant is a substantial factor in bringing about the result."  *ConAgra*, 17 Cal.

14  App. 5th at 101.  "The substantial factor standard is a relatively broad one, requiring only that the

15  contribution of the individual cause be more than negligible or theoretical."  *Rutherford v.*

16  *Owens-Ill., Inc*., 16 Cal. 4th 953, 954, 969 (1997).  "It is neither possible nor desirable to reduce

17  [the substantial factor test] to any lower terms."  Prosser and Keeton on Torts, § 41 at 267 (5th ed.

18  1984).  Thus, even "a very minor force that does cause harm is a substantial factor."  *Bockrath v.*

19  *Aldrich Chem. Co*., 21 Cal. 4th 71, 72 (1999); *see also Rutherford*, 16 Cal. 4th at 969 ("Undue

20  emphasis should not be placed on the term 'substantial.'").

21          The FAC easily clears this hurdle.  The People allege that Manufacturing Defendants

22  conducted massive, decades-long marketing schemes to persuade doctors and patients that

23  opioids can and should be used to treat chronic pain long-term by "untruthfully[] assert[ing] that

24  _____

[24] *See also In re Nat'l Prescription Opiate Litig.*, 1:17-MD-2804, 2019 WL 3917575, at *3-9
25  (N.D. Ohio Aug. 19, 2019); *Nat'l Prescription Opiate Litig. (Blackfeet)*, 2019 WL 2477416, at
    *14 (noting, in case involving same conduct, that "[t]he conclusion that DEA registrants are not
26  statutorily authorized to undertake that alleged conduct is beyond dispute"); *In re Nat'l*
    *Prescription Opiate Litig.*, 2018 WL 6628898, at *9  ("With the privilege of lawfully
27  manufacturing and distributing Schedule II narcotics—and thus enjoying the profits therefrom—
    comes the obligation to monitor, report, and prevent downstream diversion of those drugs.");
28  *Morrisey*, 2014 WL 12814021, at *13 (same).

the risk of addiction was low when opioids were used to treat chronic pain, and overstat[ing] the benefits and trivializ[ing] the risks of the long-term use of opioids." FAC ¶¶ 7-8; *see also id* ¶ 10. The People also adequately allege how this conduct "changed prescribers' willingness to prescribe opioids, led them to prescribe more of their opioids, and persuaded them not to stop prescribing opioids." *Id.* ¶¶ 541-44. In fact, "[t]he Marketing Defendants' deceptive marketing caused prescribing not only of their opioids, but of opioids as a class, to skyrocket." *Id.* ¶ 550; *see also id.* ¶¶ 23-31, 547-49, 551. Such conduct was intended to, and in fact did, lead to "diversion and abuse of these drugs and associated adverse outcomes." *Id.* ¶ 546.

The People also allege that the crisis in San Francisco was fueled and sustained by the Defendants, who "failed to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, and halt distribution and dispensing of suspicious orders, thereby contributing to the oversupply of such drugs and fueling an illegal secondary market." *Id.* ¶ 7; *see also id.* ¶ 12. Such "failure[s] to follow the law fueled the flood of pills into and significantly contributed to rising addiction and overdose rates in San Francisco." *Id.* ¶ 33. Moreover, "Defendants' wrongful conduct has also proximately caused devastating ripple effects, in the form of increased heroin, fentanyl, and methamphetamine use, morbidity, and mortality." *Id.* ¶ 59. There is no doubt that Defendants' conduct has "created an ongoing, significant, unlawful, and unreasonable interference with the public health, welfare, safety, peace, comfort, and convenience of the San Francisco community." *Id.* ¶ 899.

These and other allegations in the FAC adequately plead factual causation. Indeed, the magnitude and duration of Defendants' deceptive schemes coupled with their temporal association with the opioid epidemic are themselves sufficient to establish causation. *See State ex rel. Wilson v. Sup. Ct.*, 227 Cal. App. 4th 579, 605-608 (2014). Thus, virtually every court in the opioid litigation context, including California courts, has found similar allegations of factual causation (sometimes far less detailed) sufficient to survive motions to dismiss and summary judgment.[25]

---

[25] *See, e.g.*, *California v. Purdue Pharma L.P.,* No. 30-2014-00725287-CU-BT-CXC (Cal. Super. Ct. Orange Cty. Feb. 13, 2018) (denying demurrer brought, in part, on causation grounds); *In re Nat'l Prescription Opiate Litig.*, 406 F. Supp. 3d 672, 676 (N.D. Ohio 2019) ("[F]actfinders

*Footnote continued on next page*

## b.    The People properly plead legal causation.

Under California law, "there is no bright line demarcating a legally sufficient proximate cause from one that is too remote.  Ordinarily the question will be for the jury, though in some instances undisputed evidence may reveal a cause so remote that a court may properly decide that no rational trier of fact could find the needed nexus." *People v. Roberts*, 2 Cal. 4th 271, 320 n.11, 826 P. 3d 274, 300 (1992); *see also ConAgra*, 17 Cal. App. 5th at 104 (quoting *Roberts*, addressing public nuisance claims).  This is not such a case.  *In re Nat'l Prescription Opiate Litig. (Blackfeet)*, 2019 WL 2477416, at *16 ("[I]ntervening acts and foreseeability raise factual issues not appropriately resolved on a motion to dismiss.")

In assessing whether a defendant's conduct is a legal cause of a plaintiff's harm, California courts place great emphasis on foreseeability.  *See, e.g.*, *Hoyem v. Manhattan Beach City Sch. Dist.*, 22 Cal. 3d 508, 521, 585 P.2d 851, 858 (1978) ("[W]here an injury was brought about by a later cause of independent origin[,] the question of proximate cause revolves around a determination of whether the later cause of independent origin, commonly referred to as an intervening cause, was foreseeable by the defendant or, if not foreseeable, whether it caused injury of a type which was foreseeable."); *see also Pacific Shores Properties, LLC v. City of Newport Beach,* 730 F.3d 1142, 1168 (9th Cir. 2013) ("'[O]nce a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, he has done enough to withstand summary judgment on the ground of absence of

---

*Footnote continued from previous page*
could reasonably infer that Manufacturers' fraudulent marketing and failures to maintain anti-diversion controls were substantial factors in producing the alleged harm suffered by Plaintiffs."); *State v Purdue Pharma L.P.*, 2019 WL 2331282, at *5 (Tenn. Cir. Ct. Feb. 22, 2019) (applying substantial factor test and finding same); *State v Purdue Pharma L.P.*, 2018 WL 4468439, at *4 (Alaska Super. Ct. July 12, 2018) (same); *State v Purdue Pharma Inc.*, 2018 WL 4566129, at *4 (N.H. Super. Ct. Sep. 18, 2018) (finding the State had sufficiently pled causation on its public nuisance claims); *State v Purdue Pharma L.P.*, 2019 WL 1590064, at *5 (Ark. Cir. Apr. 05, 2019) (same); *In re Opioid Litig.*, 2018 WL 3115102, at *22 (N.Y. Sup. Ct. June 18, 2018) (same); *State v Purdue Pharma L.P.*, 2019 WL 3991963, at *11 (R.I. Super. Ct. Aug. 16, 2019) (The Court is satisfied that the State has properly alleged that . . . Defendants' conduct caused the public nuisance."); *Commonwealth v. Purdue Pharma, L.P.*, 2019 WL 5495866, at *5 (Mass. Super. Ct. Sept. 17, 2019) ("Purdue contends that this case raises several causation issues. Many of these arguments are fact-based, which this Court sees no need to discuss, given the standard applicable to a Rule 12(b)(6) motion."); *State v Purdue Pharma LP*, 2019 WL 4019929, at *14 (Okla. Dist. Ct. Aug. 26, 2019) ("I further find that the State has satisfied its burden of proof and that the Defendants' actions were the cause -in-fact of its injuries.").

causation.'") (quoting *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 758 (7th Cir. 2011)).

Here, the People's allegations readily satisfy this reasonable foreseeability requirement. The People allege that the Marketing Defendants were legally required to assure accuracy of their drugs' marketing and promotion, and that all Defendants were legally required to implement policies designed to prevent the prescription opioids they shipped and/or dispensed from being diverted. *See* FAC ¶¶ 224 (marketing, distribution, dispensing duties); ¶¶ 538-44 (Marketing Defendants' expectations); ¶¶ 549, 558, 579-96 (all Defendants' duties and expectations re distribution and/or dispensing conduct). These duties exist precisely because the risks of opioid misuse are foreseeable. The People also seek to redress public health and community harms—such as increased addiction, abuse, and overdose deaths—that are exactly the types of harms reasonably expected to result from systematic breaches of these duties for marketing, distributing, and dispensing highly addictive opioid drugs. *See id.* ¶¶ 686-96.

These are the same allegations raised in CT1, where the MDL transferee court denied summary judgment on proximate causation. *See In re Nat'l Prescription Opiate Litig.*, 2019 WL 4178617, at *2 ("[A] factfinder could easily conclude the Manufacturers' misleading marketing activities resulted in a substantial increase in the supply of prescription opioids."); *id.* at *3 ("[G]iven the massive increases in the supply of prescription opioids into the *Track One* Counties, combined with evidence that suggests there was a complete failure by Defendants to maintain effective controls against diversion, a factfinder could reasonably infer that these failures were a substantial factor in producing the alleged harm."); *id.* at *4 ("Because Plaintiffs have presented evidence that shows they have suffered the sort of injury that would be an expected consequence of the alleged wrongful conduct, Plaintiffs have done enough to withstand summary judgment on this issue."). The People's substantively identical allegations make their theory of proximate causation equally plausible, and there is no compelling reason for this Court to depart from the MDL transferee court's rulings.

None of Defendants' arguments supports a contrary conclusion. Defendants jointly assert that "[a] plaintiff does not establish proximate causation if the alleged harm was the 'result of the

independent intervening acts of others.'" Dkt. 169 at 23 (quoting *Martinez v. Pac. Bell*, 225 Cal. App. 3d 1557, 1566 (1990)). This is incorrect. Under California law, not all "intervening acts" are "superseding causes" that relieve a defendant of liability. The determination turns largely on whether the defendant could have reasonably foreseen the intervening acts. As the Court of Appeal explained:

> [W]hen "subsequent to the defendant's negligent act, an independent intervening force actively operates to produce the injury, the chain of causation *may be* broken. It is usually said that if the risk of injury might have been *reasonably foreseen*, the defendant is liable, but that if the intervening act is highly unusual or extraordinary, not reasonably likely to happen and hence not foreseeable, it is a superseding cause and the defendant is not liable."

*Ash v. N. Am. Title Co.*, 223 Cal. App. 4th 1258, 1274 (2014) (quoting 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1197 at 574). Thus, the critical question under California law is not simply whether another person's conduct intervened between a defendant's actions and the alleged harm, but rather whether the intervening conduct and/or the harms to plaintiffs were reasonably foreseeable by defendants.

Seen in this light, the Manufacturer Defendants' proximate causation arguments fail. The Manufacturers contend that each of the harms the People identify, such as drug trafficking and public injection, "is just as plausibly the result of myriad intervening acts—including the decision-making of prescribers, patients, distributors, pharmacies, and third-party criminals never even prescribed an opioid medication—which defeats [Plaintiffs'] public nuisance claim." Dkt. 171 at 13. This argument ignores that the intervening conduct identified was a foreseeable consequence of over-promoting and failing to maintain effective controls in the distribution of opioid drugs. That these types of acts are foreseeable, indeed expected, is the reason the marketing and distributing duties at issue exist. *See, e.g.*, *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943) ("The difference between sugar, cans, and other articles of normal trade on the one hand, and narcotic drugs, machine guns and such restricted commodities, on the other, arise[s] from the latter['s] inherent capacity for harm and from the very fact they are restricted . . . ."). Thus, merely identifying other parties involved in or outside of the supply chain

does not support dismissal on causation grounds.

Nor does the case law on which the Defendants rely. *See* Dkt. 171 at 13; Dkt. 170 at 14. In *Martinez*, for example, a gunshot victim sought to hold Pacific Bell vicariously liable for maintaining a public telephone used primarily for illegal drug transactions. 225 Cal. App. 3d at 1559. The Court of Appeal affirmed dismissal, holding that the plaintiff "seeks to impose on Pac Bell vicarious liability for that battery, a separate and intervening act, *not direct liability for any nuisance the pay telephone is alleged to constitute.*" *Id.* at 1566; *see also id.* at 1568 ("We do not deal here with any conventional attempt to abate a nuisance . . . ."). In other words, the court dismissed the vicarious liability claim because the telephone company, in *lawfully* maintaining the public phone, had no duty to the plaintiff as a passerby. *Id.* at 1567. Moreover, as discussed above, in *In re Firearm Cases*, the Court of Appeal affirmed the trial court's grant of *summary judgment* based on a lack of proof in a case involving what was found to be lawful manufacturing conduct. 126 Cal. App. 4th at 967. These holdings bear little relation to the People's claims alleging systematic unreasonable or unlawful conduct in Defendants' promotion, distribution, and dispensing of highly addictive opioid drugs.

The arguments specific to the Distributor Defendants fail for similar reasons. The Distributors rely upon the People's allegations against the Manufacturers, and then try to portray the Manufacturers' unlawful promotion conduct as a legally superseding cause of the public nuisance in San Francisco. *See* Dkt. 170 at 13 ("The City does not allege that Distributors played any part in this marketing campaign or knew that its claims were false."). This argument fails because the People also allege that the Defendants had independent obligations to maintain effective controls against diversion by identifying, reporting, and stopping shipment of suspicious orders until such suspicions were resolved, *see* FAC ¶¶ 579-96, and that their failure to do so led to diversion and the attendant public health and community harms of the opioid epidemic, *see id.* ¶¶ 656-96, 887-900. Thus, whether or not the Manufacturers' unreasonable or unlawful conduct *also* contributed to the nuisance by dramatically increasing prescriptions, the Distributors' systematic failures to employ policies designed to prevent diversion independently and concurrently contributed to the nuisance. *See Mitchell v. Gonzalez*, 54 Cal. 3d 1041, 1049 (Cal.

1991) ("In those few situations where there are concurrent [independent] causes, our law provides one cannot escape responsibility for his negligence on the ground that identical harm would have occurred without it.").

The Distributors' California cases do not hold otherwise. *See* Dkt. 170 at 14-15. In *Gonzalez*, plaintiffs sought to hold defendant gas station owners liable for the negligent sale of gasoline in uncovered containers that were later used for arson. *See Gonzalez v. Derrington*, 56 Cal. 2d 130, 132 (1961). The California Supreme Court affirmed judgment for the defendants because the arsonists' intervening criminal conduct was deemed unforeseeable and thus a superseding cause. *Id.* at 133. In *Lopez*, which affirmed summary judgment for restaurant franchise owners on claims by survivors of persons killed in a shooting spree at the restaurant, the court held that the owners did not have a duty to the victims because the shooting spree "constitutes a hazard outside the boundaries of a restaurant's general duty to protect its patrons from *reasonably foreseeable* criminal acts of third parties." *Lopez v. McDonald's Corp.*, 193 Cal. App. 3d 495, 500 (Ct. App. 1987).

Since the public health and community harms the People allege here are the foreseeable and, indeed, expected results of Defendants' unlawful marketing and distribution of prescription opioid drugs, the People have more than sufficiently pled proximate causation and the motion to dismiss on this ground should be denied.

c.      **The People properly plead standing and traceability as to Walgreens.**

The Court also should reject Walgreens' attempt to repackage proximate causation arguments as an argument that the People lack Article III standing to bring their public nuisance claim because their injuries are not fairly traceable to Walgreens' conduct. *See* Dkt. 168 at 4. The Supreme Court and a court in this District have held that the "traceability" element of Article III standing is less demanding than common law proximate causation. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct."); *California v. Ross*, 358 F. Supp. 3d 965, 1006 (N.D. Cal.

2019) ("This [traceability] requirement is less demanding than a proximate cause standard."). Since Article III traceability is less demanding than proximate cause, Walgreens' standing argument fails for the same reasons that all Defendants' proximate cause arguments fail.

Walgreens tries to differentiate itself by setting out a lengthy causal chain that it contends the People must show to establish liability. *See* Dkt. 168 at 4 (setting out 6 to 19-step chain). The MDL transferee court rejected almost identical arguments, finding that the "Plaintiffs have alleged sufficient facts to support a far more direct chain of causation." *In re Nat'l Prescription. Opiate Litig.*, 2018 WL 6628898, at *5. Here, the People's claims against Walgreens for its unlawful distribution and dispensing conduct involve just two of the three steps the MDL transferee court identified—that " excess opioids" distributed and prescribed without proper due diligence were "diverted into an illicit, black market" and that "Plaintiffs were forced to expend resources beyond what they had budgeted to attempt to stop the flow of the excess opioids into local communities and to bear the costs associated with cleaning them up." *Id.* The People's harms are traceable to Walgreens, and its motion to dismiss on Article III standing grounds should be denied.

## II. The People state cognizable claims under all prongs of California's Unfair Competition Law.

California's Unfair Competition Law ("UCL") provides a cause of action for business practices that are: (1) unlawful; (2) unfair; or (3) fraudulent. Cal. Bus. & Prof. Code § 17200, *et seq*. California's UCL's coverage is "'sweeping,' and its standard for wrongful business conduct intentionally broad." *Backhaut v. Apple, Inc*., 74 F. Supp. 3d 1033, 1050 (N.D. Cal. 2014). "Each of the three UCL prongs provides a 'separate and distinct theory of liability' and an independent basis for relief." *Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1018 (N.D. Cal. 2019). The FAC states a cognizable claim under each prong.

### A. The People state a claim under the "unlawful" prong of the UCL.

The unlawful prong of the UCL prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law." *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 717 (9th Cir. 2012). By proscribing unlawful business practices, the UCL "'borrows'

violations of other laws and treats them as unlawful practices that the [UCL] makes

independently actionable." *Rose v. Bank of America, N.A.*, 57 Cal. 4th 390, 396 (2013). The

People have stated a claim under the unlawful prong of the UCL based on Defendants' (1)

violations of substantive legal requirements to identify, report, and not ship, suspicious orders,

and otherwise provide effective controls against diversion under 21 C.F.R. §§ 1301.71 and

1301.74 of the CSA[26] and California Business and Professions Code § 4169.1, as well as

violations of (2) RICO, (3) the FAL, and (4) the California Consumers Legal Remedies Act

("CLRA"), Cal. Civ. Code § 1750, *et seq*.

> **1.** **The People properly allege Defendants' breach of their duties under the CSA as predicate violations for the UCL unlawful claim.**

Courts have consistently held that "virtually any statute or regulation (federal or state) can

serve as a predicate for a UCL unlawful practice cause of action." *See, e.g.*, *Gutierrez v. Carmax

Auto Superstores Cal.*, 19 Cal. App. 5th 1234, 1265 (2018). The breadth of laws that may serve

as a predicate for an unlawful UCL claim is expansive and includes laws that are "civil or

criminal, federal, state, or municipal, statutory, *regulatory*, or court-made." *Hewlett v. Squaw

Valley Ski Corp.*, 54 Cal. App. 4th 499, 531–32 (1997). Thus, courts regularly find federal

regulations to be proper predicates for UCL claims. *See, e.g.*, *Sw. Marine, Inc. v. Triple A Mach.

Shop, Inc.*, 720 F. Supp. 805 (N.D. Cal. 1989) (permitting "borrowing" of a Navy procurement

regulation as the basis for a UCL claim); *Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052

(N.D. Cal. 2017) (violations of regulations in the Federal Food, Drug and Cosmetic Act served as

predicate violations for unlawful prong).[27] The same is true for state regulations. *See, e.g.*,

*People v. McKale*, 25 Cal. 3d 626, 632 (1979) (mobile home park regulations served as predicate

---

[26] Because the People have not advanced a UCL claim against Walgreens, this section does not detail the CSA's *dispensing* duties, discussed above.

[27] *See also Fowler v. Wells Fargo Bank, N.A.*, No. 17-cv-02092, 2017 WL 3977385 (N.D. Cal. Sept. 11, 2017) (same as to violation of HUD regulation); *Smith v. Wells Fargo Bank, N.A.*, 135 Cal. App. 4th 1463 (2005) (same as to violations of regulations issued by the Office of the Comptroller of Currency regarding disclosure requirements); *Gibson v. World Savings and Loan Assn.*, 103 Cal. App. 4th 1291, 1306 (2002) (same as to violation of regulations of the Office of Thrift Supervision); *Jamison v. Bank of America, N.A.*, 194 F. Supp. 3d 1022, 1032 (E.D. Cal. 2016) (same as to violation of Regulation Z, a Federal Reserve Board regulation).

for UCL unlawful claim).[28]

Here, the People allege that the Defendants triggered the UCL's unlawful prong by, among other things, violating (i) 21 C.F.R. §§ 1301.71 and 1301.74 (discussed in detail in § I.A.2.b, *supra*), federal regulations under the CSA that require Defendants to provide effective controls against diversion, to identify and report suspicious orders upon discovery to the DEA, and to halt such orders unless and until such suspicions can be resolved; and (ii) California Business and Professions Code § 4169.1, which requires Defendants to report suspicious orders to the California State Board of Pharmacy. FAC ¶ 912. These laws, and the violations thereof, are central to the People's case. As the People allege in detail, the failure to effectively identify, investigate, report, and halt suspicious orders of controlled substances led directly to illegal diversion and fueled the opioids epidemic. *See, e.g.*, *id.* ¶¶ 579-96 (detailing Defendants' obligations to identify and report suspicious orders and prevent diversion), 656-67 (demonstrating Defendants' failure to comport with those duties), 686-96 (highlighting the devastating effects of opioid diversion).

Defendants do not dispute that regulatory violations can support a UCL claim, but argue here, as they have repeatedly in this MDL, that the regulations invoked in the FAC "merely set out" CSA registration procedures, and do not "make[] the failure to monitor or report suspicious orders substantively unlawful," or otherwise "impose a substantive legal 'duty,' the violation of which would trigger automatic legal liability." Dkt. 169 at 17-18. In a detailed opinion, the MDL transferee court rejected this precise argument, stating: "To the extent defendants assert the question of whether a registrant is maintaining effective controls against diversion is only a factor the DEA may consider relative to registration, and not a duty imposed by the statute, the Court rejects this argument for the reasons stated above." *In re Nat'l Prescription Opiate Litig.*, 2019 WL 3917575, at *8 n.10. The court went on to conclude that "Section 1301.71 plainly requires [CSA] registrants to provide effective controls and procedures to guard against the diversion of

---

[28] *Hewlett v. Squaw Valley Ski Corp.*, 54 Cal. App. 4th 499, 526 (1997) (same as to California regulations regarding timber cutting); *People v. Casa Blanca Convalescent Homes, Inc.,* 159 Cal. App. 3d 509, 528-530 (1984) (same as to nursing home regulations), *abrogated on other grounds by Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 184 (1999).

controlled substances" and that, "as a matter of law, Section 1301.74 imposes a ***legal duty*** on registrants to: (1) design and operate a system to disclose to the registrant suspicious orders; . . . (2) inform the DEA of suspicious orders when discovered by the registrant"; and also (3) a "duty not to ship suspicious orders." *Id.* at *7-9.

Defendants largely ignore this holding, addressing it only in a footnote, and dismissing it as "advisory" and "fundamentally incorrect." Dkt. 169 at 19 n.18. A review of the opinion undermines Defendants' position. Its conclusion is supported both by case law and the "plain language" of the regulations themselves. *See, e.g.*, *Masters Pharm., Inc. v. Drug Enforcement Admin.*, 861 F.3d 206, 211-12 (D.C. Cir. 2017). As all this authority instructs, §§ 1301.71, 1301.74 and Business and Professions Code § 4169.1 (which parallels § 1301.74) impose legal obligations, the violation of which supports a UCL violation.

*Samura v. Kaiser Foundation Health Plan, Inc.*, 17 Cal. App. 4th 1284 (1993), upon which Defendants rely heavily, does not hold otherwise.[29] In *Samura*, the plaintiff brought suit against an HMO to enjoin enforcement of its third-party liability provision and asserted a UCL claim based on the defendants' violation of the California Knox-Keene Act. The Court of Appeal found the plaintiffs had not stated a claim under the unlawful prong because the cited statutory sections had "little relevance to the matters enjoined" and imposed no independent legal obligations. *Id.* at 1300. Those regulations are a far cry from 21 C.F.R. § 1301.74, reinforced by Business and Professions Code § 4169.1, which—among others and as discussed above—impose a substantive legal duty on Defendants to (1) design and operate a system to disclose to the registrant suspicious orders; and (2) inform the DEA of suspicious orders when discovered by the registrant. Because the coverage of the UCL is "sweeping," "intentionally broad," *Backhaut*, 74

---

[29] Defendants' other cases offer even less support. In *NorthBay Healthcare Grp. - Hosp. Div. v. Blue Shield of Ca. Life & Health Ins*., 342 F. Supp. 3d 980, 987 (N.D. Cal. 2018), for example, the court dismissed the UCL claim because the hospital plaintiffs did not allege violation of any law or regulation. The same was true in *Elec. Indus. Serv. Bureau, Inc. v. Phila. Indem. Co*., No. 18-CV-02345-EDL, 2018 WL 7286502, at *3-4 (N.D. Cal. July 11, 2018). Similarly, in *Shroyer v. New Cingular Wireless Servs*., *Inc*., 622 F.3d 1035, 1044 (9th Cir. 2010), the predicate violation was merely a breach of contract, not the violation of a statute or regulation. In *Martinez v. Welk Group, Inc*., 907 F. Supp. 2d 1123, 1139 (S.D. Cal. 2012), the defendant was exempt from two statutory sections invoked, and the remaining section merely defined "deceit." Finally, in *Davis v. HSBC Bank Nev., N.A*., 691 F.3d 1152, 1168-69 (9th Cir. 2012), the Ninth Circuit held the defendant could not have violated the underlying regulation as a matter of law.

F. Supp. 3d at 1050, and may borrow federal and state regulations as predicate violations, the People have adequately pled a UCL "unlawful" claim for violations of 21 C.F.R. § 1301.74 and Business and Professions Code § 4169.1.

### 2. The People adequately plead predicate FAL, RICO, and CLRA violations for their UCL unlawful claim.

In addition to the regulations cited above, the People allege predicate violations of RICO, the FAL, and the CLRA as bases for their UCL unlawful claim. FAC ¶ 914. Defendants do not dispute that RICO and FAL violations can give rise to a UCL unlawful claim (Dkt. 171 at 11), and for the reasons discussed herein, Plaintiffs' well-pled RICO and FAL allegations do so here.

The FAC also properly pleads predicate violations of the CLRA, which "outlaws various unfair methods of competition and unfair or deceptive acts or practices . . . intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). Here, the People allege the Marketing Defendants violated (1) Civil Code § 1770(a)(5) by disseminating false and misleading information concerning, *inter alia*, the safety and efficacy of its prescription opioids and/or prescription opioids generally, and falsely and misleadingly downplaying or omitting the risk of addiction arising from their use; and (2) Civil Code § 1770(a)(8) by disparaging other medications, including NSAIDs, by false and misleading representations of fact. FAC § IV.D, ¶¶ 336-45. The People further contend that Defendants' deception caused significant harm. *See* FAC ¶¶ 51, 55, 57-58 (describing a spike in opioid drug use and overdoses and estimating that combatting the opioid epidemic costs the City tens of millions of dollars annually). Such allegations are sufficient to state a violation of the CLRA.

In arguing otherwise, Defendants invoke the UCL's "safe harbor" doctrine, which according to Defendants, prohibits UCL and FAL claims based on alleged conduct that is "clearly permit[ted]" by another law. Dkt. 171 at 6-7, 11. This assertion rests on a mischaracterization of Plaintiffs' claims. The People's claim is based on a series of alleged falsehoods advanced by the Defendants, including, among others, that (a) opioids present low risk of addiction, (b) signs of addiction require more (not less) opioids, and (c) opioid doses can be increased without increasing risks. *See, e.g.*, FAC ¶ 228. The People's claim is not based on any opioid's "FDA-

approved label," or even promotions that comport with such labels, as Defendants suggest. Defendants' cases are therefore distinguishable, and the safe harbor provision does not bar the People's claims. *In re Nat'l Prescription Opiate Litig. (West Boca)*, 2020 WL 1669655, at *21-22 (finding that Florida's analogous safe harbor doctrine did not bar similar Deceptive and Unfair Trade Practices Act claims because the defendants had not shown "that their methods of promoting and marketing opioids remained within the parameters specifically authorized by state or federal law"). *Cf. Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359, 1384 (S.D. Fla. 2014) (discussing similarities of the California's and Florida's unfair practices statutes).

The same is true for Defendants' arguments about Civil Code § 1770(a)(8), which rest on a single case that involved declaratory relief and a duty to indemnify, not the CLRA. *See* Dkt. 171 at 11-12 (quoting *Hartford Cas. Ins. Co. v. Swift Distrib., Inc.*, 59 Cal. 4th 277, 284 (2014)). In any case, contrary to Defendants' representations, the FAC *does* contain allegations that Defendants "derogate[d]" competitors' products. *Id.*; *see also, e.g.*, FAC ¶ 336 ("[T]he Marketing Defendants . . . emphasized or exaggerated risks of competing products so that prescribers and patients would favor opioids over other therapies such as over-the-counter acetaminophen or over-the-counter or prescription NSAIDs.").

Defendants' remaining arguments rest on the misguided assertion that the People has failed to allege injury or causation. These arguments fail for all the reasons explained in the causation analysis above. *See* § I.A.5, *supra*; FAC ¶¶ 541 (alleging that Defendants' deceptive marketing efforts, including promoting the falsity of a low abuse potential of Defendants' opioids, led doctors to prescribe more opioids), 51, 55, 57-58, 516-22, 538-46 (alleging causal link between Defendants' misconduct and Plaintiffs' harms).

### B. The People state a claim under the "unfair" prong of the UCL.

The "unfair" prong of the UCL creates a cause of action for a business practice that is unfair even if not proscribed by some other law. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003). "The UCL does not define the term 'unfair' . . . [and] the proper definition of 'unfair' conduct against consumers 'is currently in flux' among California courts.'" *Cappello v. Walmart, Inc.*, 394 F. Supp. 3d 1015, 1023 (N.D. Cal. 2019). Of the three tests in

use, Defendants seek dismissal under only one: the "balancing test" (Dkt. 169 at 21), which weighs "the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Cappello*, 394 F. Supp. 3d at 1023.[30]

The gravity of the alleged harm is severe, to say the least. As to the utility of Defendants' conduct, Defendants focus only on the purportedly "strong justification" for "useful and legitimate" uses of opioids. Dkt. 169 at 22. What they do not defend, however, are the People's allegations that Defendants "unfairly participated in the oversupply of opioids to San Franciscans by: (i) promoting their use in a manner that minimized serious risks; (ii) improperly touting purported benefits; and/or (iii) failing to make reasonable efforts to prevent diversion." FAC ¶ 915. For those actions, there is no utility, and certainly not one that outweighs the extreme harm they caused.

Defendants' remaining unfairness arguments repackage their claims that intervening causal factors (e.g., prescribing doctors) undermine any claim of injury or causation. Those arguments again fail for the reasons articulated in § I.A.5, above, and because direct harm is not required under the "unfair" prong of the UCL. *See Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 788-89 (2010) (upholding pharmacists' UCL price-fixing claims even the plaintiffs purchased drugs with inflated prices *indirectly* from defendants through wholesale distributors).

**C.      The People state a claim under the "fraudulent" prong of the UCL and FAL.**

To state a claim under either the UCL or FAL, "it is necessary only to show that members of the public are likely to be deceived." *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009). "Allegations of actual deception, reasonable reliance, and damage are unnecessary." *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 934 (N.D. Cal. 2013).

Defendants' claim that the People do not allege "with the requisite particularity" that Defendants failed to monitor and report suspicious opioids orders also fails." *See* Dkt. 169 at 16.

---

[30] Although not challenged here, the People's claims also satisfy (1) the "tethering test" because Defendants' misconduct offends established public policy by violating the CSA, Cal. Bus. & Prof. Code § 4169 and the CLRA, described above, *id.*, and (2) the "FTC test" because the alleged injuries are substantial, not reasonably avoidable by consumers, and not outweighed by any countervailing benefits, *In re Anthem, Inc. Data Breach Lit.*, 162 F. Supp. 3d 953, 989 (N.D. Cal. 2016).

The People allege in detail that Defendants failed to maintain effective controls and report suspicious orders (despite their legal obligations to do so) and that Defendants publicly misrepresented that they rigorously carried out their legal duties. FAC ¶¶ 579–680. The People's allegations are, at a minimum, "specific enough to give defendants notice of the particular misconduct so that they can defend against the charge." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).

Defendants' other argument—that members of the public cannot be deceived by Defendants' failure to monitor and report suspicious orders—raises factual questions that are not appropriate for resolution at this stage. *See Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) ("[W]hether a business practice is deceptive will usually be a question of fact not appropriate for decision on demurrer."). Regardless, the People's detailed allegations that Defendants made public statements misrepresenting that they were complying with all relevant laws and regulations are sufficient. *See Bias*, 942 F. Supp. 2d at 934 (holding a UCL fraud claim "may be based on representations to the public which are untrue, and also those which may be accurate on some level, but will nonetheless tend to mislead or deceive").

**D.     The People state viable FAL and UCL claims against the Manufacturer Defendants.**

**1.     California's safe-harbor doctrine does not bar the People's UCL and FAL claims.**

As described above, the Manufacturer Defendants' assertion that the People's claims are barred by California's safe-harbor doctrine is again premised on a mischaracterization of the People's allegations. The Manufacturer Defendants' liability does not turn simply on their representations that opioids were effective for treatment of chronic pain, but rather on their extended campaign of lies regarding the efficacy of opioids as compared to other drugs and the risk of addiction arising from their use. *See FAC ¶¶ 225-546, 911, 923.*[31] The Manufacturer Defendants similarly misrepresent the degree to which the FDA and California law condoned their conduct—neither authorized the Manufacturer Defendants' campaign of lies. Thus, the

---

[31] The People further allege that the Manufacturers represented that opioids "had characteristics, uses and benefits that they did not have, and disparaged other medications, including NSAIDs, by false and misleading representations of fact." *Id.* ¶¶ 911, 923.

safe-harbor doctrine has no bearing here.  *See Martin v. Tradewinds Beverage Co.*, 2017 WL 6816608, at *4-5 (C.D. Cal. Sept. 5, 2017) (denying dismissal because the plaintiff's claims did "not implicate Defendant's compliance with FDA rules"); *Cel-Tech Commc'ns, Inc.*, 20 Cal. 4th at 183 ("To forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct.")

### 2. The Manufacturer Defendants' statements were likely to deceive.

The Manufacturer Defendants further contend that the People's claims fail "because the risk of addiction and abuse was within the 'knowledge base' of and readily available to the 'targeted consumer,' *i.e.*, prescribing physicians."  Dkt. 171 at 7-8.  However, the People allege that the Manufacturer Defendants targeted not only physicians but also consumers with their misinformation campaign.  *See* FAC ¶¶ 494-502, 698, 725.  Defendants attempt to sidestep this fact by quoting several design defect cases to imply that only prescribing physicians may be the targeted consumer under the FAL and UCL here.  *See* Dkt. 171 at 8.  This argument has been rejected in the past and is equally unavailing here.  *See Saavedra v. Eli Lily & Co.*, No. 2:12-CV-9366-SVW-MAN, 2013 WL 6345442, at *1 (C.D. Cal. Feb. 26, 2013) ("[D]efendant's [argument] that "a 'reasonable consumer' in this context is actually the doctors who prescribed the medication . . . does not bar plaintiff's claims at a motion to dismiss stage.").

To the extent the Manufacturer Defendants did target physicians, the People allege that they altered the physicians' 'knowledge base' by intentionally misleading them "about the appropriate uses, risks, safety and efficacy of prescription opioids . . . directly through sales representatives and marketing materials and indirectly through financial relationships with academic physicians, professional societies, hospitals, trade associations for state medical boards and seemingly neutral third-party foundations."  FAC ¶ 27.  This is sufficient.  *See Krueger v. Wyeth, Inc.*, 310 F.R.D. 468, 480–81 (S.D. Cal. 2015) (rejecting argument that "limiting information was provided to health care professionals" because doctors were "systematically exposed to defendants' material misrepresentations").  Indeed, independent studies and the Manufacturer Defendants' tracking confirm that their marketing materially impacted doctors' prescribing behavior.  *See* FAC ¶¶ 538–44.  Regardless, the People are required only to allege the

likelihood of deception, which it has properly done here. *See S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861 (1999); *see also In re Nat'l Prescription Opiate Litig. (West Boca)*, 2020 WL 1669655, at *22 ("[I]t is sufficient that West Boca plausibly alleges the public was misled; whether [anyone] was actually deceived . . . is a factual question not properly resolved in a motion to dismiss.").

### 3. The People properly allege that the Manufacturer Defendants' representations were false.

The Manufacturer Defendants argue that the FAC fails to provide "a specified factual basis that defendants' representations are false." Dkt. 171 at 8. This argument overlooks hundreds of paragraphs citing studies and other evidence demonstrating that the Manufacturers' representations were false and misleading. FAC ¶¶ 225-400. Thus, unlike the cases the Manufacturers cite, this is not a case merely alleging that the Manufacturers' representations lacked substantiation. *See In re NJOY, Inc. Consumer Class Action Litig.*, No. 14-428, 2015 WL 12732461, at *18 (C.D. Cal. May 27, 2015) ("'Plaintiffs do more than allege that there is no competent scientific evidence to support [the defendant's] claims; they allege that the competent scientific evidence shows that [the] claims are objectively false.'"). Moreover, the Manufacturer Defendants' *omissions* were not as limited as Defendants suggest. Manufacturers made misleading statements about the safety of opioids that were contradicted by material, omitted information.[32] *See FAC* ¶¶ 225-400. These omissions, like the affirmative misrepresentations, are actionable. *Andren v. Alere, Inc.*, 207 F. Supp. 3d 1133, 1141 (S.D. Cal. 2016).

### 4. The People adequately allege the Manufacturer Defendants controlled key opinion leaders and other third parties.

The Manufacturer Defendants also assert that the People's claims fail because they do not establish agency relationships between the Manufacturers and third-party doctors and organizations that spread the Manufacturers' misinformation. Dkt. 171 at 10. Of course, the People's FAL and fraudulent UCL claims are based much more than representations made

---

[32] The Manufacturers had a duty to disclose because they (1) had exclusive knowledge of material facts not known to the People; (2) actively concealed facts from the People; and (3) made partial representations but also suppressed some material facts. *See Andren*, 207 F. Supp. 3d at 1142.

through third parties.  *See, e.g.*, FAC § IV.D, ¶¶ 911, 923.  And, regardless, this argument is

premature, as agency is a "question of fact."  *Van't Rood v. Cnty. of Santa Clara*, 113 Cal. App.

4th 549, 562 (2003).

Nevertheless, the FAC's detailed allegations establish an agency relationship between the

Manufacturers and the third parties.  *See* FAC ¶¶ 401–502; *Decarlo v. Costco Wholesale Corp.*,

No. 14-202, 2020 WL 1332539, at *5 (S.D. Cal. March 23, 2020) ("Liability may be imposed on

those who aid and abet another's violation of the UCL if the individual knows the other's conduct

constitutes a violation and gives substantial assistance or encouragement to the other to so act.").

Further, the Manufacturer Defendants' contention that many of the third-party statements are non-

commercial speech beyond the reach of the FAL or UCL is meritless.  The Manufacturer

Defendants controlled the third parties and used them to disseminate misrepresentations in order

to expand the opioid market.  *See Fuller v. First Franklin Fin. Corp.*, 216 Cal. App. 4th 955, 968

(2013).  The third parties' appearance of independence made the Manufacturer Defendants'

scheme particularly insidious, and they cannot be sheltered by it now.

### E.      The People adequately allege a UCL claim for restitution.

The Distributor Defendants argue the People's claim for restitution fails because the FAC

"does not allege that City residents paid any money to Distributors."  Dkt. 170 at 15-16.

California law holds otherwise.  *See Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1340

(2009) (collecting cases).  The "UCL requires only that the plaintiff must once have had an

ownership interest in the money or property acquired by the defendant through unlawful means."

*Id.*  Here, the People allege that the Distributor Defendants "were the overwhelming source of

prescription opioids distributed for sale to San Francisco residents," FAC ¶ 45, and that they

received increased profits by "flooding San Francisco with more opioids than could be used for

legitimate medical purposes," *id.* ¶ 580.  Therefore, the People state a claim for restitution of the

income, profits, and other benefits that the Distributors unlawfully obtained from San Francisco's

residents.  *See Troyk*, 171 Cal. App. 4th at 1340 (upholding trial court's decision that defendant

may be liable for restitution under the UCL for money defendant received indirectly through a

third party); *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1105 (N.D. Cal. 2007)

(upholding UCL claim because the fact that "such funds were paid to [defendant] through an intermediary does not change the fact that [plaintiffs] are seeking funds in which they have an ownership interest").

**III.     The People's state-law claims are not preempted by the Food Drug & Cosmetic Act or the Controlled Substances Act.**

Defendants make the same "implied conflict preemption" arguments here that were carefully considered and properly rejected by the MDL transferee court.  This Court should do the same.  There has been no change in the law or in the nature of the Plaintiffs' claims that would compel a different result.  Simply put, Plaintiffs assert common law and state statutory law claims that are not preempted because they do not conflict with federal law.

**A.     The MDL transferee court repeatedly considered and rejected Defendants' preemption arguments.**

Judge Polster rejected the Defendants' preemption defenses at both the motion to dismiss[33] and summary judgment[34] stages in CT1.  Like the Defendants have done here, in CT1, the defendants attempted to manufacture preemption defenses by mischaracterizing the nature of the plaintiffs' claims.  Judge Polster held that the CT1 plaintiffs' claims against the Manufacturer Defendants did not challenge the adequacy of FDA-approved labeling, but rather were predicated on a "massive marketing campaign based on false and misleading information, causing a dramatic increase in opioid prescriptions, creation of a black market for opioids, enormous profits for Manufacturers, and the public health crisis we find ourselves in today."  *In re Nat'l Prescription Opiate Litig.*, 2019 WL 4178591, at *4.  The court rejected the argument that the plaintiffs' claims were based on a "fraud on the FDA" or a "fraud on the DEA" theory, finding instead that they were based on "fraudulent marketing in the promotion and sale of their opioids."  *Id.* at *2.  Consequently, the court concluded the claims "do not run afoul of *Buckman v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001)"—the principal authority upon which Defendants rely in the motion before this Court.  *Id.* at *5.  Judge Polster also rejected the argument that state tort

---

[33] *In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856.
[34] *In re Nat'l Prescription Opiate Litig.*, 2019 WL 4178591.

1    liability "would stand as an obstacle to DEA's ability to regulate and enforce the Controlled

2    Substances Act." *Id.* at *12. The MDL transferee court's rulings apply equally here.

3        **B.    The People's claims are not preempted by the Controlled Substances Act.**

4        The Manufacturer and Distributor Defendants first argue that Plaintiffs' claims would

5    interfere with the DEA's ability to regulate opioids and to enforce the CSA. They are wrong; the

6    People's claims do not interfere with the CSA in any way. The People merely seek to hold

7    Defendants responsible for conduct that violates *both* state law *and* the CSA. Rather than

8    interfere with the CSA, the People's claims are of the type specifically contemplated by it: the

9    CSA welcomes enforcement of state law to supplement the federal enforcement scheme.

10   Congress said as much when it included a provision in the CSA titled "Application of State Law":

11           No provision of this subchapter shall be construed as indicating an
             intent on the part of the Congress to occupy the field in which that
12           provision operates, including criminal penalties, to the exclusion of
             any State law on the same subject matter which would otherwise be
13           within the authority of the State, unless there is a positive conflict
             between that provision of this subchapter and that State law so that
14           the two cannot consistently stand together.

15   21 U.S.C. § 903. Congress thus clearly embraces the states' continued exercise of their

16   traditional role in the enforcement of public nuisance and consumer protection law—even in

17   circumstances where liability might be premised in part on the violation of the CSA—so long as

18   there is no "positive conflict" between state law and the CSA. *See County of San Diego v. San*

19   *Diego NORML*, 165 Cal. App. 4th 798, 825 (2008); *see also Wyeth v. Levine*, 555 U.S. 555, 579

20   (2009) (noting that "state law offers an additional, and important, layer of consumer protection

21   that complements FDA regulation").

22       Defendants primarily rely upon *Buckman* to support their preemption argument, but

23   *Buckman* was a narrow holding based on unique facts not present in this case. The plaintiffs in

24   *Buckman* asserted claims based on injuries they sustained from orthopedic bone screws. 531 U.S.

25   at 343. They sued a consulting company that assisted the manufacturer in obtaining FDA

26   approval of the screws. *Id.* The plaintiffs alleged the consulting company made fraudulent

27   representations to the FDA and, but for the fraudulent representations, the FDA would not have

28   approved the screws. *Id.* The Supreme Court held that those state-law fraud claims were

preempted because they "exist solely by virtue of" federal law, which required disclosure of information to the FDA during the approval process, rather than any traditional state tort law. *Id.* at 347-348, 352-353. Therefore, those "fraud on the FDA" claims were preempted.

Unlike the claims in *Buckman*, the state-law claims here do not exist solely by virtue of federal law. The People's claims are based on Defendants' false and misleading promotion of prescription opioids and their failure to maintain effective controls and to investigate, report, and take steps to halt orders they knew, or should have known, were suspicious. *See* FAC ¶¶ 225-667. These claims are predicated on Defendants' common-law duty to "exercise reasonable care in delivering dangerous narcotic substances." *Id.* ¶ 580. That common-law duty required Defendants to "set up a system to prevent diversion, including excessive volume and other suspicious orders," to report suspicious orders to relevant enforcement authorities, and to stop shipment of suspicious orders. *Id.* ¶ 590. Defendants violated those duties and created a nuisance when they "distribut[ed] and [sold] opioids in ways that facilitated and encouraged their flow into the illegal, secondary market; distribut[ed] and [sold] opioids without maintaining effective controls against the diversion of opioids; and [chose] not to stop or suspend shipments of suspicious orders." *Id.* ¶¶ 892-94, 898; *see also Ileto*, 349 F.3d at 1214 (upholding nuisance claim based on "defendants' actions in creating an illegal secondary market for guns by purposefully over-saturating the legal gun market in order to take advantage of re-sales to distributors that they know or should know will in turn sell to illegal buyers."); *ConAgra*, 17 Cal. App. 5th at 84 (public nuisance claim based on promotion of lead paint that defendants knew was hazardous to public health); Cal. Civ. Code § 3479 ("Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses . . . so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance.").

Defendants argue that the People's claims are like those in *Buckman* because, if they had reported suspicious orders to the DEA, the "DEA would have investigated and shut down 'bad' pharmacies and doctors such that addiction would have been prevented or curbed." Dkt. 169 at 26. But this argument misses the point. Although Defendants did have a duty to report

suspicious orders to the DEA, the People are not suing because they merely failed to report. Rather, it was the Defendants' decision to ship suspicious orders in violation of the UCL (and the CSA), which flooded San Francisco with millions and millions of prescription opioids that caused the current public health crisis.

Some of the Defendants' misconduct violated the CSA, to be sure, but the CSA is not the only legal measure of Defendants' conduct. Rather, Plaintiffs seek to enforce separate statutes that impose upon Defendants responsibilities distinct from the CSA.[35] Because Plaintiffs' claims would exist even in the absence of the CSA, they are not preempted. *See Stengel v. Medtronic Inc.*, 704 F.3d 1224, 1233 (9th Cir. 2013) (en banc), *cert. denied*, 573 U.S. 930 (2014) (plaintiff's claim is not preempted where it "rests on a state-law duty that parallels a federal-law duty"); *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1040-41 (9th Cir. 2015) (plaintiff's claims did not "arise solely by virtue" of federal law, and recognizing that "parallel" state law claims are not preempted under *Buckman*); *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 995 (N.D. Cal. 2018) (no preemption because "the fraud claims here do not arise 'solely by virtue of' noncompliance with [federal law]; they arise out of the alleged deceit practiced on consumers by Defendants," and because "the affirmative misrepresentation claims . . . may be established even if there is no violation of federal regulations").

**C.    The People's marketing claims are not preempted by the Food Drug & Cosmetic Act.**

The People do not dispute that the FDA approved the Defendants' opioid medications. The FAC, however, identifies nine categories of misrepresentations made by the Defendants. FAC ¶ 228. The alleged misrepresentations do not include claims that opioids are never

---

[35] Defendants' reliance on *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861 (2000) is without merit. That case involved a Federal Motor Vehicle Safety Standard that had a long and detailed regulatory history, and a specific determination that the federal agency wanted a variety of different safety devices in cars. There is no such comparable regulatory framework with respect to controlled substances; it is not as if the federal government wants some distributors to monitor for suspicious orders, and some not, in order to determine which system works best. *All* distributors are required to monitor for suspicious orders and not ship them until they investigate and eliminate the risk of diversion, which they failed to do. *See* FAC ¶¶ 558-96.

1    appropriate for the long-term treatment of chronic non-cancer pain.  Thus, the Defendants do not

2    identify any allegation in the People's' marketing claims that conflicts with any FDA

3    determination about the safety or effectiveness of opioid drugs.[36]

4         Plaintiffs do not challenge the FDA-approved labeling of Defendants' products, but rather

5    their false and misleading promotion of those drugs.  There can be no preemptive conflict

6    between those state law claims and federal law, because federal law did not *require* the

7    Defendants to promote their products—let alone promote them through falsehoods and omissions.

8         Because drug manufacturers are under no obligation to promote their products, courts

9    consistently refuse to find preemption of fraud-based marketing claims involving FDA-approved

10   drugs.  This is true even where the manufacturer would be precluded from altering its label, as

11   with generic drugs for which the manufacturer is required to maintain a label identical to the

12   branded equivalent.  *See Arters v. Sandoz Inc.*, 921 F. Supp. 2d 813, 819-20 (S.D. Ohio 2013).[37]

13        The People's marketing claims do not interfere with the FDA's approval or regulation of

14   opioid medications.  They seek only to impose state-law duties not to promote those drugs using

15   false and misleading claims that far exceed the representations approved by the FDA.

16        **D.    The People's claims against the Generic Manufacturers are not preempted
               because they participated in the overall scheme to fraudulently promote the
17             use of prescription opioids.**

18        The Generic Manufacturers make the same mistake the other Manufacturer Defendants do

19   by wrongly contending the People's claims are based on prescription opioid labeling.  As

20   discussed above, that is incorrect; the People's' claims are based on the fraudulent promotion of

21   prescription opioids, so they are not preempted.

22

23   [36] Defendants take one comment out of context in Plaintiffs' Complaint (FAC ¶ 453) in yet
     another attempt to mischaracterize Plaintiffs' claims and argue this case differs from CT1.  Dkt.
24   169 at 28 n.27.  But the very same factual allegation in ¶ 453 of the FAC was pled in the CT1
     third amended complaint.  *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804-DAP (Dkt.
25   1466 ¶ 397) (N.D. Ohio. Mar. 21, 2019).
     [37] *Priest v. Sandoz, Inc.*, No. A-15-CV-00822-LY-ML, 2016 WL 11162903, at *7 (W.D. Tex.
26   Dec. 29, 2016), *report and recommendation adopted*, 2017 WL 8896188 (W.D. Tex. Jan. 31,
     2017); *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial
27   Proceedings*, No. 14-1748, 2016 WL 861213, at *3 (N.D. Ill. Mar. 7, 2016); *Beavers-Gabriel v.
     Medtronic, Inc.*, No. CIV. 13-00686 JMS, 2015 WL 143944, at *6 (D. Haw. Jan. 9, 2015);
28   *Elmore v. Gorsky*, No. 2:12-CV-00347, 2012 WL 6569760, at *3 (S.D. Tex. Dec. 17, 2012).

Moreover, the FAC specifically describes the different branded and generic opioids manufactured and sold by the various Generic Manufacturer entities, as well as the marketing efforts they engaged in. Those efforts included not only promotion of their branded drugs, but also activities designed to promote the use of prescription opioids generally in an effort to drive sales of their generic drugs:

- **Actavis Entities**: manufactured branded and generic opioids (FAC ¶¶ 115-32) and promoted branded and generic opioids, and trained sales representatives to minimize risk of addiction and promote the false condition called "pseudoaddiction" (*id.* ¶¶ 275-78).

- **Cephalon Entities**: manufactured branded and generic opioids (*id.* ¶¶ 133-36) and promoted use of opioids by sponsoring a physician guidebook, funding the front group "American Pain Foundation," sponsored continuing medical education presentations, and the preparation of internal publications used by sales representatives (*id.* ¶¶ 272-74).

- **Endo Entities**: manufactured branded and generic opioids (*id.* ¶¶ 147-52) and promoted opioids through websites, the American Pain Foundation, and publications (*id.* ¶¶ 254-62).

- **Mallinckrodt Entities**: manufactured branded and generic opioids (*id.* ¶¶ 159-65) and promoted opioids through publications, creation of the "C.A.R.E.S. (Collaborating and Acting Responsibly to Ensure Safety) Alliance," described as a "coalition of national patient safety, provider and drug diversion organizations," which promoted a book titled Defeat Chronic Pain Now! that contains numerous false claims and misrepresentations (*id.* ¶¶ 279-82).

The People have not asserted causes of action against Defendants in their capacities as generic manufacturers or brand name manufacturers, but simply as manufacturers of opioid drugs who promoted opioids generally, and fraudulently. Moreover, the People have sufficiently pled facts describing each Generic Manufacturer's role in the "massive marketing campaign based on false and misleading information, causing a dramatic increase in opioid prescriptions, creation of a black market for opioids, enormous profits for Manufacturers, and the public health crisis we find ourselves in today." *In re Nat'l Prescription Opiate Litig.*, 2019 WL 4178591, at *4.[38] *See*

---

[38] Contrary to the Generic Defendants' assertions, Plaintiffs' allegations are sufficiently specific to comply with Fed. R. Civ. P. 9(b). As the Ninth Circuit has held, "[i]nstances of corporate fraud may also make it difficult to attribute particular fraudulent conduct to each defendant as an individual. To overcome such difficulties in cases of corporate fraud, the allegations should include the misrepresentations themselves with particularity and, where possible, the roles of the

*Footnote continued on next page*

*also* § IV.B, *infra* (discussing requirements under Rule 9(b)). "[M]erely denying those allegations creates material issues of fact not suitable for resolution on a motion to dismiss." *In re Nat'l Prescription Opiate Litig. (Blackfeet)*, 2019 WL 2477416, at *8.

## IV.    The City pleads cognizable and strong RICO claims.

Decades of Supreme Court authority instruct that "RICO is to be read broadly" and "liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497-98 (1985). Accordingly, none of the "statutory terms of RICO" should be "read . . . narrowly." *Odom v. Microsoft Corp.*, 486 F.3d 541, 546 (9th Cir. 2007) (en banc).

Applying these principles, Judge Polster has repeatedly denied Defendants' attempts to dismiss plaintiffs' nearly identical RICO claims. *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *3-10 (denying Defendants' motion to dismiss); *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 4279233, at *4 (N.D. Ohio Sept. 10, 2019) (denying Defendants' motion for summary judgment).[39] Defendants have shown no reason that this Court should reach a different conclusion.

### A.    The City has suffered cognizable injuries.

The City properly alleges that Defendants' opioid Marketing and Supply Chain Enterprises injured—and continue to injure—the City's business and property. FAC ¶¶ 762-885. Defendants' arguments both that the City's alleged RICO injuries are entirely derivative of its residents' personal injuries and that it cannot recover because of its governmental status are without merit. *Cf.* Dkt. 169 at 7-9.

---

*Footnote continued from previous page*
individual defendants in the misrepresentations." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989). The FAC does just that.

[39] *See also Broward County, Florida v. Purdue Pharma L.P., et al.*, No. 1:17-md-02804-DAP, Dkt. 3274 at 13 (N.D. Ohio Apr. 27, 2020) ("Because Defendants do not make any new or additional arguments for dismissal of Broward's RICO claims beyond those previously made and addressed in the Court's Opinions in Summit County, the Court's prior analysis governs and compels the same results here"); *County of Monroe, Michigan v. Purdue Pharma L.P., et al.*, Case: No. 1:17-md-02804-DAP, Dkt. 3285 at 27-29 (N.D. Ohio Apr. 30, 2020) (same); *West Boca Medical Center, Inc. v. AmerisourceBergen Drug Corporation, et al.,* 1:17-md-02804-DAP, Dkt. 3253 at 25 (N.D. Ohio Apr. 3, 2020) (same).

1          **1.      The City seeks to recover for injuries to its business and property, not
                       for its residents' personal injuries.**
2

3          Defendants argue that the City lacks RICO standing because its injuries are entirely

4   derivative of its residents' personal injuries stemming from opioid abuse.  Dkt. 169 at 9-10.  This

5   argument misconstrues the structural injuries to the City's functions that are actually alleged in

6   this lawsuit.  It also misunderstands controlling precedent, which allows recovery for foreseeable

7   consequences—even personal harms—stemming from RICO acts.

8          The MDL transferee court has already rejected nearly identical arguments.  *See, e.g.*, *In re*

9   *Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *7-9 (denying motion to dismiss); *In re*

10  *Nat'l Prescription Opiate Litig.*, 2019 WL 4279233, at *3 (denying summary judgment).  In CT1,

11  for example, the defendants argued that the RICO harms, which mirror those alleged in the FAC,

12  were actually "pecuniary losses resulting directly from their addicted residents' physical injuries."

13  *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *8.  Judge Polster disagreed, holding

14  that multiple "categories of costs, for example . . . costs associated with . . . prevent[ing] the

15  current opioid epidemic from spreading and worsening . . . cannot be said to arise directly out of

16  Plaintiffs' residents' personal injuries."  *Id.* at *9.

17         Here, the City claims these same categories of costs as RICO harms to business and

18  property.  *See, e.g.*, FAC ¶¶ 851(e), 882(e).  The City seeks recovery for the property losses the

19  RICO enterprises have caused and the enterprises' effects on the proper functioning of all

20  manners of City business, including decreased "funding available for San Francisco's public

21  services . . . lost because it was diverted to other public services designed to address the opioid

22  epidemic."  *Id.* ¶¶ 57, 851(a), 882(a).  This is not a personal injury lawsuit.

23         Ninth Circuit precedent does not hold otherwise.  It is undoubtedly true that personal

24  injuries, in and of themselves, are not recoverable under RICO.  *RJR Nabisco, Inc. v. European*

25  *Cmty.*, 136 S. Ct. 2090, 2108 (2016).  But, contrary to Defendants' arguments, *Diaz v. Gates*, 420

26  F.3d 897, 898 (9th Cir. 2005), does not establish an absolute bar on pecuniary losses stemming in

27  any way from personal injuries.  Dkt. 169 at 9-10.  In *Diaz*, the Ninth Circuit held that losses

28  resulting from even "unintended, though foreseeable, consequences of RICO predicate acts"

confer RICO standing. *Diaz*, 420 F.3d at 901. This included losses flowing from a personal injury forming the basis of a state law tort: false imprisonment. *Id.* at 902-03. Critically, the majority recognized that its "approach allows more claims to go forward than" the dissent's "more restrictive theory," *id.* at 901, which would bar from recovery any lost business or property "flow[ing] from a personal injury" as "derivative part and parcel of the underlying non-compensable personal injury," *id.* at 914. In other words, *Diaz* rejected precisely the proposition Defendants cite it for here. *See* Dkt. 169 at 10 ("Because such damages 'flow from' personal injuries, they are not injuries to the City's 'business or property' for purposes of RICO."). The City's alleged RICO injuries are its own and, if proven, are recoverable.

### 2.    *Canyon County* does not deprive the City of statutory standing.

Defendants also argue that the City lacks standing to recover for its injuries under *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 976 (9th Cir. 2008). As the MDL transferee court held, Defendants are wrong. *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *9-10.

In *Canyon County*, an Idaho county brought suit against four agricultural defendants, alleging that they "engaged in an illegal scheme of hiring and/or harboring undocumented immigrant workers . . . and that their actions forced the County to pay millions of dollars for health care services and criminal justice services for the illegal immigrants." *Id.* 970-71. Thus, in the context of a lawsuit seeking to recover ordinary and expected government expenditures, the Ninth Circuit held that a public entity cannot satisfy RICO's standing requirement "based *solely* on its expenditure of money to provide public services," but that it may still recover for losses incurred as an "ordinary marketplace actor[]." *Id.* at 977-78.

Animating the court's decision was the concern that "[i]f government expenditures *alone* sufficed as injury to property, any RICO predicate act that provoked any sort of governmental response would provide the government entity with standing to sue." *Id.* at 976. In other words, RICO does not entitle governments to recover ordinary and customary costs related to common-place wrongs. As Judge Polster explained, however, that is not this case. After careful analysis, he concluded that while *Canyon County* limits what a public entity can recover under RICO, it does *not* bar recovery for the extraordinary expenses—of a different quantity and quality than

1   expected—incurred in responding to the opioid crisis that Defendants manufactured.  *In re Nat'l*

2   *Prescription Opiate Litig.*, 2018 WL 6628898, at *10 (*Canyon County* does not preclude public

3   entities from "recover[ing] costs greatly in excess of the norm," as alleged here, "so long as they

4   can prove the costs were incurred due to Defendants' alleged RICO violations.").

5          The FAC, like the complaints Judge Polster addressed in his orders, identifies many

6   examples of these extraordinary costs.  These include, but are not limited to, increased costs for

7   "additional therapeutic and prescription drug purchases, and other treatments for patients

8   suffering from opioid-related addiction and disease," "training emergency and/or first responders

9   and other city employees in proper treatment of drug overdoses," and "emergency responses

10  . . . to opioid overdoses."  FAC ¶¶ 851, 882.  The City has even been required to purchase

11  "specialized screening equipment—at a cost of $250,000 per unit—to detect opioids being sent

12  into the jails;" to purchase naloxone and train "65 librarians," and many other city employees, on

13  how to administer the drug to patrons suffering from overdoses; and to "replace toilet grinders in

14  the main library because drug users routinely flush needles down the toilet."  *Id.* ¶¶ 57, 61,

15  851(h), 882(h).  These costs and others greatly exceed the norm and are recoverable.  *In re Nat'l*

16  *Prescription Opiate Litig.*, 2018 WL 6628898, at *10.

17         Additionally, the City can undoubtedly still recover losses sustained "as a consumer or

18  other type of market participant."  *Canyon County*, 519 F.3d at 976.  Costs such as those

19  "associated with purchasing naloxone to prevent future fatal overdoses" "are clearly associated

20  with Plaintiffs' *participation in the marketplace*, and for those costs, Plaintiffs can undoubtedly

21  recover" under *Canyon County*.  *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *10

22  (emphasis in original).  The City has alleged these exact same losses.  *See, e.g.*, FAC ¶¶ 851(d),

23  882(d) (seeking "[i]ncreased costs associated with providing police officers, firefighters,

24  emergency and/or first responders, and other city employees with naloxone . . . to block the

25  deadly effects of opioids in the context of overdose").

26         Thus, as the MDL transferee court correctly held, *Canyon County* does not preclude the

27  City's alleged RICO injuries and does not deprive the City of statutory standing.

28

1992508.1

**B.      The City pleads its RICO mail and wire fraud claims with particularity.**

The complaint alleges that the Manufacturer and Distributor Defendants engaged in a decades-long scheme "to materially expand prescription opioid use by altering the medical community's prescribing practices of opioids through repeated fraudulent statements and misrepresentations." *In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856, at \*17 (finding that the plaintiffs properly pled a RICO enterprise involving the Manufacturer and Distributor Defendants).  In complex fraud schemes, as alleged here, Rule 9(b) does not require alleging "all facts supporting each and every instance" of fraud, only "some level of specificity" such that defendants have notice of the claims against them. *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 999 (9th Cir. 2010).[40] *See also In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856, at \*19–21 (finding that the MDL complaint—which this complaint closely parallels—pled with particularity that the Opioid Marketing and Supply Chain Enterprises, including the Manufacturer and Distributor Defendants, committed acts of fraud and racketeering).  Mail and wire fraud can be established by any communication that is "a step in the plot" or furthers a fraudulent scheme. *See Schmuck v. United States*, 489 U.S. 705, 710-11 (1989).  Thus, the relevant communications are not limited to publications containing misrepresentation (or omissions). *Id.*  "[E]ach member of the scheme does not need to make a separate misrepresentation." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 4890594, at \*11–12 (N.D. Cal. Oct. 30, 2017).  Accordingly, Defendants cannot prevail on this motion by myopically applying Rule 9(b) to their company's public statements.  They are liable for particularized fraudulent statements of other Defendants in any scheme in which they knowingly participated. *Id.*  In this context, the analysis of the Manufacturer and Distributor Defendants is too narrow to justify dismissal.

The Manufacturer and Distributor Defendants incorrectly suggest that the City failed to satisfy Rule 9(b) because it improperly used "group pleading" and "lump[ed] multiple defendants

---

[40] This standard, and the allegations in this complaint, stand in stark contrast to the cases with vague pleadings cherry-picked by Defendants. *See, e.g.*, Dkt. 170 at 8 (citing *Bhambra v. Ampco Sys. Parking*, No. C 08-05326 CRB, 2009 WL 10694587, at \*5 (N.D. Cal. June 10, 2009) (dismissing a case involving a "largely unintelligible" pro se complaint about a governmental conspiracy to issue parking tickets)).

together."  Dkt. 169, at 13; Dkt. 170, at 9; Dkt. 171, at 4.  But this argument fails because the

City's complaint isolated nine specific patterns of misrepresentations by Manufacturer

Defendants about the science behind their drugs, and each of the Defendants who made them.

FAC ¶¶ 225–283 (describing "Falsehood No. 1"); ¶¶ 284–291 (describing "Falsehood No. 2");

¶¶ 292–302 (describing "Falsehood No. 3"); *et seq.*  This misinformation campaign[41] was pursued

collectively by all Defendants to raise demand for Manufacturer Defendants' products, which

were sold by Distributor Defendants.  *Id.*; *id.* at ¶¶ 604-36, 709 (describing the collective efforts

of Manufacturer and Distributor Defendants to create demand for their products through

deception).  At the supply chain level, the Marketing and Distributor Defendants also were aware

of and omitted information regarding suspicious orders, thereby concealing and propagating their

scheme.  FAC ¶¶ 594, 597–601, 632–37, 680, 797–825.[42]  These are the same RICO allegations

that established fraud under the Rule 9(b) standard in the MDL.  *See In re Nat'l Prescription*

*Opiate Litig.*, 2018 WL 4895856, at *19–21.

These allegations are more than sufficient to put Defendants on notice of the claims

against them, particularly since they litigated them (unsuccessfully) through summary judgment

in the MDL (after their original FRCP 9(b) motion to dismiss was denied).  *In re Nat'l*

*Prescription Opiate Litig.*, 2018 WL 4895856, at *18–21; 2019 WL 4279233, at *2–3.  There is

no compelling reason to depart from the MDL transferee court's ruling and dismiss those same

claims at the pleading stage here.

[41] The lobbying components of this campaign are not immunized under the *Noerr-Pennington* doctrine, which Defendants' own case applies only to pre-litigation settlement demands and discussions.  *See* Dkt. 170 at 9-10 (citing *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 940 (9th Cir. 2006)).

[42] The Distributor Defendants' suggestions that no statement about a company's legal compliance can ever rise to the level of fraud is incorrect. Dkt. 170 at 9-10.  Defendants cite cases where no representations were made because a company only stated their opinions on a law's meaning or included puffery about corporate responsibility in their company ethics manual.  *Id.*  (*citing Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 621 (9th Cir. 2004); *Singh v. Cigna Corp.*, 918 F.3d 57, 60–64 (2d Cir. 2019); *Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 521–24 (11th Cir. 2000)). As this Court well knows, a company that expressly deceives regulators and the public about the safety of its products and its fulfillment of its legal duties can be held liable for fraud under RICO.  *In re Volkswagen*, 2017 WL 4890594, at *15 (denying motion to dismiss).  *See also In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 973–74 (N.D. Cal. 2018) (finding that RICO mail and wire fraud claims were pled with particularity where plaintiffs alleged that a corporation claimed that they were "compliant with the most stringent emission regulations in the world").

**C.      A felony violation of § 843(a)(4)(A) of the CSA is actionable racketeering under RICO § 1961(1)(D).**

By furnishing false information in violation of the CSA, Defendants have committed felonious acts of racketeering under RICO.  Under 18 U.S.C. § 1961, acts of racketeering include "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance . . . punishable under any law."  This encompasses violations of § 843 (a)(4)(A) of the CSA, which makes it unlawful to "furnish false or fraudulent information in, or omit any material information from, any application, report, record, or other document required to be made, kept, or filed."  *See In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856, at *21-22 (finding that § 843 violations qualify as racketeering activity); 2019 WL 4279233, at *1-2 (noting that "no party objected to [this] finding," which the Court adopted in denying Defendants' motion to dismiss, and "reaffirm[ing that] legal conclusion" on summary judgment when Defendants attempted to revive it with no new analysis).

Defendants again seek to re-litigate the MDL transferee court's conclusion that violations of § 843 constitute RICO predicate acts.  Yet they fail to advance any new arguments or argue that Ninth Circuit precedent should change the outcome.[43]  Nor could they.  There is no doubt that felony violations of the CSA are racketeering activities under § 1961(1)(D).  *See RJR Nabisco*, 136 S. Ct. at 2096 ("RICO . . . defines 'racketeering activity' to encompass dozens of state and federal offenses . . . [including] . . . drug-related activity that is 'punishable' under federal law[.]") (citing 18 U.S.C. § 1961(1)(D)).  Violations of § 843 are punishable by up to four years imprisonment, making them felonies.  21 U.S.C. § 843(d)(1).  Moreover, as the MDL transferee court concluded, there is simply no basis for Defendants' suggestion that felonies related to "recordkeeping" are treated differently.  *See In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856, at *21 (rejecting Defendants' distinction and finding that providing false information qualifies as "concealment," an express act of racketeering under § 1961(1)(D)).  The MDL

_____

[43] Notably, Defendants have retreated from citing the California authority they attempted (unsuccessfully) to introduce in the MDL.  *See In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856, at *21, n.32 (distinguishing *In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*, 590 F. Supp. 2d 1282, 1290 (C.D. Cal. 2008)).

1   transferee court's conclusion is further buttressed by the legislative history of the CSA's reporting

2   requirement, which was intended to prevent widespread diversion of controlled substances into

3   the illicit market. *See* 970 U.S.C.C.A.N. 4566; *United States v. Moore*, 423 U.S. 122, 135 (1975).

4   There is no reason to treat this felonious act furthering drug trafficking differently than others.

5        Defendants' argument about the basis for the reporting requirements in 21 U.S.C. § 827 is

6   a red herring. As previously recognized by the MDL transferee court, Defendants had prior

7   specific duties as licensed manufacturers and distributors of certain controlled substances

8   ("registrants") to abide by DEA regulations for the circulation of those substances. *In re Nat'l*

9   *Prescription Opiate Litig.*, 2019 WL 3917575, at *3 (citing 21 U.S.C. §§ 823 and 21 C.F.R.

10  §§ 1301.71-77). The DEA, in turn, has promulgated regulations requiring that each registrant

11  "inform the Field Division Office of the Administration in his area of suspicious orders when

12  discovered by the registrant." *Id.* (citing 21 C.F.R. § 1301.74(b)).[44] There is no statutory

13  ambiguity wide enough to excuse Defendants from all reporting obligations, particularly given

14  the scale of the facially improper orders and sales alleged here.

15      **D.**     **Defendants conspired to create a market for opioids.**

16       Plaintiffs have comprehensively pled a RICO conspiracy. "RICO conspiracy under

17  § 1962(d) requires only that the defendant was 'aware of the essential nature and scope of the

18  enterprise and intended to participate in it.'" *United States v. Christensen*, 828 F.3d 763, 780 (9th

19  Cir. 2015). In a case like this, where the Defendants collectively circulated misinformation about

20  and concealed the dangers of dangerous products, "[t]he same allegations that demonstrate

21  [Defendants'] participation in the enterprise support the [RICO] conspiracy claim." *In re*

22  *Volkswagen*, 2017 WL 4890594, at *17; *see also United States v. Hernandez*, No. CR-14-0120,

23  _____

24  [44] Defendants' assertion that the passage of Pub. L. No. 115-271 must mean there was a
    preexisting loophole is incorrect. *See* Dkt. 169, at 12 n.12. Pub. L. No. 115-271 reinforced

25  *existing legal requirements* imposed on registrants. *See* 164 Cong. Rec. S 6159-06, comments of
    Senator Cantwell at 34 ("One thing I really want to draw attention to is this issue of hearing over
    and over about how opioid manufacturers have flooded our communities when, in reality, current

26  law says they are supposed to monitor and track the distribution of this drug. Well, in too many
    cases, those safeguards have not been followed."); *see also id.* ("What is clear, though, is that we

27  need to do something now to make sure that opioid manufacturers follow the law that is already
    on the books about the reporting of suspicious distribution or volumes of distribution that are

28  suspicious. Today, this legislation takes a major step forward on that front.").

2015 WL 4498084, at *5 (N.D. Cal. July 23, 2015) ("[P]roof of an agreement the objective of

which is a substantive violation of RICO (such as conducting the affairs of an enterprise through

a pattern of racketeering) is sufficient to establish a violation of section 1962(d).").[45]  A RICO

conspiracy does not "require[] an[y additional] overt or specific act."  *Salinas v. United States*,

522 U.S. 52-54 (1997).  Any agreement to "pursue the same criminal objective" will suffice.  *Id.*

Decades of coordinated illegal conduct can support that allegation.  "Where, as here, the

evidence establishes that each defendant, over a period of years, committed several acts of

racketeering activity in furtherance of the enterprise's affairs, the inference of an agreement to do

so is unmistakable."  *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978); *see also United

States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 903–04 (D.D.C. 2006) (finding tobacco

companies liable under RICO, finding they worked together, competing only for market share,

"coordinat[ing] significant aspects of their public relations, scientific, legal, and marketing

activity in furtherance of the shared objective—to use mail and wire transmissions to maximize

industry profits by preserving and expanding the market for cigarettes through a scheme to

deceive the public").  In the MDL, similar allegations concerning a pattern of deception were

found to establish an enterprise engaging in conspiracy.  *In re Nat'l Prescription Opiate Litig.*,

2018 WL 4895856, at *17 (rejecting Defendants' contention that the conduct alleged could

merely be "a pattern of crimes" "independently and without coordination").  *See also In re

Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 33–50 (1st Cir. 2013) (upholding a RICO

verdict that pharmaceutical manufacturers conspired to use a fraudulent marketing enterprise to

encourage excessive prescribing of their drugs).  The City's claim that Defendants created

fraudulent enterprises (beginning with the Marketing Enterprise) to get thousands of unwitting

physicians to foster widespread dependence on prescription pharmaceuticals is even stronger than

the *Neurontin* plaintiff's RICO claims.  FAC ¶¶ 403-454, 697–709, 762–796.  Having created

---

[45] *Monterey Bay Military Housing, LLC v. Ambac Assurance Corp.* established no pleading rule
that is relevant here. No. 17-CV-04992-BLF, 2018 WL 3439372, at *13 (N.D. Cal. July 17,
2018).  It held only that where certain RICO allegations were levied only against certain
defendants, whereas others committed no predicate acts, the complaint must identify the basis for
liability against the various defendants.  *Id.*  Here, as demonstrated by the factual allegations, all
RICO Defendants committed predicate acts and conspired together.

widespread dependence, Defendants formed the Opioid Supply Chain Enterprise whose members systematically concealed, and refused to investigate or report, suspicious orders of prescription opioids to keep the floodgates of opioids open, with rising annual quotas. *Id.* ¶¶ 797–825, 858–61.

Defendants' argument that the City did not allege anything more than parallel, profit-seeking activity among competitors is unpersuasive, and has already been rejected by the MDL transferee court. As in *Philip Morris*, while the Manufacturer Defendants were ostensibly competitors, they cooperated in a non-competitive way to create, grow, and sustain a market for prescription opioids (that would not have existed if doctors, patients, and regulators knew the truth). FAC ¶¶ 709-17, 797–825, 858-61. *See also In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856, at *17, 46–47 (finding a common enterprise and civil conspiracy and explaining that "[i]f such a conspiracy is established by the facts, a profit motive would not negate a common purpose."). The conspiracy lay not in their mere membership in common trade groups (Dkt. 169 at 14-15), but their creation and manipulation of organizations and literature to spread misinformation. FAC ¶¶ 609-30; 709-17, 858-61. *See also In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856, at *17 ("The Defendants allegedly used front groups and KOLs, as well as their own sales representatives, to spread their false and misleading message."). This conduct furthered and actualized the common purpose of "unlawfully increasing sales, revenues and profits by fraudulently increasing the quotas set by the DEA that would allow [the Supply Chain Defendants] to collectively benefit from a greater pool of prescription opioids to manufacture and distribute." FAC ¶ 802. Nothing else is necessary to prove conspiracy.

**E.      Defendants' fraudulent scheme caused the City's injuries.**

RICO causation requires two elements: (1) factual or "but-for" causation, and (2) proximate causation. *See Oki Semiconductor Co. v. Wells Fargo Bank, N.A.*, 298 F.3d 768, 773 (9th Cir. 2002). Both elements are present here.

**1.      The City properly pleads factual causation.**

The MDL transferee court held that the CT1 plaintiffs properly pled but-for causation for RICO claims that are nearly identical to the City's RICO claims here. Rejecting substantially

similar arguments to those Defendants make here, Magistrate Judge Ruiz ruled that, "[c]ontrary to Defendants['] contention, 'but-for' causation is rather easily satisfied by the allegations in the complaint." *In re Nat'l Prescription Opiate Litig*., 2018 WL 4895856, at *12.

This Court should not depart from that holding. The City pleads in detail how RICO Marketing Defendants concealed the true risks and dangers of opioids from the medical community and the public, including in San Francisco, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. *See* FAC ¶¶ 762-96. The City also details how RICO Supply Chain Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues and profits by fraudulently increasing the quotas set by the DEA that would allow them to collectively benefit. *See id.* ¶¶ 797-825. But for the opioid epidemic created by these Defendants, "San Francisco would not have lost money or property. Such costs were either completely new or greatly in excess of the norm of what San Francisco would ordinarily pay or be expected to pay to provide services to its residents." *Id.* ¶¶ 852, 883. Taking these averments in the FAC as true, "but-for" causation is clearly alleged.

Manufacturer Defendants, in a throw-away paragraph, argue that Plaintiffs have not satisfied but-for causation because the FAC does not identify specific suspicious shipments into San Francisco that should have been reported or stopped. Dkt. 171 at 5. Those allegations are not necessary. As described above, Plaintiffs allege in detail how opioids were shipped into San Francisco and how those shipments caused corresponding harms. As the MDL transferee court correctly concluded, Plaintiffs are not required to allege every detail of each alleged shipment to plead viable RICO claims. *See Leonard v. City of Los Angeles*, 208 F. App'x 517, 519 (9th Cir. 2006) ("In the RICO context, at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice.").

### 2. The City properly pleads legal causation.

Defendants contend that the City fails to plead proximate causation because they do not allege a direct link between Defendants' fraudulent conduct and the City's injuries. *See* Dkts. 169 at 7; 171 at 2-5; 170 at 4-8. But they cite no applicable law, miscast well-pled RICO allegations,

and employ an improperly inflexible causation test that is contrary to prevailing precedent.

Proximate cause requires only that there be "some direct relation between the injury asserted and the injurious conduct alleged." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008) (quoting *Holmes v. Security Protection Investor Corp.*, 503 U.S. 258, 268 (1992)). Proximate cause "is a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case." *Id.* at 654-55. Thus, "[i]ssues of proximate cause are generally factual inquiries that are not appropriate for resolution on a Rule 12(b)(6) motion." *Pradhan v. Citibank, N.A.*, No. 10–CV–03245–LHK, 2011 WL 90235, at *6 (N.D. Cal. Jan. 10, 2011).

Applying these well-established principles, Judge Polster rejected identical arguments to those Defendants make here, including Defendants' purportedly too-attenuated, seven-step causal chain. Specifically, the court found that "Plaintiffs have alleged sufficient facts to support a far more direct chain of causation," and that "Plaintiffs have sufficiently alleged proximate cause for their RICO claims." *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898 at *5-6. Applying the policy considerations underlying the "direct relation" requirement articulated by the Supreme Court in *Holmes*, Judge Polster further found that:

> Here, Plaintiffs' alleged damages are not speculative, but concrete and ascertainable. No other party can vindicate the law and deter Defendants' alleged conduct because Plaintiffs' asserted damages are not recoverable by any other party. Finally, there is no potential for—and thus no reason for the Court to have to adopt complicated rules to prevent—duplicative recoveries.

*Id.* at *6.

Judge Polster's reasoning applies with equal force here. Like the Sixth and Ninth Circuits, this Court has recognized the "three non-exhaustive factors" which make up the proximate cause inquiry:

> (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries.

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 349 F. Supp. 3d

881, 906 (N.D. Cal. 2018) (quoting *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1169 (9th Cir. 2002)). Importantly, these factors are "not an elements test, so even if one factor tips in favor of Defendants' position, the totality of the circumstances [can] compel[] the Court to find in favor of the City." *City of Los Angeles v. Wells Fargo & Co.*, 22 F. Supp. 3d 1047, 1058 (C.D. Cal. 2014). In these cases, plaintiffs "must be allowed to make their case through presentation of evidence." *Mendoza*, 301 F.3d at 1171.

Plaintiffs easily satisfy all these factors. First, Plaintiffs are in the best position to deter the injurious conduct at issue, and there is no more direct victim for their damages. *See Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 943 F.3d 1243, 1252 (9th Cir. 2019) ("[W]e consider . . . the general interest of deterring injurious conduct or whether there are more directly injured victims we can count on to hold Defendants liable."). Here, Plaintiffs' damages include increased and extraordinary costs associated with emergency services, healthcare, treatment, police, and mental health services, among others, as well as costs incurred as a marketplace participant to combat the opioids epidemic. FAC ¶ 851. An abuser of black market opioids could not assert a personal injury claim for such harms. And even if such injuries somehow "belonged" to an individual, a person addicted to opioids (or dead from an overdose) could not be counted on to vindicate the law. *See Mendoza* 301 F.3d at 1170 (9th Cir. 2002) ("undocumented workers cannot 'be counted on to bring suit for the law's vindication'").

Moreover, as Magistrate Judge Ruiz aptly observed, "Defendants have stridently asserted that civil RICO damages are unavailable for personal injuries . . . . In such case, patients, who were inappropriately prescribed opioids and suffered physical or mental injuries as a result, would be precluded from bringing a RICO claim to recover for their personal injuries." *In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856, at *16 n.28. Here, as in the CT1, "[n]o other category of potential plaintiff groups, aside from states and their political subdivisions, can be counted on to vindicate the law in the same manner." *Id.* at *16; *see also State v Purdue Pharma Inc.*, 2018 WL 4566129, at *12 ([T]he Court is not convinced there are parties other than the State better suited to litigate these issues. . . .").

The City also satisfies the second factor, which, as applied by this Court, examines

whether the relationship between conduct and injury is "speculative in the extreme." *In re Volkswagen* 2017 WL 4890594, at *8 (quoting *Canyon Cty.*, 519 F.3d at 982); *see also id.* ("[Q]uestions as to the amount of damage, as opposed to the plausibility of damage, are best resolved at a later stage in the litigation."). No speculation is required here. Plaintiffs link Defendants' fraudulent scheme with the injuries suffered by the City, alleging in detail how Manufacturers concealed and misrepresented the true risks and dangers of opioids from the medical community and the public. FAC ¶ 764. This conduct was intended to and did promote the widespread use of dangerous, addictive opioids, causing an epidemic of addiction that injured the Plaintiffs "in the form of substantial losses of money and property that logically, directly and foreseeably arise from the opioid-addiction epidemic." *Id.* ¶¶ 851-54. Likewise, the RICO Supply Chain Defendants concealed and suppressed and/or ignored warnings from "third parties, whistleblowers and governmental entities about the reality of the suspicious orders that the RICO Supply Chain Defendants were filling on a daily basis—leading to the diversion of hundreds of millions of doses of prescriptions opioids into the illicit market." *Id.* ¶ 868. These consequences were foreseeable, and in turn directly caused the Plaintiffs to suffer substantial losses of money and property as a result of the RICO Supply Chain Defendants' fraudulent scheme. *Id.* ¶¶ 880-84. *See Bridge*, 553 U.S. 639 at 658 (finding proximate cause where damages were "a foreseeable and natural consequence of petitioners' scheme").

Finally, Plaintiffs' case will not require the Court "to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries." *In re Volkswagen*, 2017 WL 4890594, at *9 (citing *Mendoza* 301 F.3d at 1169). Typically, the question of "whether the existence of [more direct] victims would create a risk of multiple recovery . . . . [is a] factual question[], which we cannot resolve on a Rule 12(b)(6) motion." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1055 (9th Cir. 2008). This Court has found that "this factor is implicated in cases involving 'passed-on' injury, which is 'injury derived from a third party's direct injury.'" *Id.* Here, the costs the City has incurred as a result of Defendants' fraudulent enterprises are not derived from other persons' physical or personal injuries suffered as a result of over-prescription, overuse, and addiction. Rather, the City's injuries constitute direct injuries

resulting from increased and extraordinary costs to carry out their functions, among others. FAC ¶ 851. Defendants' conduct was designed to and did create an increased demand for and overabundant supply of their products on a national scale, which generated an opioid crisis in these communities and across the country. *Id.* ¶¶ 762-825. The City's damages are not derivative of other persons' injuries, but rather are their own direct costs spent in addressing the crisis. That there are two categories of direct victims—those who suffer personally and those who suffer economically—is no bar to causation. *See Painters*, 943 F.3d at 1251-52 (finding no concern of "duplicative recoveries" or "overlap" where plaintiff third-party-payors sought to recover only the dollars paid as a result of the defendants' RICO violations, and where plaintiff's action "expressly excludes individuals who are pursuing personal injury claims.").[46]

As discussed above, Judge Polster has previously adopted the foregoing application and interpretation of Supreme Court precedent, including *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010), *Holmes*, 503 U.S. 25, and *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459 (2006). *In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856, at *13-16.[47]

Defendants nevertheless argue that "governing Ninth Circuit authority" commands a result that departs from Judge Polster's ruling, but their application and interpretation of these cases ignore material and glaring factual differences. For example, in *Canyon County*, the Ninth Circuit was concerned by the unexplainable disconnect between the alleged injuries that were "only tenuously related to the RICO violation." 519 F.3d at 981. Specifically, the court ruled that it is "not clear how [private] companies' hiring of undocumented immigrants would increase demand for health care and law enforcement within Canyon County" as compared to if the companies hired legally authorized workers. *Id.* at 982. *Canyon County* did not deal with a provable and quantifiable causal link between the defendant's conduct and plaintiff's injury, as

---

[46] *See also State v. Purdue Pharma L.P.*, 2019 WL 2331282, at *6 ("The allegations in the present case are wholly different in that they are not based upon the State being fraudulently induced to inaction, nor does the State seek damages for the physical injuries of the individual opioid users. Rather, the State seeks damages sustained by it and its political subdivisions as a direct result of Purdue's alleged marketing activities designed to increase prescriptions. The claims are simply different.").

[47] The City further incorporates by reference the plaintiffs' underlying briefing on this Supreme Court precedent. *See* Cabraser Decl., Ex. E at 35-45.

the City alleges here.  Indeed, for reasons articulated above, the City's costs are directly linked to skyrocketing opioid use and addiction, which, contrary to *Canyon County*, were **the express purposes** of Defendants' RICO activities.

Defendants' reliance on several tobacco cases is similarly misplaced.  *See Ass'n of Washington Pub. Hosp. Districts v. Philip Morris Inc*., 241 F.3d 696, 701-03 (9th Cir. 2001); *Oregon Laborers-Employers Health & Welfare Tr. Fund v. Philip Morris Inc*., 185 F.3d 957, 963 (9th Cir. 1999).  These cases turned primarily on the conclusion that the plaintiffs' alleged injuries were "derivative of the injuries suffered by smokers," *Ass'n of Washington,* 241 F.3d at 703, which, as discussed above, is not the case here.  *See* IV.A.1, *supra*.  The Washington court further found that "[s]mokers [were] the 'more direct victims'" who could bring their own claims to "vindicate the public interest."  *Id.*  This makes sense because tobacco use by the individuals treated in these cases was legal.  Misuse of diverted opioids is not legal.  And even if any costs expended by the City could be categorized as "treatment," the individuals receiving such alleged "treatment" have no personal injury claims for their illegal use.  Thus, here, unlike in the tobacco cases, there is no more direct victim who can vindicate the harms the City seeks to redress in this suit.

Defendants also rely on *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866 (9th Cir. 2010), but that case is distinguishable because it involved a motion for summary judgment, and involved a vastly different scenario where the State (the more "immediate victim") "did in fact sue."  *Id.* at 872-74.  Here, the State of California has not brought RICO claims in this litigation and could not recover the damages claimed by the City.  Finally, both *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 651 (9th Cir. 2019) and *Ozeran v. Jacobs*, 798 F. App'x 120, 122 (9th Cir. 2020) are unavailing.  In both cases, the plaintiff alleged that a competitor's wrongful conduct aimed at third parties resulted in plaintiff's business losses.  Business loses, however, are different than the City's injuries here.  Indeed, as the district court in *Harmoni* observed, "[b]usinesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [Plaintiffs'] lost sales were the product of the competition . . . ."  *Harmoni Int'l Spice, Inc. v. Wenxuan Bai*, 2016 WL 9275400 at *18 (C.D.

Cal. Nov. 14, 2016) (citing *Anza*, 547 U.S. at 459). In contrast, the City is not alleging sales losses that could be explained by numerous, complex economic indicators of the international commodities trade. The City is alleging damages expended in direct response to and losses directly occasioned by the existence of the opioid epidemic Defendants created.

In short, the City alleges injuries in a detailed, 294-page complaint that were caused by and the intended result of Defendants' conduct. Their claims should be allowed to proceed.

**V.     Plaintiffs' allegations of Anda's wrongful conduct are sufficiently particular, and Anda should not be dismissed from this action.**

Defendant Anda Inc. ("Anda") separately seeks dismissal, asserting that Plaintiffs' allegations are insufficiently particular under Rules 8 and 9(b) to put it on notice of its wrongful conduct. Dkt. 167 at 1. In the FAC, Plaintiffs allege in great detail Anda's practices that flooded the San Francisco market with opioids.

Anda challenges these allegations because, in multiple instances, Plaintiffs plead the parallel conduct of multiple Defendants as a group, rather than alleging the exact same behavior separately as to each. Judge Polster already rejected similar Rule 8 "group pleading" arguments on multiple occasions,[48] and the Ninth Circuit has instructed that "[t]here is no flaw in a pleading . . . where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016). Similarly, Anda attempts to resurrect Rule 9(b) pleading arguments that have also been rejected on multiple occasions due to the depth of the allegations and complexity of the scheme alleged in substantially similar opioid complaints.[49] For the same reasons, Anda's arguments should be rejected here.

---

[48] *See In re Nat'l Prescription Opiate Litig. (Muscogee)*, 2019 WL 2468267, at *13; *In re Nat'l Prescription Opiate Litig. (West Boca)*, 2020 WL 1669655, at *14.

[49] *See In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856, at *12 n.19 (holding Summit County's complaint against defendant met 9(b)'s pleading requirements); *In re Nat'l Prescription Opiate Litig. (Muscogee)*, 2019 WL 2468267, at *13 (holding Muscogee nation's complaint met 9(b)'s pleading requirements); *In re Nat'l Prescription Opiate Litig. (West Boca)*, 2020 WL 1669655, at *20 (holding that West Boca's complaint met 9(b)'s pleading requirements).

**A.  Plaintiffs specifically allege that Anda intentionally flooded San Francisco with dangerous opioids.**

Plaintiffs allege that Anda, along with the other Distributor Defendants, ignored its legal obligations to detect, report, and suspend suspicious orders and, instead, flooded San Francisco with more opioids than could be used for legitimate medical purposes.  FAC ¶¶ 166, 580.  Anda is the fourth largest distributor of generic pharmaceuticals in the country.  *Id.* ¶ 168.  Between 2006 and 2014, Anda alone distributed 2,659,892 dosage units of opioids with a total dosage of 126,769,563 morphine milligram equivalents to San Francisco residents.  *Id.* ¶ 45.  Remarkably, given its volumes of shipments, Anda failed to provide written notice to the California State Board of Pharmacy for even a single suspicious order as required by California Business and Professions Code § 4169.1.  *Id.* ¶ 913.  Instead, Anda, like the other Distributor Defendants, sold these prescription opioids "without fulfilling the fundamental duty of wholesale drug distributors to detect and warn of diversion of dangerous drugs for non-medical purposes."  *Id.* ¶166.  This unlawful conduct "is a substantial cause for the volume of prescription opioids plaguing San Francisco."  *Id.*

Anda knew that the other Defendants named in this action could report both its failure to intercept suspicious orders and its failure to report suspicious orders to the DEA.  As a result, Anda and the other Defendants had an incentive to communicate with each other about reporting suspicious orders to ensure consistency in their dealings with the DEA.  *Id.* ¶ 715.

Plaintiffs allege coordinated conduct between multiple Defendants, through joint associations and otherwise, that facilitated the oversupply of opioids in San Francisco.  *Id.* ¶ 609, 612-30.  Anda, and all Distributor Defendants, are members of the Healthcare Distribution Alliance, or "HDA."  *Id.* ¶ 613.  Defendants, including Anda, utilized their membership in the HDA and other forms of collaboration to form agreements about their approach to their obligation under the CSA to report suspicious orders.  Defendants overwhelmingly agreed on the same approach—that is, do not to identify, report, or halt suspicious orders and to thus fail to prevent diversion.  *Id.* ¶¶ 614-20, 714.

Defendants, including Anda, were aware, both individually and collectively, of the

suspicious orders that flowed directly from their facilities. *Id.* ¶ 714. Their agreement to restrict

reporting provided an added layer of insulation from DEA scrutiny for the entire industry, with

Anda and the other Defendants collectively responsible for the entire group's compliance with

their reporting obligations. *Id.* ¶¶ 714, 802. These allegations are the basis for including Anda as

one of the Supply Chain Defendants in the City's RICO claim. *Id.* ¶ 797. Anda and the other

RICO Supply Chain Defendants operated "in a conspiracy of silence" in violation of both the

CSA and RICO. *Id.* ¶ 800. Anda and the other Supply Chain Defendants disseminated false and

misleading statements to state and federal regulators deceptively claiming, *inter alia*, that they

were (1) complying with their obligations to design and maintain effective controls against

diversion and (2) complying with their obligation to notify the DEA of any suspicious orders or

diversion of their prescription opioids. *Id.* ¶ 804. By intentionally refusing to report and halt

suspicious orders of their prescription opioids, Anda, like the other RICO Supply Chain

Defendants, engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern

of racketeering activity. *Id.* ¶ 825.

## B. Anda's critiques of Plaintiffs' factual allegations are without merit.

As summarized above, the FAC pleads specific allegations regarding Anda's (1) flood of

opioid sales into San Francisco; (2) participation in a scheme by all Defendants to circumvent

their obligations to detect, report, and suspend suspicious orders of opioids; and (3) efforts to

conceal that circumvention through a conspiracy of silence. Anda's arguments that these

allegations fail to provide sufficient notice under Rule 8 or meet the particularity pleading

requirements of Rule 9(b) have been rejected more than once by the MDL transferee court.

Specifically, the court found that similar allegations provide "fair notice of the claims sufficient to

permit the Defendants to understand and respond to them," and correctly observed that group

pleading case law

> Do[es] not stand for the proposition that where multiple defendants
> are alleged to have engaged [in] the same pattern of conduct or
> conspired in a fraudulent scheme, that a plaintiff must reiterate its
> allegations against each defendant individually. Such a finding
> would exponentially increase the length of pleadings while adding
> no substantive value.

1    *In re Nat'l Prescription Opiate Litig. (Muscogee)*, 2019 WL 2468267, at *13. Ninth Circuit

2    decisions are in accord. *See, e.g.*, *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161,

3    1184 (9th Cir. 2016) ("There is no flaw in a pleading, however, where collective allegations are

4    used to describe the actions of multiple defendants who are alleged to have engaged in precisely

5    the same conduct.").[50]  There is, therefore, no reason for this Court to reach a contrary conclusion.

6        It is worth noting that much of the conduct pleaded against Anda and its co-Defendants

7    involves *omissive* conduct: their failure to detect suspicious orders, their failure to report them,

8    and their failure to stop them.  Omissive conduct, by its nature, is difficult to plead with

9    specificity.  *Huntair, Inc. v. Gladstone*, 774 F. Supp. 2d 1035, 1044 (N.D. Cal. 2011) (stating that

10   the Rule 9(b) standard is somewhat relaxed when a claim rests on an alleged fraudulent omission

11   because "a plaintiff cannot plead either the specific time of [an] omission or the place, as he is not

12   alleging an act, but a failure to act").

13       Anda's argument that Plaintiffs have not identified a "single specific allegation of

14   misrepresentation or fraud by Anda" is also misplaced.  Dkt. 167 at 5.  Plaintiffs allege Anda's

15   participation in a fraudulent scheme.  There is no requirement to allege specific false statements

16   as to every defendant that participates in a scheme.  *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th

17   Cir. 2007) ("[T]here is no absolute requirement that where several defendants are sued in

18   connection with an alleged fraudulent scheme, the complaint must identify *false statements* made

19   by each and every defendant.").  Moreover, the bases of Plaintiffs' claims against Anda and its

20   codefendants are broader than misrepresentation and fraud.  For example, there are three

21   independent bases under which the People's UCL claim may be pled: unlawful, unfair, or

22   fraudulent conduct.  *See* § II, *supra*.  The People allege that Anda's conduct violated all three

23   prongs.  FAC ¶¶ 907-19.  Even if the Court were to rule that Plaintiffs' FAC did not meet the

24   pleading requirements of Rule 9(b) under the "fraudulent" prong, Anda's claims under the

25   ---
     [50] *See also Adobe Sys. Inc. v. Blue Source Grp., Inc.*, 125 F. Supp. 3d 945, 964 (N.D. Cal. 2015)
26   (where plaintiff defined "Defendants" as inclusive of all defendants and where the gravamen of
     plaintiff's allegations was that all defendants infringed on trademarks and copyrights, complaint
     provided sufficient notice); *Sebastian Brown Prods., LLC v. Muzooka, Inc.*, 143 F. Supp. 3d
27   1026, 1037 (N.D. Cal. 2015) (finding complaint did not impermissibly lump defendants and
     provided them with sufficient notice where it stated that individual corporate directors and
28   officers committed infringement through operation of various websites).

1   unlawful and unfair prongs of the UCL should be sustained.

2           Finally, while Plaintiffs have pled aggregate—and massive—fraudulent sales of opioids

3   by Distributor Defendants into San Francisco, including by Anda, the specific details of those

4   transactions are in Defendants' possession, not Plaintiffs'.  FAC ¶¶ 45, 631, 635.  Rule 9(b)

5   requires only that plaintiffs "specifically plead those facts surrounding alleged acts of fraud to

6   which they can reasonably be expected to have access." *Concha v. London*, 62 F.3d 1493, 1503

7   (9th Cir. 1995).  In fraud cases, courts in the Ninth Circuit "relax pleading requirements where the

8   relevant facts are known only to the defendant." *Rubenstein v. Neiman Marcus Grp. LLC*, 687

9   Fed. App'x 564, 568 (9th Cir. 2017).  Because Anda is uniquely in possession of the details of its

10  transactions, including whether each order was held by its suspicious order monitoring system

11  and released, Plaintiffs have adequately pled their claims against Anda.  Plaintiffs' claims against

12  Anda should proceed.

13                              **<u>CONCLUSION</u>**

14          For the foregoing reasons, the motions to dismiss filed by all Defendants, Manufacturers,

15  Distributors, Walgreens, and Anda should be denied.

16

17  DATED:  May 15, 2020                    Respectfully submitted,

18                                          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

19                                          */s/ Elizabeth J. Cabraser*
                                            Elizabeth J. Cabraser
20                                          Richard M. Heimann
                                            Paulina do Amaral
21                                          Kevin R. Budner
                                            Michael Levin-Gesundheit
22                                          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                            275 Battery Street, 29th Floor
23                                          San Francisco, California 94111-3339
                                            Telephone: 415.956.1000
24                                          Facsimile: 415.956.1008
                                            ecabraser@lchb.com

25

26

27

28

DENNIS J. HERRERA
City Attorney
RONALD P. FLYNN
YVONNE R. MERE
OWEN J. CLEMENTS
SARA J. EISENBERG
JAIME M. HULING DELAYE
Deputy City Attorneys
Fox Plaza
1390 Market Street, Sixth Floor
San Francisco, CA 94102
Telephone: 415.554.3957
jaime.hulingdelaye@sfcityatty.org

Aelish M. Baig
Matthew S. Melamed
Hadiya K. Deshmukh
ROBBINS GELLER RUDMAN & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
aelishb@rgrdlaw.com

Paul J. Geller
Mark J. Dearman
Dorothy P. Antullis
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com

Thomas E. Egler
Carissa J. Dolan
Alexander M. Mendoza
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
tome@rgrdlaw.com

Louise Renne
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, CA 94104
Telephone: 415/848-7240
415/848-7230 (fax)
lrenne@publiclawgroup.com

Jennie Lee Anderson
Paul Laprairie
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: 415/986-1400
415/986-1474 (fax)
jennie@andrusanderson.com

Kevin Sharp
SANFORD HEISLER SHARP, LLP
611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: 615/434-7000
615/434-7020 (fax)
ksharp@sanfordheisler.com

Edward Chapin
SANFORD HEISLER SHARP, LLP
655 West Broadway, Suite 1700
San Diego, CA 92101
Telephone: 619/577-4253
619/577-4250 (fax)
echapin2@sanfordheisler.com

David S. Casey, Jr.
Gayle M. Blatt
Alyssa Williams
CASEY GERRY SCHENK FRANCAVILLA BLATT
& PENFIELD LLP
110 Laurel Street
San Diego, CA 92101-1486
Telephone: 619/238-1811
619/544-9232 (fax)
dcasey@cglaw.com
gmb@cglaw.com
awilliams@cglaw.com

Ellen Relkin
Paul Pennock
WEITZ & LUXENBERG P.C.
700 Broadway
New York, NY 10003
Telephone: 212/558-5500
212/344-5461 (fax)
erelkin@weitzlux.com
ppennock@weitzlux.com

*Attorneys for Plaintiffs The City and County of San
Francisco, California and The People of the State of
California, acting by and through San Francisco City
Attorney Dennis J. Herrera*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on May 15, 2020, service of this document was accomplished pursuant to the Court's electronic filing procedures by filing this document through the ECF system.

*/s/ Elizabeth J. Cabraser*
Elizabeth J. Cabraser

1992508.1