1   DENNIS J. HERRERA, State Bar # 139669
    City Attorney
2   RONALD P. FLYNN, State Bar # 184186
    Chief Deputy City Attorney
3   YVONNE R. MERE, State Bar # 173594
    Chief of Complex & Affirmative Litigation
4   OWEN J. CLEMENTS, State Bar # 141805
    SARA J. EISENBERG, State Bar # 269303
5   JAIME M. HULING DELAYE, State Bar # 270784
    Deputy City Attorneys
6   Fox Plaza
    1390 Market Street, Sixth Floor
7   San Francisco, CA 94102
    Telephone: 415.554.3597
8   jaime.hulingdelaye@sfcityatty.org

9   *Attorneys for The City and County of San Francisco*

10  [Additional counsel appear on signature page.]

11

12                 UNITED STATES DISTRICT COURT

13                NORTHERN DISTRICT OF CALIFORNIA

14                    SAN FRANCISCO DIVISION

15

16  THE CITY AND COUNTY OF SAN            Case No. 3:18-cv-07591-CRB
    FRANCISCO, CALIFORNIA and THE PEOPLE
17  OF THE STATE OF CALIFORNIA, Acting by  **THE CITY AND COUNTY OF SAN
    and through San Francisco City Attorney DENNIS  FRANCISCO'S SUPPLEMENTAL
18  J. HERRERA,                            BRIEF REGARDING RICO
                                           STATUTORY STANDING IN
19            Plaintiffs,                  RESPONSE TO COURT'S JUNE 11,
                                           2020 ORDER**
20       v.
                                           Judge: Honorable Charles R. Breyer
21  PURDUE PHARMA L.P., et al.

22            Defendants.

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 1

ARGUMENT ...................................................................................................................... 6

I.    The City has incurred extraordinary costs far in excess of the norm as a result of Defendants' misconduct in fueling the opioid epidemic.................................................... 6

II.   Injuries sustained in the City's proprietary capacity, both as a property owner and marketplace actor, are independently recoverable under *Canyon County*.......................... 9

    A.    Damage to the City's real property attributable to the opioid epidemic confers standing under RICO.................................................................................. 9

    B.    The City has standing to recover property losses it sustained as a marketplace actor forced to purchase products exclusively for the purpose of combating the opioid epidemic........................................................................ 10

III.   Injuries to the City's businesses survive any plausible interpretation of *Canyon County*. .................................................................................................................... 13

CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
  458 U.S. 592 (1982) ............................................................................................. 5, 9

*Broward County, Florida v. Purdue Pharma L.P., et al.,*
  No. 1:17-md-02804-DAP, Dkt. 3274 (N.D. Ohio Apr. 27, 2020) ........................... 4

*Canyon County v. Syngenta Seeds, Inc.,*
  519 F.3d 969 (9th Cir. 2008) ........................................................................... passim

*Chattanooga Foundry & Pipe Works v. City of Atlanta,*
  203 U.S. 390 (1906) ......................................................................................... 6, 14

*City of Almaty v. Khrapunov,*
  956 F.3d 1129 (2020) ........................................................................................... 12

*City of Cleveland v. Ameriquest Mortg. Sec., Inc.,*
  615 F.3d 496 (6th Cir. 2010) .................................................................................. 7

*County of Monroe, Michigan v. Purdue Pharma L.P., et al.,*
  No. 1:17-md-02804-DAP, Dkt. 3285 (N.D. Ohio Apr. 30, 2020) ........................... 4

*County of Oakland v. City of Detroit,*
  866 F.2d 839 (6th Cir. 1989) ................................................................................ 14

*In re Nat'l Prescription Opiate Litig.,*
  No. 1:17-MD-2804, 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) ............... passim

*In re Nat'l Prescription Opiate Litig.,*
  No. 1:17-MD-2804, 2019 WL 4279233 (N.D. Ohio Sept. 10, 2019) ........................ 4

*Oscar v. Univ. Students Co-op. Ass'n,* 965 F.2d 783 (9th Cir. 1992)
  *abrogated on other grounds by Diaz v. Gates,* 420 F.3d 897 (9th Cir. 2005) ......... 10

*Reiter v. Sonotone Corp.,*
  442 U.S. 330 (1979) ......................................................................................... passim

*West Boca Medical Center, Inc. v. AmerisourceBergen Drug Corporation, et al.,*
  No. 1:17-md-02804-DAP, Dkt. 3253 (N.D. Ohio Apr. 3, 2020) .............................. 4

**Statutes**

18 U.S.C. § 1961(3) ............................................................................................... 13

18 U.S.C. § 1964(c) ........................................................................................ 2, 6, 13

**Other Sources**

*America's Addiction to Opioids: Heroin and Prescription Drug Abuse,* National Institute
  on Drug Abuse (2014), *available at* https://archives.drugabuse.gov/testimonies/2014/
  americas-addiction-to-opioids-heroin-prescription-drug-abuse ................................. 7

- ii -

# INTRODUCTION AND SUMMARY OF ARGUMENT

The opioid epidemic has affected nearly every community in this country. The City and County of San Francisco ("San Francisco" or the "City") is no exception. If anything, San Francisco is a microcosm of the societal and economic harm that the oversupply of opioids has wrought. Indeed, the foreseeable effects of the RICO defendants' actions—drug sales, opioid injection, and discarded needles—are on full view right outside the federal courthouse.[1]

Extrapolating from CDC estimates, approximately 10% of San Francisco's residents engage in nonmedical opioid use each year. First Amended Complaint ("FAC") (Dkt. 128) ¶ 51. Opioid-related hospitalizations, emergency room visits, and deaths are all significant and trending upwards. The death rates would be even higher but for the City's aggressive campaign to supply the antidote to opioid overdoses—naloxone—which San Francisco paramedics administered to 1,647 people in 2018 alone. *Id.* ¶ 55. Intervening to prevent an average of more than four opioid overdoses every day is possible only because of the extraordinary steps the City has taken and costs it has incurred to combat the opioid epidemic. Nearly every department in the City—from the main library whose toilet grinders had to be replaced at great expense because of improper syringe disposal, to the Municipal Transportation Agency whose business interests in operating parking garages have been injured by opioid-related cleaning expenses—has been economically impacted by the crisis in some form or another.[2] Notwithstanding the City's efforts, however, the opioid epidemic rages on, and the City continues to incur great cost in combating it.

The present situation is the consequence of the Defendants' indifference and greed—specifically, the manufacturers' deliberate and deceptive misinformation campaign to increase sales of opioids and all Defendants' failure to adequately implement restrictions on distribution

---

[1] The oversupply of prescription opioids is primarily responsible for the corresponding rise in heroin and fentanyl abuse. *See, e.g.*, FAC ¶¶ 5 ("According to the American Society of Addiction Medicine, 80% of people who initiated heroin use in the past decade started with prescription painkillers. . . ."), 14 ("The increased volume of opioid prescribing correlates directly to . . . a concomitant rise in heroin and fentanyl abuse by individuals who can no longer legally acquire or simply cannot afford prescription opioids.").

[2] In an effort to streamline this case for trial, the City does not seek to recover for all of the ways in which it has been damaged by the Opioid crisis though this lawsuit.

2004445.4

and dispensing of these extremely addictive and dangerous controlled substances.[3] Through its RICO claims, the City seeks to right these wrongs and to obtain compensation for the damages it has suffered, and will continue to suffer, as a result of Defendants' conduct.

As explained in Plaintiffs' Omnibus Opposition (Dkt. 208 at 58-59) and further detailed below, the Ninth Circuit's opinion in *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008), does not deprive the City of statutory standing to pursue these claims. To state a claim under RICO, a plaintiff must allege cognizable injuries to either "business or property." 18 U.S.C. § 1964(c). Unlike the plaintiff county in *Canyon County*, San Francisco has alleged both, and the underlying facts and injuries in *Canyon County* are distinguishable.

In *Canyon County*, the plaintiff brought a RICO claim against agricultural employers and the executive director of the Idaho Migrant Council alleging the companies had engaged in an "Illegal Immigrant Hiring Scheme" and that the council had "directed [its] staff to assist immigrant workers in fraudulently applying for public benefits." 519 F.3d at 972-73. Canyon County claimed damages in the form of general welfare services—specifically, "millions of dollars [paid] for health care services and criminal justice services for the illegal immigrants who ha[d] been employed" "and/or harbored" by the defendants. *Id.* at 975. As the court noted, however, those alleged damages were "speculative in the extreme" because, to accept Canyon County's allegations, "the court would have to construct the alternative scenario of what would have occurred had the companies employed legally authorized workers, and determine how this might have affected the County's total population, and how these alternative workers might have differed from the undocumented workers in their consumption of County services, if at all." *Id.* at 983. Simply put, the court could not presume—as Canyon County had advocated—that undocumented workers were more costly to the county than documented workers or, therefore, that the county's ordinary health and law enforcement expenditures were any greater than they would have been absent the defendants' conduct. The Ninth Circuit therefore dismissed the action, holding that an entity acting in its sovereign capacity may not claim injury to property under RICO where it has incurred expenditures based "solely" on the ordinary provision of

---

[3] The City's RICO claims are brought against all Defendants except Walgreen Co.

government services. *Id.* at 976 ("When a governmental body acts in its *sovereign or quasi-sovereign* capacity, seeking to enforce the laws or promote the public well-being, it cannot claim to have been 'injured in [its] . . . property' for RICO purposes based *solely* on the fact that it has spent money in order to act governmentally.").[4]

Underlying the Ninth Circuit's conclusion was the court's concern that "[i]f government expenditures alone sufficed as injury to property, any RICO predicate act that provoked any sort of governmental response would provide the government with standing to sue." *Id.* In other words, the court refused to recognize a RICO cause of action for sovereign entities to recover the routine costs of government services. To do so would open a floodgate the court could not accept for any municipality seeking to tie its customary expenses to any alleged wrong.

The facts and injuries alleged in this case set it apart from *Canyon County* in several critical ways. To begin, it is worth noting that San Francisco's suit, unlike Canyon County's, is not motivated by desire to *avoid* providing routine government services on an equal basis to all residents by excluding certain residents from its locality entirely. Put another way, the "injury" Canyon County sought to redress was no injury at all—it was the presence of undocumented immigrants in its community and their attendant costs to the local government. The Ninth Circuit rightly found that a locality is not injured by the existence of individuals whom it disfavors. By contrast, San Francisco alleges RICO damages that are based on economic *harms* it has incurred in attempting to mitigate and the impacts of Defendants' actions on its residents. In stark contrast to Canyon County, San Francisco seeks to protect and provide needed services to *all* of its residents.

Moreover, at issue here are not customary law enforcement and healthcare costs that were incurred in the ordinary course of providing government services and that likely would have been incurred even without the defendants' wrongful conduct. Rather, San Francisco seeks recovery for the *extraordinary* costs of services provided to combat the opioid epidemic. Finally, unlike Canyon County, which sought recovery only for unspecified injuries sustained as a sovereign provider of healthcare and law enforcement, San Francisco alleges additional, specific harms that

---

[4] Here and throughout emphasis is added unless otherwise indicated.

are categorically different—namely, injuries that the City sustained in its proprietary capacity (as that term is used in the RICO context) as a marketplace participant, property owner, and business operator.[5]

For many of these reasons, in considering RICO claims brought by similarly-situated counties in the opioid MDL, Judge Polster repeatedly rejected the precise *Canyon County* arguments that Defendants advance here. *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2018 WL 6628898, at *9-10 (N.D. Ohio Dec. 19, 2018); Dkt. 208 at 7 (noting that "the City's RICO claims . . . are, in all material respects, identical to those that have already survived extensive motion practice"), 58-59 (discussing Judge Polster's rulings applying *Canyon County*).[6] This Court should do the same.

In sum, consistent with Judge Polster's rulings and the law of this Circuit, there are at least four different categories of injury that independently suffice to establish statutory standing after *Canyon County*—each of which the City has alleged:

**The City's injuries in the form of service costs greatly in excess of the norm.** As Judge Polster concluded, the scheme and injuries alleged here stand in stark relief to those in *Canyon County*, where the injury alleged was *only* the supposed provision of ordinary governmental services to undocumented residents, in contrast to the supposedly lesser services it would have provided to in-status resident workers. There, the claim presumed that the mere presence of certain people constituted a harm, which was speculative in the extreme. Here, in contrast, "the scope and magnitude of the opioid crisis—the illicit drug market and attendant human suffering—allegedly created by Defendants," has forced the City "to go far beyond what a governmental entity might ordinarily be expected to pay to enforce the laws or promote the

---

[5] In this brief, the terms "sovereign" and "proprietary" are used consistent with their meaning in *Canyon County* and the Supreme Court jurisprudence arising in the RICO and related antitrust contexts upon which *Canyon County* relies. These terms are not meant to reflect analysis of "sovereign" or "proprietary" interests or capacities in any other legal context.

[6] *See also In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 4279233, at *4 (N.D. Ohio Sept. 10, 2019); *Broward County, Florida v. Purdue Pharma L.P., et al.*, No. 1:17-md-02804-DAP, Dkt. 3274 at 13 (N.D. Ohio Apr. 27, 2020); *County of Monroe, Michigan v. Purdue Pharma L.P., et al.*, No. 1:17-md-02804-DAP, Dkt. 3285 at 27-29 (N.D. Ohio Apr. 30, 2020); *West Boca Medical Center, Inc. v. AmerisourceBergen Drug Corporation, et al.*, No. 1:17-md-02804-DAP, Dkt. 3253 at 25 (N.D. Ohio Apr. 3, 2020).

general welfare." *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *10; *see also* FAC ¶¶ 851, 882. As Judge Polster correctly held, such extraordinary injuries are not barred by *Canyon County*'s dismissal of claims "'based *solely* on the fact that [a government] has spent money in order to act governmentally.'" *Id.* (quoting *Canyon Cty.*, 519 F.3d at 976) (emphasis in *In re Nat'l Prescription Opiate Litig.*).

**The City's injuries as an owner of physical property.** *Canyon County* addresses only injuries suffered in a government's sovereign and quasi-sovereign capacity. 519 F.3d at 976. The opinion is careful to clarify—consistent with the Supreme Court precedent it relies on—that a government, like any other person or entity, may also suffer injuries in its "proprietary" capacity (as that term is understood in RICO jurisprudence), including as an owner of physical property, and that such injuries confer statutory standing. *Id.*; *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). Here, the City has clearly alleged cognizable injuries to its physical property, which exist independent of its governmental role. As an illustrative example, the City was forced to replace expensive toilet grinders in its main library building that were destroyed by frequent disposal of needles used to inject opioids. *See* FAC ¶ 57. The City can recover for all such property injuries.

**The City's commercial injuries as a consumer in the marketplace.** A city or county may also suffer an injury to its property in its proprietary capacity when acting as a consumer in the marketplace. *Canyon Cty.*, 519 F.3d at 976. When a defendant's illegal conduct wrongfully induces a consumer expenditure, that expenditure is a valid RICO injury. *Id.*; *Reiter v. Sonotone Corp.*, 442 U.S. 330, 340-41 (1979). As Judge Polster concluded, costs such as those "associated with purchasing naloxone to prevent future fatal overdoses" "are clearly associated with Plaintiffs' *participation in the marketplace*, and for those costs, Plaintiffs can undoubtedly recover" under *Canyon County*. *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *10 (emphasis in original). The City has alleged identical consumer injuries (and, indeed, has provided even more examples) it incurred from its forced purchase of products used exclusively to combat the opioid epidemic that Defendants fueled. *See, e.g.*, FAC ¶¶ 57 (seeking recovery for purchases of "specialized training [courses] and materials for handling and disposal of" the opioid

fentanyl), 61 (seeking recovery for purchases of buprenorphine the City administered for opioid treatment), 851(d), 882(d) (seeking recovery for "[i]ncreased costs associated with providing police officers, firefighters, emergency and/or first responders, and other city employees with naloxone . . . to block the deadly effects of opioids in the context of overdose"), 851(g), 882(g) (seeking recovery for purchases of equipment required to enable Department of Public Works employees to clean streets and sidewalks of improperly discarded needles and syringes), 851(h), 882(h) (seeking recovery for purchases of "specialized screening equipment—at a cost of $250,000 per unit" required to "detect opioids being sent into the jails").

**The City's business injuries.** All of the injuries described above relate to the City's property interests. RICO also expressly redresses injury to business. 18 U.S.C. § 1964(c). *Canyon County* in no way forecloses, or in any way limits, a municipality's recovery of business injuries, which the City has alleged here. *See, e.g.*, FAC ¶¶ 71 (alleging that the opioid epidemic "resulted in financial harm suffered by the City in its role as a business and marketplace participant"), 796 (alleging injury to the City's "business *and* property"), 822, 849, 872, 879 (same). Supreme Court precedent confirms that the City's commercial endeavors (including, *e.g.*, the operation of City-owned parking lots) constitute businesses under RICO, and the City has suffered cognizable injuries to those interests by, for example, paying to clean up and properly dispose discarded syringes. *See, e.g., Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 395 (1906); *Reiter*, 442 U.S. at 340-41.

Each of these injuries separately confers statutory standing, and the City's RICO claims survive any reasonable application of *Canyon County*.

## ARGUMENT

### I. The City has incurred extraordinary costs far in excess of the norm as a result of Defendants' misconduct in fueling the opioid epidemic.

Judge Polster has already held that, under both Sixth *and* Ninth Circuit law, sovereign entities (like San Francisco) can recover damages that "go beyond the ordinary cost of providing [governmental] services and are attributable to the alleged injurious conduct of Defendants." *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *10. As set forth in Plaintiffs'

2004445.4

Omnibus Opposition, the law of the case doctrine typically prevents transferor courts from departing from MDL rulings absent clear error or an intervening change in law or fact. *See, e.g.*, Dkt. 208 at 7. Neither is present here. The MDL transferee court carefully examined *Canyon County* (and the Sixth Circuit's reliance thereon in *City of Cleveland v. Ameriquest Mortgage Securities, Inc.,* 615 F.3d 496 (6th Cir. 2010)) and held that it does not preclude cities and counties from recovering costs "greatly in excess of the norm," so long as they can prove the costs were incurred due to Defendants' RICO violations. *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *10.

Underpinning Judge Polster's conclusion were two critical observations: (i) *Canyon County*'s facts are dissimilar to those alleged in the opioids litigation and thus distinguishable, and (ii) *Canyon County* precludes only alleged property interests "based *solely* on the fact that [a government] has spent money in order to act governmentally." *Id.* (citing *Canyon Cty,* 519 F.3d at 976) (emphasis in *In re Nat'l Prescription Opiate Litig.*). With respect to the facts, Judge Polster has repeatedly recognized that "there has never been a case with facts analogous to those alleged by Plaintiffs here. It cannot be stressed strongly enough that the prescription opiates at issue in this case **are Schedule II controlled substances**" (*In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898 at *9 (emphasis in the original))—*i.e.*, substances with a molecular formula almost identical to heroin.[7] Like the bellwether Summit County, San Francisco has alleged "a wanton disregard for public health and safety exhibited by Defendants with respect to their legal duty to try to prevent the diversion of prescription opioids." *Id.* Moreover, as Judge Polster observed, "the scope and magnitude of the opioid crisis—the illicit drug market and attendant human suffering—allegedly created by Defendants" is tremendous. *Id.* at *10.

This is true, and San Francisco's claimed injuries are quantitatively greater than, and qualitatively different from, the injuries alleged in *Canyon County* and the cases cited therein. The City does not seek to recover ordinary and customary costs related to everyday governmental services or commonplace wrongs; nor does it seek to recover law enforcement wages or overtime,

---

[7] *America's Addiction to Opioids: Heroin and Prescription Drug Abuse*, National Institute on Drug Abuse (2014), *available at* https://archives.drugabuse.gov/testimonies/2014/americas-addiction-to-opioids-heroin-prescription-drug-abuse.

2004445.4

or even healthcare outlays that would have been expended irrespective of Defendants' false marketing and failure to report and halt suspicious orders. Rather, it seeks to recover the extraordinary costs incurred in redressing a crisis of outsized scope and magnitude manufactured by Defendants—including, for example, increased costs for "additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction and disease," "training emergency and/or first responders and other city employees in proper treatment of drug overdoses," "training emergency and/or first responders and other city employees in proper treatment of drug overdoses," and "emergency responses . . . to opioid overdoses." FAC ¶¶ 851, 882. As one example, but for the opioid crisis that Defendants orchestrated, the City would not have been required to purchase large quantities of opioid antagonist naloxone for City departments (from the police department to the library), develop safety protocols and train employees on how to administer the drug, distribute the drug and replace it regularly upon the pharmaceutical's expiration, and then, when City employees save residents from otherwise-deadly overdoses, provide not only social services, but opioid addiction treatment with buprenorphine in City-operated clinics. *See, e.g.*, FAC ¶¶ 61, 851, 882.

Because, as Judge Polster noted, this case presents facts like no other, it does not present the slippery slope of providing too broad a basis for RICO standing that the Ninth Circuit was wary of in *Canyon County*, *i.e.*, that "any RICO predicate act that provoked ***any sort of governmental response***" would suddenly become actionable. *Canyon Cty.*, 519 F.3d at 976. As Judge Polster explained, the Ninth Circuit's use of the word "solely" was intentional and "implies that [municipalities] might be able to assert an injury to their property based on the expenditure of money plus something else"—here, that the defendants have "forced [municipalities] to go far beyond what a government entity might ordinarily be expected to pay to enforce the laws or promote the general welfare." *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *10. The burden associated with Defendants' wholesale failure to comply with statutory and regulatory requirements to prevent diversion has been shifted to the City, which is now faced with "clean[ing] up the mess allegedly created by Defendants' misconduct." *Id.* at *9-10. Thus, while *Canyon County* limits what a public entity can recover when its expenditures are based solely on

the ordinary expenditure of money to act governmentally, it does not bar recovery for "costs greatly in excess of the norm, so long as they can prove the costs were incurred due to Defendants' alleged RICO violations." *Id.* at *10. This conclusion is sound, and this Court should follow it, especially in light of the law of the case principles governing this extremely complex multi-district litigation.

Regardless, the City has pled at least three other types of injury to "business or property" that separately afford RICO standing.

## II.     Injuries sustained in the City's proprietary capacity, both as a property owner and marketplace actor, are independently recoverable under *Canyon County*.

Independently, the City can also pursue losses to its "business or property" suffered in its proprietary capacity, as that term is used in the RICO context. *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *9. *Canyon County* does not impose *any* limitations on the City's standing based in its allegations of injuries incurred in its non-"sovereign" or proprietary capacity as a consumer or owner of physical property. 519 F.3d at 980. This distinction is critically important because San Francisco is both a property owner and a consumer, and it has suffered injuries in both capacities attributable to Defendants' RICO-violative conduct. *See, e.g.*, FAC ¶¶ 71, 822, 849, 872, 879. As explained below, damage to the City's physical property and losses incurred in the consumer marketplace are both recoverable property losses under RICO. Neither was alleged by the plaintiff and *Canyon County*, and each establishes independent grounds for statutory standing.

### A.     Damage to the City's real property attributable to the opioid epidemic confers standing under RICO.

By its own terms, *Canyon County*'s analysis is limited to government expenditures associated with services provided in a "sovereign or quasi-sovereign capacity." 519 F.3d at 976. But, as explained in *Alfred L. Snapp & Son*, a Supreme Court case upon which *Canyon County* relies, "[n]ot all that a [government] does . . . is based on its sovereign character." 458 U.S. at 601. Indeed, a municipality, "like other associations and private parties[,] . . . is bound to have a variety of proprietary interests," including "own[ing] land," and, "[a]s a proprietor, it is likely to have the same interests as other similarly situated proprietors." *Id.* Accordingly, *Canyon County*

does not preclude the City from recovering under RICO for damage to its most fundamental form of property: physical property. Damage to buildings owned by the City stemming from the opioid epidemic therefore provides an independent ground for statutory standing.

While discovery will illuminate the full extent of the physical property damage attributable to the opioid epidemic that the City seeks to recover through this litigation, the FAC provides an illustrative example: "[T]he City was required to replace toilet grinders at the main library because drug users"—whose opioid use in many cases is attributable to the epidemic that Defendants fueled—"routinely flush needles down the toilet, running the grinder pumps" to the point of mechanical exhaustion. FAC ¶ 57. This is unquestionably a cognizable RICO injury incurred in the City's proprietary capacity as the owner of real property. *See Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783, 786 (9th Cir. 1992) (holding that cognizable RICO injuries could include "out-of-pocket expenditures" such as "costs incurred to repair damage to . . . personal property") *abrogated on other grounds by Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005). Although this is but one example, it is all that is needed to establish statutory standing.[8]

**B.     The City has standing to recover property losses it sustained as a marketplace actor forced to purchase products exclusively for the purpose of combating the opioid epidemic.**

Under *Canyon County*, the City can also recover for injuries sustained in what is described as its proprietary role as "as a consumer or other type of market participant." 519 F.3d at 976. Relying on this important provision of the Ninth Circuit's holding, Judge Polster held that costs such as those "associated with purchasing naloxone to prevent future fatal overdoses" "are clearly associated with Plaintiffs' *participation in the marketplace*, and for those costs, Plaintiffs can undoubtedly recover" under *Canyon County*. *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *10 (emphasis in original). *See also id.* ("[T]he Ninth Circuit held in *Canyon County* that governmental entities can, in fact, recover in RICO for the costs associated with doing business in the marketplace.").

The City has alleged these exact same losses incurred in its role as a market participant. *See, e.g.*, FAC ¶¶ 851(d), 882(d) (seeking "[i]ncreased costs associated with providing police

---

[8] Even a "modest" financial injury confers statutory standing. *Reiter*, 442 U.S. at 340.

2004445.4

officers, firefighters, emergency and/or first responders, and other city employees with naloxone

. . . to block the deadly effects of opioids in the context of overdose"). The City has also been

required to purchase buprenorphine specifically as a treatment for residents' opioid addiction.

FAC ¶ 61. Additionally, in order to "detect opioids being sent into the jails," the City was

required to purchase "specialized screening equipment—at a cost of $250,000 per unit." *Id.*

¶¶ 851(h), 882(h). The City has also been required to purchase "specialized training [courses]

and materials for handling and disposal of" the opioid fentanyl. *Id.* ¶ 57. Further, with the

increase in heroin use tied to opioid addiction, the Department of Public Works has been required

to purchase personal protective equipment for its staff responsible for cleaning streets and

sidewalks of improperly discarded needles and syringes. *Id.* ¶¶ 851(g), 882(g). Were it not for

the opioid epidemic, the City would not have been required to purchase these items (and others)

from the marketplace.

Defendants' contention that these marketplace injuries are foreclosed by *Canyon County*

rests on mischaracterizations of law and fact.

On the law, Defendants incorrectly suggest that a sovereign entity may recover only for

commercial transactions in which it is "overcharged." Dkt. 220 at 3-4 (arguing that "the

Complaint does not allege, for instance, that the City was ***overcharged*** by Defendants for

naloxone in a commercial transaction") (emphasis in original). This is incorrect. A government

need not allege a price-fixing conspiracy to establish standing as a market participant under

RICO. To be sure, *Canyon County* noted that "government entities that have been overcharged in

commercial transactions" stand as examples of recoverable RICO losses. 519 F.3d at 976.

*Canyon County*, however, did not hold that an overcharge is the exclusive harm for which a

municipality may recover under RICO. Rather, relying on Supreme Court precedent in *Reiter*,

regarding questions of municipal recovery in an analogous antitrust context, the Ninth Circuit

explained that a municipality suffers marketplace harm simply through "payment of money

wrongfully induced." *Canyon Cty.*, 519 F.3d at 978 (quoting *Reiter*, 442 U.S. at 342). Under

*Reiter*, this category of injury is broad, encompassing all harms incurred "as a party to a

commercial transaction." 442 U.S. at 342. *See also Hawaii v. Standard Oil Co.*, 405 U.S. 251,

264 (1972) (describing a municipality's ability to sue "for injuries to its commercial interests").

This is also consistent with the Ninth Circuit's recent decision in *City of Almaty v. Khrapunov*, which confirmed that under *Canyon County* any "***forced expenditures*** made in a state's commercial capacity state an injury to property" under RICO. 956 F.3d 1129, 1133 (2020). The City's purchases of items necessary to combat the opioid epidemic were marketplace expenditures forced by Defendants' RICO-violative conduct.

With respect to the facts, Defendants claim that the purchase of naloxone is no different from the injuries alleged in *Canyon County* because the government entity there presumably had to purchase "weapons and cars," for example, to provide the police services that were deemed unrecoverable. *See, e.g.*, Dkt. 169 at 9. It is not clear that Canyon County actually sought to recover for those marketplace purchases, but regardless, the injury alleged here is qualitatively different in at least one critical way. Unlike "weapons and cars," which are purchased generally for all types of policing unrelated to the alleged RICO scheme in *Canyon County*, the specific marketplace purchases identified by Judge Polster (naloxone) and those additional commercial transactions alleged here (opioid-screening equipment, training courses and materials for opioid disposal, buprenorphine, etc.) relate specifically—and ***exclusively***—to combating the opioid epidemic fueled by Defendants' predicate acts of racketeering. Thus, unlike in *Canyon County*, these are not purchases precipitated simply by "greater demand" for "public services" of the type the City already provided. *See Canyon County*, 519 F.3d at 977. Rather, they are entirely novel consumer expenditures forced directly by Defendants' conduct and intended only to combat the effects thereof.

Defendants' conduct has forced the City to incur costs as a consumer in the marketplace, purchasing products used exclusively to combat the effects of the opioid epidemic. From the life-saving opioid antagonist naloxone to specialized screening equipment capable of detecting fentanyl and preventing it from entering the City's jails, the expenditures are substantial. The City has lost this property acting as a marketplace participant, providing an independent basis for statutory standing under *Canyon County*.

2004445.4

**III.** **Injuries to the City's businesses survive any plausible interpretation of _Canyon County_.**

RICO confers statutory standing to "any person[9] injured in his business _or_ property." 18 U.S.C. § 1964(c). The sections above address injuries to the City's property. Separate and apart from those injuries, however, the City has also alleged injury to its businesses. _See, e.g._, FAC ¶¶ 71 (alleging that the opioid epidemic "resulted in financial harm suffered by the City in its role as a business and marketplace participant"), 796 (alleging injury to the City's "business _and_ property"), 822, 849, 872, 879 (same).

These injuries are in no way foreclosed by _Canyon County_ or any other controlling authority. Again, in _Canyon County_, the plaintiff's alleged injury was limited to money expended in its sovereign capacity to provide ordinary "health care services and criminal justice services" for its residents. 519 F.3d at 980. The Ninth Circuit found those alleged injuries insufficient because (a) "a governmental body act[ing] in its sovereign or quasi-sovereign capacity. . . cannot claim to have been 'injured in [its] . . . **property**' for RICO purposes based solely on the fact that it has spent money in order to act governmentally" and (b) "the government does not possess a **property** interest in the law enforcement or health care services that it provides to the public." _Id._ at 976-77. In other words, _Canyon County_ focuses only on injury to property. But municipalities can and do function in both sovereign capacities (providing welfare services to residents) and, separately, in business capacities. As but a few examples, the City operates San Francisco International Airport as a business enterprise, sells advertising space on City property (including buses and trains), and operates a water system through the Public Utilities Commission, which transports and sells water from the Sierra Nevada mountains not only to the City, but to numerous wholesale customers outside of San Francisco. Nothing in _Canyon County_ suggests that local governments cannot recover injuries to these kinds of business interests. Supreme Court precedent confirms that they can.

---

[9] Defendants do not and cannot challenge the City's status as a "person," which RICO defines to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

In *Chattanooga Foundry*, a case on which *Canyon County* relies, the City of Atlanta brought suit under the Clayton Act alleging that it overpaid for "iron water pipe" as a result of the defendants' anti-competitive conduct. 203 U.S. at 395. The Supreme Court concluded that the city was "[i]njured in its property, at least, if not in its business of furnishing water, by being led to pay more than the worth of the pipe." *Id.* at 396. Seventy years later, the Court observed that, although the "[t]he holding of *Chattanooga Foundry*" was "grounded" in a property injury," it "could well have been grounded on the undisputed fact that the city was engaged in the commercial enterprise of supplying water for a charge and, therefore, engaged in a business." *Reiter*, 442 U.S. at 340. Moreover, while both *Chattanooga* and *Reiter* analyzed the Clayton Act, not RICO, *Canyon County* confirmed that the statutes' identical "business or property" injury requirements are to be interpreted "in a like manner." 519 F.3d at 977. Thus, sovereign entities that undertake a "commercial enterprise"—including by supplying a good or service "for a charge"—are "engaged in a business," and injuries to such businesses confer statutory standing under RICO. *Reiter*, 442 U.S. at 340; *see also County of Oakland v. City of Detroit*, 866 F.2d 839, 847 (6th Cir. 1989) (finding that counties operating the "'business' of furnishing sewer service" had standing to sue under RICO).

These are precisely the commercial injuries asserted through the City's allegations that it suffered "financial harm . . . in its role as a business." FAC ¶ 71. As with its physical property injuries, a fulsome analysis of these business injuries will be developed through this litigation, but injuries to the City's business interests are already apparent. The San Francisco Municipal Transportation Agency ("SFMTA"), for example, provides some services that are sovereign in nature, such as providing public transportation, but also acts as a business by, among other things, selling advertisements on buses and at transit stops. One of its other revenue-generating business operations is parking lots, at which it offers parking "for a charge." *See Reiter*, 442 U.S. at 340. Those lots are frequently littered with syringes from drug use tied to opioid addiction. Syringes are hazards, not only to people, but to vehicles parked at the lots, and they are a deterrent to potential customers. SFMTA maintains a cleaning contract with the Department of Public Works, under which Public Works provides cleaning services on demand at the parking lots, for

which it invoices SFMTA based on the hours of staff time expended.  This arrangement is distinct from how Public Works operates in the general right of way—responding to public calls to clean up streets and plazas without a contract and without invoicing any other City department.  Due to the frequency with which its paid parking lots are littered with syringes, SFMTA has incurred increasingly expensive cleaning costs as part of this business operation. The City therefore incurs these opioid-related clean-up expenses in its business-operating capacity, and those costs harm the financial viability of its fee-based parking lots.  These costs—and others like them—are therefore injuries to the City's **business** interests that fall squarely within RICO's ambit, are not foreclosed by *Canyon County*, and provide independent grounds for statutory standing.

## CONCLUSION

For the foregoing reasons, *Canyon County* does not deprive the City of statutory standing under RICO.  The City has alleged cognizable injuries to its business and property, and Defendants' motion to dismiss the City's RICO claims should be denied.

DATED:  June 26, 2020

Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

*/s/ Elizabeth J. Cabraser*
Elizabeth J. Cabraser
Richard M. Heimann
Paulina do Amaral
Kevin R. Budner
Michael Levin-Gesundheit
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008
ecabraser@lchb.com

2004445.4

DENNIS J. HERRERA
City Attorney
RONALD P. FLYNN
YVONNE R. MERE
OWEN J. CLEMENTS
SARA J. EISENBERG
JAIME M. HULING DELAYE
Deputy City Attorneys
Fox Plaza
1390 Market Street, Sixth Floor
San Francisco, CA 94102
Telephone: 415.554.3957
jaime.hulingdelaye@sfcityatty.org

Aelish M. Baig
Matthew S. Melamed
Hadiya K. Deshmukh
ROBBINS GELLER RUDMAN & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
aelishb@rgrdlaw.com

Paul J. Geller
Mark J. Dearman
Dorothy P. Antullis
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com

Thomas E. Egler
Carissa J. Dolan
Alexander M. Mendoza
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
tome@rgrdlaw.com

Louise Renne
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, CA 94104
Telephone: 415/848-7240
415/848-7230 (fax)
lrenne@publiclawgroup.com

2004445.4

Jennie Lee Anderson
Paul Laprairie
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: 415/986-1400
415/986-1474 (fax)
jennie@andrusanderson.com

Kevin Sharp
SANFORD HEISLER SHARP, LLP
611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: 615/434-7000
615/434-7020 (fax)
ksharp@sanfordheisler.com

Edward Chapin
SANFORD HEISLER SHARP, LLP
655 West Broadway, Suite 1700
San Diego, CA 92101
Telephone: 619/577-4253
619/577-4250 (fax)
echapin2@sanfordheisler.com

David S. Casey, Jr.
Gayle M. Blatt
Alyssa Williams
CASEY GERRY SCHENK FRANCAVILLA BLATT
& PENFIELD LLP
110 Laurel Street
San Diego, CA 92101-1486
Telephone: 619/238-1811
619/544-9232 (fax)
dcasey@cglaw.com
gmb@cglaw.com
awilliams@cglaw.com

Ellen Relkin
Paul Pennock
WEITZ & LUXENBERG P.C.
700 Broadway
New York, NY 10003
Telephone: 212/558-5500
212/344-5461 (fax)
erelkin@weitzlux.com
ppennock@weitzlux.com

*Attorneys for The City and County of San Francisco*

2004445.4

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 26, 2020, service of this document was accomplished pursuant to the Court's electronic filing procedures by filing this document through the ECF system.

/s/ *Elizabeth J. Cabraser*
Elizabeth J. Cabraser