*City and County of San Francisco, et al. v. Purdue Pharma L.P., et al.*
Case No. 3:18-cv-7591-CRB-JSC

## Joint Discovery Dispute Letter Regarding Plaintiff's Responses to Certain RFPs

### I.   Manufacturer Defendants' Initial Statement

After months of meet and confer discussions, including three videoconferences,[1] Plaintiff still has not committed to producing two critical categories of documents and data responsive to Manufacturer Defendants' First Set of Requests for Production.

**Claims and encounter data:** Request for Production ("RFP") No. 5 seeks prescription-level data showing what opioid prescriptions were written and why.[2] Plaintiff has acknowledged that it has two types of this data in its possession, custody or control. *First*, Plaintiff has claims data, including that in the possession of the San Francisco Department of Public Health ("DPH"). Ex. 2, 12/1/2020 K. Stampfl Letter at 1. Claims data reflects prescriptions and medical diagnoses in the form of claims for reimbursement made to insurers. *Second*, Plaintiff has encounter data, also in DPH's possession. *Id.* at 1. Encounter data is information submitted by health care providers that tracks clinical conditions diagnosed as well as the treatment provided in response.

This prescription-level data is crucial, because prescriptions for opioids that purportedly should not have been written are an essential link in any conceivable causal chain between any Defendant's alleged wrongdoing and the purported public nuisance. Plaintiff's central causation theory is that Manufacturer Defendants' marketing caused prescribers to write opioid prescriptions that they otherwise would not and should not have written, which in turn allegedly caused harm in the jurisdiction. *E.g.*, Dkt. No. 128, First Am. Compl. at ¶¶ 8-11, 538, 545-46. Defendants are entitled to information to show that prescriptions for their medications were appropriate given the diagnosis and medical history of the patient.

Plaintiff's primary argument for withholding this data is that it intends to prove its case using "aggregate proof." But, under Rule 26, Defendants are entitled to discovery relevant to either a party's affirmative claim or any party's "defense." Fed. R. Civ. P. 26(b)(1); *see also* 8 Fed. Prac. & Proc. Civ. § 2011 (3d ed.) ("[A] party is entitled to seek discovery on its theory of the facts and the law, and is not limited in discovery by the opponent's theory."). Thus, no matter how Plaintiff plans to put on its case, Defendants are entitled to discovery supporting their defenses.

In addition, this data is highly relevant to an evaluation of Plaintiff's "aggregate" theories themselves. For example, prescription-level data allows Manufacturer Defendants and their experts to analyze whether prescribing patterns by the subset of physicians who were visited by Defendants' sales representatives were affected by the detailing. For example, it permits analysis

---

[1] The parties' Zoom meet and confers occurred on September 22, November 2 and November 11. Along with counsel for other Manufacturer Defendants, Donna M. Welch and Karl Stampfl participated.

[2] Specifically, RFP No. 5 requests "[a]ll prescription- and individual-level data relating to Prescription Opioids, including (a) the full Medicaid or other Program claims history for prescriptions and other health care services submitted to Medicaid or any other Program, whether reimbursed or not, for all patients who received a prescription for any Prescription Opioid; and (b) pharmacy and medical Claims Data, encounters data, and/or prescription dispensing data related to any Prescription Opioid prescribed to any patient, or substance abuse treatment provided to any patient, from hospitals, pharmacies, and/or any other treatment providers operated by or affiliated with (by contract or otherwise) Plaintiffs." Ex. 1 at 7.

of whether those prescribers increased their opioid prescribing *after* being detailed, or simply substituted a prescription for a Defendant's opioid medication for a prescription of a non-Defendant's opioid medication.

Critically, Plaintiff's own claims and encounter data is also relevant to show whether San Francisco continues to (i) reimburse prescriptions for opioids (including the volume of any such prescriptions) and (ii) allow health care providers in its facilities to write prescriptions for opioids under circumstances it now claims are inappropriate. For example, among Plaintiff's core contentions is that Manufacturer Defendants misrepresented whether opioids are appropriate to treat chronic non-cancer pain. *E.g.*, Dkt. 128, First Am. Compl. at ¶¶ 9, 13, 23, 25. Whether and to what extent San Francisco continues to permit the reimbursement of prescriptions for chronic non-cancer pain, and to allow doctors in its hospitals to write such prescriptions, is therefore highly probative.[3]

Numerous courts in opioid-related litigation have ordered production of claims and encounter data. For example, in the Track One MDL cases, the Court ordered plaintiffs to produce "claims information for any patient who received an opioid prescription, including records of medical treatment for that patient where no opioid prescription was provided." Ex. 3, Dkt. No. 703, Case No. 1:17-02804-DAP (July 3, 2018); Ex. 4, Dkt. No. 1147, Case No. 1:17-02804-DAP ( Nov. 21, 2018) (requiring plaintiffs to produce "all opioid-related claims data *not* implicated by Title 42, Part 2 . . . with individual-identifying information" and "all claims data that *is* implicated by Part 2, de-identified as to individual information"). Likewise, in the case pending in Orange County state court also brought by "the People," the Court has ordered the production of both claims and encounter data. *E.g.*, Ex. 5, ROA No. 3355, Case No. 30-2014-00725287 (Feb. 11, 2020) (requiring production of "100 percent of [Plaintiff Jurisdiction's] claims data"); Ex. 6, ROA No. 3741, Case No. 30-2014-00725287 (Mar. 12, 2020) (requiring production of encounter data); Ex. 7, ROA No. 4058, Case No. 30-2014-00725287 (June 25, 2020) (requiring Plaintiff Jurisdiction Los Angeles County to "provide to Rawlings the identified data for the County's previous [encounter data] production to defendants, so that Rawlings can de-identify all such data and make it cross-referenceable against other de-identified data processed by Rawlings in this case").[4]

---

[3] Nor should patient privacy concerns prevent the production of this data. Plaintiff should be ordered to produce the data through Rawlings, a company that both sides in opioid-related litigation have used, to de-identify the data. *See, e.g.*, Ex. 8, *In re: Texas Opioid Litigation* (ordering plaintiff in Texas state MDL to produce "complete prescription and medical claims data for any patient who received an opioid prescription that was reimbursed, or denied for reimbursement" by "produc[ing] this claims data to The Rawlings Group, which will deidentify any protected health information before producing the claims data to the parties in this litigation"). In this way, no patient's identity would be revealed.

[4] In the parties' meet and confer discussions, Plaintiff has relied heavily on a decision by the Northern District of Illinois in an opioid-related case brought by the City of Chicago. Ex. 9. There, the Magistrate Judge stated that "it makes sense to require Defendants to seek this information from third-party insurers first, and then ascertain the extent to which that compiled data is sufficient from their experts' perspective." *Id.* at 13. The *Chicago* case, unlike the cases before several other courts that have ordered this production, does not include a public nuisance claim like that here. In addition, Defendants have objected to the Magistrate Judge's order there, and their objection is pending before the District Judge.

In sum, Manufacturer Defendants respectfully request that the Court order Plaintiff to produce, in de-identified form through Rawlings, all available claims and encounter data for each patient who received at least one opioid prescription.

**Mortality records:** Manufacturer Defendants' RFPs also seek mortality records from the Medical Examiner's Office.[5] Specifically, Defendants have requested: **(i)** a listing/output from the Medical Examiner's database listing all drug-related deaths, including all available fields that bear on what caused the death; and **(ii)** all underlying documents, such as toxicology and autopsy reports, relating to each of those deaths.

These records are squarely relevant to Plaintiff's numerous allegations that Defendant conduct has led to "overdose and death." *E.g.*, Dkt. 128, First Am. Compl. at ¶¶ 14, 16, 18, 19. For example, Plaintiff alleges that "[f]rom 2010 through 2012, approximately 331 individuals died in San Francisco from accidental overdose caused by opioids," and that "[b]etween 2016 and 2018, San Francisco saw a 70% increase in opioid-related overdose deaths." *Id.* at ¶ 19. These records are necessary to an evaluation of whether Defendants caused these deaths—as distinguished from countless alternative causes, such as heroin traffickers, illicit Chinese fentanyl, pill mills, and many other causes.

In light of these allegations, Plaintiff appears to acknowledge that production of these records is required—but it refuses to specify precisely what it will produce or when. Most recently, in response to Defendants' request that it so clarify given that it has been more than half a year since Manufacturer Defendants served these RFPs,[6] Plaintiff did not do so.[7]

In light of the aggressive schedule on which Plaintiff insisted, the parties cannot afford to delay resolution of these issues. Accordingly, Defendants request that the Court order Plaintiff to produce the following:

1. The listing/output from the database listing all drug-related deaths, including all available fields that bear on what caused the death; and

2. For each death listed on the listing/output, all related underlying documents, including but not limited to toxicology reports, autopsy reports, medical records, prescription records, and coroner reports, and including not only electronic files but also hard copies.

---

[5] Specifically, RFP No. 9 requests "[w]ith respect to any natural Person whom Plaintiffs believe, suspect, or are aware was harmed in connection any Prescription Opioid, all Documents concerning each Person's medical history, medical treatment, medical examinations, medical tests, prescriptions, therapy, injuries, diagnoses, medical condition, and/or death records, including any HCP's reports, records, summaries, test results, medical records, insurance records, pharmacy records, medical examiner records, any other records relating to the use of any prescription or over-the-counter medication or illicit drugs." Ex. 1 at 9. Likewise, RFP No. 10 requests, among other documents/data, "a copy of the medical examiner's database(s), coroner's reports, autopsy reports, toxicology reports, reports printed from the CURES database, medical examiners' verdicts, death certificates, and all other underlying Documents" for "deaths in Your jurisdiction that involved prescription drugs, including but not limited to Prescription Opioids, or any illicit drug (including heroin, illicitly manufactured fentanyl and fentanyl-type drugs, methamphetamine, cocaine, and/or marijuana." *Id.* at 10.

[6] Ex. 2, 12/1/2020 K. Stampfl Letter at 2-3.

[7] Ex. 10, 12/3/2020 M. Melamed Letter (responding to Manufacturer Defendants' December 1 letter but not addressing this issue).

3

## II.     Plaintiff's Position Statement

*RFP No. 5.*  This precise issue – whether the People should be compelled to produce individual claims-level data – has already been decided in a parallel case.  As in that case, the Court should deny the Manufacturers' motion to compel as neither relevant nor proportional.

The People have agreed to a voluminous production in response to RFP No. 5.  They have already produced more than 110,000 documents from custodial and non-custodial sources in the relevant custodial department, the San Francisco Department of Public Health ("DPH"), which have been identified using search terms selected to surface documents reflecting prescription opioids administration and substance use/abuse treatment.  The People are also in the process of collecting aggregate data reflecting all the prescription opioids administered and all of the patient encounters for the treatment of overdoses that is reasonably available from DPH databases.[8]

Despite this ongoing production, the Manufacturers insist they need each line item reflecting each claim sent to an insurer reflecting each individual administration of a prescription opioid and each instance of treatment for substance abuse that occurred at a DPH facility.  In the *Chicago* case, Magistrate Judge Kim held that defendants did not need such data to investigate which doctors prescribed their mediations and why, because the plaintiff there, as the People here, had made clear its decision to rely on aggregate proof of causation.  Ex. 9 at 11.  Magistrate Judge Kim further held that because the plaintiff's case was based on the Manufacturers' conduct in marketing and distributing opioid medications and the resulting increase in opioid-related harms, as is the People's case here, the information was not relevant.  *Id.*[9]  This ruling is consistent with the one issued in the lead paint case, where the California Court of Appeal upheld the trial court's determination that plaintiff was not required to "identify the location of each individual property in order to establish a public nuisance."  *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51, 118-19 (2017).

Notably, Magistrate Judge Kim based his opinion on presiding MDL Judge Polster's holding that plaintiffs in the Track One action needn't respond to interrogatories seeking individualized data so long as they would not assert "that any specific prescriptions 'were unauthorized, medically unnecessary, ineffective, or harmful' or that 'the filling of [any specific prescriptions] caused or led to harm for which [Plaintiffs] seek to recover.'"  Ex. 11 at 1-2 (alterations in original)[10]; *see* Ex. 9 at 11-12 (discussing the MDL order).  Magistrate Judge Kim

---

[8] This has been and continues to be a laborious undertaking.  The Manufacturers asked the People to produce aggregate data regarding the administration of pharmaceutical drugs with 21,358 unique National Drug Code numbers and aggregate data regarding overdose treatments as reflected by more than 50 unique International Classification of Diseases codes.  The People anticipate production of these data within the next month.

[9] The Manufacturers' attempts to distinguish Magistrate Judge Kim's order because the *Chicago* case does not include a claim for public nuisance.  But that distinction militates against the Manufacturers' position.  The Manufacturers assert individual claims-level data is relevant to causation, and, like the People's public nuisance claim, the *Chicago* case includes a claim with a causation requirement.  Ex. 9 at 8.  However, whereas the relevant claim in *Chicago* seeks the recovery of past costs of providing services to respond to the opioid crisis (*id.*), the People's public nuisance claim seeks only prospective abatement, which makes past individual claims-level data even less relevant here than there.

[10] The interrogatories Judge Polster considered requested that plaintiffs identify: "all prescriptions of opioids that were written in [Plaintiff's jurisdiction] in reliance on any alleged misrepresentations, omissions or other alleged wrongdoing by any Defendant"; "every person who allegedly became addicted to any substance or was otherwise

properly understood that "for the same reasons the City's decision to rely on aggregate proof undermines the relevance of" other information, "it also undermines the need for insurance claims data" to prove or disprove causation. Ex. 9 at 10-11.[11]

Even if conceivably relevant, the production of individual claims-level data it not proportional to the needs of this case for several reasons. ***First***, the data already in the Manufacturers' possession will allow them "to analyze whether prescribing patterns by the subset of physicians who were visited by Defendants' sales representatives were affected by the detailing." Mfrs' Ltr. at 1. By way of example, the Manufacturers maintained call notes regarding each visit by any sales representative to each physician nationwide.[12] The Manufacturers also purchased detailed information from nonparty IQVIA that reflects transaction-level detail of between 74-90% of all prescriptions filled by retail pharmacies (and projections for 100% of all such prescriptions), from 1997-2017, which enables the Manufacturers to identify prescriptions for opioids written by San Francisco practitioners.[13] Thus, even if relevant, the Manufacturers can already trace the causal link between detailing and prescriptions. ***Second***, the Manufacturers have already issued subpoenas seeking ***all*** individual claims-level data on a statewide basis concerning prescriptions of opioids and treatment for substance abuse from other health care providers and related companies, including but not limited to California Medicaid, Humana, Optum Rx, Cigna Health and Life Insurance Company, Blue Shield of California, Express Scripts, SCAN Health Plan, The Rawlings Group, Western Health Advantage, and Centene Corporation.[14] The data available from the Department of Public Health is a sliver of the individual claims-level data reflecting prescriptions for opioids and treatment for substance abuse for San Francisco residents available from these third parties. *See* Ex. 9 at 12-13 ("to the extent [the Manufacturers] believe that the information they can glean from insurance claims data is relevant to their defense, a large universe of that data is available to [Manufacturers] regardless of the City's production"; further, "the data the City would produce is likely to be cumulative or meaningless"). ***Third***, it would be extremely burdensome for the People to produce individual claims-level data. Those burdens include

---

harmed as a result of any prescription of an opioid(s) in [Plaintiff's jurisdiction]"; "all prescriptions of opioid(s) that Plaintiff contends were unauthorized, medically unnecessary, ineffective, or harmful"; "each prescription upon which you base, or which you contend supports, Your claims in this case"; and "each prescription the filling of which caused or led to harm for which you seek to recover in this case." Ex. 12 at 2-5 (alterations in original).

[11] The District Court here similarly stated that it "will rely on the MDL's rulings as highly persuasive authority to the extent that these decisions are consistent with California and Ninth Circuit authority." ECF No. 285 at 4. The showing required to prove causation under Ohio law is consistent with California authority. *Compare* Ex. 13 at 5 (causation is proven by showing that the conduct of each defendants was a substantial factor in producing the harm), *with Bockrath v. Aldrich Chem Co., Inc*., 21 Cal. 4th 71, 79 (Cal. 1999) ("'The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.'").

[12] Ex. 14 is a one-page excerpt of the collected call notes produced by Allergan reflecting each sales representative interaction with a San Francisco healthcare providers.

[13] A CDC summary discusses the data available through IQVIA's Xponent database here: https://gis.cdc.gov/grasp/PSA/Downloads/OAU-Data-Methods.pdf. Another example of the type of data the Manufacturers have is Ex. 15, an excerpt of a document produced by Allergan that lists the highest prescribing doctors nationwide for a drug, Opana ER, manufactured, marketed, and sold by competitor Endo.

[14] By way of example, Plaintiff attaches as Ex. 16 an excerpt of the subpoena served on Blue Shield of California, which repeats nearly verbatim the language in RFP No. 5.

5

not only the huge investment of time required by civil servants in the San Francisco department that is on the frontlines of responding to the ongoing COVID pandemic to export the relevant data (*see* Ex. 18), but also the substantial time and expense of redacting personal health information from those records.[15]

The Manufacturers' reliance on two MDL orders as supporting their position is misleading. Neither resolved a dispute regarding the production of individual claims-level data; rather, each concerned solely the manner of production. *See* Exs. 3-4.[16] Similarly, two of the three opinions issued by the discovery referee in the Orange County state court case on which the Manufacturers rely address the manner of production; the fact of production was not contested.[17] The other Orange County opinion, reflected in Ex. 5, is not convincing. Whereas the rule governing discovery practice in federal court incorporates a proportionality requirement, the rule governing California discovery practice doesn't. *Compare* Fed. R. Civ. P. 26(b)(1), *with* Cal. Code Civ. P. §2017.010. Moreover, the discovery referee ordered County of Santa Clara Health System ("CSCHS") to produce 100% of individual prescription-level claims data because it had already voluntarily provided 25%. The court brushed off CSCHS's privacy concerns because it had not raised such concerns when producing the first 25% of the data, and found that CSCHS did not make any effort to substantiate the burden additional production would impose.

*RFP. No 10.* The People have already agreed to produce an extract from the Medical Examiner's database for all drug-related deaths, and have stated that they anticipate production in early January. Ex. 17 at 3. Regarding the production of "all underlying documents" for each such death, the People have informed the Manufacturers that the files are not organized in a way that enables ready extraction, and that compilation of the death records for those deaths, which contain all of the underlying documentation for each death, is a time- and labor-intensive process. *Id.* Moreover, the Manufacturers have not been able to describe any need for most of what they seek, such as coroner reports, which are not relevant or proportional here. While it is possible that the toxicology reports for decedents may be relevant, the Medical Examiner's Office has more than 37,000 such reports going back more than 10 years, and there appears to be no method by which to automate production of the relevant, non-privileged subset of such reports through the Medical Examiner's database. The People will continue to work with the Manufacturers and the Medical Examiner's Office to determine whether the People can determine a feasible manner to produce the relevant subset of these toxicology reports.

---

[15] Manufacturers assert that these privacy concerns are easily addressed by providing the information to third-party Rawlings to de-identify. DPH cannot agree to provide such sensitive information to Rawlings (or anyone else) absent a Court order and confirmation that the nonparty meets the DPH and City requirements for handling HIPAA-protected information, including but not limited to adequate cybersecurity insurance. Moreover, the Manufacturers' proposal evades the massive expense and complications that have arisen with providing data to Rawlings for deidentification in related proceedings. If the Court grants the Manufacturers' motion, they should be required to pay for Rawlings' services.

[16] That's because plaintiffs in the Track One case agreed to produce individual claims-level data, without any motion practice, before deciding to prove causation solely through aggregate evidence.

[17] Ex. 6 orders the reproduction of individual claims-level data that Los Angeles County had already produced to enable it to be more easily cross-referenced to other data. Ex. 7 applies the Protective Order to the third party that will assist in making the reproduced data more easily cross-referenced.

### III.     Manufacturer Defendants' One-Page Statement on Remaining Dispute[18]

**Claims and encounter data:**  In an effort to avoid patently relevant discovery, Plaintiff relies heavily on two cases.  In the first, *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51 (2017), defendants were provided individualized discovery, including a database that "collect[ed] all of the data from children who happen to be tested for lead in California" and lead poisoning "case files."  *Id.* at 152, 157.  Plaintiff's quotation from this case involves what proof was ultimately required (*id.* at 118-19)—a distinct issue from what discovery is warranted.  Plaintiff's second opinion, from the *City of Chicago* case (Ex. 9) and to which Defendants have lodged a pending objection to the District Judge, is likewise inapposite.  That order does not hold this data irrelevant but rather that "it makes sense to require Defendants to seek this information from third-party insurers first."  *Id.* at 13.  Further, it is from a case that did not include a public nuisance claim, a common thread in the several cases where this discovery has been ordered.  While Plaintiff argues that it seeks only "prospective abatement," the same was true in other cases too.  For example, in the Orange County action where "the People" bring identical claims as here, the court has repeatedly ordered the provision of both claims and encounter data.  *E.g.*, Ex. 5-7.

Plaintiff is incorrect that "data already in the Manufacturers' possession" is sufficient.  Defendants have no data reflecting ***why*** prescriptions were written.  IQVIA data reflects only prescriptions—not medical diagnoses that led to them.  Defendants are entitled to discovery on whether the prescriptions were medically appropriate, as this may disprove causation.  In addition, that Defendants are also seeking data from others does not render Plaintiff's own data immune from discovery.  ***Only*** Plaintiff's data can show that San Francisco continues to reimburse for the types of prescriptions that it contends are medically unnecessary for purposes of litigation.  Finally, Plaintiff's burden argument is misplaced.  While Manufacturer Defendants recognize the COVID-19 responsibilities described in Plaintiff's Declaration (Ex. 18 at ¶¶ 6-7, 10, 12), there is no "pandemic exception" to highly relevant discovery.

**Mortality records:**     Plaintiff has agreed to produce an extract from the Medical Examiner's database reflecting all drug-related deaths by early January 2020.  But two issues remain.  *First*, Plaintiff has not yet confirmed that the extract will include all fields that bear on what caused each death.  Plaintiff has agreed to identify what fields it is and is not producing, which Defendants will review.  One field, though, is plainly relevant: an open-text narrative field.  Plaintiff has stated only that it *may* produce this field, unless it deems it too burdensome to redact it for any protected information.  This field is highly likely to contain information on what led to each death, such as notes from the scene of death.  It should be ordered produced.

*Second*, Plaintiff refuses to commit to producing underlying documents, namely toxicology reports, registers (which contain top-line information about each death) and investigator's reports (which detail, *inter alia*, what investigators learned at the scene) as well as medical and prescription records.  In light of the centrality of overdoses to Plaintiff's allegations (*see* above), and the parties' experience in other jurisdiction that underlying documents provide crucial information about the cause of each that is not reflected in the extract itself, Manufacturer Defendants request that the Court order the above-mentioned underlying documents produced for each death listed on the extract.

---

[18] In accordance with DR No. 2, the parties conducted an additional Zoom meet and confer on December 11, 2020.  Along with counsel for other Manufacturer Defendants, Karl Stampfl participated.

## IV. Plaintiff's Response to Manufacturer Defendants' One-Page Statement[19]

*RFP No. 5*.  Though the Manufacturers contend that *Chicago* merely held that defendants there should first seek claims and encounter data from third-party insurers first (*supra* at 7), they ignore that the court held the claims data was "no longer relevant" after Chicago dropped claims for reimbursement.  Ex. 9 at 11.  (The People have never sought reimbursement.).  Indeed, that holding was in response to the specific assertion the Manufacturers make here: that they "can use this data to show that the City still reimburses claims for opioid prescriptions in a way that undermines the City's allegations that Defendants' marketing representations are false."  *Id*.[20]  Nevertheless, as they concede, *Chicago* also counsels the Manufacturers seek this data from third-party insurers first.  Defendants have already served the major insurers covering San Franciscans.  *See supra* at 5 (listing insurers and other sources of claims and encounters data).  As in *Chicago*, the data available from the People will "represent only a sliver of the claims data Defendants intend to access" and there will be "substantial overlap between claims data Defendants obtain from third-party insurers and claims data [the People] would produce."  Ex. 9 at 13.  Thus, even crediting the Manufacturers' incomplete reading of the *Chicago* opinion undercuts their motion.[21]  Nor is the Manufacturers' reliance on *ConAgra* compelling.  There is no evidence that the court there compelled production of the relevant database.  *See ConAgra*, 17 Cal. App. 5th at 152.  More importantly, there was no burden associated with producing the database, which collected blood lead level testing results and was therefore tailored precisely to the needs of the case.  *Id.*  In contrast, the People do not maintain a database specific to opioid-related claims and encounters data.  Rather, the data across multiple databases concern every type of medical claim and encounter at a DPH facility.  The burden of producing the responsive data would therefore be substantial.  *See* Ex. 18.

*RFP No. 10.*  The People have stated that they anticipate including in the extract from the Medical Examiner's database the narrative field the Manufacturers seek.  The only concern is whether that field includes the names of confidential witnesses or other individuals whose identities would require redaction.[22]  If so, it will substantially increase the time required to complete the production.  The People have also stated that they anticipate producing the toxicology reports underlying overdose deaths, but are attempting to figure out how to identify the appropriate set of such reports.

---

[19] Matt Melamed represented the People on the November 2 and 11 meet and confers with the Manufacturers.

[20] *Compare with supra* at 7 ("*Only* Plaintiff's data can show that San Francisco continues to reimburse for the types of prescriptions that it contends are medically unnecessary for purposes of litigation.") (emphasis in original). This assertion misunderstands the identity of the plaintiff and the nature of the data accessible to it.  San Francisco is not the plaintiff, the People are.  As such, San Francisco is not "contend[ing]" anything.  Moreover, the data available to the People through the DPH does not reflect claims San Francisco paid, but rather encounters at DPH facilities and claims submitted to insurers for payment.

[21] The Manufacturers' repeated effort to distinguish the *Chicago* case because it did not include a public nuisance claim fails for the reason addressed above – the different claims make the data *less*, not more, relevant here.  *Supra* n.9.

[22] The investigator's reports that the Manufacturers' seek *will* be included in the information extracted from the Medical Examiner's database, including the narrative field discussed at the beginning of this paragraph.

DATED:  December 16, 2020				Respectfully submitted,


By: */s/ Karl Stampfl*
Zachary W. Byer (Bar No. 301382)
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Email: zachary.byer@kirkland.com

Donna Welch, P.C. (Admitted pro hac vice)
Timothy W. Knapp, P.C. (Admitted pro hac vice)
Karl Stampfl (Admitted pro hac vice)
KIRKLAND & ELLIS LLP
300 N. LaSalle St.
Chicago, IL 60654
Telephone: (312) 862-2000
Email: donna.welch@kirkland.com
timothy.knapp@kirkland.com

Jennifer G. Levy, P.C. (Admitted pro hac vice)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Telephone: (202) 879-5000
Email: jennifer.levy@kirkland.com

*Attorneys for Defendants Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc., Allergan Sales, LLC, Allergan USA, Inc. and Allergan Limited (f/k/a Allergan plc f/k/a Actavis plc)*

By:  */s/ Elizabeth A. Sperling*
Elizabeth A. Sperling (CA Bar No. 231474)
ALSTON & BIRD LLP
333 South Hope Street, 16th Floor
Los Angeles, CA 90071
Telephone: (213) 576-1000
Fax: (213) 576-1100
elizabeth.sperling@alston.com

Daniel G. Jarcho (pro hac vice)
ALSTON & BIRD LLP
950 F Street, NW

9

Washington, DC 20004
Telephone: (202) 239-3300
Daniel.jarcho@alston.com

Cari K. Dawson (pro hac vice)
Jenny A. Hergenrother (pro hac vice)
ALSTON & BIRD LLP
1201 West Peachtree Street, Suite 4900
Atlanta, GA 30309-3424
Telephone: (404) 881-7000
cari.dawson@alston.com
jenny.hergenrother@alston.com

*Attorneys for Defendant Noramco, Inc.*

By: */s/ Amy R. Lucas*
Amy R. Lucas (S.B. #264034)
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Tel: (310) 553-6700
Fax: (310) 246-6779
alucas@omm.com

Charles C. Lifland (S.B. #108950)
Sabrina H. Strong (S.B. #200292)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Tel: (213) 430-6000
Fax: (213) 430-6407
clifland@omm.com
sstrong@omm.com

Amy J. Laurendeau (S.B. #198321)
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Tel: (949) 823-690
Fax: (949) 823-6994
alaurendeau@omm.com

Stephen D. Brody (pro hac vice)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006

Tel: (202) 383-5300
Fax: (202) 383-5414
sbrody@omm.com

*Attorneys for Defendants Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc.*

By: */s/ Zachary Hill*
Zachary Hill (S.B. #275886)
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Tel: (415) 442-1000
zachary.hill@morganlewis.com

Eric W. Sitarchuk*
Rebecca J. Hillyer*
MORGAN, LEWIS & BOCKIUS LLP
eric.sitarchuk@morganlewis.com
rebecca.hillyer@morganlewis.com
1701 Market Street
Philadelphia, 19103-2921
Tel: +1.215.963.5000
Fax: +1.215.963.5001

Wendy West Feinstein (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
One Oxford Centre, 32nd.Fl.
Pittsburgh, PA 15219-6401
Tel: (412) 560-7455
wendy.feinstein@morganlewis.com

*Attorneys for Defendants
Teva Pharmaceuticals USA, Inc., Cephalon, Inc., Actavis LLC, Watson Laboratories, Inc., and Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.*

*\*Denotes national counsel, pro hac vice forthcoming*

By: */s/ Sean O. Morris*
Sean O. Morris
John D. Lombardo
ARNOLD & PORTER KAYE SCHOLER LLP

|  |  |
|---|---|
|  | 777 South Figueroa Street, 44th Floor<br>Los Angeles, CA 90017-5844<br>Tel: (213) 243-4000<br>Fax: (213) 243-4199<br>Sean.Morris@arnoldporter.com<br>John.Lombardo@arnoldporter.com<br><br>*Attorneys for Defendants Endo Pharmaceuticals Inc., Endo Health Solutions Inc., Par Pharmaceutical, Inc., and Par Pharmaceutical Companies, Inc.* |
| DATED:  December 16, 2020 | Respectfully submitted,<br>ROBBINS GELLER RUDMAN<br>  & DOWD LLP<br>AELISH M. BAIG<br>MATTHEW S. MELAMED<br>HADIYA K. DESHMUKH<br><br>             s/ Aelish M. Baig<br>―――――――――――――――――<br>             AELISH M. BAIG<br><br>Post Montgomery Center<br>One Montgomery Street, Suite 1800<br>San Francisco, CA  94104<br>Telephone:  415/288-4545<br>415/288-4534 (fax)<br>aelishb@rgrdlaw.com<br>mmelamed@rgrdlaw.com<br>hdeshmukh@rgrdlaw.com<br><br>ROBBINS GELLER RUDMAN<br>  & DOWD LLP<br>PAUL J. GELLER<br>MARK J. DEARMAN<br>DOROTHY P. ANTULLIS<br>120 East Palmetto Park Road, Suite 500<br>Boca Raton, FL  33432<br>Telephone:  561/750-3000<br>561/750-3364 (fax)<br>pgeller@rgrdlaw.com<br>mdearman@rgrdlaw.com<br>dantullis@rgrdlaw.com |

ROBBINS GELLER RUDMAN
  & DOWD LLP
THOMAS E. EGLER
CARISSA J. DOLAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
tome@rgrdlaw.com
cdolan@rgrdlaw.com


DENNIS J. HERRERA
City Attorney
RONALD P. FLYNN
YVONNE R. MERE
OWEN J. CLEMENTS
SARA J. EISENBERG
JAIME M. HULING DELAYE
Deputy City Attorneys
Fox Plaza
1390 Market Street, Sixth Floor
San Francisco, CA  94102
Telephone:  415/554-3957
jaime.hulingdelaye@sfcityatty.org


LIEFF, CABRASER, HEIMANN
  & BERNSTEIN, LLP
ELIZABETH J. CABRASER
RICHARD M. HEIMANN
PAULINA DO AMARAL
KEVIN R. BUDNER
MICHAEL LEVIN-GESUNDHEIT
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415/956-1000
415/956-1008 (fax)
ecabraser@lchb.com
rheimann@lchb.com
pdoamaral@lchb.com
kbudner@lchb.com
mlevin@lchb.com


RENNE PUBLIC LAW GROUP
LOUISE RENNE
350 Sansome Street, Suite 300
San Francisco, CA 94104
Telephone:  415/848-7240
415/848-7230 (fax)
lrenne@publiclawgroup.com

ANDRUS ANDERSON LLP
JENNIE LEE ANDERSON
AUDREY SIEGEL
155 Montgomery Street, Suite 900
San Francisco, CA  94104
Telephone:  415/986-1400
415/986-1474 (fax)
jennie@andrusanderson.com
audrey.siegel@andrusanderson.com

SANFORD HEISLER SHARP, LLP
KEVIN SHARP
611 Commerce Street, Suite 3100
Nashville, TN  37203
Telephone:  615/434-7000
615/434-7020 (fax)
ksharp@sanfordheisler.com

SANFORD HEISLER SHARP, LLP
EDWARD CHAPIN
655 West Broadway, Suite 1700
San Diego, CA  92101
Telephone:  619/577-4253
619/577-4250 (fax)
echapin2@sanfordheisler.com

CASEY GERRY SCHENK FRANCAVILLA
   BLATT & PENFIELD LLP
DAVID S. CASEY, JR.
GAYLE M. BLATT
ALYSSA WILLIAMS
110 Laurel Street
San Diego, CA  92101-1486
Telephone:  619/238-1811
619/544-9232 (fax)
dcasey@cglaw.com
gmb@cglaw.com
awilliams@cglaw.com

WEITZ & LUXENBERG P.C.
ELLEN RELKIN
700 Broadway
New York, NY  10003
Telephone:  212/558-5500
212/344-5461 (fax)
erelkin@weitzlux.com

>WEITZ & LUXENBERG P.C.
>MELINDA DAVIS NOKES
>1880 Century Park East
>Los Angeles, CA  90067
>Telephone:  310/247-0921
>310/786-9927 (fax)
>mnokes@weitzlux.com
>
>WEITZ & LUXENBERG P.C.
>PAUL F. NOVAK
>TIFFANY R. ELLIS
>3011 W. Grand Blvd, 24th Floor
>Detroit, MI  48202
>Telephone:  313/800-4170
>646/293-7960 (fax)
>pnovak@weitzlux.com
>tellis@weitzlux.com
>
>*Attorneys for Plaintiff The People of the State of California, acting by and through San Francisco City Attorney Dennis J. Herrera*