# EXHIBIT I

**BartlitBeck** LLP

Sten Jernudd
Sten.Jernudd@BartlitBeck.com

Courthouse Place
54 West Hubbard Street
Chicago, IL 60654
main: (312) 494-4400
direct: (312) 494-4439

BartlitBeck.com

May 27, 2021

Michael Levin-Gesundheit
Leiff, Cabraser, Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
mlevin@lchb.com

      Re: *The City and County of San Francisco, et al. v. Purdue Pharma L.P., et al.*

Dear Michael:

I write to follow up on our May 18 and May 19 meet and confers regarding Walgreens' and plaintiff's prescription due diligence notes, your May 20 letter regarding the same, and our May 26 meet and confer regarding plaintiff's possession of additional data relating to the dispensing of methadone, buprenorphine, and other drugs used for the treatment of substance use disorders such as opioid use disorder. We disagree with many of the characterizations in your May 20 letter but have focused our response on several specific points below.

*Walgreens' Electronic Notes*

During the May 10 status conference, the Court ordered the parties to share examples of due diligence electronic notes fields, to demonstrate the burden inherent in redacting and producing them. *See* May 10, 2021 Hearing Tr. at 22-23. We did so. We showed Plaintiff examples from two relevant fields that included a variety of Walgreens' patients' protected health information ("PHI"), as you acknowledged during our calls. Given the time-sensitive nature of the meet and confer process, we were unable to collect and process examples of all the relevant fields for your review in advance, though we are in the process of doing so.

We are, frankly, surprised by the assertions in your May 20 letter that we failed to substantiate our burden. You agreed during our May 19 meet and confer that the PHI we identified in our notes is, in fact, protected health information. *See* Jernudd to Levin-Gesundheit, May 19, 2021. You agreed that this PHI included patient names, birthdates, phone numbers, emails, and addresses. *See id.* You also agreed that such information may be redacted, and that you are considering redacting the same type of PHI from your own prescription notes. *Id.* And you do not dispute that, before redacting PHI, all notes need to be reviewed to identify that PHI.

Nevertheless, Walgreens has continued to collect additional electronic notes fields. We hope to have two additional fields collected by the end of this week, and we are working on whether there is a faster or more efficient way to collect, review, and redact the data for production. We are disappointed that, in spite of these efforts, you have refused to negotiate a sampling of electronic notes along the lines of what was ordered in the MDL, nor even proposed a sample along the lines of what the MDL plaintiffs proposed.

**BartlitBeck** LLP

Sten Jernudd
May 27, 2021
Page 2 of 5

### *Walgreens' Hard Copy Prescriptions*

We confirmed that Walgreens' hard copy prescriptions are generally stored at Walgreens pharmacies for three years before being transported to Iron Mountain (unless the pharmacy has sought leave to retain hard copy prescriptions for a shorter time period). And we described the difficulties, time, and effort necessary to track down individual prescriptions at Iron Mountain. That burden is not alleviated by having Iron Mountain pull the prescriptions instead of a Walgreens employee or outside counsel. Regardless of who pulls them, thousands of boxes would have to be retrieved, and individual prescriptions would have to be located within those thousands of boxes, before each one could be reviewed for notes and then redacted.[1]

As a show of good faith, we are moving ahead with the following production, even though plaintiff has refused to negotiate, refused to provide methadone data it previously agreed to provide, and ignored all the work Walgreens has undertaken to demonstrate its burden:

- We will produce notes on hard copy prescriptions for a random sample of 1,000 prescriptions per year, going back three years, from the 12 San Francisco stores we produced hard copy due diligence documents from, to the extent those documents remain at the stores. We will generate the random sample using the seed number that Special Master Cohen provided us for the same purpose in Track 3.
- We will produce electronic notes for the same random sample of 1,000 prescriptions per year, going back three years, and an additional 200 prescriptions per year prior to that back to 2006, from the 12 San Francisco stores we produced hard copy due diligence documents from. We will generate the random sample using the seed number that Special Master Cohen provided us for the same purpose in Track 3.
- As we are still collecting electronic notes, and we have not been able to begin collecting hard copy prescription notes, due to plaintiff's refusal to negotiate, we cannot say when this production will be complete, but we are working to complete it as quickly as possible.

### *Plaintiff's Notes*

Plaintiff shared certain electronic notes during our meet and confer, including new types of notes it previously represented it did not have. *See* Jernudd to Levin-Gesundheit, May 19, 2021. In addition, you have repeatedly asserted (including in representations to the Court) that plaintiff does not possess any notes from its jail pharmacy. *See, e.g.*, 5/20/21 Levin-Gesundheit Letter at 4 ("No notes have been located for the outpatient dispensing data production from the County Jail."). Yet in the notes production you made on May 19, there appear to be a small number of

---

[1] Contrary to your letter, we did not say that Iron Mountain stores "10 years' of hard copy prescriptions." Levin-Gesundheit to Jernudd, May 20, 2021, at 3.

**BartlitBeck** LLP

Sten Jernudd
May 27, 2021
Page 3 of 5

notes from the jail pharmacy.  We reiterate our request that you provide an explanation of how you have gone about determining what data plaintiff does and does not possess, as your representations continue to be inaccurate and also continue to change.

During our meet and confers, Plaintiff did *not* demonstrate how any of the data is maintained in the ordinary course of business.  Instead, counsel shared a version of the data that counsel created, duplicating notes repeatedly to associate them with multiple prescriptions, regardless of whether those notes even existed at the time an individual prescription was filled.  Please produce the data as it exists in the ordinary course, so that we can assess what plaintiff's pharmacists would have actually seen at the time they filled the prescriptions.

Plaintiff also indicated, for the first time during the meet and confers, that it may produce redacted versions of its notes.  But your May 20 letter ignored my questions about if you plan to do so and when.  We need to know immediately in order to plan for upcoming depositions.  Please let us know at once.

### *Plaintiff's Hard Copy Notes*

During our May 19 meet and confer, plaintiff represented (contrary to its counsel's prior assertions) that plaintiff's pharmacists *do* sometimes make notes on hard copy prescriptions, but that you will not make any claim at trial that such notes reflect due diligence.  Please confirm in writing that plaintiff will enter a stipulation to that effect, or that you will produce your hard copy prescriptions with notes.

### *Methadone Data*

At plaintiff's request, the parties met and conferred on May 26 about whether plaintiff will agree to produce methadone data from its pharmacies, even though the parties agreed months ago to the list of opioid medications for which dispensing data would be produced, and that list included methadone.

Plaintiff has represented for months that its pharmacies do not dispense methadone.  *See, e.g.*, Levin-Gesundheit to Jernudd, May 6, 2021.  Indeed, during our May 26 meet and confer, counsel persisted in this representation.  But contrary to those assertions, plaintiff's own documents, as well as the CURES data produced by the California Department of Justice and the ARCOS data produced by DEA, show that *all* of plaintiff's pharmacies have dispensed methadone for years. *See, e.g.*, SF-Opioids00030434 at 2 ("I am very pleased to report that the State Department of Alcohol and Drug Programs recently approved the Community Behavioral Health Services (CBHS) Pharmacy at 1380 Howard St. to become a methadone dispensing site for San Francisco's Office Based Opiate Treatment (OBOT) program."); SF-Opioids00832831 ("Our BHS pharmacy does *quite a bit of tracking*, and has participated in various performance improvement projects related to prescription safety.  It is also a methadone dispensing station.") (emphasis added); SF-Opioids01151242 ("See below, MOU for an outpatient pharmacy at the

**BartlitBeck**ₗₗₚ

hospital to dispense methadone under OBOT. BHS pharmacy here does this too."); SF-Opioids01168506 ("Methadone is stored and dispensed at one of the two OBOT pharmacies … [t]hose orders are filled by the community pharmacist (either at 1380 Howard CBHS pharmacy or SFGH pharmacy).").

Despite maintaining the odd fiction that plaintiff does not "dispense" but merely "administers" methadone, during our meet and confer you acknowledged that plaintiff provides methadone to patients through "Ward 93," a program run out of Zuckerberg San Francisco General Hospital ("Zuckerberg"). Plaintiff described how Ward 93 encompasses a number of programs, including the Opiate Treatment Outpatient Program ("OTOP"), which is its primary program for methadone detoxification. You explained that in some instances, patients are given a bottle of methadone to take home. But you insisted that plaintiff does "not collect the same data along the same parameters" as a traditional pharmacy, because "there is no prescription, there is no prescribing doctor, it is not a pharmacy." We do not understand these assertions, particularly given that the provision of opioid medications to patients is heavily regulated by law.

Regardless of how plaintiff describes it, plaintiff is still providing methadone to patients. Plaintiff's dispensing data for methadone should have been included in its dispensing data production.

### *Plaintiff's "Treatment Data" For Other Treatment Drugs*

During our May 26 meet and confer, we also discussed whether plaintiff will agree to produce dispensing data for other opioid treatment drugs, or else agree not to raise its treatment of substance use disorders such as OUD as part of its abatement plan, or otherwise discuss it at trial. We asked that plaintiff produce "all of its pharmacies' dispensing data for buprenorphine, methadone, and any other addiction treatment medications," as that data is responsive to several document requests. *See* Jernudd to Levin-Gesundheit, May 11, 2020. *See also* Walgreens Third Set of RFPs, RFP 7 (seeking documents relating to abatement); Walgreens Third Set of RFPs, RFP 12 (seeking documents relating to plaintiff's endorsement or approval of medications as treatment therapies); Manufacturer Defendants First Set of RFPs, RFP 6 (seeking, amongst other things, documents relating to any program, initiative, or other efforts plaintiff has undertaken to address the supposed public nuisance asserted in the Complaint).[2] And as Judge Corley made clear, no party may rely at trial on information that it has not produced in discovery. To the

---

[2] During our May 26 meet and confer, plaintiff requested that Walgreens identify which drugs it is seeking data for with this request. Walgreens is seeking plaintiff's dispensing data for methadone, buprenorphine, suboxone, and *any* other treatment drug which plaintiff's experts intend to argue is necessary for its proposed abatement program. To the extent plaintiff is not prepared to answer that question—as you represented during the call—Walgreens requests data for *all* drugs plaintiff has dispensed, administered, or provided to patients to treat substance use disorders such as OUD.

**BartlitBeck**~LLP~

Sten Jernudd
May 27, 2021
Page 5 of 5

extent plaintiff intends to seek abatement for its treatment of patients for disorders such as OUD, this data should be produced.

In addition, this data is important to determine whether plaintiff's dispensing of opioid treatment medications contributed to the public nuisance for which you have sued Walgreens. To make that determination, we need individualized dispensing data, not aggregate or summary reports. Indeed, the entirety of plaintiff's methadone data is necessary for Walgreens' red flag analysis. Please produce this methadone dispensing data as quickly as you can.

Given our meet and confer, we understand plaintiff will not agree to provide dispensing data[3] for methadone or any other treatment drugs, and we intend to raise these issues with the Court. Please let us know immediately if our understanding is incorrect, in which case please produce this data—along with any associated pharmacist notes—as quickly as possible. Please also clarify what plaintiff's position is regarding any data that potentially implicates 42 C.F.R. Part 2.

Sincerely,

Sten Jernudd
Counsel for Walgreens

---

[3] Or the equivalent of dispensing data, whatever plaintiff intends to call it.