DENNIS J. HERRERA, State Bar # 139669
City Attorney
RONALD P. FLYNN, State Bar # 184186
Chief Deputy City Attorney
YVONNE R. MERE, State Bar # 173594
Chief of Complex & Affirmative Litigation
OWEN J. CLEMENTS, State Bar # 141805
SARA J. EISENBERG, State Bar # 269303
JAIME M. HULING DELAYE, State Bar # 270784
Deputy City Attorneys
Fox Plaza
1390 Market Street, Sixth Floor
San Francisco, CA 94102
Telephone: 415.554.3597
jaime.hulingdelaye@sfcityatty.org

*Attorneys for Plaintiff The People of the State of
California, acting by and through San
Francisco City Attorney Dennis J. Herrera*

Additional counsel appear on signature page

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA and THE PEOPLE OF THE STATE OF CALIFORNIA, Acting by and through San Francisco City Attorney DENNIS J. HERRERA,<br><br>Plaintiffs,<br><br>v.<br><br>PURDUE PHARMA L.P., et al.<br><br>Defendants. | Case No. 3:18-cv-07591-CRB-JSC<br><br>**JOINT STATUS UPDATE**<br><br>**Judges**: Hon. Charles R. Breyer and Jacqueline Scott Corley<br><br>**Courtroom**: Via Videoconference<br><br>**Hearing Date**: September 22, 2021<br><br>**Hearing Time**: 9:30 a.m. |

The parties respectfully submit this Joint Status Update in advance of the Court's discovery conference scheduled for September 22, 2021, at 9:30 a.m.

**JOINT STATEMENT REGARDING SCHEDULE AND DISPUTE RESOLUTION**

The parties jointly report on a number of case developments that have taken place since the last conference with the Court.

## I.   Case Schedule

On June 15, the Court entered the Parties' Joint Stipulation and Amended Order to Modify Case Schedule. Doc. 572. The specific dates are reflected in the chart below:

| Event | Current Schedule |
| --- | --- |
| Custodial Productions Substantial Completion Deadline | June 4, 2021 |
| Document Production Substantial Completion Deadline | June 21, 2021 |
| Plaintiff's Expert Reports | October 5, 2021 |
| Close of Fact Discovery | November 12, 2021 |
| Defendants' Expert Reports | December 2, 2021 |
| Plaintiff's Expert Rebuttal Reports | December 23, 2021 |
| Close of Expert Discovery | January 14, 2022 |
| Motions for Summary Judgment and *Daubert* Motions | January 24, 2022 |
| Oppositions to Motions for Summary Judgment and *Daubert* Motions | February 25, 2022 |
| Replies in Support of Motions for Summary Judgment and *Daubert* Motions | March 11, 2022 |
| All Trial Materials Due | March 24, 2022 |
| Final Pretrial Conference | April 4, 2022 |
| Trial | April 25, 2022 |

## II.   Update on Status of Settlement Among Stipulating Parties

On January 26, 2021, the Court stayed the proceedings as to the Stipulating Defendants.[1] On August 9, 2021, the Stipulating Parties filed a Fourth Joint Notice Regarding Update on Status of Settlement, explaining the mechanics and timeline for the settlement process.  Doc. 616.  The Court ordered the Stipulating Parties to submit a further update to the Court on September 20. Doc. 624.  The Stipulating Parties did so on September 20, 2021 (Doc. 658), reporting that: "The

---

[1] The Stipulating Defendants are distributors McKesson Corporation, AmerisourceBergen Drug Corporation, and Cardinal Health, Inc.; and manufacturer Johnson & Johnson, its subsidiary Janssen Pharmaceuticals Inc. f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. and its former affiliate Noramco, Inc. (with Plaintiff, the "Stipulating Parties").

political subdivisions have until January 2, 2022 to decide whether to become initial Participating Subdivisions.  The Stipulating Defendants will then have up to 30 days to determine whether a sufficient number of political subdivisions have agreed to participate in the settlement and to inform the settling parties whether they intend to proceed with the settlement (the "Reference Date").  Following the Reference Date, if the Defendants elect to proceed, the parties will execute consent judgments in each state."

On August 20, Non-Stayed Defendants filed a Motion to Stay, asking the Court to stay the entire case until the proposed nationwide settlements are either finalized or they fail.  Doc. 627.  Plaintiff timely filed its response in opposition to Non-Stayed Defendants' motion on September 3.  Doc. 647.  On September 8, Plaintiff filed a Notice of Settlement Progress, noting that on September 4 the Stipulating Defendants agreed to proceed with the national settlement process.  Doc. 648.  Non-Stayed Defendants did not file a reply in support of their motion.

**III.**   **Discovery Orders Issued Since Prior Conference (Docs. 635, 638, 644, 655)**

The Court issued four discovery orders shortly before and immediately after the August 30 status conference.

The first discovery order (Doc. 635) addressed three discovery disputes briefed by Plaintiff and Walgreens (Docs. 622, 623, 626).  In it, the Court: (A) ordered Walgreens to produce Paul Blankenship's custodial files by September 3; (B) ordered Walgreens to produce responsive documents from the non-personal corporate email accounts of four Walgreens custodians[2] by September 16; and (C) directed Plaintiff and Walgreens to confer regarding Walgreens' internal complaint database (APIS) by August 26.

The second discovery order (Doc. 638) addressed Plaintiff's motion to compel supplemental interrogatory requests from Teva (Doc. 629).  The Court ordered Teva to supplement its responses to Interrogatories No. 4, 11, 15, by September 17.  Doc. 638.

The third discovery order (Doc. 644) addressed two additional discovery dispute letters (Docs. 628 and 630) as well as additional issues raised in the previous status report (Doc. 639)

---

[2] The specified custodians are Jeff Bruneteau, Jason Cunningham, Hieu-Ngoc Huynh, and Calvin Yeung.

and discussed at the hearing.  The Court ordered: (A) Allergan to supplement responses to

Interrogatory Nos. 1-2 and 3-4 consistent with the agreements outlined in Plaintiff and Allergan's

submission by September 13; (B) Allergan and Teva to provide additional information[3] in a

supplemental response by September 17; (C)  Endo to comply with a number of discovery

obligations on or by September 13; and (D) Plaintiff and Walgreens to meet and confer by

September 7 as to "whether [Walgreens'] delayed production" of hard-copy due diligence

documents "warrants an extension of time for certain" of Plaintiff's "expert reports" and to have

their "respective technical experts meet and confer" by September 3 regarding the searchability of

Walgreens' internal complaint database.

The fourth discovery order (Doc. 655) granted Defendants Endo Health Solutions Inc.,

Endo Pharmaceutical Inc., and Par Pharmaceutical Companies Inc.'s motion for Extension of

Time to Comply with Order Following August 30, 2021 Discovery Conference and extended the

deadlines for (1) producing Compliance documents; (2) completing an investigation into

SpeakerNet data files; and (3) finishing an investigation into potential sources of HCP payments,

until September 27, 2021.

**IV.   Plaintiff-Walgreens Agreement Re: Deadline Extension for Certain of Plaintiff's Expert Reports**

Following the last status conference, and to address Walgreens' delay in producing hard-

copy prescriptions, Plaintiff and Walgreens have agreed to stipulate to: (1) a two-week extension

(to October 19) for one of Plaintiff's expert reports addressing prescription due diligence; and (2)

a supplemental report from a separate expert, Craig McCann, addressing only Walgreens'

prescription due diligence, to be filed one week later (October 26).  Neither the extension nor the

supplemental report will affect the deadline for Walgreens' responsive expert reports.  Plaintiff

reserves the right to seek relief related to the 2,693 unproduced hard copy prescriptions—

including but not limited to an adverse inference of no due diligence—at another time.

Walgreens opposes any further relief.

---

[3] Specifically, this information consisted of: (1) product name, (2) FDA NDC code, (3) gross dollar sales for each opioid by year, and (4) San Francisco and California sales volume by number of individual units for both the branded and generic opioids sold, either by Allergan or Teva, including through entities that have been divested to Teva.

1

**V.**     **Discovery Motions**

2          There are no fully briefed discovery disputes before the Court.

3                              **PLAINTIFF'S STATEMENT**

4     **I.**    **Plaintiff's Productions**

5          Plaintiff has produced more than 630,000 documents in this action, consisting of more

6     than 4 million pages of information retrieved from 39 individual custodians, numerous common

7     network drive spaces, websites and massive database collections.  The production includes emails

8     dating back to 2001 and databases that reach as far back as 1997.  After substantially completing

9     production for the existing custodial sources in June, Plaintiff has now completed re-reviewing

10    documents it had set aside under a claim of privilege.  In June and July Plaintiff produced more

11    than 50,000 additional documents it had initially withheld.  As of September 20, Plaintiff will

12    have de-privileged and produced just over 70,000 total documents,[4] the majority of which were

13    produced by the end of July.[5]

14         Defendants did not raise a single complaint about this process in June, July, or August.

15    Now that Plaintiff has pursued relief for Walgreens' admittedly late productions, however,

16    Walgreens' counsel has all of a sudden cried foul and demanded an extension of all schedule

17    deadlines by at least two months.  Their complaints ignore two critical facts.  First, in the

18    stipulation and proposed order to modify case schedule, which Judge Breyer signed in June,

19    Plaintiff made perfectly clear that, even after the substantial completion deadline, Plaintiff would

20    still be producing: "(1) privilege and redaction review documents (i.e., documents set aside for

21    privilege that could be produced after further review and/or redaction) and (2) documents that

22    require re-review because of a coding issue or technical issue identified during the initial review."

23    Doc. 572 at 2 n.1.  These are precisely the documents that Plaintiff continued producing.  Second,

24

25    _____

[4] Several thousand of these custodial documents are duplicates or near duplicates of documents
26    that Plaintiff had already produced from non-custodial sources by the substantial completion
      deadline.
      [5] Plaintiff made some privilege downgrade productions from the files of custodians who were
27    about to be deposed. Plaintiff acknowledges this was not ideal and apologizes for any
      inconvenience.  However, Plaintiff promptly addressed the matter and worked to provide
28    Defendants' counsel alternate deposition dates as quickly as possible.

the June deadline was for *substantial* completion—not final completion—and by that deadline, Plaintiff had produced nearly 90% of all the documents it would ultimately produce.  Defendants' manufactured outrage is misplaced.

In addition, throughout the course of this discovery process, Plaintiff became aware of and identified two more custodians, Dr. Kathleen Chung and Dr. Claire Horton.[6]  As of Friday, September 17 Plaintiff is substantially finished producing documents and materials from those individuals' files and will finish its privilege review in the coming week.  Plaintiff has completed production of documents for every other custodian.

Defendants have raised a litany of concerns below.  The parties are meeting and conferring about most of them.  A few require a brief response:

**Police investigation files.**  There is no reason to think that any investigation files are "missing," as Defendants claim. After an intensive search, Plaintiff spoke to Defendants on August 5, explaining that it located three investigation files and searched thoroughly for the others. Plaintiff answered all of Defendants' questions about those files at that time, then produced them on August 10.  More than a month later, Defendants asked Plaintiff to repeat its answers from August in writing. Plaintiff addressed that request and explained, again, that its production is "complete[]."

**Questions following deposition.**  Below, Defendants list six issues they raised following the deposition of Dr. Michelle Geier.  These six issues were presented in a letter sent the evening of Friday, September 20.  Plaintiff disagrees with Defendants' assertions and characterizations and will respond to their letter.

**Plaintiff's amended responses to Walgreens' third set of interrogatories**.  Plaintiff served amended responses to two interrogatories on June 11.  The responses reflected significant efforts and fully complied with the Court's order.  Walgreens seemed to agree, as they raised no objection for two and half months.  Then, on August 24, Walgreens' counsel emailed a series of

---

[6] Defendants suggest below that Plaintiff will be withholding documents form Drs. Horton and Chung. That is not true.  Dr. Horton holds separate appointments at the San Francisco Department of Public Health and UCSF (a non-party).  Plaintiff does not control and will not be producing documents maintained by UCSF.

1 questions, which Plaintiff attempted to answer, and asked if Plaintiff's responses were

2 "complete." In response, Plaintiff explained that "[w]e have no supplement at this time, and we

3 are not withholding any information." It is unclear what further relief or information Walgreens

4 seeks.

5 **II.**   **Defendants' Discovery Deficiencies and Other Issues Requiring the Court's**
**Attention**

6

7 Plaintiff addresses the following select few of Defendants' discovery deficiencies that

8 require emphasis.

9 **A.**   **Walgreens Refuses to Engage with Plaintiff to Complete its Production of**
**Internal Complaint and Investigation Files.**

10 On August 18, 2021, Plaintiff filed a motion to compel Walgreens to (i) complete its

11 production of documents related to a whistleblower complaint regarding Walgreens' national

12 dispensing policy; and (ii) produce complaint and investigation files from the internal complaint

13 database(s) where they are stored. Plaintiff seeks production of complaint and investigation files

14 related to Walgreens' national policies on a nationwide basis, while seeking such files related to

15 individual instances of drug diversion on only a regional basis. Doc. 626. Plaintiff had sought

16 the discovery requested both in its initial document requests (served in May 2020) and more

17 recent, narrowly tailored requests (served in May 2021). The parties have traded numerous letters

18 and emails about these issues and have conferred by video several times (July 9, July 30, August

19 13, August 26, and September 1). This motion remains unresolved.

20

21 **1.**   **Walgreens' production of materials regarding the whistleblower**
**complaint is incomplete.**

22 On July 16, Walgreens represented that its production of documents related to the

23 whistleblower complaint was complete. However, in the parties' August 18 joint discovery

24 dispute letter, Walgreens represented to the Court that it was "working to confirm whether any

25 additional responsive documents relating to the complaint . . . Plaintiff identified exist." Doc. 626

26 at 5. On August 23—that is, after briefing had completed—Walgreens produced a handful of

27 additional documents, including limited internal correspondence and a screen capture of a case

28 report from Walgreens' internal complaint database. After reviewing these documents, Plaintiff

1   then identified multiple categories of responsive information that Walgreens had not produced.

2   Walgreens has ignored Plaintiff's many inquiries about them.  At minimum, the following

3   categories of documents related to the whistleblower complaint remain outstanding:

4   - ***Documents addressing "'institutional' issues [that] were being further reviewed by***
5   ***[Employee Relations] and the company."***  WAGCASF00314276.  Plaintiff identified
    internal correspondence regarding the whistleblower complaint in which Walgreens
6   indicated it was conducting a "further" investigation of "institutional" concerns about its
    dispensing policy.  Plaintiff requested documents reflecting that review in correspondence
7   sent on August 25, September 2, and September 8.  Walgreens did not respond until
    September 17 (shortly before this report was to be exchanged).  In its response, Walgreens
8   claimed that the investigation consisted entirely of witness statements predating the
    representation that "'institutional' issues ***were being further reviewed***."  Walgreens has
9   not confirmed what, if anything, it has done to reach a conclusion that appears to conflict
    with the plain language of the document in question.

10  - ***Documents reflecting "training" conducted in response to whistleblower complaint.***
    WAGCASF00314276.  Internal correspondence Walgreens produced suggests that a
11  training took place in response to the whistleblower's complaint about application of
    Walgreens' national dispensing policy.  Plaintiff requested documents reflecting this
12  training on August 25, September 2, and September 8.  Walgreens responded for the first
    time on September 20, claiming it had conducted a "reasonable, diligent search," but
13  would not explain what that search entailed.

14  - ***"[R]espon[se] to [whistleblower] in writing to address his concerns."***
    WAGCASF00314276.  Similarly (and unsurprisingly), Walgreens' production revealed
15  that Walgreens responded in writing to the whistleblower's complaint.  Plaintiff requested
    such correspondence on August 25, September 2, and September 8.  Once again,
16  Walgreens did not respond until September 17.  Plaintiff is still evaluating this response,
    but notes that Walgreens offered only to look for the correspondence from one individual
17  (rather than, for example, searching Mr. Yagar's emails).

18  - ***Case summary cataloged under different case number.***  At the September 10 deposition
    of a Walgreens investigator, the witness testified that he understood there to be *two*
19  separate case reports in the internal complaint database related to the whistleblower
    complaint filed at case numbers 8239138 and 1195618.  Walgreens had only produced the
20  case report associated with case number 8239138 (on August 23).  On September 10,
    Plaintiff requested that Walgreens produce the case report associated with case number
21  1195618 (and its attached documents).  On September 17, Walgreens represented that
    "[t]here is no additional APIS file."  Similarly, in a previous draft of this status report,
22  Walgreens again represented that "Plaintiff's representations regarding the two alleged
    case numbers are incorrect" and that there were no additional documents to produce.
23  During a meet and confer on September 20, Walgreens would not say whether it had
    actually queried the two different case numbers in the database.  Then, on September 21,
24  Walgreens told Plaintiff that it actually had identified "additional information" from the
    other case number—which calls into question Walgreens' repeated representations that its
25  searches have been comprehensive and its productions complete.

26      All of these documents are responsive to Plaintiff's requests, highly relevant, and fall

27  within the universe of documents that Walgreens agreed to produce.  Plaintiff will attempt to

28  confer with Walgreens again before the hearing, and may seek further relief at that time.

JOINT STATUS UPDATE
CASE. NO. 18-CV-07591-CRB-JSC

1
2

**2.      After opioid litigation had begun, Walgreens degraded the search functionality of its internal complaint database and now refuses to work with the software vendor to export files.**

3

Pursuant to the Court's order (Doc. 644), Plaintiff, Walgreens, and their respective

4

technical experts conferred on September 3 regarding how to search for and export files from

5

Walgreens' internal complaint and investigation database.  Unfortunately, the parties remain at

6

impasse, as Walgreens refuses to facilitate the export of, *inter alia*, any complaints about its

7

national dispensing policy.  As the MDL court recognized in a similar context, national discovery

8

on these issues is warranted because "[w]hen a Pharmacy Defendant issues a national policy, it

9

should expect feedback from its pharmacies."  Doc. 626-9 (MDL Doc. 3689) at 3.  "It does not

10

matter which pharmacy the feedback comes from.  The feedback is ***necessarily national in scope***

11

***because it implicates the effectiveness of the national policy*** . . .—an issue that is the very heart

12

of this litigation."  *Id.*

13

Prior to the technical meet and confer, Plaintiff had understood that the internal complaint

14

database at issue was a deployment of NAVEX Global's EthicsPoint.  During a previous meet

15

and confer on August 27, Walgreens' counsel had indicated that she was under the same

16

impression, but that she was not certain.  Plaintiff thus asked for confirmation.  At the same time,

17

Plaintiff conducted research regarding EthicsPoint's export functionality and confirmed that a

18

user may indeed export materials *en masse*.  It was not until the first few minutes of the parties'

19

September 3 technical meet and confer (many weeks after the discussion began) that Walgreens

20

revealed that the internal complaint software in use from 2011 to 2019 was *not* a deployment of

21

NAVEX Global's EthicsPoint, but an offering from Appriss, Inc.  Plaintiff's technical expert thus

22

was unable to conduct any research regarding the software prior to the technical meet and confer.

23

During the technical meet and confer, Walgreens' experts explained that, in September

24

2019,  Walgreens transitioned to a new database (hosted by NAVEX) and transferred  an

25

unspecified portion of complaint and investigation files from the old Appriss system into a new

26

NAVEX database.[7]  Although it was not entirely clear, Walgreens' experts suggested that user

27
28

---

[7] Since the meet and confer, Walgreens has not clarified exactly what portion of files were transferred, though a witness Plaintiff deposed on September 10 testified that he was under the

JOINT STATUS UPDATE
CASE. NO. 18-CV-07591-CRB-JSC

1    search functionality was reduced at the time Walgreens transitioned databases in 2019—or that it

2    became more difficult to export complaints from the database, given that Walgreens had

3    effectively cut ties with Appriss.  To be clear, Walgreens was a defendant in the MDL and several

4    other opioid litigations when it transitioned away from Appriss without, to Plaintiff's knowledge,

5    notifying a single plaintiff.  According to Walgreens' experts, who confirmed they did not review

6    any manuals or documentation about the Appriss platform, at present, search and extraction of the

7    complaint and investigation files Plaintiff seeks would require that Walgreens make a request to

8    Appriss.  Walgreens' technical experts confirmed that they had not been in touch with Appriss.

9    Following the meeting, Plaintiff asked Walgreens' experts to work with Appriss to

10   determine whether Appriss could run search terms through the 2011 to 2019 database and/or

11   export the complaint files to an e-discovery platform (in which search terms could be run).

12   Plaintiff also requested that Walgreens (i) produce the last operative version of Walgreens'

13   contract with Appriss setting forth the current relationship with respect to data export; and (ii)

14   produce the software manual, instructions, technical notes, or the like explaining how data is

15   stored.  Walgreens refused Plaintiff's requests and directed Plaintiff to serve a subpoena on

16   Appriss.  On September 17, Plaintiff did so, though it appears likely that if Walgreens requested

17   that Appriss export the data at issue (or if Walgreens had not decommissioned the database

18   without notice), no subpoena would be necessary.

19   Walgreens will argue that the complaint files Plaintiff seeks are duplicative of its custodial

20   productions.  They are not, for at least three reasons.  First, at a minimum, the detailed,

21   investigation summary forms—which includes critical information such as the investigations'

22   ultimate disposition—are *not* found in custodial emails.  Second, the database contains all

23   relevant documents dating back to at least 2010; the date ranges for Walgreens' custodial

24   productions, in contrast, is quite limited due to, among other reasons, Walgreens' retention

25   policy.  *See generally* Doc. 623.  Third, the scope of Walgreens' custodians is also very limited.

26   Indeed, Walgreens has not produced documents from its MDL compliance custodians on a

27

28   impression that all files had been migrated to NAVEX.  Walgreens also refuses to search for
     responsive complaints from the current NAVEX database.

2304536.2

national basis.  Walgreens also misled Plaintiff about the responsibilities of the investigator custodian selected here.  Walgreens suggested that the investigator Plaintiff chose as a custodian had responsibly for San Francisco from 2000 to present.  While Plaintiff's independent research this summer suggested that this was not true, it was only at the investigator's deposition on September 10, that Plaintiff learned that he covered San Francisco for only two years: 2019 to 2021.  Walgreens' representations have shifted over time, but its comments below about the investigator's responsibilities within "California" are a red herring, and say nothing of his responsibility for San Francisco. Setting aside deficiencies in Walgreens' custodial productions, it is clear that there is no substitute for searching the actual complaints database.

### B.     Allergan and Teva

On September 13, 2021, pursuant to the Court's Motion to Compel Order, Allergan served its Second Amended and Supplemental Responses to Plaintiff's First Set of Interrogatories (Nos. 1-5, 9).  In its amended responses to Plaintiff's marketing interrogatories, Allergan identified over one hundred additional responsive documents.  Plaintiff is currently reviewing these materials in anticipation of providing its marketing experts with information necessary to draft expert reports.

On September 17, 2021, Plaintiff received supplemental responses from Allergan and Teva to Plaintiff's Interrogatory Nos. 6 and 4, respectively, regarding sales data, and supplemental responses by Teva to Plaintiff's marketing interrogatories (Nos. 8, 11, and 15), as stated by the Court's Motion to Compel Order.  Plaintiff will review any responsive materials identified in the supplemental responses for relevant information to provide its experts.

While Plaintiff is presently working expeditiously to review these newly identified materials, it notes the limited timeline between Teva and Allergan's supplemental responses and the quickly approaching expert report deadline of October 5.  Plaintiff is working to provide any new and relevant information with sufficient time for the experts to incorporate the information into their reports.  Given the volume of newly disclosed information, Plaintiff will seek relief with the Court, should it be necessary.

### C.    Endo/Par

On August 30, 2021, this Court ordered Endo to complete its investigation of multiple document sources identified by Plaintiff no later than September 13, 2021.  Doc. 644.  On September 20, 2021, the Court entered an order granting Endo's motion for an extension of time ("Motion for Extension"), continuing the deadline for (1) producing Compliance documents; (2) completing an investigation into SpeakerNet data files; and (3) finishing an investigation into potential sources of HCP payments, until September 27, 2021, which is merely eight days before Plaintiff's expert reports are due.

Endo's ongoing failure to make these and other long overdue productions in compliance with this Court's orders has greatly prejudiced Plaintiff's ability to prepare for trial in this matter.  Below is a summary of the most troubling discovery issues that have arisen since the Parties last appeared before this Court.

#### 1.    Endo's Settlement in New York State Court

In order to avoid a New York state court's ruling on its orders to show cause why sanctions, including terminating sanctions, should not be levied against Endo and its counsel, APKS and Redgrave LLP, for their discovery abuses, Endo entered into a $50 million settlement to resolve the claims against it in that jurisdiction on September 9, 2021.  The orders to show cause were supported by documents and data produced in response to discovery ordered in this case, much of which is still incomplete.

#### 2.    Endo's New Counsel

In an apparent effort to distance itself from both recent court orders indicating that Endo and its counsel engaged in discovery abuse, and purportedly in response to this Court's order to meet discovery obligations by September 13, 2021, Endo informed Plaintiff on September 15, 2021, that it has now also retained the law firm of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), whose attorneys assert that they are poised to "get up to speed" in the "last several days" and remedy Endo's years of discovery abuses.  However, in the same correspondence, Endo reiterated that it had no intention of meeting this Court's deadlines and merely says it "expects" to be able to produce "additional" documents by September 27, 2021.

### 3. Documents Previously Withheld as "Nonresponsive"

After facing terminating sanctions in two related cases for withholding plainly relevant and responsive documents, Endo and its new counsel propose creating a repository of documents that have been withheld as non-responsive for the last several years so plaintiffs in the various cases can take on the burden themselves of identifying responsive documents and then asking Endo that they be formally produced. The Endo Defendants say that the platform will be hosted at their expense. Plaintiff will hear Endo out on this unorthodox proposal, but, at minimum, any and all costs of searching, retrieving, and producing documents must also be borne solely by the Endo Defendants, who have already wasted countless resources and hours of attorney time with their efforts to avoid producing these same documents.

### 4. Missing Data and Documents

For months, Plaintiff was required to scour through Endo's documents to identify sources of missing data. As noted above, the Court has ordered Endo to complete its investigation and productions from these sources by September 13, 2021, but Endo has not done so. The status as Plaintiff understands it is as follows.

### a. Compliance Documents and Navigator Data

Plaintiff has pressed Endo for more information regarding the location of compliance documents such as Reports of Suspected Diversion and other methods for tracking suspicious orders, including whether suspected diversion incidents may be tracked in two additional CRM systems, Engage and Navigator. The Court ordered that any additional documents from these sources be produced by September 13, 2021. On September 10, 2021, Endo represented it has identified some 90 boxes of hardcopy compliance documents not previously produced and which were not adequately reviewed. Doc. 650. On September 15, 2021, Endo reported to Plaintiff that it has identified: (1) the hard copy documents; (2) additional electronically stored compliance documents; and (3) "message" and "reaction" fields in its IMS/Navigator CRM system identified by Plaintiff, none of which have been previously produced. Endo reports that it expects to produce compliance documents by September 27, 2021, and that it is "working to create reports

1    of [the IMS/Navigator CRM] data for production this month."  Endo has provided no explanation

2    of why these efforts were not undertaken months or years ago.

3                    **b.        SpeakerNet Data File**

4          Plaintiff initially raised inconsistencies in Endo's SpeakerNet Data File on ***May 28, 2021***.

5    Despite this Court's order that all such data be produced by September 13, 2021, Endo claims that

6    it needs until September 27, 2021, four months after Plaintiff identified the missing data, to

7    search "two additional sources that may contain SpeakerNet data" and to "complete its production

8    of additional files."  However, Endo has provided no explanation of why these efforts were not

9    previously undertaken.  Nor has Endo explained why it took ***over three months*** (until September

10   3, 2021) to provide Plaintiff with additional SpeakerNet data from the ***very same report*** as Endo's

11   original production of SpeakerNet Data in April of 2020, or why information regarding events

12   costs, fees, "honoraria", and travel expenses, were excluded from its original production of data.

13                   **c.        Health Care Professional ("HPC") Payment and Clinical Trial
                               Data**

14

15         The Court ordered that Endo investigate these potential sources of data identified by

16   Plaintiff by September 13, 2021.  Endo did not comply.  Instead, Endo stated that it has just now

17   "identified certain individuals (and one source)" who may have been responsible for payments

18   relating to clinical trials and "research activities" in its September 7, 2021, written statement

19   detailing the sources searched for payments.  Endo provides no explanation for why this basic

20   investigation was not previously undertaken in preparing its initial response to Plaintiff's

21   discovery requests, but now claims it will not be able to produce responsive information until

22   September 27, 2021.

23         As for Par, counsel has now confirmed that third-party vendor Porzio Life Sciences has a

24   legacy instance of the Porzio database that may contain the pre-2015 payments to HCPs Plaintiff

25   has been seeking.  This database has been in Endo's possession or control, and yet Endo said that

26   it has only now inquired as to whether Porzio retained any legacy database and begun reviewing

27   it.  Par says it "expects" to be able to produce responsive materials by September 27, 2021.  Par

28   provides no explanation of why this search was not done previously.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

#### d.    Pharmacy, Contact, Location, Organization/Client Data Notes (previously referred to as "Pharmacy Notes")

Endo produced these notes relating to sales activities directed to pharmacies for 2002-2007 and 2008-2012 on September 3, 2021, and September 10, 2021, respectively.  However, in addition to the pharmacy calls initially described, such productions also included hundreds of thousands of lines of free-style notes on healthcare providers and/or pharmacies in additional datasheets titled "contact," "location" "client" (2002-2006) and "organization" (2008-2012) which had not previously been disclosed.  Plaintiff is also still waiting for post 2012 data.

#### e.    Representations by Publication

Endo did amend its response to Interrogatory Nos. 3 and 4 by September 13, 2021, after this Court ordered it to do so at Plaintiff's request.  But the response is still incomplete on its face. After months of telling Plaintiff that it is not aware of any central location for publication information, Endo has suddenly identified a non-custodial source provided by a third-party vendor, PubsHub, which "includes information regarding journal abstracts, posters, presentations, and articles Endo sponsored" in connection with its sale of opioids.  On September 15, 2021, Endo represented it "will work to produce any responsive information by September 27, 2021." Plaintiff served the interrogatories on *December 3, 2020*.[8]

#### f.    Additional Non-Custodial Sources

On September 15, 2021, Endo also advised that it is "continuing to investigate whether there are other potentially responsive non-custodial sources" and promised to update Plaintiff at some unidentified date.  Obviously, all such sources should have been identified months, if not years, ago.  Plaintiff asks the Court to order a date by which the Endo Defendants will verify under oath that *all* potential sources have been searched.

---

[8] While Endo argues that "it was only on August 5, 2021, that Plaintiff clarified" that these interrogatories referred to "published statements that Endo disseminated or 'caused to be disseminated,' such as by seeking out or working with authors, approving draft articles, assisting with submission, editing, or publication of articles," Plaintiff has been seeking publication information for months, and this (and all of the other categories of information apparently in the PubHub file) are plainly responsive to the interrogatories served.

JOINT STATUS UPDATE
CASE. NO. 18-CV-07591-CRB-JSC

1

### g.   Call Messages and Materials Dropped

2    Although Endo represented in the parties' August 23, 2021, Joint Status Update that it had

3    conducted (and completed) an "exhaustive investigation" to locate any and all materials dropped

4    data, Endo has recently disclosed that additional materials dropped data may also exist in its

5    Navigator CRM system, and accordingly, its search remains ongoing.  Endo has not provided ***any***

6    ***explanation*** as to why the Navigator CRM system was not previously searched ***nor requested***

7    ***any extension of time*** to produce such information.  Further, Plaintiff has asked Endo to

8    determine whether the previously identified SIF2007 Backup also includes information regarding

9    materials dropped for the time period of 2002-2007, but has not received any response.

10    In addition, although Endo's Motion for Extension made no mention of Endo's ongoing

11    production of call messages, correspondence from Endo's new counsel, Skadden, explains that

12    Endo has now located ***additional call messages and reaction data from 2016*** in its Navigator

13    CRM system.  Endo has not provided any explanation for why these call messages were not

14    previously searched for and produced.

15    Indeed, Endo was initially ordered to complete its investigation into call messages and

16    materials dropped and "[t]o the extent that Endo identifies additional responsive data, ***that data***

17    ***shall be produced*** … by ***May 31, 2021.***"  Doc. 561 (emphasis in original).  However, as it did

18    here, Endo ***ignored*** this Court's deadline to produce responsive data and instead filed a "Status

19    Report" on May 28, 2021, stating that its investigation into the missing data was "ongoing."  Doc.

20    566.  Subsequently, on June 16, 2021, this Court issued an order providing in relevant part that:

21    "Endo shall submit a status update to the Court ***by June 30, 2021*** regarding the status of its

22    investigation into data and other information potentially responsive to Plaintiff's Interrogatory

23    Nos. 1-4 and the expected date of completion. Doc. 578.  Following Endo's Status Report of June

24    30, 2021, this Court ordered that Endo "shall complete its investigation of the Commercial Data

25    Warehouse and the StayinFront CRM database and database backups and ***produce any***

26

27

28

1    *responsive materials discovered therein by July 21, 2021.*"  Two months later, Endo's

2    investigation and production of call message data and materials dropped is *still* incomplete.[9]

3    Further, Plaintiff notes that Endo's production of such call messages (in addition to its

4    previous productions of 2012-2015 call messages) indicates that Endo's initial "explanation" for

5    *why* the data has not been previously produced and *why* its investigation into the existence and

6    collection of call messages was so time consuming was inaccurate.  Specifically, Endo initially

7    dismissed Plaintiff's evidence that Endo routinely tracked, not only key messages entered by its

8    sales representatives, but also HCP reactions, stating that the document Plaintiff cited

9    demonstrated only that such information was entered into a "TRex" CRM system used in 2008

10   that "may no longer be accessible."  In response, Plaintiff provided Endo with further

11   documentation demonstrating that the TRex structured call note system was in use until *the end*

12   *of 2011,* and that Endo *continued* to utilize a structured call note system even when it switched

13   CRM system to Atlas (Veeva) in 2012.

14   Despite this, in the parties' May 7, 2021, Joint Discovery Letter Brief, Endo represented

15   that it had "*conducted a diligent investigation of potentially responsive* data *at the time*

16   *discovery began in the MDL*, identifying what it then understood to be reasonably available

17   sources related to call notes and promotional materials 'dropped' with healthcare providers."

18   Doc. 551 at 8.  Endo defended its failure to produce the relevant and responsive call notes by

19   stating that, "Plaintiff refers to certain fields from the TRex *call note system used in 2011*, but

20   Endo's collection of call note data occurred in 2017, *when those fields from 2011 and prior*

21   *years were no longer readily accessible*."  *Id.* (emphasis added).  Given that it now appears that

22

---

23   [9] In addition to prejudicing Plaintiff in this action, Endo's ongoing refusal to abide by this Court's
     discovery orders regarding production of call messages and materials dropped data has proved to
24   be prejudicial to plaintiffs in *related* litigation.  Shortly after Endo finally produced its call
     messages and notes, a trial court in the State of New York (where trial was already under way)
25   granted the State of New York's Motion for an Order to Show Cause against Endo.  The motion
     was primarily based upon and supported by Endo's belated production of smoking gun call
26   messages and call notes.  The plaintiffs in *People of the State of California v. Purdue Pharma, et*
     *al., Orange County Superior Court*, Case No. CGC-13-534108, where trial began on April 19,
27   2019, and concluded on July 26, 2021, were even more severely prejudiced.  Accordingly, Santa
     Clara County, Orange County, Los Angeles County, and the City of Oakland brought a Motion
28   for Sanctions (based in large part on Endo's failure to produce call messages and call notes) on
     September 10, 2021.

call messages continued to be entered through 2016, only *one year* before data collection, this statement appears to be false.  Endo could have determined the extent to which its sales representatives tracked their call messages and physician responses across CRM systems by, *inter alia,* asking its current or former employees.  For example, Ernesto Sayo, an Endo Specialty Sales Representative in the Bay Area (and a custodian in this case) from 2008 through the present, may have been able to provide such information long ago.

### h.    Plaintiff's Challenge to Privilege Designations

Plaintiff has challenged several of Endo's privilege designations. ***First,*** on August 13, 2021, Plaintiff challenged Endo's efforts to claw back 17 documents on privilege grounds, and Endo has agreed to withdraw privilege designations for nearly all of these documents ***Second,*** on September 11, 2021, Plaintiff challenged 15 documents from the custodial file of Eric Vandal listed on Endo's privilege log.  At 8:39 pm on September 20, 2021, Endo responded and agreed to withdraw or modify the majority of these entries.  ***Third***, Plaintiff challenged the privilege designation of 52 documents from the custodial files of Bobbie Sue Brown, and Endo has de-designate in whole or in part 27 of these documents.  Plaintiff is evaluating the adequacy of the responses.

### 5.    Potential Remedies

Plaintiff is still evaluating what remedies may be appropriate for the misconduct and delays described herein and in earlier reports.  At minimum, Plaintiff reserves the right to seek an extension on its expert report deadline and reserves the right to seek evidentiary and monetary sanctions as may be necessary and appropriate.

## DEFENDANTS' STATEMENT

### I.    Status of Party Discovery

### A.    Status of Party Discovery

### 1.    Defendants' Discovery Requests

Defendants have identified numerous concerns with Plaintiff's document productions and privilege logs, which have impacted depositions and the schedule, and make it increasingly likely that Defendants will be unable to complete necessary fact depositions or work through deficiencies

in Plaintiff's productions before the November 12 fact discovery deadline.  These concerns are set forth more fully below.

a.  <u>Late Production of Documents.</u>  Since the substantial completion deadline of June 21, 2021, Plaintiff has produced over ***89,000*** documents—more than 26,000 in the past five days.  It is unclear how many more documents remain to be produced or when Plaintiff will complete its productions.

Plaintiff tries to explain its discovery failures by carving out documents set aside for privilege review.  But if setting aside those documents meant that Plaintiff would not meet the Court's substantial completion deadline, Plaintiff should have said so, instead of sandbagging Defendants with tens of thousands of documents,  three months late.  Plaintiff also argues that Defendants' complaints about Plaintiff's discovery failures come too late. But Plaintiff did not disclose until August 27 that it was adding two new custodians, discussed below; and Plaintiff only disclosed as depositions were supposed to get going in earnest that their deponents' custodial files were far from complete.  Defendants raised these issues with Plaintiff as soon as they became apparent.

b.  <u>Newly Added Custodians.</u>  Months after the substantial completion deadline, Plaintiff has identified two additional custodians.  On August 27, 2021, Plaintiff identified Kathleen Chung, an Opioid Safety Subject Matter Expert with San Francisco's Department of Public Health, in the People's Fourth Supplemental Responses and Objections to Distributor Defendants' First Set of Interrogatories. And on August 30, 2021, Plaintiff produced SF-Opioids_VOL00047, stating that it included 258 "documents from the custodial production of Dr. Claire Horton and Dr. Kathleen Chung." This was the first time Plaintiff alluded to the additions of Drs. Horton[10] and Chung as custodians.

On September 9, 2021, in Plaintiff's Fifth Supplemental Response to the same interrogatories, and the accompanying email, Plaintiff confirmed Dr. Claire

---

[10] Dr. Horton is San Francisco Department of Public Health's Chief Medical Officer.

- 18 -

1    Horton's custodial status for the first time. Plaintiff subsequently informed

2    Defendants on September 10, 2021 that it would be producing at least 5,700

3    documents from Dr. Horton's custodial files the following week. Plaintiff has not

4    explained why these two custodians were not added sooner. This is particularly

5    troubling as Defendants identified Dr. Horton as a necessary additional custodian,

6    and first requested Dr. Horton as a custodian, on February 2, 2021. Plaintiff

7    refused, and failed to produce any documents from her custodial file until seven

8    months later, long after the substantial completion deadline.  Plaintiff has also not

9    specified how many documents for these custodians it will produce or when it will

10   produce them.

11           Plaintiff was not substantially complete with its custodial productions by

12   June 21.  It produced zero documents for Dr. Horton and Dr. Chung by that date,

13   and Plaintiff's late disclosure and production of these custodians has nothing to do

14   with privilege review.  To make matters worse, Plaintiff represented that it will not

15   produce all of Dr. Horton and Dr. Chung's documents, and that Defendants will

16   have to proceed via third-party subpoena to UCSF to obtain some of their

17   responsive documents.  In short, Plaintiff cherry-picked custodians, produced them

18   months late, and now Defendants are behind the eight ball in terms of getting their

19   documents in time to depose them before the November 12 fact discovery

20   deadline.

21       c.   Upcoming Depositions. Multiple depositions of Plaintiff witnesses have been

22   postponed at the last minute due to Plaintiff's failure to produce documents timely.

23   The deposition of Dr. Luke Rodda, the Chief Forensic Toxicologist and Forensic

24   Laboratory Director at San Francisco's Office of the Chief Medical Examiner, was

25   scheduled for September 14, 2021, but was postponed after Plaintiff informed

26   Endo's counsel on September 13, 2021 of its intention (as noted above) to

27   belatedly produce an additional 4,900 documents associated with Dr. Rodda by

28   September 17, 2021. The deposition of Dr. Amy Hart, a former Chief Medical

Examiner at San Francisco's Office of the Chief Medical Examiner, was similarly

postponed due to Plaintiff's inability to confirm that documents associated with

her had been produced in full. Defendants were also forced to postpone the

deposition of Brian Philpott *twice*. Mr. Philpott's original deposition was

scheduled for September 9, 2021, but was rescheduled to September 15, 2021 due

to a late production of Mr. Philpott's custodial documents. Five days before Mr.

Philpott's rescheduled deposition, Plaintiff confirmed it would be producing more

than 400 additional custodial documents for Mr. Philpott the week of his scheduled

deposition.  Defendants are now forced to review tens of thousands of late-

produced documents, including for depositions of custodians it was otherwise

prepared to proceed with, and custodians who have already been deposed (as

discussed below), all while preparing for many other depositions, in the next two-

and-a-half months.

d.   Past Depositions.  Defendants deposed Dr. Michelle Fouts and Dr. Michelle Geier

in July 2021. On August 4, Defendants asked a number of questions coming out of

Dr. Geier's deposition. Plaintiff refused to answer them, instead insisting that the

number of questions was unreasonable. Plaintiff has subsequently answered some

of Defendants' questions, though many issues remain:

i.   Plaintiff has, as of this date, not searched for or produced all of its

"standard work" training documents relating to dispensing, in violation of

this Court's April order.  April Hearing Tr. at 45-46 (instructing Plaintiff to

find and produce policy materials relating to the dispensing and prescribing

of prescription opioids "[b]y the end of April.").

ii.   Dr. Geier testified that prescribing buprenorphine and chronic opioids was,

but no longer is, a red flag. Plaintiff refused to provide, or identify by bates

number, if it already did provide, documents identifying what Plaintiff

taught its pharmacists is a dispensing red flag and how those alleged red

flags changed over time. These documents are also encompassed by this

1    Court's April order instructing Plaintiff to produce policy materials relating

2    to dispensing.

3    iii.   Plaintiff has not produced documentation from its pharmacies of when its

4    patients are turned away from non-City pharmacies. Dr. Geier testified that

5    City pharmacies document these instances "[]to the best of [their]

6    knowledge," Geier Dep. Tr. at 235, and these documents are responsive to

7    Walgreen's RFP No. 5 (First Set of RFPs) (seeking documents reflecting or

8    relating to complaints, investigations, problems, concerns, or harm

9    resulting from the refusal or dispense Prescription Opioids).

10   iv.   Plaintiff refused to search for or produce documents regarding its patients'

11   abuse or diversion of buprenorphine and other opioids.

12   v.   Dr. Geier testified that she cannot validate whether CBHS pharmacists

13   document resolution of red flags (and Plaintiff objected to the questioning

14   to the extent such documentation is outside Dr. Geier's personal scope of

15   knowledge). Defendants asked if there is anyone specifically responsible

16   for validating red flag resolution and documentation. Plaintiff refused to

17   answer.

18   vi.    Plaintiff refused to produce all of its inspection reports from City

19   pharmacies, despite Walgreens' production of all inspection reports it

20   could locate at 12 of its pharmacies. Walgreens sought these documents in

21   its Third Set of RFPs to Plaintiff (RFP 4, requesting "[a]ll audits, reviews,

22   or other assessments of compliance with state and federal law . . . regarding

23   the dispensing of controlled substances for each [Plaintiff] pharmacy.").

24   e.   <u>Temporal Deficiencies in Plaintiff's Current Production.</u> Nearly two-thirds of

25   Plaintiff's production dates from 2016 to 2021. Only 8% of documents are dated

26   prior to 2013, with only 4% dated prior to 2010.  Defendants have been able to

27   identify only 297 documents from Plaintiff's production that are dated from 1980

28   to 2000.  This temporal deficiency is evident with respect to specific custodians.

For example, Dr. Amy Hart has worked for San Francisco's Office of the Chief Medical Examiner since 2001, and has held numerous roles within the Office including Chief Medical Examiner; none of her produced custodial documents appear to originate prior to 2013.

f.  <u>Missing Investigation Files Associated with CDW Incident Reports.</u> Following the Court's April 15, 2021 Order for Plaintiff to produce Crime Data Warehouse ("CDW") narratives (Doc. 530), Plaintiff made multiple productions of CDW documents, which Plaintiff represented were complete on June 10. On June 17, following review of those productions, Defendants followed up to narrow their prior requests for police department investigation files in response to Defendants' discovery requests to the files associated with 36 particularly relevant incidents, a small percentage of the CDW incidents listed in the CDW for which Plaintiff produced the CDW incident reports. Plaintiff has informed Defendants that it has located only three of the 36 investigation files requested by Defendants, and could only provide vague and general answers during an initial phone call in response to some of the questions Defendants asked regarding what efforts were made to search for the other files (and has subsequently disputed what Defendants understood to be the answers it did provide). To put the parties on the same page, Defendants have repeatedly asked Plaintiff to explain in writing what specific efforts were made to locate each of the other files and, for incidents where no file was created by the San Francisco Police Department, to explain why. To date, Plaintiff has "addressed th[is] request" by generally *refusing* to provide the written answers requested.

g.  <u>Needed Information Regarding Databases for Incident Reports.</u> Defendants have also inquired about equivalent databases for incident reports from the San Francisco Sheriff's Department and additional information regarding San Francisco Emergency Medical Services ("EMS") incidents. Plaintiff has represented that there is no such database for the Sheriff's Department, but as of

the date of this status report has not responded to Defendants' questions about

EMS incidents.

h.   Missing Privilege Log Entries. Plaintiff has produced approximately 32,000

documents that appear to be fully redacted, one-page documents only containing

the word "privileged." The *Agreed Order Governing Privilege* states that "[t]he

Designating Party shall produce a privilege log within forty-five (45) days of a

production that substantially completes production for a particular custodian or

non-custodial source."  Agreed Order Governing Privilege, *In Re: National*

*Prescription Opiate Litigation*, Case No. 1:17-md-02804-DAP, ECF No. 2882, at

1 (N.D. Ohio October 29, 2019). Plaintiff's six custodial privilege logs contain

entries for only 11,699 documents.  As such, Plaintiff appears not to have provided

corresponding privilege log entries for over 20,000 documents, or more than 63%

of Plaintiff's fully redacted documents, three months after Plaintiff confirmed

substantial completion of its custodial production.  Plaintiff represented on

September 20, 2021 that its recent productions, in which it produced materials

previously withheld as privileged, "should" address these missing log entries.

Defendants are evaluating the productions.[11]

i.   Inadequate Privilege Log Entries. Plaintiff's privilege log entries often lack key

information to allow Defendants to properly evaluate Plaintiff's privilege

designations.  Across Plaintiff's six custodial privilege logs, Plaintiff provided

approximately 930 entries without any privilege description.  Many of these

entries also do not contain key information, such as recipient information in the

"PrivAuthor," "Email To," "Email CC," or "email subject" descriptions.  Volume

1 alone has 292 entries without any privilege descriptions, and 75 entries for which

---

[11] Plaintiff confirmed substantial completion of its custodial production on June 15, 2021, stating that "consistent with the representations made in Plaintiff's declaration accompanying the parties' stipulation, Plaintiff completed the substantial production of its custodial documents on June 4, 2021."  *See* Joint Status Update, *City and County of San Francisco, et al. v. Purdue Pharma, L.P., et al.*, Case No. 3:18-cv-07591-CRB, ECF No. 571, at 4 (N.D. Cal. June 15, 2021).

attorney-client privilege was asserted that do not include an identifiable attorney. The parties are meeting and conferring about these issues.

j. <u>Substantive Challenges to Plaintiff's Privilege Logs.</u> Defendants submitted hundreds of privilege challenges to Plaintiff on August 11, 2021, and hundreds more on September 9, 2021, noting what appear to be systemic overbroad and unsubstantiated privilege claims. On September 20, Plaintiff responded to Defendants' first round of challenges.

k. <u>Plaintiff's Amended Responses and Objections to Walgreens' Third Set of Interrogatories</u>: This Court ordered that Plaintiff respond to these interrogatories and identify prescriptions Walgreens filled that Plaintiff contends were illegitimate or diverted. May Hearing Tr. at 18. Plaintiff's Amended Responses cite 800 documents, only five of which mention Walgreens in *any* way. None of the documents in Plaintiff's Amended Response identify prescriptions Walgreens filled that Plaintiff contends were illegitimate or diverted.  Plaintiff has refused to confirm its responses to the interrogatories are complete, refused to identify any basis for its assertion that *any* of the prescription opioids in the hundreds of documents are "likely to have come from Walgreens," and refused to inform Walgreens which prescriptions at issue in those documents it contends came from Walgreens. Plaintiff failed to substantively respond to either of the two interrogatories, or to tell Walgreens that it does not intend to identify prescriptions filled by Walgreens that were illegitimate or diverted, in violation of the Court's order.

It is difficult for Defendants to say how much additional time for fact discovery will be necessary due to Plaintiff's significant late productions, and because Plaintiff has not answered Defendants' questions regarding how many documents are outstanding, for which custodians, or when the remaining documents will be produced.  Defendants believe an extension of the schedule will be necessary, however, of at least two months.  Defendants are evaluating other necessary relief, including a motion to preclude Plaintiff from relying on late-produced documents.

2. **Plaintiff's Discovery Requests**

Defendants have produced millions of documents in the MDL, which are deemed produced in this case.  In addition, Defendants have made additional productions specific to this case.

In advance of the last status conference, **Walgreens** completed its custodial productions, resulting in a production of approximately 50,000 custodial documents, on top of the more than 380,000 documents Walgreens has produced in the MDL. On May 17, Walgreens completed its production of hard copy refusals to fill and Target Drug Good Faith Dispensing checklists resulting in a total hard copy production of over 35,000 documents and over 135,000 pages.[12]

On August 13 (three days early), Walgreens completed its production of electronic due diligence records resulting in a production of over 31 million records.  On September 1, Walgreens completed its production of hard copy prescriptions.

On September 16, Walgreens completed its production of documents as ordered in ECF 635.  The parties separately negotiated an additional Walgreens production of RXM mailboxes, which will be complete on September 24.

Plaintiff and Walgreens also met and conferred regarding the searchability of Walgreens' internal complaint database.  Walgreens' two technical experts (one outside consultant and one Walgreens' employee with first-hand knowledge of the system), explained how and why the internal complaint database is ***not*** searchable beyond front-end, burdensome searches.

Based on the technical meet and confer, it is Walgreens' understanding that Plaintiff is not moving to compel a categorical production from the APIS database.  Instead, Plaintiff has asked follow-up questions about running targeted searches both inside and outside of the APIS database.  Walgreens has conducted additional searches in response to those requests, and aims to produce any additional responsive documents by September 24.

Plaintiff remains unsatisfied, however, making four additional requests, each of which Walgreens is either already responding to, or will respond to shortly.  Walgreens addresses each in turn:

---

[12] Walgreens has also updated its Interrogatory responses a couple times at Plaintiff's request.

1.    *Documents addressing "'institutional' issues [that] were being further reviewed by [Employee Relations] and the company."*

Plaintiff has mischaracterized this document.  It does not refer to any additional documents.  Instead, it says the pharmacist "was advised that his concerns around 'institutional' issues were being further reviewed by ER and the company."  Indeed, the company investigated the issues, and determined the complaint was unsubstantiated.  Walgreens has already conducted a reasonable, diligent search and produced the documents that it could find.  If Plaintiff has additional specific requests, Walgreens remains willing to discuss the issues.

2.    *Documents reflecting "training" conducted in response to whistleblower complaint.*

Here, an investigator wrote that, as a result of an internal complaint, Walgreens conducted additional training at that pharmacist's location.  Walgreens has already conducted a reasonable, diligent search for documents and produced all that it could find.  If Plaintiff has specific additional requests, Walgreens remains willing to discuss the issues.

3.    *"[R]espon[se] to [whistleblower] in writing to address his concerns."*

Walgreens agreed to search for the email Plaintiff references here.  Walgreens anticipates producing what it finds on September 24.

4.    *Case summary cataloged under different case number.*

Plaintiff initially provided the case number 1195618 to Walgreens and asked Walgreens to find and produce the complaint and documents at issue.  Walgreens has already produced the APIS complaint file, maintained under APIS complaint number 8239138.  Walgreens subsequently identified a small amount of additional information related to the initial complaint number, and will produce that information on Friday, September 24.

Walgreens has also already produced a wide variety of other documents about the internal complaint at issue, including all of the witness statements from the investigation and other documents relating to the complaining pharmacist's board actions, despite the limited relevance of an employee complaint from outside this jurisdiction.  Walgreens has also produced information

related to all complaints, including close cases, related to diversion in San Francisco that Walgreens could identify.

Plaintiff also now complains about the Appriss database, and incorrectly asserts that Walgreens "*decommissioned*" its Appriss database as a result of the opioid litigation.  This is false.  Walgreens retains the same access to the Appriss database that it always had.  As explained in detail during the meet and confer with Walgreens' subject matter experts on this topic, searching that database is unduly burdensome and not proportional to the needs of the case, particularly given that Walgreens has already produced documents from custodial files that are duplicated in the database.  Plaintiff has now served an extraordinarily broad third-party subpoena on Appriss, and therefore does not appear to be seeking this information from Walgreens any longer.

Plaintiff also asserts that Walgreens misled Plaintiff about the responsibilities of an investigator custodian.  This is false.  Walgreens' counsel informed Plaintiff in June of the timeframe of that custodian's California-specific role.   Indeed, Plaintiff knew that custodian's responsibilities as to California were limited when counsel complained to this Court in an August 13 filing, *attaching that custodian's LinkedIn resume*.  Dkt. 623, Ex. 28.   Plaintiff nevertheless chose to proceed with that deposition (surprising Walgreens, considering Plaintiff's complaints about his irrelevance to the case), and now pretends it is surprised by that custodian's responsibilities.

The **Endo** and **Par** Defendants have been working as diligently and quickly as possible to comply with the Court's Order Following August 30, 2021 Discovery Conference ("Order"). In particular, and as set forth in its motion for leave (Doc. 650), Endo timely produced the "Pharmacy Notes" discussed at the August 30, 2021 status conference, as well as additional SpeakerNet Data identified in the parties' August 23, 2021 Joint Status Report (Doc. 632 at 6, 13) on September 3, 2021.  Following the parties' September 7, 2021 meet and confer, Endo also produced additional notes (defined in the Order as "Pharmacy Notes") from the legacy "SIF 2007 Backup" on September 10, 2021.[13]   Endo also provided additional information and answers to Plaintiff's

---

[13] Endo included in the meet and confer Diana Fasching, a Managing Director from Redgrave LLP, who is part of the team investigating "Pharmacy Notes," and per the Court's statements at the August 30, 2021 status conference, is familiar with them.

questions regarding Endo's investigation of other identified data sources containing customer relationship management information that it was investigating to assess whether "Pharmacy Notes" can be located in such sources.  Endo also completed its investigation into whether any additional responsive materials exist for medical science liaison interactions and is close to finishing its investigation with regard to materials dropped data.  *See* Doc. 650 and 650-1.  Endo also timely provided plaintiff with amended responses to Interrogatory Nos. 3-4 on September 13, 2021, which relate to "representations by publication."  Finally, on September 7, 2021, as required by the Order, the Endo and Par Defendants provided a "written statement" to CCSF regarding its investigation and planned approach for producing responsive information related to payments to healthcare professionals ("HCP payments") and pre-2013 clinical trial payments.

Despite best efforts, however, the Endo and Par Defendants were not able to meet the September 13, 2021 deadline with respect to some of the other discovery items addressed in the Court's Order. Consequently, after meeting and conferring with Plaintiff, on September 10, 2021, the Endo and Par Defendants submitted a Motion for Extension of Time ("Motion") to the Court seeking a two-week extension of certain of the discovery obligations initially imposed in the Order. Doc. 650.  The Court has since granted that Motion, specifically extending the deadline for (1) producing Compliance documents; (2) completing an investigation into SpeakerNet Data files; and (3) finishing an investigation into potential sources of HCP payments, until September 27, 2021. Doc. 655.

In its Status Report, Plaintiff acknowledges the progress with respect to each of items at issue in the Court's August 30 Order, but levies varied criticisms.  Those are briefly addressed:

### a.      Compliance Documents and Navigator Data

Plaintiff claims that "[o]n September 10, 2021, Endo represented it has identified some 90 boxes of hard copy compliance documents not previously produced or reviewed."  This is incorrect and misstates the record.  In the Motion, Endo stated that it "is also reviewing documents from both hard-copy and identified electronic Compliance sources with *broader responsiveness criteria* in an effort to address ongoing and anticipated discovery requests."  Doc.

1   650 at 4 (emphasis added).  Moreover, paragraph 8 of the Declaration of Karen O. Hourigan

2   states: "Endo has identified approximately 90 boxes that may contain additional hard-copy

3   Compliance materials, *some of which were assessed in connection with Endo's previous*

4   *productions*."  Doc. 650-1 at ¶ 8 (emphasis added).

5          As for additional Call Data (as previously defined in court submissions as sales calls made

6   by Endo personnel on HCPs) to be produced from Endo's Navigator system, counsel for Endo

7   stated that this Call Data is from one year: 2016.  As the Court is aware, Endo has spent hundreds

8   of hours in its efforts to locate Call Data that was the subject of the parties' May 7, 2021 joint

9   discovery letter.  Doc. 551.  Endo has made multiple productions of Call Data and other

10  information that was originally entered into its CRM systems.  Endo also has had multiple meet

11  and confer session and status update meetings with Plaintiff where Plaintiff has asked and Endo

12  has provided answers regarding its prior efforts.  Indeed, the record regarding Endo's efforts over

13  the past several months is reflected in the docket for this case.  As Endo has only recently located

14  additional fields related to Call Data (i.e., "message" and "reaction" fields), Endo is now working

15  to make this production.  Endo also will be producing similar additional fields that it located in

16  the Navigator data source for the period of time between February and December 2015; however,

17  Endo has located only the "message" field for the 2015 time period.  Plaintiff's statement that

18  "none of which have been previously produced" may be accurate when limited to "message" and

19  "reaction" fields.  However, Endo produced Call Data from 2015 and 2016 on July 6, 2018 in this

20  matter that was extracted from its Commercial Data Warehouse.  Endo's future production of Call

21  Data that has been located in the Navigator data store will include the additional fields that

22  Plaintiff has requested to the extent Endo has been able to locate them.

23                      **b.      SpeakerNet Data File**

24         Contrary to Plaintiff's assertion that "Endo has provided no explanation" of its efforts and

25  investigation regarding SpeakerNet Data, Endo informed Plaintiff no later than August 20, 2021

26  that it expected to make additional productions of SpeakerNet Data as a result of its investigation

27  following Plaintiff's questions regarding prior productions.  Also contrary to Plaintiff's

28

contentions, the September 15, 2021 letter provides substantial information regarding speaker program data.

### c. Health Care Professional ("HCP") and Clinical Trial Payments

Plaintiff asserts that Endo did not comply with the Court's order, which it characterizes as requiring that "Endo investigate these potential sources of data identified by Plaintiff by September 13, 2021."  At the same time, however, Plaintiff acknowledges that in its September 7, 2021 letter to Plaintiff, Endo reported having identified 11 individuals and 1 source whose responsibilities may have included tracking payments in relation to Endo clinical trials and research activities.  These same sources were referenced in Endo's September 10, 2021 Motion. (Further, the Court has since extended until September 27, 2021 the date by wish to finish this investigation.)  Plaintiff continues that "Endo provides no explanation for why this basic investigation was not previously undertaken…."  Plaintiff did not inquire specifically about these sources until July 29, 2021.

Plaintiff also faults Par for having only now "confirmed that third-party vendor Porzio Life Sciences has a legacy instance of the Porzio database that may contain the pre-2015 payments to HCPs…," and that "[t]his database has been in Endo's possession or control….." Early in the litigation, Endo produced data from a Porzio database that included certain data relating to payment to HCPs.  As part of Endo and Par's investigation regarding HCP payment data in response to Plaintiff's inquiries beginning on July 29, 2021, Par was able to confirm that third-party vendor Porzio retained possession of a legacy instance of a Porzio database that may contain information related to payments made by Par to HCPs dating to the period before 2015. The data was obtained from Porzio recently, and Par is now working to produce responsive data by September 27.

### d. Pharmacy, Contact, Location, Organization/Client Data Notes (previously referred to as "Pharmacy Notes")

Plaintiff raised "Pharmacy Notes" with the Court at the August 30, 2021 status conference.  Endo has made two productions of this information, which includes notes fields relating to pharmacy, contact, location, and organization in compliance with the Court's August

30, 2021 Order (Doc. No. 644).  Should Endo identify that similar information exists in other data sources it has recently located related to Endo's CRM systems, including for the period post-2012, Endo will produce that data.  In connection with Endo's investigation of the Navigator data source, Endo will produce additional extracts containing similar information as what it produced from the SIF 2008-2012 and SIF 2007 data sources and is endeavoring to make that production by September 27, 2021 barring any unforeseen technical issues that may arise.

In meet and confer discussions, Endo has disclosed to Plaintiff why this information had not previously been included in Endo's productionso of Call Data (i.e., Endo does not consider this information to fall within the definition of Call Data and different SQL search queries are needed to locate and join this type of information because it often is stored in different tables than Call Data in the numerous data sources from which Endo has located and extracted this information and produced it to Plaintiff).  Endo also notes that it disclosed to Plaintiff what it produced in relation to Plaintiff's Interrogatory No. 1 on February 10, 2021 in its objections and responses to Plaintiff's interrogatories, and "Pharmacy Notes" were not included as information sought by Plaintiff in the parties' May 7, 2021 joint discovery letter (Doc. 551).

### e.      Representations by Publication

Endo timely supplemented its responses to Interrogatory Nos. 3-4.  Nonetheless, Plaintiff faults Endo for only now having "identified a non-custodial source provided by a third-party vendor, PubsHub, which 'includes information regarding journal abstracts, posters, presentations, and articles Endo sponsored' in connection with its sales of opioids."  It was only on August 5, 2021 that Plaintiff clarified that it interpreted these interrogatories to refer not only to journal advertisements, but also any published statements that Endo disseminated or "caused to be disseminated," such as by seeking out or working with authors, approving draft articles, assisting with submission, editing, or publication of articles.

### f.      Additional Non-Custodial Sources

Plaintiff notes that in its September 15, 2021 letter, Endo has undertaken to "continu[e] to investigate whether there are other potentially responsive non-custodial sources," but requests that the Court order a date by which the Endo Defendants will verify that "*all* potential sources

have been searched."  Considering the amount of effort, time, and money Endo has expended on locating additional documents and information (often in response to myriad questions raised by Plaintiff), as Endo conducts the assessment described in the September 15 letter, it also may seek protection from additional efforts should they be disproportionate and beyond what is permitted by Rule 26.

### g.   Call Message and Materials Dropped

As part of Endo's continuing commitment to produce relevant data as it may be identified in the course of other investigations, Endo is supplementing its production of Call Data that it has recently located by obtaining access to a data source related to its Navigator CRM system that Endo recently obtained from a third party, IQVIA.  Plaintiff protests that this investigation should have been conducted earlier, and further asserts that the discovery of these materials calls into question Endo's previous belief and representation that it had conducted a diligent investigation of potentially responsive data at the time discovery began in the MDL.  Not so, as Endo said in its May 7, 2021 submission to the Court (Doc. 551__), its understanding was based on what it "understood to be reasonably available sources related to call notes and promotional materials 'dropped' with healthcare providers."  Since May 2021, as this Court has observed, Endo has engaged in substantial additional and extraordinary efforts to locate Call Data and materials dropped information.[14]

Endo consistently has informed this Court and Plaintiff that if it locates additional Call Data or materials dropped information as it continuously searches for information requested by Plaintiff in this matter or requesting parties in other matters, Endo will inform Plaintiff of any discoveries and work rapidly to produce additional relevant and non-cumulative data or

---

[14] Plaintiff asserts that Endo "ignored" this Court's order to produce Call Data and materials dropped data by May 31, 2021.  Doc. 561.  That is false.  The Court's Order plainly provided that "Endo 'is further investigating whether additional information is available from data sources Endo has identified in its response,'" and ordered that "*[t]o the extent that Endo identifies additional responsive data*, that data shall be produced and Endo's responses to Interrogatories Nos. 1-4 shall be supplemented by May 31, 2021."  *Id*. (emphasis added).  That is exactly what Endo did; and at the same time, also updated the Court about its continuing investigation.  Endo also complied with the Court's June 16, 2021 Order by producing responsive Call Data and materials dropped information it located in the Commercial Data Warehouse and the StayinFront CRM database and database backups.  Far from "ignoring" the Court's August 30, 2021 Order, Endo sought and was granted an extension of time.

1    information.  Endo did not search data sources associated with its Navigator system because it

2    recently obtained the data sources from a third party.  Endo's previous searches of its Commercial

3    Data Warehouse includes searches of data that was migrated from the Navigator CRM system

4    into the Commercial Data Warehouse.

5         Whether the sources from which Endo has now located, searched, and obtained from

6    multiple third parties are "readily accessible" is not something the parties have litigated to date.

7    However, Endo's efforts to respond to Plaintiff's requests for additional information have been

8    extensive, time-consuming, and resource demanding.  They also have been communicated

9    extensively to Plaintiff and, in many instances, have been disclosed to or discussed with the

10   Court.  Plaintiff's disparagements suggesting otherwise are inaccurate and unfounded.

11            **h.**    **Plaintiff's Challenge to Privilege Designations**

12        Plaintiff also asserts concern with certain privilege challenges that it has made.   On

13   September 17, 2021, the Endo and Par Defendants advised Plaintiff that it had evaluated the

14   challenges made in Plaintiff's September 7, 2021 letter concerning clawbacks and its September

15   10, 2021 letter concerning privilege designations for Eric Vandal custodial materials, and would be

16   responding substantively on September 20, 2021.  The Endo and Par Defendants have since done

17   so, agreeing to produce, redact or modify redactions within 12 of the 15 challenged Vandal

18   custodial documents, and to limit or withdraw its clawback with respect to 16 of the 17 challenged

19   clawback documents.  The Endo and Par Defendants previously responded to challenges made with

20   respect to Bobbie Sue Brown custodial materials.  All documents that the Endo and Par Defendants

21   are de-designating (or reducing redactions) in response to the Vandal and Brown challenges were

22   produced on September 20, and in response to the clawback challenge on September 21—in

23   advance of any required deadlines and any forthcoming depositions of Endo and Par witnesses.

24   With the materials now produced, the Endo and Par Defendants are prepared to meet and confer,

25   as necessary, with respect to the few remaining documents.

26        Simultaneously as they have been addressing the above inquiries, in an effort to

27   streamline the Endo and Par Defendants' responses to inquiries by plaintiffs nationwide, the Endo

28   and Par Defendants' recently retained counsel, Skadden, Arps, Slate, Meagher, & Flom LLP

("Skadden"), along with Redgrave LLP, recently served a letter describing ongoing discovery-related efforts.  Those efforts include, in order to address questions raised about documents previously determined to be non-responsive in an objective and transparent manner, establishing repositories on a secure searchable platform by which plaintiffs can view certain documents previously coded as non-responsive.  Skadden and Redgrave also invited counsel for plaintiffs in the various opioid matters across the country to attend a call on Monday, September 20 at noon ET where plaintiffs could ask questions that Skadden and Redgrave would address.  On Friday, September 17, Plaintiff in this matter indicated Plaintiff's unavailability and requested to schedule a separate call on Tuesday the 22nd or Wednesday the 23rd of this month.  As of this time this Joint Status Report was filed, this call has not occurred.

Finally, Plaintiff again raises discovery proceedings in other matters, and reserves the right to seek sanctions.  As the Endo and Par Defendants have previously stated, this Court should continue to evaluate discovery on the basis of the record in this matter.  The Endo and Par Defendants respectfully suggest that the parties should remain focused on productively pursuing and completing discovery.  As noted elsewhere in this report, Plaintiff also has several deficiencies in its production, only recently producing many thousands of documents, and in an effort to defend that late production, stated in a meet and confer letter on September 19, 2021:  "As fact discovery in this action does not close until November 12, 2021, defendants have more than adequate time to review and process any additional document produced for these and any other individuals."  The same applies as well for Plaintiff.

**Allergan** has deemed produced in this case documents gathered and produced—without geographic limitation—in other opioid cases. It has also made productions specifically for this case, most recently on March 24, 2021, which included its privilege log, and on September 20, 2021, when it produced five "lookup" files used in responding to Plaintiff's interrogatories. Allergan's production is substantially complete.

### B.      Status of Other Third-Party Discovery

The California Department of Justice ("CA DOJ") produced its CURES data on April 28. On May 14, DOJ made a supplemental production of CURES data correcting issues identified by

Walgreens. Walgreens recently notified Plaintiff and the CA DOJ that it intends to seek re-identification of certain prescribers, including all of Plaintiff's prescribers, contained in the CURES data that CA DOJ produced. The parties and CA DOJ met and conferred about this issue on July 14. CA DOJ indicated it was not willing to identify Plaintiff's prescribers in the CURES data, even if notice was properly provided, because of its "other" outstanding objections. The parties asked whether CA DOJ would agree to provide an overlay for the CURES data flagging which prescribers are employed by Plaintiff, but not actually identifying them, in order to help Walgreens limit the number of names it ultimately must seek for identification. CA DOJ indicated that it will do so by this week.  Walgreens also submitted a much shorter list to DOJ, containing a few dozen additional non-plaintiff prescribers, who it intends to identify by name in the CURES data, and is working with CA DOJ to provide notice to these prescribers in accordance with the governing statute.

In April 2020, Defendants served requests for production on Plaintiff for the production of documents and data from all pertinent subdivisions of the City and County of San Francisco. When the City and County was dismissed as a plaintiff, Plaintiff took the position that certain of its subdivisions were not within Plaintiff's custody and control, requiring third-party subpoenas. Defendants therefore served subpoenas on the San Francisco departments and entities that Plaintiff has deemed outside of its custody and control, including the Department of the Environment, Department of Emergency Management, Board of Supervisors, Controller's Office, Mayor's Office, District Attorney's Office, Department of Human Resources, Health Service System, and Human Services Agency.[15] These subdivisions have responded to the subpoenas, and the parties are in the process of meeting and conferring regarding those responses. Most recently, Defendants inquired about the productions from the Board of Supervisors and the Mayor's Office. Defendants noted that the majority of the documents that these entities produced appeared to be dated from 2018 onward. Additionally, Defendants identified apparent gaps in the productions of both entities. Plaintiff took the position that Defendant's challenges to the productions were untimely because the parties did not meet and confer about Defendants' objections or the entities' responses earlier

---

[15] Defendants have also served subpoenas on the San Francisco Superior Court and the University of California San Francisco Hospital.

1   this year. Defendants maintain that their inquiries are timely because discovery is open. The parties

2   will submit disputes to the Court as necessary.

3       Defendants are also pursuing third-party discovery from various state agencies, law

4   enforcement entities, and third-party pharmacies, and have subpoenaed the Medical Board of

5   California, the Dental Board of California, the California Board of Registered Nursing, and the

6   United States Drug Enforcement Administration. Defendants have met and conferred with the

7   Medical Board of California, the Dental Board of California, the California Board of Registered

8   Nursing, and the United States Drug Enforcement Administration, and are negotiating the scope

9   of their productions.

10

11   DATED:  September 21, 2021                    Respectfully submitted,

12                                                 */s/ Kevin R. Budner*
     DENNIS J. HERRERA                             Elizabeth J. Cabraser
13   City Attorney                                 Richard M. Heimann
     RONALD P. FLYNN                               Paulina do Amaral
14   YVONNE R. MERE                                Kevin R. Budner
     OWEN J. CLEMENTS                              Michael Levin-Gesundheit
15   SARA J. EISENBERG                             Jacob H. Polin
     JAIME M. HULING DELAYE                        Miriam E. Marks
16   Deputy City Attorneys                         LIEFF CABRASER HEIMANN &
     Fox Plaza                                     BERNSTEIN, LLP
17   1390 Market Street, Sixth Floor               275 Battery Street, 29th Floor
     San Francisco, CA  94102                      San Francisco, California 94111-3339
18   Telephone:  415/554-3957                      Telephone: 415.956.1000
     jaime.hulingdelaye@sfcityatty.org             Facsimile: 415.956.1008
19                                                 ecabraser@lchb.com

20   Aelish M. Baig                                Paul J. Geller
     Hadiya K. Deshmukh                            Mark J. Dearman
21   Taeva Shefler                                 Dorothy P. Antullis
     ROBBINS GELLER RUDMAN & DOWD                  Nicolle Brito
22   LLP                                           ROBBINS GELLER RUDMAN & DOWD LLP
     Post Montgomery Center                        120 East Palmetto Park Road, Suite 500
23   One Montgomery Street, Suite 1800             Boca Raton, FL  33432
     San Francisco, CA  94104                      Telephone:  561/750-3000
24   Telephone:  415/288-4545                      561/750-3364 (fax)
     415/288-4534 (fax)                            pgeller@rgrdlaw.com
25   aelishb@rgrdlaw.com

26   Thomas E. Egler                               Louise Renne
     Jay Alvarez                                   RENNE PUBLIC LAW GROUP
27   ROBBINS GELLER RUDMAN & DOWD                  350 Sansome Street, Suite 300
     LLP                                           San Francisco, CA 94104
28   655 West Broadway, Suite 1900                 Telephone:  415/848-7240
     San Diego, CA  92101                          415/848-7230 (fax)

Telephone:  619/231-1058
619/231-7423 (fax)
tome@rgrdlaw.com

Jennie Lee Anderson
Audrey Siegel
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA  94104
Telephone:  415/986-1400
415/986-1474 (fax)
jennie@andrusanderson.com
audrey.siegel@andrusanderson.com

Edward Chapin
SANFORD HEISLER SHARP, LLP
655 West Broadway, Suite 1700
San Diego, CA  92101
Telephone:  619/577-4253
619/577-4250 (fax)
echapin2@sanfordheisler.com

Ellen Relkin
WEITZ & LUXENBERG P.C.
700 Broadway
New York, NY  10003
Telephone:  212/558-5500
212/344-5461 (fax)
erelkin@weitzlux.com

Paul F. Novak
Tiffany Ellis
WEITZ & LUXENBERG, P.C.
24th Floor, The Fisher Building
3011 W. Grand Boulevard
Detroit, Michigan 48202
Tel: (313) 800-4170
pnovak@weitzlux.com

lrenne@publiclawgroup.com

Kevin Sharp
SANFORD HEISLER SHARP, LLP
611 Commerce Street, Suite 3100
Nashville, TN  37203
Telephone:  615/434-7000
615/434-7020 (fax)
ksharp@sanfordheisler.com

David S. Casey, Jr.
Gayle M. Blatt
Alyssa Williams
CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD LLP
110 Laurel Street
San Diego, CA  92101-1486
Telephone:  619/238-1811
619/544-9232 (fax)
dcasey@cglaw.com
gmb@cglaw.com
awilliams@cglaw.com

Melinda Davis Nokes
WEITZ & LUXENBERG P.C.
1880 Century Park East
Los Angeles, CA  90067
Telephone:  310/247-0921
310/786-9927 (fax)
mnokes@weitzlux.com

2304536.2

JOINT STATUS UPDATE
CASE. NO. 18-CV-07591-CRB-JSC

*Attorneys for Plaintiff The People of the State of California, acting by and through San Francisco City Attorney Dennis J. Herrera*

DATED:  September 21, 2021                    Respectfully submitted,


/s/ Sean O. Morris                                    /s/ Brent A. Hawkins

Sean O. Morris (SBN 200368)                   Brent A. Hawkins (S.B. # 314266)
John D. Lombardo (SBN 187142)               Zachary Hill (S.B. #275886)
ARNOLD & PORTER KAYE                        MORGAN, LEWIS & BOCKIUS LLP
SCHOLER LLP                                          One Market, Spear Street Tower
777 South Figueroa Street, 44th Floor         San Francisco, CA  94105-1596
Los Angeles, CA  90017-5844                     Telephone: (415) 442-1000
Telephone: (213) 243-4000
Facsimile: (213) 243-4199                          brent.hawkins@morganlewis.com
sean.morris@arnoldporter.com                    zachary.hill@morganlewis.com
john.lombardo@arnoldporter.com


Jeremy T. Kamras (SBN 237377)              Eric W. Sitarchuk*
Jeremy.Kamras@arnoldporter.com             Rebecca J. Hillyer*
ARNOLD & PORTER KAYE                        MORGAN, LEWIS & BOCKIUS LLP
SCHOLER LLP                                          eric.sitarchuk@morganlewis.com
Three Embarcadero Center, 10th Floor        rebecca.hillyer@morganlewis.com
San Francisco, CA 94111-4024                   1701 Market Street
Telephone: (415) 471-3100                        Philadelphia, PA  19103-2921
Fax: (415) 471-3400                                  Telephone: +1.215.963.5000
                                                             Facsimile: +1.215.963-5001


Karen O. Hourigan (SBN 206957)            Wendy West Feinstein (*pro hac vice*)
khourigan@redgravellp.com                      MORGAN, LEWIS & BOCKIUS LLP
REDGRAVE LLP                                       One Oxford Centre, 32nd Floor
One Sansome Street, Suite 3500                 Pittsburgh, PA  15219-6401
San Francisco, CA 94104                          Telephone: (412) 560-7455
Telephone: (415) 636-2687                       wendy.feinstein@morganlewis.com
Fax: (703) 230-9859

John C. Hueston (SBN 164921)               *Attorneys for Defendants*
HUESTON HENNIGAN LLP                       *Teva Pharmaceuticals USA, Inc., Cephalon,*
620 Newport Center Dr., Suite 1300         *Inc., Actavis LLC, Watson Laboratories, Inc.,*
Newport Beach, CA 92660                       *and Actavis Pharma, Inc. f/k/a Watson*
Telephone: (949) 229-8640                      *Pharma, Inc.*

                                                             *\*Denotes national counsel, pro hac vice*
                                                             *forthcoming*

2304536.2

1   Moez M. Kaba (SBN 257456)
    Padraic Foran (SBN 268278)
2   Michael K. Acquah (SBN 313955)
    mkaba@hueston.com
3   pforan@hueston.com
    macquah@hueston.com
4   HUESTON HENNIGAN LLP
5   523 West 6th Street, Suite 400
    Los Angeles, CA 90014
6   Telephone: (213) 788-4340
    Facsimile: (888) 775-0898
7
8   *Attorneys for Defendants Endo*
    *Pharmaceuticals Inc., Endo Health*
9   *Solutions Inc., Par Pharmaceutical, Inc.,*
    *and Par Pharmaceutical Companies, Inc.*
10  Zachary W. Byer (S.B. #301382)          Charles J. Stevens (SBN 106981)
    KIRKLAND & ELLIS LLP                    cstevens@gibsondunn.com
11  555 South Flower Street                 Joshua D. Dick (SBN 268853)
    Los Angeles, CA 90071                   jdick@gibsondunn.com
12  Telephone: (213) 680-8400               Kelsey J. Helland (SBN 298888)
    zachary.byer@kirkland.com               khelland@gibsondunn.com
13                                          GIBSON DUNN & CRUTCHER LLP
    Jennifer G. Levy, P.C. (*pro hac vice*) 555 Mission Street, Suite 3000
14  KIRKLAND & ELLIS LLP                    San Francisco, CA 94105
    1301 Pennsylvania Ave., N.W.            Telephone: 415.393.8200
15  Washington, DC 20004                    Facsimile: 415.393.8306
    Telephone: (202) 879-5000
16  Facsimile: (202) 879-5200
    jennifer.levy@kirkland.com
17
18  /s/ Karl Stampfl
    _____
19  Donna Welch, P.C. (*pro hac vice*)
    Timothy W. Knapp, P.C. (*pro hac vice*)
20  Karl Stampfl (*pro hac vice*)
    KIRKLAND & ELLIS LLP
21  300 North LaSalle
    Chicago, IL 60654
22  Telephone: (312) 862-2000
    Facsimile: (312) 862-2200
23  donna.welch@kirkland.com
    tknapp@kirkland.com
24  karl.stampfl@kirkland.com
25  *Attorneys for Defendants*
    *Allergan Finance, LLC, Allergan Sales,*
26  *LLC and Allergan USA, Inc. and specially*
    *appearing defendant Allergan plc[16]*
27  _____
    [16] Defendant Allergan Finance, LLC was formerly known as Actavis, Inc., which was formerly
28  known as Watson Pharmaceuticals, Inc.  Defendant Allergan plc, which was formerly known as

1   Kaspar Stoffelmayr (*pro hac vice*)
    kaspar.stoffelmayr@bartlitbeck.com
2   Katherine M. Swift (*pro hac vice*)
    kate.swift@bartlitbeck.com
3   BARTLIT BECK LLP
    54 West Hubbard Street
4   Chicago, IL  60654
    Telephone: 312.494.4400
5   Facsimile: 312.494.4440

6   Alex Harris (*pro hac vice*)
    alex.harris@bartlitbeck.com
7   BARTLIT BECK LLP
    1801 Wewatta Street, Suite 1200
8   Denver, CO  80202
    Telephone: 303.592.3100
9   Facsimile: 303.592.3140

10  *Attorneys for Defendant*
    *Walgreen Co.*

11

12  Alan R. Ouellette (CA Bar. No. 272745)
13  FOLEY & LARDNER LLP
    555 California Street, Suite 1700
14  San Francisco, CA  94104-1520
    Telephone: (415) 434-4484
15  Facsimile: (415) 434-4507
    aouellette@foley.com
16  James W. Matthews (*pro hac vice*)
    Ana M. Francisco (*pro hac vice*)
17  Katy E. Koski (*pro hac vice*)
    FOLEY & LARDNER LLP
18  111 Huntington Avenue
    Boston, MA  02199-7610
19  Telephone: (617) 342-4000
    Facsimile: (617) 342-4000
20  jmatthews@foley.com
    francisco@foley.com
21  kkoski@foley.com

22  *Attorneys for Defendant*
    *Anda, Inc.*

23

24

25

26

27

—————————————————

28  Actavis plc and is now known as Allergan Limited, does not waive but rather expressly preserves
    its objection to the Court's personal jurisdiction over it.

- 40 -

1

2

## <u>ATTESTATION</u>

3        Pursuant to Civil L.R. 5-1(i)(3), I hereby attest that concurrence in the filing of this

4   document has been obtained from the above signatories.

5    Dated: September 21, 2021                        By: <u>/s/ *Kevin R. Budner*</u>

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CERTIFICATE OF SERVICE

I hereby certify that, on September 21, 2021, service of this document was accomplished pursuant to the Court's electronic filing procedures by filing this document through the ECF system.

/s/ *Kevin R. Budner*
Kevin R. Budner

JOINT STATUS UPDATE
CASE. NO. 18-CV-07591-CRB-JSC