1  DAVID CHIU, State Bar # 189542
   City Attorney
2  YVONNE R. MERE, State Bar # 175394
   Chief Deputy City Attorney
3  SARA J. EISENBERG, State Bar # 296303
   Chief of Complex & Affirmative Litigation
4  OWEN J. CLEMENTS, State Bar # 141805
   JAIME M. HULING DELAYE, State Bar #
5  270784
   JOHN H. GEORGE, State Bar # 292332
6  Deputy City Attorneys
   Fox Plaza
7  1390 Market Street, Sixth Floor
   San Francisco, CA  94102
8  Telephone:  415.554.3597
   jaime.hulingdelaye@sfcityatty.org
9
   *Attorneys for Plaintiff The People of the State of*
10 *California, acting by and through San Francisco*
   *City Attorney David Chiu*
11
   [Additional counsel appear on signature page.]
12

13                 UNITED STATES DISTRICT COURT

14               NORTHERN DISTRICT OF CALIFORNIA

15                    SAN FRANCISCO DIVISION

16

17

   THE CITY AND COUNTY OF SAN          Case No. 3:18-cv-07591-CRB
18 FRANCISCO, CALIFORNIA and THE
   PEOPLE OF THE STATE OF CALIFORNIA,  **THE PEOPLE'S PRELIMINARY**
19 Acting by and through San Francisco City  **OUTLINE OF PROPOSED**
   Attorney DAVID CHIU,                **FINDINGS OF FACT AND**
20                                      **CONCLUSIONS OF LAW**
                     Plaintiff,
21
           v.                          Judge: Honorable Charles R. Breyer
22
   PURDUE PHARMA L.P., et al.
23
                     Defendants.
24

25

26

27

28

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................ 1

II.    PRELIMINARY OUTLINE OF PROPOSED FINDINGS OF FACT ................... 3

     A.     Defendants ............................................................................ 3

     B.     Background ........................................................................... 4

          1.     Opioids and Their Addictive Properties............................. 4

          2.     History of Opioid Use and Prescribing .............................. 5

     C.     The Crisis in San Francisco .................................................... 9

     D.     Oversupply through Fraudulent and Misleading Statements and Unfair and Improper Promotion ........................................... 12

          1.     The False Messages and the Channels through Which They Were Conveyed ............................................................ 12

          2.     Walgreens' Participation in the False and Misleading Statements ................................................................... 16

          3.     The Causal Link between Defendants' Conduct and the Increase in Inappropriate Prescribing............................... 17

     E.     Oversupply through Diversion ............................................... 18

          1.     Regulatory Framework.................................................... 18

          2.     What the People's Evidence Will Show ............................. 20

III.   PROPOSED CONCLUSIONS OF LAW ..................................................... 29

     A.     The People Have Proven Their Public Nuisance Cause of Action ............. 29

          1.     An Opioid Crisis Exists in San Francisco and Constitutes a Public Nuisance............................................................ 30

          2.     Each Defendant Engaged in Conduct that Contributed to a Public Nuisance in San Francisco ................................... 32

          3.     Defendants' Conduct, Individually and Collectively, Caused the Public Nuisance Existing in San Francisco................... 34

          4.     Defendants Are Jointly and Severally Liable..................... 38

          5.     The People Have Proven Their Unfair Competition Law Cause of Action ............................................................ 38

     B.     Defendants' Affirmative Defenses are Unavailing ..................... 44

     C.     Non-Waiver ........................................................................ 44

## I.    INTRODUCTION

The People of the State of California, acting by and through the San Francisco City Attorney David Chiu, seek recovery to abate a public nuisance, the ongoing opioid epidemic in San Francisco.   This opioid epidemic has affected, and interfered with, the public health and other public rights in San Francisco.  Each of the Defendants caused or contributed to the creation and/or maintenance of this public nuisance.  In addition, the same behavior that contributed to the nuisance also violated California's Unfair Competition Law through conduct over a period of many years that was deceptive, unlawful, and unfair.

The nuisance in San Francisco was caused by an oversupply of opioids and, in particular, by a flood of opioids into San Francisco that should not have been there.  The greatest risk factor for "opioid use disorder" (OUD) – the medical term that encompasses both the popular conception of "addiction" as well as other misuse of opioids – is exposure to opioids.  When opioids are widely available, a certain percentage of people exposed to them will develop OUD; those who never encounter opioids do not develop a problem with them.  Moreover, with an increased supply of opioids, and increased incidence of OUD, come a host of other problems, including overdoses and overdose deaths; illegal markets for opioids developed to feed the habits of those who have become addicted; and increased use of illegally-manufactured drugs, including heroin and street fentanyl, and the attendant harms that flow from such use.

The opioids that should not have been in San Francisco, the oversupply, got here in two distinct ways, each of which was the result of the Defendants' misconduct.  First, prescription opioid manufacturers and others working with them engaged in campaign of false and misleading statements about prescription opioids, for the purpose of undoing decades of medical understanding of the risks and benefits of opioids and changing the paradigm for opioid use.  These false and misleading statements included representations that the drugs were safe, that patients rarely become addicted, that dosages need not be limited or monitored, and that opioids approved specifically for cancer pain could and

should be safely prescribed for non-cancer patients.  Doctors, who were misled by this campaign of false and misleading statements, wrote opioids prescriptions in unprecedented numbers, bringing vastly increased amounts of opioids into San Francisco and exposing thousands of patients to opioids who would not otherwise have encountered them. This vast increase in opioid prescribing was driven by medically inappropriate prescriptions, that is, prescriptions that would not be medically justified by a proper understanding of the risks and benefits of the drugs.  Predictably, as the number of opioid prescriptions went up, so did the number of people with OUD.  All of the Defendants in this case participated in the campaign to promote opioids through these misrepresentations.

The second pathway of opioid oversupply was diversion.  With increased availability and prescriptions for opioids came increased diversion into illegal markets and for inappropriate use, aided by unscrupulous doctors who exploited the new environment of permissive use, as well as unscrupulous "patients" who manipulated doctors to prescribe drugs that could be sold in illegal markets.  The risk of diversion of prescription opioids has long been understood – because of the addictive nature of these drugs, there is an active illegal market.  To address the problem of diversion, the manufacture, sale and dispensing of opioids are tightly controlled under the federal Controlled Substances Act ("CSA").  As described below, the statute and regulatory framework mandate a "closed system" in which, in order to manufacture, distribute or dispense opioids, a person or entity must register with the Drug Enforcement Administration.  All registrants under the CSA are required to provide "effective controls against diversion." As discussed in detail below, all of the Defendants were obliged to maintain such controls, but none of them did so in a meaningful way.  All of the Defendants had information in their possession that allowed them to identify situations where there was a meaningful risk of diversion, and all of them routinely disregarded this information in order to keep selling more opioids.

Together, the oversupply of opioids that resulted from Defendants' false and misleading statements and from Defendants' failure to control against diversion flooded

San Francisco with prescription opioids, predictably and foreseeably contributing to the public health crisis – the nuisance – for which the People now seek to hold the Defendants accountable.

This document will provide an outline of the facts to be shown at trial, and of the conclusions of the law the People expect to ask the Court to draw at the end of the case; it will be updated and fleshed out as the evidence supporting the People's case is admitted at trial. Because of the preliminary nature of this submission, and the fact that no evidence has yet been submitted, this document is necessarily provisional and is not intended to be comprehensive nor to describe all of the evidence that the People may submit at trial. And to the extent the composition of the Defendants changes over the course of the trial, the approach the People elect to take may change and with it the substance of this document.

## II.   PRELIMINARY OUTLINE OF PROPOSED FINDINGS OF FACT

### A.   Defendants

Defendants in this action are: (1) three "families" of opioid manufacturers, known generally as the Endo, Allergan, and Teva Defendants; (2) Anda, a wholesale distributor of opioids; and (3) Walgreen Co., which acted as a wholesale distributor to its own stores and continues to act as a dispenser of opioids through the large chain of pharmacy stores it owns and operates across the United States, and in San Francisco, where it maintains a dominant market share. The Endo, Allergan, and Teva Defendant families consist of multiple corporations that have been named as Defendants here. These entities are listed in Appendix A.

To complicate matters, certain of the Allergan and Teva entities have been historically intertwined, especially with respect to certain entities referred to as the "Watson/Actavis" entities. These entities operated first under the name Watson, then under the name Actavis, then became part of the Allergan defendant family, and were later sold by Allergan to Teva. The entities that were sold to Teva manufacture and sell generic opioids; other portions of the Watson/Actavis business that manufacture and sell

certain branded opioids remain part of the Allergan family.  The People understand that Teva and Allergan entered into an indemnity agreement when Allergan sold its generic opioid business to Teva, but that they do not agree as to the meaning and effect of that agreement on their respective liabilities in this case.  The People do not believe that the indemnity agreement between Allergan and Teva has any effect on whether or to what extent those entities or their affiliates are liable to the People in this case.

Anda is also intertwined with Allergan and Teva.  It is a wholesale distributor that sold branded and generic opioids manufactured by several pharmaceutical companies. Anda was at one point part of Watson and then Allergan; it was acquired by Teva from Allergan in 2016 along with the other entities discussed above.

Walgreen Co. is a national chain that operates retail pharmacy stores all over the United States under the name "Walgreens," where it dispenses prescription opioids. Walgreens maintains a particularly strong presence in San Francisco, where it operates approximately 50 retail stores in San Francisco (down from a high watermark of around 70 stores).  Until approximately 2014, Walgreens also distributed prescription opioids to its own stores.

## B.   Background

### 1.   Opioids and Their Addictive Properties

Addiction is a chronic, relapsing and remitting disease with a behavioral component, characterized by neuroadaptive brain changes resulting from exposure to addictive drugs.  Every human being has the potential to become addicted.  Some are more vulnerable than others.  Risks for becoming addicted include genetic, developmental, and environmental factors (nature, nurture, and neighborhood).  The biggest risk factors for addiction is simple access to addictive drugs.  When supply of an addictive drug is increased, more people misuse and suffer the harms of that drug.

From a neuroscience perspective, addiction is a disorder of the brain's reward circuitry.  Opioids, which relieve pain by binding to the mu-pain receptors, also cause the release of the neurotransmitter dopamine.  In order to accommodate the high amount of

dopamine released, the brain adapts by downregulating its own internal dopamine and its own internal dopamine receptors.  This process is called neuroadaptation, and the result is a dopamine deficit state, wherein the threshold for experiencing pleasure goes up, and the threshold for experiencing pain goes down.  Individuals struggling with addiction then need the substance not to feel good, but to escape the pain of withdrawal.  In advanced stages of addiction, individuals commit all available resources to obtaining more of the substance, even forgoing natural rewards like food, finding a mate, or raising children.  By hijacking the brain's reward and motivational centers, addiction leads to compulsive, self-destructive consumption that overcomes the limits of voluntary choice.

Among addictive substances, opioids are uniquely dangerous, for at least three reasons.  First, they are sold as medicine, normalizing their use and propagating a misleading safety profile, with devastating consequences.  Second, through increasing tolerance, they create a debilitating dependence such that painful withdrawal leads to a vicious cycle of drug-seeking and withdrawal.  Third, they kill quickly; the course of addiction is extremely rapid compared to other addictive substances, potentially destroying lives within months, and even a single exposure in an opioid naïve person can lead to death.

### 2.    History of Opioid Use and Prescribing

Opioids have been known as addictive, potentially poisonous drugs since antiquity and their special dangers widely recognized.  In the 19th century, after the isolation of morphine and the invention of the hypodermic syringe, it was wrongly assumed that opioids administered by a doctor using a syringe would not be addictive.  During the Civil War, opium, laudanum, and hypodermic morphine were used extensively to treat soldiers and Victorian housewives alike.  Hypodermic morphine soon became the major driver of American's first opioid epidemic.  Hundreds of reports in late nineteenth century medical journals detailed iatrogenic (physician-initiated) cases of morphine addiction.  The risk of addiction increased in cases where doctors continued to administer hypodermic morphine over long periods of time for protracted illnesses.  The two most important risk factors

were exposure to opioids and a history of chronic illness.

In the 1870s and 1880s, America's per capita consumption of opioids tripled. In 1897, Bayer chemists, trying to find a less addictive form of morphine, synthesized heroin. Heroin was marketed by Bayer as a cough and cold remedy alongside Bayer Aspirin from 1898 to 1910.

The opioid addiction epidemic of the late 19th and early 20th century led to ever-stricter laws and regulations regarding the prescribing and dispensing of opioids in medical practice, beginning, at the federal level, in the early 1900s with the Harrison Narcotic Act, which effectively made heroin illegal. (As in many other areas, California was a trend-setter: it was home to the first local ordinances restricting opioid sales, starting with San Francisco's 1875 ban on non-pharmacy sales, adopted statewide in 1881.) By the end of the 19th century, leading physicians had reached consensus that opioids were dangerous and should be used as sparingly as possible, almost exclusively for short-term, acute pain or end-of-life palliative care (primarily in the context of cancer). The evidence-based conservative standard of care was consistent, widespread, and quite durable. Medical training and education throughout the 20th century, save for the last two decades, was filled with warnings about the addictive potential of medicinal opioids, even when prescribed to patients with severe pain and dire illness, but especially when used long-term in the treatment of chronic pain. Perhaps as a result, subsequent opioid epidemics in the 1940s and 1970s were smaller-scale heroin epidemics unrelated to medical prescribing. They were targeted and quelled through a process of repatriating Vietnam War veterans, criminalization, and methadone maintenance treatment.

In 1970, Congress enacted the CSA, which serves as the cornerstone of today's drug scheduling system. The impetus for the new law came in part from a disastrous experiment in the late 1950's and early 1960's with looser restrictions on one particular opioid – an Endo product marketed under the name Percodan that combined oxycodone and aspirin. Endo (not the same entity named as defendant here) claimed that Percodan was less addictive than other opioids, and for a time it was successful in having Percodan

1    subject to less restrictive regulation, especially in California.  Sales and addiction spiked,

2    and the regulations applicable to other opioids were put back in place for Percodan.  The

3    Percodan fiasco was one of the triggers for the push that emerged in the late 1960's for

4    stronger regulation of prescription drugs, leading, ultimately, to the enactment of the CSA,

5    the provisions of which are described below.

6         In 1990, as part of the broader pain reform movement, California passed an

7    Intractable Pain Treatment Act ("IPTA") that expanded care options for pain patients by

8    protecting physicians from Board discipline when they "prescribe or administer controlled

9    substances" to treat a "diagnosed condition causing intractable pain."  *See* Cal. Bus. &

10   Prof. Code § 2241.5.  It expanded medical opioid availability, but did so cautiously in

11   several ways.  First, it defined intractable pain as pain that could not be relieved or cured

12   "after reasonable efforts," meaning that opioids were still seen as a last resort: a physician

13   had to try other "reasonable" approaches to treating the pain first.  Second, it excluded

14   opioids provided to a person known to be using drugs or substances for "nontherapeutic

15   purposes."  In other words, the law discouraged prescribing opioids to a group with

16   known addiction risks. Finally, the law clearly affirmed the Board's authority to require

17   the usual consumer protection standards: limiting to legitimate therapeutic purposes,

18   requiring record-keeping and continuing to require that the use of opioids be consistent

19   with "public health and welfare."  Although the statute was a significant change to the

20   state's opioid policies, recognizing limited circumstances where long-term opioids to be

21   prescribed for reasons other than palliative (end-of-life) care, it did not upend California's

22   long-standing guardrails to protect the public from opioids, or the federal statutes

23   requiring those companies in the opioid supply chain to exercise important controls.

24   Instead, it retained most of those safeguards, particularly for known at-risk groups.  More

25   importantly, it did not reflect a change in understanding of the risks of opioid therapy – it

26   simply recognized that, when opioids are carefully prescribed and managed, there might

27   be limited, additional circumstances in which those risks could be outweighed by potential

28   benefits to those for whom other pain treatments had failed.

1    In 1997, after intensive lobbying by the pharmaceutical industry, California

2    enacted the Pain Patients' Bill of Rights ("PPBR"), *see* Cal. Health & Safety Code

3    §§ 124960-961.  The PPBR recognized that opioids might be appropriate treatment for the

4    control of pain in a variety of circumstances and sought to ensure that patients would have

5    access to them when appropriate.  The PPBR did not, however, adopt particular guidelines

6    for when opioids are appropriate, nor did it set forth the risks and benefits of the drugs.

7    Rather, it deferred to the judgment of physicians to determine when and for whom opioids

8    are appropriate. *See* §§ 124960(f) (stating that opioids therapy may be safe "in the hands

9    of knowledgeable, ethical, and experienced pain management practitioners"); 124961(c)

10   (allowing physicians to refuse to prescribe opioids); 124961(d) (deferring to physicians to

11   choose appropriate dosage).  In many instances, it also required doctors to act in

12   accordance with the IPTA, which, as noted above, left in place many of the traditional

13   prescribing guardrails.  *See* §§ 124960((d), (j), 124961(b), (d).  It granted doctors greater

14   autonomy is deciding how and when to prescribe opioids.

15   The PPBR's emphasis on, and deference to, the judgment of prescribing physicians

16   made it all the more important that doctors be properly informed about the risks and

17   benefits of opioid therapy, so that they could make appropriate prescribing decisions for

18   their patients.  Doctors who were misinformed about the safety and efficacy of opioid

19   therapy were unable properly to exercise the broad discretion granted to them by the

20   PPBR.  Moreover, the PPBR made it easy for drug companies to influence prescribers and

21   increase prescribing through false and misleading representations; instead of having to

22   convince the medical establishment to change specific guidelines, Defendants needed only

23   to mislead newly-empowered doctors, one physician at a time. As described below, the

24   proved adept at this.

25   The opioid crisis that emerged beginning in the middle 1990's, which runs through

26   today, reflected an abandonment (orchestrated by Defendants and others in the industry)

27   of the prior conservative consensus  about the need to restrict opioid prescribing.  How

28   that change came about – and the role of the Defendants in altering that consensus – is

- 8 -

discussed below.  In short, however, the supply of prescription opioids dramatically increased, nationwide and in San Francisco, when doctors, through a massive and coordinated campaign of misrepresentations about the risks and benefits of opioids, were persuaded to forget the hard lessons learned in the 19th century and to prescribe opioids freely under the mistaken impression (already disproved by the close of the 19th century) that patients taking opioids for pain do not become addicted.  As a result, the supply of prescription opioids was increased – and dangerously so – by both increases in medically inappropriate prescribing by doctors misled by Defendants' false and misleading messaging. As the number of prescriptions went up, so, too, did diversion, facilitated by unscrupulous doctors and patients, further increasing the supply of prescription opioids. While only a percentage of those who have been prescribed opioids will go on to problematic use (albeit a significant and all-too-high percentage), each and every diverted opioid by definition is being misused.  Thus, the actual harms of diverted opioids are disproportionate to the number of diverted pills, when compared to the harms of inappropriately, but validly, prescribed opioids.

Eventually, many doctors began to notice that what they had been told was untrue. Many patients prescribed opioids for pain *did* become addicted, and greater caution in prescribing and greater care in management of opioid patients was clearly required.  As a result, there was a decline in prescribing.  But patients who were already addicted to opioids didn't magically lose their dependence.  As prescription opioids became harder to get or more expensive, many of these individuals turned to heroin and other illegally-manufactured opioids to feed the habits they had already developed.

## C.    The Crisis in San Francisco

The opioid epidemic has hit San Francisco especially hard.  The huge increase in the availability of prescription opioids led here, as elsewhere, to dramatic increases in OUD, overdoses, and related problems.  But the opioid epidemic in San Francisco occurred on the heels of a prior heroin problem that the City had been successfully managing, when it was overwhelmed by the influx of prescription opioids.  This meant

1   that the timing and pattern of the opioid epidemic looks somewhat different in San

2   Francisco from elsewhere in the United States.

3        In the 1990s, heroin was a significant issue in San Francisco, with heroin overdose

4   deaths not uncommon through 1999.  The City took swift and pioneering action to address

5   this problem.  For example, in 2003, the San Francisco Department of Public Health

6   (SFDPH) partnered with a community-based program, the Drug Overdose Prevention and

7   Education Project (DOPE Project) to establish the first health-department sanctioned take-

8   home naloxone prescription program in the United States.  SFDPH also opened methadone

9   and buprenorphine programs for people with opioid use disorder, and SFDPH doctors

10   began co-prescribing naloxone to patients receiving opioid prescriptions for pain.  These

11   programs were remarkably successful.  Beginning in 2000, these efforts began to slow the

12   high rate of heroin overdose deaths and by 2010 the number of people who died from

13   heroin-related overdose was down to approximately ten per year.

14        Unfortunately, during the same period, in the 1990s and 2000s, the supply of

15   prescription opioids dramatically increased, nationwide and in San Francisco for the

16   reasons described above and in more detail below.  As a result of the increasingly large

17   supply of prescription opioids, the number of people using prescription opioids in San

18   Francisco increased significantly—as did the number of people dying from overdoses

19   related to prescription opioids.  By 2010, San Francisco's overdose death rate went up (to

20   between 100 and 150 people per year), with approximately 90% of deaths caused by

21   prescription pills.

22        During the 2010s, as the oversupply of prescription opioids began to wane, the

23   number of overdose deaths caused by prescription opioids decreased as well.  But, as

24   noted, individuals who had developed OUD years earlier were psychologically and

25   chemically dependent on opioids.  Accordingly, as prescription opioids became less

26   available, many turned to illegal sources.  As a result, heroin use—and heroin overdose

27   deaths—increased again.  Notably, however, prescription opioid involved deaths

28   continued to exceed those related to heroin and fentanyl combined well into the 2010s.

THE PEOPLE'S PRELIMINARY OUTLINE
OF PROP. FINDINGS OF FACT & CONL. OF LAW
3:18-CV-07591-CRB

Although they reached a low around 2016, they then rose again through 2019. But overall, while many parts of the country saw their total overdose numbers increase significantly between 2010 and 2015, San Francisco did not. The City significantly increased its harm reduction and treatment programs during these years: the DOPE Project alone was responsible for 604 opioid overdose reversals in 2015—up more than one-thousand percent (1000%) from 2010. Unfortunately, just when the City should have seen the fruits of its investment in addressing opioid use in San Francisco, and when it should have been able to turn its attention to other problems, it was forced in the latter half of the 2010s, instead, to redouble its efforts to address the scourge of opioid addiction and to devote significant additional resources to the problem.

The City's efforts were no match for illicitly-manufactured fentanyl. Some prescription opioids include fentanyl, but the fentanyl that has appeared on the streets is distinct from pharmaceutical fentanyl. It is wildly dangerous and turns up in unexpected quantities and unexpected places; it is frequently used to "cut" heroin, so that users, believing they are encountering only familiar heroin, can find themselves unexpectedly exposed – often dangerously, and even fatally – to street-grade fentanyl. Street fentanyl first spread on the East Coast and slowly began to show up in San Francisco in 2015-2016, increasing substantially in 2018. With fentanyl on the scene, the number of opioid overdose deaths increased over 478% from 101 in 2015 to 584 in 2020—more than double the number of people who died of COVID-19 in 2020.

But opioid related deaths are only part of the tragic picture. The Zuckerberg San Francisco General Hospital (ZSFG) Emergency Department (ED) handles approximately 15 to 20 opioid-related overdose incidents every day. The number of patients presenting at the ZSFG ED with other opioid-related health conditions—including, for example, sepsis, infections, or abscesses from unsterile injection practices—has also increased steadily over the last six years. The impact of the opioid epidemic is so significant that in a typical day about 25% of all visits to the ZSFG ED are opioid-related.

The opioid nuisance continues in San Francisco to this day. Nearly every resident

of San Francisco has been impacted in one way or another.  Many thousands of people have a friend or family member struggling with addiction.  Park rangers, street cleaners, even librarians have had to clean up needles, handle overdoses, and administer naloxone with alarming frequency.  Libraries had to install special toilets to prevent blockages from the high volume of needles that people attempt to dispose of on a regular basis.  Entire neighborhoods—like the Tenderloin—have been devastated.  And residents' enjoyment of public areas like sidewalks, parks, and libraries has been impeded citywide.

### D.    Oversupply through Fraudulent and Misleading Statements and Unfair and Improper Promotion

False, misleading, and overly aggressive promotion of prescription opioids led to a dramatic increase in the number of opioid prescriptions in San Francisco, far beyond what would have been appropriate to treat legitimate medical needs – referred to as the "false statement theory" in the Court's summary judgment orders.  (In fact, the Defendants' conduct encompassed both statements that were literally false and also many that were misleading, standing alone or in context.)  Defendants, in general, overstated the benefits of opioid use, understated the risk of opioid addiction, minimized the risks associated with long term use, and engaged in improperly aggressive promotion for drugs that were unquestionably dangerous when misused.  They did so as part of a concerted effort to alter the long-standing conservative consensus about opioid prescribing and to convince doctors that the hard lessons of the past did not apply to the newer generation of opioids Defendants were selling.  In fact, there was little or no evidence to support their claims, which turned out to be, tragically, false. Moreover, Defendants knew their claims were false or knew, at a minimum, that they lacked any scientific basis for what they were saying.

#### 1.    *The False Messages and the Channels through Which They Were Conveyed*

There were several categories of misrepresentations disseminated by Defendants, the most prominent of which were:  (1) the risk of addiction from chronic opioid therapy is low; (2) if opioid addiction occurs, it can be easily identified and managed; (3) signs of

1   addictive behavior are "pseudoaddiction," which merely require more opioids; (4) opioid

2   withdrawal can be avoided with tapering; (5) opioid doses can be increased without limit

3   or greater risks; (6) long-term opioid use improves patient functioning; (7) alternative

4   forms of pain relief pose greater risks than opioids; and (8) new formulations of certain

5   opioids successfully deter abuse.  None of these categories of misrepresentations directly

6   contradict the FDA's decision that opioids were safe and effective for certain conditions,

7   but rather go beyond the FDA-approved labeling.  Indeed, and tragically, the Defendants

8   misrepresented not only the dangers of opioid therapy, but also its benefits.  They led the

9   medical community to believe that opioid therapy could bring pain relief indefinitely

10  when, in fact, the biochemistry of how opioids work means that, for many patients, relief

11  is temporary; in time, increasing doses of opioids are necessary to relieve the pain of the

12  opioids themselves, without being able offer true relief or improved functionality to the

13  patients now hooked on them.

14          Defendants knew that their opioid story would be more effective if it did not come

15  only from them and their sales force.  To change the prescribing paradigm and expand

16  usage, Defendants engaged in a systematic and multi-pronged effort to communicate their

17  opioid messaging through a variety of channels.

18          **Sales Representatives:**  Some of the false statements and misrepresentations did

19  come from company-employed sales representatives who were specifically trained to

20  present the messages described above.  Those sales representatives "detailed" physicians

21  and other prescribers, encouraging them to prescribe certain branded opioids specifically,

22  reassuring them about the safety of opioids generally.  The companies knew exactly which

23  health care providers were prescribing what opioid drugs because they purchased data on

24  prescribing activity to (1) strategically choose which prescribers to target for which opioid

25  sales presentations; (2) gauge whether their promotion efforts were working; and

26  (3) evaluate the performance of their sales representatives, including using weekly and

27  monthly prescription data to calculate "incentive compensation" and "sales contest"

28  winners.

**Paid Advocates:**  Defendants also paid physician "key opinion leaders" to communicate the various categories of false statements to their fellow physicians at dinners, lunches, one-on-one meetings, and seminars.  Certain Defendants maintained "Speakers Bureaus," with a roster of physicians on their payroll to deliver their message to other doctors.  In many instances, these "KOLs" would include discussions about "off label" uses of certain opioids, which the companies are not allowed to do themselves.  This had the effect of further broadening the categories of medical conditions for which physicians were encouraged to use opioids, particularly with respect to the use of opioids for treatment of long-term chronic pain, such as back pain.

**Educational Materials:**  Defendants also disseminated false assurances about the safety and efficacy of opioids through "patient education" brochures and websites.  The materials often were edited by KOLs with extensive financial ties to the Defendants (paid speaker positions, grants, etc.).

**CME:**  Another vehicle by which Defendants communicated their misleading messaging about opioids was through sponsoring continuing medical education (CME) activities.  The CMEs were used to spread Defendants' messaging as to opioids generally, not just the specific products they sold.  Some Defendants created "captive" CME programs that, in theory, were run by independent sponsors, but in fact were funded entirely by one or more opioid manufacturers, who both the steered the content and faculty for the programs (often the same physicians who were paid KOLs for the companies), used sales representatives to invite doctors to the events, and then had sales representatives attend the events.  While there is nothing inherently wrong with industry-sponsored CME, the CMEs at issue here were carefully managed by the sales marketing and other commercial departments of the Defendants and were not independent, "hands off" or viewpoint-neutral.

**Front Groups:**  In a similar vein, Defendants provided financial support to a wide variety of "front groups" that maintained the appearance of independence and legitimacy, but advanced Defendants' false messaging about opioids, including through treatment

1   guidelines, journal articles, and conferences.  As with the CME-related activity, the

2   financial support Defendants gave to these front groups was provided with the expectation

3   that the groups receiving support would convey pro-opioid messaging consistent with the

4   companies' objectives.  Indeed, Defendants were able to control the messages, including

5   sponsoring particular publications or brochures with pro-opioid content approved by

6   Defendants.  A 2020 report issued by the United States Senate Finance Committee details

7   its findings about the relationship between opioid manufacturers and a variety of front

8   groups who advanced pro-opioid messaging.  The report states that "the Committee is

9   releasing the financial information collected during the 2012 investigation, in addition to

10   data collected over the past two years, because we remain concerned that the opioid

11   epidemic was driven, in part, by misinformation and dubious marketing practices used by

12   pharmaceutical companies and the tax-exempt groups they fund."

13        Defendants used these channels to deliver their misrepresentations about opioids in

14   both branded and unbranded contexts.  Some misleading statements were made in the

15   form of promotion of specific branded drugs; other misleading statements pertained to

16   prescription opioids generally and served to reassure doctors about the purported safety of

17   opioid therapy without reference to particular products.  Importantly, for Defendants who

18   manufacture both branded and generic opioids, there is a synergy between these two types

19   of promotional activity.  Defendants understood that promotion of their branded products

20   would also increase the market for their generic drugs, while unbranded materials that

21   reassured doctors about opioids generally would increase the market for all opioids,

22   including both branded and generic drugs.  Indeed, many of the most insidious

23   misrepresentations were made in the context of unbranded materials that served to

24   promote opioids generally and often did not even appear to be promotional materials.

25   Thus, while Defendants attempt to draw a bright line between their branded and

26   unbranded promotional activities, the reality is that they reaped the benefit of all of their

27   misleading marketing activities across all of their opioid products.

28        Moreover, Defendants' improper promotion of opioids was not limited to false and

1    misleading claims about the risks and benefits, but also included the use of unfair and

2    improper tactics for promoting the use of a controlled substance.  These tactics included

3    incentive-based compensation programs for their sales representatives and their managers,

4    including bonuses and contests for those representatives who could "sell" the most

5    opioids.  Defendants' campaign to turn dangerous, addictive drugs into "blockbuster"

6    best-sellers was itself an unfair and improper tactic, given the dangerous nature of the

7    product in question.  Defendants also used data on opioid prescriptions to identify and

8    target high volume prescribers for marketing purposes, but failed to use that same data to

9    comply with their anti-diversion obligations under the CSA.  This conduct contributed to

10   the oversupply of opioids in San Francisco and the resulting public nuisance, and also

11   constituted an unfair business practice in violation of the UCL.

12          2.      *Walgreens' Participation in the False and Misleading Statements*

13          Defendant Walgreen Co. ("Walgreens") occupies a critical position in the opioid

14   supply chain and, accordingly, in this litigation.  In addition to its role in the distribution

15   and dispensing of prescription opioids (discussed below), Walgreens collaborated with

16   Defendants to: (1) promote the widespread availability of opioids, including through

17   "Super Stores" and increased inventory in its 24-hour stores; (2) spread pro-opioids

18   misinformation to its pharmacists; and (3) engage in direct-to-patient advertising of

19   opioids in Walgreens' pharmacies.

20          As part of its efforts to promote the availability of opioids, Walgreens proposed

21   increased stocking of opioids in its 24-hour stores, multiplying opioid inventory as much

22   as eight-fold to cover each area, and assuring high prescribers that Walgreens stores had

23   adequate supply.  Walgreens also discussed providing doctors the assurance that

24   prescriptions for opioids would be filled by pharmacists less likely to question their

25   prescribing.

26          Walgreens worked with various manufacturers on continuing-education programs

27   for pharmacists and agreed to distribute "Manufacturer Product Updates" (MPUs) about

28   opioids products in exchange for payment. These MPUs were another means by which the

manufacturers spread false and misleading messaging about their opioid products.  By providing such messages to its pharmacists, Walgreens improperly encouraged them to underestimate the significant risks of opioids, which had the natural and foreseeable result of reducing the level of scrutiny that Walgreens' pharmacy employees applied to opioid prescriptions.

3.     The Causal Link between Defendants' Conduct and the Increase in Inappropriate Prescribing

Internal company documents show that the connection between Defendants' marketing efforts and increased sales was not merely theoretical.  Rather, Defendants were able to quantify a precise relationship between their marketing programs and sales growth.  They knew that marketing increased sales, and they knew by how much.

The net effect of the Defendants' pro-opioid messaging campaign was that historically skeptical prescribers were led to believe that the so-called "new" opioids had overcome the historical opioid-related problems about which they had learned in medical school.  This resulted in a paradigm shift in the way doctors thought about opioids, and led to a massive increase in opioid prescribing.

But it wasn't simply an increase in the *number* of opioid prescriptions that contributed to the opioid epidemic, it was a broadening of the conditions for which opioids were prescribed, as well as increases in the dosages and durations for which opioids were prescribed, along with a decrease in oversight as to who should receive opioids and what level of supervision was required to ensure safe use.  What the Defendants accomplished was to bring about a wholesale paradigm shift in which the entire understanding of when opioids are "medically appropriate" was altered.  Doctors came to believe that opioids were appropriate when an understanding of the true risks and benefits of the drugs would have shown that they were not.  This resulted in a dramatic increase in the number of medically inappropriate opioid prescriptions that did not reflect the true risks and benefits of the drugs.  San Francisco was awash in opioids because doctors had been led to believe that the drugs were much safer and more effective, as

compared to other therapies, than was in fact the case.

### E.    Oversupply through Diversion

The other significant source of excess opioids in San Francisco – and of significant harms from those opioids – was diversion.  Diversion refers to a situation in which opioids make their way into the hands of someone other than a patient for whom they were prescribed pursuant to a valid prescription.  A valid prescription is one issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.  (A "legitimate" medical purpose may nonetheless be a medically inappropriate one – that is to say, the legitimacy of a prescription and its appropriateness are entirely separate issues.)  Opioids obtained through invalid prescriptions are, by definition, diverted.  Defendants contributed to a public nuisance in San Francisco by failing to control the opioid supply chain and prevent diversion, when each of them was under a legal obligation to provide effective controls against diversion of these drugs and each of them had information in its possession that would have allowed them to detect and stop at least some of the diversion that occurred.

#### 1.    *Regulatory Framework*

The prescription opioids that are the subject of these actions are regulated under the federal CSA, 21 U.S.C. §§ 801, *et seq*., a comprehensive statutory scheme enacted in 1970 to combat drug abuse. The purpose of the CSA was to establish a "closed system" for the manufacture, distribution and sale of these exceptionally dangerous drugs to the public and to control against the diversion of those drugs for non-medical use. *See* H.R. Rep. 91-1444, 1970 U.S.C.C.A.N. 4566, 4571-72.

The CSA and its regulations categorize controlled substances into "schedules" based on the degree of harm they pose to the community. 21 U.S.C. § 812.  Schedule I drugs, such as heroin, may not be prescribed or used for any purpose.  Schedule II drugs are tightly controlled and available only by prescription.  Nearly all prescription opioids, including oxycodone, hydrocodone, and hydromorphone, are currently categorized as Schedule II drugs.  Opioids used in combination with other drugs or that have a lower risk

for abuse and psychological or physical dependence are categorized as Schedule III (e.g., Codeine with aspirin), IV (e.g., Tramadol), or V (e.g., cough medicines that include codeine).  (Opioids are categorized in multiple ways, including, in particular, by their relative strength as compared to morphine.  That strength is expressed in "morphine milligram equivalents" or MMEs.  Drugs with lower MMEs are typically viewed as less dangerous and may be scheduled less restrictively on that basis.  Some opioids previously thought to be less dangerous, and either left unscheduled or categorized on a less restrictive schedule, have been scheduled or re-categorized once the true extent of their dangers was understood.)

In order to ensure that controlled substances are handled, throughout the supply chain, by those in the best position to maintain the closed system and prevent diversion, the CSA requires anyone who manufactures, distributes, or dispenses controlled substances to register with the Drug Enforcement Administration ("DEA"), the agency charged with enforcement of the CSA.  21 U.S.C. § 822.  It is unlawful for any person knowingly to manufacture, distribute, or dispense controlled substances other than in accordance with the requirements of the CSA and its implementing regulations.  21 U.S.C. § 841.  The system requires that registered manufacturers sell only to registered wholesale distributors (or registered dispensers) who sell only to registered dispensers, who may dispense only to patients with valid prescriptions.  Thus, in exchange for the privilege of trading in these dangerous substances, registrants must comply with the statutory and regulatory regime designed to protect individuals and communities from the consequences of diversion use of these drugs.  The CSA regulations require that all registrants "provide effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R. § 1301.71(a).

Distributors of controlled substances – which includes manufacturers when they sell to wholesalers as well as wholesalers who sell to dispensers – are required to maintain a system for detecting and reporting suspicious orders and must halt shipments of orders so identified until it can be determined that the orders are proper and not part of a

1   diversion scheme.  21 C.F.R. § 1301.71(a), § 1301.74; *City and Cty. of San Francisco v.*

2   *Purdue Pharma LP*, 491 F. Supp. 3d 610, 631 (N.D. Ca. Sept. 30, 2020) ("*San Francisco*

3   *MTD*"); *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 3917575, at

4   *1 (N.D. Ohio Aug. 19, 2019).

5          With respect to dispensing, the CSA provides that, unless dispensed directly by a

6   non-pharmacist practitioner, no Schedule II controlled substance may be dispensed

7   without the written prescription of a practitioner, such as a physician, except in an

8   emergency, and no Schedule III controlled substance may be dispensed without a written

9   or oral prescription. 21 U.S.C. § 829(a)-(b). The implementing regulations regarding

10  dispensing of controlled substances specify that a valid controlled substance prescription

11  may only be issued by an individual who is authorized to prescribe and is registered with

12  the DEA. 21 U.S.C. § 822; 21 C.F.R. § 1306.03. Furthermore, a prescription, whether

13  written or oral, is legally valid only if it is issued for "a legitimate medical purpose by an

14  individual practitioner acting in the usual course of his [or her] professional practice." 21

15  C.F.R. § 1306.04(a); *see also San Francisco MTD*, 491 F. Supp. 3d at 669.

16                  *2.      What the People's Evidence Will Show*

17         None of the Defendants complied with their obligations under the CSA to maintain

18  effective controls against diversion.  Each Defendant failed to establish, implement, or

19  follow effective systems to detect and control against diversion, and often did not have

20  any system at all.  Moreover, each of the Defendants was in possession of enormous

21  amounts of data that would have alerted it to the possibility of diversion, but failed to

22  make appropriate use of data (which were used to increase profits) to detect and

23  investigate potential diversion.

24                  (a)      Manufacturers (Teva, Allergan, Endo)

25         For the most part, the Manufacturer Defendants did not sell directly to dispensers

26  (such as pharmacies), but to intermediaries that then distributed to dispensers.

27  Nonetheless, the Manufacturers had a wealth of information about their "downstream

28  customers" – that is, the customers of their customers – to see which doctors wrote

1  prescriptions for their products and which dispensers filled those prescriptions.

2  First, as part of their sales and marketing operations, Defendants routinely bought

3  or licensed detailed data and reports from companies like IMS/IQVIA, Wolters-Kluwer,

4  and ValueCentric that gave a reliable picture of how many prescriptions of which types of

5  opioids each practitioner was writing.  This granular data was used to target sales efforts

6  and track the effectiveness of the Defendants' sales and marketing efforts, including to

7  compensate the salesforce.  Defendants also tracked opioid stocking and "pull through" at

8  the pharmacies.  And, of course, sales people calling on doctors and pharmacies had

9  information about what they were seeing and hearing in the field, including first-hand

10  observation of "pill mills" in their territories.

11  Second, Defendants also had so-called "chargeback" data, provided by the

12  wholesalers.  The "chargeback" data allowed Defendants to track with precision which

13  opioids were sold by which wholesalers in what volumes and to which pharmacies.

14  Defendants routinely used this "chargeback" data as part of programs that allowed

15  wholesalers to claim credits for discounted pricing Defendants agreed to with certain

16  dispensers.  All three of the Manufacturer Defendant families – Teva, Endo, and Allergan

17  – were in possession of such "chargeback" and other dispensing sales data.

18  All of this data and information shows the volume of prescriptions filled at

19  particular pharmacies and written by particular doctors and thus provides a window into

20  unusual increases in the volume of opioid prescriptions in particular places, as well as

21  unusual patterns of prescribing, including particular suspicious drugs combinations.  Such

22  patterns may be indicative of diversion.  See 21 C.F.R. § 1301.74 (defining "suspicious

23  orders" to include "orders of unusual size, orders deviating substantially from a normal

24  pattern, and orders of unusual frequency"). This data was sufficient for Manufacturers to

25  create an indirect suspicious order management (SOM) program from which they could

26  track unusual patterns, volume, or frequency of opioid dispensing at particular

27  pharmacies.   In each instance, the Manufacturers knew which pharmacies were selling

28  unusual or suspicious amounts of opioids:  they had a window into the likely places where

1    diversion was occurring.

2           None of the Manufacturers, however, implemented or maintained for any

3    significant period such a system.  They failed to maintain appropriate systems for

4    detecting suspicious orders at any level, and failed, in particular, to make use of the data

5    that told them what was actually happening at the pharmacies where their drugs were

6    being sold.  Each of them was told by the DEA what they needed to do and each of them

7    hired consultants who told them that their systems were inadequate.  All of them ignored

8    the criticisms of their consultants and failed to implement effective controls against

9    diversion making use of the data in their possession.

10          The failures of the Manufacturers to make use of their data and implement

11   effective SOM programs led to the shipment and dispensing of large amounts of opioids

12   that were suspicious and should have been investigated.  As discussed below, this

13   evidence is sufficient for the Court, acting as factfinder, to find that the failures of the

14   Manufacturers to maintain effective controls against diversion led to diversion and its

15   associated harms in San Francisco.

16                        (b)      Distributors (Walgreens and Anda)

17          Through 2014, Walgreens served as a wholesale distributor of opioids to its retail

18   stores.  Anda was a wholesale distributor of opioids from at least 2000 through the

19   present.  During these time frames, the Controlled Substances Act imposed a duty on

20   Walgreens and Anda—as wholesalers—to design and implement suspicious order

21   monitoring systems to identify controlled substances distribution orders that unusually

22   large or frequent or otherwise deviated from normal patterns.  Walgreens and Anda were

23   obligated to report suspicious orders to the DEA when it discovered them, conduct

24   independent investigations prior to filling them, and then ship to their stores or customers

25   only if the investigation cleared the suspicion.  In 2006 and 2007, the Deputy Assistant

26   Administrator of the DEA's Office of Diversion Control, Joseph Rannazzisi, sent letters to

27   DEA registrants reiterating their legal duties to "design and operate a system to disclose

28   . . . suspicious orders of controlled substances."  The letters also emphasized the

1    requirement to report suspicious orders to the DEA and the prohibition against shipping

2    any order flagged as suspicious until due diligence is performed on the order and the

3    suspicion is cleared.

4          Despite these duties and reminders, until 2012, Walgreens maintained no bona fide

5    suspicious order monitoring system.  In 2006, DEA informed Walgreens it was not

6    satisfying CSA and DEA requirements.  Walgreens' internal audits from 2008-2012 admit

7    that "there was no monitoring process in place to stop a suspicious order to assess if the

8    order is suspicious or not" and that Walgreens was "filling orders that have been deemed

9    suspicious without performing any research to ascertain their legitimacy" and could be

10   filling "illicit orders." In 2010, its Divisional Supply Chain VP wrote, "We were

11   instructed in 1985 not to review or contact anyone on the data.  Who . . . has been

12   reviewing the data collected for the past twenty-five year?" Instead of reviewing

13   suspicious orders, conducting due diligence where required, and reporting them to the

14   DEA before shipment, Walgreens was simply listing orders that exceeded an

15   inappropriate "3 times" threshold (which the DEA had rejected), filling all such orders,

16   and sending lists of the orders to the DEA after they were shipped.  Walgreens did not

17   disclose to the DEA that Walgreens had not performed due diligence on the suspicious

18   orders or cleared the suspicions before shipment, as required by the CSA.

19         Although Walgreens worked to improve its systems in 2012 by creating its

20   Pharmaceutical Integrity division, at the same time it faced regulatory action by the DEA

21   over gross violations of its duties and responsibilities vis-à-vis suspicious order

22   monitoring and controlled substance dispensing, as will be further discussed below.

23   Walgreens ultimately entered into a settlement with the DEA in 2013 in which it admitted

24   that "suspicious order reporting for distribution to certain pharmacies did not meet the

25   standards identified by the DEA."  Walgreens then exited the business of opioid

26   distribution.

27         As a result of its failure to maintain a system of compliance, Walgreens repeatedly

28   shipped suspicious orders of prescription opioids to its pharmacies without any due

THE PEOPLE'S PRELIMINARY OUTLINE
OF PROP. FINDINGS OF FACT & CONL. OF LAW
3:18-CV-07591-CRB

diligence review.  Walgreens admitted as much in internal audits; it also admitted the same to the DEA in its 2013 settlement.  Walgreens' own suspicious order reports show that the size of the orders it was shipping to its San Francisco stores were multiplying over time.  The scale of the increases was not justifiable and shows that Walgreens was not reviewing its data.  The escalating orders would—at a minimum—have required significant due diligence to determine whether and where diversion was occurring.

For its part, Anda also failed to conduct adequate due diligence for its opioids customers, and failed to design and implement a suspicious order monitoring program to prevent diversion.  Anda also designed its processes to circumvent and conceal, rather than report, the suspicious orders placed by its customers.

In 2005, and again in 2007, the DEA identified Anda as the primary hydrocodone supplier to internet pharmacies.  From at least 2000 until 2010, Anda supplied opioids to a number of other repackagers and distributors at abnormally high levels or, in some instances, on an "unlimited" basis.  Several of these distributors and repackagers, in turn, channeled opioids into physicians' offices and clinics in San Francisco.  Anda was a significant opioid supply source to both Southwood Pharmaceuticals and the Harvard Drug Group, both of which had their licenses suspended by the DEA.

Between 2005 and August 2007, Anda identified thousands of suspicious orders, reported them to the DEA, but still shipped them to customers in violation of the CSA.  Starting in approximately September 2007, Anda discontinued its practice of reporting suspicious orders to the DEA and has failed to appropriately identify and report suspicious orders ever since.  After identifying thousands of orders as suspicious and reporting them to the DEA between 2005 and August 2007, Anda failed to subsequently report suspicious orders anywhere in the country for almost eight years.

Anda designed its opioids ordering processes to either conceal or destroy evidence of suspicious orders.  Anda's electronic ordering system was designed *not* to record orders that were deemed as excessive so that there was no suspicious order to report.  In other instances, even when orders were identified as suspicious by Anda, Anda compliance

1   personnel would simply "delete" the orders rather than report them to the DEA.

2                    (c)      Walgreens as Dispenser

3          Walgreens' obligations as a dispenser are described above.  The CSA and

4   California standards of pharmacy practice both impose obligations on pharmacies and

5   pharmacists to investigate so-called "red-flag" prescriptions to ensure they are valid.

6   Because registered manufacturers sell to registered distributors who sell to registered

7   dispensers, in the end, the only means for prescription opioids to "escape" from the closed

8   system are through theft or through dispensing pursuant to a prescription.  Dispensing is

9   where a huge proportion of diversion "leaks" occur.  Thus, if all other checks within the

10  system fail, the pharmacy is supposed to serve as the last line of defense.

11         As the largest retail pharmacy by market share in San Francisco (56% of opioids

12  from 2012-2020), Walgreens was in a unique position to serve as a gatekeeper against

13  diversion—and that means investigating each red flag of diversion evidenced at the

14  presentation of a prescription and documenting the resolution of that red flag prior to

15  dispensing the medication.  Yet, for many years, the policy and practice at Walgreens was

16  to dispense virtually every prescription as long as the prescriber "said it was ok."  Then, in

17  2011 and 2013, Walgreens settled DEA enforcement actions based on conduct in

18  California and Florida (but implicating nationwide practices) that exposed Walgreens'

19  failures under the CSA.  As a result of those settlements, Walgreens began to pay lip-

20  service to the need to guard against diversion by revising its policies, but it failed to

21  meaningfully implement the systems that would have prevented diversion.  For example,

22  Walgreens implemented a due diligence checklist, but it only mandated its use for three

23  specific, single-ingredient opioids and excluded highly prescribed and highly abused

24  hydrocodone products.  Rather than take its duties under the CSA seriously, Walgreens'

25  head of controlled substance compliance suggested that the company simply "consider not

26  documenting our own potential noncompliance."

27         Walgreens also maintained vast amounts of data about the prescriptions it filled

28  and the patients who filled them, but failed to use this data to aid in the identification of

1    "red-flag" prescriptions or suspicious prescribers.  To the extent that Walgreens did

2    analyze its data to identify prescriptions with indicia of diversion, it kept that information

3    from its pharmacists and did not provide them a systematic means of sharing concerns

4    about suspicious prescriptions and prescribers with other pharmacists within the chain.

5    Nor did it ever ban suspicious prescribers from their access to the chain.  Instead, diligent

6    Walgreens pharmacists within the chain kept critical information about suspicious

7    prescribers on Post-it notes; could not circulate information about warnings,

8    investigations, or bans between stores: and never received information from the company

9    that would have reduced the volume of suspicious prescriptions that were improperly

10   filled.  Walgreens also kept important records that could assist the next pharmacist—e.g.,

11   refusal-to-fill forms—in hard copy and inaccessible to its personnel.  Walgreens had the

12   information necessary to see patterns of diversion—it just didn't want its pharmacists to

13   see it.  As a result, San Francisco Walgreens filled an alarming number of opioid

14   prescriptions from doctors with extremely suspicious prescribing patterns, many of whose

15   licenses were revoked for gross negligence.

16        Other policies ensured that even pharmacists who wished to investigate suspicious

17   prescriptions would find it difficult to do so.  Walgreens instituted performance metrics

18   that focused on speed, prescription volume, and customer feedback.  This meant that

19   pharmacists often did not have the ability to conduct adequate prescription due diligence

20   if they wished to keep their jobs.  Pharmacists were consistently subject to extreme

21   workloads that put patient safety at risk, as documented in an internal report and by

22   Walgreens' pharmacists in numerous internal complaints.  Walgreens, and the pharmacists

23   who worked in its pharmacies, were well aware that a customer lost because Walgreens

24   refused to fill his or her opioid prescription might be an entire patient "profile" lost and all

25   the revenue that comes with it—e.g., medications for blood pressure, cholesterol, diabetes,

26   etc.  Walgreens was also well aware that chronic pain patients represented a significant

27   percentage of its business and especially did not want such patients to take their business

28   elsewhere.  As documented in internal complaints and pharmacist testimony, this led

THE PEOPLE'S PRELIMINARY OUTLINE
OF PROP. FINDINGS OF FACT & CONL. OF LAW
3:18-CV-07591-CRB

managers to put pressure on pharmacists to disregard Walgreens' written dispensing policies (as revamped in 2012 in the midst of DEA enforcement actions) and to prioritize profits over patient safety.

(d)     Causation

Defendants' failure to maintain effective controls against diversion led to diversion and also contributed to the public nuisance created by the illicit oversupply of prescription opioids.  The influx of suspicious opioid orders into San Francisco as a result of lax anti-diversion policies is precisely the result Congress set out to avoid when it enacted the CSA, and when DEA adopted its implementing regulations.  As a 2007 letter from DEA to Defendants states: "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."  And, as this Court itself observed in rejecting Defendants' motion to dismiss, "[t]he very existence of the duties to maintain effective controls supports the notion that opioid misuse is foreseeable."  *San Francisco MTD*, 491 F. Supp. 3d at 680.  Moreover, the People's summary judgment evidence shows that controls against diversion – if used – would have worked.  For example, when Walgreens implemented a more robust suspicious order system in 2013, its sales of OxyContin dropped 18% in three months with a disproportionate share of the reduction occurring in higher dosages (i.e., the most dangerous pills).

Defendants failed to identify, halt and investigate hundreds of thousands of suspicious orders with indicia that diversion might be occurring, and dispensed well over a million prescriptions in San Francisco that had red flags indicative of potential diversion.

In particular, the People's expert, Dr. Craig McCann, analyzed data from the DEA's Automation of Reports and Consolidated Orders System (ARCOS) under multiple algorithms that have been used to determine the volume of suspicious orders shipped by Walgreens to its stores and by Anda to its customers.  This data shows that, for both Walgreens and Anda, significant percentages of oxycodone and hydrocodone orders should have been flagged as suspicious and not shipped unless the distributors' due

1    diligence eliminated the suspicion of diversion.  Dr. McCann also analyzed which

2    manufacturer's opioid products were shipped to pharmacies in San Francisco.  He applied

3    metrics indicative of suspicious orders to the total quantities shipped by wholesalers of

4    each manufacturer's products, with the understanding that the manufacturers had access to

5    the data demonstrating the extent to which the sales of their products were suggestive of

6    ongoing diversion.  According to the People's expert, James Rafalski, this analysis, along

7    with the absence of adequate distributor due diligence, showed that tens, if not hundreds,

8    of thousands, of Defendants' products were shipped to San Francisco in transactions that,

9    alone or in the aggregate, should have alerted Defendants to the dangers of diversion.  As

10   Rafalski makes clear, the evidence supports the inference that the Defendants' failure to

11   identify and halt suspicious orders led to large quantities of suspicious opioids entering

12   San Francisco and, predictably, to diversion of significant quantities of them.

13         The evidence also shows the effect of Walgreens' failure to comply with the CSA

14   at the dispensing level.  The People's expert, Carmen Catizone, has identified specific

15   indicia of potential diversion that may be evidenced by an opioid prescription.  Applying

16   algorithms that reflect these red flags, Dr. McCann has analyzed Walgreens' dispensing

17   data; that analysis shows that approximately *60% of the opioid prescriptions that*

18   *Walgreens filled* presented with at least one red flag of diversion.  Another of the People's

19   experts, Elizabeth Park, analyzed Walgreens' due diligence notes and concludes that, at

20   least 95% of the time, Walgreens' pharmacists did not identify and document resolution of

21   red flags prior to dispensing opioids, meaning that the vast majority of suspicious

22   prescriptions were simply dispensed in the face of easily-identifiable concerns that should

23   have been recognized and investigated.  Notably, Walgreens' policy required pharmacists

24   to document any due diligence efforts, which supports the general pharmacy principle and

25   California Board of Pharmacy expectation that "if you don't document it, it didn't

26   happen."

27         Among these filled prescriptions, there were many written by suspicious

28   prescribers who were subject to discipline for drug diversion and thus whose prescriptions

1   were very likely to be diverted.  In some instances, Walgreens learned about these

2   suspicious prescribers but continued filling for them until the last possible moment.

3       The precise consequence anticipated and foreseen by Congress and the DEA of the

4   failure to maintain effective control – widespread diversion of prescription opioids –

5   occurred in San Francisco.  As Judge Polster has explained, this kind of evidence is

6   sufficient to establish causation.  *See In re Nat'l Prescription Opiate* Litig., 2019 WL

7   4178617, at *3.  In particular, in the face of evidence of the massive increase of

8   prescription opioids being sold in San Francisco, and evidence that there was a complete

9   failure by the Defendants to maintain effective controls against diversion, the factfinder

10  and should reasonably infer that these failures were a substantial factor in producing the

11  harm demonstrated by the People in this case.

## III.   PROPOSED CONCLUSIONS OF LAW

### A.   The People Have Proven Their Public Nuisance Cause of Action

12

13

14  1.   To prove a cause of action for public nuisance under California law, the

15  People must show that a defendant (1) despite having knowledge of the hazards (2)

16  engaged in affirmative conduct (3) that was a substantial factor (4) in creating or

17  maintaining an unreasonable and substantial interference with one or more rights common

18  to the public.  *People ex rel. Gallo v. Acuna*, 929 P.2d 596, 604, 618 (Cal. 1997);  *People*

19  *v. ConAgra Grocery Prods.*, 227 Cal. Rptr. 3d 499, 525 (Ct. App. 2017); *Cty. of Santa*

20  *Clara v. Atlantic Richfield Co*., 40 Cal. Rptr. 3d 313, 325 (Ct. App. 2006).

21  2.   The burden of proof in a public nuisance action is a preponderance of the

22  evidence.  *People v. Frangadakis*, 7 Cal. Rptr. 776, 782 (Ct. App. 1960) ("This being a

23  case in equity, the burden of the People was to prove the case only by a preponderance of

24  the evidence.").

25  3.   There is no statute of limitations for a public nuisance cause of action when

26  the nuisance continues to exist.  Civ. Code § 3490 ("No lapse of time can legalize a public

27  nuisance, amounting to an actual obstruction of public right."); *Mangini v. Aerojet-*

28  *General Corp.*, 281 Cal. Rptr. 827, 838 (Ct. App. 1991) ("Section 3490 has been

construed to mean that the statute of limitations is no defense to an action brought by a public entity to abate a public nuisance.").

4.      The People have proven their public nuisance claim by a preponderance of the evidence.

>    *1.      An Opioid Crisis Exists in San Francisco and Constitutes a Public Nuisance*

5.      A nuisance is "[a]nything" that is "injurious to health" or "interfere[s] with the comfortable enjoyment of life or property."  Civ. Code § 3479; *San Francisco MTD*, 491 F. Supp. 3d at 669.

6.      A public nuisance is one that "affects at the same time any entire community or neighborhood, or any considerable number of persons." Civ. Code § 3480; *San Francisco MTD*, 491 F. Supp. 3d at 669.

7.      Public nuisances at common law are defined as "'offenses against, or interferences with, the exercise of *rights common to the public*,' such as public health, safety, peace, comfort, or convenience." *Citizens for Odor Nuisance Abatement v. City of San Diego* 213 Cal. Rptr. 3d 538, 545 (Ct. App. 2017) (quoting *Acuna*, 929 P.2d at 604). The interference "must be both substantial and unreasonable." *Acuna*, 929 P.2d at 604. The interference is substantial if it causes "significant harm."  *Id.* at 605. The interference is "unreasonable" if "the gravity of the harm outweighs the social utility of the defendant's conduct." *San Diego Gas & Electric Co. v. Superior Court*, 920 P.2d 669, 697 (Cal. 1996).

8.      The Restatement (Second) of Torts lists three circumstances that qualify as "unreasonable": (a) whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort, or the public convenience; (b) whether the conduct is proscribed by a statute, ordinance, or administrative regulation, or (c) whether the conduct is of a continuing nature or has produced permanent or long-lasting effect and, as the actor knows or has reason to know, has a significant effect upon the public right.  Restatement (Second) of Torts § 821B(2).

9.      The evidence shows the existence of an opioid crisis constituting a public nuisance in San Francisco.  This opioid crisis encompasses the significant increase in the availability and strength of prescription opioids in San Francisco together with the accompanying rise in opioid addiction, abuse, misuse, opioid-related morbidity, diversion, overdoses, and deaths that have followed.  The opioid crisis affects a considerable number of people in San Francisco.  It is not limited to individuals suffering from addiction, but include harm to entire communities.  The evidence shows, for example, that opioid use disorder (OUD) is an all-encompassing and often lifelong disease that in turn exacerbates or creates other medical conditions, increases the risk of illicit drug use and the accompanying harms of such use, heightens the risk of a non-fatal or fatal overdoses, imposes tremendous costs on healthcare, mental healthcare, and first responder systems, and often requires sustained and prolonged treatment and services for the individual and their families.

10.     The opioid crisis in San Francisco constitutes a substantial interference with public health and other public rights.  As described above, the opioid crisis has inflicted significant harm within San Francisco in terms of the number of people affected by OUD, the profound suffering they and those in their community experience, and the resulting consequences and demands on the healthcare system and other service needs in San Francisco.

11.     The opioid crisis in San Francisco also constitutes an unreasonable interference with the common right to public health and other public rights. Defendants' wrongful conduct meets each of the possible definitions of "unreasonable" in the Restatement and California case law.  Manufacturing Defendants' affirmative and deceptive promotion of opioids, despite their knowledge of the harms that would result, caused harm that far outweighed any possible social utility: While prescription opioids have certain legitimate medical uses consistent with their respective FDA approvals, promoting these highly addictive drugs in a manner that downplays and/or omits their risks and overstates their benefits has no social utility, and certainly none that would

outweigh the grave harms inflicted on the People in San Francisco.  This marketing

misconduct also is unreasonable under the Restatement because it had a significant

adverse effect on public health and other public rights, and that adverse effect has been

long-lasting.

12.     Likewise, all Defendants' failure to design and operate systems to identify

suspicious orders of prescription opioids, maintain effective controls against diversion,

and halt distribution and dispensing of suspicious orders, thereby contributing to the

oversupply of such drugs and fueling an illegal secondary market, constitutes an

unreasonable interference with the common right to public health and other public rights.

Failure to take these actions served no social utility, and caused a significant adverse

effect on public health and other public rights that has been long-lasting.  Moreover, this

conduct is proscribed by the CSA and its implementing regulations.

> 2.      *Each Defendant Engaged in Conduct that Contributed to a Public Nuisance in San Francisco*

13.     To establish liability for a public nuisance, a plaintiff may prove that a

defendant "created or assisted in the creation" of a public nuisance, generally through

some "affirmative steps."  *Cty. of Santa Clara*, 40 Cal. Rptr. 3d at 325; *City of Modesto*

*Redevelopment Agency v. Superior Court*, 13 Cal. Rptr. 3d 865, 876 (Ct. App. 2004).

"Public nuisance liability 'does not hinge on whether the defendant owns, possesses, or

controls the property, nor on whether he is in a position to abate the nuisance; the critical

question is whether the defendant created to assisted in the creation of the nuisance.'"

*Melton v. Boustred*, 107 Cal. Rptr. 3d 481, 499 (Ct. App. 2010) (quoting *City of Modesto*

*Redevelopment Agency*, 13 Cal. Rptr. 3d at 872).  A defendant is likewise liable for

maintaining or assisting in the maintenance of a public nuisance.  *See Acuna*, 929 P.2d at

618.

14.     A manufacturer may be liable for a public nuisance if it affirmatively

promoted a product for a use that the manufacturer knew to be hazardous.  *ConAgra*, 227

Cal. Rptr. 3d at 529–30.  Proof of fraudulent conduct is not required.  *Cty. of Santa Clara*,

1  40 Cal. Rptr. 3d at 328–29; *City of Modesto Redevelopment Agency*, 13 Cal. Rptr. 3d at

2  872–73, 876.

3      15.   Defendants may also be liable for contributing to a public nuisance where

4  they "participate[]" in affirmative, third-party conduct that was a substantial factor in

5  bringing about the nuisance. *ConAgra*, 227 Cal. Rptr. 3d at 543. For purposes of a public

6  nuisance cause of action, financial support of third-party conduct is sufficient to

7  demonstrate that Defendants "participated" in that conduct. *See id.* at 536–38, 543–44

8  (third party promotional activities were attributed to the defendants where they provided

9  financial support for advertisements and promotional campaigns placed by paint and

10  hardware stores and by trade associations in which they were members).

11      16.   California authorities disagree about whether a plaintiff must prove that a

12  defendant acted with "actual knowledge" of the hazard to public health and other public

13  rightsthat would result from its conduct. *San Francisco MTD*, 491 F. Supp. 3d at 672–

14  674. However, to demonstrate actual knowledge, the People do not need to show that

15  Defendants knew of the specific nuisance occurring in San Francisco. Instead, the People

16  must only show that Defendants had actual knowledge of the risks associated with opioids

17  that, taken together, resulted in the public nuisance. *ConAgra*, 227 Cal. Rptr. 3d at 530

18  (actual knowledge established where defendants knew that "(1) 'lower level lead exposure

19  harmed children,' (2) 'lead paint used on the interiors of homes would deteriorate,' and

20  (3) 'lead dust resulting from this deterioration would poison children and cause serious

21  injury.'").

22      17.   Actual knowledge may be shown exclusively through circumstantial

23  evidence and reasonable inferences from the circumstantial evidence. *Id.* (above facts

24  were sufficient to show that lead paint manufacturers "*must have known* . . . that interior

25  lead paint posed a serious risk of harm to children").

26      18.   This Court need not decide whether California law requires proof of actual

27  knowledge, because the People have shown by a preponderance of the evidence that each

28  Defendant actually knew of the risks associated with prescription opioids, including the

risk of opioid addiction, misuse, abuse, diversion, overdose, and death, and that increasing the availability of prescription opioids, and or failing to prevent their diversion, would lead—and in fact was leading—to an increase in these adverse public health harms.

        *3.*    *Defendants' Conduct, Individually and Collectively, Caused the Public Nuisance Existing in San Francisco.*

19.     The People's evidence establishes by a preponderance of the evidence that each Defendant's conduct is a cause in fact and a proximate cause of the public nuisance existing in San Francisco.

        (a)    Each Defendant's Conduct Was a Substantial Factor in Bringing About a Public Nuisance in the Jurisdictions

20.     In order to establish causation for a public nuisance, the People need only show that a Defendant's conduct was "a substantial factor" in bringing about the public nuisance. *ConAgra*, 227 Cal. Rptr. 3d at 543; *see also San Francisco MTD*, 491 F. Supp. 3d at 677.

21.     "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.  Thus, a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor, but a very minor force that does cause harm is a substantial factor." *ConAgra*, 227 Cal. Rptr. 3d at 543 (citations and quotation marks omitted); *see also Bockrath v. Aldrich Chemical Co., Inc.*, 980 P.2d 398, 403–04 (Cal. 1999). The substantial factor standard is broader than "but for" causation and reaches situations "involving independent or concurrent causes in fact." *Rutherford v. Owens-Illinois, Inc.,* 941 P.2d 1203, 1214 (Cal. 1997) ("[T]he substantial factor standard [was] formulated to aid plaintiffs as a broader rule of causality than the 'but for' test . . . .").

22.     If a defendant's wrongful conduct "operated concurrently with other contemporaneous forces to produce the harm, it is a substantial factor, and thus a legal cause, if the injury, or its full extent, would not have occurred but for that conduct." *In re Ethan C.*, 279 P.3d 1052, 1071 (Cal. 2012).  Thus, the People only had to demonstrate that "Manufacturers' and Distributors' conduct was necessary in bringing about the *full extent*

of the [People's] injuries." *San Francisco MTD*, 491 F. Supp. 3d at 677.  The People have satisfied this burden.

23.     The People have proven by a preponderance of the evidence that each Defendant was a substantial factor in bringing about the opioid crisis in San Francisco: each Defendant contributed to an increase in the availability and strength of prescription opioids that triggered the present crisis of opioid misuse, abuse, addiction, diversion, overdose, and death that exists in San Francisco.

24.     As this Court found above, each of the Manufacturing Defendant's marketing and promotion was a substantial factor in expanding the overall market for prescription opioids, including in San Francisco.  This includes through unbranded marketing, which promoted the use of prescription opioids as a class, not any particular branded or generic product, and thus expands the market as a whole.  It also includes branded marketing, which, in addition to promoting the specific product marketed, also expands the market for the same Defendant's other branded and generic opioids.  As such, the evidence shows that Defendants' marketing was effective at increasing the number of prescriptions for opioids and the strength of those prescriptions (as expressed in morphine milligram equivalents or MMEs) in San Francisco.

25.     The increase in the supply and strength of opioids, including Defendants' branded and generic opioids, in San Francisco created a concomitant rise in addiction, misuse, abuse, diversion, overdose, and death that constitutes the opioid crisis in San Francisco.

26.     Similarly, the evidence has shown that all Defendants' failure to design and operate systems to identify suspicious orders of prescription opioids, failure to maintain effective controls against diversion, and failure to halt distribution and dispensing of suspicious orders were substantial factors in bringing about the opioid crisis in San Francisco.  Defendants' failure to maintain such controls, as required by the CSA, fueled the oversupply of pills into San Francisco, and the growth of an illegal secondary market

in both diverted and unlawful opioids, and significantly contributed to rising addiction and overdose rates in San Francisco.

27.     Each Defendant's misconduct was a substantial factor in bringing about the opioid crisis as it exists in San Francisco today.  Even though the number of prescriptions has declined somewhat, the strength of those prescriptions remains higher than it was before Defendants' marketing efforts.  Moreover, as the People have shown, there continue to be significant overdose deaths from prescription opioids and a large number of the people in San Francisco who continue to struggle with OUD developed from the use of prescription opioids.  Even where individuals who developed OUD from using prescription opioids have subsequently transitioned to using illicit opioids, the injuries to public health associated with that illicit opioid use (including for example, the increase in needle use and associated harms and the rise in overdose deaths from heroin and fentanyl), would not have occurred to their fullest extent but for Defendants' conduct.  *See In re Ethan C.*, 279 P.3d at 1071.

(b)     Defendants' Conduct Was a Proximate Cause of the Public Nuisance Existing in San Francisco

28.     Proximate cause requires that the opioid crisis existing in San Francisco be a foreseeable consequence of Defendants' conduct.  *Novak v. Cont'l Tire N. Am.*, 231 Cal. Rptr. 3d 324, 329 (Ct. App. 2018) (a defendant may be relieved of liability if "it appears to the court highly extraordinary that [the defendant's conduct] should have brought about the harm" (citation and quotation marks omitted)).  "[A] public nuisance claim satisfies proximate cause if the defendant's conduct is likely to cause a significant invasion of a public right." *San Francisco MTD*, 491 F. Supp. 3d at 679 (citing *In re Firearms Cases*, 24 Cal. Rptr. 3d 659, 680 (Ct. App. 2005)).

29.     The opioid crisis existing in San Francisco was a foreseeable consequence of Defendants' conduct.  It was foreseeable—and indeed Defendants' intent—that their marketing would increase the supply of prescription opioids in San Francisco.  It was also foreseeable that their failure to maintain effective controls against diversion and to stop shipment or dispensing of suspicious orders unless and until such suspicions were

1    resolved would lead to diversion and the growth of an illegal secondary market in opioids.

2    Indeed, as this Court has previously recognized, "[t]he very existence of the duties to

3    maintain effective controls supports the notion that opioid misuse is foreseeable." *San*

4    *Francisco MTD*, 491 F. Supp. 3d at 690 (citing *Dent v. National Football League,* 902

5    F.3d 1109, 1119 (9th Cir. 2018) ("A lack of reasonable care in the handling, distribution,

6    and administration of controlled substances can foreseeably harm the individuals who take

7    them. That's why they are 'controlled' in the first place—overuse or misuse can lead to

8    addictions and long-term health problems.")).  Finally, it was foreseeable that increasing

9    the volume of prescriptions, and failing to prevent diversion, would increase addiction,

10   misuse, abuse, overdose and death.

11        30.     It was also foreseeable to Defendants that once individuals developed opioid

12   use disorder, they were likely to seek out illicit opioids, including heroin and fentanyl.

13   The medical literature demonstrates a well-established link between prescription opioid

14   use and later use of illicit opioids like heroin and fentanyl.

15        31.     That the intervening acts of other persons might have contributed to this

16   outcome does not break this chain of causation or render Defendants' conduct too

17   attenuated from the public nuisance to be proximate.  As this Court previously found,

18   Defendants "could reasonably foresee the intervening acts of third parties." *San*

19   *Francisco MTD*, 491 F. Supp. 3d at 679.  Indeed, in some cases, these actions by third

20   parties were the intended result of Defendants' misconduct.  Defendants' conduct thus

21   was a proximate cause of the public nuisance.

22                    (c)     The Identification of Other Potential Contributors to the
                              Public Nuisance Does Not Negate Defendants' Role

23        32.     Finally, Defendants argue that their liability is negated by the presence of

24   other factors potentially contributing to the opioid crisis in San Francisco.  This argument

25   lacks merit.

26        33.     The substantial factor test does not require that all other contributing causes

27   be ruled out in order to hold Defendants liable for a public nuisance.  *ConAgra*, 227 Cal.

28   Rptr. 3d at 543–45; *see also Johnson & Johnson Talcum Powder Cases*, 249 Cal. Rptr. 3d

642, 674 (Ct. App. 2019); *Markow v. Rosner*, 208 Cal. Rptr. 3d 363, 378 (Ct. App. 2016);

*Cooper v. Takeda Pharmaceuticals America, Inc.* 191 Cal. Rptr. 3d 67, 92 (Ct. App.

2015).  Rather, a defendant is liable for any public nuisance it contributed to, *Cty. of Santa*

*Clara*, 40 Cal. Rptr. 3d at 324–25, and the Court must find that each Defendant's conduct

was a substantial factor in bringing about or sustaining the nuisance.  *ConAgra*, 227 Cal.

Rptr. 3d at 544–45. That finding, for the reasons set forth above, is well-supported. The

fact that other actors or other dynamics may also be impacting the creation, scope, or

duration of an opioid-related public nuisance is no defense to nuisance liability.  *Wade v.*

*Campbell*, 19 Cal. Rptr. 173, 177–78 (Ct. App. 1962); *see also Judson v. Los Angeles*

*Suburban Gas Co.*, 106 P. 581, 582 (Cal. 1910) (defendant had "no defense" to a public

nuisance action based on "other sources of possible discomfort to plaintiff").

### 4. Defendants Are Jointly and Severally Liable

34.     When multiple tortfeasors are each a substantial factor in creating or

maintaining a public nuisance, they are jointly and severally liable for that nuisance.  *See*

*American Motorcycle Ass'n v. Superior Court*, 578 P.2d 899, 904 (Cal. 1978); *ConAgra*,

227 Cal. Rptr. 3d at 556–57; *Dauenhauer v. Sullivan*, 30 Cal. Rptr. 71, 74 (Ct. App.

1963).  Any burden of proving that liability is either divisible or severable is borne by

defendants.  *Lineaweaver v. Plant Insulation Co.*, 37 Cal. Rptr. 2d 902, 907 (Ct. App.

1995) ("Defendants would not escape liability simply because the precise contribution of

each exposure to the disease cannot be determined, but they would be entitled to limit

damages assessed against them if they proved the harm was capable of apportionment

among them."); see also *ConAgra*, 227 Cal. Rptr. 3d at 556–57 (affirming trial court's

finding that defendants failed to prove divisibility of public nuisance) ("The wrongdoers

should be left to work out between themselves an apportionment.").

### 5. The People Have Proven Their Unfair Competition Law Cause of Action

35.     California Business and Profession Code Section 17200 defines "unfair

competition" to include "any unlawful, unfair or fraudulent business act or practice." The

statute uses "broad, sweeping language" to include "anything that can properly be called a

1    business practice and that at the same time is forbidden by law." *Cel-Tech Commc'ns,*

2    *Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 539–40 (Cal. 1999); *Bank of the West*

3    *v. Superior Court*, 833 P.2d 545, 553 (Cal. 1992).

4        36.    The fact a party may have believed its conduct was lawful is not a defense:

5    "intent is not an element of such a violation." *Hewlett v. Squaw Valley Ski Corp.*, 63 Cal.

6    Rptr. 2d 118, 130 (Ct. App. 1997). "'The statute imposes strict liability. It is not

7    necessary to show that the defendant intended to injure anyone.'" *Id.* (quoting *State Farm*

8    *Fire & Casualty Co. v. Superior Court*, 53 Cal. Rptr. 2d 229, 233 (Ct. App. 1996)).

9        37.    In actions brought in the name of the People, reliance and actual damages

10   need not be shown. *People v. Pacific Land Research Co.*, 569 P.2d 125, 129 n.7 (Cal.

11   1977) ("In an action by the People, on the other hand, only the violation of statute is

12   necessary to justify injunctive relief and civil penalties."). "As an action designed to

13   protect the public rather than benefit private parties, reliance and actual damages need not

14   be established. '[O]nly the violation of statute is necessary to justify an injunctive relief

15   and civil penalties.'" *People v. Toomey*, 203 Cal. Rptr. 642, 657 (Ct. App. 1984) (quoting

16   *Pacific Land Research Co.*, 569 P.2d at 129 n.7).

17       38.    The People's UCL claim is predicated on unlawful business practices, unfair

18   business practices, and fraudulent business practices, including violations of both the

19   federal Controlled Substances Act and California's Consumer Legal Remedies Act. The

20   People's UCL claim, asserted against all defendants except Walgreens, is predicated on

21   unlawful business practices, unfair business practices, and fraudulent business practices,

22   including violations of both the federal Controlled Substances Act and California's

23   Consumer Legal Remedies Act.

24       39.    The burden of proof for a claim for violations of the UCL is preponderance

25   of the evidence. *People v. First Fed. Credit Corp.*, 128 Cal. Rptr. 2d 542, 549 (Ct. App.

26   2002) (citing *People v. Superior Court (Kaufman)*, 525 P.2d 716, 722 n.9 (Cal. 1974)).

27       40.    **Unlawful Business Practices:** Under the "unlawful" prong, Section 17200

28   "borrows violations of other laws and treats them as unlawful practices that the unfair

THE PEOPLE'S PRELIMINARY OUTLINE
OF PROP. FINDINGS OF FACT & CONL. OF LAW
3:18-CV-07591-CRB

competition law makes independently actionable." *Cel-Tech Commc'ns, Inc.*, 973 P.2d at 539–40 (quotation marks and citations omitted).  "'[V]irtually any law or regulation— federal or state, statutory or common law—can serve as [a] predicate for a . . . [section] 17200 "unlawful" violation.'"  *Klein v. Chevron U.S.A., Inc.*, 137 Cal. Rptr. 3d 293, 326– 27 (Ct. App. 2012) (quoting *Paulus v. Bob Lynch Ford, Inc.*, 43 Cal. Rptr. 3d 148, 165 (Ct. App. 2006)).  In an action by the People under the "unlawful" prong of the UCL, an actual injury to the consuming public is not required to be proven as an element.  *People ex rel. Van de Kamp v. Cappuccio, Inc*., 251 Cal. Rptr. 657, 663 (Ct. App. 1988).

      a.  The People have proven that each Defendant against whom a UCL claim is asserted violated the federal CSA, specifically their duties under 21 C.F.R. §§ 1301.71(a) and 1301.74(b).  As such, the People have established that each Defendant violated the unlawful prong of the Unfair Competition Law.  As this Court has previously held, "California's UCL permits the [People] to use the CSA's regulations as predicate violations that trigger liability."  *San Francisco MTD*, 491 F. Supp. 3d at 685–86 (citing *Samura v. Kaiser Foundation Health Plan Inc.*, 22 Cal. Rptr. 2d 20, 31 (Ct. App. 1993)).

      b.  Likewise, the People have proven additional predicate violations of the UCL's "unlawful" prong through evidence that each of the Manufacturing Defendants violated the CLRA.  The CLRA prohibits certain "unfair methods of competition and unfair or deceptive acts or practices . . . intended to result or which results in the sale . . . of goods . . . to any consumer," including representing that goods "have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," Civ. Code § 1770(a)(5), or "of a particular standard, quality, or grade ,. . . if they are of another" § 1770(a)(7), or "disparaging the goods of another by false or misleading representation of fact."  § 1770(a)(8).

c. The People have proven by a preponderance of the evidence that each Manufacturing Defendant engaged in deceptive business practices in violation of the CLRA by representing in California that its opioids had characteristics, uses or benefits which they did not have, representing that its opioids were of a particular standard, quality or grade when they were of another, and disparaging the goods of another (specifically, the class of non-steroidal anti-inflammatory drugs (NSAIDs)) through false or misleading representations of fact.

d. Finally, the People have proven by a preponderance of the evidence that Defendants contributed to a public nuisance, as explained above, in violation of Cal. Civ. Code § 3749 and § 3480. Violations of the Public Nuisance Law are unlawful business practices under the UCL.  *People ex rel. Trutanich v. Joseph*, 140 Cal. Rptr. 3d 9, 19 (Ct. App. 2012).

e. Thus, the People have established that each Defendant violated the UCL under the "unlawful" prong by violating the CSA, the CLRA, and the Public Nuisance Law.  *See Comm. On Children's Television, Inc. v. Gen. Foods Corp.*, 673 P.2d 660, 668 (Cal. 1983).

41.    **Fraudulent Business Practices**: A business practice is "fraudulent" within the meaning of section 17200 if it is "likely to deceive the public." *McKell v. Washington Mutual, Inc.*, 49 Cal. Rptr. 3d 227, 239 (Ct. App. 2006) (citing *Bank of the West*, 833 P.2d at 553; *Massachusetts Mutual Life Ins. Co. v. Superior Court*, 119 Cal. Rptr. 2d 190, 194–95 (Ct. App. 2002)).  "It may be based on representations to the public which are untrue, and 'also those which may be accurate on some level, but will nonetheless tend to mislead or deceive . . . .  A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under' the UCL." *Id.* (quoting *Massachusetts Mutual Life Ins. Co.*, 119 Cal. Rptr. 2d at 194; *Prata v. Superior Court*, 111 Cal. Rptr. 2d 296, 302 (Ct. App. 2001)).  While a common law "fraudulent deception must be actually false, known to be false by

1  the perpetrator, and reasonably relied upon by a victim who incurs damages," "[n]one of

2  these elements are required to state a claim for injunctive relief" under the UCL.  *Day v.*

3  *AT&T Corp.*, 74 Cal. Rptr. 2d 55, 60 (Ct. App. 1998).

4        a.   The People have proven by a preponderance of the evidence that each

5              Manufacturing Defendant violated the "fraudulent" prong of the UCL by

6              marketing and promoting their opioids in California in a false and

7              misleading manner that was likely to deceive healthcare providers and the

8              public.

9        b.   The evidence also establishes that each Manufacturing Defendant may be

10             held liable under the UCL for the fraudulent statements of third parties—

11             including front groups, key opinion leaders, and Continuing Medical

12             Education programs—carried out under their influence and with their

13             substantial involvement.  As this Court previously ruled, "'Liability may be

14             imposed on those who aid and abet another's violation of the UCL if the

15             individual knows the other's conduct constitutes a violation and gives

16             substantial assistance or encouragement to the other to so act.'"  *San*

17             *Francisco MTD*, 491 F. Supp. 3d at 691 (quoting *DeCarlo v. Costco*

18             *Wholesale Corp.*, No. 14cv00202 JAH-BLM, 2020 WL 1332539, at *5

19             (S.D. Cal. Mar. 23, 2020)).  The evidence establishes that Defendants

20             exercised sufficient influence and control over these third party

21             statements—indeed, in many instances Defendants approved and/or

22             developed these third-party misrepresentations—to be held legally

23             responsible for these violations of the UCL.

24     42.    **Unfair Business Practices**: A business practice may be "'unfair' even if not

25 specifically proscribed by some other law."  *Korea Supply Co. v. Lockheed Martin Corp.*,

26 63 P.3d 937, 943 (Cal. 2003).  The definition of "unfair" under the UCL is currently in

27 flux.  The Ninth Circuit, however, has applied a balancing test that weighs "the harm to

28 the consumer" against "the utility of the defendant's practice."  *Lozano v. AT&T Wireless*

1    *Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007); *see also Bardin v. DaimlerChrysler Corp.*,

2    39 Cal. Rptr. 3d 634, 642 (Ct. App. 2006) ("[A]n unfair business practice occurs when it

3    offends an established public policy or when the practice is immoral, unethical,

4    oppressive, unscrupulous or substantially injurious to consumers." (quotation marks

5    omitted)).

6        43.    Each Defendant engaged in business practices that violated established

7    public policy and were immoral, unethical, oppressive, or unscrupulous by aggressively

8    marketing and promoting opioids for the treatment of chronic, non-cancer pain with

9    knowledge of the hazard and deceptively downplaying the risks and overstating the

10   benefits.  Each Defendant likewise engaged in business practices that violated established

11   public policy and were immoral, unethical, oppressive, or unscrupulous by failing to

12   maintain effective controls against diversion and to identify, report, and stop suspicious

13   orders for prescription opioids.

14       44.    This conduct resulted in substantial injury to the public, including an

15   entirely foreseeable rise in opioid addiction, overdoses, deaths, and other related harms,

16   and has fueled the opioid crisis in San Francisco.

17       45.    The utility, if any, of each Defendant's conduct, is clearly outweighed by

18   the substantial injury and gravity of harm to the People in San Francisco.

19       46.    Thus, the People have proven by a preponderance of the evidence that each

20   Defendant violated the "unfair" prong of the UCL.

21       47.    **Joint and Several Liability** "As a general matter, parties may be held

22   jointly and severally liable for unfair competition and for making false and misleading

23   statements." *First Fed. Credit Corp*., 128 Cal. Rptr. 2d at 551; *see also People v. Dollar

24   Rent–A–Car Systems, Inc*., 259 Cal. Rptr. 191, 192 (Ct. App. 1989) (imposing a civil

25   penalty jointly and severally against three rental car agencies whose employees made false

26   and misleading representations to customers); *People v. Bestline Prods., Inc.*, 132 Cal.

27   Rptr. 767, 770, 796 (Ct. App. 1976) (affirming imposition of joint and several civil

28   penalty for FAL violations where defendants each made false statements at meetings of

distributors of their products).  The imposition of joint and several liability is appropriate for the People's UCL cause of action.

### B.      Defendants' Affirmative Defenses are Unavailing

48.      Defendants raised numerous affirmative defenses in their answers to the People's Sixth Amended Complaint.  Defendants have the burden of proving these affirmative defenses by a preponderance of the evidence.  *Bertero v. Nat'l General Corp.*, 529 P.2d 608, 616 (Cal. 1974).

49.      The People have moved for summary judgment on Defendants' affirmative defenses, which the Court today granted in part.  *City and Cty. of San Francisco v. Purdue Pharma LP*, No. 3:18-CV-07591-CRB, Dkt. # 1250, (N.D. Ca. April 18, 2022).  The People will address the affirmative defenses that have survived summary judgment and for which Defendants present evidence and argument, if any, in subsequent drafts of their proposed FOFCOL.

### C.      Non-Waiver

Given the preliminary nature of this document, the People reserve all rights with respect to the submission of evidence, of proposed findings of fact, and of proposed conclusions of law, as the parties proceed through the trial.  Nothing herein should be construed to limit the People's case in any way or to preclude the People from submitting additional evidence not referenced here, or making legal arguments not addressed in this document.

1  DATED:  April 18, 2022              Respectfully submitted,

2                                      LIEFF CABRASER HEIMANN & BERNSTEIN,
                                       LLP
3
                                       */s/ Paulina do Amaral*
4                                      Paulina do Amaral
                                       Elizabeth J. Cabraser
5                                      Richard M. Heimann
                                       Donald C. Arbitblit
6                                      Mark P. Chalos
                                       Kevin R. Budner
7                                      Michael Levin-Gesundheit
                                       Jacob Polin
8                                      Miriam Marks
                                       Ian Bensberg
9                                      275 Battery Street, 29th Floor
                                       San Francisco, California 94111-3339
10                                     Telephone: 415.956.1000
                                       Facsimile: 415.956.1008
11                                     pdoamaral@lchb.com

12

13                                     David Chiu
                                       City Attorney
14                                     Yvonne R. Mere
                                       Sara J. Eisenberg
15                                     Owen J. Clements
                                       Jaime M. Huling Delaye
16                                     John H. George
                                       Deputy City Attorneys
17                                     Fox Plaza
                                       1390 Market Street, Sixth Floor
18                                     San Francisco, CA  94102
                                       Telephone:  415.554.3957
19                                     jaime.hulingdelaye@sfcityatty.org

20                                     */s/ Aelish M. Baig*
                                       Aelish M. Baig
21                                     Taeva C. Shefler
                                       Hadiya K. Deshmukh
22                                     ROBBINS GELLER RUDMAN & DOWD LLP
                                       Post Montgomery Center
23                                     One Montgomery Street, Suite 1800
                                       San Francisco, CA  94104
24                                     Telephone:  415/288-4545
                                       415/288-4534 (fax)
25                                     aelishb@rgrdlaw.com

26

27

28

THE PEOPLE'S PRELIMINARY OUTLINE
OF PROP. FINDINGS OF FACT & CONL. OF LAW
3:18-CV-07591-CRB

Paul J. Geller
Mark J. Dearman
Dorothy P. Antullis
Nicolle B. Brito
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com

X. Jay Alvarez
Thomas E. Egler
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
tome@rgrdlaw.com

Louise Renne
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, CA 94104
Telephone:  415/848-7240
415/848-7230 (fax)
lrenne@publiclawgroup.com

Jennie Lee Anderson
Audrey Siegel
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA  94104
Telephone:  415/986-1400
415/986-1474 (fax)
jennie@andrusanderson.com

Kevin Sharp
SANFORD HEISLER SHARP, LLP
611 Commerce Street, Suite 3100
Nashville, TN  37203
Telephone:  615/434-7000
615/434-7020 (fax)
ksharp@sanfordheisler.com

Edward Chapin
SANFORD HEISLER SHARP, LLP
655 West Broadway, Suite 1700
San Diego, CA  92101
Telephone:  619/577-4253
619/577-4250 (fax)
echapin2@sanfordheisler.com

THE PEOPLE'S PRELIMINARY OUTLINE
OF PROP. FINDINGS OF FACT & CONL. OF LAW
3:18-CV-07591-CRB

1

2
David S. Casey, Jr.
Gayle M. Blatt
3
Alyssa Williams
CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD LLP
4
110 Laurel Street
San Diego, CA  92101-1486
5
Telephone:  619/238-1811
619/544-9232 (fax)
6
dcasey@cglaw.com
gmb@cglaw.com
7
awilliams@cglaw.com

8
Ellen Relkin
9
WEITZ & LUXENBERG P.C.
700 Broadway
10
New York, NY  10003
Telephone:  212/558-5500
11
212/344-5461 (fax)
erelkin@weitzlux.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Melinda Davis Nokes
WEITZ & LUXENBERG P.C.
1880 Century Park East
Los Angeles, CA 90067
Telephone:  310/247-0921
310/786-9927 (fax)
mnokes@weitzlux.com

Paul F. Novak
Tiffany Ellis
WEITZ & LUXENBERG P.C.
1880 Century Park East
24th Floor, The Fisher Building
3011 W. Grand Boulevard
Detroit, Michigan 48202
Telephone: 313/800-4170
pnovak@weitzlux.com
tellis@weitzlux.com

*Attorneys for Plaintiff the People of the State of
California, acting by and through San Francisco
City Attorney David Chiu*

Jayne Conroy (*pro hac vice*)
Andrea Bierstein (*pro hac vice*)
Ellyn Hurd (*pro hac vice*)
Justin Presnal (*pro hac vice*)
Tom Sheridan (*pro hac vice*)
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
jconroy@simmonsfirm.com

Peter J. Mougey (*pro hac vice*)
Page A. Poerschke (*pro hac vice*)
Laura S. Dunning (*pro hac vice*)
Jeff Gaddy (*pro hac vice*)
LEVIN, PAPANTONIO, RAFFERTY, PROCTOR,
BUCHANAN, O'BRIEN, BARR & MOUGEY,
P.A.
316 S. Baylen St., Ste. 600
Pensacola, FL 32502
(850) 435-7068
pmougey@levinlaw.com
ppoerschke@levinlaw.com
ldunning@levinlaw.com
jgaddy@levinlaw.com

*MDL Co-Lead, Plaintiff Executive Committee*

1

*Counsel*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I hereby certify that, on April 18, 2022, service of this document was accomplished

3

pursuant to the Court's electronic filing procedures by filing this document through the

4

ECF system.

5

6

                   /s/ *Paulina do Amaral*
                      Paulina do Amaral

7

8

9

10

11

12

13

14

15

16

2407436.1

17

18

19

20

21

22

23

24

25

26

27

28

THE PEOPLE'S PRELIMINARY OUTLINE
OF PROP. FINDINGS OF FACT & CONL. OF LAW
3:18-CV-07591-CRB