Volume 1

Pages 1 - 134

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

THE CITY AND COUNTY OF SAN          )
FRANCISCO, et al.,                  )
                                    )
           Plaintiffs,              )
                                    )
  VS.                               )    NO. C 18-07591 CRB
                                    )
PURDUE PHARMA PHARMA, L.P., et )
al.,                                )
                                    )
           Defendants.              )
_____ )

                    San Francisco, California
                    Monday, April 25, 2022

              <u>TRANSCRIPT OF PROCEEDINGS</u>

<u>APPEARANCES</u>:

For Plaintiffs:

                    OFFICE OF THE CITY ATTORNEY
                    CITY OF SAN FRANCISCO
                    Fox Plaza
                    1390 Market Street, Sixth Floor
                    San Francisco, California  94102
              BY:   **DAVID CHIU, CITY ATTORNEY**
                    **SARA J. EISENBERG**
                    **JAIME M. HULING DELAYE**
                    **JOHN H. GEORGE**
                    **DEPUTY CITY ATTORNEYS**


         **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**



REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

**APPEARANCES:**  **(CONT'D)**

For Plaintiffs:

            LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
            275 Battery Street, 29th Floor
            San Francisco, California  94111
       BY:  **ELIZABETH J. CABRASER, ATTORNEY AT LAW**
            **RICHARD M. HEIMANN, ATTORNEY AT LAW**
            **KEVIN R. BUDNER, ATTORNEY AT LAW**
            **MICHAEL LEVIN-GESUNDHEIT,ATTORNEY AT LAW**

            LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
            222 2nd Avenue South, Suite 1640
            Nashville, Tennessee  37201
       BY:  **MARK P. CHALOS, ATTORNEY AT LAW**

            LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
            25 Hudson Street, 8th Floor
            New York, New York  10013
       BY:  **PAULINA DO AMARAL, ATTORNEY AT LAW**

            ROBBINS GELLER RUDMAN & DOWD LLP
            One Montgomery Street, Suite 1800
            San Francisco, California  94104
       BY:  **AELISH M. BAIG, ATTORNEY AT LAW**
            **TAEVA C. SHEFLER, ATTORNEY AT LAW**
            **HADIYA K. DESHMUKH, ATTORNEY AT LAW**

            ROBBINS GELLER RUDMAN DOWD LLP
            120 East Palmetto Park Road, Suite 500
            Boca Raton, Florida  33432
       BY:  **PAUL. J. GELLER, ATTORNEY AT LAW**
            **MARK J. DEARMAN, ATTORNEY AT LAW**
            **DOROTHY P. ANTULLIS, ATTORNEY AT LAW**
            **NICOLLE B. BRITO, ATTORNEY AT LAW**

            ROBBINS, GELLER, RUDMAN & DOWD LLP
            655 West Broadway, Suite 1900
            San Diego, California 92101
       BY:  **X. JAY ALVAREZ, ATTORNEY AT LAW**

            ANDRUS ANDERSON LLP
            155 Montgomery Street, Suite 900
            San Francisco, California 94104
       BY:  **JENNIE L. ANDERSON, ATTORNEY AT LAW**

         **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

**APPEARANCES:**   **(CONT'D)**

For Plaintiffs:

                  WEITZ & LUXENBERG, P.C.
                  3011 West Grand Boulevard, 24th Floor
                  Detroit, Michigan  48202
        BY:  **PAUL F. NOVAK, ATTORNEY AT LAW**
              **TIFFANY R. ELLIS, ATTORNEY AT LAW**

                  SIMMONS HANLY CONROY LLC
                  112 Madison Avenue, 7th Floor
                  New York, New York  10016
        BY:  **JAYNE CONROY, ATTORNEY AT LAW**
              **JUSTIN PRESNAL, ATTORNEY AT LAW**

                  LEVIN PAPANTONIO RAFFERTY
                  316 South Baylen Street
                  Pensacola, Florida  32502
        BY:  **PETER J. MOUGEY, ATTORNEY AT LAW**

For Defendants Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Actavis LLC; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Watson Laboratories, Inc.; Warner Chilcott Company LLC; Actavis South Atlantic LLC; Actavis Elizabeth LLC; Actavis Mid Atlantic LLC; Actavis Totowa LLC; Actavis Kadian LLC; Actavis Laboratories UT, Inc. f/k/a Watson Laboratories, Inc.-Salt Lake City; and Actavis Laboratories FL, Inc. f/k/a Watson Laboratories, Inc.-Florida:

                  MORGAN, LEWIS & BOCKIUS LLP
                  One Market Plaza, Spear Street Tower
                  San Francisco, California 94105
        BY:  **ZACHARY S. HILL, ATTORNEY AT LAW**

                  MORGAN, LEWIS & BOCKIUS, LLP
                  600 Anton Boulevard, Suite 1800
                  Costa Mesa, California  92626-7653
        BY:  **COLLIE F. JAMES, IV, ATTORNEY AT LAW**

                  MORGAN LEWIS & BOCKIUS, LLP
                  One Oxford Centre, 32nd Floor
                  Pittsburgh, Pennsylvania  15219-6401
        BY:  **WENDY WEST FEINSTEIN, ATTORNEY AT LAW**
              **KATHERINE A. VAKY, ATTORNEY AT LAW**

        **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

```
 1   APPEARANCES:   (CONT'D)

 2   For Defendant Anda, Inc.:

 3                       FOLEY & LARDNER LLP
                         111 Huntington Avenue
 4                       Boston, Massachusetts  02199-7610
                 BY:   JAMES W. MATTHEWS, ATTORNEY AT LAW
 5                     KATY E. KOSKI, ATTORNEY AT LAW

 6                       FOLEY & LARDNER LLP
                         555 California Street, Suite 1700
 7                       San Francisco, California 94104
                 BY:   JAIME DORENBAUM, ATTORNEY AT LAW

 8
     For Defendant Allergan Finance, LLC,  Allergan Sales, LLC and
 9   Allergan USA, Inc., and specially appearing for Allergan plc:

10                       KIRKLAND & ELLIS LLP
                         300 North LaSalle Street
11                       Chicago, Illinois  60654
                 BY:   HARIKLIA KARIS, ATTORNEY AT LAW
12                     RICHARD HOWELL, ATTORNEY AT LAW

13   For Defendant Walgreen Co.:

14                       BARTLIT BECK LLP
                         54 West Hubbard Street
15                       Chicago, Illinois  60654
                 BY:   KATHERINE M. SWIFT, ATTORNEY AT LAW
16                     BRIAN C. SWANSON, ATTORNEY AT LAW

17

18

19

20

21

22

23

24

25
```

1                          **I N D E X**

2    Monday, April 25, 2022 - Volume 1

3                                                    **PAGE    VOL.**

4    Opening Statement by Mr. Heimann                   12     1
     Opening Statement by Ms. Baig                      29     1
5    Opening Statement resumed by Mr. Heimann           57     1
     Opening Statement resumed by Ms. Baig             128     1

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  <u>**Monday - April 25, 2022**</u>                    <u>**9:29 a.m.**</u>

2                    <u>**P R O C E E D I N G S**</u>

3                        **---oOo---**

4        **THE CLERK:**  All rise.  Court is now in session.  The

5  Honorable Charles R. Breyer now presiding.

6     You may be seated.

7        **THE COURT:**  Would you call the matter, please.

8        **THE CLERK:**  Calling Civil action C 18-7591, City and

9  County of San Francisco, et al. vs. Purdue Pharma, et al.

10     Judge, do you want the attorneys to come forward?

11        **THE COURT:**  They don't have to come forward, but

12  simply announce yourselves from the --

13        **THE CLERK:**  I turned their mics off.

14        **THE COURT:**  Right.

15     -- from our tables.

16        **THE CLERK:**  Okay.  One moment.

17        **THE COURT:**  But speak into the microphone.  Let me

18  remind people that this is being live streamed, and so it's

19  helpful for those people who aren't in this courtroom and the

20  court reporter to see you.

21        **THE CLERK:**  So, plaintiffs' counsel, please state your

22  appearance for the record and please speak into the microphone.

23  Thank you.

24        **MR. CHIU:**  Good morning, Your Honor.  San Francisco

25  City Attorney David Chiu appearing on behalf of the People of

**PROCEEDINGS**

1    the State of California.

2          **THE COURT:**  Good morning, Mr. Chiu.

3          **MS. EISENBERG:**  Sara Eisenberg, San Francisco City

4    Attorney's Office, for the People of the State of California.

5          **THE COURT:**  Good morning.

6          **MS. BAIG:**  Good morning, Your Honor.  Aelish Baig with

7    Robbins, Geller, Rudman & Dowd for the People of the State of

8    California.

9          **MR. HEIMANN:**  And good morning, Your Honor.  Richard

10   Heimann also for the People.

11         **MS. CONROY:**  Good morning, Your Honor.  Jane Conroy,

12   Simmons Hanly Conroy, for the People.

13         **THE COURT:**  Good morning.

14         **MR. MOUGEY:**  Good morning, Your Honor.  Peter Mougey

15   on behalf of the People of the State of California, Levin

16   Papantonio Rafferty.

17         **MS. CABRASER:**  Good morning, Your Honor.  Elizabeth

18   Cabraser, Lieff, Cabraser, Heimann & Bernstein, for the People.

19         **THE COURT:**  Good morning.

20         **MS. DO AMARAL:**  Good morning, Your Honor.  Paulina Do

21   Amaral, Lieff, Cabraser, Heimann & Bernstein, for the People.

22         **THE COURT:**  Good morning.

23         **MS. KARIS:**  Good morning, Your Honor.  Hariklia Karis

24   from Kirkland & Ellis on behalf of the Allergan defendants.

25         **MR. HOWELL:**  Rich Howell from Kirkland and Ellis, also

1  on behalf of the Allergan defendants.

2      **MS. KOSKI:**  Good morning, Your Honor.  Katy Koski,

3  Foley & Lardner, on behalf of the Anda defendant.

4      **MR. MATTHEWS:**  James Matthews also here for Anda, Inc.

5      **MS. WEST FEINSTEIN:**  Good morning, Your Honor.  Wendy

6  West Feinstein with Morgan Lewis for Teva, Cephalon, and the

7  Actavis generic defendants.

8      **MR. JAMES:**  Good morning, Your Honor.  Collie James of

9  Morgan Lewis on behalf of the Cephalon, Teva, and Actavis

10  generic defendants.

11      **MS. SWIFT:**  Good morning, Your Honor.  Kate Swift for

12  Walgreens.

13      **MR. SWANSON:**  Good morning, Your Honor.  Brian Swanson

14  also for Walgreens.

15      **THE COURT:**  Good morning.

16      Well, everybody, welcome.  I'm pleased that we are finally

17  starting this trial.  Let me just make a couple of

18  observations.

19      First of all, we are live streaming it because of COVID

20  considerations, and also this district is part of a pilot

21  project in connection with it's called The Cameras in the

22  Courtroom Project.  Several districts in the United States have

23  agreed to participate in this.

24      You'll note that the cameras mercifully are not on me.

25  That's that is for the good of the cause, but they are going to

1   focus on the two podiums, plaintiffs and defendants, as well as

2   the witnesses.

3        And also we have a camera facility -- I don't quite know

4   how it works -- actually, I don't know how any of this works --

5   to reproduce or broadcast or stream exhibits.  So during the

6   course of a witness' testimony or during the counsel's

7   presentation, exhibits will also be visible outside the

8   courtroom.

9        Let me just remind everyone who may be listening or

10  participating in it, that the reproduction or the filming of

11  screen shots is prohibited.  And I expect that people will

12  simply follow the protocols that have been established by the

13  Judicial Conference, as well as this court, in the pilot

14  project.

15       So, with that, let's -- let's commence with plaintiffs'

16  opening statements.  Today are plaintiffs' opening statements.

17  Tomorrow are defendants' opening statements.

18       I want to remind everyone something that I'm sure I don't

19  need to remind you of, is the fact that opening statements are

20  expectations of what the evidence will show.

21       It's not evidence in and of itself; and, therefore, I

22  would not expect any objections from any party because if, in

23  fact, a party doesn't prove that which the party asserts it

24  could prove, either because I don't permit it into evidence or

25  there's a lack of evidence substantiated, it has no consequence

**PROCEEDINGS**

1  as far as I am concerned.  It's simply an expectation.  It is

2  not evidence in and of itself.

3      So with that and the hope that we will move quickly, but,

4  you know, but according to your intentions of presenting your

5  case, we will turn first to the plaintiffs.

6      **MS. SWIFT:**  Your Honor, with apologies.  Kate Swift

7  for Walgreens.

8      And appreciating everything that you just said, we do have

9  a privilege objection to several of the slides in plaintiffs'

10  opening statement.  It's Slides Number 79 through 86.

11      Judge Polster in the MDL ruled on this objection.  He

12  overruled our claim of privilege.  He said it was a very close

13  call.  We have consistently maintained the claim of privilege

14  over those -- the documents in those slides.

15      **THE COURT:**  So let me ask you this:  There are two

16  ways we can handle it, because I don't want to get embroiled in

17  some dispute during the course of an opening statement.

18      One way -- and, by the way, I intend to do this, a failure

19  to object during an opening statement is not a waiver of

20  anyone's position.  Okay.  So that -- that's preserved.  All

21  your objections are preserved.

22      Now, if it's of a particular nature where it ought not to

23  be -- not to be shown, I can ask that those exhibits simply be

24  handed to the Court if that -- during the opening if that's the

25  way you'd like to proceed.

**PROCEEDINGS**

1    I don't want to sit down and have a discussion of it at

2    this point.

3        How do you want to proceed?  Which way?

4        **MR. HEIMANN:**  Well, my understanding, Your Honor, is

5    that the objection has been overruled.

6        **THE COURT:**  Oh.  Do you mean I overruled them?

7        **MR. HEIMANN:**  No, no, no.  Not by Your Honor yet, but

8    by the MDL trial judge, and --

9        **THE COURT:**  Well, be that as it may, let's -- I don't

10   want to now spend a lot of time figuring out what Judge Polster

11   did.

12       How do you want to proceed?  Do you -- do you have a

13   concern if it's shown in the course of his -- in the course of

14   his presentation?

15       **MS. SWIFT:**  I believe I have to maintain the objection

16   to it being shown in order to maintain the privilege.

17       **THE COURT:**  So as a matter of law -- so would you

18   not -- either not show them or simply those -- it's identified;

19   is that right?  You're aware of which --

20       **MR. HEIMANN:**  I'll need to get the numbers.

21       **THE COURT:**  Okay.

22       **MR. HEIMANN:**  Again, but these are -- I want to

23   emphasize these are important exhibits.

24       **THE COURT:**  They can be shown to me.

25       **MR. HEIMANN:**  Okay.

1      **THE COURT:**  They can be shown to me.

2      **MS. SWIFT:**  That's fine, Your Honor.

3      **THE COURT:**  You know, as we said c'est moi.  I mean, I

4  can deal with it.  Judges deal with it all the time, but I

5  think that there is a concern if there's a privacy concern, so

6  forth, that it be disseminated nationally, and I appreciate the

7  defendants' position on that.

8      So show it to me.  I'll let -- this is not your first

9  rodeo.  You figure out how you want to present it.  Just don't

10  show it to the -- don't live stream it.  Okay?

11      **MR. HEIMANN:**  I got that, Your Honor.

12      **THE COURT:**  Great.

13      **MR. HEIMANN:**  Can you tell me the slides?

14      **THE COURT:**  Does that take care of it?  Do you have

15  the numbers --

16      **MS. SWIFT:**  Yes.

17      **THE COURT:**  -- and everybody is happy and --

18      **MR. HEIMANN:**  It won't come until this afternoon so we

19  will figure it out.

20      **MS. SWIFT:**  Thank you, Your Honor.

21      **THE COURT:**  All right.  Clean slate.  Go ahead.

22      **MR. HEIMANN:**  Thank you, Your Honor.

23                          **OPENING STATEMENT**

24      **MR. HEIMANN:**  May it please the Court, my name again

25  is Richard Heimann, and with Your Honor's permission I will be

1  sharing the opening statement with my colleague Ms. Baig, and

2  we'll -- I don't want to say we'll tag team it, but I'll do the

3  opening remarks and then she will be standing up next, and I

4  will come back probably sometime this afternoon given the

5  timing of how this thing works.  Let me begin then.

6       There may be issues open to debate in this case, but about

7  this there is no debate.  We are in the midst of an opioid

8  epidemic and that epidemic has had catastrophic consequences in

9  San Francisco.  It has been the cause of death and suffering

10  for going onto two decades now.

11       Despite years of efforts by the City to stem the tide of

12  death and suffering from addiction to opioids, the epidemic

13  still rages in the City to this day.

14       You only have to walk a few steps from this courthouse to

15  witness the effects of the epidemic, and that is why the People

16  chose to bring this case before this court.

17       So while some issues may be open to debate, the fact of

18  the epidemic and its impact in San Francisco is not debatable.

19  Instead, the real questions before the Court are:  How did this

20  happen?  Who is responsible?  Who can and should be held

21  accountable?

22       Many books and articles have been written that address

23  these questions, but now those questions are before Your Honor

24  for determination.

25       Patrick Keefe in his book *Empire of Pain* put it this way

OPENING STATEMENT / HEIMANN

1    (as read):

2           "The opioid crisis is, among other things, a parable

3       about the awesome capability of private industry to

4       subvert public institutions."

5    The defendants here are not the only ones who we concede

6    are responsible for the opioid epidemic.  There are others,

7    actually many others, who share that responsibility.

8       For example, the Stanford Lancet Commission, a diverse

9    group of scholars and experts, gathered together in an effort

10   to review the history of the epidemic in order to identify the

11   causes of the epidemic and at the same time to formulate ways

12   to avoid the epidemic occurring again.

13      That commission in its report published in February put it

14   this way (as read):

15          "The origins of the opioid crisis reflect substantial

16      failures within the corporate sector, regulatory, and

17      legislative bodies, the medical profession, and healthcare

18      systems."

19      Although you will hear from the defendants that they deny

20   responsibility, they will point the fingers at other actors,

21   and they may be right.

22      Some of those actors do bear some responsibility; but in

23   our view, the defendants in this courtroom are some of those

24   who are indeed responsible and who we contend should be held

25   legally accountable.

1    Again from the Stanford Lancet article (as read):

2         "Perhaps the most important fact to remember about

3    the opioid crisis is that for some people it brought not

4    suffering but enormous wealth.  OxyContin alone is

5    estimated to have generated revenues of over $35 billion

6    for Purdue Pharma and its owners."

7    But while Purdue may be the starting point, it was far

8    from alone.  Other opioid manufacturers also reaped substantial

9    revenue from soaring prescription rates.

10    And it wasn't just the manufacturers of opioids that

11    profited.  Many pharmaceutical distributors also profited

12    handsomely while knowingly making astonishingly large shipments

13    of pills which they were required to report to regulators but

14    did not.

15    And profit seeking was not entirely external to the

16    healthcare system.  Some hospitals, clinics, pharmacies,

17    professional societies, and individual healthcare professionals

18    also enriched themselves.

19    Opioids and its addictive properties have been known to

20    mankind for millennia, but the Twentieth Century -- by the

21    Twentieth Century the nature of opioids was so well known by

22    the medical community that opioids, if used at all, were only

23    used for acute pain with short duration, for end-of-life care,

24    and for cancer pain.  All that -- all that began to change in

25    the 1990s, however.

 1      As good a place as any to start is with Purdue Pharma

 2  obtaining approval from the FDA for OxyContin in 1995 and the

 3  marketing campaign that followed.

 4      As the Lancet article again provides, OxyContin was

 5  fraudulently marketed as less addictive than other opioids and,

 6  hence, is more acceptable to use for a broad range of

 7  indications and at high doses.

 8      Backed by the most aggressive marketing campaign in the

 9  history of the pharmaceutical industry, OxyContin became the

10  best known of a number of opioid medications whose prescription

11  rate exploded in the United States.

12      But Purdue and OxyContin were followed by the introduction

13  by other manufacturers of their own products:  Watson, Actavis,

14  Allergan, Endo, Teva, Insys, Mallinckrodt, to name just a

15  handful.

16      And why was there such an influx of others into the opioid

17  market promoting extensively for chronic pain?  The size of the

18  market and the potential profits to be made from expanding the

19  market for opioids from acute short-term use, a relatively

20  small market, to chronic long-term use for very common

21  conditions like arthritis and low-back pain.

22      Here, for example, is the former CEO of Endo describing

23  how and why Endo got into the market.

24              (Video was played but not reported.)

25      **MR. HEIMANN:**  But how did they move the market?  By

 1    false marketing and promotion.  Here is an early example from

 2    Purdue.

 3                    (Video was played but not reported.)

 4         **MR. HEIMANN:**  I'm going to emphasize the language

 5    there about the rate of addiction for patients undergoing

 6    opioid therapy is less than 1 percent.  That will become a

 7    significant issue in the case as we move forward.

 8         Anna Lembke, Dr. Anna Lembke, be our first witness.  She's

 9    the author of the book *Drug Dealer MD:  How Doctors Were Duped,*

10    *Patients Got Hooked, and Why It's So Hard To Stop*.

11         Dr. Lembke is a Stanford psychiatrist and addiction

12    specialist.  She has testified before Congress regarding

13    addiction and addiction treatment.  She will testify here about

14    addiction and how it works, and she will testify about how the

15    opioid industry brought about a paradigm shift in the medical

16    use of opioids.

17         Now, I mentioned that the method -- the means by which the

18    opioid industry caused the paradigm shift was focused on false

19    and misleading statements.  Here are some of those statements

20    that were used (as read):

21              "Addiction to prescription opioids is rare or

22         virtually nonexistent in patients treated for chronic

23         pain."

24              "Only addicts are at risk of addiction to

25         prescription opioids."

 1           "There is no clinical ceiling dose of prescription

 2      opioids."

 3           "Drug seeking behavior is not a sign of addiction

 4      but, rather, a pseudoaddiction."

 5           "Opioids are effective in treating chronic pain and

 6      should be used first line."

 7           "Dependence is a benign and easily treated

 8      condition."

 9           "Screening tools can identify who will become

10      addicted."

11      And what were the means and methods by which these

12      misrepresentations and misleading statements were communicated

13      to the medical community and beyond?

14      A broad range, starting with aggressive sales force, drug

15      representatives who actually meet with physicians in their

16      offices in an effort to persuade them to take up opioids for

17      use in chronic conditions, key opinion leaders and speakers

18      bureaus that the manufacturing defendants had and used to speak

19      to physicians across the country in an effort to persuade

20      physicians to change their medical practices.

21      Funding front groups, such as the American Pain Society,

22      and the American Academy of Pain Medicine, so that it would

23      appear that independent groups were advocating when, in fact,

24      those independent groups were largely financed by the

25      manufacturers of opioids themselves.

1    Continuing medical education courses, coopting medical

2    watchdog organizations, seeding the medical literature with

3    flawed and biased studies, medical school curricula promoting

4    opioids for off-label uses, targeting the highest prescribers

5    of opioids in order to increase the sales of opioids, and,

6    finally, free drug samples and coupons and vouchers.

7        The goal of the industry was to alter medical practice

8    dramatically from what had been the conservative use of opioids

9    for more than a century.  The goal was to create a new market.

10   As an example -- this is from the launch by Cephalon of a drug

11   called Fentora in 19 -- excuse me -- in 2006.

12                 (Video was played but not reported.)

13       **MR. HEIMANN:**  Pain is the market that they created

14   together.  They created the market, the market for opioid drugs

15   to be used for chronic and long-term periods.

16       And what was the consequence -- a consequence of all of

17   this effort?  The foreseeable consequence is increasing the

18   supply of available opioids resulting in increased addiction

19   and the opioid crisis of today.

20       Here, again, from the Stanford Lancet Commission their

21   findings (as read):

22           "Departing from decades of medical practice in which

23       opioids were used mainly for cancer, surgery, and

24       palliative care, U.S. and Canadian regulators, physicians,

25       and dentists expanded opioid prescribing to a broad range

 1          of non-cancer pain conditions from lower-back pain to

 2          headaches to sprained ankles."

 3          Opioid addiction was prevalent for more than a century

 4     before the current crisis began, but nothing in the drug

 5     history of the United States was remotely on the scale of the

 6     contemporary opioid crisis.

 7          This level of opioid exposure has no historical

 8     antecedents worldwide.  The widespread availability of

 9     pharmaceutical opioids also has no historical parallel.

10          In fact, as this graph shows, the sale of prescription

11     opioids over the period from roughly 1999 to its peak in 2010

12     increased fourfold, and right along with that increase deaths

13     increased in parallel from overdose; and, in addition,

14     substance abuse, treatment admissions, in parallel with the

15     increase in sales and use of opioids for long term.

16          And the same thing happened in San Francisco.  This is a

17     reflection of the shipments of opioids into San Francisco based

18     on MME, morphine milligram equivalent, between the years -- the

19     mid-'90s and the peak in 2010, a fivefold increase in shipments

20     of opioids into San Francisco.

21          The opioid crisis came in three waves.  The first wave

22     involved prescription opioids and occurred at a time when the

23     illicit markets in heroin were isolated and stable in much of

24     the country.

25          The second wave beginning in around 2010, although it

**OPENING STATEMENT / HEIMANN**

1  varied a little bit depending upon which part of the country

2  we're talking about, was fueled by the first wave and was

3  instigated by drug traffickers realizing that individuals who

4  had become addicted to prescription opioids were a fertile

5  market for heroin.

6      The best-available data shows that some 80 percent of

7  Americans who initiated heroin during this period started with

8  prescription opioids.

9      The third wave beginning in around 2014, involved the

10  addition to illicit opioid products of fentanyl, and this

11  brought about a unprecedented fatality to the opioid crisis.

12      All three waves continue to this day.

13      The third wave was particularly catastrophic in

14  San Francisco as this bar graph demonstrates.  The increase in

15  deaths from fentanyl skyrocketed.

16      The defendants will attempt to blame the problems in

17  San Francisco, particularly the current problems, on fentanyl

18  itself; but the evidence will show that there's a direct line

19  between prescription opioids, heroin, and fentanyl -- a direct

20  causal line between prescription opioids, heroin, and fentanyl.

21      The myths, the lies, the misleading statements, and the

22  promotion by the opioid industry was a substantial cause of the

23  opioid epidemic that we face today, but that epidemic should

24  never have happened.

25      The claims regarding the safety and efficacy of

1    prescription drugs were false.  They were false at the time

2    they were made and not supported by reliable science at the

3    time either that they were made or ever since.

4        The scientific reality is reflected here.  Prescription

5    opioids are as addictive as heroin.  The best conservative

6    data -- I come back to that less than 1 percent that you heard

7    from Mr. -- the gentleman speaking for Purdue -- the best

8    conservative data showing addiction prevalence of 10 to

9    30 percent among chronic pain patients.

10        The risk of overdose and death increases dramatically as

11   the dose and duration are increased.

12        No reliable evidence shows long-term opioid therapy is

13   effective for chronic non-cancer pain.

14        Any person, any person can become addicted regardless of

15   prior abuse; and, again, the greatest risk factor for addiction

16   to opioids is dose and duration.

17        Weaning addicted or dependent patients from opioids is

18   often difficult and can take years to accomplish and in some

19   cases is not possible at all.

20        Pseudoaddiction, a term that was used excessively by those

21   promoting the use of opioids for chronic pain, is a made-up

22   term.  There's no empirical support for it.  And there are no

23   reliable screening tools to predict who will get addicted to

24   prescription opioids.

25        I come back to Dr. Lembke.  She will testify that when the

1  supply of an addictive drug is increased, more people become

2  addicted to and suffer the harms of the drug.

3      She will testify that the defendants' conduct in her

4  opinion promoting increased supply and widespread use of access

5  to opioids, including through misleading messaging and

6  unchecked distribution and dispensing, has resulted in the

7  opioid epidemic of addiction and overdose death.

8      Today's opioid crisis would not have occurred without the

9  paradigm shift substantially caused by the defendants and

10  others in the pharmaceutical opioid industry.

11      I want to step back now in time, back to the 1970s, with

12  the passage of the Controlled Substance Act by Congress and its

13  signing into law by then President Nixon.

14      The purpose of that act in large part was to regulate the

15  manufacture and distribution of dangerous drugs in the country

16  to prevent illicit diversion of drugs.

17      Chief among the drugs that was of concern were those that

18  were defined as Schedule II drugs, drugs with a high potential

19  for abuse and with use potentially leading to severe

20  psychological and physical dependence, including opioids such

21  as oxycodone.

22      The act was intended to create a closed system for the

23  distribution -- for the manufacture and distribution of

24  Schedule II drugs.  So the manufacturer to the distributor, the

25  distributor to the practitioner or to the hospital or the

1   pharmacy, and ultimately to the actual patient.

2       The purpose of the closed system was to prevent diversion

3   outside of the system, illicit diversion outside of the system,

4   and the use of those drugs by persons other than those who were

5   properly prescribed it for medical purposes.

6       And to that end, all participants in that closed system

7   are required to register with the DEA.  The primary aim, as I

8   said -- or a primary aim -- was to prevent diversion outside

9   the closed system, and Congress recognized that in enacting the

10  Controlled Substances Act in 1970.

11      There are two critical aspects of the Controlled Substance

12  Act with respect to diversion and with respect to the duties

13  and responsibilities imposed on registrants that relate

14  directly to the concern over potential diversion.

15      The first is the distribution phase, the transfer from the

16  manufacturer to the distributor and the distributor to the

17  retailer.

18      And the second is the dispensing stage, which primarily

19  involves doctors prescribing controlled substances and then

20  pharmacies filling those prescriptions to patients.

21      I'm going to start now with issues relating to

22  distribution and hold the dispensing subject until we talk more

23  deeply about Walgreens later today.  Probably this afternoon.

24      The regulation 21 C.F.R. 1301 that I'm showing here

25  provides that manufacturers and distributors are required to

1    design and operate a system to disclose to them suspicious

2    orders of controlled substances.

3         Suspicious orders are defined to include, but are not

4    limited to, orders of unusual size, orders deviating

5    substantially from a normal pattern, and orders of unusual

6    frequency.

7         But the criteria is not exclusive.  Characteristics of

8    orders known to the distributor may indicate other reasons for

9    suspicion and, importantly, the DEA did not and does not

10   approve any particular ordering -- suspicious order monitoring

11   system.  It's up to the registrants themselves knowing their

12   businesses and their customers to devise a system appropriate

13   for their business model.

14        But whatever the business model, the obligations are

15   really simple.  They are:  Identify suspicious orders, report

16   suspicious orders to the DEA when discovered, conduct an

17   independent investigation prior to filling an order that is

18   deemed suspicious, and shipping that order only if the

19   investigation dispels the basis for suspicion.

20        These statutory and regulatory requirements and duties

21   have been in effect since the enactment of the Controlled

22   Substances Act in 1970.

23        And the proof in this trial, the proof that we will

24   present to Your Honor, will show that none of the defendants in

25   this case, none of the defendants had an adequate system at any

1   time during the relevant time period.

2       None of the defendants fulfilled their duties and

3   responsibilities as distributors under the Controlled

4   Substances Act.

5       The DEA over time repeatedly informed the pharmaceutical

6   industry of their legal obligations.

7       In 2006 and 2007, for example, the DEA sent letters to all

8   DEA-registered distributors and manufacturers regarding their

9   statutory and legal duties under the CSA and the regulations.

10      The first two letters in September 2006 and February 2007

11  began with (as read):

12          "The purpose of the letter is to reiterate the

13          responsibilities of controlled substance distributors in

14          view of the prescription drug abuse problem our nation

15          currently faces."

16      Let me emphasize that last point.  By 2006 when these

17  letters were sent by the DEA to the manufacturers and

18  distributors, the epidemic that we're suffering from today was

19  already raging.

20      Both of those letters described the statutory scheme and

21  legal duties of distributors as DEA registrants:  To maintain

22  effective controls against diversion of controlled substances

23  into other than legitimate medical, scientific, and industrial

24  channels.

25      The registrant shall design and operate a system to

OPENING STATEMENT / HEIMANN

1  disclose suspicious orders of controlled substances to the

2  registrant.

3       The registrant shall then inform the DEA of the suspicious

4  orders -- tongue twister now -- when discovered by the

5  registrant.

6       The letter also clearly stated the responsibility for

7  designing that system and implementing a system and defined,

8  again, suspicious orders to include those of unusual size,

9  those deviating substantially from normal pattern, and orders

10 of unusual frequency.

11      The regulation also requires that the registrant inform --

12 I'm sorry.

13      The third letter -- I skipped over, the third letter --

14 the first two letters were in 2006 and early 2007.  The third

15 letter was sent in December of 2007 and stressed that federal

16 regulation requires the registrant to inform the DEA of

17 suspicious orders when they are discovered.

18      And that will become important with respect to the conduct

19 of a number of the defendants in this case including,

20 importantly, Walgreens.

21      The letters went on to state that the regulation, as I

22 mentioned a moment ago, clearly indicates that it is the sole

23 responsibility of the registrant to design and operate the

24 system.

25      The DEA does not approve or otherwise endorse any specific

1    system for reporting suspicious orders for the reasons that I

2    mentioned before.  It's up to the registrant to understand

3    their business, their business model, and their customers.

4         I will return and Ms. Baig will return to a more fulsome

5    discussion, Your Honor, of the failings of the distribution

6    systems that were involved -- involving these defendants and --

7    when we address the liability case for each of the defendants.

8         But at this time let me give you some guidelines as to

9    where we're intending to go from the balance of this opening

10   statement forward.

11        We'll next discuss the legal claims in the case, the

12   liability case against Teva, the liability case against

13   Allergan and Actavis, and then the case against Anda and

14   finally the case against Walgreens; and at the conclusion we

15   will address specifically the scope of the nuisance, the impact

16   of the epidemic in San Francisco.

17        At this point I will turn over the podium to Ms. Baig to

18   continue.  Thank you, Your Honor.

19             THE COURT:  Do people want to stand up and just

20   stretch a bit?  I do.  The jury wants to stand up, so...

21                       (Laughter)

22                   (Pause in proceedings.)

23             THE COURT:  Okay.  Please be seated.

24             MS. BAIG:  Good morning, Your Honor.

25             THE COURT:  Good morning.

1              **OPENING STATEMENT**

2        **MS. BAIG:**  As my colleague, Mr. Heimann, explained

3    earlier, I will lay out the legal claims as well as walk you

4    through Allergan, Teva, and Anda's misconduct, which the People

5    allege fueled the opioid epidemic in San Francisco.

6                    (Pause in proceedings.)

7        **MS. BAIG:**  As I know you are aware, the People assert

8    a public nuisance claim against all of the defendants.

9        We allege and we believe the evidence will show that

10   defendants' conduct, that their false, misleading and otherwise

11   unfair marketing practices, along with their failure to

12   identify, halt and report suspicious orders contributed to the

13   creation of a public nuisance:  The opioid epidemic in

14   San Francisco.

15       The evidence will also show that the opioid epidemic is

16   injurious to health.  It is indecent or offensive to the senses

17   and that it interferes with the comfortable enjoyment of life

18   or property.

19       We only need to establish one of those elements,

20   Your Honor.  We intend to establish all three.

21       The People also assert an unfair competition law claim, a

22   UCL claim, against Allergan, Teva, and Anda.

23       There are three ways to prove unfair competition.  One can

24   prove the business acts were unlawful, unfair, or fraudulent.

25   We intend to prove all three.

1        Under the unlawful prong, the evidence will show that

2   Allergan, Teva, and Anda violated the Controlled Substances Act

3   by failing to identify, report, and halt suspicious orders and

4   by failing to provide effective controls against diversion,

5   which means the transfer of legally prescribed controlled

6   substances from the individual to whom it was prescribed to

7   another person.

8        It has been recognized by Congress as being a danger to

9   the safety of the community.

10       The People have alleged that Allergan and Teva violated

11  the Consumer Legal Remedies Act, which requires a showing that

12  they engaged in unfair or deceptive acts or practices intended

13  to result or which did, in fact, result in the sale of goods.

14       The evidence will show their unfair and deceptive acts

15  were intended to and did, in fact, result in maximizing opioid

16  sales.

17       Under the fraudulent prong of the UCL, the People need to

18  establish that defendants' conduct was likely to deceive

19  members of the public.

20       The evidence will show that defendants' promotion of

21  opioids was not only likely to but designed to and, in fact,

22  did broadly deceive members of the medical community and the

23  public about the safety and efficacy of opioids for chronic

24  pain for everyday use.

25       Under the unfair prong, the People need to establish that

 1    the harm to the victim outweighs any benefit.

 2         The evidence will show defendants' false, misleading, and

 3    unfairly aggressive promotion of controlled substances coupled

 4    with their utter failure to identify, halt, or report

 5    suspicious orders to the DEA certainly resulted in more harm

 6    than benefit to the People of the State of California.

 7         Now, Your Honor, turning to the defendants Allergan and

 8    Teva, these are manufacturers who make and distribute a wide

 9    variety of morphine products.

10         Morphine beautifully described by Sam Quinones, author of

11    *Dreamland:  The True Tale of the American Opiate Epidemic* (as

12    read):

13              "Like no other particle on earth, the morphine

14         molecule seemed to possess heaven and hell.  It allowed

15         for modern surgery, saving, and improving too many lives

16         to count but," he says, "it stunted and ended too many

17         lives to count with addiction and overdose."

18              "No other molecule in nature provided such merciful

19         pain relief and then hooked humans so completely and

20         punished them so mercilessly for wanting their freedom

21         from it."

22         This is the drug at issue.  Morphine, derived from the

23    seed pod of the poppy plant, comes from the fluid in the pod

24    and has been known to be deadly for more than a century.

25         More than a century ago we understood the dangers of

**OPENING STATEMENT / BAIG**

1   opioids, and the evidence will show from the 1900s to the 1980s

2   we were very conservative in our approach to opioids.

3        But with the 1990s became the beginning of a paradigm

4   shift, and part of what prompted that shift, a large part, were

5   the unfair promotional efforts of manufacturers, including

6   Allergan and Teva.

7        Allergan, Teva, Anda, and Walgreens are the remaining

8   defendants in this action.  Allergan and Teva, the

9   manufacturers.  Anda is a distributor that was first owned by

10  Allergan and then sold to Teva.  Walgreens has acted as both a

11  distributor and a dispenser.

12       I'll be talking with you about the manufacturers and Anda

13  conduct and will turn it back over to my colleague Mr. Heimann

14  who will address Walgreens.

15       Each of these defendants has a number of corporate

16  entities which fall within their defendant family, and there

17  are a great number of mergers and acquisitions which happened

18  along the way.

19       Not to belabor things, but it will likely be important for

20  you to understand at some level the merger history which I will

21  explain here.

22       And this simply shows the generic drug company Watson

23  acquired generic drug company Actavis Group, and then there

24  were a couple of name changes.  Watson changed its name to

25  Actavis, Inc., in 2012.

1        And then Actavis, Inc., changed its name to Allergan

2    Finance LLC; and finally Allergan Finance LLC's parent,

3    Allergan PLC, sold its generic business to Teva in 2016 for

4    $40 billion.

5        Distilled down to its essence, it's just this:  Allergan

6    Finance LLC, formerly known as Actavis, Inc., formerly known as

7    Watson, sold some branded opioids, like Kadian and Norco, but

8    was a generic drug company giant with many generic opioids.

9        And Allergan sold that generic drug business along with

10   Anda, its in-house distributor, to Teva in 2016.

11       Before August of 2016, the giant generics business that

12   resulted from the merger of Watson and Actavis Group belonged

13   to Allergan.

14       Teva, prior to that sale, prior to acquiring Allergan's

15   massive generics business, had its own profitable branded

16   opioids, Actiq and Fentora, and some generic opioids as well.

17       It sold opioids in the U.S. prior to 2016 through Teva

18   Pharmaceuticals USA and Cephalon, Inc.; and after 2016, it sold

19   many more opioids through the Actavis generic entities it

20   purchased from Allergan.

21       So Teva's corporate family includes, in relevant part,

22   Teva Pharmaceuticals Industry, which is the parent corp in

23   Israel, Cephalon, and Teva USA; and as of August 2016, the

24   Actavis generics entities it acquired from Allergan.

25       What did these companies sell?  The whole gamut in terms

**OPENING STATEMENT / BAIG**

1    of opioids, Your Honor.  They sold the generic form of

2    OxyContin, which is oxycodone HCL.  They sold oxymorphone.

3    They sold fentanyl.  They sold many, many formulations of

4    opioids.

5         And here we've broken Teva down for you by subsidiary.

6    Cephalon sold Actiq and Fentora, both fentanyl products.

7         Teva sold generic OxyContin, oxymorphone, and others.  A

8    massive number of these pills were sold into San Francisco.

9         Allergan and Teva promoted opioids with both branded and

10   unbranded marketing strategies, meaning that some of their

11   promotional efforts came in the form of glossy brochures with

12   brand names of an opioid drug splashed across the front or

13   sales reps visits directly to prescribers' offices; but a lot

14   of their promotional efforts, which we will get into, were more

15   subtle than that and, yet, still worked phenomenally well.

16        We can't very well talk about marketing without first

17   talking about the Food and Drug Administration's role in

18   approving these drugs; and you will likely hear from defendants

19   that because the opioids were FDA approved, they ought not to

20   be held liable for selling them.

21        A few things on that, Your Honor.  First, the FDA in

22   approving these drugs relies on defendants to be honest about

23   their drugs.

24        And, in any event, along with approval come very strict

25   rules requiring that all marketing be truthful and not

 1  misleading, meaning that defendants cannot understate the risks

 2  or understate the ben -- overstate the benefits.

 3      Defendants cannot engage in misleading promotion under the

 4  guise of third parties.

 5      Defendants cannot promote for unapproved or off-label

 6  uses.

 7      The evidence will show that defendants did all of the

 8  above.

 9      Indeed, former FDA Commissioner David Kessler has

10  testified in a preservation deposition, Your Honor, that

11  defendants departed from industry practice and standards that

12  they were expected to adhere to.

13      How?  By minimizing risks of abuse, by promoting opioids

14  for off-label purposes, by understating the risks of addiction

15  either themselves, through the use of key opinion leaders, or

16  through collaboration with third-party pain advocacy groups and

17  other professional, medical, and trade group organizations.

18      The evidence will show that OxyContin marketing began with

19  Purdue and the Sackler family that owned it.  It was incredibly

20  lucrative, brought enormous success; and with success like

21  that, the evidence will show many others, including defendants

22  here, clamored onto the bandwagon marketing and selling opioids

23  as a risk-free panacea for all kinds of pain.

24      And prescriptions and sales of opioids soared for all

25  kinds of uses, nationally and in San Francisco.

1          But, again, Your Honor -- and I know my colleague

2    Mr. Heimann raised this, it bears repeating -- that all of the

3    opioids at issue here were Schedule II drugs, which by their

4    very nature have a high potential for physical dependence and

5    abuse.

6          And we ask that you keep in mind when evaluating whether

7    the marketing and SOMS practices were fair, not only the false

8    and misleading marketing, which we believe the evidence will

9    show was obviously unfair, but the other practices as well,

10   like motivating sales reps with incentive compensation,

11   bonuses, contests, prizes; sales reps whose very livelihood is

12   based on how much they sell.  They are the ones tasked with

13   educating prescribers about the risks of the drugs which were

14   controlled substances?

15         There's an obvious tension, an obvious conflict there.

16   This is a practice which is perhaps widely accepted for selling

17   other products.

18         It may be fine for selling chocolate bars; but,

19   Your Honor, the People will show that the way they did it here

20   for highly dangerous controlled substances was unfair.

21         The sales employees tasked with educating doctors were

22   also in charge of addressing first-line SOMS issues.

23         So the sales reps, again paid based on how much they sell,

24   they are the ones tasked with addressing suspicious orders with

25   the customers?

**OPENING STATEMENT / BAIG**

1    How many of those orders do you think they halted and

2    reported if their compensation was based on maximizing sales?

3              THE CLERK:  Judge, one moment, technical issue.

4              THE COURT:  Okay, we need to re-start the computer so,

5    hold that thought.

6              MS. BAIG:  Okay.

7                        (Pause in the proceedings.)

8              THE COURT:  All set?  Great.  Thank you.

9        Go ahead.

10             MS. BAIG:  The obvious inherent tension, Your Honor,

11   made the practice unfair, but we do know the practices were

12   highly effective and, tragically, we note that opioid use

13   disorder and overdose deaths advance in lockstep with opioid

14   sales.

15       By 2008, drug overdoses, mostly from opiates surpassed car

16   accidents as a leading cause of accidental death in the U.S.

17   By 2012, overdose deaths rose to one every half hour.

18       That's --

19                        (Pause in proceedings.)

20             MS. BAIG:  A strong summary of certain aspects of

21   unbranded marketing, Your Honor, can be found in the

22   December 2020 bipartisan Senate report issued by Senators Chuck

23   Grassley and Ron Wyden, which illuminates the extensive

24   connections between opioid manufacturers and nonprofit patient

25   advocacy groups, professional provider groups, and medical

**OPENING STATEMENT / BAIG**

1    associations.

2        Your Honor, we ask that you read the Senate report.  The

3    report found that these groups sought to influence

4    opioid-prescribing practices and related federal policy.

5        The goal of the investigation was to take a look at

6    seemingly neutral pain advocacy organizations, like American

7    Pain Society, American Society of Pain Educators, and the like,

8    and identify the groups largest donors.

9        The investigation revealed that manufacturers here

10   contributed to such organizations, and specifically that Teva

11   led the way having paid over $4.8 million to organizations like

12   the American Chronic Pain Association, the International

13   Association of Pain; and in exchange, they received deep

14   cooperation with their overall messaging about opioids.

15       The report expressed (as read):

16           "We remain concerned that the opioid epidemic was

17           driven in part by misinformation and dubious marketing

18           practices used by pharmaceutical companies and the

19           tax-exempt groups they fund."

20       Part and parcel of that sort of collaboration between

21   opioid manufacturers and pain advocacy groups is the source of

22   messaging found in the book *Exit Wounds:  A Survival Guide to*

23   *Pain Management for Returning Veterans and Their Families*.

24       And the evidence will show that Cephalon contributed to

25   the American Pain Foundation.  The American Pain Foundation

1    then published this book designed to reach out to veterans.

2    And I'm going to read a passage from it (as read):

3             "Veterans who answered the call to service and who

4         have endured grievous harm to body and soul deserve the

5         best pain medicine available.  The goal of *Exit Wounds* is

6         to arm veterans and their families with the information

7         and resources they need to advocate for the quality of

8         pain treatment they deserve."

9    It goes on to state that (as read):

10            "The pain relieving properties of opioids are

11        unsurpassed.  They are today considered the gold standard

12        of pain medications and so are often the main medications

13        used in the treatment of chronic pain.  Yet, despite their

14        great benefits, opioids are often underused.  For a number

15        of reasons, healthcare providers may be afraid to

16        prescribe them and patients may be afraid to take them.

17        At the core of this wariness is the fear of addiction so I

18        want to tackle this issue head on."

19            "Long experience with opioids shows that people who

20        are not predisposed to addiction are unlikely to become

21        addicted to opioid pain medications.  When used correctly,

22        opioid pain medications increase a person's level of

23        functioning."

24    Here you have an example of pharma preying with their

25    false marketing on one of their country's most vulnerable

 1   populations.

 2        Another example of unbranded marketing, manufacturers

 3   promoted the notion that pain ought to be assessed as the fifth

 4   vital sign and that prescribers should use a pain assessment

 5   tool like this one in every patient visit.

 6        Pain is not a vital sign.  It's not something that can be

 7   objectively measured.  Dr. Lembke will testify that pain

 8   evaluators have never been shown to improve pain outcomes and

 9   do not add to understanding patient's pain, and she will also

10   testify that such tools have been shown to increase opioid

11   prescribing.

12        False and misleading statements came in both nonbranded

13   and branded marketing forms.  Defendants made statements to the

14   effect that opioid addiction was rare.

15        Allergan trained every sales rep nationally, including

16   those who came into San Francisco, with this false statement in

17   its Kadian learning brochure (as read):

18             "There is no evidence that simply taking opioids for

19        a period of time will cause substance abuse or addiction."

20        This was false.

21        Now, defendants are likely to tell you that this document

22   was only used internally but, Your Honor, it was used

23   internally to train every single Allergan sales rep selling

24   opioids nationally.  Those same sales reps were then tasked

25   with promoting not only branded Kadian but also generic

1    opioids, including generic Kadian, generic oxymorphone, and

2    others.

3         The evidence will show that similarly for Teva, in all of

4    its pain products learning systems in 2008, 2014, and 2017,

5    including for Fentora, a fentanyl product, Teva trained sales

6    reps that (as read):

7              "Generally patients do not become addicted to opioids

8         and that use of opioids rarely leads to addiction."

9         These statements were false, as our addiction specialist

10   Anna Lembke, and other prescriber witnesses in San Francisco

11   will aptly confirm.

12        Manufacturers also downplayed the risk of addiction by

13   spreading the notion of pseudoaddiction, the idea that

14   addictive behavior was really just your body telling you that

15   you needed more pain relief and that your symptoms would

16   disappear once you simply took more opioids, a convenient

17   notion for someone trying to maximize sales of opioids.

18        Again, addiction specialist Anna Lembke will testify that

19   there is no empirical support for the diagnosis of

20   pseudoaddiction nor for the notion that more opioids is an

21   appropriate response to patients exhibiting drug-seeking

22   behavior.

23        Both Allergan and Teva promoted this notion of

24   pseudoaddiction, which will be debunked by Dr. Anna Lembke and

25   other physician witnesses with similar expertise.

**OPENING STATEMENT / BAIG**

1          Additionally, the evidence will show that manufacturers

2    misrepresented that there was no dosing limit; that addictive

3    behavior was really just your body telling you that you needed

4    more pain medication.

5          Again, convenient if you're in opioid sales, but our

6    addiction specialist Anna Lembke will testify that multiple

7    studies have verified that the risk of overdose increases with

8    higher doses and longer duration as does the risk of addiction.

9          And here you see both companies promoting the notion that

10   there is no ceiling dose for opioids generally.

11         Keep in mind that the Allergan-Actavis family of

12   defendants was the second-largest opioid manufacturer

13   nationally and the largest opioid manufacturer in

14   San Francisco.  They sold more than 24.1 percent of all

15   prescription opioids that came into San Francisco from 2006 to

16   2014.

17         The Allergan-Actavis marketing evidence will show that

18   there was -- there were sophisticated, well-developed brand and

19   generics marketing departments in place, that all marketing

20   policies were national, the policies did not change state by

21   state or city by city, and the national policies and practices

22   were implemented in San Francisco.

23         It will also show that in 2010 the U.S. Food and Drug

24   Administration, Division of Drug Marketing and Communications,

25   DDMAC, sent Actavis a warning letter flagging false and

1  misleading misrepresentations made in Actavis' promotional

2  materials for Kadian.

3       DDMAC warned that Actavis' promotional materials omit and

4  minimize the serious risks associated with Kadian, broaden and

5  fail to present the limitations to the approved indication of

6  the drug, and present unsubstantiated superiority and

7  effectiveness claims.

8       Despite being warned by DDMAC, the evidence will show that

9  Actavis continued to market opioids with messaging DDMAC had

10  found to be misleading.

11      The evidence will show that Allergan trained its sales

12  reps with false and misleading messaging, that the sales force

13  was tasked with selling brand and generic opioids, and trained

14  with messages around the long history of safe and efficacious

15  use, as well as the false messaging we just discussed, and that

16  the marketing aggressively targeted high prescribers.

17      Jennifer Altier, marketing director at Actavis, trained

18  all the sales reps with the Kadian learning brochure, which, as

19  we've seen, was full of false and misleading statements about

20  opioids downplaying the risk of addiction.

21      The evidence will also show that she used IMS data, which

22  the company purchased precisely so they could track the highest

23  prescribers in any given community, including in San Francisco,

24  for marketing purposes.

25      And what did they do with this data?  They set goals for

1    their sales reps.  For example, 26,000 Kadian prescriptions per

2    week.  These goals, again, might be fine if you're selling a

3    less dangerous product; but for highly dangerous controlled

4    substances, this, along with the false and misleading

5    marketing, is an unfair business practice.

6        And it wasn't just the brute force sales reps that were

7    used to sell.  They used, for example, techniques telesales to

8    target the three highest prescribers, including in

9    San Francisco.

10       They used Anda and McKesson telemarketing; and they used

11   direct mail campaigns, trade journals, and several websites to

12   target San Francisco healthcare professionals and pharmacies

13   with their messaging.

14       You will likely hear from defendants that they don't

15   market their generic drugs at all, but the evidence will show

16   that Jinping McCormick, who was the director of generic

17   marketing, marketed oxycodone, fentanyl patch, oxymorphone,

18   generic Kadian, and others, and her compensation was also based

19   on her ability to grow sales.  She used all kinds of data:

20   IMS; IQVIA data; chargeback data, which it received back from

21   its customers; Wolters Kluwer data, Medi-Span data that allowed

22   them to track their pills to the pharmacy and prescriber level

23   for marketing purposes.  And, yet, she couldn't remember ever

24   using it for SOMS' purposes.

25       She also used multichannel marketing, volume incentive

1  programs, stocking incentives to pharmacies, all with the

2  primary objective of growing sales of controlled substances

3  additional.

4      Additional marketing strategies employed include

5  collaborating with McKesson to make calls to the 500 highest

6  dispensing pharmacies, hiring ad agencies for e-mail blasts to

7  90,000 pharmacists, direct mail campaigns to doctors, journal

8  advertising, e-mail campaigns to pharmacies, all promoting

9  oxymorphone in this example.

10     Notably, they even used Anda for telemarketing promotion

11  through Anda's call center.  And note that telemarketers are

12  financially incentivized to promote oxymorphone.  Even

13  Walgreens had a marketing team to help Actavis grow oxymorphone

14  sales.

15     Michael Perfetto, the vice president of sales and

16  marketing, acknowledged, like everyone else, that performance

17  is measured and compensation is based on how much is sold.

18  We'll get deeper into SOMS in just a few minutes, but he also

19  acknowledged that the SOM system in place was so inadequate

20  they would need to, quote, "start from scratch" to bring it

21  into compliance.

22     Debbie Webb was a top ten sales rep in 2011.  She was a

23  sales rep in San Francisco.  She was trained with the

24  misrepresentations in the Kadian learning system, and she was

25  bonused for exceeding sales quota for opioids.

 1          Same for Robin Hagy, another sales rep selling brand and

 2    generic opioids.  She too was trained with the false messages

 3    and ordered marketing materials, including those found

 4    misleading by DDMAC, for use in her doctors visits.

 5          Moving on to Teva marketing.  The evidence will show that

 6    all told, Teva spent a good deal of time and energy on

 7    marketing.  Teva's main drugs, Actiq and Fentora, both fentanyl

 8    products, were only approved for breakthrough cancer pain,

 9    BTCP; and, yet, 92 percent of prescriptions were for noncancer

10    use.

11          How did that happen?  While it's true that doctors can in

12    their discretion prescribe drugs for off-label uses, drug

13    companies are strictly prohibited under federal law for

14    off-label marketing.  And while Teva pled guilty and paid a

15    fine for off-label promotion, they made substantially more than

16    that in revenue from Actiq and Fentora.

17          The evidence will show that even as late as 2017, Teva

18    continued to teach that opioid phobia leads to undertreatment

19    of pain and that, in general, patients do not become addicted

20    to opioids; thus, continuing to downplay the very real risks of

21    opioids.

22          While always pressuring sales reps to maximize sales,

23    incentive compensation targets, quotas, bonuses, the goals

24    provided the sales rep -- to the sales reps at the national

25    sales meeting, quote, "Money.  Money.  Money."  Again, their

**OPENING STATEMENT / BAIG**

1   livelihood based on how much they sell and yet they are the

2   ones tasked with educating doctors about the risks of opioids;

3   and with addressing SOMS concerns, it's an unfair practice

4   where controlled substances are concerned, and it contributed

5   greatly to the nuisance.

6        A quick two-minute video, Your Honor, created by Teva for

7   a sales training perhaps intended to be funny, but the

8   messaging is very, very clear.  And, remember, fentanyl was

9   only approved for breakthrough cancer pain.

10                 (Video was played but not reported.)

11        **MS. BAIG:**  Another video, Your Honor, played by Teva

12   for sales reps that follows from the first.  And just so you

13   can follow the thread, here Mr. Spokane, the sales rep who

14   didn't get coffee in the first video because he didn't sell

15   enough, was caught using an unapproved, unauthorized homemade

16   sales aid to sell more.  And the question here is whether his

17   sales director told him to do it or not, and a trial ensues.

18                 (Video was played but not reported.)

19        **MS. BAIG:**  Again, Your Honor, Teva will likely tell

20   you that this is just intended to be funny, and it might have

21   been funny if they were talking about less dangerous products;

22   but we're talking about fentanyl here, far more powerful than

23   morphine, which was only approved for cancer patients.

24        And what is message from the sales director to the sales

25   reps here?  It's that we live in a world where sales reps have

 1    to meet and exceed quota.

 2          THE COURT:  Let's take a recess now.  We'll be in

 3    recess until 11:00 o'clock.

 4          MS. BAIG:  Okay.

 5          THE COURT:  Thank you.

 6                    (Recess taken at 10:46 a.m.)

 7              (Proceedings resumed at 11:00 a.m.)

 8          THE CLERK:  Come to order.  Court is now in session.

 9    You may be seated.

10          THE COURT:  Okay.  You may continue.

11          MS. BAIG:  Thank you, Your Honor.

12     And one last sales video for now, Your Honor, which

13    comments on the Teva-funded, quote/unquote, "studies" the

14    company could create to show all doctors in every location, not

15    just cancer doctors, how great fentanyl was for all

16    breakthrough pain, not just cancer pain.

17               (Video was played but not reported.)

18          MS. BAIG:  You will hear form our marketing expert,

19    Berkeley Professor Jeziorski, that collectively defendants

20    brought over 2 million marketing impressions into

21    San Francisco.

22      You will hear from our marketing expert, Matthew Perri,

23    that defendants' marketing conduct clearly violated industry

24    standards and that it contributed to the growth and expansion

25    of the opioid market.

1        Okay.  Apart from the marketing, the manufacturers also

2   engaged in unfair business practices related to their

3   suspicious order monitoring system, SOMS.  These unfair

4   business practices also worked to fuel the public nuisance.

5        As we've discussed, defendants had obligations to

6   identify, halt, and report to the DEA suspicious orders under

7   the Controlled Substances Act.

8        You've seen these elements of the Controlled Substances

9   Act before.  I won't go through them again, except to add that

10  it's been recognized by Congress that diversion of opioids into

11  illicit channels is dangerous to individuals and to the

12  community at large.

13       In enacting the CSA, Congress stated that diversion and

14  illicit use of controlled substances have a substantial and

15  detrimental effect on the health and general welfare of the

16  American people.

17       Congress further recognized that diversion of controlled

18  substances presents a danger to the safety of the community.

19       In 2007, the DEA through Joe Rannazzisi reminded

20  manufacturers of their obligations under the CSA stating that

21  (as read):

22            "Registrants must conduct an independent analysis

23       before completing a sale to determine if opioids are

24       likely to be diverted and that reliance on rigid formulas

25       to identify suspicious orders is not enough."

 1         The DEA said in its 2000 letter to manufacturers that

 2    (as read):

 3              "Even just one distributor that uses its DEA

 4         registration to facilitate diversion can cause enormous

 5         harm."

 6         In a follow-up 2012 letter, the DEA told manufacturers and

 7    distributors that their role in the proper handling of

 8    controlled substances is critical for public safety as it helps

 9    to protect society against drug abuse and diversion.

10    Nevertheless, the Watson-Actavis-Allergan entities had no

11    meaningful SOM system from 2000 forward.

12         Nancy Baran, who was head of SOMS at Actavis noted that

13    with their existing SOM system in 2009, if a customer's monthly

14    usage limit was 3,000 units, that customer could order 2,999

15    units every day of the month and it still would not be caught.

16         She also noted that orders were coming in all day long

17    over the 25 percent threshold, 25 percent over the historical

18    average for a given customer, and that their suspicious order

19    report did a, quote, "lousy" job.

20         And in all the orders that Actavis shipped, how many were

21    reported to the DEA?

22              (Video was played but not reported.)

23         **MS. BAIG:**  In 2012, the DEA called Actavis to its

24    headquarters to address significant concerns regarding

25    diversion of opioids.  At the meeting, the DEA reminded Actavis

that it was responsible for ensuring that oxycodone is not

diverted.

The DEA told Actavis that manufacturers are just as

responsible as distributors and pharmacies for preventing

diversion, and urged Actavis to be part of the solution and not

the problem.

The DEA asked them to get to know their customers'

customers for Actavis products.  Notably, Actavis already knew

their customers' top customers.  As we saw earlier, they

purchased that data for marketing purposes and they also had

access to chargeback data from their distributor customers.

So Actavis was already very well aware of who the top

downstream customers were, but the evidence will show they only

used that information for marketing purposes, not for SOMS.

The DEA also raised the issue of quota with Actavis.

Specifically, Actavis compliance officer Michael Clarke was at

the DEA meeting, and he had a very vivid memory of it.  He

testified that the DEA treated them like street dealers.  He

also testified about Actavis' response to the DEA's request

that they reduce quota to protect against diversion against

oxycodone.

(Video was played but not reported.)

MS. BAIG:  CEO Doug Boothe confirmed Clarke's

testimony that he wasn't interested in reducing quota.

Astonishingly, he also testified that he did not believe that

 1   Actavis had any obligation to prevent diversion.

 2        The evidence will show that in 2012, Actavis worked to

 3   revise its SOM system.  It installed the revised system, which

 4   required it to monitor its downstream customers and report any

 5   problems not only to the distributors but also to the DEA, but

 6   it abandoned that new system in less than three months as a

 7   result of merger activity and reverted back to the old system.

 8        The Watson SOM system wasn't better than Actavis's.  From

 9   2000 to 2016 it made four reports to the DEA in total and none

10   were in writing.  The Watson team was run by sales and

11   marketing, a team again that's compensated based on their

12   ability to maximize sales.  So tasking that team with halting

13   suspicious orders creates an inherent conflict of interest.

14        This evidence will come in through Mary Woods, who worked

15   as part of the customers relations team which oversaw DEA

16   compliance.

17        Tom Napoli, the head of Watson DEA Affairs Group, hired

18   Cegedim, a/k/a Buzzeo, to do an audit.  The auditor failed

19   Watson system and told Watson it would have to revisit their

20   entire approach to fully address the DEA SOMS requirements.

21        Like the Watson-Actavis-Allergan entities, the Teva SOM

22   system was similarly deficient.  Sales reps were the first line

23   of defense regarding SOMS issues.  Out of millions of orders,

24   they identified zero suspicious orders prior to the end of 2012

25   and they identified only 28 from 2013 to 2018.

 1        Colleen McGinn, who was in charge of SOMS at Teva,

 2   admitted that Teva did not have adequate resources for its SOMS

 3   program and testified that an audit revealed Teva SOM system to

 4   be at high and moderate risk for DEA action.

 5        The same outside auditor Cegedim, a/k/a Buzzeo, that

 6   reviewed the prior systems reviewed Teva's as well in 2012, and

 7   found that Teva had a rudimentary SOM system that had never

 8   identified or reported a single suspicious order.

 9        The auditor further found fault with Teva's failure to

10   review its downstream distribution; i.e., its customers'

11   customers, like pharmacies.  And, yet, the evidence will show

12   that like Allergan, Teva too had access to prescriber and

13   pharmacy-level today data and used it for marketing but not

14   SOMS purposes.

15        Here we have Teva's diversion operations manager,

16   Mr. Tomkiewicz, shedding light on the nature of the problem,

17   the inherent tension of having sales employees paid with

18   incentive compensation play a substantial role in suspicious

19   order monitoring.

20             (Video was played but not reported.)

21        MS. BAIG:  Notably, the former director of DEA

22   compliance at Teva doesn't deny any responsibility for fueling

23   the opioid epidemic.  In fact, she accepts it.

24             (Video was played but not reported.)

25        MS. BAIG:  In 2012, Tomkiewicz circulated an e-mail

1   entitled "OxyContin for Kids" with a graphic of the kids

2   Kellogg's Sugar Smacks serial box, except that it said

3   "Kellogg's Smack" and had the frog injecting himself with a

4   syringe.

5        I'm all for comic relief, but this is the corporate

6   investigator in 2012 when the nation and San Francisco were

7   already in the midst of a devastating epidemic.

8        And this, Your Honor, is -- he circulated this e-mail in

9   2012 when he worked for AmerisourceBergen.  He was subsequently

10  hired to run SOMS for Teva.

11       Tomkiewicz also circulated a song called "Beverly

12  Pillbillies" laughing at the crisis, mocking at it, referring

13  to them as a bevy of pillbillies traveling south to Florida

14  cash-and-carry pill mills all to the tune of the *Beverly*

15  *Hillbilly* theme song.

16       And they would have us believe that Teva was striving to

17  comply with the CSA requirements, that they took the obligation

18  seriously when the corporate investigator that they hired had

19  circulated things like these.

20       Finally, with regard to Teva SOMS, Teva did, like

21  Allergan, come up with a replacement for its SOMS program, but

22  in 2015 that program too was found to be deficient.  An

23  internal audit report noted that in the past year, only two

24  suspicious orders had been reported to the DEA.

25       Turning now to Anda.  Anda was founded in 1992.  As of

OPENING STATEMENT / BAIG

2006, it was owned by Watson, which became Actavis, which became Allergan Finance LLC, and it distributed the majority of Allergan's opioids and then Teva's when it was sold to Teva in 2016.  It was also a primary supplier of internet pharmacies.

In 2011, the DEA sent a letter to Anda vice president Albert Paonessa stating the results of their investigation of Anda the year prior.  The DEA stated that Anda failed to maintain complete and accurate records of controlled substances and further called out Anda's pattern of distributing larger quantities of controlled substances than permitted.

The DEA noted that Anda had a monthly limit of 5,000 dosage units for certain customers yet shipped many more units to those same customers.  The letter concluded that (as read):

> "This letter is formal notification that your firm is in violation of the CSA."

An internal e-mail from 2012 confirms that Anda had reported zero suspicious orders in the last five years.

In 2015, Buzzeo did an audit of Anda's SOM system and made many recommendations to bring Anda's system into compliance, including that Anda needed a "know your customer" program.

The DEA also called Anda out for using eight as the multiplier to trigger orders of interest as part of its SOMS program.  That means a customer could order up to eight times its historical average before an order would even be flagged as of interest.

1    An internal e-mail also shows that Anda agreed to use

2 marketing to push hydrocodone, Oxycontin, and fentanyl, and it

3 did precisely that.

4    Despite the fact that Anda is a distributor and not a

5 manufacturer, it did actively and aggressively market opioids

6 by encouraging pharmacies to send fliers to customers which,

7 for example, offered discounts to customers who had not

8 purchased controlled substances from Anda in the past 12

9 months.

10    Former DEA Investigator James Rafalski has reviewed all of

11 the SOMS programs at issue here, compared them with industry

12 standards, and found that defendants failed to design and

13 operate adequate suspicious order monitoring systems and failed

14 to maintain effective controls to prevent diversion.

15    The conduct of Allergan, Teva, and Anda, all of this

16 marketing, all of these SOMS failures, has had a tremendous

17 effect on the country and on San Francisco.

18    The People's epidemiologist Katherine Keyes will testify

19 that with increased supply came increased heroin and fentanyl

20 deaths, and that 75 percent of people addicted to illicit

21 opioids began with prescription opioids.

22    The People's expert Daniel Ciccarone, professor of Family

23 Community Medicine at UCSF, will testify there is a

24 well-defined link between the use of prescription opioids and

25 the subsequent use of illicit opioids.

1      Heroin overdose deaths have increased 394 percent

2   nationally from 2008 to 2018.  Opioid overdose deaths have

3   increased 178 percent.

4      Your Honor, with that, I would like to turn the discussion

5   back over to my colleague for a discussion of Walgreens.

6          THE COURT:  Thank you.

7                  (Pause in proceedings.)

8          MR. HEIMANN:  I'm pleased to report we're actually

9   going much quicker than I expected, frankly.

10         THE COURT:  Okay.

11                  **OPENING STATEMENT**

12         MR. HEIMANN:  So the case against Walgreens -- thank

13   you.

14      The case against Walgreens comes down to three primary

15   elements:  Collaboration, distribution, and dispensing.

16      I'll start with the collaboration case, and let me begin

17   by noting that the case against Walgreens covers a period of

18   more than actually 20 years, and much of the proof in the case

19   is drawn from the business records of the company itself; and

20   so I'm forced to refer to a fair number of exhibits in the

21   course of presenting the basis for the claims against

22   Walgreens.  So I'm hoping Your Honor will bear with me with

23   respect to that.

24      So with respect to collaboration, it wasn't just the

25   manufacturers who promoted the new opioid message.  Walgreens

1   collaborated with the manufacturers, including Purdue and

2   others, in the promotion of opioids promoting them to

3   pharmacists, to doctors, and even to patients.

4       That collaboration between Walgreens and Purdue began as

5   early as the introduction of OxyContin in the 1990s.  Walgreens

6   engaged in multiple means to promote the widespread

7   availability of access to opioids at Walgreens pharmacies.

8       One of the Walgreens ideas included the notion of

9   superstores, stores that would be open 24 hours a day and would

10  stock narcotics multifold beyond what they actually expected

11  would be needed in the areas covered by the superstores.

12      They intended to inform high-prescribing opioid doctors in

13  the area of the stores that they could always be counted on for

14  an adequate inventory of opioid drugs.

15      In addition, the notion was promoted that the stores would

16  allow Schedule II prescriptions to be telephoned into the

17  pharmacy by the doctor rather than requiring that it be

18  presented in the first instance by written script.

19      On Purdue's part, it proposed to assist Walgreens in the

20  opioid business by actively promoting Walgreens as the pharmacy

21  for prescribers and patients to patronize.

22      And in this instance I'm showing you a Purdue e-mail

23  exchange, internal, in which a level district manager at Purdue

24  is talking to a salesperson at Purdue about communications that

25  that salesperson had had with a Walgreens pharmacist.

1        And the district Purdue manager is advising the

2   salesperson that he could inform the Walgreens pharmacist that

3   he was dealing with, that if he can keep adequate inventory of

4   all sizes of OxyContin available in the store, that you can

5   then inform you -- the salesperson can inform our key accounts,

6   meaning physicians primarily, including telling the doctors

7   which are the preferred pain stores in the area.

8        And that Purdue employee went on to say (as read):

9            "While we're not in the business of promoting

10           pharmacies per se, it is obligation to our customers" --

11       again, meaning doctors that they were detailing -- "to

12           direct them to locations that will without a doubt be

13           carrying our OxyContin line.  You should inform these key

14           doctors, nurses, physician assistants, and nurse

15           practitioners, et cetera, on your calls and have a list

16           available near their phones so they can take action

17           towards OxyContin prescriptions at a moment's notice."

18       According to Purdue, this particular pharmacist they were

19   dealing with advertised -- actively advertised to doctors and

20   patients in his area that Walgreens was a full-service pain

21   management pharmacy.  Even going so far as saying (as read):

22           "The doctors will have the assurance that the pain

23           meds will be filled by a pharmacist less likely to

24           question his or her prescribing habits."

25       According to Purdue, this pharmacist actively advertised

1  that, among other things, they would be -- Walgreens would be

2  accepting after-hours emergency Schedule II prescriptions

3  without a hassle.

4       In addition to this sort of collaboration between

5  Walgreens and Purdue and other manufacturers, Walgreens

6  actively sought out KOLs, key opinion leaders, and continuing

7  education courses for, among others, its own pharmacists.

8       Walgreens sought out speakers from Purdue's speaker

9  program with key opinion leaders to educate Walgreens'

10  pharmacists on opioid and pain management through continuing

11  education courses, and assured Purdue that the programs would

12  be distributed to Walgreens' pharmacists nationwide, and also

13  to recognize Purdue's sponsorship of the programs on Walgreens

14  website where pharmacists submit the forms for continuing

15  education credit.

16       Purdue was eager to comply and even agreed to fund the

17  continuing education programs for Walgreens because, as

18  Purdue's head of sales and marketing said in the year 2000

19  (as read):

20            "The last thing we want is for the OxyContin

21       prescription to be bounced out at the pharmacy level

22       because of uneducated fears from," quote, "the

23       'uneducated'" -- "unfounded fears" -- excuse me -- "from

24       the," quote, "'uneducated pharmacist."

25  The continuing education lectures and the programs that

1    they used invariably misrepresented critical aspects of opioids

2    and pain management.

3         For example, the program entitled "The Use of Opioids in

4    Chronic Noncancer Pain" by a gentleman by the name of Lipman,

5    whose name will come up again in a few minutes, instructed

6    Walgreens pharmacists that (as read):

7              "Addiction from prescription opioids was rare.

8         "Opioid -- excuse me -- "Iatrogenic" -- that's a hard word

9         to pronounce, but I understand -- I've learned that that

10        means doctor caused basically by treatment -- "Iatrogenic

11        addiction from opioid analgesia in patients experiencing

12        pain is exquisitely rare."

13        And also the promotion and the continuing education

14   material made reference to (as read):

15             "Addiction" -- "Addicts normally exhibit profound

16        drug-seeking behavior, but drug-seeking behavior is not

17        necessarily indicative of abuse.  Such patients have been

18        described in the oncology setting as pseudoaddicts.

19        Pseudoaddiction is appropriate drug-seeking behavior for

20        the purpose of comfort not abuse."

21        Walgreens sought hundreds of copies of these materials to

22   distribute to its pharmacists.

23        Why?  Because corporate Walgreens was concerned that the

24   pharmacists, or at least a good many of them, were skeptical at

25   that time about the appropriateness of the use of opioids for

chronic long-term purposes.

Purdue was also justly concerned that in the early period of OxyContin sales some pharmacists were skeptical of the use of opioids for chronic pain.

As the head of Purdue's sales and marketing wrote at the time (as read):

"There is so much misinformation at the retail pharmacist level, and the last thing we need is a retail pharmacist refusing to fill or questioning a prescription that one of your reps worked so hard to generate.  The issues at the retail level always seem to come back to unfounded fears of regulation and lack of knowledge of pain management terminology, such as physical dependence, addiction, abuse, diversion, et cetera."

Purdue saw the continuing education programs as a way for Purdue to forge a stronger alliance with Walgreens and at the same time deal with Walgreens' pharmacists who were concerned about opioid abuse.

Here is another internal Purdue e-mail exchange (as read):

"I spoke with Walgreens' district manager.  He was very pleased to hear that" -- "very pleased to hear that we have a pain CE" -- meaning continuing education -- "and he wants 150 of them so that he can mail them to all the pharmacists in his district."

"This will help us gain a stronger alliance with

1          Walgreens and help to fend off any remaining abuse issues

2          that are going through their stores."

3          Walgreens itself was quick to take action with pharmacists

4   who expressed concerns about opioid prescribing.

5          When one of Purdue's speakers reported back that some of

6   Walgreens' pharmacists who had attended a continuing education

7   program that he had presented were questioning doctors who were

8   prescribing OxyContin, Purdue contacted the Walgreens district

9   managers who promptly agreed to deal with the matter in this

10  way (as read):

11          "The district" -- this is the Purdue reporting what

12          they had learned from the district managers.  "The

13          district managers will send an e-mail to all stores" --

14          meaning all Walgreens stores -- "reinforcing

15          expectations."

16          Walgreens employees were keenly aware -- excuse me.

17          The continuing education programs were effective in

18  boosting sales of OxyContin and sales by Walgreens as Purdue's

19  analysis itself confirmed.

20          In March 2001, Purdue measured the impact on sales of

21  continuing education presentations in five rural towns in Utah,

22  and found that after Mr. Lipman or Dr. Lipman had presented

23  several continuing education programs in that area, this was

24  the result (as read):

25          "Interesting to note that range of OxyContin sales

 1          increases was anywhere from double to eight times that of

 2          the average prior to the lectures.  This is outstanding."

 3          Walgreens business employees were keenly aware of the

 4     impact of sales of OxyContin and other products and

 5     profitability and the importance of continuing education

 6     programs for persuading the pharmacists to fill prescriptions.

 7          As one Walgreens district manager told a Purdue

 8     representative (as read):

 9               "He informed me that a few pharmacists were afraid to

10          stock and dispense OxyContin because of theft.  He also

11          informed me that OxyContin is one of the most highly

12          profitable items to dispense and did not want to miss out

13          on any sales because of fear of theft or suspicion of

14          diversion.  He would like to personally educate and

15          mandate completion of continuing education programs by

16          Lipman on the use of -- excuse me -- on the use of opioids

17          in chronic pain at his biweekly meeting.  He supervises 30

18          pharmacists in his territory."

19          And, incidentally, the district manager they're talking

20     about here is a gentleman by the name of Richard Ashworth who

21     later became the president of Walgreens.

22          In order to make the Purdue-sponsored continuing education

23     programs more effective, Walgreens proposed that they be

24     presented on a regional basis.

25          And this is a Purdue internal e-mail again reporting on

1   the conversations they had had with Walgreens about that (as

2   read):

3            "For the first time ever Walgreens has agreed to a

4        regional approach.  Why was that important?  Because we

5        can hit a lot more pharmacists this way."

6   Purdue saw this as a great opportunity to address the

7   concerns they knew Walgreens pharmacists had with opioid

8   dispensing.

9            Another Purdue e-mail acknowledging (as read):

10           "We are hearing many concerns at the retail level."

11   Meaning concerns from pharmacists or about pharmacists.

12           "This would be a great educational opportunity to help

13       preserve the rights of the pain patients while helping to

14       further educate the Walgreens pharmacists."

15   Walgreens management of trade relations, a woman by the

16   name of Dawn DiLullo, thought that presenting testimonials from

17   high-dose opioid patients was a great way to get pharmacists

18   past their concerns.

19           Again, a Purdue e-mail reporting conversations with this

20   lady (as read):

21           "She suggested patient testimonials at these programs

22       to help the pharmacist in understanding the need for high

23       dosage levels given appropriately to meet people in need."

24   When Walgreens suggested that Purdue finance a continuing

25   education program which addressed human factors in pharmacy

1    errors, Purdue agreed and agreed to pay for it but only if they

2    could have one of their programs on pain management at the same

3    time.

4         This is, again, reflected in an internal Purdue document

5    (as read):

6              "I explained to Dawn that we could only support this

7         with a small contribution if we could have one of our

8         programs on pain management with this.  Dawn was in

9         complete agreement.  Walgreens was happy to oblige and

10        even asked for a disk, an electronic disk, of the pain

11        management program so they could" -- so that it could be

12        put up on Walgreens pharmacy website and available to all

13        Walgreens pharmacists nationwide."

14        It wasn't just Purdue that Walgreens cooperated --

15   collaborated with.  They held other manufacturers to sell

16   opioids as well.

17        For example, when Endo brought Opana to market, they

18   looked to Walgreens to help launch their new product and

19   Walgreens eagerly complied.

20        Here's an e-mail internal to Endo in which they were

21   reporting what they had accomplished with Walgreens (as read):

22             "I feel confident that our sales team will do the job

23        and pull this product off your shelves." I'm sorry.  This

24        is an e-mail from Endo to Walgreens.  "We need Walgreens

25        to make the launch of Opana a success."

1        Walgreens also collaborated with Endo to spread

2    misinformation about opioids and increase dispensing of opioid

3    products.

4        And this collaboration included continuing education

5    courses that emphasized the importance of the pharmacist as a

6    source of information for both laypersons and healthcare

7    professionals, and at the same time emphasized pro-opioid

8    messages such as the notion that opioid phobia was a source of

9    irrational fear and prejudice (as read):

10            "Pharmacists are the primary drug information

11        resource for laypersons and healthcare professionals.

12        Patients and physicians alike" -- this is from the

13        continuing education piece that they were using at the

14        time -- "Patients and physicians alike have various fears

15        and prejudices associated with the use of opioid

16        analgesics, which seems to unnecessarily limit the use of

17        this class of medicines.  The term 'opioid phobia' has

18        been coined to refer to these fears, which may be a result

19        at least in part of misunderstandings concerning the

20        concepts of addiction, physical dependence, and

21        tolerance."

22        So in sum, Walgreens was actively involved in the

23    promotion of opioids itself, not only to its own pharmacists to

24    overcome concerns that its own pharmacists had about the use of

25    opioids for chronic pain and for long-term periods but also to

1   patients and to doctors as well.

2       As our expert Anna Lembke will testify, she will explain

3   the Walgreens collaboration in greater detail than I have here

4   today with drug manufacturers and the consequences of that

5   collaboration.

6       I mentioned there were three primary bases for the

7   liability case against Walgreens.  The second has to do with

8   distribution and what you've heard about already, the whole

9   subject of suspicious order monitoring.

10      Walgreens had three distribution centers that distributed

11  Schedule II controlled drugs.  One was in Perrysburg, Ohio,

12  served the northwest for the most part -- northeast, excuse me,

13  for the most part; second in Jupiter, Florida, where my mother

14  lives, by the way; and then, finally, the third was in

15  Woodland, California, near Sacramento.

16      From as far back as the 1980s to at least 2012, Walgreens

17  had no system which satisfied its legal obligations to identify

18  and investigate suspicious orders.

19      The system they did have, if it could be called a system,

20  involved, one, no due diligence or investigation of suspicious

21  orders; two, no reporting to the DEA upon discovery of

22  suspicious orders, and orders were shipped routinely despite

23  knowledge on the part of Walgreens as a distributor of their

24  suspicious nature.

25      To the extent they had any sort of program to identify

1    suspicious orders, this is how they described it to DEA

2    investigators in about 2006 I believe this is from, and this is

3    reflected in an internal Walgreens memorandum (as read):

4            "The explanation of the formula is all stores are put

5        into groups of 25 based on the amount of daily

6        prescriptions filled.  The average from these stores is

7        then taken from the orders to the DC" -- that is

8        distribution center -- "on each group of 25" -- so they

9        are putting 25 stores together, take an average on a

10       monthly basis of what the size of their orders is -- "and

11       then the trigger is equal to the average order times the

12       DEA factor."

13       And what was the DEA factor?  Three.  So what that means

14   is that unless an order from a pharmacy to the district -- the

15   distribution center exceeded by three times the average orders

16   for that store and its group of stores, it was not deemed

17   suspicious.  It passed through undeterred.

18       After the visit on that occasion from the DEA to the -- it

19   was the Perrysburg center incidentally, Walgreens wrote

20   internally (as read):

21           "After that inspection, the DEA specifically

22       informed" --

23       I'm sorry.  Let me back up.  This is what the Walgreens

24   memorandum that I was referring to reported internally about

25   what the DEA had orally advised the representatives of

1    Walgreens at the distribution center (as read):

2             "The DEA feels that the suspicious order report is

3         inadequate.  They specifically did not like the DEA factor

4         and would like to know how we determine it.  They said the

5         formula should be based on size, pattern, and frequency."

6         And I'll note that there are records within Walgreens that

7    show that Walgreens was fully aware of the size, pattern, and

8    frequency formula way back in the 1990s, if not before, and

9    note that the actual formula they were using at the time

10   involved only size.  That's three times the prior order.

11        It had no formula for identifying suspicious patterns or

12   for identifying frequency as a basis for concern or suspicion

13   with respect to an order.

14        For at least as early as 2006, the DEA repeatedly informed

15   Walgreens that it was not in compliance with its legal

16   obligations under the Controlled Substances Act and the

17   applications under that, but to no avail.

18        After a visit from the DEA to the Perrysburg center,

19   Walgreens wrote as I've indicated.

20        After that inspection, the DEA specifically informed

21   Walgreens in writing that the suspicious order -- excuse me --

22   the suspicious ordering of controlled substances program in use

23   at Walgreens was not in compliance with the statute and

24   regulations.

25        And this is an excerpt from that letter written in,

1    I believe, May of 2006 with respect to the investigation and

2    visit that had occurred two or three months earlier (as read):

3              "The formulation utilized by the firm for reporting

4         suspicious ordering of controlled substances was

5         insufficient."

6         And the DEA went on to quote for Walgreens the

7    requirements of the regulation, that requires the registrant

8    design and operate a system to disclose to the registrant

9    suspicious orders of controlled substances and inform the DEA

10   of suspicious orders.

11        Now, Your Honor, I think I'm at the point where I need

12   to -- well, is this one all right?  I don't want to get afoul

13   of what we've agreed to here.  Slide 58?

14        **MS. SWIFT:**  I'm sorry, sir.  I don't know what

15   agreement you're speaking about.

16        **MR. HEIMANN:**  Our collective agreement not to

17   display --

18        **THE COURT:**  Why don't you go over and talk to her?

19        **MR. HEIMANN:**  Yeah.

20                  (Pause in proceedings.)

21        **MR. HEIMANN:**  Thank you, Your Honor.

22        All right.  I think at this point, Your Honor, I have to

23   hand up the slides that we're going to be talking about.

24        **THE COURT:**  Okay.  Just give it to Ms. Scott, but

25   identify it as a number.  Is there a number to it?

 1          Okay.  So I'm being handed Plaintiffs' Exhibit 20656, and

 2     now I'll read it.  I assume that's why you're giving it to me.

 3                         (Pause in proceedings.)

 4          **MR. HEIMANN:**  So I should have a blank here.  Yeah,

 5     all right.

 6          So I was saying, the internal audit function, if you will,

 7     Your Honor, at Walgreens repeatedly informed corporate that the

 8     company was in violation of its obligations and was

 9     systematically filling suspicious orders that could lead to

10     diversion of controlled drugs.

11          Now, when I say "the internal audit function," I mean that

12     arm within Walgreens company that was responsible for

13     reviewing -- and for purposes of compliance -- the conduct of

14     the company.

15          And with respect to the suspicious order monitoring

16     obligation and responsibility, that internal audit function

17     repeatedly informed corporate Walgreens in Chicago that they

18     were not in compliance with the regulations.

19          **MS. SWIFT:**  Your Honor, I apologize truly for

20     interrupting.  I understand that the document is on the screen

21     for all to see.

22          **THE COURT:**  Oh.  Why is it on the screen?

23          **MR. HEIMANN:**  I didn't think that it was.  This is

24     Number -- you said Number 79, and the only one that's on the

25     screen is 78.

 1              MS. SWIFT:  My apologies.  It's the same.  It's the

 2     same document.

 3              THE COURT:  Well, we'll take it off the screen.

 4                         (Pause in proceedings.)

 5              THE COURT:  Thank you.

 6              MR. HEIMANN:  All right.  Sorry, Your Honor.

 7              THE COURT:  No.  But, I mean, I want it clear, it is

 8     the parties' responsibility for what goes on the screen.  So

 9     just be mindful of that responsibility.

10              MR. HEIMANN:  Yes, Your Honor.

11              THE COURT:  Thank you.

12              MR. HEIMANN:  The internal audit function in this

13     incidence reported that (as read):

14              "Walgreens is submitting this monthly suspicious

15         control drug orders report to the DEA with numerous

16         instances of filled suspicious controlled substance

17         orders.  Also, there is no monitoring process in place to

18         stop a suspicious order to assess if the order is

19         suspicious or not."

20              MS. SWIFT:  Your Honor, once again, my apologies.

21              THE COURT:  You don't have to apologize.  What is

22     the --

23              MS. SWIFT:  He's reading from the document.

24              THE COURT:  Yeah.  I wondered about that.

25         I don't think you can read it.  The point is that --

 1   there's an argument that this is privilege, this is a

 2   privileged document.

 3        So I'll read it.  I can read it.  Obviously I'd have to

 4   make that -- I'd have to read it to make a determination.

 5        So I'm going to strike your reading of it from the record,

 6   and I'll read it as I have.  So I think we can move onto the

 7   next document that you want me to read, and I'll read it, but

 8   do not show it.

 9        Is it -- the next document is also purportedly privilege

10   or not?

11             MS. SWIFT:  It's slides 78 through 86, which are

12   different excerpts, I believe, all from the same document.

13             THE COURT:  Okay.  So --

14             MR. HEIMANN:  No.  That's not correct, Your Honor.

15   May I?

16             THE COURT:  Well, anyway, be guided by the fact that

17   if it's --

18             MS. SWIFT:  It is those slides.

19             THE COURT:  If Walgreens' counsel has identified them,

20   don't -- you can point me to them.  I'll read them myself, but

21   don't recite them into the record.

22             MS. SWIFT:  Thank you, Your Honor.

23             THE COURT:  I'll mark this for the record so that it's

24   clear in any reviewing court what I have seen and what I

25   haven't seen.  Is that satisfactory?

```
 1              MS. SWIFT:  Yes.  Thank you, Your Honor.

 2              THE COURT:  Okay.  All right.

 3              MR. HEIMANN:  So the exhibits in question, if I may,

 4    Your Honor, Exhibit 20656 --

 5              THE COURT:  Okay.  And I've read that.

 6              MR. HEIMANN:  -- and 20658 --

 7              THE COURT:  Okay.  Let me read it right now to myself.

 8                   (Pause in proceedings.)

 9              THE COURT:  I've read that.

10              MR. HEIMANN:  There are three excerpts from that

11    exhibit.

12              THE COURT:  Okay.  I'm on the page 81 of that.

13                   (Pause in proceedings.)

14              THE COURT:  Now I'm on page 82 of it.

15              MR. HEIMANN:  Yes, Your Honor.

16                   (Pause in proceedings.)

17              THE COURT:  Okay.  Thank you.

18              MR. HEIMANN:  And then Exhibit 57.

19              THE COURT:  57?  I'll read that to myself.

20                   (Pause in proceedings.)

21              THE COURT:  And now I'll read page 84.  It's

22    Plaintiffs' Exhibit 57.

23              MR. HEIMANN:  Yes, Your Honor.

24                   (Pause in proceedings.)

25              THE COURT:  Page 85.  This is now Plaintiffs' Exhibit
```

 1   19904, is that also --

 2        **MR. HEIMANN:**  Yes, Your Honor.

 3        **UNIDENTIFIED SPEAKER:**  [Inaudible.]

 4        **COURT REPORTER:**  I'm sorry --

 5        **THE COURT:**  You have to -- first of all, anybody who

 6   speaks has to identify who they are, not like "Voice Heard From

 7   Body of Courtroom."

 8       So if you want to speak, you have to be in front of a

 9   microphone and you have to identify yourself, and I don't know

10   who you are.

11        **MR. BUDNER:**  Apologies, Your Honor.

12        **THE COURT:**  That's okay.

13        **MR. BUDNER:**  Kevin Budner from Lieff Cabraser on

14   behalf --

15        **THE COURT:**  From where?

16        **MR. BUDNER:**  -- on behalf of the People.

17       I only wanted to clarify that Your Honor is viewing the

18   slide -- what we've been calling the exhibit numbers are the

19   slides from the deck and the actual underlying exhibit is in

20   Tab 4 of your binder, if you'd like to review it, the

21   underlying exhibit itself.

22        **THE COURT:**  The underlying exhibit is, sorry, what?

23        **MR. HEIMANN:**  What he's saying is the full exhibit is

24   in your binder.  These are just excerpts from that exhibit.

25        **THE COURT:**  Oh.  Okay.  I appreciate that.  Thank you.

OPENING STATEMENT / HEIMANN

1    Thank you for that clarification.

2         So when I refer to Plaintiffs' Exhibit 19904, the full

3    exhibit would be in the binder?

4              MR. HEIMANN:  Yes.

5              THE COURT:  And this is page 85 of that full exhibit,

6    I guess.

7              MR. HEIMANN:  Yes.

8              THE COURT:  I mean, it has 85 on it.  Or is it some

9    other page?

10             MR. BUDNER:  Your Honor, my apologies again.  Kevin

11   Budner for the People.

12        The page number 85 just refers to the slide number in the

13   deck.  It's not a page number of the exhibit.

14             THE COURT:  Okay.  It's a slide number in the deck.

15   Okay.  I'll read it in any event.  Okay.

16                       (Pause in proceedings.)

17             THE COURT:  And Slide Number 86, okay.

18                       (Pause in proceedings.)

19             THE COURT:  Now, I do have a question about the

20   document itself, which is who prepared this?  As I understand

21   it -- and you can chime in, Counsel -- as I understand it, this

22   document was prepared as a -- from the internal audit division,

23   if we can call it that -- I don't know what to call it,

24   section -- of Walgreens to be presented to a higher management

25   or management of Walgreens.

```
 1              MS. SWIFT:  Correct, in addition to counsel,
 2     Your Honor.
 3              MR. HEIMANN:  Well --
 4              THE COURT:  In addition -- in other words, it was
 5     prepared for both of those entities?
 6              MS. SWIFT:  That's correct, Your Honor.
 7              THE COURT:  Okay.  And I will entertain some
 8     discussion about that when we get to it.  You've objected to it
 9     on privilege grounds.
10          Have you addressed it in a -- in a brief or not?
11              MS. SWIFT:  Not before Your Honor, no.  We've
12     addressed it in front of Judge Polster.
13              THE COURT:  Okay.  Okay.
14              MS. SWIFT:  It hasn't come up until just now in front
15     of you.
16              THE COURT:  All right.  Okay.  But before
17     Judge Polster was it briefed or was it not briefed?
18              MS. SWIFT:  It was briefed, Your Honor.
19              THE COURT:  Okay.  All right.  Thank you.
20          We'll move on.  I now have read this, but we don't want to
21     show it.  Okay.
22                        (Pause in proceedings.)
23              THE COURT:  Go right ahead, Mr. Heimann.
24              MR. HEIMANN:  Yes, Your Honor.  I want to make sure I
25     don't --
```

 1          **THE COURT:**  Right.  I appreciate that.

 2          **MR. HEIMANN:**  I'm trying to get my slides correct so I

 3     don't put up the wrong -- let me do this, Your Honor.

 4          I think it's important for me to summarize what Walgreens

 5     was actually doing with respect to suspicious order monitoring

 6     program.

 7          What they actually did was this:  They had this three

 8     times trigger we were talking about.  And as it turns out, over

 9     many years that times trigger actually identified -- hit a

10     great many times.

11          Despite the fact that it was hitting on orders, the orders

12     were not investigated in any way, shape, or form and instead

13     were simply shipped.

14          And then at the end of the month, or sometimes on a

15     quarterly basis, the distribution centers would send to the

16     DEA -- the appropriate office of the DEA a massive list of all

17     of the orders that had hit as suspicious but had been shipped

18     anyway without any sort of investigation or review to determine

19     whether it was appropriate to ship those orders.  In fact,

20     witnesses have described the size of those reports as phone

21     book size.

22          So what the point here is, Walgreens was actually

23     identifying, according to their substandard at best system,

24     based only on size multiple orders that were suspicious but

25     shipping them and conducting no due diligence and not informing

1  the DEA of those shipments until after the fact, all clearly in

2  violation of what they had to have known their obligations were

3  because they were told repeatedly by the DEA what their

4  obligations were.

5      And all they had to do to know what their obligations were

6  was to read the federal regulation.

7          **THE COURT:**  Okay.

8          **MR. HEIMANN:**  And all of that was acknowledged

9  multiple times by internal audit and communicating to

10  management.

11      Now, I need to get to Slide 87, please.  Thank you.

12      All right.  So we've been talking about internal audit

13  reports in the year 2007-2008.

14      Almost two years later in an internal e-mail circulated

15  widely to corporate Walgreens, Walgreens divisional VP of

16  supply chain wrote concerning the still unchanged suspicious

17  order monitoring system, and this is what he wrote at the time

18  (as read):

19          "I recall the old paper report as being inches

20          thick" -- he's talking about that monthly report that I

21          just described -- "inches thick full of suspicious orders

22          that they had filled."

23      He goes on to say (as read):

24          "We were instructed in 1985 not to review or contact

25          anyone on the data."

1      And then he poses this question (as read):

2          "Who from your group has been reviewing the data

3      collected for the past 25 years?"

4          THE COURT:  Sorry.  This document was sent to whom?

5          MR. HEIMANN:  I'd have to blow it up.  It's an e-mail

6   and you can see the recipients of the e-mail.  There are

7   probably a dozen or more.

8          THE COURT:  Well, can you categorize the position of

9   the person who received the e-mail?

10         MR. HEIMANN:  My understanding is that they were

11  employees of Walgreens mostly, if not all, headquartered at

12  their corporate headquarters in Chicago.

13         THE COURT:  Okay.

14         MR. HEIMANN:  I could be wrong about that.

15         THE COURT:  Well, we'll see.  I mean, that's what the

16  trial is about in part.

17         MR. HEIMANN:  And, by the way, we couldn't find an

18  answer as to who has been reviewing the data for the past

19  25 years.

20      I don't think it was a rhetorical question; but, in any

21  event, I don't believe the author of this question got an

22  answer.

23      Moving on, if I may, Your Honor.  In September 2012 -- so

24  now we've moved on a few years later -- the DEA issued an order

25  to show cause and immediate suspension -- I didn't know when

 1   Your Honor wanted to stop for lunch so --

 2            **THE COURT:**  No, no, no.  I want to go to 12:15 if we

 3   can.

 4            **MR. HEIMANN:**  Very well.

 5        In September 2012, the DEA issued an order to show cause

 6   and immediate suspension of registration.  That's important.

 7        Immediate suspension of registration means the DEA has

 8   decided that the situation is so critical that it is imperative

 9   to stop, in this case, the distribution from this Jupiter

10   facility immediately.  Not to simply bring a charge and

11   subsequently litigate it but, rather, to stop the distribution

12   in its tracks.

13        And that was with respect to the Jupiter, Florida,

14   distribution center and also involved similar action with

15   respect to a number of pharmacies located -- Walgreens

16   pharmacies located in Florida alleging gross violations of

17   Walgreens duties and responsibilities with respect to

18   suspicious order monitoring.

19        In December of 2012, Walgreens' head of a newly created

20   group called Pharmaceutical Integrity -- Pharmaceutical

21   Integrity was a group that was created in late 2012, early 2013

22   directly as a consequence of DEA action being taken against

23   Walgreens having to do both with their distribution failures

24   and their dispensing failures that were resulting in diversion

25   of narcotic drugs.  And you'll hear more about them, a little

1  bit more from me today and a great deal more during the course

2  of the evidence at trial.

3      In December of 2012, the Walgreens head of the newly

4  created then Pharmaceutical Integrity Group wrote that the DEA

5  was seeking actions against their registrations.

6      And that's exactly what they were, registrations,

7  particularly of the Jupiter facility, meaning the Jupiter

8  facility as a DEA registrant.  And what the DEA was proposing

9  to do to was pull that registration, which would mean the DC,

10  distribution center, would be out of business altogether.

11      And she said in the e-mail that the head of Pharmaceutical

12  Integrity wrote at that time, that they were demanding --

13  "they," the DEA was demanding civil penalties totaling hundreds

14  of millions of dollars.

15      She also acknowledged in that e-mail that the DEA had

16  confirmed orally that additional regulatory actions were

17  pending against other Walgreens distribution centers -- there

18  were only two others.  One is in Woodland and the other in

19  Perrysburg, Ohio -- regarding Walgreens' failure to comply with

20  federal law with respect to distribution.

21      And then she added this (as read):

22          "In response, the company has enhanced its suspicious

23      order monitoring program for controlled substances in an

24      effort to convince DEA that the proposed penalty is

25      excessive."

1          But, in fact, the DEA continued its investigation of

2     Walgreens' distribution practices.   In February of 2013, the

3     DEA subpoenaed records from the Perrysburg distribution

4     center -- so now they've closed the Florida center and now

5     they're moving on to Perrysburg -- looking for suspicious

6     orders dating back from February 2011.   I'm paraphrasing from

7     an e-mail, internal e-mail, at Walgreens that reported this.

8          Walgreens' personnel at Perrysburg, who were obviously

9     familiar with the ordering and fulfilling practices at

10    Perrysburg at the time, believed in response to that subpoena

11    that it was only a matter of a short period of time before they

12    got closed down.

13         This is an e-mail internal (as read):

14              "In response, the company" -- "Last week the DEA came

15         into Perrysburg with subpoenas looking at records for

16         suspicious drug ordering dating back to February 2011.  We

17         believe they could lock Perrysburg up and not allow us to

18         ship from there."

19         They were right.  They went on to say (as read):

20              "With respect to" -- This is CII.  That's a reference

21         to Schedule II narcotics -- "Perrysburg will continue to

22         pick" -- that's the term that was used meaning pick, pull

23         drugs from the shelves and send them off to their

24         Walgreens stores -- "what they can until the DEA comes and

25         shuts them down."

1      In 2013, Walgreens entered into a settlement with the DEA

2  in which it admitted violations relating to distributing

3  controlled substances.

4      And here's just a portion of the memorandum of agreement

5  that was entered into at that time (as read):

6          "Acknowledges that suspicious order reporting for

7      distribution to certain pharmacies did not meet the

8      standards identified by DEA."

9      And you'll remember those three letters that we talked

10 about earlier.  This is with reference to the Jupiter DC

11 specifically, but obviously it had greater implications, given

12 the same practices that were followed in Jupiter were followed

13 in Perrysburg and in the Sacramento facility, Woodland

14 facility.

15     In addition, Walgreens agreed to pay a world record fine

16 at the time of $80 million.  I may be overstating world record,

17 but an enormous fine at the time of $80 million.

18     At about that same time, Walgreens corporate came to the

19 realization that they weren't going to be able -- I'm inferring

20 this now -- to really operate distribution centers that would

21 be operated in compliance with the law, and so they made a

22 decision to get out of the business of distributing Schedule II

23 drugs from their distribution centers.

24     That decision was implemented largely in the year 2013,

25 and Walgreens' involvement in the business of distributing

1   Schedule II drugs came to an end at that point.

2       Two other points on the distribution point before we

3   break.  This is testimony from John Coman.  John Coman was the

4   manager of the distribution center up in Woodland, and at the

5   end of his deposition he was asked after having gone through

6   any number of materials having to do with the operations of

7   that distribution center with respect to suspicious order

8   monitoring (as read):

9           "Looking back on the documents that we reviewed today

10      that begin in 2008 and similar notations that continue

11      until 2011, do you believe that Walgreens deployed

12      adequate resources within Woodland to perform due

13      diligence on suspicious orders?"

14      He had a one word answer, "No."

15      Finally, if I may, Ms. Baig has made reference to our DEA

16  diversion investigator James Rafalski.

17      Mr. Rafalski will testify that Walgreens failed to

18  maintain effective controls against diversion of prescription

19  opioids into the illicit market in violation of the applicable

20  federal regulation; that Walgreens failed to design and operate

21  a system to monitor and detect suspicious orders of controlled

22  substances by its pharmacies in San Francisco and, for that

23  matter, nationwide in violation of the security requirement of

24  the same C.F.R.; and failed to conduct adequate due diligence

25  on suspicious orders of opioids placed by Walgreens' pharmacies

 1   in San Francisco.

 2        And last but not least, if I may, Your Honor, in order to

 3   engage the impact -- remember, we're talking about suspicious

 4   orders, some of which may be okay, many of which probably

 5   weren't; but in order to gauge the impact of Walgreens'

 6   disfunctional suspicious order monitoring program on diversion

 7   of controlled substances in San Francisco, our experts analyzed

 8   the shipments of opioids to Walgreens stores in San Francisco

 9   for the period 2006 to 2014.

10        My understanding is they looked at all of the orders --

11   all the orders from San Francisco pharmacies that went to -- at

12   least to the Woodland facility because that's the distribution

13   center that would have fed San Francisco, using several

14   different methodologies to identify suspicious orders;

15   methodologies that were both used by some manufacturers and

16   distributors and others that the experts concluded were

17   appropriate means for identifying suspicious orders.

18        And the results of that analysis showed on a highly

19   conservative -- and I want to emphasize this -- on a highly

20   conservative basis that of those shipments, somewhere in the

21   range of 20 to 25 percent were actually suspicious and should

22   never have been shipped.

23        And that brings me to the end of the presentation on

24   distributions and Walgreens, Your Honor.

25            THE COURT:  Okay.  Let me ask you, Mr. Heimann.  How

1    much longer do you have today to roughly, ballpark?

2          **MR. HEIMANN:**  My next subject is the third component

3    of the case against Walgreens' dispensing.  That's probably 45

4    minutes.  And then Ms. Baig will follow-up with the impact on

5    San Francisco, and she promises me that won't take more than an

6    hour.

7          **MS. BAIG:**  Less than an hour.

8          **THE COURT:**  That will conclude, then, your opening?

9          **MR. HEIMANN:**  Yes.

10         **THE COURT:**  All right.  So let's resume at

11   1:00 o'clock.  45 minutes for lunch.  Thank you.

12         **MR. HEIMANN:**  Thank you, Your Honor.

13              (Luncheon recess was taken at 12:14 p.m.)

14   **AFTERNOON SESSION**                              **1:00 p.m.**

15         **THE COURT:**  Let the record show that all parties are

16   present.

17         Before we commence with the opening statement, I want to

18   just turn back for a moment to the document to which a

19   privilege objection has been raised.

20         My understanding is that this document or series of

21   documents -- and I should address Walgreens -- was presented to

22   Judge Polster in the trial which he had before a jury and that

23   he ruled -- he permitted it; is that correct?  Or did not?

24         **MS. SWIFT:**  Not exactly, Your Honor.  He ruled on it

25   long -- well, before trial.

**PROCEEDINGS**

1          **THE COURT:**  Well, whenever.  I mean, was --

2          **MS. SWIFT:**  He ruled on it before trial.  It did not

3  come up at trial.

4          **THE COURT:**  Oh, it didn't even come up at trial?

5          **MS. SWIFT:**  It did not.

6          **THE COURT:**  So it's never been -- has it ever been

7  published -- quote, "published"; that is, released in a public

8  forum?

9          **MS. SWIFT:**  I'm honestly not sure, Your Honor.  It's

10  been used at depositions.  We object.  It's been produced over

11  our objection in a number of cases.

12          **THE COURT:**  Well, has it -- well, I have a slightly

13  different question, and it may or may not make a difference.

14  But has it been released publicly?  Not whether it's been with

15  Walgreens' consent.  I'm just saying, is it out there or is it

16  not out there?  If you know.

17          **MS. SWIFT:**  I don't know.  I don't believe so, but I

18  don't know, honestly.

19          **THE COURT:**  Okay.  So let's do this:  If you would be

20  so kind, would you identify the docket numbers in which you --

21  and I assume opposition submitted briefs --

22          **MS. SWIFT:**  Yes.

23          **THE COURT:**  -- on this subject and Judge Polster ruled

24  on the subject.  Can you just, you know, get your, you know,

25  your friends there --

 1          MS. SWIFT:  We'll do that.

 2          THE COURT:  -- your friends to find out where on

 3   docket that is?  Then I'll have access to it, I assume.

 4          MS. SWIFT:  We'll do that right away.  Thank you,

 5   Your Honor.

 6          THE COURT:  Okay.  Well, I'm not going to do it right

 7   away.  I'm going to listen to the rest of the discussion, but

 8   at your convenience if you could give it to me, that would be

 9   helpful, yes.

10      All right.  Let's continue.  Thank you.

11          MR. HEIMANN:  All right, Your Honor.  May it please

12   the Court, as I mentioned just before we broke, we're moving oh

13   now to the dispensing -- liability case having to do with

14   dispensing practices and procedures at Walgreens.

15      Let me start with what's called corresponding

16   responsibility, if I may.  And, again, we're talking now about

17   a federal regulation, 21 C.F.R. 1306.04.

18      The responsibility for the proper prescribing and

19   dispensing of controlled substances is upon the prescribing

20   practitioner, the doctor, but the corresponding responsibility

21   rests with the pharmacist who fills that prescription.

22      And what is that corresponding responsibility?  To ensure

23   that all prescriptions are valid and issued for a legitimate

24   medical purpose by a practitioner authorized by law while

25   acting in the usual course of his -- is that the regulation? --

**OPENING STATEMENT / HEIMANN**

1   his or her professional practice.

2       What does that mean in practical terms for pharmacists?

3   Pharmacists have an obligation to identify indicia of possible

4   diversion, commonly known in the industry and has been known

5   for years in the industry as red flags, and to resolve any red

6   flags before filling the prescription.

7       Let me emphasize that last point "resolve any flags before

8   filling the prescription."

9       And it is the responsibility of the pharmacist to execute

10  sound professional judgment in doing so.

11      So there is an obligation in terms of resolving the red

12  flags to look at the red flag, to examine it, maybe to conduct

13  an investigation in order to come to the conclusion whether or

14  not it is or is not answerable in terms of whether or not the

15  prescription should be fulfilled -- or filled.  Excuse me.

16      But the pharmacies also have a corresponding

17  responsibility to their pharmacists.  First, to create systems

18  and programs to enable pharmacists to perform their

19  corresponding responsibility; second, to train pharmacists to

20  comply with their corresponding responsibility; and, finally --

21  and this will become very important as we move forward into the

22  evidence -- to provide pharmacists adequate time to perform

23  their corresponding responsibility.

24      Beginning at least by the mid-1990s Walgreens had what

25  they called or characterized as a good faith policy or good

1    faith practices, and that was intended to address the

2    corresponding responsibility of pharmacists to identify red

3    flags and to investigate red flags.

4        At that time there were only seven red flags in the system

5    or in the documentation of their policy that remained unchanged

6    for more than a decade.

7        But, perhaps, more importantly, during the period up until

8    June of 2012, Walgreens utterly failed to promulgate and

9    implement any kind of system to afford its pharmacists the

10   means to resolve red flags.

11       Now, why do I say that?  Well, here's what the pharmacists

12   were instructed to do when they identified red flags during

13   that time period (as read):

14           "If a pharmacist is unable to dispense" -- this is

15           one iteration of the written policy -- "If a pharmacist is

16           unable to dispense a prescription in good faith" -- and

17           what that is a reference to in context is, if the

18           pharmacist identifies one or more red flags that would

19           unless dispelled would prevent the pharmacist from

20           dispensing in good faith, so this is a reference to

21           identifying a red flag, that's just a long-winded way of

22           saying if they identify a red flag -- "they are to contact

23           the prescriber" -- this is the instruction to the

24           pharmacist -- "contact the prescriber and confirm or

25           clarify the prescription."

OPENING STATEMENT / HEIMANN

1     And if the prescriber says it is valid, that's it.  Fill

2     the prescription.  Nothing more.  Nothing more.

3     Now, language to this effect in one form or another was in

4     the -- in all of the prescribing policies practices at

5     Walgreens up until June of 2012.  So for more than -- well over

6     a decade.

7     Now, I would submit to Your Honor that on the evidence,

8     this is an utter abrogation entirely of the corresponding

9     responsibility on pharmacists to simply go back to the doctor.

10    Some of the red flags, I'm not going to go into them in

11    detail now, but some of the red flags would have involved

12    aberrant behavior on the part of the prescriber; pill mill

13    doctors, for example.

14    But what pharmacists were told at Walgreens is:  No matter

15    what the nature of the red flag that you uncover, simply call

16    the doctor.  If the doctor says it's okay, that's it.  Fill the

17    prescription.

18    An example I'm going to give you of what that really means

19    in practice comes from recent testimony by a Walgreens former

20    employee in the Florida Attorney General trial.

21    The witness in question is Christine Lucas.  Christine

22    Lucas was in charge of the Jupiter distribution center

23    dispensing of -- excuse me, not dispensing -- distributing CII,

24    Schedule II, drugs to the various pharmacies.  She was the one

25    who did basically the mechanical distribution to the pharmacies

 1   that ordered from Jupiter.

 2        In about 2009 or 2010 -- I'm not sure the precise date --

 3   the law in Florida changed.  Up until that time, prescription

 4   clinics were allowed to prescribe and fill prescriptions for

 5   opioid drugs directly.

 6        And there were at that time a good many of these pain

 7   mills, I would call them, and that was causing a serious

 8   problem with dispersion because of over-distribution or

 9   overprescribing and dispensing of drugs.

10        So the law in Florida changed, and what the change

11   amounted to is these clinics could no longer dispense directly

12   so they had to send their prescriptions to pharmacies like

13   Walgreens to get filled instead.

14        And that led to an enormous increase almost overnight of

15   prescriptions being presented to pharmacies like Walgreens, and

16   that in turn led to an incredible increase in orders by

17   Walgreens' pharmacies to the distribution center.

18        The magnitude of those orders was off the wall and was

19   noticed as such by, among others, Christine Lucas who raised

20   questions about it, including sending e-mails on multiple

21   occasions up to Walgreens corporate asking:  What's going on?

22   Is anybody looking at these orders to see whether or not

23   they're legitimate or not?

24        And one of the things that she did when she was wrestling

25   with this issue, is she talked to some of the pharmacists who

1   were placing these orders with the distribution center to find

2   out about what they were thinking and what they were doing.

3        And this is what she testified to about the conversations

4   that she had with some of those pharmacists when she was trying

5   to figure out why they were ordering such extraordinary

6   quantities of drugs for their stores.

7                    (Video was played but not reported.)

8        **MR. HEIMANN:**  "I'm not a doctor.  I'm a pharmacist."

9   So they were following essentially Walgreens' policy:  If the

10  doctor says it's okay, dispense.  That's the end of your

11  responsibility.

12       That, as I suggest to Your Honor, is an abrogation of

13  their obligation under corresponding responsibility.

14       Now, that did finally change, but it didn't change until

15  June of 2012.  And you remember the timing of some of the stuff

16  I said earlier to you.

17       The DEA was hard onto Walgreens beginning in 2009 -- I'll

18  come back to that in a minute -- and in 2012 is when they shut

19  down the Jupiter facility completely in December of 2012.

20       So what was that change?  Here is the language from the

21  June 2012 policy (as read):

22            "If the prescriber informs the pharmacist" -- this is

23            another situation I've left off the beginning part, which

24            is "If you identify a red flag, you identify one or more

25            red flags, contact the prescriber.  If the prescriber

1          informs the pharmacist that a prescription for a

2          controlled substance is valid but" -- and here's where the

3          corresponding responsibility comes into play -- "but the

4          pharmacist determines that the elements of good faith

5          dispensing are not present, the pharmacist has a

6          responsibility to refuse to dispense."

7          That's what corresponding responsibility is all about,

8    that which has been abrogated for all of the years leading up

9    to June of 2012.

10          But how did that change come about?  Was that something

11   that Walgreens identified themselves and voluntarily realized,

12   "Oh, we haven't been doing that right"?  Not a chance.

13          In September of 2009, the DEA issued an order to show

14   cause to Walgreens with respect to a pharmacy in San Diego

15   asserting multiple violations of the Controlled Substance Act

16   with respect to this dispensing of controlled substances by

17   that pharmacy.

18          These included dispensing controlled substances to

19   individuals based on prescriptions by physicians not even

20   licensed in California, dispensing controlled substances to

21   individuals located in California based on internet

22   prescriptions where the doctors hadn't even seen the person to

23   whom the medications were prescribed, and dispensing controlled

24   substances to individuals that Walgreens knew or should have

25   known were diverting the controlled substances, and, finally,

 1  refilling prescriptions too early.

 2       And that's an important red flag obviously.  If you've got

 3  a patient that's coming back 10 days early or 15 days early and

 4  asking for a refill, that's a red flag.  That may be someone

 5  who's using opioids not for medical purposes but because

 6  they're addicted.

 7       In internal e-mails Walgreens corporate explained the

 8  connection between the DEA's action in this regard and the

 9  revisions they made to their dispensing policies, and that's

10  right here.

11       This is the then head of Pharmaceutical Integrity,

12  I believe, writing (as read):

13            "We are having to enter into an agreement with the

14       DEA based on an issue in a California store."

15       The agreement she's referring to was one that the DEA

16  insisted on include a compliance program and procedures to

17  identify red flags, procedures that had not existed before, a

18  program that simply did not previously exist in any form or any

19  coherent form.

20       The DEA also insisted that Walgreens provide periodic

21  training to its employees for dispensing controlled substances

22  training which did not exist at that time either.

23       So in March of 2011, Walgreens entered into a memorandum

24  of agreement arising out of this action against the San Diego

25  pharmacy with the DEA and the Department of Justice, which

 1   provided in part that Walgreens agrees to maintain a compliance

 2   program to detect and prevent diversion of controlled

 3   substances as required by the CSA, the Controlled Substances

 4   Act, and applicable regulations.

 5       And the program was to include procedures to identify the

 6   common signs associated with diversion, meaning red flags,

 7   including, but not limited, to doctor shopping and requests for

 8   early refills and the sort; and the program shall include

 9   routine and periodic training of Walgreens' employees,

10   particularly their pharmacists, in their obligations to perform

11   their corresponding responsibilities under the CSA.

12       Now, as I mentioned, that was in March of 2011, but it

13   still wasn't more than a year before they finally changed that

14   "just rely on the doctor" policy because that didn't come about

15   until June of 2012.

16       But, once again, that change was linked to action by the

17   DEA, not voluntarily undertaken by Walgreens.  And that's,

18   again, shown in another e-mail or this is -- I think this is

19   either an e-mail or a PowerPoint presentation that was made by

20   the Pharmaceutical Integrity folks through others at Walgreens,

21   and it links the June 2012 change directly to the DEA action

22   (as read):

23           "Due to recent action taken by the DEA, select

24       policies and procedures have been updated to ensure our

25       pharmacists and stores are compliant with dispensing

1      controlled substances."

2         In November 2012, Walgreens' personnel attended

3   presentations by representatives of the DEA at the National

4   Association of Boards of Pharmacy, I think it's called, an

5   organization that is for pharmacists and pharmacies.

6         Walgreens -- at that meeting were representatives of the

7   DEA, including a name that Your Honor will become familiar with

8   as we go forward, Joseph Rannazzisi, who was the then head of

9   disbursement enforcement at the DEA, and he was the author,

10  incidentally, of those three letters from 2006 and 2007 that we

11  talked about this morning.

12        And among the notes that the Walgreens people who were in

13  attendance at that meeting took about what Mr. Rannazzisi had

14  to say at that time were these (as read):

15             "A pharmacist is a professional and shouldn't be

16        filling every prescription that comes through the door."

17        Mr. Rannazzisi and the DEA believe that pressure from

18  owners/operators to fill scripts is driving the problem.  The

19  problem being diversion.

20        And we'll come back to this in a few minutes because this

21  is a major problem that was identified at Walgreens going

22  forward for years. (As read):

23             "If suspicious, you don't ship."  Now he's talking

24        about distribution.  "Decreasing the order in shipping is

25        not in compliance with the regulation."

1     And he said that the DEA was hearing complaints from

2  pharmacists that they don't have enough time to check the

3  prescriptions for good faith, meaning to investigate the red

4  flags when they were identified, or let alone to identify red

5  flags; and he wants to make sure that chains are not inhibiting

6  this by pressuring your pharmacists to fill fast or not provide

7  the adequate labor.

8     And, again, I'm going to come back to this in a moment

9  both with respect to staffing, the adequacy of staffing at

10 Walgreens stores to enable pharmacists to do their job and also

11 the adequacy of the time available to pharmacists to do their

12 job.

13     These are going to be two major issues that will go

14 forward as problems with Walgreens and the dispensing practices

15 at the Walgreens pharmacies.

16     And, finally, Mr. Rannazzisi said that he believes that

17 compensation bonus should not be tied to prescription volumes

18 of controlled substances as it was at that time at Walgreens.

19     And ultimately that policy was changed but was not

20 necessarily changed in a way that was effective, as will come

21 forward either later today or during the course of the

22 presentation of evidence.

23     And in a January 2013 presentation, the director -- then

24 new director of Pharmaceutical Integrity, a lady by the name of

25 Polster, Tasha Polster, explained dispensing practices and

1    policies in this fashion (as read):

2              "In June" -- now she's talking about June of 2012.

3         That's when that policy was changed so that you no longer

4         just go to the doctor -- "In June we relaunched our good

5         faith dispensing policy.  However, we have learned more

6         about DEA's expectations around GFD" -- that's good faith

7         dispensing as if they didn't know about it before -- "and

8         we felt the steps we were talking with good faith

9         dispensing did not go far enough."

10             "The game has changed.  We can no longer rely on the

11        'I spoke to the prescriber and he said it was okay'" --

12        what they had been relying upon for decades before then.

13        One of the changes that was announced around that time was

14   the creation of what was characterized as a target drug good

15   faith dispensing policy.

16        So up until that time, there is dispensing policy and

17   practice was good faith dispensing.  Now they alter it to be

18   target drug good faith dispensing.

19        And what did that mean?  That they would identify certain

20   drugs as particularly problematic, and that they would ask or

21   require additional procedures be performed by their pharmacists

22   with respect to those drugs, and I'll come to that in a moment.

23        But that policy was under -- even when that policy was

24   under development and it was intended to provide those

25   procedures, one of the procedures included a checklist for

1   so-called target drugs.

2       But from the outset of the program, it was highly limited.

3   By that I mean, first, a new policy was limited only to three

4   drugs:  Oxycodone, hydromorphone, and Methadone, and then only

5   in single-ingredient form.  So it did not include any opioid

6   containing those ingredients where -- in combination with other

7   drugs.

8       So, for example, it didn't include Percocet, Vicodin,

9   Norco, Opana, Kadian, some of the most prescribed drugs on the

10  market during that time period.  They were all highly addictive

11  and highly dangerous.

12      And it didn't include hydrocodone.  At that point in time

13  hydrocodone was only a Schedule III, but it was on its way to

14  Schedule II; and it became a Schedule II within a fairly short

15  period of time after this, but it was recognized at that time

16  universally as the most commonly abused opioid in the nation;

17  but it was not included on the target drug list of three.

18      Despite these improvements, over time and as belated and

19  limited as they were, there were still persistent problems that

20  continued at Walgreens for years.

21      First, a continuing emphasis on sales and filling

22  prescriptions.  This is an e-mail from a Walgreens pharmacy

23  supervisor to Walgreens corporate commenting on the oxycodone

24  dispensing activity in Florida stores in August of 2010

25  (as read):

1              "Great info.  This is an entire month and all" --

2       "and" -- it should be "on," it was a typo in the e-mail --

3       "on all strengths.  Please look at stores at the bottom

4       end."

5          So this writer is concerned with stores at the bottom end,

6    meaning stores that aren't -- right? -- filling enough

7    prescriptions, particularly for oxy -- opioids,

8    inappropriately.  (As read):

9              "We need to make sure we aren't turning away

10       legitimate scripts.  Please enforce."

11         Who's the "please enforce" to?  That's to the management

12   of the pharmacies, the managers who manage the pharmacists,

13   telling them to enforce -- make the pharmacists writing --

14   filling prescriptions for drugs that are prescribed by

15   physicians.

16         And corporate's response to that e-mail?  (As read):

17             "We have a wide range of oxycodone business in our

18       stores.  The busiest store in Florida is Orlando.  Almost

19       18 oxycodone prescriptions per day.  We also have stores

20       doing about one a day.  Are we turning away good

21       customers?"

22         And this is a presentation on pharmacy manager bonus

23   programs in December of 2010 (as read):

24             "The purpose of the bonus is to recognize and reward

25       persons responsible for improving pharmacy operations.

1        How so?  The best evidence of a well-run pharmacy is the

2        increase in prescriptions and pharmacy sales."

3        And this from a couple of years later from a corporate VP

4    regarding an update for the Western Division in February of

5    2012 (as read):

6        "We have to strive for the activities that drive

7        incremental scripts.  There are metrics we can improve

8        today that will demonstrate the," quote, "doing whatever

9        it takes to achieve 100 percent of fiscal year" -- I

10        assume that's fiscal year 2011 -- "script volume."

11        So the point here is that Walgreens corporate was sending

12    the message down to their managers at the district level and at

13    the pharmacy level that corporate wanted sales.  They wanted

14    prescriptions filled.  That was a priority.  And that was the

15    message that got through from management to the pharmacists

16    behind the counter.

17        As late as 2014 -- 2014 now -- Walgreens developed a

18    program to identify pharmacists who were not filling enough

19    opioid prescriptions called the pharmacists nondispensing

20    report.  And here is an e-mail talking about it (as read):

21        "Ed and Jeff" -- Ed and Jeff were two employees in

22        the pharm -- I believe in the Pharmaceutical Integrity

23        unit, a unit comprised of some 10 or 12 individuals --

24        "developed a report that supervisors" -- meaning business

25        people now -- "will be able to use in order to see

1              pharmacists in their districts that are not dispensing a

2              lot of controlled drugs.  Bad.  Not dispensing a lot of

3              controlled drugs."

4          The intent is to give visibility into whether or not we

5      have pharmacists that are concerned -- I'm adding my own

6      language in here -- about the efficacy and propriety of opioid

7      use for chronic pain because that's what they're really talking

8      about.

9          Are you concerned that pharmacists just won't fill a

10     controlled med or maybe are selective about filling them?

11         And part of this plan with respect to this -- to this

12     new -- the nondispensing report and the directions given down

13     to the business people for how to deal with these pharmacists

14     who weren't up to snuff in terms of the amount of opioid

15     prescriptions they were filling was continuing education, to

16     have them -- subject them to continuing education programs

17     prepared at the direction -- well, I'll come to that.

18         So here's the e-mail.  This is the head of Pharmaceutical

19     Integrity responding to her subordinates' development of this

20     program.  She says (as read):

21              "Encourage the pharmacists, the low-filling

22              pharmacists, to obtain more information on pain

23              management, such as continuing education courses, in order

24              to better understand treatment protocol and feel more

25              comfortable in filling controlled substances."

**OPENING STATEMENT / HEIMANN**

 1      Now, let's keep in mind the time period we're talking

 2  about.  We're in 2014 now.  The opioid epidemic has been raging

 3  for more than a decade.  It's probably at its height in terms

 4  of prescription opioids, or close to it.

 5      So naturally pharmacists see this.  They understand it.

 6      We heard a little bit ago when Ms. Baig was here, she had

 7  the testimony of one of the folks from Walgreens acknowledging

 8  they were aware of the epidemic.  They knew what was going on.

 9  They knew why it was going on from diversion of controlled

10  substances.

11      So it's natural that Walgreens in 2014 would have any

12  number of pharmacists that were concerned about whether or not

13  they should be filling prescriptions for these kinds of drugs

14  for the kinds of patients that were coming in.

15      And these materials that Ms. Polster is encouraging her

16  subordinates to present to the low-filling pharmacists, these

17  continuing education programs, were those programs that often

18  were either written by or financed by the manufacturers of

19  opioids, like Purdue and Endo.

20      You know, you'll likely hear from Walgreens that in the

21  early period of what I've characterized as Walgreens'

22  collaboration particularly with Purdue, you may hear from

23  Walgreens that they too were duped about the science; that

24  their pharmacists weren't any better than the doctors at

25  knowing what the science actually was and so they could have

OPENING STATEMENT / HEIMANN

1    been fooled.

2        But this was a recurring theme in Walgreens even as late

3    as 2014.  For example, you remember the e-mail I showed you a

4    bit ago about -- the e-mail exchange about oxycodone business

5    in Florida.

6        Here's the suggestion Walgreens corporate made as a way to

7    induce pharmacists to fill more oxycodone prescriptions at that

8    time (as read):

9            "Please review the stores in your district and use

10           the continuing educations that I sent out a couple of

11           weeks ago."

12       Those continuing education programs that this gentleman is

13   referring to were the pharmacist's role in pain management, a

14   legal perspective, and navigating the management of chronic

15   pain, a pharmacist's guide, two CEs, continuing education

16   programs, financed in the first instance by Purdue and in the

17   second by Endo, each of which contained multiple, multiple

18   misrepresentations about opioids and pain management.

19       The same type of lies that Purdue told in the late 1990s

20   and early 2000s in the continuing education programs that they

21   sponsored at that time in which they provided at Walgreens'

22   request to Walgreens to use with Walgreens' pharmacists to

23   reeducate or to educate them at that time.

24       But coming back to the notion of the overriding goal being

25   more profits, more sales, more filling of prescriptions -- and,

1  by the way, filling prescriptions is the lion's share of

2  revenue for Walgreens over everything else.  It's their

3  prescription business that drives the revenue of the company.

4       This is the message that went to the heart of Walgreens'

5  business philosophy to pharmacists about what they should do in

6  terms of their good faith dispensing activities (as read):

7            "Good faith dispensing concerns don't relieve you

8       from trying to attain the numbers that have been set for

9       you" -- "the numbers that have been set for you in terms

10      of prescriptions to be filled," the quota.

11      In 2015, Walgreens conducted a survey of some 2,400

12 stores -- now I'm moving on to another aspect of the problems

13 at Walgreens -- to determine the level of Walgreens compliance

14 with the memorandum agreement that they had with the DEA and

15 the DOJ that I described a few moments ago.  It was called the

16 basic control initiative.

17      The idea was to see whether or not Walgreens' pharmacists

18 were actually doing what they had been instructed to do with

19 the relaunched, as they called it, good faith dispensing

20 practices and with respect to the target drug good faith

21 dispensing policies.

22      The results weren't good.  So as we see here, this is a

23 slide presentation concerning this basic control initiative in

24 order to check if stores are compliant with the policies and

25 procedures put in place (as read):

1              "Per the MOU" -- excuse me -- "memorandum of

2        agreement, a random sample size audit was conducted in

3        June.  Results were unfavorable."

4        Less than 60 percent of the stores were compliant with

5   respect to the target drug checklist being attached to

6   prescription hard copies, and in some three quarters or only

7   three quarters of the stores were compliant with attaching

8   refused PD prescription hard copies so that there would be a

9   record of why the prescription was refused.

10       Now, as I said, in addition to the focus on profits and

11  selling more opioid prescriptions, there were other major flaws

12  in Walgreens' dispensing system.

13       The first had to do with inadequate software capacity.

14  Now, that may not seem significant at first blush, but actually

15  it is.

16       Under the target drug good faith dispensing policy that

17  was put in place in 2012, 2013, 2014, the target drug

18  checklist -- and I haven't got one to show you, but it's

19  basically a list of potential red flags.  You're supposed to

20  check and see whether or not these things are apparent or not

21  with respect to the -- each individual prescription that they

22  were being called upon to fill.

23       But at that time they had to fill that out in hard copy,

24  and they couldn't be -- it could not be stored electronically

25  in the patient's prescription -- electronically stored

 1    prescription record.

 2         Instead, it was kept in hard copy at the pharmacy itself

 3    and stored in a file drawer or in a folder, whatever, but not

 4    with the prescriptions for the patients themselves.

 5         And what did that do?  Well, it made it difficult even for

 6    the same pharmacy store when the next prescription comes in to

 7    check back to see what had happened with the earlier

 8    prescription for an opioid.

 9         And, of course, it made it literally if not impossible,

10    nearly impossible if the patient went to a different Walgreens

11    store the next time because that different Walgreens store

12    wouldn't have the record of what happened in the earlier

13    prescription, particularly if the prescription, for example,

14    had been denied for reasons that had to do with the failure to

15    pass good faith dispensing practices.

16         This issue was not just a theoretical issue.  This was

17    actually raised by Walgreens pharmacists at the very time that

18    the new system was being pilot tested.

19         Here's an example of that.  This is one of many.  So

20    here's a pharmacist writing in to Pharmaceutical Integrity

21    again, because that was the place you raised these kinds of

22    questions, and the question was (as read):

23              "In order to determine when the last time Q11 was

24         completed" -- I believe that's a reference to the

25         checklist -- "can we scan in the checklist as an

1          additional image rather than having to go back through the

2          hard copy filed scripts to retrieve?  It would be easier

3          for us to look through the scanned images."

4          Well, of course it would be, but what was the answer?

5     (as read):

6               "No.  IC+" -- IC+ is the term for the software

7          electronic storage facility that Walgreens was using at

8          the time -- "IC+ does not have the memory capacity for all

9          those images."

10         So, no, you get it in hard copy and that's the only way

11    you get it.

12         And this wasn't the only problem.  In the IC+ software

13    there was a section for comment field, and that comment field

14    for a prescription and a patient was intended primarily to

15    record reasons for denying prescriptions or perhaps reasons for

16    granting prescriptions, even though a red flag had been

17    identified.

18         So if the prescription gets denied because it doesn't pass

19    good faith dispensing, those comments go in that field,

20    presuming it should; and if the red flags are identified but

21    cleared, those comments should go in the comment field.

22         It's a really important field for the next time a

23    pharmacist is confronted with the same patient with another

24    opioid prescription.

25         The field -- but, again, there was no way, given the

1   system at the time, that that could be done on an ongoing

2   basis.  Why was that?  Because they didn't have enough room.

3        And this too was raised by pharmacists right at the outset

4   when the new -- new program was going into effect in the 2012,

5   2013, 2014 time period.  And this is just one example of many

6   where a pharmacist writes in again to Pharmaceutical Integrity

7   saying (as read):

8            "Apparently there is a limit to the amount of

9        characters we can put in a patient's comment section."

10       That's right.  There was.  "How can we overcome this as

11       the area fills up?"

12       The answer (as read):

13           "Tough.  Just make sure the most recent comments are

14       in there and delete the oldest."

15       Although, of course, the oldest might be the most

16   important when it comes to the next prescription from that

17   patient that comes into the store.

18       For six or more years the folks at Pharmaceutical

19   Integrity asked for the electronic software program to be

20   improved, updated so that these serious problems could be

21   addressed.  And for six years or more, they went begging.

22       Finally at the end of 2019 -- end of 2019 -- the system

23   was partially enhanced to at least allow the checklist to be

24   completed and retained electronically.

25       And how did the head of Pharmaceutical Integrity -- that's

1   Ms. Polster again -- greet this change?  This way (as read):

2          "I have been waiting to do this from day one" --

3      Day one.  She was made head of Pharmaceutical Integrity at

4   the latter part of 2012.  So seven years earlier (as read):

5          "I have been waiting to do this from day one and

6      Kermit wouldn't let me.

7      And that's not Ms. Piggy's Kermit.  That's Kermit, CEO of

8   Walgreens, c'est moi.

9                          (Laughter)

10     **MR. HEIMANN:**  Moving on.  Bad docs, another problem.

11  Yet another major failing had to do with bad doctors by which I

12  mean doctors who were obviously overprescribing controlled

13  substances, pill mill doctors and others whose prescribing

14  practices were highly suspicious.

15     Walgreens had the ability and, in fact, did at corporate

16  level identify such doctors, high-prescribing doctors, from

17  data that was available to Walgreens at the corporate

18  initiative level.

19     Remember, Walgreens had insight into all prescriptions

20  filled by their stores nationwide by patient and by prescriber.

21  So they used that data to create a system to identify

22  problematic doctors.

23     This is an example.  A prescriber index.  And what they

24  did was they used a variety of metrics to identify doctors that

25  were at best dubious if not worse.  So they ranked them by pill

 1   mill volume, percentage of total prescriptions that were

 2   target, maybe those three target drugs, number of patients who

 3   paid in cash because patients paying in cash was another

 4   indicia of possible diversion, and sudden increases in these --

 5   and this is just a few of the metrics that they used to

 6   identify doctors that they recognized were potentially, if not

 7   actually, seriously problematic.

 8         So they had that ability at the corporate level.  Now, one

 9   would think that that would be valuable information to

10   communicate to pharmacists on the line who were being

11   confronted with prescriptions written by these doctors.

12         And did they do that?  Did they provide that key data,

13   that critical data, to their pharmacists?  Let's see.

14         Here's Eric Stahmann.  Eric Stahmann was part of

15   Pharmaceutical Integrity, a manager.  He was a manager for the

16   Western Region.  His deposition was taken recently, and here's

17   what he had to say about that.

18                    (Video was played but not reported.)

19         **MR. HEIMANN:**  Think about that.  Corporate had a

20   policy, a directive, that the pharmacists were not to be

21   provided data that corporate had identifying doctors who were

22   highly questionable so that the pharmacists could be aware of

23   that when evaluating prescriptions written by those doctors.

24         They didn't want to cloud the judgment of their

25   pharmacists.

1        Now, why would that be?  Why would they not want their

2   pharmacists to have that information?

3        Could it be because it would be more likely that a

4   pharmacist without that information would fill those

5   prescriptions rather than reject them?

6        This had real consequences incidentally in San Francisco.

7   For example, here is a screen shot of that prescriber index

8   this time using a metric of prescribers -- top 25 prescribers

9   in the U.S. for hydrocodone.  Remember, that's one of the

10  seriously abused drugs in the opioid field.

11       And if you look down a little closely, you'll see a doctor

12  identified as Ray Seet, S-E-E-T, as one who appears on that

13  list.

14       Now, who was Dr. Seet?  Dr. Seet was a physician with

15  offices in Petaluma, California, who wrote lots and lots of

16  opioid prescriptions.  And he was identified no later than 2012

17  by -- at corporate level as a problematic doctor.

18       Notwithstanding that, Walgreens pharmacists still filled

19  almost 800 more prescriptions by that doctor after he was

20  identified for opioids by Walgreens San Francisco Bay Area

21  stores.

22       In fact, Walgreens continued filling prescriptions from

23  Dr. Seet almost a month after the California Medical Board

24  terminated his license in 2013.

25       There were any number of indicia prior to that time that

1  would have raised serious questions about Dr. Seet, but

2  Walgreens pharmacists who were presented with those

3  prescriptions were never told about what corporate knew about

4  the history of Dr. Seet.

5        98 percent of Dr. Seet's San Francisco opioid

6  prescriptions triggered at least one red flag.  That's

7  information that corporate should have known and probably did.

8        A second example, Dr. Guido Gores.  Dr. Gores had an

9  office in San Francisco on Hyde Street; and as it indicates

10  here, between 2006 and 2020 Walgreens filled more than 10,000

11  Dr. Gores opioid prescriptions even though 83 percent triggered

12  at least one red flag during that time period.

13        In addition, by no later than 2012 Walgreens prescriber

14  index had identified him as being a top 1 percent -- in the top

15  1 percent of opioid prescribing.

16        In fact, even though corporate didn't advise the

17  pharmacists in San Francisco after that about this doctor, many

18  years later in 2019 one of the Walgreens stores, the one at

19  Market and 9th -- we all know where Market and 9th is --

20  adopted a policy to stop filling any of his prescriptions.  In

21  another store, this one at Bush and Larkin followed suit a few

22  months later.

23        And then by September, Walgreens finally becomes aware of

24  a DEA investigation when it provided documents to the DEA

25  concerning the doctor, but it still continued to fill hundreds

OPENING STATEMENT / HEIMANN

1    of Dr. Gores' opioid prescriptions after that.  Finally in

2    2021, Dr. Gores ceases to become -- ceases to be a doctor.

3         So, as I said, the failure on the part of Walgreens to

4    provide the information that it had at corporate to the

5    pharmacists on the line has real consequences.

6         Another problem, even when individual pharmacists are

7    identified by -- even when individual pharmacists at the stores

8    identify a problematic doctor, they had no way to

9    systematically inform other pharmacists at Walgreens stores

10   about what they knew.

11        In fact, two policies of Walgreens actually inhibited

12   pharmacists from access to critical information to use in their

13   efforts to comply with their corresponding responsibility.

14        First, pharmacists were instructed by corporate Walgreens

15   that they absolutely could not bar or ban a doctor wholesaler.

16        No matter how bad the history and record of the doctor

17   was, no matter how obvious it was that the doctor was a pill

18   mill doctor, Walgreens pharmacists were forbidden from banning

19   such doctors from refusing to fill such doctors' prescriptions

20   across the board.

21        For example, and here's just one, when informed about a

22   doctor who had been banned by the CVS pharmaceutical chain and

23   who was in the 98th percentile for oxycodone and 97 percentile

24   for hydrocodone and who had 860 prescriptions were filled

25   within the preceding 90 days, 76 percentage of which were for

1    controlled substance, this is how Pharmaceutical Integrity

2    responded to the pharmacist on the line who was asking for

3    help:  What can I do about this doctor?  And this is what they

4    told him (as read):

5           "With all that having been said" -- meaning with all

6        this history of this conduct by this doctor and his

7        prescribing practices -- "as long as the doctor has a

8        valid DEA and state license, you've got to fill.  We

9        should in no circumstances be blanketly refusing

10       prescriptions."

11       Instead they were told:  Treat -- effectively what the

12   pharmacists were being told is:  Treat this doctor like you

13   would any other doctor in applying your good faith dispensing

14   policies.

15       So the pharmacist was instructed effectively not to take

16   into account the history of the doctor because they hadn't been

17   provided the history of the doctor by corporate who had the

18   information but chose to withhold it.

19       In another instance with a similar doctor and a pharmacist

20   was asking for help from Pharmaceutical Integrity, here's what

21   Pharmaceutical Integrity said (as read):

22           "Regardless of a prescriber's prescribing history, if

23       they have a license, we can't blanketly refuse or

24       systematically deny his prescriptions."

25       In addition to this, pharmacists were even forbidden by

1  corporate policy from noting in the pharmacy records of the

2  prescriber the character of such obvious pill mill doctors.

3       So even if the pharmacists identified such a doctor as we

4  saw a few minutes ago they did in the case of the doctor who I

5  showed you, they weren't permitted to make notations in the

6  prescriber's record at the pharmacy about that.

7       Here's a situation:  When a pharmacist, again, was asking

8  "What can I do," they say (as read):

9            "Comments in IC+ for prescribers" --

10  Let me back up.  (as read):

11            "Comments in IC+ for prescribers" -- so they had a

12       computerized electronic record by prescriber -- "should be

13       limited to the following caution use GFD, standard caution

14       for everybody.

15            "Any comments, such as prescriber under

16       investigation, in the prescriber's profile should be

17       removed.  Refrain from making any statements about the

18       prescriber or patient."

19       That's just one of many examples.  Here's another

20  (as read):

21            "Advise the pharmacy staff to refrain from entering

22       any slanderous comments like 'pill mill doctor' or 'watch

23       out' in the prescriber's IC+ profile and stick with the

24       very generic comments, such 'As verify GFD.'"

25       Walgreens' corporate was well aware of other problems

1    arising from the target drug good faith policy and program.

2        Concerns over how the target good faith dispensing

3    policies were overtaxing pharmacists -- remember, I mentioned

4    that we were going to come to this -- where overtaxing

5    pharmacists were identified and communicated to corporate even

6    during the early stages of the testing of the new TDGFD

7    program.

8        For example, here's a report on store visits in February

9    of 2013.  February 2013, so shortly after they devised the new

10   program and now they've got it in a pilot mode in certain

11   stores.  They sent out folks to go to those stores to see what

12   the impact of the new policy was on pharmacists at the stores.

13   And here's what was reported back (as read):

14          "Two biggest issues in centralization markets.  High

15       volume stores does not seem to be enough labor to perform

16       all the tasks.

17          "Secondly, fatigue and sustainability of our

18       pharmacists is a real concern.  We're asking them to do a

19       lot, but how long can they continue?"

20       They're asking them to do a lot because they were putting

21   additional obligations on the pharmacists that they had never

22   had before with respect to this target drug good faith

23   dispensing program.  (As read):

24          "When they don't meet the goals and standards on

25       everything, they feel like they are failing."

**OPENING STATEMENT / HEIMANN**

1    And I'm going to come to that a little bit more towards

2  the end of this presentation about dispensing.

3    With respect to this notion of stressing pharmacists and

4  adequate staffing to do all that they were being called upon to

5  do according to the written guidelines, in 2019 Walgreens

6  engaged the services of a Tata Consulting to look into a number

7  of Walgreens' issues, including stress levels among

8  pharmacists.

9    The findings as presented to a Walgreens' executive

10  included, and I'm going to show you now a slide from an early

11  draft of the report from the consulting firm about what they

12  had found and I've highlighted certain of the findings.

13  (as read):

14    "We heard reports, multiple reports" -- so this is

15    reports from pharmacists -- "of improper behavior which

16    was largely attributed to the desire to keep below promise

17    time."

18    Now let me tell you about promise time.  For those of us

19  who've stood in lines at Walgreens pharmacies many times, the

20  policy at Walgreens was -- I think it still is -- that the

21  pharmacist was expected to fill a prescription that was

22  presented at the store, presented to the pharmacy department,

23  within 15 minutes of the prescription being presented.

24    And if you've ever stood in a Walgreens store in those

25  lines and you see people come up one after the other presenting

 1    prescriptions for filling, you can imagine how difficult a job

 2    that is for the pharmacist behind the counter, particularly if

 3    there's only one pharmacist there, which we'll come to in a

 4    little bit in terms of staffing.

 5         They -- the report went on (as read):

 6             "All participants expressed a high level of stress in

 7         trying to meet promise time, and the belief that given the

 8         current level of staffing, promise time was unreasonable

 9         while following proper procedure."

10    Proper procedure?  Good faith dispensing policies and

11    practices.  That's the procedure they're talking about.  (as

12    read):

13             "One said that they are so much concerned about

14         taking their lunch break as they will feel they are judged

15         for not making promise time following the lunch break and

16         they said they cut their lunch break short.

17    However, senior leaders at Walgreens were not happy with

18    these findings and, in fact, they actually directed the

19    consultants to remove some of the more damaging findings,

20    including, as it turned out, this slide in its entirety, which

21    does not appear in the final form of the report from the

22    consulting report.

23         Other key findings were also altered.  For example, here

24    is the language that appeared in the -- in an earlier draft

25    version of the report (as read):

1          "Proper procedures are sometimes skirted or

2      completely ignored due to worries of meeting promise

3      time."

4      Now, what procedures are they talking about?  The good

5  faith dispensing procedures.  Those are the important

6  procedures that the pharmacists were reporting to the

7  consulting investigators were sometimes skirted or ignored

8  because of the requirements of promise time.

9      Was that included in the final?  No.  It was modified at

10  the instruction of senior Walgreens' people to read (as read):

11          "Promise procedures are sometimes perceived as

12      barriers to addressing all necessary pharmacy tasks."

13      So the meaning is altered in a significant way.

14      Once again, as we did with the distribution issue, in

15  order to gauge the impact of Walgreens, in this case,

16  disfunctional dispersing policies and practices on diversion of

17  drugs -- controlled drugs in San Francisco, our experts

18  analyzed prescriptions filled by Walgreens stores in

19  San Francisco during the period 2006 to roughly mid-2020.

20      And in doing that, we used multiple criteria, or red

21  flags, against the actual records of the prescriptions that

22  were filled and the data about them to identify prescriptions

23  that were filled but that showed red flags.

24      The analysis revealed -- and, once again, on a highly

25  conservative basis -- when we present the evidence, we'll

present the various percentages that this analysis showed; but

on a highly conservative basis, this is what it showed:

60 percent of the opioid drugs and opioid-associated drugs

triggered one or more red flags.  60 percent of those

prescriptions that were filled.

Another effort that we undertook to gauge the impact in

San Francisco has to do with documentation.

Walgreens had an express policy in place, I think for

most, if not all, of the time we're talking about, that

pharmacists were required to document in writing the reasons

for particularly if they denied a prescription, refused to fill

it, or did fill it, to document the reasons with respect to

their good faith dispensing policy.

So, for example, if they found a red flag, they were

supposed to document that.  If they resolved that red flag in

favor of dispensation, they were supposed to document that.  If

they found a red flag and they didn't resolve it, they were

supposed to -- and didn't fill the prescription, they were

required to document that.

So one of our experts, Elizabeth Park, who is a pharmacist

and practices in the field of reviewing pharmacy practices,

examined what Walgreens told us were the complete documentation

of their due diligence for some 2300 filled prescriptions

subject to one or more red flags.  So what we're talking about

here are prescriptions that were recognized as having one or

 1   more red flags attached to them but were filled anyway.

 2        So, presumably, if one was doing your job right, you would

 3   have written down the basis upon which you resolved the red

 4   flag.  That should have been documented in the materials that

 5   Walgreens provided to us.

 6        Well, what happened?  In this examination she concluded

 7   that fewer than 5 percent of those prescriptions contained

 8   adequate evidence of due diligence to solve or address the red

 9   flags that were identified.

10        In addition to all of that evidence from the files and

11   records of Walgreens itself, we will be offering the testimony

12   of Mr. Catizone, the former executive director and CEO of the

13   National Association of Board of Pharmacy.  And Mr. Catizone

14   will testify about Walgreens, that based on his analysis of

15   Walgreens' practices and policies, Walgreens had inadequate

16   policies, procedures, and systems to detect diversion; that

17   Walgreens had a history and pattern of filling opioid

18   prescriptions without resolving and documenting the resolution

19   of red flags; and that corporate performance metrics at

20   Walgreens undermine compliance with corresponding

21   responsibility.

22        Finally, Your Honor, we will be presenting the testimony

23   of a number of current and former Walgreens' pharmacists about

24   the problems that they encountered and dealt with while

25   employed as Walgreens pharmacists.  Many of them are things

**OPENING STATEMENT / HEIMANN**

 1   I've already mentioned; but among the other things -- among the

 2   things that they will talk about is the -- again, the

 3   prioritization by the company of filling prescriptions and

 4   prioritizing filling prescriptions faster, constant pressure to

 5   fill and to fill quickly.

 6       They'll talk about the 15-minute wait time and the impact

 7   it had on their ability to perform their corporate

 8   responsibility with respect to good faith dispensing, and the

 9   fact that they were often forced to cut corners with respect to

10   that because of the 15-minute deadline.

11       They'll talk about inadequate staffing and how inadequate

12   staffing also undermined their ability to perform their good

13   faith dispensing responsibilities as pharmacists.

14       They will tell you about how they were often penalized by

15   management for failing to fill prescriptions for controlled

16   substances; and how their failure to fill prescriptions when

17   seen by management impacted their performance scores, which in

18   turn impacted their advancement in the company and their

19   compensation.

20       They'll talk about the fact that the good faith dispensing

21   practices weren't audited or monitored by management in any

22   effective way on an ongoing basis.

23       And they'll talk about what I also mentioned a little bit

24   ago, the drugs that are high for diversion and abuse are not

25   included on the target drug list, the three-drug list, and

1     many, as I noted before, are not on the list at all.

2          And, finally, they'll talk about how management reprimands

3     pharmacists for refusing to fill prescriptions for controlled

4     substance; and that the whole notion that businesspeople

5     supervise and rate pharmacists presents a conflict of interest

6     because the businesspeople are interested in the business and

7     the pharmacists are interested in the patient's health, and

8     there is a conflict when the latter are controlled and directed

9     by the former.

10          I want to give you in closing my portion of this anyway,

11     just a snippet from two of the pharmacists who will testify

12     before Your Honor.

13          This is Rebecca Gayle, who was a pharmacist with the -- in

14     San Francisco for some five years in the mid-2011 to 2016 time

15     period.

16               (Video was played but not reported.)

17          **MR. HEIMANN:**  And now Golnaz Kamali -- I hope I'm

18     pronouncing that right -- who was with Walgreens for the same

19     period of time but in the Los Angeles area.

20               (Video was played but not reported.)

21          **MR. HEIMANN:**  And that's dispensing, Your Honor.

22          **THE COURT:**  Thank you.

23          We'll take a recess until 2:15.

24               (Recess taken at 2:01 p.m.)

25               (Proceedings resumed at 2:15 p.m.)

1          **THE CLERK:**  Come to order.

2      Court is now in session.  You may be seated.

3          **THE COURT:**  Okay.  Let the record show all parties are

4      present.

5      You may proceed.

6          **MS. BAIG:**  Thank you, Your Honor.

7                    **OPENING STATEMENT**

8          **MS. BAIG:**  Your Honor, the conduct that we've spent

9      the better part of today discussing --

10         **THE COURT:**  Why don't you move the microphone closer

11     to you.  Okay?

12         **MS. BAIG:**  Closer to me?

13         **THE COURT:**  Yeah.  We want to make sure it's on.

14         **MS. BAIG:**  Better?

15         **THE COURT:**  I think so.  Thank you.  Yeah.

16                    (Pause in proceedings.)

17         **MS. BAIG:**  What we have spent the better part of today

18     discussing, the masterful promotion which was false and

19     misleading, combined with the incredible pressure and

20     incentives set up for sales employees to aggressively grow

21     sales of controlled substances and the practically nonexistent

22     SOM systems, all of this had a devastating effect on our

23     country and on our beloved San Francisco.

24         Time permitting, we expect to call a number of the

25     following witnesses to testify with respect to the scope of the

 1   nuisance right here in San Francisco outside our courthouse

 2   doors.

 3                     (Pause in proceedings.)

 4         **MS. BAIG:**  San Francisco, just 47 square miles with

 5   about 875,000 people and more than 40,000 people living with

 6   opioid use disorder, with Walgreens being the primary opioid

 7   dispenser across the city, with the top six Walgreens

 8   dispensing locations ranging from 102 million morphine

 9   milligram equivalents to 416 million morphine milligram

10   equivalents from 2006 to 2020, and with dispensers receiving

11   nearly 8.8 billion MMEs between 2006 and 2014, enough for every

12   resident, not just those in pain but every adult and child to

13   consume over 1200 MMEs per year.

14         That consumption and oversupply continues to wreak havoc

15   in every corner of our city, and the city struggles mightily to

16   combat the problem.

17         Take, for example, the San Francisco public library, one

18   of the premier national urban libraries, 28 branches, millions

19   of visitors yearly.  One of the main branch's largest

20   challenges is the opioid epidemic.  65 staff members had to be

21   trained with Naloxone in 2016 so they could revive people on

22   the premises.

23         Sheriffs have to maintain a presence to assist with

24   responding to overdoses.  Needle boxes and toilet grinders

25   required to help with the excess needles and drug debris.

**OPENING STATEMENT / BAIG**

1   Certainly not how librarians should be forced to spend their

2   time.

3        San Francisco's Zuckerberg General Hospital treats 10 to

4   20 people a day for opioid overdose or addiction, which its

5   chief of emergency medicine, Christopher Colwell will testify

6   is San Francisco's most immediate threat.

7        Up to 25 percent of all visits to the emergency department

8   in a given day that are opioid related.

9        Chief Colwell recently treated a physician, two nurses, a

10  professional athlete, a drug dealer, a lawyer, two teenagers,

11  and a 7-year-old girl who got into her mother's purse.

12       We will hear from Dr. Phillip Coffin, the director of

13  San Francisco's Center On Substance Use and Health at DPH.

14  He's looked at the San Francisco data on opioid use disorder

15  and overdose for over a decade.  His review of the data shows

16  that with an increase in supply of opioids, we see an increase

17  in people with OUD and an increase in overdose deaths.

18       From his review of the data, he described San Francisco's

19  experience of the epidemic in three waves.

20       First, beginning in the late '90s, 1990s, a flood of pills

21  accompanied a high incidence of OUD patients.

22       Second, beginning in about 2010 to 2012 timeframe,

23  San Francisco's overdose rate was 2.23 times the national

24  average.  More than 93 percent involved prescription opioids.

25       Third, beginning in about 2015, overdose deaths increased

1   by more than 478 percent.

2        His review of the data shows that many were addicted to

3   prescription pills and later turned to heroin and fentanyl.

4        The Department of Public Health physician Dr. Joseph Pace

5   has been treating patients largely in the Tenderloin for about

6   20 years.  He often stops and checks the vitals of potential

7   overdose victims lying on the street as he walks to work.

8        He will testify about having bought into many of the

9   promotional messages circulated by defendants earlier in his

10  career and how he had to shift his thinking on appropriate

11  prescribing as the crisis emerged.

12       He will also describe the challenges he's faced in

13  treating patients with chronic pain and opioid use disorder,

14  and how San Francisco implemented a harm reduction program to

15  try to save lives and otherwise improve outcomes.

16       Dr. Barry Zevin has also been a treating physician for

17  decades.  He treats San Francisco homeless population for

18  opioid use disorder.  He came to San Francisco in the early

19  '90s to treat HIV patients when there was no medication at all.

20       He observes that San Francisco's current drug scourge is

21  as bad or worse than that era.  He has learned that

22  approximately half of his patients with opioid use disorder

23  report their initial opioid use was with prescription opioids.

24  And he will testify that overdose is the number one cause of

25  death for the homeless community that he serves.

**OPENING STATEMENT / BAIG**

1     San Francisco Police Department, recently commended for

2   saving lives in 2021, the Tenderloin officers alone helped save

3   the lives of 124 people from overdose death using the Naloxone

4   in 2020, but San Francisco lost 700 people to overdose death

5   that year.

6     The Department of Public Works collects thousands of

7   needles per year.  The needle waste problem impacts everyone

8   who tries to enjoy San Francisco's parks and playgrounds.

9     Similarly, San Francisco's park rangers have collected

10  thousands of needles.  They encounter numerous overdoses and

11  are trained to and frequently administer Narcan.

12    San Francisco's Fire Department is also determined to save

13  as many lives as possible.

14    In fact, they created a street overdose response team

15  seven days a week whose job it is to go out on the city streets

16  and find and revive people who have overdosed, people for whom

17  there is no one to place a call to EMS.  Who's ever even heard

18  of that before?  The fact that San Francisco needs such a team

19  speaks volumes.

20    One thing, Your Honor, I want to make sure you don't

21  misunderstand.  We do not seek to ban opioids.  We recognize

22  their value.

23    Instead, we are seeking truth about the risks of opioids;

24  and we are demanding that defendants comply with the Controlled

25  Substances Act and the other applicable laws we've discussed.

1        In closing, I'd like to return to Patrick Radden Keefe's

2    words cited by my colleague in opening (as read):

3            "The opioid crisis is, among other things, a parable

4        about the awesome capability of private industry to

5        subvert public institutions."

6        And while San Francisco struggled and continues to

7    struggle to face the worst drug scourge it has ever faced,

8    defendants made a mockery of the laws put in place to protect

9    our communities from unfair marketing and diversion of

10   controlled substances with their ultimate concern being first,

11   last, and always to drive sales, make quota, and reach their

12   goals.

13       And, finally, I'd just like to end with a last Teva sales

14   video.  It's called "Pain Lingers," and it certainly does here

15   in San Francisco.

16                (Video was played but not reported.)

17       MS. BAIG:  With that, Your Honor, I have nothing

18   further.  Thank you.

19       THE COURT:  Okay.  Thank you very much.

20       Well, defense wants to proceed tomorrow I assume, and

21   that's fine at 9:30.  I don't know where we've -- were you able

22   to locate -- since I have some time, were you able to locate

23   those documents from Walgreens?

24       MS. SWIFT:  Kate Swift for Walgreens, Your Honor.

25       Yes.  I have most of them.  I was just informed that

**PROCEEDINGS**

1   there's an additional document that is not in my stack that is

2   in the slide deck, but I have -- I have what you've requested.

3          **THE COURT:**  Pardon me?

4          **MS. SWIFT:**  I have what you have requested.

5          **THE COURT:**  Great.  Well, why don't you, if you will,

6   give them -- show them to plaintiffs' counsel and then just

7   hand them to Ms. Scott, and I'll take a look at them.

8        And if there's anything that needs to be supplemented, you

9   may do so.  I'll take a look at them.

10                        (Pause in proceedings.)

11         **THE COURT:**  Okay.  And thank you very much.

12       Ladies and gentlemen, very interesting.  And you probably

13  won't hear a lot of comments out of me.  And don't take

14  anything I say indicative of any direction I'm going.  It's not

15  helpful to you.  It may be helpful to me, I don't know, but it

16  is not helpful.

17       I'm going to listen to the evidence.

18       Thank you very much.  See you tomorrow morning.

19                  (Proceedings adjourned at 2:29 p.m.)

20                        ---oOo---

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    day         , month            date           ,

8

9

10

11    _____

12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
            United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25