Volume 19

Pages 2247 - 2437

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

THE CITY AND COUNTY OF SAN        )
FRANCISCO, et al.,                )
                                  )
            Plaintiffs,           )
                                  )
   VS.                            )   NO. C 18-07591 CRB
                                  )
PURDUE PHARMA, L.P., et al.,      )
                                  )
            Defendants.           )
_____   )

                        San Francisco, California
                        Thursday, June 2, 2022

                   <u>TRANSCRIPT OF PROCEEDINGS</u>

<u>APPEARANCES</u>:

For Plaintiffs:

                   OFFICE OF THE CITY ATTORNEY
                   CITY OF SAN FRANCISCO
                   Fox Plaza
                   1390 Market Street, Sixth Floor
                   San Francisco, California  94102
              BY:  DAVID CHIU, CITY ATTORNEY
                   SARA J. EISENBERG
                   JAIME M. HULING DELAYE
                   JOHN H. GEORGE
                   DEPUTY CITY ATTORNEYS


        (APPEARANCES CONTINUED ON THE FOLLOWING PAGE)


REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

```
 1   APPEARANCES:   (CONT'D)

 2   For Plaintiffs:
                           LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
 3                         275 Battery Street, Suite 2900
                           San Francisco, California  94111
 4                 BY:  ELIZABETH J. CABRASER, ATTORNEY AT LAW
                        RICHARD M. HEIMANN, ATTORNEY AT LAW
 5                      KEVIN R. BUDNER, ATTORNEY AT LAW
                        MICHAEL LEVIN-GESUNDHEIT,ATTORNEY AT LAW
 6                      DONALD C. ARBITBLIT, ATTORNEY AT LAW

 7                         LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
                           222 2nd Avenue South, Suite 1640
 8                         Nashville, Tennessee  37201
                   BY:  MARK P. CHALOS, ATTORNEY AT LAW
 9
                           LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
10                         250 Hudson Street, 8th Floor
                           New York, New York  10013
11                 BY:  PAULINA DO AMARAL, ATTORNEY AT LAW

12                         ROBBINS GELLER RUDMAN & DOWD LLP
                           One Montgomery Street, Suite 1800
13                         San Francisco, California  94104
                   BY:  AELISH M. BAIG, ATTORNEY AT LAW
14                      TAEVA C. SHEFLER, ATTORNEY AT LAW
                        HADIYA K. DESHMUKH, ATTORNEY AT LAW
15
                           ROBBINS GELLER RUDMAN DOWD LLP
16                         120 East Palmetto Park Road, Suite 500
                           Boca Raton, Florida  33432
17                 BY:  PAUL. J. GELLER, ATTORNEY AT LAW
                        MARK J. DEARMAN, ATTORNEY AT LAW
18                      DOROTHY P. ANTULLIS, ATTORNEY AT LAW
                        NICOLLE B. BRITO, ATTORNEY AT LAW
19
                           ROBBINS, GELLER, RUDMAN & DOWD LLP
20                         655 West Broadway, Suite 1900
                           San Diego, California  92101
21                 BY:  X. JAY ALVAREZ, ATTORNEY AT LAW

22                         ANDRUS ANDERSON LLP
                           155 Montgomery Street, Suite 900
23                         San Francisco, California  94104
                   BY:  JENNIE L. ANDERSON, ATTORNEY AT LAW
24

25           (APPEARANCES CONTINUED ON THE FOLLOWING PAGE)
```

**APPEARANCES:   (CONT'D)**

For Plaintiffs:

                         WEITZ & LUXENBERG, P.C.
                         3011 West Grand Boulevard, 24th Floor
                         Detroit, Michigan  48202
         BY:  **PAUL F. NOVAK, ATTORNEY AT LAW**
               **TIFFANY R. ELLIS, ATTORNEY AT LAW**

                         SIMMONS HANLY CONROY LLC
                         112 Madison Avenue, 7th Floor
                         New York, New York  10016
         BY:  **JAYNE CONROY, ATTORNEY AT LAW**
               **JUSTIN PRESNAL, ATTORNEY AT LAW**

                         LEVIN PAPANTONIO RAFFERTY
                         316 South Baylen Street
                         Pensacola, Florida  32502
         BY:  **PETER J. MOUGEY, ATTORNEY AT LAW**

For Defendants Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Actavis LLC; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Watson Laboratories, Inc.; Warner Chilcott Company LLC; Actavis South Atlantic LLC; Actavis Elizabeth LLC; Actavis Mid Atlantic LLC; Actavis Totowa LLC; Actavis Kadian LLC; Actavis Laboratories UT, Inc. f/k/a Watson Laboratories, Inc.-Salt Lake City; and Actavis Laboratories FL, Inc. f/k/a Watson Laboratories, Inc.-Florida:

                         MORGAN, LEWIS & BOCKIUS LLP
                         One Market Plaza, Spear Street Tower
                         San Francisco, California  94105
         BY:  **ZACHARY S. HILL, ATTORNEY AT LAW**

                         MORGAN, LEWIS & BOCKIUS, LLP
                         600 Anton Boulevard, Suite 1800
                         Costa Mesa, California  92626
         BY:  **COLLIE F. JAMES, IV, ATTORNEY AT LAW**

                         MORGAN LEWIS & BOCKIUS, LLP
                         One Oxford Centre, 32nd Floor
                         Pittsburgh, Pennsylvania  15219
         BY:  **WENDY WEST FEINSTEIN, ATTORNEY AT LAW**
               **KATHERINE A. VAKY, ATTORNEY AT LAW**

        **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

1    **APPEARANCES:   (CONT'D)**

2    For Defendant Anda, Inc.:

3                          FOLEY & LARDNER LLP
                         111 Huntington Avenue, Suite 2500
4                          Boston, Massachusetts  02199
                 BY:   **JAMES W. MATTHEWS, ATTORNEY AT LAW**
5                        **KATY E. KOSKI, ATTORNEY AT LAW**

6                          FOLEY & LARDNER LLP
                         555 California Street, Suite 1700
7                          San Francisco, California  94104
                 BY:   **JAIME DORENBAUM, ATTORNEY AT LAW**

8

9    For Defendant Allergan Finance, LLC,  Allergan Sales, LLC and
     Allergan USA, Inc., and specially appearing for Allergan plc:

10                         KIRKLAND & ELLIS LLP
                         300 North LaSalle Street
11                         Chicago, Illinois  60654
                 BY:   **HARIKLIA KARIS, ATTORNEY AT LAW**
12                       **RICHARD HOWELL, ATTORNEY AT LAW**

13   For Defendant Walgreen Co.:

14                         BARTLIT BECK LLP
                         54 West Hubbard Street
15                         Chicago, Illinois  60654
                 BY:   **KATHERINE M. SWIFT, ATTORNEY AT LAW**
16                       **BRIAN C. SWANSON, ATTORNEY AT LAW**

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2    Thursday, June 2, 2022 - Volume 19

 3                                              PAGE   VOL.

 4    Plaintiff Rests                           2255   19

 5    PLAINTIFFS' WITNESSES                      PAGE   VOL.

 6    PREVOZNIK, THOMAS
      By Video Deposition (not reported)        2255   19
 7
      DEFENDANTS' WITNESSES                      PAGE   VOL.
 8
      POLSTER, NATASHA
 9    (SWORN)                                    2256   19
      Direct Examination by Ms. Swift           2256   19
10    Cross-Examination by Mr. Mougey           2322   19

11                      E X H I B I T S

12    PLAINTIFFS' EXHIBITS               IDEN   EVID   VOL.

13     62                                2329   2332   19

14     128                               2327   2328   19

15     2657                              2335          19

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS

1   **Thursday - June 2, 2022**                                    **9:30 a.m.**

2                          **P R O C E E D I N G S**

3                               **---000---**

4          **THE CLERK:**  All rise.  The Court is now in session.

5   The Honorable Charles R. Breyer presiding.

6                          (Pause in proceedings.)

7          **THE CLERK:**  You may be seated.

8          **THE COURT:**  Will you call the case, please.

9          **THE CLERK:**  Calling Civil Action C 18-7591, City and

10  County of San Francisco, et al. vs. Purdue Pharma, et al.

11         **THE COURT:**  Good morning, everyone.

12      Let the record reflect that all parties are present.

13      And we turn to the defense, I think.  I don't know.  Or

14  Ms. Conroy.

15         **MS. CONROY:**  Surprise.

16         **THE COURT:**  Yeah.

17         **MS. CONROY:**  Good morning, Your Honor.

18         **THE COURT:**  Somebody should speak, whoever it is.

19         **MS. CONROY:**  We --

20         **THE COURT:**  Yes, good morning.

21         **MS. CONROY:**  We have -- good morning.

22      We do have the final deposition to play first thing this

23  morning.

24         **THE COURT:**  Okay.

25         **MS. CONROY:**  Okay.

1          **THE COURT:**  Then let's do that.

2          **MS. CONROY:**  And so Mr. Thomas Prevoznik,

3     P-R-E-V-O-Z-N-I-K.

4          **THE COURT:**  P-R-E --

5          **MS. CONROY:**  P-R-E-V-O-Z-N-I-K.  He was the DEA

6     30(b)(6) witness.  At the time of his deposition, he was the

7     acting section chief of pharmaceutical investigation for the

8     DEA's Diversion Control Division.

9          This short 16-minute video contains both the plaintiff and

10    the defendant designations.  The video begins with questioning

11    by defense counsel and ends with questions from plaintiffs'

12    counsel.

13         Mr. Prevoznik will reiterate Mr. Rannazzisi's testimony

14    that the DEA provides guidance to the registrants, but that the

15    implementation of an effective suspicious order monitoring

16    system is dependent on the registrant and in consideration of

17    the registrant's particular business model.

18         Mr. Prevoznik will testify that once a pharmacy has

19    flagged an order as suspicious, it should remain flagged until

20    due diligence has resolved all suspicions.

21         He will confirm that after-the-fact reporting of a

22    suspicious order has never been in compliance with the law

23    pursuant to guidance by the DEA.  The registrant has a duty to

24    not ship suspicious orders.  That is and always has been the

25    law.

PROCEEDINGS

1          **THE COURT:**  I'm sorry.  How long did you say this was

2    going to be?

3          **MS. CONROY:**  16 minutes.

4          **THE COURT:**  16.  Okay.

5      Yes.

6          **MS. KOSKI:**  Thank you, Your Honor.  Katy Koski for

7    Anda, Inc.

8      And on behalf of all defendants, as Mr. Conroy indicated,

9    Mr. Prevoznik was designated to testify on behalf of the DEA in

10   response to defendants' Rule 30(b)(6) witness.

11     You'll hear testimony on behalf of the DEA about the

12   evolving guidance given to distributors regarding order

13   monitoring from the early days of the excessive purchase system

14   to the evolution of today's more sophisticated electronic

15   system.

16     DEA through Mr. Prevoznik confirms there is no, quote,

17   "one-size-fits-all system" that complies with the CSA; rather,

18   every registrant is charged with designing and implementing a

19   system based on their own business and customer base.

20     Furthermore, he will testify that DEA conducted regular

21   audits where DEA investigators reviewed not only the particular

22   policies and procedures a registrant had in place for its

23   overall SOMS, but specifically reviewed the monitoring system

24   itself.  DEA informed the registrant if and when changes were

25   needed.

1      Finally, DEA confirmed that if a registrant is found out

2  of compliance, a range of actions could be taken against that

3  registration.

4      And I would just note, as Ms. Conroy said, there are clips

5  from both sides.  At about the 10-minute mark, you'll hear one

6  of plaintiff's counsel introduce themselves, which I think is

7  approximately when it switches from defendant to the plaintiff.

8         **THE COURT:**  Great.

9         **MS. KOSKI:**  Thank you.

10        **THE COURT:**  Thank you very much.

11        (Video was played but not reported.)

12        **THE COURT:**  Thank you.  Anything further from the

13  plaintiffs?

14        **MS. CONROY:**  Nothing further from plaintiffs,

15  Your Honor.

16        **THE COURT:**  Okay.  So subject to there's some

17  documents and we're working on that, the plaintiff rests; is

18  that correct?

19        **MS. CONROY:**  That's correct, Your Honor.

20        **THE COURT:**  All right.  So let me turn to the defense.

21        **MS. SWIFT:**  Thank you, Your Honor.  Kate Swift for

22  Walgreens.

23        **THE COURT:**  Yes.

24        **MS. SWIFT:**  Walgreens calls Tasha Polster to the

25  stand.

POLSTER - DIRECT / SWIFT

1          **THE COURT:**  Okay.

2                          (Pause in proceedings.)

3          **MS. SWIFT:**  I believe she is just right outside.

4                          (Pause in proceedings.)

5          **THE CLERK:**  Please raise your right hand.

6                          <u>**NATASHA POLSTER**</u>,

7    called as a witness for the Defendants, having been duly sworn,

8    testified as follows:

9          **THE CLERK:**  Please be seated.

10        Please state your full name for the record and spell your

11   last name.

12         **THE WITNESS:**  Natasha Polster, P-O-L-S-T-E-R.

13                      <u>**DIRECT EXAMINATION**</u>

14   BY MS. SWIFT:

15   **Q.**   Good morning, Ms. Polster.

16   **A.**   Good morning.

17   **Q.**   Would you please introduce yourself to the Court and

18   explain what you do at Walgreens today?

19   **A.**   Good morning.  I am Tasha Polster.  I lead the pharmacy --

20         **THE COURT:**  Could you pull your chair a bit closer to

21   the microphone or the microphone closer to you?

22         **THE WITNESS:**  Sure.

23         **THE COURT:**  I have some hearing issues so --

24         **THE WITNESS:**  No problem.

25         **THE COURT:**  -- I want to hear your testimony.

1        **THE WITNESS:**  Okay.  Tasha Polster.  I lead the

2  pharmacy patient safety and compliance for the Walgreens retail

3  chain; and in that responsibility is patient safety, the

4  Pharmacy Integrity Group, prescription third-party billing, the

5  prescription drug monitoring program, and the immunization

6  program.

7  **BY MS. SWIFT:**

8  **Q.**    When did you start working in Walgreens?

9  **A.**    In 1982.

10  **Q.**    Were you in high school at that point?

11  **A.**    Yes.

12  **Q.**    What did you do when you first started at Walgreens?

13  **A.**    I was a cashier.

14  **Q.**    Did you work through pharmacy school at Walgreens as a

15  pharmacy technician?

16  **A.**    Yes, I did.

17  **Q.**    When did you graduate from pharmacy school?

18  **A.**    In 1989.

19  **Q.**    And did you begin as a pharmacist at Walgreens right after

20  you graduated in 1989?

21  **A.**    Yes, I did.

22  **Q.**    I don't want to spend too much time on your lengthy

23  history, but have you worked at Walgreens as a staff

24  pharmacist, a pharmacy manager, a pharmacy supervisor?

25  **A.**    Yes.

**POLSTER - DIRECT / SWIFT**

1    **Q.**    Those are all field positions; is that right?

2    **A.**    Correct.

3    **Q.**    How long did you spend working in the field at Walgreens?

4    **A.**    I had been out of pharmacy school -- let's see, I moved to

5    the support office in 2002.  I graduated in '89, and then I

6    took a support center role.

7    **Q.**    What is the support center?

8    **A.**    It's the corporate office for Walgreens.

9    **Q.**    What role did you take when you moved to the support

10   center?

11   **A.**    It was a manager of operating systems.  It was responsible

12   for our intranet and pharmacist payroll system.  It was more a

13   support center role to help on the back end of the work that

14   our pharmacists needed in order to do their everyday job.

15   **Q.**    You refer to it as a support center or support office.

16   Who are you supporting?

17   **A.**    The stores and the people within the stores as well as

18   customers.

19   **Q.**    Is that specifically the pharmacy end of the stores?

20   **A.**    Yes.

21   **Q.**    Okay.  In 2012 were you promoted to head up a new team

22   called Pharmaceutical Integrity?

23   **A.**    Yes.

24   **Q.**    Have your responsibilities as the head of Pharmaceutical

25   Integrity included executing on compliance for both dispensing

POLSTER - DIRECT / SWIFT

1  and distributing controlled substances?

2  **A.**   Yes.

3  **Q.**   Explain just briefly what you do as the head of

4  Pharmaceutical Integrity.

5  **A.**   So my team is responsible for the policies and procedures

6  around controlled substances, how many controlled substances go

7  into any location.

8      We support the stores if they have any questions around an

9  order or how to proceed on, you know, different ways to

10  document prescription filling.

11     I'm also responsible for being the liaison with the DEA if

12  a subpoena would come in, if there's a question.

13     Sometimes law enforcement will reach out to my team for

14  documents or -- and just examples like that.

15  **Q.**   Before Pharmaceutical Integrity was put in place in 2012,

16  were other groups responsible for controlled substance

17  compliance at Walgreens?

18  **A.**   Yes.

19  **Q.**   How do you know that?

20  **A.**   When -- back in 2012 before I took over for the Pharmacy

21  Integrity Group, there were a series of cross-functional

22  meetings that had many people from the organization and

23  different business units from supply chain, the distribution

24  centers, pharmacy inventory, loss prevention, and they all had

25  a role.

POLSTER - DIRECT / SWIFT

1  **Q.**   Was one of the goals of your group, Pharmaceutical

2  Integrity, to bring all of those different functions under one

3  roof?

4  **A.**   Yes.

5  **Q.**   Where do you fit into the hierarchy at Walgreens?   How

6  many steps down from the president are you?

7  **A.**   Two steps.

8  **Q.**   And how many people work for you?

9  **A.**   My entire business team, I have about a hundred people.

10 **Q.**   How many people work for you in Pharmaceutical Integrity?

11 **A.**   I have 15 people.

12 **Q.**   And just very briefly, what are their backgrounds?

13 **A.**   I have one manager that is loss -- law enforcement and

14 then he worked in the Loss Prevention Department before he came

15 to my team.

16      I have a pharmacist, and I have a manager that helps with

17 data and posting information into our intranet.   And I have a

18 director that is over that group now, and he is also a

19 pharmacist.

20 **Q.**   And you mentioned that you have somebody with law

21 enforcement background and loss prevention background.   Just

22 very briefly, what is loss prevention at Walgreens?

23 **A.**   Loss Prevention is our team that helps protect company

24 assets they have boots on the ground, loss prevention managers

25 that go into stores, help with investigations, are -- you know,

1    they work with local law enforcement on, you know, various

2    things that happen at the stores as well as look for different

3    trends at stores.  They have responsibility for front-end and

4    pharmacy.

5    **Q.**   Are you still licensed as a pharmacist today?

6    **A.**   I am.

7    **Q.**   Do you still fill prescriptions?

8    **A.**   No.

9    **Q.**   Why do you maintain your pharmacy license?

10   **A.**   You know, I worked really hard for that license.  It was

11   not easy to get.  So there's no sense getting rid of it, I

12   didn't think.

13   **Q.**   All right.  I want to ask you some questions about

14   Walgreens' distribution of controlled substances.

15        **THE COURT:**  Before you get there, could you tell me

16   how many -- now I'm looking at 2012, and have you maintained

17   the same position since 2012?

18        **THE WITNESS:**  No.  I've -- then I was a director, then

19   I was promoted to a senior director, and now I'm a vice

20   president.

21        **THE COURT:**  But with respect to your responsibilities

22   over Pharmaceutical Integrity, does that still -- is that still

23   within your --

24        **THE WITNESS:**  Yes, it is.

25        **THE COURT:**  -- ambit of responsibility?

POLSTER - DIRECT / SWIFT

1        And during that period of time, from 2012 to the present

2    or 2017 or so, let's take that period of time, not the present

3    but that period of time, could you give me an approximation --

4    and I know it is an approximation -- of how many pharmacies

5    Walgreens had and how many pharmacists --

6            THE WITNESS:  Sure.

7            THE COURT:  -- did they have during that period of

8    time, which would have fallen within the ambit of your

9    responsibility?

10           THE WITNESS:  Sure.  Approximately 10,000 stores at

11   that time, and --

12           THE COURT:  And what time are we talking about?

13           THE WITNESS:  From 2012 to 2017.

14           THE COURT:  That's fine.

15           THE WITNESS:  Yeah.  I would say approximately 10,000

16   stores we had open, most of which have pharmacies.  We only

17   have a few that do not have pharmacies.  And we have

18   approximately 26,000 pharmacists that are in our employ.

19           THE COURT:  And in terms of geography, are you in

20   every state or are you in fewer than every state?

21           THE WITNESS:  We are in every state.  There is one

22   state where we have one store that does not have a pharmacy.

23           THE COURT:  Okay.  And in -- may I -- you may or may

24   not know this, and maybe they're going to get to it, but let's

25   talk about San Francisco for a minute.

POLSTER - DIRECT / SWIFT

```
1              THE WITNESS:  Sure.

2              THE COURT:  Do you know how many pharmacies that were

3     Walgreens pharmacies from 2012 to 2017?

4              THE WITNESS:  I know I'm not --

5              THE COURT:  Roughly.

6              THE WITNESS:  Yeah.  I know I'm not going to have the

7     number right.  Today we have 38 within San Francisco, but I

8     know we've closed a few recently and --

9              THE COURT:  Right.

10             THE WITNESS:  -- I don't know the exact number.

11             THE COURT:  Do you know how many pharmacists roughly?

12             THE WITNESS:  Um...

13                        (Pause in proceedings.)

14             THE WITNESS:  I would say it probably averages from

15    two-and-a-half -- well, there's two-and-a-half pharmacists for

16    every store that is not a 24-hour store, and there are four

17    pharmacists or four-and-a-half pharmacists for 24-hour stores.

18             THE COURT:  You're going to have to tell me what a

19    half a pharmacist is.

20                           (Laughter)

21             THE WITNESS:  So it would mean that the pharmacist

22    shares two stores.  They go between two different locations.

23             THE COURT:  I see.  That's great.  Well, thank you so

24    much.

25             THE WITNESS:  Sure.
```

1          **THE COURT:**  Sorry to interrupt, but I wanted to get

2     some numbers there.

3          **MS. SWIFT:**  Oh, no.  You saved me some questions,

4     Judge.  Thank you.

5          **THE COURT:**  Well, I assumed you were going to get to

6     it.  I should be patient.

7          **MS. SWIFT:**  We may come back to some of those issues

8     in a bit.

9          **THE COURT:**  Okay.  Please go ahead.

10          **MS. SWIFT:**  First I'm going to ask questions about

11     Walgreens' distribution of controlled substances, which has

12     been an issue in the case.

13     **BY MS. SWIFT:**

14     **Q.**   Does Walgreens distribute controlled substances today?

15     **A.**   No.

16     **Q.**   When did Walgreens stop distributing controlled

17     substances?

18     **A.**   In 2014.

19     **Q.**   Did Walgreens ever distribute controlled substances to

20     non-Walgreens pharmacies?

21     **A.**   No.

22     **Q.**   Did Walgreens ever distribute controlled substances to

23     internet pharmacies?

24     **A.**   No.

25     **Q.**   Did Walgreens ever distribute controlled substances to

1   pain clinics?

2   **A.**   No.

3   **Q.**   When you started in Pharmaceutical Integrity in 2012, did

4   Walgreens already have a system in place to monitor the orders

5   for controlled substances that Walgreens' pharmacies placed

6   with its distribution centers?

7   **A.**   Yes.

8   **Q.**   All right.  I'm going to show you a document that is cited

9   in your declaration.  This is WAG-MDL-00324, and it's also in

10  your binder.

11      Do you recognize this document, Ms. Polster?

12  **A.**   Yeah.  My monitor is not working.  I don't know if that

13  doesn't matter --

14  **Q.**   That's a problem.

15  **A.**   -- but I have the hard copy here.

16          **THE CLERK:**  You need to switch it on.

17          **MS. SWIFT:**  Okay.  Great.

18          **THE COURT:**  We'll turn it on in a minute.  We're

19  trying to turn it on now.

20          **MS. SWIFT:**  Will you let us know when you see it?

21          **THE WITNESS:**  Sure.  I have the hard copy here too.

22          **THE COURT:**  Well, I'd prefer if it were on the

23  screen --

24          **THE WITNESS:**  Gotcha.

25          **THE COURT:**  -- and anybody who's watching these

1    proceedings can then see it too.  So let's just wait a minute.

2            MR. JAMES:  Your Honor, on that point I am told

3    that --

4            THE COURT:  Sorry.  Go ahead, Mr. James.

5            MR. JAMES:  -- the volume on the Zoom feed is not on

6    or they can see but they can't hear anything.

7            THE COURT:  You can see and not hear?

8            THE CLERK:  I have it on, but let me turn it off and

9    back on.

10           MR. JAMES:  Great.  Thanks.  Sorry to interrupt.

11           THE COURT:  Yeah, and I would appreciate -- obviously

12   you're able to monitor this or somebody is.

13                      (Pause in proceedings.)

14           THE COURT:  Just let me know if there seems to be a

15   problem.  I mean, we don't see it here, but you might.

16           THE CLERK:  Okay.  It's on.

17           THE COURT:  You might have your teams, teams --

18           MS. SWIFT:  Can you see it now?

19           THE COURT:  -- teams, teams of lawyers --

20                         (Laughter)

21           THE COURT:  -- vast teams of lawyers out there.

22           THE CLERK:  I'm getting different messages.  Some can

23   see.  Some can't see.  Some can hear.  Some can't hear.  But I

24   think we're good now.

25           THE COURT:  You think we're, like, good enough; is

**POLSTER - DIRECT / SWIFT**

1     that it?

2                        (Laughter)

3          **THE COURT:**  Or really good or as good as it gets for

4     government work, that's what I always say.

5          Okay.  Go ahead.  But if there's a problem, please, just

6     somebody let me know and I'll try to help you.  Thank you so

7     much.

8     **BY MS. SWIFT:**

9     **Q.**   Ms. Polster, can you see WAG-MDL-324 on the screen now?

10    **A.**   Yes.

11    **Q.**   Is this -- are you familiar with this document?

12    **A.**   Yes, I am.

13    **Q.**   Does WAG-MDL-324 describe the system that Walgreens had in

14    place for controlled substance ordering when you came into your

15    role in Pharmaceutical Integrity in 2012?

16    **A.**   Yes.  It describes kind of a history of it because it had

17    already been in place for a while but, yes.

18    **Q.**   I'm going to focus your attention on Slide Number 3.  Does

19    Slide 3 show that history that you just mentioned of Walgreens'

20    controlled substance reporting system as it existed at the

21    corporate office?

22    **A.**   Yes.

23    **Q.**   And can we call that system CSR for short?

24    **A.**   Sure.

25    **Q.**   That's how it's referred to in the document; is that

POLSTER - DIRECT / SWIFT

1  right?

2  **A.**   Correct.

3  **Q.**   Was this CSR system always operated out of the corporate

4  office?

5  **A.**   Yes.

6  **Q.**   Who at Walgreens is in charge of this system, if you know?

7  **A.**   Well, my -- my team is the business user of the system and

8  then the IT team that we work with is responsible for the

9  functionality; and if we want to make an enhancement to the

10 system or make a change, then we would work through them to do

11 that.

12 **Q.**   When you were brought in to set up Pharmaceutical

13 Integrity in 2012, what phase was the CSR system in?

14 **A.**   The Phase 5 is -- was just being released or about to be

15 released when I took over.

16 **Q.**   And is that what I'm highlighting on the screen right now

17 next to the number 5?

18 **A.**   Yes.

19 **Q.**   At that point in 2012 was there also still a process in

20 place to monitor orders for controlled substances at the

21 distribution centers?

22 **A.**   Yes.

23 **Q.**   How do you know that?

24 **A.**   Through that cross-functional team that I referred -- or

25 meeting that I had referred to before, I had heard that

1   distribution person speaking about that.

2   **Q.**   And you can see here on Phase 5 where that's discussed,

3   there's a reference to ceiling limits.  Do you see that?

4   **A.**   Yes.

5   **Q.**   What's a ceiling limit?

6   **A.**   A ceiling limit is the amount of controlled -- any one

7   controlled substance that can be -- that can go into a store

8   over a six-week rolling period of time.

9   **Q.**   Does -- I just flipped to the next page of the document.

10  It's page 4 of WAG-MDL-324.  Does this page describe how a

11  ceiling limit is calculated at Walgreens?

12  **A.**   Yes, it does.

13  **Q.**   And without getting too much into the weeds on how the

14  algorithm is run, is the ceiling limit different for each

15  store?

16  **A.**   Yes, it is.  We take -- we take a store and its volume and

17  compare it to peer group stores that are of the same volume,

18  and we -- the -- the mathematician that we hired to do this

19  created an algorithm that we try to keep the look -- the amount

20  of controlled substances under this ceiling, which is a linear

21  regression line based on the amount of volume that they do in

22  comparison from store to store.

23      And if for whatever reason that store needs to go above

24  that line, which you can see indicated by some of those dots

25  that are above the line there, any store that needs more than

1    what our system calculates would have to order -- request their

2    store to be reviewed and submit documentation as to why that

3    store would need more than the linear regression line

4    calculation that the system has in place.

5    **Q.**   Who has to review that request for an override?

6    **A.**   The first level of review is the district manager who's

7    boots on the ground responsible for that location.

8         And then after they put in their comments and they've done

9    their review, it goes up to my team to review and make the

10   ultimate decision whether or not we're going to pass it to the

11   wholesaler for fulfillment.

12         **THE CLERK:**  I need to turn the video off on Zoom and

13   turn it back on.

14         **MS. SWIFT:**  Okay.

15         **THE CLERK:**  There are still complaints.

16                    (Pause in proceedings.)

17         **THE CLERK:**  The Zoom is turning on and off the

18   evidence.  I just turned it on and it just turned it off.  I

19   will try it again.

20         **MS. SWIFT:**  Okay.

21         **THE CLERK:**  Sorry.

22                    (Pause in proceedings.)

23         **THE CLERK:**  It's on for now.

24         **MS. SWIFT:**  Okay.  We'll see how we do.

25   \\\

 1   **BY MS. SWIFT:**

 2   **Q.**   Ms. Polster, I think you touched on this very briefly in

 3   the course of a prior answer, but does -- the ceiling limit, is

 4   it based on prior order history of the store?

 5   **A.**   Yeah.  Order history is considered in that and it's a

 6   six-week rolling history.

 7   **Q.**   Does that mean that the store -- each individual store's

 8   ceiling limit changes over time?

 9   **A.**   Yes, it could.

10          **THE CLERK:**  Oh, it's off again.

11                  (Pause in proceedings.)

12   **BY MS. SWIFT:**

13   **Q.**   Did Walgreens stop using --

14          **THE COURT:**  Well, can I ask a question on this?

15   Because I want to make sure I understand it.

16      I see this linear line.  I'm now looking at Phase 5,

17   functionality.

18          **THE WITNESS:**  Sure.

19          **THE COURT:**  Do you see it on your screen?

20          **THE WITNESS:**  Yes.

21          **THE COURT:**  And it says (as read):

22       "Each store in the chain is represented by a dot in

23      this chart."

24      And it also is a line, and I can't really read it very

25   well, but on the -- on the -- on the vertical axis it's

 1   between -- yeah, let's see, maybe that will highlight it.

 2       Okay.  The line commences between 10K and 15K.

 3           **THE WITNESS:**  Correct.

 4           **THE COURT:**  And then it goes vertically -- I mean,

 5   pardon me, horizontally up to a different limit over time.  Is

 6   it over time or is it over some other measure?

 7           **THE WITNESS:**  Total --

 8           **THE COURT:**  Daily total scripts.

 9           **THE WITNESS:**  Yeah.  The volume of the store based on

10   the prescriptions.

11           **THE COURT:**  So the argument, as I understand this --

12   and, again, I know I'm interrupting you.  I apologize for that,

13   but I don't want to leave a chart that I just don't understand.

14       As I understand this, if you have a store, as an example,

15   that issues 700 scripts a day, that clearly would have a higher

16   ceiling than that which issues 100.

17           **THE WITNESS:**  Correct.

18           **THE COURT:**  Okay.  And the line represented it.

19           **THE WITNESS:**  Right.

20           **THE COURT:**  My question is:  How is that line chosen?

21   That is to say, it's -- it is -- it commences between 10,000

22   and 15,000; right?

23           **THE WITNESS:**  Yes.

24           **THE COURT:**  My question is:  What was the basis for

25   commencing the line -- we'll call it 12,000.

POLSTER - DIRECT / SWIFT

1          THE WITNESS:  Sure.

2          THE COURT:  -- just for ease -- at 12,000 rather than

3    10,000 --

4          THE WITNESS:  Sure.

5          THE COURT:  -- 8,000, 20,000?

6          THE WITNESS:  Well, what I'd like to do is call your

7    attention to the dark line below that, which is the average

8    chain-wide relationship.

9          THE COURT:  Okay.

10         THE WITNESS:  So that line, you know, you can see

11   where the average store -- all those dark blue dots, that's the

12   average --

13         THE COURT:  Okay.

14         THE WITNESS:  -- volume of most of the chain.

15     Then we have the stores that hit in between, and then we

16   have the stores that are above the ceiling for whatever reason

17   is going on.

18     I don't know all the details to go into all the

19   algorithms, but I can speak in generalities.

20     There are a lot of factors that are determined or at least

21   considered when the ceilings are calculated; where -- what's

22   the percent of controlled substances to noncontrolled

23   substances in a location, the location of like a surgical

24   center or a, you know, hospital to that location.  There's

25   going to be different demographic.

POLSTER - DIRECT / SWIFT

1          **THE COURT:**  I can appreciate that, but that's actually

2     not my question.

3          **THE WITNESS:**  Okay.

4          **THE COURT:**  Because I understand how the line

5     operates, and I understand -- and I'm looking at a

6     distribution.

7          And what I'm trying to figure out is -- because I think

8     that's where the testimony is -- is whether something exceeds

9     the ceiling and then what do you do if something exceeds the

10    ceiling.

11         But my question is:  How do you get that ceiling?  In

12    other words, I see the average line.

13         **THE WITNESS:**  Right.

14         **THE COURT:**  So that means some are above and some are

15    below, and I understand that.

16         And I see the mass of blue, which is -- well, I don't

17    know, they're different colors.  I'm sorry.  I don't know that

18    I appreciate the colors yet.

19         But, again, my question is -- and maybe it's not clear,

20    but my question is:  The line starts between 10 and 15,000, yet

21    the average is considerably below that.

22         And I wondered, since this is a triggering device, that

23    is, it calls for certain actions by the pharmacies, it's clear

24    to me that if a line, as an example, was at 20,000 rather than

25    15,000 or 12,000, there would be far fewer triggers or there

1    would be far fewer inquiries with respect to prescriptions.

2         So the line has a particular significance because it then

3    is the triggering mechanism on this system.

4              **THE WITNESS:**  Yes.

5              **THE COURT:**  And so what do you understand, if you do

6    have an understanding, caused the line to be set at 12,000

7    rather than 8,000?

8              **THE WITNESS:**  I would not be able to speak to that in

9    exact detail.  It was just -- that specific feature was rolling

10   out right when I took over, and I do not know the exact reason

11   for that.

12             **THE COURT:**  Okay.

13             **MS. SWIFT:**  If I may, Your Honor.

14             **THE COURT:**  Thank you very much.

15        And maybe there will be further testimony about that

16   further on in the trial, but that is a question in -- I want to

17   tell the parties --

18             **MS. SWIFT:**  Understood.

19             **THE COURT:**  -- that's a question in my mind because

20   you're coming in and telling me this is a controlled mechanism

21   and -- which I appreciate, which I understand it is, or at

22   least intended to be, and I need to know, well, to be candid

23   with you, was it effective in the sense that the way it was

24   constructed was designed to capture the issues that we're

25   talking about in the trial.  Okay?

```
1        Thank you.
2            MS. SWIFT:  I'm going to explore it a little bit just
3   to see if it helps --
4            THE COURT:  Go right ahead.
5            MS. SWIFT:  -- without exceeding the limits of the
6   witness' knowledge --
7            THE COURT:  Well, okay.  Yeah.
8            MS. SWIFT:  -- obviously.
9   BY MS. SWIFT:
10  Q.   Ms. Polster, do you have an understanding that when the
11  ceiling limit was designed, Walgreens hired a mathematician to
12  help design an algorithm to figure out where to set that
13  ceiling limit line?
14  A.   Yes.
15  Q.   When you were coming into your role in 2012 and the
16  ceiling limit was rolling out, was part of your team's job to
17  evaluate how the ceiling limit was working in practice for
18  various stores around the country?
19  A.   Yes.  We did give feedback -- and I think his name was
20  Steve Bancroft or something like that -- we did give feedback
21  and he took that feedback and made, you know, changes
22  accordingly.
23  Q.   If I can interrupt you, what do you mean when you say you
24  gave feedback?
25  A.   So when my team was learning how to use the system --
```

POLSTER - DIRECT / SWIFT

 1   because it's already in place when I took over -- and my team

 2   began to learn to use the system and understand the triggers

 3   and understood what was happening when a ceiling override had

 4   to come in, a request to get more product, they would ask

 5   questions, work with Steve.

 6        I don't know if he took any of that feedback and made

 7   changes or not, but I do know that they met with him numerous

 8   times to learn how to understand the system and what the

 9   trigger points were.

10   Q.   And was there an attempt through your team to figure out

11   whether the ceiling limit was limiting stores too much, whether

12   it was not limiting them enough?  Did you get feedback from the

13   stores on those sorts of issues?

14   A.   Yes.  So when -- when that would happen, an example of

15   that would be if there was a new manufacturer because our

16   system works NDC by NDC, so if there was --

17   Q.   Explain to the Court what an NDC is.

18   A.   An NDC is a national drug code.  It's a number that's used

19   in pharmacy that each individual drug has its own unique

20   number.

21        And if a new manufacturer, a new generic company was

22   making a product and we'd never dispensed that product before

23   in the store, the ceiling -- or even the orders may not be set

24   correctly.

25        And so we would have to work with his team to understand:

 1   Okay.  What do we need to do differently to ensure that if

 2   we're phasing out a certain manufacturer, that the store still

 3   has product for their patients?

 4   **Q.**   Did Walgreens stop using the ceiling limits, or any other

 5   part of its order monitoring system, when Walgreens stopped

 6   distributing controlled substances?

 7   **A.**   No.

 8          **THE COURT:**  I'm sorry.  We're having, as they say,

 9   technical difficulties, so I think --

10          **MS. SWIFT:**  Take a break?

11          **THE COURT:**  -- we'll take a break.

12      And thank you so much, and I am following your testimony

13   so even though it's --

14          **MS. SWIFT:**  I'll re-ask the last question.

15          **THE COURT:**  That's great.

16      Okay.  Let's break subject to technological advances.

17                   (Recess taken at 10:18 a.m.)

18              (Proceedings resumed at 10:33 a.m.)

19          **THE CLERK:**  Come to order.  Court is now in session.

20                   (Pause in proceedings.)

21          **THE CLERK:**  You may be seated.

22          **THE COURT:**  Okay.  Let the record reflect all parties

23   are present.

24      I understand there was a loose cable, and now we have a

25   wonderful graphic up, it's very colorful but I don't think it's

1    necessarily the exhibit that we were referring to.

2              **MS. SWIFT:**  Are we back up and running?

3              **THE CLERK:**  Yes, we are, hopefully.

4              **MS. SWIFT:**  Excellent.

5                        (Pause in proceedings.)

6              **MS. SWIFT:**  I might have made it go down.

7              **THE CLERK:**  Okay.  There we go.

8              **THE COURT:**  All right.  Thank you.

9         You may proceed.

10             **MS. SWIFT:**  Thank you, Your Honor.

11   **BY MS. SWIFT:**

12   **Q.**   Welcome back, Ms. Polster.  Just a couple more questions

13   on this CSR system.

14        Is the ceiling limit the only threshold that operates as

15   part of the CSR system at Walgreens?

16   **A.**   No.

17   **Q.**   Is there another threshold that's called a tolerance

18   threshold?

19   **A.**   Yes.

20   **Q.**   What is that?

21   **A.**   That is -- limits the number of bottles that can go into a

22   store at any one given order.

23   **Q.**   And do you know how the tolerance threshold is set for an

24   individual store?

25   **A.**   Not in detail enough to be able to speak to it.

POLSTER - DIRECT / SWIFT

1   Q.   Did Walgreens stop using this CSR system when it stopped

2   distributing controlled substances?

3   A.   No.

4   Q.   Why not?

5   A.   I felt that it was -- I felt it was a really good system.

6   We had -- it gave us good visibility into what the stores were

7   ordering, and it gave me an additional way to ensure I had

8   documentation.

9        Our wholesaler will at times question an order and if

10  they -- you know, because through their course of corresponding

11  responsibility, they may stop an order on -- based on their

12  system, and this way I had documentation for what we felt was

13  appropriate for a store and we can give them that documentation

14  as part of our due diligence for them.

15  Q.   If something out of the ordinary is going on at one of

16  Walgreens' stores in terms of how they order controlled

17  substances, is that something that you and your team want to

18  know about?

19  A.   Yes.

20  Q.   And then do you take steps to address it if that happens?

21  A.   Yes.  We will work with field leadership.  We would ask

22  field leadership to go into the store and do a supervision

23  visit specifically around that ask to understand what has

24  changed or what might be different.

25  Q.   All right.  Now I'm going to change topics and ask you

**POLSTER - DIRECT / SWIFT**

1   some things about dispensing of controlled substances at

2   Walgreens.  Okay?

3   **A.**   Okay.

4   **Q.**   Do pharmacists have a professional obligation to provide

5   medications to patients in need?

6   **A.**   Yes.

7   **Q.**   Why is that?

8   **A.**   You know, it's part of the oath that we take.  It's their

9   job to provide medications based on a prescription from a

10  prescriber.

11  **Q.**   Can it cause significant harm to a patient if they don't

12  get the medication that they need?

13  **A.**   Yes.

14  **Q.**   Is that true of controlled substances medications?

15  **A.**   In some cases.

16  **Q.**   Do pharmacists also have a responsibility to refuse to

17  fill prescriptions that were not written for a legitimate

18  medical purpose?

19  **A.**   Yes.

20  **Q.**   Does Walgreens have a policy for its pharmacists around

21  dispensing controlled substances to help guide them in making

22  those decisions?

23  **A.**   Yes.

24  **Q.**   What is that policy called?

25  **A.**   The good faith dispensing policy.

POLSTER - DIRECT / SWIFT

1   Q.   How long has Walgreens had a good faith dispensing policy?

2   A.   Ever since I remember filling prescriptions.  So there's

3   always been one in place since I've been a pharmacist for

4   Walgreens.

5   Q.   Remind us what year you became a pharmacist.

6   A.   1989.

7   Q.   Are you familiar with the various iterations of Walgreens'

8   good faith dispensing policy over the years based on your work

9   at Walgreens for several decades?

10   A.   Yes, I am.

11   Q.   Do you recognize the document that I've put on the screen

12   as a Walgreens' good faith dispensing policy from 1988?

13   A.   Yes.

14   Q.   Okay.  This is WAG-MDL-00018.  And I'm going to call out

15   the bullet list on the first page there.

16       Do you recognize that bullet list as a set of red flags,

17   to use today's parlance?

18   A.   Yes.

19   Q.   I want to ask you about one of them.  It says (as read):

20           "Increased frequency of prescriptions for the same

21       controlled drug by one prescriber."

22       Do you see that?

23   A.   Yes.

24   Q.   Why is that sometimes a concern?

25   A.   If a prescriber has changed their prescribing pattern --

1  practice where maybe they rarely wrote controlled substance

2  prescriptions in the past and now they're writing more

3  controlled substance prescriptions, it would be good for the

4  pharmacist to understand what has changed.

5      Did they change disciplines?  Did they, you know, start

6  doing more orthopedic surgery instead of just consultations?

7      It's always good to understand the "why" behind it as

8  they're making a decision on whether the prescription was

9  written in good faith.

10 **Q.**  Is that something that Walgreens has always told its

11 pharmacists to look out for?

12 **A.**  Yes.

13 **Q.**  Below the bullet list in the 1998 good faith dispensing

14 policy -- let's see if I can call this out -- it says (as

15 read):

16      "If a pharmacist becomes aware of circumstances

17      including one or more elements of good faith

18      dispensing" --

19      And do you understand that to mean one or more of the

20 things that are bullet listed above?

21 **A.**  Yes.

22 **Q.**  It says (as read):

23      "If a pharmacist becomes aware of any of those

24      circumstances, the pharmacist should not dispense the

25      drug."

**POLSTER - DIRECT / SWIFT**

1           Do you see that?

2   **A.**   Yes.

3   **Q.**   Has it always been Walgreens' policy that a pharmacist

4   should not dispense if they can't resolve red flags on a

5   prescription?

6   **A.**   Yes.

7   **Q.**   Is that Walgreens' policy still to this day?

8   **A.**   Yes.

9   **Q.**   All right.  I'm going to show you another one of these

10  policies.

11          Now, I've got on the screen another good faith practices,

12  fraudulent prescriptions policy.  It's WAG-MDL-01756.  Do you

13  see that on the screen?

14  **A.**   Yes.

15  **Q.**   And just so that we can get the date on this one, do you

16  see at the bottom of the second page where it says "Revised

17  June 26, 2006"?

18  **A.**   Yes.

19  **Q.**   Do you recognize this document as the 2006 good faith

20  dispensing policy at Walgreens?

21  **A.**   Yes, I do.

22  **Q.**   All right.  I want to focus on the bottom half of the

23  first page.  It says "Prescription Validation Procedures."  Do

24  you see that?

25  **A.**   Yes.

**POLSTER - DIRECT / SWIFT**

1  Q.   Do you see in the bullet where it talks about documenting

2  validation from the prescriber on a prescription?

3  A.   Yes.

4  Q.   And then it also says, let's see if I can highlight this

5  part (as read):

6          "If the pharmacist confirms the validity of the

7       prescription, document this on the hard copy and process

8       the prescription as normal."

9       And this is something the Court has heard about in this

10  trial so I want to ask you about it directly.

11      If a doctor says to a Walgreens pharmacist "Just fill the

12  prescription," is that what the pharmacist is supposed to do?

13  A.   No.

14  Q.   If the pharmacist thinks that the doctor is suspicious, is

15  the pharmacist supposed to just take the doctor's word that the

16  prescription is legitimate?

17  A.   No.

18  Q.   Has that ever been Walgreens' policy?

19  A.   No.

20  Q.   If contacting a doctor does not resolve the pharmacist's

21  concerns, what is the pharmacist supposed to do?

22  A.   We have multiple tools for the pharmacists to use.  They

23  can look at the state prescription drug monitoring.  They can

24  speak to the patient or the caregiver.  Pharmacists also talk

25  amongst each other.

1        And we -- you know, we -- there's no hard-and-fast rule of

2   what they have to do.  It will vary by situation and by

3   prescription.

4        But we at no time say it's okay if the doctor says, "Oh, I

5   wrote it.  That's fine.  Go ahead," for them to just take a

6   blanket okay to fill the prescription.

7   **Q.**   So if a pharmacist can't resolve their concerns, even if

8   the doctor says "Go ahead and fill it," what -- is the

9   pharmacist supposed to refuse the prescription?

10  **A.**   Yes.  They are supposed to refuse the prescription and not

11  dispense it.

12  **Q.**   Has that always been Walgreens' policy?

13  **A.**   Yes.

14  **Q.**   Okay.  I've got one more to show you.

15                      (Pause in proceedings.)

16  **BY MS. SWIFT:**

17  **Q.**   I've got on the screen WAG-MDL-00304.

18       Do you recognize this as another good faith dispensing

19  policy, Ms. Polster?

20  **A.**   Yes.

21  **Q.**   And go to the end of it.  Can you read for the Court what

22  the date on this one is?

23  **A.**   We revised it on June of 2012.

24  **Q.**   Okay.  Let me go back to the beginning of this one.

25                      (Pause in proceedings.)

**POLSTER - DIRECT / SWIFT**

1    BY MS. SWIFT:

2    **Q.**   All right.   I want to focus your attention on page 3 of

3    the 2012 good faith dispensing policy.

4        Do you see there that there's a more detailed list of red

5    flags relating to prescribers than we've seen in the previous

6    policies?

7    **A.**   Yes.

8    **Q.**   Is there also a more detailed list of red flags for

9    patients?

10   **A.**   Yes.

11   **Q.**   And do you also see a more detailed list of red flags for

12   prescriptions?

13   **A.**   Yes.

14   **Q.**   Focusing on the prescriber red flags, has Walgreens ever

15   tried to institute corporate blocks on doctors instead of just

16   giving a list of red flags?

17   **A.**   We did have a pilot in place when I first took over the

18   team.   We piloted that and made the decision to keep our policy

19   as is, which was prescription by prescription.

20   **Q.**   What was involved in that pilot project on trying to block

21   doctors?

22   **A.**   Um, we -- we -- we used data.   We had field personnel do

23   drive-bys or visit the doctors' offices.   We at times had a

24   conversation with the prescriber.

25       We took a lot of different factors into play and

POLSTER - DIRECT / SWIFT

1  ultimately made the decision that keeping our policy as is,

2  having the pharmacists review each prescription on its own

3  merit, was the best thing to do for patient care.

4  Q.   Why did you make that decision?

5  A.   It was very difficult to determine if the doctor really

6  did not have a legitimate practice, and there's no guarantee

7  that each prescription that they were writing was not for a

8  legitimate purpose.

9        And, therefore, the decision that I made was I -- I felt

10  that the pharmacists have the tools to review each prescription

11  on its own merit and they should be using their good judgment

12  to do their corresponding responsibility while filling the

13  prescription that's in front of them.

14  Q.   In making that decision, did you seek input from the

15  pharmacists in the field?

16  A.   Yes.  I considered -- I considered some feedback from the

17  field but -- yes.

18  Q.   Does Walgreens allow individual pharmacists in the field

19  to refuse prescriptions from individual doctors if they

20  determine that that's the best course of action in their

21  professional judgment?

22  A.   We allow them to do it as long as they can document that

23  there were red flags that they were not able to resolve; but

24  for them to say "I am not going to fill any of Dr. Jones'

25  prescriptions" and not give the prescription their full

1    attention, no, that's not our policy.

2    **Q.**   Has Walgreens recently agreed to re-visit the question

3    whether to apply corporate blocks to doctors as part of a

4    settlement with the Florida Attorney General?

5    **A.**   Yes.

6    **Q.**   Do you know yet what that process will involve?

7    **A.**   I don't.  That just happened and we are working on

8    identifying a list of parameters that we want to consider to

9    determine which doctors we would potentially block.

10   **Q.**   Do you agree with the idea of doing corporate blocks on

11   doctors?

12   **A.**   I stand behind my decision that I made back when I took

13   over the team to have the pharmacists look at each prescription

14   on its own merit, but we'll comply and we just have to come up

15   with a process and determine that we're looking at all aspects

16   because it is not easy to, you know, determine if the

17   prescription -- or if the doctor is not prescribing

18   legitimately.

19   **Q.**   All right.  Now I'm going to ask you about something on

20   page 4 of WAG-MDL-304, which is the 2012 good faith dispensing

21   policy.

22        You see at the top there it says that it is imperative

23   that pharmacists document all efforts used to validate good

24   faith dispensing?

25   **A.**   Yes.

POLSTER - DIRECT / SWIFT

1   Q.   Is it up to the pharmacist to determine whether something

2   is a red flag in the first place and, therefore, needs to be

3   documented?

4   A.   Yes.

5   Q.   Why is it important for pharmacists to document it when

6   they've determined that there's a concern on a prescription?

7   A.   Well, what might be a red flag for me may not be a red

8   flag for another pharmacist particularly if I am a pharmacist

9   that is filling in for a vacation and I'm at a store that I

10  don't normally work at.

11      I may not know the patient.  I may not know the

12  prescribers.  I may not, you know, know enough around the

13  prescription to be able to make that same determination as the

14  pharmacist who works at that location all the time.

15  Q.   If a pharmacist determines something is not a red flag

16  based on their knowledge of the circumstances, is there any

17  need to document it?

18  A.   No.

19  Q.   Is it necessary to re-document the same resolution of a

20  red flag if a patient comes in to fill a prescription regularly

21  over time?

22  A.   Not always because if that red flag was previously

23  resolved, you know, a few months ago and the patient comes in

24  again, it's the same condition and the pharmacist is aware of

25  what's happening with that patient, it may not be a red flag

 1  for that next fill.

 2  **Q.**   All right.  When you came into your role --

 3        **THE COURT:**  I'm sorry.  I don't understand.  Can we go

 4  back to that?

 5        **MS. SWIFT:**  Yep.

 6        **THE COURT:**  If a red flag appears, I think the

 7  question was, and it's been resolved in favor of issuing a

 8  prescription, is it your view that that inquiry does not have

 9  to be documented?

10        **THE WITNESS:**  The second time around.  So I'll give

11  you --

12        **THE COURT:**  No.  I'm talking about the first time a

13  pharmacist looks at a prescription and sees a red flag, then is

14  able to resolve the red flag, either through conversations or

15  whatever, in order to -- and fills the prescription.

16      Was it Walgreens' policy that that process be

17  documented -- be required to be documented or not documented?

18        **THE WITNESS:**  Yes.  For -- yes.  For that -- for that

19  prescription, that red flag, if the pharmacist felt it was a

20  red flag at that point in time for that prescription --

21        **THE COURT:**  Yes.

22        **THE WITNESS:**  -- yes, they would be responsible for

23  documentation.

24        **THE COURT:**  Okay.  So the resolution of a red flag

25  would be -- it was the policy of Walgreens to have that

POLSTER - DIRECT / SWIFT

 1   documented?

 2            **THE WITNESS:**  Correct.

 3            **THE COURT:**  Okay.  I think I understand that.  Thank

 4   you.  Thank you.

 5   **BY MS. SWIFT:**

 6   **Q.**   Ms. Polster, when you came into your role as the head of

 7   Pharmaceutical Integrity in 2012, did you put together

 8   something called the target drug good faith dispensing

 9   checklist?

10   **A.**   Yes.

11   **Q.**   And was that an effort to require additional documentation

12   on certain types of opioid prescriptions?

13   **A.**   Yes.

14   **Q.**   I'm going to show you one of the checklists.  I've got on

15   the screen WAG-MDL-00547.

16       Do you recognize this --

17   **A.**   Yes.

18   **Q.**   -- as one of the target drug good faith dispensing

19   checklists?

20   **A.**   I do.

21   **Q.**   What does this checklist require pharmacists at Walgreens

22   to do?

23   **A.**   This pharmacist -- or, sorry.

24       This checklist was a tool that the pharmacists used to

25   document the steps that they took in the course of filling the

POLSTER - DIRECT / SWIFT

1   prescription.

2       They would document if the patient wasn't known to them,

3   that they checked their ID.

4       There's a series of questions or red flags for them to

5   consider, and it was a way for us to have the -- a consistent

6   paper trail of documentation for certain medications that they

7   dispensed across the chain.

8   **Q.**   Did the DEA or anyone else require Walgreens to put this

9   checklist in place?

10  **A.**   No.

11  **Q.**   Did the target drug good faith dispensing checklist

12  replace Walgreens' good faith dispensing policy?

13  **A.**   No.

14  **Q.**   How is the target drug policy different from the good

15  faith dispensing policy?

16  **A.**   The good faith dispensing policy is an overarching policy

17  for all controlled substances and reiterates that the

18  pharmacist has a responsibility for all controlled substances

19  to do their due diligence.

20      The target drug good faith dispensing policy checklist,

21  that is an extra step of documentation that we require for

22  select medications that were of particular interest to the DEA

23  at the time when I took over the team.

24  **Q.**   Is the checklist designed to provide proof of every single

25  thing a pharmacist does every time they fill a controlled

**POLSTER - DIRECT / SWIFT**

1   substances prescription?

2   **A.**   It's designed for, you know, documentation purposes.  It's

3   not all inclusive.  They may be doing more, but it was a way

4   for us to have a consistent level of documentation across the

5   chain.

6   **Q.**   I'm going to ask you about one specific part of the

7   checklist.  It's part number 10 about offering Naloxone to the

8   patient in case of an emergency for prescriptions greater than

9   or equal to 15 morphine milligram equivalents.  Do you see

10  that?

11  **A.**   Yes.

12  **Q.**   Does Walgreens offer Naloxone to patients in those

13  circumstances?

14  **A.**   We do.

15  **Q.**   Does Walgreens offer Naloxone to patients without a

16  prescription?

17  **A.**   Yes.

18  **Q.**   Why is that important?

19  **A.**   You know, Naloxone is a lifesaving medication if somebody

20  is in an overdose situation.

21      We counsel patients and caregivers on the risks of taking

22  opioid medications, and for them to have a Naloxone on hand is

23  kind of like having a fire extinguisher in your house.  It's

24  for just in case.

25  **Q.**   Do you know how many patients Walgreens has dispensed

POLSTER - DIRECT / SWIFT

1   Naloxone to in San Francisco?

2   **A.**   Yes.

3   **Q.**   How many?

4   **A.**   Approximately 20,000.

5   **Q.**   And what's the timeframe that covers?

6   **A.**   I think I had them pull the data back from 2006, but --

7   and I want to say in 2016 is when California laws changed that

8   we could dispense without a patient-specific prescription; and

9   so after that point in time, the majority of the Naloxone was

10  dispensed.

11  **Q.**   All right.  I'm going to turn to another area.

12          **THE COURT:**  Before we get there, the last document,

13  the checklist for documentation, when was that put into effect?

14          **THE WITNESS:**  When I took over the team, we started

15  it -- I took over the team at the end of the year, maybe around

16  December-ish and I started it early in 2013.

17          **THE COURT:**  Thank you.

18  **BY MS. SWIFT:**

19  **Q.**   And I'll represent to you -- I'll ask you first.  Do you

20  know whether this is the checklist that was in place in 2013 or

21  not?

22  **A.**   Oh, there's lots of reiterations.  This is not the

23  original one.

24  **Q.**   If I represented to you that this one had a date of 2017,

25  does that sound about; right?

POLSTER - DIRECT / SWIFT

1   **A.**   Yes.

2   **Q.**   Okay.  New area of questions.  I want to ask you about the

3   support and tools that Walgreens provides to its pharmacists.

4        First of all, do you know how many pharmacists are in a

5   Walgreens pharmacy at one time in the state of California?

6   **A.**   It will vary based on the volume of the store and the

7   store hours.  Anytime the pharmacy is open, there's always one

8   pharmacist on duty.  Then another pharmacist will come in later

9   in the day to provide lunch break and continue the shift to

10  close the store.

11  **Q.**   Are there also sometimes techs -- technicians in the

12  pharmacy?

13  **A.**   Yes.

14  **Q.**   And is there -- are there state laws regarding how many

15  technicians are allowed to be in the pharmacy in comparison to

16  how many pharmacists are there?

17  **A.**   Yes.

18  **Q.**   Do you know what the requirements are in California?

19  **A.**   California has one of the more stricter ratios, and it is

20  one filling technician per pharmacist until the second

21  pharmacist comes in; and then they can have two filling

22  technicians per pharmacist.

23  **Q.**   Are there also field leaders supporting the pharmacists in

24  the stores?

25  **A.**   Yes.

1   Q.   Explain to the Court what different types of field leaders

2   there are.

3   A.   Sure.  We have district managers who are responsible for

4   15 stores or so.

5        Then we have directors of pharmacy and retail operations

6   and their counterpart, the healthcare supervisors, that are

7   pharmacists that oversee probably 50 or 60 stores.

8        And then above them, we have the regional vice president

9   and the regional healthcare directors, and the regional

10  healthcare directors are pharmacists as well and they may

11  oversee 500 stores.

12  Q.   All right.  Just I want to make sure I get this straight.

13  Are district managers sometimes but not always pharmacists?

14  A.   Correct.

15  Q.   Are healthcare supervisors always pharmacists?

16  A.   Yes.

17  Q.   Are regional healthcare directors always pharmacists?

18  A.   Yes.

19  Q.   Do all of those field leaders play a role ensuring that

20  the Walgreens pharmacists in the stores are complying with

21  policies?

22  A.   Yes.

23  Q.   Okay.  Does your team at the corporate support center also

24  support pharmacists across the country?

25  A.   Yes.

POLSTER - DIRECT / SWIFT

1    Q.    How do you support them?

2    A.    We -- oftentimes they're -- they may speak to their field

3    leader.  Their field leader will contact my team for -- to give

4    us some feedback.

5         Like, for example, the reiterations of the checklist that

6    you referred to, our first iteration wasn't perfect.  We were

7    learning.  We got a lot of feedback from the field on that, and

8    we made changes accordingly.

9         We have an intranet that they can ask questions through,

10   and my team will respond to the questions that they have.

11        You know, we -- sometimes we'll have a DEA agent come in

12   and do an audit in a store, and they'll need data or

13   information.  My team will help support.

14        Those are just some random examples.

15   Q.    Does Walgreens provide training to its pharmacists on the

16   dispensing of controlled substances?

17   A.    Yes.

18   Q.    What kind of training does Walgreens provide?

19   A.    We have a good faith dispensing training.  We have

20   documents on our intranet.  Sometimes there's various

21   continuing educations that, you know, we'll post on the

22   intranet.

23        My team is a source of help and coaching and answering

24   questions.  That's a form of training.

25        So we have multiple training modules, compliance modules

**POLSTER - DIRECT / SWIFT**

1    as well as dispensing modules.

2    **Q.**   Are there other and more specific descriptions of the

3    training that Walgreens provides in the declaration that you

4    submitted to the Court?

5    **A.**   Yes.

6    **Q.**   And just for the record, you did submit a written

7    declaration in support of your testimony today; correct?

8    **A.**   Yes.

9         **THE COURT:**   Before we get there, can I go back to the

10   technician staffing?

11        **THE WITNESS:**   Sure.

12        **THE COURT:**   In the state of California, you said that,

13   as I understand it, it's a restrictive -- it's a restriction on

14   the number of people who can be, what I call, behind the glass

15   or --

16        **THE WITNESS:**   Right.

17        **THE COURT:**   -- in the pharmacy area.  That's a secured

18   area, isn't it?

19        **THE WITNESS:**   It is.

20        **THE COURT:**   Okay.  So you need access to it, and

21   it's -- you have to be a proper person -- when I say "proper

22   person," you have to be authorized by law to be behind the

23   glass?

24        **THE WITNESS:**   I believe the answer to that is, yes, to

25   fill prescriptions.

POLSTER - DIRECT / SWIFT

1      **THE COURT:**  To fill prescriptions?

2      **THE WITNESS:**  Yes.

3      **THE COURT:**  That's what I wanted to know.

4      **THE WITNESS:**  Yeah.

5      **THE COURT:**  I mean, not to clean or to sell shampoo or

6  something like that.

7      Okay.  So, as I understand it, the law -- or your

8  understanding of the law in California and what governs

9  staffing decisions by Walgreens during this period of time was

10  a ratio of not more than one technician to a single pharmacist?

11  Let's start with that.

12      **THE WITNESS:**  Okay.  Not more than one filling

13  technician, "filling" meaning putting pills in the bottle --

14      **THE COURT:**  Okay.

15      **THE WITNESS:**  -- to one pharmacist.  There might be a

16  cashier.

17      **THE COURT:**  Right.  So, in other words, if I -- if I

18  staff my pharmacy in San Francisco, as an example, and I have

19  one pharmacist, I could have one technician but not more than

20  one -- not more than one filling technician?

21      **THE WITNESS:**  Correct.

22      **THE COURT:**  If I had two pharmacists, I could have

23  two?

24      **THE WITNESS:**  You could have four.

25      **THE COURT:**  I could have four technicians?

 1          THE WITNESS:  Four filling technicians.

 2          THE COURT:  Okay.  So -- and this is, in a sense, an

 3     optional staffing decision.

 4          In other words, you could have a pharmacist without a

 5     filling technician and that wouldn't run afoul as your

 6     understanding is of the California law?

 7          THE WITNESS:  Correct.

 8          THE COURT:  But if you had one pharmacist, you

 9     couldn't have two filling technicians?

10          THE WITNESS:  Correct.

11          THE COURT:  Okay.  Now, let me go back to your

12     staffing decision.  I don't know that you're the person who

13     staffs it and makes these decisions, but you may be aware of

14     them.

15          Is there a ratio of number of pharmacists, as a matter of

16     policy, number of pharmacists as a function of the number of

17     prescriptions that are presented to the pharmacy for

18     dispensing?

19          THE WITNESS:  Yes.  We do have a labor and capacity

20     team that works through those models, and a 24-hour store, for

21     example, would have a different number of pharmacists than a

22     non-24-hour store.

23          THE COURT:  Okay.  So it would be a function -- it

24     would be a function of hours of operation?

25          THE WITNESS:  Hours of operation.

POLSTER - DIRECT / SWIFT

 1          **THE COURT:**  That's a variable?

 2          **THE WITNESS:**  Yes.  And volume.

 3          **THE COURT:**  And volume.  Are you aware of the volume

 4   per pharmacist notwithstanding the hours of operation?

 5          **THE WITNESS:**  Not to speak to it in that level of

 6   detail.  Just very high level.  I mean, if you have -- let's

 7   just say, for example, you have a relatively low volume store.

 8   You may have two pharmacists that are there for that day, a

 9   pharmacist that works 8:00 to 4:00 and a pharmacist that works

10   1:00 to 9:00, and the hours of operation of that store is

11   8:00 a.m. to 9:00 p.m.  And so there would be two pharmacists

12   on duty.

13          **THE COURT:**  Some of the time?

14          **THE WITNESS:**  Some of the time.  And -- and there may

15   be a very low volume store where there's only one pharmacist

16   there and they are not open longer than, I don't know, eight or

17   nine hours.

18          **THE COURT:**  And are you aware of the numbers?  That is

19   to say, what is the policy of -- or was the policy of Walgreens

20   with respect to the number of pharmacists per volume of

21   prescriptions?

22      Like, was it -- if there are 200 prescriptions, there has

23   to be one or two or some other number?

24          **THE WITNESS:**  I know that the labor and capacity team

25   knows that, but I don't know the detail enough to be able to

 1    answer your question specifically.

 2           **THE COURT:**  Okay.  Thank you so much.

 3        And I don't want you to go beyond your scope of knowledge

 4    obviously.  Thank you.

 5           **MS. SWIFT:**  Thank you, Your Honor.

 6    **BY MS. SWIFT:**

 7    **Q.**   Ms. Polster, the Court has heard a fair amount about

 8    pharmacy's access to prescriber data, and what I mean by that

 9    is data on the volume of prescriptions for controlled

10    substances that particular doctors write and the rankings of

11    high-prescribing doctors.  Are you familiar with data like

12    that?

13    **A.**   Yes.

14    **Q.**   Do you and your team in Pharmaceutical Integrity have

15    access to data on volumes of prescriptions written by

16    particular prescribers of controlled substances?

17    **A.**   We do.

18    **Q.**   Can you look at Walgreens' own dispensing data in its

19    computer system to see who the highest ranking prescribers of

20    opioids are at Walgreens?

21    **A.**   We could, yes.

22    **Q.**   Do you do that sometimes?

23    **A.**   Sometimes.

24    **Q.**   Does your team also have access to prescriber rankings

25    from third parties like IQVIA that compile data from Walgreens

1   and other pharmacies?

2   **A.**   Yes.

3   **Q.**   Does your team look at that data sometimes as well?

4   **A.**   Yes.

5   **Q.**   What does your team do with that type of prescriber data

6   that you have?

7   **A.**   It depends on the circumstance.  Because we are not

8   actively blocking doctors yet, we -- we'll look at the data.

9        Sometimes we'll get information from the field that

10  something is amiss in the area.

11       Like, for example, there is -- there might be a DEA raid

12  at a certain doctor's office, and we will hear that quickly

13  from field personnel because they're boots on the ground, and

14  we may run data and do our own analysis.

15       And if -- if the circumstances are correct, we may block

16  that prescriber for that specific instance.

17  **Q.**   I'm going to stop you right there because I thought I

18  heard you say before that it's Walgreens' policy today, and has

19  been for a number of years, that you do not block doctors.

20       Is it the case that you have done that in some

21  circumstances?

22  **A.**   In rare circumstances we have, yes.

23  **Q.**   Are you able to quantify how rarely this has happened?

24  **A.**   I would say maybe less than five or ten before the DEA

25  actually revoked the prescriber's license have we done that.

1  **Q.**   And just to be clear, if the DEA has revoked a

2  prescriber's license, is it even possible for a Walgreens

3  pharmacist to fill their prescription?

4  **A.**   No.  Our system will block that.

5  **Q.**   Okay.

6      **THE COURT:**  So I don't understand.  Let me ask a

7  question.  I understand that.

8      I'm not sure I understand your last -- your previous

9  response to the one about blocking doctors who -- who have a

10 valid license, not suspended or revoked by the DEA.

11     And are you -- is it your testimony that in five or ten

12 circumstances you have?

13     **THE WITNESS:**  Where we have gotten field intel that

14 there was a DEA raid on that prescriber's office, before their

15 license ended up getting revoked, we have -- we have stopped

16 and -- stopped the filling of their prescriptions.

17     So I guess I kind of contradicted myself.  And thanks for

18 pointing it out.

19     We don't yet look at overprescribing doctors and say "This

20 guy we're going to block"; but we will take a harder look if we

21 get feedback from field personnel that something is amiss and

22 do some analysis on that, take, you know, look at -- understand

23 what's happening with that specific prescriber.

24     If their -- if their office was indeed raided, it was

25 completely shut down, we may potentially block their

POLSTER - DIRECT / SWIFT

1    prescriptions from being filled.

2              **THE COURT:**  Okay.  Thank you.

3    **BY MS. SWIFT:**

4    **Q.**   In the roughly five to ten circumstances where that has

5    happened, have you made that decision to cut off that doctor's

6    prescriptions based solely on prescriber ranking data?

7    **A.**   No.  It was more than that.

8    **Q.**   Do you -- are there concerns about patient safety when

9    you're considering cutting off a doctor's prescriptions

10   altogether?

11   **A.**   Sure.  You have to -- you have to make sure that -- I

12   mean, the reality is that there are patients that need this

13   medication; and for them to not be able to get their

14   prescription filled, they could potentially go into withdrawal,

15   and that is a concern.

16        It's a concern for the healthcare industry in general.

17   And I do think that there are circumstances that have led to

18   the abuse of other medications or drugs on the street, frankly,

19   when a patient is not able to get their prescription medicine.

20   **Q.**   Do you share prescriber ranking data with field leaders,

21   such as district managers or healthcare supervisors?

22   **A.**   Not prescriber, no.

23   **Q.**   Do you share that kind of data with pharmacists?

24   **A.**   No.

25   **Q.**   Why not?

1  **A.**   With the policy being that they should be looking at each

2  prescription on its own merit, a prescriber ranking doesn't

3  tell them that that prescription is or is not legitimate, and

4  they need to use their due diligence through their

5  corresponding responsibility to ensure that the prescription in

6  front of them is for a legitimate medical need.

7  **Q.**   Do you have a concern that if you were to share prescriber

8  ranking data with the field, it would lead your pharmacists to

9  treat different doctors differently in terms of the due

10  diligence that they perform?

11  **A.**   I do think that's a possibility, yes.

12  **Q.**   Can a pharmacist see notes on a doctor in Walgreens'

13  dispensing system when they go in to fill a prescription?

14  **A.**   Yes.

15  **Q.**   Has there ever been a point when Walgreens' corporate

16  support center deleted all prescriber notes from the dispensing

17  system?

18  **A.**   Not notes, but we did -- we did have circumstances where

19  the field personnel would put notes in the doctor's address.

20       So it would say "123 Main Street" and then it would say

21  "Do not fax refills" or it would have some other information in

22  the address field.

23       And putting it in the address field is not an appropriate

24  place for those, and we did remove those because sometimes we

25  use those address fields for mailers; and it does not -- I

POLSTER - DIRECT / SWIFT

1  mean, it's not good on the postage envelope to have that

2  information on there so we did delete those; but notes in the

3  note field, no.

4  **Q.**   Do pharmacists at Walgreens have access to other

5  information about doctors in the Walgreens' computer system?

6  **A.**   Yes.

7  **Q.**   Their name and address is in there?

8  **A.**   Correct.

9  **Q.**   Are there a variety of different prescriber comments in

10  the computer system?

11  **A.**   Sometimes.

12  **Q.**   Do you believe that your pharmacists are well supported at

13  Walgreens?

14  **A.**   I do.

15  **Q.**   Why?

16  **A.**   I feel that the computer system is state of the art.  We

17  give them access to any external websites that they need.

18      Like, for example, the prescription drug monitoring

19  program, if there's one available in the state, we were -- we

20  ensured that they had access to that website.

21      They have field personnel, the field leaders that help

22  support them.  My team supports them.

23      We have policies and procedures to help them.  I think

24  we've done a really good job in supporting our pharmacists.

25  **Q.**   All right.  Now I want to ask you some questions about the

1    oversight that you and the other leaders at Walgreens provide

2    to the pharmacists.

3        Does your team in the Pharmaceutical Integrity monitor

4    pharmacists compliance with the good faith dispensing policies

5    at Walgreens?

6    **A.**   Yes.

7    **Q.**   How do you do that?

8    **A.**   We have -- we have a good faith dispensing opportunities

9    report where we will review a pharmacist's dispensing patterns.

10       If we have a prescription that maybe is a high dose or it

11   was an early refill, that might trigger on this particular

12   report, that we would ask the field leader to go to the store

13   and look at that specific example with the pharmacist and

14   ensure that we had the appropriate documentation for that

15   prescription.

16   **Q.**   And we don't need to go into it, but just for the record

17   is -- in your binder WAG-MDL-3871, is that an opportunity -- is

18   that an example of what the good faith dispensing opportunities

19   reports look like?

20   **A.**   Yes.

21   **Q.**   And are the ones that are in your binder, are those the

22   ones for the San Francisco stores?

23   **A.**   Yes.

24   **Q.**   All right.  Do -- so I asked you about how your team

25   monitors pharmacists to ensure they're complying with policies.

POLSTER - DIRECT / SWIFT

1   Are there other things that you guys do before I move to the

2   field leaders?

3   **A.**   Um, I mean, there's other areas of the company.   Like,

4   asset protection will do their due diligence.

5   **Q.**   Okay.   Do field leaders, like the district managers and

6   the area healthcare supervisors, also play a role in monitoring

7   compliance with dispensing policies?

8   **A.**   Yes.

9   **Q.**   How do they do that?

10  **A.**   We have various store walks that they are responsible to

11  go in and look for certain things in the store, and the

12  compliance around policies and good faith dispensing is part of

13  that.

14  **Q.**   And is in your binder, the exhibit that's WAG-MDL-3100, is

15  that a set of store walk questionnaires like what you're

16  discussing?

17  **A.**   Yes.

18  **Q.**   Are those the ones, or at least some of them -- for the

19  record, I'm not sure it's all of them -- for the San Francisco

20  stores?

21  **A.**   Yes.

22  **Q.**   Okay.   Has Walgreens conducted internal audits of

23  compliance with dispensing policies?

24  **A.**   Yes.

25  **Q.**   I've put on the screen WAG-MDL-02606.   Do you recognize

**POLSTER - DIRECT / SWIFT**

1    this as an executive summary of results of an audit that the

2    company performed on compliance with some of the dispensing

3    policies?

4    **A.**    Yes.

5    **Q.**    It says at the top that it's a BCI Executive Summary.

6    What is BCI?

7    **A.**    I don't know if I remember.  Business continuity -- I

8    don't remember.

9    **Q.**    Who performed this audit?

10   **A.**    It was the asset protection team.

11   **Q.**    Is asset protection another name for the loss prevention

12   team?

13   **A.**    Yes.

14   **Q.**    Is this an example -- I already asked you that.  I

15   apologize.

16        Were you involved in the conducting of this audit?

17   **A.**    No.

18   **Q.**    Were you involved in reviewing the results of the audit

19   and communicating those results to your team and to field

20   leaders?

21   **A.**    Yes.

22   **Q.**    Okay.  I want to focus your attention on question number

23   five at the bottom of page 1.  It says (as read):

24        "When target drug prescriptions are dispensed,

25        pharmacy team members are responsible for completing the

POLSTER - DIRECT / SWIFT

1          target drug good faith dispensing checklist."

2          And then it goes on to say (as read):

3               "Number of filled target drug prescriptions that did

4          not have a completed target drug good faith dispensing

5          checklist attached."

6          And then it lists different percentages for different

7     numbers of -- well, what does it list there after that -- after

8     that intro?

9     **A.**   Right.  It -- yeah.  It lists the number of missing

10    checklists by store, and so we had almost 60 percent of the

11    stores had no missing checklists.

12    **Q.**   Is that that 59.5 percent compliance rate at the bottom?

13    **A.**   Correct.

14    **Q.**   Just to be very clear, what's the 59.5 percent?

15    **A.**   Those stores had zero missing checklists that were

16    attached to the hard copy.

17    **Q.**   So those are the stores that had perfect compliance?

18    **A.**   Perfect compliance, yes.

19    **Q.**   What does this audit result say about the number of stores

20    who had 11 or more checklists missing?

21    **A.**   So we had 10 stores.  So .4 percent of the stores that

22    were audited were missing checklists attached to the hard copy

23    prescriptions that were supposed to have them.

24    **Q.**   And what does it say about the number of stores that had 6

25    to 10 missing?

**POLSTER - DIRECT / SWIFT**

1   **A.**   5.5 percent.

2   **Q.**   How many stores by percentage had five or fewer checklists

3   missing?

4   **A.**   If my math is right, 89 percent -- 90 percent.

5   **Q.**   If you add the 5.5 percent and the .4 percent and then

6   subtract that, do you get 94.1 percent?

7   **A.**   Yes.

8   **Q.**   So what does it tell you about that 94.1 percent?

9   **A.**   So 94.1 percent had 10 or fewer missing checklists.

10  **Q.**   Is it 10 or fewer or 5 or fewer?

11  **A.**   Five or fewer.  Sorry.

12  **Q.**   What does this -- what does this result tell you about the

13  pharmacists at these stores compliance with the dispensing

14  policy in general?

15  **A.**   That they were doing a good job.  They just -- they

16  weren't perfect.

17  **Q.**   Now, your team -- the Court has heard about this -- your

18  team --

19         **THE COURT:**  No, I'd like to ask just a question about

20  this.

21      Is this broken down -- we're looking at paragraph 5 on the

22  screen, and you have just testified -- is it broken down by the

23  number of prescriptions that a given store issued for these

24  drugs?

25         **THE WITNESS:**  No.  It's broken down by the number of

 1   missing checklists that the auditor when they went into the

 2   location didn't find.

 3          THE COURT:  So if a store -- a pharmacy issued one

 4   prescription and had one targeted -- one of the targeted

 5   prescriptions --

 6          THE WITNESS:  Right.

 7          THE COURT:  After all, this is just targeted; right?

 8          THE WITNESS:  Correct.

 9          THE COURT:  To a couple of drugs?

10          THE WITNESS:  Yes.

11          THE COURT:  Not all opioids?

12          THE WITNESS:  Correct.

13          THE COURT:  Okay.  So if it had one and it issued a --

14   a -- it had the checklist, it would then fall within the zero?

15          THE WITNESS:  Correct.

16          THE COURT:  And if a store, as an example, had 50 and

17   was not in compliance, it would not fall within that?

18          THE WITNESS:  It would not fall within the zero if

19   they were not in compliance, correct.

20          THE COURT:  So we have no idea of knowing the

21   magnitude from this chart, the magnitude of compliance.

22          THE WITNESS:  Correct.

23          THE COURT:  We understand the number of stores that

24   are in compliance, but we don't understand the significance of

25   it other than the number.

POLSTER - DIRECT / SWIFT

1      But the number doesn't say, and we all know that, doesn't

2   say how significant it is, does it?

3           THE WITNESS:  It does not.  I do not know exactly how

4   many prescriptions at each store.

5           THE COURT:  Or even approximately.

6           THE WITNESS:  Correct.

7   BY MS. SWIFT:

8   Q.   Did you look to see that?  And do you recall whether you

9   looked to see how many checklists should have been there at the

10  time the audit was conducted?

11  A.   I -- not in the aggregate enough to be able to answer.

12  Q.   Now, your team put together -- well, did your team put

13  together a training presentation on the results of this audit

14  for the district managers?

15  A.   Yes.

16  Q.   Do you recall that your team called these results

17  unfavorable in that training presentation?

18  A.   I do.

19  Q.   Why did you -- why did you characterize these results that

20  way?

21  A.   The way the -- that my team wrote the document, because it

22  wasn't a hundred percent and because there were missing

23  checklists in -- you know, in the stores -- because only 59 and

24  a half percent of the stores had perfect compliance, that is

25  unfavorable because we wanted that number to be higher.

**POLSTER - DIRECT / SWIFT**

1   Q.   Do you strive for perfect results from the pharmacists who

2   work for you?

3   A.   I do.

4   Q.   Okay.  You talked a bit about the good faith dispensing

5   opportunities reports.

6        At a certain point in time, did your team also generate

7   something that was called, and I'm paraphrasing here, like, the

8   nondispensing report?

9   A.   We did.

10  Q.   What was the nondispensing report?

11  A.   The nondispensing report was a report that showed

12  pharmacists that were filling less controlled substances than

13  their peer.

14  Q.   Why did you create that report?

15  A.   We were getting feedback from the field, from pharmacists

16  and from their leaders, that we had certain pharmacists that

17  were not filling any controlled substance.

18       They would just tell the patient -- and we had complaints

19  from patients as well, and we would -- they would come into the

20  store and the pharmacist would say, "I'm sorry.  I don't fill

21  this drug.  You'll have to come back when my partner is here or

22  come back next week or whatever."

23  Q.   Is it a problem if your pharmacists aren't even reviewing

24  the prescriptions that come into the pharmacy?

25  A.   Yes.

POLSTER - DIRECT / SWIFT

1  **Q.**   Would you consider that an abdication of their

2  professional responsibility?

3  **A.**   Yes.

4  **Q.**   Do you still use the non --

5          **THE COURT:**  I'm sorry.  I want to ask this question

6  because you used the word "partner."

7          **THE WITNESS:**  Yes.

8          **THE COURT:**  What does that mean?

9          **THE WITNESS:**  So generally there's two pharmacists

10  that are assigned to a store.  There is a pharmacy manager and

11  there is a staff pharmacist, and then there's that half

12  pharmacist that we talked about earlier.

13          **THE COURT:**  Right.  Right.

14          **THE WITNESS:**  And so --

15          **THE COURT:**  The short person.

16          **THE WITNESS:**  Yeah, the short person.  They might be

17  tall.  You never know.

18          Anyway --

19          **THE COURT:**  Yeah.

20          **THE WITNESS:**  -- so we had instances where the staff

21  pharmacist or the pharmacy manager, could be either one, would

22  say, "You know, come in when -- come in when my partner is

23  working tomorrow."

24          **THE COURT:**  I don't understand what that means.  I

25  mean, I'm trying to figure out.  Somebody goes in with a

1    prescription and presents it, and the pharmacist, who is

2    authorized by law to dispense the drug and for whatever

3    reason -- and that's -- I'm sort of curious as to why is that

4    person, under everything that you've explained, that the

5    pharmacists have a duty to fill the prescription, patients are

6    in pain, if the prescription appears to be valid, they must

7    fill it, and so forth.

8         And you -- and the response is, "I'm sorry.  I don't fill

9    that prescription"?

10        What does that mean?  What's your understanding of "I'm

11   sorry.  I don't fill that prescription.  My partner does"?

12             THE WITNESS:  Yeah.  And that -- those were examples,

13   real examples, that we got, which was why we put forth this

14   report to give to field leadership to say "Here is a specific

15   example at a specific store of a pharmacist that is not filling

16   the average" -- and "average" isn't the right word -- but why

17   is the partner filling or the second pharmacist at that

18   location, why are they filling more than their fair share of

19   controlled substance prescriptions at that location?  What is

20   happening?

21        And then the field leader, the district manager, the

22   healthcare supervisor would go into the store to do their good

23   faith dispensing check and ask, "You know, what's happening

24   here?"

25        And we were getting feedback where the partner would say

1  "This guy that I'm working with won't fill their prescriptions.

2  They just wait for me to come in and fill it instead of doing

3  their due diligence," and basically not doing their job is what

4  was happening.  They were sloughing off the responsibility --

5          THE COURT:  I see.

6          THE WITNESS:  -- of taking the extra steps to fill a

7  controlled substances prescription.

8          THE COURT:  Okay.  Thanks.  I understand that.

9  BY MS. SWIFT:

10  Q.  What was the timeframe of when this was happening?

11  A.  It was very early with the -- my team being set up.  I

12  don't remember the exact years.  I don't even think we do the

13  nondispensing report anymore.

14      But, you know, when we started requiring the extra steps,

15  we started requiring the checklist.  All of the -- all of the

16  extra things that we were looking for and auditing for, that

17  was when we started seeing that behavior.

18  Q.  Overall based on your years of oversight at Walgreens in a

19  variety of different positions, do you have concerns that the

20  pharmacists are not following the dispensing policies that are

21  in place?

22  A.  No, I don't.

23  Q.  Why not?

24  A.  Well, we're seeing -- we're seeing good compliance.  We

25  have multiple levels of areas -- and areas of the organization

1    that are checking and making sure that we have compliance.

2        And, you know, I feel that our pharmacists do a really

3    good job with our corresponding responsibility.

4    **Q.**   Have you personally taken steps over the past decade plus

5    to make sure that Walgreens' pharmacists are aware of the

6    problems with opioid abuse in the United States?

7    **A.**   Yes.

8    **Q.**   Does Walgreens provide ways for patients and others in the

9    community to safely dispose of unused medications?

10   **A.**   We do.

11   **Q.**   Can you explain that briefly?

12   **A.**   Sure.  So when the state -- well, when the federal

13   regulations changed that we could take back unwanted or unused

14   medications at the store, I developed a program for the safe

15   disposal kiosks.  And it varied by state because not all state

16   regulations allowed it, so it took some time to get the program

17   nationwide.

18       But we have kiosks in locations where you can safely

19   dispose of those -- all medications, not just controlled

20   substances but all medications; and then we have a vendor that

21   comes in and pulls those medication out for destruction.

22   **Q.**   Do you know how many Walgreens stores across the country

23   have --

24   **A.**   We have --

25   **Q.**   -- the safe disposal kiosks?

1  **A.**   Sorry to talk over you.

2        We have 1,400 -- let's see 1,415 locations that have a

3  kiosk, and then we have all locations that have access to a

4  program or a product called DisposeRX, which is --

5  **Q.**   What's that?

6  **A.**   It's a powder that you pour into the vial of unwanted

7  medications and you add water and it creates a sticky, gooey

8  substance that deactivates the medication; and then it can be

9  thrown away in household trash safely.

10  **Q.**   Why is it important for people to safely dispose of their

11  unused medications?

12  **A.**   Well, there's a -- it's really safety, making sure that

13  people who don't need the medications anymore, you get them out

14  of the house, get them away from potential, you know, children

15  getting to them or people that shouldn't have access to them.

16        It's not good to take old expired medications anyway, so

17  it's always good to get that out of your house and then dispose

18  of it properly so it doesn't get into the water system.

19  **Q.**   Thank you, Ms. Polster.  That's all I have for you right

20  now.

21        **THE COURT:**  Okay.  Let's proceed.

22        I want to ask my court reporter.  Is that all right if we

23  proceed?  What do you want?  What would you like?  Do you want

24  to take a break?

25        **THE CLERK:**  We do.

```
 1              THE COURT:  We do.  My team here would like to take a
 2    break, so let's take a break until a quarter of 12:00; and then
 3    we will probably go until -- you should tell me in your cross
 4    where you think it would be appropriate.
 5         It can go from 12:30 or to 1:00 o'clock, whatever you
 6    think is the appropriate time.
 7              MR. MOUGEY:  Yes, sir.  That sounds good.  Thank you.
 8              THE COURT:  All right.  Thanks.  We're in recess.
 9                   (Recess taken at 11:28 p.m.)
10              (Proceedings resumed at 11:45 a.m.)
11              THE CLERK:  Come to order.  Court is now in session.
12                        (Pause in proceedings.)
13              THE CLERK:  You may be seated.
14              THE COURT:  All right.  Let the record reflect all
15    parties are present.
16         You may proceed with cross.
17                        CROSS-EXAMINATION
18    BY MR. MOUGEY:
19    Q.   Pete Mougey for the People.  Good morning, Ms. Polster.
20    A.   Good morning.
21    Q.   If you would please open back up defense counsel's
22    notebook to the 304 tab.
23    A.   Okay.
24    Q.   This document is titled "Controlled Substance Ordering."
25    A.   Sorry.  I was on the -- 324 maybe?
```

POLSTER - CROSS / MOUGEY

```
 1   Q.   I'm sorry?
 2            THE COURT:  Sorry.  Let's wait just a moment for
 3   defense counsel.
 4            MS. SWIFT:  304 is a different document.
 5            MR. MOUGEY:  324.  I apologize.
 6            THE WITNESS:  Okay.
 7            THE COURT:  Is it 324?
 8            MR. MOUGEY:  324.
 9            THE COURT:  All right.  Thank you.
10   BY MR. MOUGEY:
11   Q.   You there, Ms. Polster?
12   A.   I am.  Thanks.
13   Q.   And this document walks through the CSR system in place at
14   Walgreens; correct?
15   A.   Yes.
16   Q.   And at the bottom of this ledger -- or at the bottom of
17   this document is a ledger indicating that this document was
18   created in anticipation of litigation; correct?
19   A.   That's what it says, yes.
20   Q.   And you were -- you participated in creating this
21   document; correct?
22   A.   I did not.
23   Q.   And this document was used in meetings with the DEA after
24   the order to show cause that Walgreens received in mid-2012;
25   correct?
```

**POLSTER - CROSS / MOUGEY**

1   A.   I don't know the answer to that.

2   Q.   So if you turn to Bates Number 40, the ceiling that you

3   walked the Court through with the line on the next page wasn't

4   in place until 2012 -- the end of 2012; correct?

5   A.   Correct.

6   Q.   The system began in 2008 as a beta version; correct?

7   A.   That's my understanding.

8   Q.   And the ceiling that you walked the Court through did not

9   begin until late 2012; correct?

10  A.   That's correct.

11  Q.   And it was only in place for a series of months; correct?

12  Before Walgreens stopped distributing; correct?

13  A.   I'm not sure I'm understanding the way you're asking the

14  question.

15       The ceilings was an additional enhancement that was put

16  into place on top of what we already had, which was the

17  threshold that stopped a total number of bottles at any given

18  time in a store.

19       And then the system enhancement was put in place in

20  November, and we began phasing out distributing controlled

21  substances between then and 2014.

22  Q.   November 2012 was when the ceiling was in place at

23  Walgreens; correct?

24  A.   Yes.

25  Q.   And by 2014, early 2014, Walgreens was getting out of the

1  distribution business; correct?

2  **A.**    Yes.  We were out of the -- yes.

3  **Q.**    So the ceiling that you walked the Court through with the

4  line that is described in this deck was only in place from

5  November of 2012 until the beginning of 2014 with Walgreens as

6  a distributor; correct?

7  **A.**    That was the additional enhancement, but the ceiling that

8  you're talking about, yes, was in place November of 2012.

9  **Q.**    And there were gaps or holes in the CSR system that

10  Walgreens did not apply to specific orders; correct?

11  **A.**    There were things that we were made aware of over the

12  course of the system and enhancements that we made to ensure

13  that we included.

14      So I don't -- I don't know what you're referring to

15  exactly, but that's the reason why you make system

16  enhancements.

17  **Q.**    So on line -- August of 2012 incorporates all vendor

18  orders; correct?

19  **A.**    Yes.

20  **Q.**    Ms. Polster, prior to Walgreens getting out of the

21  distribution business, it relied on other distributors in

22  addition to distributing to itself; correct?

23  **A.**    Yes.  We had wholesalers.

24  **Q.**    So the system that you described to the Court about the

25  ceilings, not only did it begin in November '12, but prior to

1  that, it did not apply to orders sent to other distributors,

2  for example, Cardinal; correct?

3  **A.**  Can you reask the question?  I don't think I understood

4  what you were saying.

5  **Q.**  The CSR system at Walgreens did not apply to outside

6  vendors that distributed to Walgreens until August of 2012;

7  correct?

8  **A.**  The vendor orders were not added into our system until

9  then, no.

10  **Q.**  So the answer to my question is, yes, the CSR system did

11  not apply to orders to other distributors outside of Walgreens;

12  correct, Ms. Polster?

13  **A.**  The system did not.  However, again, we have field

14  personnel and the wholesalers also have their controlled

15  substance monitoring program as well.

16  **Q.**  All I'm asking you about right now -- we have plenty of

17  time to talk about that, Ms. Polster -- I just want to talk

18  about the description you gave to the Court about the CSR.

19      So the CSR until August '12 did not apply to orders from

20  other opiate distributors outside of Walgreens until August of

21  '12; correct?

22  **A.**  I would agree with you that that is what the document

23  said.  I took over the system when I took over the integrity

24  program, which was at the end of 2012; but, yes, I agree that

25  that's what the PowerPoint says.

1   **Q.**  And there are other gaps in the CSR system outside of the

2   fact it didn't apply to outside vendors; correct?

3   **A.**  You'll have to elaborate on that, please.

4   **Q.**  Let me hand you what I've marked as Exhibit 128.

5       (Plaintiffs' Exhibit 128 marked for identification)

6          **MR. MOUGEY:**  May I approach, Your Honor?

7          **THE COURT:**  Yes.  And you don't have to ask.

8          **THE WITNESS:**  Thank you.

9               (Pause in proceedings.)

10  **BY MR. MOUGEY:**

11  **Q.**  Ms. Polster, you can see what I've handed you is marked as

12  Exhibit 128 is an e-mail exchange in intra-Walgreens; correct?

13  **A.**  Yes.

14  **Q.**  And you know who Barb Martin is; correct, Ms. Polster?

15  **A.**  I do.  I do.

16  **Q.**  And if you turn to Bates Number 73 (as read):

17       "Due to conditions outside of the store's control,

18      functionality will be added to the application to allow

19      stores to be removed from the suspicious ordering limits

20      or have individual items removed from the suspicious

21      ordering limits."

22      Correct?

23  **A.**  I see that says that.

24  **Q.**  So at least as of the date of this document, 2012,

25  individual stores could simply remove themselves from the

1    Walgreens CSR system; correct?

2              MS. SWIFT:  Objection.  Foundation.

3              THE WITNESS:  I don't -- I don't --

4              THE COURT:  Overruled.  Go ahead.

5              THE WITNESS:  I don't read that to be what that says.

6    So I don't know if individual stores could be removed their own

7    self.  They would have to be -- it would have to go through

8    this team.

9    BY MR. MOUGEY:

10   Q.   The language of this document, Barb Martin allows stores

11   to be removed from the suspicious ordering limits or to have

12   individual items removed from the stores; correct?

13   A.   I'm sorry.  I've got to reread this.  Can I look at this?

14   Q.   Take your time.

15   A.   (Witness examines document.)

16             THE COURT:  By the way, Exhibit 3 -- is that what it

17   is?  No.  It's 128.

18             MR. MOUGEY:  128.

19             THE COURT:  Admitted.

20        (Plaintiff's Exhibit 128 received in evidence)

21             THE WITNESS:  It says it can be removed, but it

22   doesn't say how it can be removed.

23   BY MR. MOUGEY:

24   Q.   As of the date of this document, 2012, there was a gap

25   inside the Walgreens CSR system that stores could be removed;

 1   correct?

 2   **A.**    No.  It's saying that it's adding that functionality.

 3       So due to conditions outside of the store's control,

 4   functionality will be added.  It's saying it's adding the

 5   functionality to remove the store -- or an item for that store

 6   from the order monitoring system.

 7   **Q.**   For example, an override; correct, Ms. Polster?  You're

 8   familiar with overrides; correct?

 9   **A.**   I am familiar with what the word "override" means, but

10   that's not what this says here.

11   **Q.**   I understand.  I'm asking you about overrides.  You're

12   familiar with overrides; correct?

13   **A.**   I know what the word "override" means.

14   **Q.**   That was one of the issues that you brought to

15   Your Honor's attention, that Walgreens had override forms to

16   increase the ceilings; correct?

17   **A.**   With proper documentation, yes.

18   **Q.**   Yes, ma'am.  And also increase the thresholds via override

19   forms; correct?

20   **A.**   The ceiling.  I don't know about the threshold.

21   **Q.**   Ms. Polster, let me hand you what I have marked as

22   Exhibit 62.

23       (Plaintiffs' Exhibit 62 marked for identification)

24               (Pause in proceedings.)

25   \\\

1  BY MR. MOUGEY:

2  Q.   This is an internal e-mail dated 5-23-2016 between

3  yourself and Mr. Bratton; correct?

4  A.   Yes.

5  Q.   And Mr. Bratton is part of the Pharmaceutical Integrity

6  team; correct?

7  A.   He is.

8  Q.   And you're familiar with this document; correct,

9  Ms. Polster?

10  A.   It has been a long time since I've seen this document.

11  Q.   Yes, ma'am.

12      Well, let's go ahead and turn to page 62.

13  A.   (Witness examines document.)  Is that -- can you display

14  which one you're talking about?  I want to make sure we're

15  right.

16  Q.   Sure.  Bates Number 62 --

17  A.   I'm sorry.  I'm not following 62.  All my pages say 62 and

18  then there's a dash and then there's a bunch of numbers after.

19  Q.   Why don't we use the screen, Ms. Polster.  I'm just going

20  to reference one page.  Okay?

21      It's titled "Controlled Substance Override Forms."  Do you

22  see that?

23          THE COURT:  It is on your screen.

24          THE WITNESS:  Okay.

25          THE COURT:  Yeah.

POLSTER - CROSS / MOUGEY

1  BY MR. MOUGEY:

2  Q.   All right.  Ms. Polster, it's entitled "Controlled

3  Substance Override Forms"; correct?

4  A.   Yes.

5  Q.   And Walgreens tracked -- your group tracked the number of

6  overrides approved within Walgreens; correct?

7  A.   Yes.

8  Q.   And overrides enabled a store to order more opiates than

9  the ceiling; correct?

10  A.   More controlled substances.

11  Q.   Including opiates; correct?

12  A.   It did include opiates.

13  Q.   Yes, ma'am.

14       And as of the date of this document, fiscal year 2014 and

15  fiscal year 2015, Walgreens had approved -- and this is your

16  department; correct?

17  A.   Yes.

18  Q.   -- had approved 95 percent in each 2014 and 2015; correct?

19  A.   Of the percentage of overrides, yes, 95.52 percent were

20  approved.

21  Q.   All right.  So the CSR that you explained to the Court

22  this morning, 95 percent of overrides reviewed by field

23  leadership and Pharmaceutical Integrity were approved; correct?

24  A.   That's what it says.

25  Q.   That's what it says, and you agree that is consistent with

POLSTER - CROSS / MOUGEY

1  your recollection; correct?

2  **A.**   They were approved, yes.

3  **Q.**   And just fiscal year 2014 -- Walgreens operates on a

4  fiscal year; correct?

5  **A.**   Correct.

6  **Q.**   It's August to August essentially; right?  September to

7  August?

8  **A.**   September 1st through the end of August.

9  **Q.**   So when we look at fiscal year 2014, that is September of

10  2013 to August of 2014.  Did I get that right?

11  **A.**   Correct.

12  **Q.**   So that's 2013-'14, 95 percent were approved by Walgreens

13  corporate integrity approving overrides; correct?

14  **A.**   Yes.

15       **THE COURT:**  Exhibit 62 admitted.

16       (Plaintiffs' Exhibit 62 received in evidence)

17       **MR. MOUGEY:**  Thank you.

18  **BY MR. MOUGEY:**

19  **Q.**   Now, are you familiar with the term within Walgreens

20  "PDQ"?

21  **A.**   Yes.

22  **Q.**   And what does that stand for, Ms. Polster, within

23  Walgreens?

24  **A.**   It was -- we called it pretty darn quick or something like

25  that.  I don't know what the official term was, but it was an

1  order that could be processed and they could receive the

2  product the next day or shortly thereafter after they ordered

3  it.

4  **Q.**   So that's a store saying "I need an opioid -- an order of

5  controlled substances, specifically opiates, PDQ"; right?

6  **A.**   It could be any drug.

7  **Q.**   Right.  But we're talking about opiates here.  You

8  understand that; correct?

9  **A.**   Yes.

10  **Q.**   And you understand this trial is about opiates; right?

11  **A.**   I do.

12  **Q.**   Okay.  Great.

13      The PDQ is a store saying "I need an order of opiates

14  PDQ," pretty darn quick; correct?

15  **A.**   It is an additional ordering process that a store can do

16  outside of their weekly order.

17  **Q.**   And the PDQ orders, "I need opiates pretty darn quick,"

18  like OxyContin, did not aggregate to the monthly cumulative

19  limits under the CSR; correct?

20  **A.**   Not at that time when it first was developed, no.

21  **Q.**   At least until late 2012, early 2013, the CSR that you

22  described to Your Honor as state-of-the-art computer system did

23  not include PDQs; correct?

24  **A.**   At that time it did not.  When my team found out that it

25  was not included, we made an enhancement request for them to be

POLSTER - CROSS / MOUGEY

1  included.

2  **Q.**   And that was part of the state-of-the-art computer system

3  which you described to the Court that as of right now, orders

4  from other vendors, PDQ orders, and -- which other one did we

5  go through? -- overrides are all ways for stores to order more

6  opiates outside of CSR; correct?

7  **A.**   Based on the business that is happening at the store, yes.

8  **Q.**   Are you familiar with inter-store order?

9  **A.**   Yes, I am.

10  **Q.**   And an inter-store order is when, for example, one

11  Walgreens here in San Francisco needs a specific opiate that it

12  can order from another store in San Francisco; correct?

13  **A.**   They could at the time.  They cannot now.  That was

14  another thing that when we found out about, that we created an

15  enhancement to stop that.

16  **Q.**   So the -- as of 2000 and at least '13, a Walgreens here in

17  San Francisco could order opiates from another Walgreens here

18  in San Francisco outside of the CSR that you explained to the

19  Court this morning; correct?

20  **A.**   Any drug could be transferred from one store to the other,

21  yes.

22                        (Pause in proceedings.)

23  **BY MR. MOUGEY:**

24  **Q.**   Now, you were part of the cross-functional team that met

25  about the distribution of opiates; correct?

POLSTER - CROSS / MOUGEY

1   **A.**   Yes.

2   **Q.**   And that cross-functional team meeting, you participated

3   along with other departments within Walgreens; correct?

4   **A.**   Correct.

5   **Q.**   And do you have an understanding -- I'm going to hand you

6   what we've marked as Exhibit 2657.

7        (Plaintiffs' Exhibit 2657 marked for identification)

8                    (Pause in proceedings.)

9   **BY MR. MOUGEY:**

10  **Q.**   Now, you're familiar as part of that cross-functional team

11  meeting the system in place at Walgreens to detect suspicious

12  order prior to the CSR; correct?

13  **A.**   I'm aware that there was a system in place.  I don't think

14  I can speak to it in detail, but I do know there was a system

15  in place.

16  **Q.**   This morning you testified to the Court that at that point

17  in 2012 there was still a process in place to monitor orders

18  for controlled substances at the distribution centers; correct?

19  **A.**   That was my understanding, yes.

20  **Q.**   And your answer was that you were aware of that through

21  the cross-functional team; correct?

22  **A.**   Yes.

23  **Q.**   And that system was reporting suspicious orders to the DEA

24  all the way to 2012; correct?

25  **A.**   That's my understanding, yes.

1  **Q.**   And it was the end of 2012, approximately November, when

2  you started at Pharmaceutical Integrity; correct?

3  **A.**   Yes.

4  **Q.**   And Walgreens was shipping those suspicious orders to its

5  own Walgreens stores without performing due diligence; correct?

6  **A.**   I don't know that to be true.

7  **Q.**   You're familiar with Mr. Bratton; correct?

8  **A.**   Yes.

9  **Q.**   And you understand that Mr. Bratton testified on behalf of

10  Walgreens as the corporate representative; correct?

11  **A.**   I know that he testified, yes.

12  **Q.**   And are you aware that Mr. Bratton testified on behalf of

13  Walgreens that Walgreens is currently unaware of due diligence

14  that was performed based on the order being flagged in the

15  Chemical Handler's Report, which is Walgreens' suspicious order

16  system up to 2012 -- November 2012?

17  **A.**   Is there a document I'm supposed to be looking at?

18  **Q.**   No, there is not.

19       **MS. SWIFT:**  I object.

20       **THE COURT:**  I'm sorry.  Timeout.

21       **MR. MOUGEY:**  My fault.

22       **THE COURT:**  Okay.  Now, Counsel.

23       **MS. SWIFT:**  Objection.  Mischaracterizes the document,

24  which is not in front of the witness.

25       **THE COURT:**  It mischaracterizes the document.  Okay.

1          MR. MOUGEY:  I'd be happy to publish it, Your Honor.

2          THE COURT:  Yeah, would you publish it --

3          MR. MOUGEY:  Sure.

4          THE COURT:  -- and see whether it mischaracterizes it.

5          MR. MOUGEY:  Put on the screen Mr. Bratton's written

6   testimony on behalf of Walgreens in this case.  Okay?

7   BY MR. MOUGEY:

8   Q.   Now, before we do that, you understand that Walgreens'

9   suspicious order system up to the end of 2012 is -- was also

10  commonly referred to as the Chemical Handler's Report; correct.

11  A.   No, I did not know that, but thank you for pointing it

12  out.

13  Q.   Mr. Bratton's corrected testimony in this case -- it's

14  already admitted into evidence -- that Walgreens is currently

15  unaware of due diligence that was performed based on an order

16  being flagged in the Chemical Handler's Report.

17       Were you aware as part of the cross-functional meeting,

18  that Walgreens was not performing due diligence on orders that

19  were identified in its Suspicious Order Report?

20  A.   I don't know that to be true, and I don't know anything

21  about this.

22  Q.   You are familiar or understand that the suspicious order,

23  the Chemical Handler's Report, ran at Walgreens until 11 of --

24  November of 2012; correct?

25  A.   That Chemical Handler's Report that you're talking about,

1  this is the first time I've heard of that report.

2  **Q.**   When you testified this morning that there was still a

3  process in place to monitor orders for controlled substances at

4  the distribution center, were you not referencing Walgreens'

5  suspicious order reports that were sent to the DEA until 11 of

6  2012?

7  **A.**   I was referencing that there were people in place and

8  systems in place, but I don't have specifics on them.

9  **Q.**   So you mentioned to the Court this morning that you knew

10  there were processes and systems in place, but you don't have

11  any idea what those are?

12  **A.**   I can't speak to them in specifics, no.

13  **Q.**   Actually, just generally, when you mentioned to the Court

14  this morning that there were systems in place prior to 2012

15  outside of CSR, you don't know specifically what those are?

16  **A.**   I don't know exactly to be able to speak to the details of

17  them, no.

18  **Q.**   You don't even know the name of the report; that it was a

19  Suspicious Order Report that went to the DEA; correct?

20  **A.**   But you just called it a Chemical Handler's Report.

21  **Q.**   Yes, ma'am.  And I asked --

22  **A.**   Are they different?

23  **Q.**   Assume that they're the same, the Chemical Handler's

24  Report and the Suspicious Order Report.  Okay?

25  **A.**   I don't --

POLSTER - CROSS / MOUGEY

1   **Q.**   You don't know one way or another; correct?

2   **A.**   I don't know that to be.  I don't know them to be exactly

3   the same.  You showed me a document that said one word and

4   you're saying another word.  Apologies.  I don't know.

5   **Q.**   You can't give the Court any specificity prior to 2012,

6   November of what was done and wasn't done outside of the CSR;

7   correct?

8   **A.**   I can tell you that there were people in place, there were

9   people at the distribution center, and people in -- that were

10  responsible for that.  I can tell you that they were reporting.

11       I can tell you that ARCOS was another system that the DEA

12  used for ordering, but I don't have enough specifics to be able

13  to answer your question.

14  **Q.**   You don't know whether there was due diligence on the

15  orders prior to being shipped; correct?

16  **A.**   I don't know specifics, no.

17  **Q.**   Just generally do you know that there was -- if there was

18  due diligence performed on those orders being shipped?

19  **A.**   I can't say one way or the other.  I don't know.

20  **Q.**   So the answer is, no, you don't know?

21  **A.**   Well, I can say I don't know.

22       **MS. SWIFT:**  I'm going to object to the argumentative

23  nature of the questioning.

24       **THE COURT:**  Overruled.

25  \\\

1   BY MR. MOUGEY:

2   **Q.**   You don't know whether or not Walgreens was reporting

3   suspicious orders to the DEA after they were already shipped;

4   correct, Ms. Polster?

5   **A.**   I don't know that it was after the fact.  I can tell you

6   what I did when I took over the team, and I knew that --

7          **THE COURT:**  No.  I think the question was in your

8   participation in the cross-functional team --

9          **THE WITNESS:**  Okay.

10         **THE COURT:**  -- what you learned and what you did at

11  that level, not subsequent to when you became -- not when you

12  became in charge of it; but, rather, as part of the

13  cross-functional team.

14         **THE WITNESS:**  Was that your question?

15  BY MR. MOUGEY:

16  **Q.**   Let's answer the judge's question.

17         **THE COURT:**  Well --

18                          (Laughter)

19         **MR. MOUGEY:**  -- that's how I understood that question.

20  BY MR. MOUGEY:

21  **Q.**   Let's start with that question, Ms. Polster.

22  **A.**   As part of the cross-functional team, there were meetings

23  and discussions on things the DCs did.

24       I don't have the exact specifics to it.  I can't speak to

25  the exact specifics to what everybody in the DC did.

1          What I can tell you is that, as I was developing the team

2     and we worked with various areas around the organization and

3     how they handled controlled substance orders and the

4     responsibility of reporting suspicious orders, how my team

5     incorporated their responsibilities of what we needed to do as

6     part of my taking over the responsibility.

7     **Q.**   This morning you told the Judge that there was a process

8     in place at the distribution centers.

9          Other than the fact that you think that there was a

10    process in place, you don't know anything really above and

11    beyond that; correct?

12    **A.**   I cannot speak to the specifics.  I knew it was in place.

13    **Q.**   You keep saying "exactly" and "specifics."  I didn't ask

14    you about exact and I didn't ask you about specifics.  Okay,

15    Ms. Polster?

16         I said generally do you have an understanding of what was

17    incorporated or included in the process that you told the Judge

18    this morning was in place prior to CSR?

19    **A.**   I have a very high-level understanding that they reported

20    suspicious orders.  I don't know the details around any of

21    that.

22    **Q.**   So you don't know if Walgreens performed due diligence on

23    those orders before they were shipped; correct?

24    **A.**   That was before I took over, correct.

25    **Q.**   So you don't know whether or not Walgreens was reporting

 1   orders that were actually shipments already filled to the DEA

 2   as suspicious; correct?

 3   **A.**   Correct.

 4   **Q.**   You don't know who was in charge or if anyone was in

 5   charge of those specific processes; correct?

 6   **A.**   I know that the distribution center had a hierarchy of

 7   people in place but, no.

 8   **Q.**   That's it?  That's your understanding --

 9   **A.**   That's my understanding.

10   **Q.**   -- generally what the process was?

11       So as part of this cross-functional team, did you review

12   the audits from 2008 and 2011 that were created by Walgreens'

13   internal audit team?

14   **A.**   No, I did not.

15   **Q.**   So you weren't aware that Walgreens' internal audit team

16   was -- concluded that Walgreens was submitting the monthly

17   suspicious controlled drug orders report to the DEA with

18   numerous instances of field -- filled suspicious controlled

19   substance orders; correct?

20   **A.**   I was --

21   **Q.**   You weren't aware; correct?

22   **A.**   I was not made aware of that through the cross-functional

23   teams, no.

24   **Q.**   Ms. Polster, let me hand you what we've marked as

25   Exhibit 2657, which is already admitted.

 1   **A.**   Is that in my binder?

 2   **Q.**   Nope.  I'm going to hand it to you right there.

 3        **THE COURT:**  Maybe we can put it on the screen.

 4        **MR. MOUGEY:**  I will, Your Honor.

 5        **THE CLERK:**  Thank you.

 6   **BY MR. MOUGEY:**

 7   **Q.**   Ms. Polster, do you see in the upper left-hand corner of

 8   this document the "Woodland Distribution Center DEA Review"?

 9   Do you see that?

10   **A.**   Yes.

11   **Q.**   And you recognize this document as a Walgreens internal

12   audit document; correct?

13   **A.**   Yes.

14   **Q.**   And you see on the left-hand side is the language I just

15   read you regarding the internal audit group's conclusion that

16   Walgreens was submitting monthly suspicious control drug orders

17   to the DEA with numerous instances of filled suspicious orders;

18   correct?

19   **A.**   Yes, that's what it says.

20   **Q.**   And under the risk category, you see that Walgreens is

21   filling orders that have been deemed suspicious without

22   performing any research to ascertain the legitimacy of the

23   order; correct?

24   **A.**   Yes, that's what it says.

25   **Q.**   And on the right-hand side of this page you see the header

**POLSTER - CROSS / MOUGEY**

1   "Dwayne Pinon, Senior Attorney"?

2   **A.**   Yes.

3   **Q.**   You know Mr. Pinon; correct?

4   **A.**   I do.

5   **Q.**   And Mr. Pinon was assigned the management response to

6   internal audits, identifications of problems with Walgreens'

7   suspicious order system; correct?

8   **A.**   He provided this response, yes.

9   **Q.**   Yes.  And the response is an ongoing cross-functional team

10  meeting has been scheduled for June 30th, 2008; correct?

11  **A.**   That's what it says.

12  **Q.**   That was the cross-functional team that you referenced to

13  the Court this morning; correct?

14  **A.**   No.

15  **Q.**   Oh, it's a different controlled --

16  **A.**   Cross-functional.

17  **Q.**   -- cross-functional team?

18  **A.**   Yeah.

19  **Q.**   It's -- you had nothing to do with the cross-functional

20  team that looked at Walgreens' suspicious orders and performing

21  due diligence and whether they were shipped prior to the order

22  being submitted in 2008, 2009, 2010, '11 until you began at

23  Pharmaceutical Integrity until late 2012; correct?

24  **A.**   I -- this is a different cross-functional team.

25      The cross-functional team that I am referring to was late

1   in 2012.  I don't know who was involved in this

2   cross-functional team.

3   **Q.**   Now, as part of your preparation for your testimony today,

4   have you reviewed a gentleman by the name of Mr. Ferry's

5   testimony?

6   **A.**   No.

7   **Q.**   Do you know who Mr. Ferry is?

8   **A.**   I don't.

9   **Q.**   Mr. Ferry was the C2 manager at the Woodland Distribution

10   Center here in California.

11   **A.**   Okay.

12   **Q.**   And it was your testimony to the Court this morning that

13   the process in place prior to you starting at Walgreens in

14   2012, the process in place to identify suspicious orders within

15   the distribution centers was run at the distribution center;

16   correct?

17   **A.**   Can you restate that, please.

18   **Q.**   Yeah.  It was a bad question.

19        Let me just pull directly from your declaration.

20                     (Pause in proceedings.)

21   **BY MR. MOUGEY:**

22   **Q.**   Your declaration on page 3, paragraph 6, said (as read):

23        "I also understand that during earlier time periods

24        Walgreens' suspicious order monitoring was conducted by

25        distribution center personnel."

POLSTER - CROSS / MOUGEY

1          Correct?

2     **A.**     Yes, that's my understanding.

3     **Q.**     And the -- your understanding during our earlier time

4     periods, which was prior to you starting at Pharmaceutical

5     Integrity, that the monitoring for suspicious orders was

6     conducted not at the corporate level but at the distribution

7     level; correct?

8     **A.**     That's my understanding.

9     **Q.**     And you have an understanding or you believe that that

10    would be done by or performed by the C2 manager; correct?

11    **A.**     Not necessarily the C2 manager.  I don't know who did

12    that, but that was my understanding.

13    **Q.**     So your understanding was that the -- someone in the C2

14    space would have been performing the due diligence on the

15    suspicious orders?

16    **A.**     They could be, yes.

17    **Q.**     You would expect that the C2 manager would know if the

18    distribution center was monitoring the suspicious orders coming

19    through the Walgreens distribution center; correct?

20    **A.**     I cannot speak to the specifics about that specific job

21    function, but somebody at the distribution center would have

22    their eyes on that information.

23    **Q.**     Mr. Ferry was deposed in this case on December 8th, 2021.

24    I'm going to show you his testimony.  His testimony, the

25    question was asked (as read):

1            "I want to ask you some questions about how -- the

2      concept of suspicious order monitoring while you were

3      working at the Walgreens distribution center."  And he was

4      the C2 manager.  "Did you ever have any duties or

5      responsibilities regarding suspicious order monitoring?"

6      And his answer said -- was (as read):

7            "I mean, as far as suspicious, I mean, our

8      procedure -- well, my understanding that there were

9      controls in place at corporate level, that they handled

10     that."

11     So do you have any firsthand knowledge in your declaration

12     that the monitoring of suspicious orders was done by

13     distribution personnel?

14           **MS. SWIFT:**  I'm going to object to the hearsay in the

15     deposition of another witness who's not in the court.

16           **THE COURT:**  Well, wait a minute.

17           **MR. MOUGEY:**  It's admission by party opponent,

18     Your Honor.  It's a Walgreens employee.

19           **THE COURT:**  Well, it's a Walgreens employee so it

20     would be an exception to the hearsay rule, wouldn't it?

21           **MR. MOUGEY:**  Exactly.

22           **MS. SWIFT:**  They could have played this testimony --

23           **THE COURT:**  Pardon?

24           **MS. SWIFT:**  They could have played this testimony in

25     their case had they chosen to do so.

1          **THE COURT:**  They didn't have to.  Cross-examination

2     isn't limited to -- to impeachment by documents that are

3     already in evidence, is it?

4          I mean, that would be a new rule for evidence.  This is

5     impeachment.

6          The witness has said -- the witness has said that she

7     believes X was done, and here is a witness who -- here is a

8     statement by a person from Walgreens saying not X.

9          **MS. SWIFT:**  That's a different issue.  She lacks

10     foundation.  It's not her statement.  I don't know how she can

11     be impeached by the statement of another witness.

12          **THE COURT:**  Impeach in the sense of the person who is

13     actually there at the scene says X and this witness says Y.

14          And I'm not sure why you can't ask the witness, "Well, in

15     fact, in your declaration you say Y, but the witness who is at

16     the scene said X."

17          I'm just having a hard time why this isn't appropriate

18     cross.  It's cross-examination.  I don't know why it's not

19     appropriate.  Are you saying this is not a Walgreens employee?

20          **MS. SWIFT:**  I did not say that, Your Honor.  I said it

21     was not proper impeachment and lack of --

22          **THE COURT:**  Why is it not proper impeachment to

23     impeach a person from the statement made by your client?

24          **MS. SWIFT:**  Because the witness didn't make the

25     statement, and she doesn't have foundation about the rest of

POLSTER - CROSS / MOUGEY

```
 1   the testimony in the deposition.
 2        THE COURT:  You don't cross-examine a witness by
 3   impeachment by virtue of something that the witness said.
 4        You can impeach a person a lot of different ways and what
 5   is a contrary statement by the defendant.
 6        MS. SWIFT:  Well, the additional concern, Your Honor,
 7   is that he's -- because she lacks foundation, she hasn't read
 8   this deposition, he's taking one snippet out of it and
 9   mischaracterizing it.
10        THE COURT:  But she opined on this subject.  She gave
11   a declaration on this subject.  So I don't know why it's
12   improper impeachment, but I'll take it into consideration.
13   Thank you.
14        MS. SWIFT:  Thank you, Your Honor.
15   BY MR. MOUGEY:
16   Q.   Ms. Polster, the question that I asked you was:  Do you
17   have any personal knowledge regarding your statement in your
18   declaration was that Walgreens' suspicious order monitoring was
19   conducted by distribution center personnel?
20   A.   Can you do me a favor?  Can you please tell me which page
21   and which line so I can read it again?
22   Q.   I'll put it up on the screen for you.
23                     (Pause in proceedings.)
24   BY MR. MOUGEY:
25   Q.   Page 3, paragraph 6, wherein you stated to the Court under
```

POLSTER - CROSS / MOUGEY

 1  your declaration (as read):

 2          "I understand that during earlier time periods,

 3      Walgreens' suspicious order monitoring was conducted by

 4      distribution center personnel."

 5      Ms. Polster, what was your personal knowledge justifying

 6  that statement; that the monitoring of suspicious orders was

 7  performed in the distribution center?

 8  A.   So before my team -- before my team was formed and I took

 9  the responsibility of the Pharmacy Integrity team, we had a

10  cross-functional group that came together that had areas of

11  pharmacy inventory, had areas of loss prevention, had areas

12  from operations, and other areas of, you know, distribution

13  centers, and all of that.

14      Through those course -- through that course of those

15  various meetings, that was my understanding, that we had

16  systems and we had people on the ground at the DCs looking at

17  this.  I -- I -- that is what my understanding was.

18          THE COURT:  Thank you.

19  BY MR. MOUGEY:

20  Q.   You've never reviewed or seen any evidence of that --

21  firsthand that that suspicious order monitoring was conducted

22  at the distribution center?

23  A.   I never saw reports or anything like that, no.

24  Q.   So when you say in your report -- in your declaration,

25  rather, when you use the word "understand" -- which I think you

1  do in a few paragraphs; correct?

2  **A.**   Yes.

3  **Q.**   In several instances, especially talking about the

4  distribution side, you refer to "I understand"; correct?

5  **A.**   Yes.

6  **Q.**   And when you say "I understand," that means that somebody

7  told you --

8  **A.**   Right.

9  **Q.**   -- right?

10      You haven't seen any evidence or any physical documents

11  verifying your declaration statement; correct?

12  **A.**   I knew there were ARCOS reports.  I knew there were things

13  in place, that I had conversations with the head of supply

14  chain that helped me understand the responsibilities that I was

15  taking over for, but they were all conversations.  I didn't see

16  reports.  I didn't see audits.

17      **THE COURT:**  Well, I think you can testify as to

18  conversations.

19      But are you saying that you had a conversation with

20  somebody or that you had a -- or you reviewed a document that

21  was given to you that -- in support of the proposition that

22  Walgreens' suspicious order monitoring was conducted by the

23  distributor?  Was there something that somebody told you or

24  showed you?

25      **THE WITNESS:**  I don't remember seeing anything.  I do

POLSTER - CROSS / MOUGEY

1  remember having conversations with her.  I remember having

2  conversations with --

3        THE COURT:  When you said you had conversations with

4  her, who is she?

5        THE WITNESS:  Her name was Sue Thoss.

6        THE COURT:  And you're saying that Sue Thoss said to

7  you that the distribution centers were conducting this?

8        THE WITNESS:  She had told me about what ARCOS was.

9  She had told me about --

10        THE COURT:  That's not my question.  My question is:

11  Is it your testimony here, is it your testimony that Sue Thoss

12  told you that the distribution center conducted the monitoring?

13        THE WITNESS:  It's my testimony that I talked to

14  numerous people in different job functions, but I -- you know,

15  it was a very long time ago, and I -- I don't want to say

16  something that is not --

17        THE COURT:  You are under oath.

18        THE WITNESS:  Right.

19        THE COURT:  So it is important to be truthful.  And

20  you may have a recollection.  You may not have a recollection.

21  And that's what's being explored.

22      And if you do have a recollection, what's it a

23  recollection of?

24      But you make a statement in your declaration that the

25  suspicious order monitoring was conducted by the distribution

 1  center personnel.  That's your understanding.

 2       Counsel is asking you:  What's the basis of that

 3  understanding?  Did somebody tell you?  And if somebody told

 4  you, who told you?

 5            THE WITNESS:  Yes.

 6            THE COURT:  And what did they say?  Because you put it

 7  in your declaration.

 8            THE WITNESS:  I understand.

 9            THE COURT:  So there must be a basis for it.

10            THE WITNESS:  Right.  I understand.

11            THE COURT:  And he's asking:  What's the basis for it?

12  That's all.

13            THE WITNESS:  Yeah.

14            THE COURT:  And if you can't recall, you can't recall.

15            THE WITNESS:  Yeah.

16            THE COURT:  Or if you do recall, you testify what it

17  is.

18            THE WITNESS:  I do not understand -- sorry.

19       I do not recall exact specifics.  I can tell you that I

20  met with Sue Thoss, T-H-O-S-S, and we had discussions around

21  suspicious order monitoring and what my team was being

22  responsible for, but I can only tell you it was in

23  generalities.  I don't have any specifics that I recall.

24  BY MR. MOUGEY:

25  Q.   Thank you, Ms. Polster.

POLSTER - CROSS / MOUGEY

1           **THE COURT:**  Thank you.

2    **BY MR. MOUGEY:**

3    **Q.**   Pharmaceutical Integrity was created at Walgreens at

4    approximately the same time that Walgreens was being

5    investigated by the DEA; correct?

6    **A.**   It was created at the end of 2012 following -- yes.

7    **Q.**   The order to show cause that Walgreens received in its

8    Jupiter distribution center was April 2012; correct?

9    **A.**   You'll have to remind me that, which you did, and I would

10   say that you have it in front of you, and the answer to that

11   is, yes.

12   **Q.**   Sounds about right, yes, ma'am.

13         And the Pharmaceutical Integrity Group was specifically

14   identified in the memorandum of understanding with the DEA;

15   correct?

16   **A.**   Yes.

17   **Q.**   And it was defined as prospective compliance; correct?

18   **A.**   I don't remember those words, but I'll take your word for

19   it.  I'm sure you're reading from the document.

20   **Q.**   Let me hand you what I've marked as --

21                     (Pause in proceedings.)

22   **BY MR. MOUGEY:**

23   **Q.**   While I'm breaking those apart in two documents, let me go

24   ahead and read you what I believe is --

25           **MR. MOUGEY:**  Thank you.  Perfect.

1                        (Pause in proceedings.)

2    **BY MR. MOUGEY:**

3    **Q.**   Let me direct your attention to -- I'll put it up on the

4    screen so it's easy for you to find -- titled "Addendum

5    Prospective Compliance."  Because you're familiar with this

6    document; correct?

7    **A.**   I have seen the memorandum of agreement, yes.

8    **Q.**   Yes, ma'am.  And you've read the memorandum of agreement;

9    correct?

10   **A.**   I've read the responsibilities that I took over, yes.

11   **Q.**   Yes, ma'am.

12        And it's titled "Addendum Prospective Compliance" (as

13   read):

14            "The parties agree that Walgreens will maintain the

15        following specific compliance measures for the duration of

16        this agreement.  To the extent any compliance measures

17        identified below are not yet in place, Walgreens commits

18        to implement such measures within the timeframe specified

19        herein."

20        Correct?

21   **A.**   Yes.

22   **Q.**   And under "General" (as read):

23            "Walgreens will maintain a department of

24        Pharmaceutical Integrity composed of personnel with

25        pharmacy-related training and managerial personnel who

1      shall be trained in relevant diversion-related issues."

2      Correct?

3  A.   Yes.

4  Q.   And Walgreens was required by the DEA to enhance its

5  policies and procedures related to distribution and dispensing

6  of opiates; correct?

7  A.   Does it say that in there?

8  Q.   Ms. Polster, you --

9  A.   I'm sorry.  I mean, it's part -- it was part of my overall

10  responsibility.  I'm not trying to be evasive.  I'm trying to

11  be exact here.

12  Q.   In the section titled "Addendum Prospective Compliance"

13  creating the department that you've been running since late

14  2012, early 2013, one of the issues required by the DEA is

15  beginning in 2014, Walgreens will exclude any accounting for

16  controlled substance prescriptions dispensed by a particular

17  pharmacy from bonus calculations; correct?

18  A.   Yes.

19  Q.   Paragraph number 4 (as read):

20          "Walgreens will continue to enhance its good faith

21      dispensing policy and training materials to identify red

22      flags of potential diversion for pharmacists of controlled

23      substances."

24      Correct?

25  A.   Yep.  That's what it says there, but I'm going to tell you

1   that we already had those in place and we continue to enhance

2   and update as things change in the industry.  That's the way I

3   took that when I read that part of the agreement.

4   **Q.**   And on the following page under C, "Distribution Centers"

5   (as read):

6         "Walgreens agrees not to ship any order of interest

7      or suspicious orders, in whole or in part, until Walgreens

8      resolves the reasons that caused it to designate the order

9      as an order of interest or a suspicious order."

10   Correct?

11   **A.**   Yes.

12   **Q.**   Repeatedly through this document that creates

13   Pharmaceutical Integrity, the word "compliance" is used;

14   correct?

15   **A.**   Yes.

16   **Q.**   There's no doubt in your mind that Pharmaceutical

17   Integrity was created to ensure Walgreens' compliance under the

18   Controlled Substance Act in relation to opiates; correct?

19   **A.**   In relation to all controlled substances and bringing

20   everything under one umbrella.  It was spread out all over the

21   organization, and this -- and my team helped bring everything

22   under one team.

23   **Q.**   You were the hub for all controlled substance issues

24   related to opiates at Walgreens; correct?

25   **A.**   All controlled substances, yes.

**POLSTER - CROSS / MOUGEY**

1   Q.   Essentially a Corporate Compliance Department charged with

2   ensuring Walgreens' compliance with regard to opiates under the

3   Controlled Substance Act; correct?

4   A.   Yes.

5   Q.   There was no business purpose designated in any of the

6   documents that we just reviewed for Pharmaceutical Integrity;

7   correct?

8   A.   I don't know if I understand your question.  I mean, from

9   a business perspective, it would make sense it would be under

10   all one team, and we were complying with the memorandum of

11   agreement.

12       Is that what you were asking?

13   Q.   So as head of the Pharmaceutical Integrity Department,

14   rolling out your new group, you needed people; correct?

15   A.   Sure.

16   Q.   You needed databases; correct?

17   A.   Yes.

18   Q.   You needed code?

19   A.   I needed what?

20   Q.   Code, computer code, to pull data; correct?

21   A.   Yes.

22   Q.   You needed policies and procedures written; correct?

23   A.   We had them but, yes.

24   Q.   You needed new training materials or enhanced training

25   materials; correct?

1   **A.**   We added enhanced training materials, yes.

2   **Q.**   You needed large computers or supercomputers to handle all

3   the data and fields that your team was reviewing; correct?

4   **A.**   We had those computers in place but, yes, my team needed

5   to know how to use them.

6   **Q.**   Right.  Because that's what you told the Court this

7   morning, that Walgreens' system was state of the art; correct?

8   **A.**   Yes.

9   **Q.**   Walgreens had over 200,000 employees; correct?

10  **A.**   Yes.

11  **Q.**   That's 6-, 7,000 on the low end up to 10,000 stores;

12  correct?

13  **A.**   Yes.

14  **Q.**   And here in San Francisco there was a peak of almost 70

15  stores here in San Francisco; correct?

16  **A.**   I don't know the answer to that.

17  **Q.**   And distribution centers for controls for Schedule IIs,

18  there were three that you were ensuring that Walgreens complied

19  with its obligations under the Controlled Substance Act;

20  correct?

21  **A.**   That sounds right, yes.

22  **Q.**   And for C2 through 5s, there were more than 10

23  distribution centers around the United States; correct?

24  **A.**   That -- yeah, that could be true.  I don't know the exact

25  number but, yes.

1  Q.   Now, Walgreens, to roll this out for its 200,000

2  employees, almost 10,000 --

3  A.   Let me stop you for a second.

4  Q.   Let me -- there's not a question pending.

5        THE COURT:  Go ahead, yes.  Go right ahead.

6        THE WITNESS:  Sorry.

7        So we do have, you know, more than 200,000 employees, but

8  we don't have 200,000 employees that work back in the pharmacy.

9  So I'm not understanding where you're going.

10       THE COURT:  Well, I don't think you have to -- it's

11  not --

12       THE WITNESS:  Sorry.  It's just -- it threw me off.

13       THE COURT:  You don't have to understand where he's

14  going.

15       THE WITNESS:  Got it.  Okay.

16       THE COURT:  But if you want to add to the testimony or

17  explain it in some way --

18       THE WITNESS:  Okay.

19       THE COURT:  -- please do so.

20       THE WITNESS:  Okay.

21       THE COURT:  I mean, don't feel constrained not to do

22  so.

23  BY MR. MOUGEY:

24  Q.   So how many of those 200,000 were pharmacists and

25  pharmacist technicians, Ms. Polster?

**POLSTER - CROSS / MOUGEY**

 1    A.   Significantly less than 200,000.  So we have approximately

 2    26,000 pharmacists, and we have probably somewhere in the

 3    neighborhood of 80 or 90,000 technicians.  There might be a

 4    little bit more.  I don't know the exact number, but --

 5    Q.   So roughly half of Walgreens' employees were pharmacists

 6    and technicians; correct?

 7    A.   Yes.

 8    Q.   And what you were rolling out in response to the DEA's

 9    mandate in the settlement agreement -- training, policy,

10    updates -- had to be communicated to at least the pharmacists

11    and the technicians; correct?

12    A.   Correct.

13    Q.   Now, are you aware that Walgreens received its first order

14    to show cause from the DEA in a San Diego pharmacy in 2009?

15    A.   I was made aware of that, yes.

16    Q.   And, actually, you participated in the responses to the

17    DEA in response to the 2009 order to show cause; correct?

18    A.   I was made aware of it.  You'll have to refresh my memory

19    on I responded to the DEA because I don't remember that.

20    Q.   You helped create training materials for --

21    A.   Sure.

22    Q.   There you go.

23         -- in response to the 2009 San Diego order to show cause;

24    correct?

25    A.   Yes, I did.  I was involved in some of the training, yes.

1    **Q.**   And that order to show cause related to diversion;

2    correct?  Of opiates; correct?

3    **A.**   You'll have to refresh my memory.

4    **Q.**   Now, the settlement agreement with Walgreens and the DEA

5    is around 300 pages.  The last time you and I talked, you'd

6    never read this agreement in its entirety; correct?

7    **A.**    In its entirety, I did not.  I read the memorandum of

8    agreement of which I was responsible for executing.

9    **Q.**   But the -- you understand that there are a significant

10   number of details included in the 290 pages that you didn't

11   review; correct?

12   **A.**   From what you told me, yes.

13   **Q.**   Yes, ma'am.

14       Well, let me go ahead and show you the 2009 order to show

15   cause that's referenced in part of the section that you didn't

16   review.  Okay, Ms. Polster?

17   **A.**   Okay.

18   **Q.**   September 30th, 2009, the Deputy Assistant Administrator,

19   Office Diversion Control DEA, issued an order to show cause

20   proposing to revoke DEA certificate of registration, skipping

21   to Walgreens in San Diego.  Do you see that?

22   **A.**   I do.

23   **Q.**   The order to show cause that you participated in creating

24   the training material for after 2009 covered the dispensed

25   controlled substances to individuals based on purported

 1  prescriptions issued by physicians who were not licensed to

 2  practice in California; correct?

 3  **A.**   Yes.

 4  **Q.**   Number two, dispensed controlled substances to individuals

 5  located in California based on internet prescriptions; correct?

 6  **A.**   That's what it says.

 7  **Q.**   Number three, dispensed controlled substances to

 8  individuals that Walgreens knew or should have known that were

 9  diverting the controlled substance; correct?

10  **A.**   That's what it says.

11  **Q.**   And last, in addition to allegations raised in the order

12  to show cause, DEA's investigation also revealed that

13  Walgreens' store 6094 was alleging refilling prescriptions for

14  controlled substances too early and allegedly filled several

15  prescriptions that were issued using expired DEA registration

16  numbers; correct?

17  **A.**   Yes, I see that.

18  **Q.**   So by the time you became involved in Pharmaceutical

19  Integrity in late 2012, Walgreens had been going back and forth

20  with the DEA on orders to show cause at least since 2009;

21  correct?

22  **A.**   For this location you're talking about?

23  **Q.**   Just generally, Ms. Polster.  Walgreens generally had been

24  dealing with the DEA on orders to show cause since 2009?

25  **A.**   I'm aware of this order to show cause and from this, yes.

POLSTER - CROSS / MOUGEY

1   Q.   Yes, ma'am.

2        And the second-to-last-paragraph of the first page (as

3   read):

4            "The parties believe that continued cooperation

5        between the parties to reduce the potential for diversion

6        is in the public interest and entering into this agreement

7        will ensure nationwide compliance by Walgreens with

8        respect to its pharmacy operations."

9        Correct?

10  A.   Yes.

11  Q.   So Walgreens had been ensuring the DEA that it was going

12  to comply with the Controlled Substance Act under, at least its

13  dispensing side, since the date of that memorandum of

14  agreement; correct?

15  A.   That's what the document said, yes.

16  Q.   So the DEA efforts to work with Walgreens were not new

17  when you started at Pharmaceutical Integrity in late 2012?

18  A.   Can you restate the question?  The DEA --

19  Q.   I'm sorry.  Pharmaceutical Integrity --

20  A.   Yes.

21  Q.   -- was -- I'm sorry.  Let me redo that.

22       Walgreens working with the DEA to ensure nationwide

23  compliance began at least in 2009; correct?

24  A.   I don't know what you mean by "working with the DEA."  So

25  I -- apologies.  I'm just making sure I'm understanding your

POLSTER - CROSS / MOUGEY

 1  question.

 2  **Q.**   Yes, ma'am.

 3  **A.**   But, yes, there was an order to show cause and, yes,

 4  that's what the document said, but I have never in all my times

 5  I've worked at Walgreens and been in my role would I say that

 6  I'm working with the DEA.

 7  **Q.**   Yes, ma'am.  I understand that.

 8       The word "cooperation" -- do you understand what

 9  cooperation means?

10  **A.**   Following what they're asking, yes.

11  **Q.**   Yes, ma'am, that's exactly right.

12       Pharmaceutical Integrity was created as a result of the

13  DEA including it in the settlement agreement; correct?

14  **A.**   That was part of the agreement in the memorandum of

15  agreement, yes.

16  **Q.**   So when you started at Pharmaceutical Integrity in late

17  2012, were you asked to perform the financial impact of

18  Walgreens' compliance with enhanced good faith dispensing

19  policies and procedures?

20  **A.**   I don't know what you mean by financial impact.  Um, we

21  had various requests and part of the agreement was to remove

22  controlled substances as part of the bonuses.

23       Maybe show me your specific -- where you're going so that

24  I can answer you.

25  **Q.**   Yeah.

POLSTER - CROSS / MOUGEY

```
 1                    (Pause in proceedings.)
 2   BY MR. MOUGEY:
 3   Q.   I'll direct your attention to Exhibit 19574, Bates
 4   Number 33.
 5        You see that your name is on the front page of this
 6   document; correct?
 7   A.   (Witness examines document.)  You'll have to show me where
 8   it says my name, but I've seen this, yes.
 9   Q.   You've seen this; correct?
10   A.   I don't see my name on here.  Sorry.
11   Q.   Very first page.
12   A.   There we go.  Thank you.  On the e-mail.
13   Q.   Yes, ma'am.  Do you see that?
14   A.   Yes.
15   Q.   It's dated -- well, let's just go right to the report.
16        "DEA Financial Impact"; correct?
17   A.   Yes, I see that now.
18   Q.   And I want to help with some timing.
19        FY '13 forecast equals 44 million.  Do you see that?
20   A.   I do.
21   Q.   And "FY" stands for fiscal year; correct?
22   A.   Correct.
23   Q.   Based on -- you're familiar with Walgreens using fiscal
24   year '13; correct?
25   A.   Yes.
```

**POLSTER - CROSS / MOUGEY**

1   Q.   And what is your understanding of what FY '13 -- give me a

2   general timeframe of what that's referencing to.

3   A.   It is -- September 1st of 2012 through August 31st of 2013

4   is the fiscal year.

5   Q.   You started in Pharmaceutical Integrity in late 2012,

6   November; correct?

7   A.   Yes.

8   Q.   So this is within -- this document or these initial

9   financial impact from the DEA requirements were generated

10  within months of you starting at Walgreens in the

11  Pharmaceutical Integrity Group; correct?

12  A.   I don't know that to be true.  I don't know when this

13  document -- I mean, it says that.  That might have been the

14  data set that we pulled from, but I don't know when because

15  this -- e-mails were in 2014.

16  Q.   Yes, ma'am.

17       And what is the -- what is underneath the e-mails?  We

18  need to pull a refresh data set; correct?

19  A.   Yeah, that -- for the first e-mail that Ed sent, yes.

20  Q.   Yes, ma'am.

21       And in the far right-hand side it says "Fiscal Year '13

22  Forecast," which means in the future; correct?  Forecast?

23  A.   Forecast, yes.

24  Q.   44 million; correct?

25  A.   That's what it says.

1   Q.   And good faith -- I'm sorry.

2        Pharmaceutical Integrity broke down the labor impact

3   required from good faith dispensing in relation to the DEA

4   financial impact; correct?

5   A.   That's what it says, yes.

6   Q.   And it says (as read):

7            "Good faith dispensing performed on 25 percent of

8        C2s."

9        Correct?

10  A.   Yes.

11  Q.   Your group knew that it was going to take five minutes per

12  script to comply with the requirements imposed by the DEA;

13  correct?

14  A.   So my group worked with the Labor and Capacity team.

15  We -- my group didn't come up with the five minutes.

16       It's what it says here, but Labor and Capacity team, which

17  is another division within Walgreens, has industrial engineers

18  that review the prescription-filling process to ensure that the

19  stores have the adequate time to fill their prescriptions.

20       For this particular one, the GFD performed on 25 percent

21  of the C2s, that -- it doesn't say it here, but that references

22  the additional steps for documentation for the target drug good

23  faith dispensing checklists.

24  Q.   Yes, ma'am.

25       Your group, Pharmaceutical Integrity, charged with

POLSTER - CROSS / MOUGEY

1    compliance by the DEA was involved in valuing the financial

2    impact on Walgreens; correct?

3    **A.**   We were involved in -- being included is part of the

4    entire picture of the financial impact because you want to make

5    sure that you're understanding what additional labor needs to

6    be added.  There is a dollar to that.

7        You want to understand what's happening in the business.

8    There's a dollar to that.

9        Every organization, every company forecasts and projects

10   so that they're prepared for questions that might happen as the

11   course of the year goes.

12   **Q.**   And your group participated in calculating complying with

13   the DEA requirements at 65 million; correct?

14   **A.**   I don't know what that means.  My team helped put this

15   document together.

16   **Q.**   Yes, ma'am.

17       And the conclusion of this document and the analysis that

18   your group participated in, the compliance group at Walgreens

19   mandated by the DEA, participated in calculating that the DEA

20   financial impact would be 65 million; correct?

21   **A.**   That's what the document says, yes.

22   **Q.**   And the fiscal year forecast, the prior forecast, was

23   44 million; correct?

24   **A.**   That's what it said, yes.

25   **Q.**   And that Walgreens calculated down to the minute how long

1    it was going to take to comply with the DEA requirements;

2    correct?

3    **A.**   We calculate out each task of a prescription process so

4    that we can ensure that our teams are -- have the right number

5    of budget hours in any given store in order to ensure that they

6    are supported for the volume of the location that they have.

7         So what you're saying is, yes, that's correct, we do go

8    down to -- well, the industrial engineers and the Labor and

9    Capacity team do take each process of filling a prescription

10   and add minutes to it, yes, because a compounded prescription

11   is going to take more time than an inhaler that you just put a

12   label on.

13        And so the answer to that in aggregate is, yes; and

14   specifically for this, it was determined by the industrial

15   engineers that it would -- we would need to give five

16   additional minutes for the addition of the checklist that I put

17   in place.

18   **Q.**   Yes.  And Walgreens' financial impact on the requirements

19   imposed by the DEA as part of the settlement agreement, did

20   that financial impact influence in any shape, form, or fashion

21   Walgreens' decision on what drugs to include on the target drug

22   good faith dispensing form?

23   **A.**   No.  We -- I don't -- when I created the target drug good

24   faith dispensing form, the drugs I chose were the drugs that

25   the DEA had the specific interest in when I took over, and --

 1   which was Methadone, hydromorphone, and oxycodone.

 2   **Q.**   And the financial impact of complying with the DEA

 3   settlement, if you'll turn to Bates Number 32, went to the

 4   highest level of Walgreens; correct, Ms. Polster?

 5   **A.**   Kermit was the president, yes.

 6   **Q.**   Kermit was the president, which he's a direct report to

 7   the CEO; correct?

 8   **A.**   Yes.

 9   **Q.**   So Kermit Crawford, direct report to the CEO, was being

10   impacted [sic] on the scope of the drugs that were included in

11   Walgreens' target drug good faith dispensing; correct?

12   **A.**   I don't even understand what your question was in that.

13   **Q.**   Kermit Crawford, president of Walgreens --

14   **A.**   Yes.

15   **Q.**   -- was being updated?

16   **A.**   Updated.  You said the word "impact."  That's what got me

17   confused.

18   **Q.**   Kermit Crawford was being updated on the financial impact

19   of the scope of the drugs included on the target drug good

20   faith dispensing form; correct?

21   **A.**   That's what this is -- this says, yes.

22   **Q.**   And Walgreens was able to quantify with a specific dollar

23   amount how long, including oxycodone, hydromorphone, and

24   Methadone on the target drug good faith dispensing form;

25   correct?

1   **A.**   I don't understand your question.

2   **Q.**   Walgreens was able to quantify the specific dollar

3   amount --

4   **A.**   The dollar amount in labor?

5   **Q.**   -- including oxycodone, hydromorphone, and Methadone on

6   the target drug good faith dispensing form; correct?

7   **A.**   For the amount of labor you're talking about?

8   **Q.**   Yes, ma'am.

9   **A.**   Yes.

10  **Q.**   The labor and all of the analysis that went into the

11  65 million; correct?

12  **A.**   I can only speak to the labor in that question that you

13  were asking me before; but we did an overall financial impact

14  of the overarching year, and this was part of it.

15  **Q.**   And your testimony today is that that had no impact on

16  Walgreens' decision, for example, to include hydrocodone on the

17  target drug good faith dispensing form?

18  **A.**   Hydrocodone was not a Schedule II at the time.  And if you

19  recall, on that checklist there was an option for any store to

20  use that checklist anytime they wanted or the district manager

21  could also add that drug.

22          **THE COURT:**   I'm sorry.  What did you say about

23  hydrocodone?

24          **THE WITNESS:**   Hydrocodone was not a Schedule II drug

25  at the time that all that happened.  It was an opioid.  It has

1  since become a Schedule II drug, but at the time it was

2  Schedule III, and we did not have --

3          THE COURT:  When did it become a Schedule II drug?

4          THE WITNESS:  Schedule II?  I don't remember exactly.

5  Maybe --

6          THE COURT:  Approximately.

7          THE WITNESS:  -- '14, '15.  Maybe '15, '16.  I don't

8  remember.  I'd have to look that up.

9          THE COURT:  Thank you.

10          THE WITNESS:  Sure.

11  BY MR. MOUGEY:

12  Q.   Were you aware at the time that Walgreens was calculating

13  the financial impact of what drugs to include on the target

14  drug good faith dispensing form, that the DEA included

15  hydrocodone as the commonly abused controlled pharmaceuticals?

16  A.   I don't know that to be true.  I can tell you that when I

17  took over the Pharmacy Integrity Group, the three drugs that I

18  chose were the ones of interest.

19          But I do know that hydrocodone is an opioid, and I do know

20  that opioids have addictive qualities.  So I'm not saying that

21  what you're telling me is not a fact.  I just don't remember

22  that specific piece.

23          THE COURT:  When you say "interest," of interest to

24  whom?

25          THE WITNESS:  So of interest to the DEA for

POLSTER - CROSS / MOUGEY

 1  possibilities of diversion.

 2          **THE COURT:**  So, in other words, your testimony is that

 3  the DEA was not interested in hydrocodone being diverted?

 4          **THE WITNESS:**  No.  My testimony is that the drugs that

 5  I chose were the ones that they were specifically telling us

 6  that there was a concern with at that point in time.

 7          **THE COURT:**  And they never expressed a concern about

 8  hydrocodone?  That's your testimony?

 9          **THE WITNESS:**  When I first took over the team, no.

10  They have since -- obviously, they have since --

11          **THE COURT:**  When did they first express a concern?

12          **THE WITNESS:**  I don't remember the exact date that

13  they talked about hydrocodone.

14          **THE COURT:**  Approximately.

15          **THE WITNESS:**  Because it's an opioid and once -- once

16  they started their order to show cause against Walgreens and

17  additional retailers and the prescribing of C2s went down,

18  the -- there was an increase in dispensing of hydrocodone among

19  the industry; and shortly thereafter, they changed the

20  regulations and made it a C3 to a C2.

21          **THE COURT:**  Okay.  Thank you.

22  **BY MR. MOUGEY:**

23  **Q.**  Ms. Polster, you're aware that the DEA made a series of

24  regional presentations around the country; correct?

25  **A.**  Yes, I am.

POLSTER - CROSS / MOUGEY

1   **Q.**   And they occurred in multiple cities; correct?

2   **A.**   Yes, I am.

3   **Q.**   And those occurred primarily in 2012; correct?

4   **A.**   I don't remember the time.  I do remember going to one,

5   but it wasn't before I went into my role.  It was afterwards.

6   So it had to have been 2013 when I first sat through one of

7   those presentations.

8   **Q.**   And do you recall that there were internal discussions and

9   correspondence at Walgreens related to the DEA regional

10  meetings?

11  **A.**   Yes.

12  **Q.**   And sometimes even the slide decks from these meetings

13  were sent around within Walgreens; correct?

14  **A.**   Yes.

15  **Q.**   And they were discussed, the DEA presentations, at the

16  highest levels; correct?

17  **A.**   We -- we did let the highest levels know that those

18  presentations were happening.

19  **Q.**   All right.  Ms. Polster, I'm going to hand you what I've

20  marked as Exhibit 19656.  It's a large number of slides.  I'm

21  just going to put it on the -- will it make it easier?

22         **THE COURT:**  My question is:  I want to take a recess,

23  so do you want to finish this subject or --

24         **MR. MOUGEY:**  We're thinking exactly alike.  One

25  document and I'm done.

POLSTER - CROSS / MOUGEY

1              THE COURT:  One document and done.

2              MR. MOUGEY:  When I say "I'm done," I'm done for

3    lunch.

4              THE COURT:  Okay.  This is 19656.

5                        (Pause in proceedings.)

6    BY MR. MOUGEY:

7    Q.   United States Department of Drug -- Justice, Drug

8    Enforcement Administration.  This is the first page.  Do you

9    see that, Ms. Polster?

10   A.   I do.

11   Q.   Drug Trends, Indianapolis, Indiana, December 2012;

12   correct?

13   A.   Yes.

14   Q.   And the DEA wasn't just sending any low-level staffer to

15   come make these presentations.

16        Joe Rannazzisi, the deputy assistant administrator of the

17   DEA Office of Diversion Control, presented on a majority of

18   these regional shows; correct?

19   A.   I don't know about the majority, but his name's on here,

20   yes.

21   Q.   Yes, ma'am.

22        And you know who Joe Rannazzisi is?

23   A.   I do.

24   Q.   And it's the same gentleman that sent letters out from the

25   DEA reminding registrants of their obligations in 2006 and

POLSTER - CROSS / MOUGEY

1  2007; correct?

2  **A.**   I don't know the exact answer to that, but I have seen

3  correspondence from him, yes.

4  **Q.**   Yes.  And that correspondence is reminding registrants

5  like Walgreens of their obligations under the Controlled

6  Substance Act; correct?

7  **A.**   I will take your word for it.  I don't know.

8  **Q.**   And within this information that's being relayed by the

9  DEA, four pages in, "Commonly abused controlled

10  pharmaceuticals."  Do you see that, Ms. Polster?

11  **A.**   I do.

12  **Q.**   And seven different drugs are listed; correct?

13  **A.**   Yes.

14  **Q.**   But not all of them are opiates; correct?

15  **A.**   Correct.

16  **Q.**   One of the opiates is hydrocodone?

17  **A.**   I see that.

18  **Q.**   And the date of this document is December of 2012;

19  correct?

20  **A.**   I see that.

21  **Q.**   After you've started at Pharmaceutical Integrity; correct?

22  **A.**   Yes.

23  **Q.**   During the time period when Walgreens is making

24  determinations about what drugs to put on its target drug good

25  faith dispensing form; correct?

POLSTER - CROSS / MOUGEY

1    **A.**   That -- that is correct, but I'm going to just say that

2    all controlled substances go through the pharmacist's

3    corresponding responsibility and the good faith dispensing

4    policy.

5         Because we don't have hydrocodone on the checklist does

6    not mean our pharmacists were not doing their due diligence in

7    filling their prescriptions.

8         **THE COURT:**   I think the question is limited to the

9    targeted.  He's asking about the targeted.

10        **THE WITNESS:**   It was not on the targeted good faith

11   dispensing checklist.

12        **THE COURT:**   Okay.  That was the question.

13   **BY MR. MOUGEY:**

14   **Q.**   Thank you.

15        Despite the fact that DEA is alerting the registrants

16   during these regional meetings that oxy -- I'm sorry --

17   hydrocodone is one of the most commonly abused drugs; correct?

18   **A.**   It's not on the checklist.

19   **Q.**   And -- but the DEA is alerting registrants that were

20   attending these meetings that it is one of the most commonly

21   abused opiates; correct?

22   **A.**   It's alerting -- when I went to one of these meetings, it

23   was alerting them -- it was alerting the audience, who was not

24   just registrants, by the way, it was pharmacists in practice,

25   they were all invited, and it was giving an overall

POLSTER - CROSS / MOUGEY

 1   presentation.

 2        And the answer to what you're saying on the screen and

 3   what's on the slide is, yes, it is a -- a commonly abused

 4   medication.  It is an opioid.  It does have addictive

 5   qualities, yes.

 6   **Q.**   And it is also one of -- it is the most highly prescribed

 7   drug in the United States; correct?  2006 to 2010.  Just look

 8   at the screen, Ms. Polster.

 9   **A.**   Sorry.  You're on a different screen than what I --

10   **Q.**   Do you see hydrocodone?

11   **A.**   Yes, I see that.

12   **Q.**   The blue, highest prescribed drug; correct?

13   **A.**   Yes.  Yes.

14   **Q.**   One of the most commonly abused and one of the highest

15   prescribed; correct?

16   **A.**   That's what it says.

17   **Q.**   The DEA also alerted that hydrocodone -- do you see the

18   green arrow on the left-hand side up on the screen?

19   **A.**   Yes.

20   **Q.**   -- that hydrocodone was one of the -- I'll call it the

21   initial drugs used in the cycle of addiction; correct?

22   **A.**   That's what it says here.

23   **Q.**   And this circle or cycle of addiction, as the DEA

24   communicated in 2012 to Walgreens, was that -- the circle

25   begins with hydrocodone, continues to oxycodone to OxyContin,

1   heroin; correct?

2   **A.**   That's what it says on the screen.

3   **Q.**   Yet, Walgreens, based on its financial impact analysis, at

4   least in part, decided not to put hydrocodone on its target

5   drug good faith dispensing form; correct?

6   **A.**   That's not the reason that I chose not to put it on there.

7   I did not put it on there because when I took over the team,

8   the DEA was focusing in the conversations that I was in with

9   the meetings -- I'm not saying that it's not an addictive drug

10  for the record.

11         What I'm saying is, in the meetings that I was in when we

12  were determining the drugs of interest, the three drugs that I

13  chose were the drugs that were of interest in the meetings that

14  I was in.  And that's what I chose.

15         And I will take responsibility that I chose those drugs,

16  and I also take responsibility that I allowed the stores and

17  the districts to add additional drugs if they chose fit.

18         But I also state for the record that all prescriptions

19  that are controlled substance go through a due diligence

20  process.

21         **THE COURT:**   Okay.  Let's take our recess.  We'll be in

22  recess until 1:30.

23         (Luncheon recess was taken at 1:00 p.m.)

24  <u>**AFTERNOON SESSION**</u>                                    <u>**1:30 p.m.**</u>

25         **THE CLERK:**   Come to order.  Court is now in session.

1                          (Pause in proceedings.)

2              **THE CLERK:**  You may be seated.

3              **THE COURT:**  Okay.  Let the record reflect all parties

4    are present.

5         You may proceed.

6    **BY MR. MOUGEY:**

7    **Q.**   Ms. Polster, you understand that hydrocodone was the most

8    frequently prescribed drug or dispensed drug by Walgreens in

9    San Francisco; correct?

10   **A.**   I don't know where you say "by Walgreens."  I mean, that

11   may be true, but this document that you showed me earlier was

12   not Walgreens data.

13   **Q.**   Yes, ma'am.

14        I'm asking, do you have an understanding -- Ms. Polster,

15   sitting here today, absent any document, do you have an

16   understanding that hydrocodone was the most dispensed opiate by

17   Walgreens?

18   **A.**   I have an understanding that it is very highly dispensed.

19   I don't recall that it was the most dispensed, but that it was

20   one of the top dispensed opioids.

21   **Q.**   Ms. Polster, I'm going to hand you a series of

22   documents --

23   **A.**   Okay.

24   **Q.**   -- and I'm going to ask you to draw your attention to the

25   first document that I have marked as Exhibit 29837.

```
 1                    (Pause in proceedings.)

 2   BY MR. MOUGEY:

 3   Q.   I want to make sure I just called out the right number.

 4   Ms. Polster, are you at 29849?  I'm going to put it on the

 5   screen for you to compare.

 6        Oops.  I'm sorry.  I just pulled the wrong -- I wondered.

 7             THE CLERK:  837?

 8             MR. MOUGEY:  Yes, ma'am.

 9        Bear with me, Judge.  I'm sorry.  I just pulled the wrong

10   stack.

11                    (Pause in proceedings.)

12   BY MR. MOUGEY:

13   Q.   29837 -- I have it up on the monitor for your convenience,

14   Ms. Polster -- this is a chart evidencing Walgreens' dispensing

15   data of the nine prescription opiates dispensed by Walgreens by

16   drug in dosage units.  Do you see that, Ms. Polster?

17             MS. SWIFT:  I'm objecting to the use of this document,

18   which is from the plaintiffs' expert's report and the witness

19   doesn't have any foundation for it.

20             THE COURT:  Overruled.

21        Go ahead.

22   BY MR. MOUGEY:

23   Q.   You understand -- when I use the words "Walgreens'

24   dispensing data," you understand that Walgreens has produced

25   its dispensing data in this case?
```

POLSTER - CROSS / MOUGEY

1   **A.**   Yes.

2   **Q.**   And the nine drugs are a subset of the 14-drug ARCOS

3   subset database.  Do you understand that?

4   **A.**   I understand that -- I'm not -- I don't understand the way

5   you said that, but I understand that this is our dispensing

6   data and it's broken down by drug.

7   **Q.**   In San Francisco you see that hydrocodone is 49.1 percent

8   of the nine prescription opiates dispensed by Walgreens by

9   dosage unit.  Do you see that?

10   **A.**   Yes.

11   **Q.**   Oxycodone is 31 percent; correct?

12   **A.**   Yes.

13   **Q.**   Methadone is 8 percent; correct?

14   **A.**   Yes.

15   **Q.**   Target drugs, oxycodone, Methadone; correct?

16   **A.**   Yes.

17   **Q.**   The third target drug is hydromorphone; correct?

18   **A.**   Correct.

19   **Q.**   And that is, I represent to you, part of the 3.8 other

20   percent; correct?  Do you see hydromorphone?

21   **A.**   I'll have to take your word for it but, yes, it would make

22   sense it's other because it's not in the aggregate big wheel.

23   **Q.**   So almost one out of two opiates dispensed by Walgreens in

24   San Francisco as part of the nine-drug Walgreens database is

25   hydrocodone; correct?

POLSTER - CROSS / MOUGEY

1   **A.**   That's what it says.

2   **Q.**   I direct your attention to Bates Number 9, "Nine

3   prescription opiates dispensed by Walgreens by year."

4         Hydrocodone, oxycodone.   The orange is hydrocodone.   Do

5   you follow me, Ms. Polster?

6   **A.**   Yes.

7   **Q.**   The blue is oxy, the red is Methadone, and the

8   hydromorphone are these tips.   Do you see that --

9   **A.**   I see that.

10  **Q.**   -- Ms. Polster?

11  **A.**   I do.

12  **Q.**   Turn to page Bates Number 10, "San Francisco population

13  809,000."   Orient yourself to this chart beginning in year 2006

14  down to year 2020, dosage units per capita.

15        Walgreens was dispensing per year 2008, '9, '10, and '11

16  as many as 20 dosage units per person in the city of

17  San Francisco; correct?

18  **A.**   I see that that's what it says; however, I don't know how

19  you would say per person unless you're just randomly taking the

20  actual population of San Francisco and not attributing that

21  there may be people from outside of San Francisco that are

22  coming to see specialists or to get a pharmacy because they're

23  in a rural, but I see that's what that says there.

24  **Q.**   And the total of nine prescription opiates dispensed by

25  Walgreens in San Francisco during -- or from the periods 2006

1  up to a partial year of 2020 is 155 million dosage units or

2  pills; correct?

3  **A.**    I see that.

4  **Q.**    Now, when you began at Pharmaceutical Integrity and

5  working on the target drug good faith dispensing, was there any

6  discussion once you started that the target drug good faith

7  dispensing list had to be manageable?

8  **A.**    Manageable?  I don't remember the word "manageable."

9  **Q.**    Meaning that by including hydrocodone, 50 percent of the

10  nine prescription drugs dispensed by Walgreens in opiates, that

11  would exponentially increase the target drug good faith

12  dispensing form; correct?

13  **A.**    It would increase the number of times that the form was

14  used per policy, yes.

15  **Q.**    And the $65 million financial impact that your group

16  helped calculate as the compliance people, that would have

17  increased significantly if hydrocodone was included; correct,

18  Ms. Polster?

19  **A.**    It would have increased because we would have added labor

20  because we would have mandated the checklist to be used on

21  every prescription.

22       However, I will still go back to say good faith dispensing

23  was done on each of these prescriptions.  Just because a

24  checklist wasn't used --

25       **THE COURT:**  I think -- so we get through your

POLSTER - CROSS / MOUGEY

 1   testimony, I think --

 2            MR. MOUGEY:  Thank you.

 3            THE COURT:  -- you've answered the question.

 4   BY MR. MOUGEY:

 5   Q.   I direct your attention to what I've marked as

 6   Exhibit 20799.

 7        You're familiar with Kristie Provost; correct?

 8   A.   Yes.

 9   Q.   And this is -- the exchange of this e-mail is dated

10   October of 2012; correct?

11   A.   I see that.

12   Q.   That's within weeks of you beginning at Pharmaceutical

13   Integrity; correct?

14   A.   Yeah.  I started in November and December, yes.

15   Q.   The subject line of this e-mail between Ms. Provost,

16   Mr. Murray, and Mr. Umbleby was titled "Good Faith Dispensing,

17   High-Risk Product Discussion"; correct?

18   A.   Yes.

19   Q.   And they were working through -- or were you aware that

20   they were working through what drugs to include on the target

21   drug good faith dispensing list?

22   A.   I see that here, yes.

23   Q.   Yes, ma'am.

24        And they were discussing that the list would need to be

25   manageable; correct?

 1  **A.**   That's the words they used here, yes.

 2  **Q.**   Yes, ma'am.

 3       And when you began Pharmaceutical Integrity, one of the

 4  first things that your group did was to calculate the financial

 5  impact of what drugs were on target drug good faith dispensing;

 6  correct?

 7  **A.**   That was not the first thing that my team did, and we did

 8  it at the request of whoever put that document together.  So,

 9  no.

10  **Q.**   Yes, ma'am.

11       I don't think I said the thing, but the question was:  One

12  of the first projects that your group took on in Pharmaceutical

13  Integrity in 2013 was to calculate the financial impact of the

14  breadth of -- or the scope of the target drug good faith

15  dispensing; correct?

16  **A.**   We were included in that document, yes.

17  **Q.**   There were several discussions intra-Pharmaceutical

18  Integrity about controlling the workload; correct?

19  **A.**   Having the -- understanding the operational concerns of

20  any policy is a topic of discussion.

21       So if you have something to refresh my memory, please show

22  me because I -- we talk about all kinds of things, and it was a

23  long time ago.

24  **Q.**   Almost 10,000 stores with Walgreens when you started in

25  2013 in Pharmaceutical Integrity; correct?

1  **A.**    Yes.

2  **Q.**    Almost a hundred thousand pharmacists and technicians at

3  Walgreens; correct?

4  **A.**    Yes.

5  **Q.**    And the ceiling limit that you were explaining to the

6  Judge today on Walgreens' CSR could be manipulated; that would

7  drive the number of flags; correct?

8  **A.**    I don't know what you mean by that.

9  **Q.**    Ms. Polster, I put in front of you what I've marked as

10  Exhibit 59, an e-mail exchange between you and Mr. Mills.

11      Mr. Mills is part of Pharmaceutical Integrity; correct?

12  **A.**    Yes.

13  **Q.**    And you and he were discussing the ceiling update;

14  correct.

15  **A.**    Let me read this, please.

16  **Q.**    It's in the subject line; correct, Ms. Polster?

17  **A.**    That's what the subject says.

18  **Q.**    The e-mail from Mr. Mills to you said (as read):

19          "As we decrease the upper limit of ceiling more, the

20          number of stores/workload will be increased.  We can

21          control the workload by how much we decrease the ceiling

22          value at any given point in time."

23          Correct?

24  **A.**    That's what it says, yes.

25  **Q.**    And you didn't respond to him that the objective isn't to

POLSTER - CROSS / MOUGEY

1    control the workload; correct?

2    **A.**    No.

3    **Q.**    You didn't respond to him that "We are focused on

4    compliance at Walgreens and ensuring patient safety, not

5    controlling the workload"; correct?

6    **A.**    I think you're mischaracterizing that, but that -- I

7    didn't respond to that.  You see what my response was.

8    **Q.**    You didn't --

9    **A.**    I was responding to what he sent me.

10   **Q.**    You were aware by the time you started Pharmaceutical

11   Integrity that here in California opiate overdoses had become

12   the number one cause of death in 30 to 40 year olds; correct?

13   **A.**    You're right.  The industry was changing, and it wasn't

14   just in California.

15   **Q.**    Ms. Polster, you understand that there were Congressional

16   investigations on OxyContin, the use and abuse, dating back to

17   2001; correct?

18   **A.**    I understand that OxyContin and oxycodone and all

19   controlled substance prescriptions have the ability for abuse,

20   and I --

21   **Q.**    Yes, ma'am.

22   **A.**    -- but I don't under -- I don't know the answer to the

23   Congressional question.

24   **Q.**    You said that things were changing.

25   **A.**    Yes.

POLSTER - CROSS / MOUGEY

1  Q.   What I asked you was:  Are you aware there were

2  Congressional investigations about the OxyContin, the use and

3  abuse, as early as 2001?

4  A.   When you say "Congressional," I can't say "Congressional,"

5  but I know that there were things happening around controlled

6  substances for sure.

7      There has been controlled substance topics of media and

8  other documents and it was in the news.  It was in everywhere

9  around controlled substances.

10     We know that it was -- that the controlled substances can

11 be dangerous when they're not used appropriately.

12 Q.   And you are familiar with a gentleman by the name of

13 Mr. Bratton in your group, correct?

14 A.   Ed works for me.

15 Q.   And Mr. Bratton was part of Pharmaceutical Integrity;

16 correct?

17 A.   Yes.

18 Q.   He started right in the beginning with you in late 2012,

19 early 2013; correct?

20 A.   Yes.

21 Q.   He sat in the war room with you as you-all were trying to

22 figure out what kind of plan you were going to roll out at

23 Walgreens in response to the DEA settlement; correct?

24 A.   Yes.  He was in some of the meetings, yes.

25 Q.   And you understand that Mr. Bratton concluded that the

POLSTER - CROSS / MOUGEY

1   lack of systems at Walgreens created the runaway growth

2   internal at Walgreens in relation to the dispensing of opiates;

3   correct?

4   **A.**   I understand that as we learned more about our systems and

5   we learned more about different things happening, either with

6   the system or processes in the stores, that we had things that

7   we needed to correct, yes.

8   **Q.**   And that Mr. Bratton, based on him sitting in meetings

9   with you working on policies and procedures and training, his

10  conclusion that the lack of systems at Walgreens up until 2013

11  caused runaway growth in relation to opiates; correct?

12  **A.**   That may have been his words, yes.

13  **Q.**   I direct your attention to what I've marked as Exhibit 27.

14      Actually, I apologize, Ms. Polster.  Let me direct your

15  attention to one more issue in Exhibit 59, the paragraph before

16  in the ceiling update.

17      Mr. Mills was relaying to you that (as read):

18          "We have the ability to investigate orders submitted

19      by the RXS when they are using the controlled substance

20      quantity override forms.  The orders the war room members

21      are able to investigate today are a week old.  In most

22      cases these orders have already been shipped making it

23      very hard for us to report any orders using Manuela's

24      dashboard."

25      Correct?

1   **A.**   That's correct.  We had -- we had identified that early in

2   the process and then made changes.

3   **Q.**   And you say that this is the -- all of the issues and the

4   loopholes or the gaps that you identified when you started in

5   '13.  These went back, some of them, as much as a decade;

6   correct?

7   **A.**   I don't recall back in early when -- I don't recall

8   exactly when the DEA went on record saying it was illegal or

9   something to dispense or to ship a suspicious order.

10      I know that when I took over the Integrity Group, that we

11  made the determination that we were going to halt any order

12  that was deemed suspicious, investigate; and if it was

13  determined to be suspicious, we report it to the DEA and we do

14  not ship, but --

15  **Q.**   Ms. Polster -- sorry.

16  **A.**   Sorry.  No you go.

17  **Q.**   Ms. Polster, it's not your testimony to this Court that at

18  any point in time an order that was flagged by Walgreens as

19  suspicious, whatever report, that it wasn't Walgreens'

20  responsibility to investigate; correct?

21  **A.**   I don't understand your question.  Could you just, like,

22  ask it again?  I'm sorry.

23  **Q.**   It's not your testimony today to this Court that at any

24  point in time it wasn't Walgreens' responsibility to

25  investigate orders that it had identified as suspicious?

1  **A.**   No.  It was our responsibility of course, but I'm not

2  saying that it wasn't our responsibility to do it.  I'm just

3  saying you -- you showed me something which is different than

4  before.

5  **Q.**   Let me direct your attention to what I've marked as

6  Exhibit 27, an e-mail exchange between yourself and Dan Doyle

7  dated December 16, 2012.  Do you see that?

8  **A.**   Yes.

9  **Q.**   Ms. Polster, your group was running the algorithm that you

10  explained to the Court this morning, the CSR, to determine how

11  many orders were flagged; correct?

12  **A.**   My group, yes, was the business user group of the system,

13  yes.

14  **Q.**   And the discussion with Mr. Doyle is in relation to the

15  DEA's allegations in the order to show cause; correct?

16  **A.**   Yes.  It was in relation -- in regard to my setting up my

17  team that I needed to execute on the memorandum of agreement.

18  **Q.**   In the second paragraph, Ms. Polster, you relayed to

19  Mr. Doyle in your role as head of compliance at Pharmaceutical

20  Integrity, that (as read):

21          "In response" -- and you're referring to the DEA --

22      "the company has enhanced its suspicious order monitoring

23      program for controlled substances in an effort to convince

24      the DEA that the proposed penalty is excessive."

25      Correct, Ms. Polster?

**POLSTER - CROSS / MOUGEY**

1  **A.**   That's what it says.

2  **Q.**   So creating Pharmaceutical Integrity, the reports, the

3  PowerPoint that we saw earlier, those were all designed to

4  convince the FDA -- DEA that the proposed fines were excessive;

5  correct?

6  **A.**   I put that in there, but that's kind of taking it a bit

7  out of context, but that is what I have in my e-mail.

8  **Q.**   You went on in the third paragraph of your e-mail to

9  Mr. Doyle that (as read):

10        "The updated suspicious order monitoring program is

11        currently being piloted."

12        Do you see that?

13  **A.**   I do.

14  **Q.**   All right.  So as of December 12, the CSR is in a pilot;

15  correct?

16  **A.**   That version is in a pilot.

17  **Q.**   And you went on (as read):

18        "Once turned on for all controlled medications

19        nationwide, it is expected to generate thousands of orders

20        of interest per week.  These orders of interest will all

21        require review prior to allowing the drugs to be shipped

22        to our pharmacists."

23        Correct?

24  **A.**   Yes.

25  **Q.**   (as read):

**POLSTER - CROSS / MOUGEY**

1            "Without adequate resources to review these orders,

2       the program will not have the necessary impact."

3       Correct?

4  **A.**   Correct.

5  **Q.**   And when your group flipped the switch on the CSR to

6  identify those suspicious orders, pursuant to your e-mail, how

7  many orders were flagged?

8  **A.**   We did not know that they were suspicious orders.  I will

9  just put that out there.  It's not suspicious until you

10 investigate it and the orders would trigger.

11            I see in here it says 14,000 items.  This was a long time

12 ago.  I don't remember the exact context of the entire e-mail

13 other than I was asking for my budget to be increased so I

14 could hire people in order to review these orders and run the

15 system.

16 **Q.**   And you were given ten people?

17 **A.**   At the time, yes.

18 **Q.**   Yes, ma'am.

19            And it never increased materially from that ten; correct?

20 **A.**   I have 15 people now but, yes.

21 **Q.**   And part of the settlement agreement with the DEA and the

22 language we read earlier that Walgreens agrees not to ship any

23 order of interest or suspicious order, in whole or in part,

24 until Walgreens resolves the reason that caused it to designate

25 the order as an order of interest or a suspicious order;

POLSTER - CROSS / MOUGEY

1   correct?

2   **A.**   That's right.

3   **Q.**   And as of this week when Pharmaceutical Integrity flipped

4   the switch on the CSR, there were 14,000 orders that ten people

5   were supposed to investigate before they were shipped; correct?

6   **A.**   That is what the document says, yes.

7   **Q.**   And at that this point in time, the time of this e-mail,

8   late 2012 all the way up to 2019, you had been asking Kermit,

9   the president of CEO -- I mean, the president of Walgreens, to

10  convert the target drug good faith dispensing form that was in

11  paper in filing cabinets into an electronic form; correct?

12  **A.**   Yes.

13  **Q.**   The electronic form would have given Pharmaceutical

14  Integrity the ability to see those in real time; correct?

15  **A.**   Yes.

16  **Q.**   It would have given a pharmacist on one side of

17  San Francisco to review the target drug good faith dispensing

18  form in another part of San Francisco; correct?

19  **A.**   Yes.

20  **Q.**   It would have given Pharmaceutical Integrity the

21  opportunity to audit or monitor the use of target drug good

22  faith dispensing in real time; right?

23  **A.**   Yes, in real time.  We had to do it manually.

24  **Q.**   And you asked the president of Walgreens year after year

25  after year for an increase in your budget item from 2013 to

1  2019 before it was approved; correct?

2  **A.**  Correct.

3  **Q.**  And in an e-mail exchange when it was finally approved on

4  11-21-2021 (as read):

5       "I had been wanting to do this" -- this is from

6       you -- "from day one" --

7  **A.**  Yep.

8  **Q.**  (as read):

9       -- "and Kermit wouldn't let me.  This is a huge team

10      [sic] for the field."

11      Correct?

12  **A.**  A huge win for the team, exactly.  Because what it made is

13  my job and my people's job much easier having it in electronic

14  format versus us calling the store and asking them to fax

15  documents or what have you.

16  **Q.**  So there was a financial decision made at Walgreens after

17  opiate overdoses had become the leading cause of death in the

18  state of California from 2012 to 2019, that that target drug

19  good faith dispensing form was kept in a filing cabinet.

20  Mr. Crawford would never approve it; correct?

21  **A.**  Mr. Crawford did not approve my budget.  We were in the

22  process of rolling out a new computer system, and we were

23  waiting for the new computer system before the enhancement came

24  on board.

25  **Q.**  And you told Mr. Crawford from 2012 to 2019 that an

1  electronic form would provide greater visibility into a

2  patient's full GFD history; correct?

3  **A.**    Yes.

4  **Q.**    You said that it would replace the target -- the manual

5  target drug that couldn't be audited; correct?

6  **A.**    The checklist you mean?

7  **Q.**    Yes, ma'am.

8  **A.**    Yeah, easily audited, correct.

9  **Q.**    Yes, ma'am.

10        And you relayed to Mr. Crawford that it was important

11  because it enhanced the ability for pharmacists to document the

12  good faith dispensing review; correct?

13  **A.**    It made it easier for them, yes.

14  **Q.**    And the new process would allow for GFD chain-wide

15  reporting; correct?

16  **A.**    Yes.

17  **Q.**    And you told Mr. Crawford that it would provide increased

18  transparency; correct?

19  **A.**    For my team to see, yes.

20  **Q.**    And, yet, Walgreens, based on the financial impact, made

21  the decision not to follow your recommendations; correct?

22  **A.**    I can't speak to the financial impact or his decision as

23  to why I did or didn't get the budget.

24        My team was reviewing it.  We had boots on the ground

25  doing audits, but it wasn't easy.  We had to do it manually.

POLSTER - CROSS / MOUGEY

1  Q.   I direct your attention to what I've marked as

2  Exhibit 4873, an e-mail exchange dated June 16th, 2017, that

3  you were included on.  Do you see that, Ms. Polster?

4  A.   Yes.

5  Q.   And the subject matter is "Target Drug Good Faith

6  Dispensing, the Greenbelt Project Meeting."  Do you see that?

7  A.   I do.

8  Q.   And do you recall what the "Greenbelt Project Meeting" was

9  in reference to?

10  A.   No.

11  Q.   Let me help refresh your memory on Bates Number 51, "What

12  is the problem statement?"

13       And you recognize this type of form?  This was used

14  routinely within Walgreens in your group; correct?

15  A.   It's a -- well, it was a PowerPoint at Walgreens, yes.

16  Q.   (as read):

17         "Pharmacists and technicians must comply to

18       completing our TDGFD checklist when dispensing

19       prescriptions for target drugs.  An observed study shows

20       pharmacists spend approximately 4.14 minutes completing

21       each checklist excluding time spent on phone calls,

22       consultations, and scanning the patient ID.  Checklist

23       labor to technicians, the organizations could save

24       2.5 million per year across approximately 7,900 stores."

25       Correct?

POLSTER - CROSS / MOUGEY

1    **A.**    That's what it says, yes.

2    **Q.**    And this is your group analyzing the impact of TDGFD after

3    all of these years still being in paper form; correct?

4    **A.**    It is my team's analysis of a win for the stores and for

5    my team to have it electronic, yes.

6    **Q.**    And on Bates Number 55 your group had the process time of

7    TDGFD broken down to .13, almost down to the second; correct?

8    **A.**    We had the various steps, yes, in there.

9    **Q.**    This is using data available to your department; correct?

10   **A.**    Through the Labor and Capacity team, yes.

11   **Q.**    Have you had an opportunity to review the results of the

12   target drug good faith dispensing as compared to the actual

13   prescriptions filled in San Francisco?

14   **A.**    You will have to be a little more specific on reviewing

15   it.

16   **Q.**    Let me draw your attention to Plaintiff Exhibit 29849.

17   **A.**    I don't recognize this document.

18   **Q.**    Yes, ma'am.

19        This is an exhibit that was created based off of

20   Walgreens' both dispensing data and its target drug good faith

21   dispensing checklist that were produced in San Francisco.

22   Okay?

23   **A.**    Okay.

24   **Q.**    And let me turn to the chart form, which is on page 5.

25        And the green lines are the number of target drug good

1    faith dispensing checklists that were provided, and the red are

2    the number of target drug prescriptions that were filled.

3         Do you see that?

4    **A.**   I see that.

5    **Q.**   And do you see that it's here in San Francisco; correct?

6    **A.**   Okay.

7    **Q.**   In twelve Walgreens pharmacies; correct?

8    **A.**   Okay.

9    **Q.**   Starting in the year 2013 to a partial year of 2020?

10   **A.**   Okay.

11   **Q.**   Okay.  So starting from the most recent, because you would

12   think Walgreens would have the document collection would be

13   best in the most recent years; correct?

14   **A.**   Well, you would hope that compliance to -- excuse me --

15   the policy would improve as the number of years pass and that

16   it's been in place.

17   **Q.**   And it didn't go electronic until late 2019, early 2020;

18   correct?

19   **A.**   I don't remember the date, but it was around that

20   timeframe.

21   **Q.**   Even in the last three to four years -- 2020, 2019, '18,

22   '17 -- you can see that 30, 40 percent in 2019 and '20, there

23   was not a target drug good faith dispensing checklist to go --

24   to match with the actual drugs dispensed; correct?

25   **A.**   I can't tell you to the percentage.  I don't see scale.

 1    But I will tell you that I'm disappointed in these findings,

 2    but that I still stand behind the fact that good faith

 3    dispensing is done on all of our prescriptions.

 4        Even if a target drug checklist is not attached to the

 5    prescription, that does not mean that the pharmacist did not do

 6    their due diligence, and a -- it's not in compliance with our

 7    policy, but it's not illegal to not have a target drug

 8    checklist to a prescription.

 9        THE COURT:  Well, are you saying that it is your

10    opinion that pharmacists did in all cases use this

11    documentation?

12        THE WITNESS:  I don't know if they used this specific

13    documentation, Judge, but I would say they used their good

14    faith dispensing processes.

15        THE COURT:  Okay.  And may I ask you:  How do you know

16    that?

17        THE WITNESS:  As part of the pharmacists'

18    corresponding responsibility, part of their legal

19    obligations --

20        THE COURT:  No, no, I understand what a policy is, but

21    you're saying something different.  You're saying -- your

22    testimony is they followed the policy in all cases.

23        THE WITNESS:  No.  No.  I'm sorry.  I -- for the good

24    faith dispensing policy, which is different than the target

25    drug good faith dispensing policy --

```
 1              THE COURT:  Yeah.

 2              THE WITNESS:  -- it's two different policies --

 3              THE COURT:  Right.

 4              THE WITNESS:  -- the overarching good faith dispensing

 5    policy says that they are to use their corresponding

 6    responsibility and due diligence on every single controlled

 7    substance prescription no matter what.

 8              THE COURT:  That's the policy.

 9              THE WITNESS:  Yes.

10              THE COURT:  My question to you is:  How do you know

11    that policy was followed?

12              THE WITNESS:  I don't have, like, proof that they --

13              THE COURT:  But you have a basis.  I wouldn't call it

14    proof.

15              THE WITNESS:  Right.

16              THE COURT:  Call it -- what is the basis for your

17    opinion that it was followed in all cases?

18              THE WITNESS:  As a pharmacist -- I'm speaking only as

19    a pharmacist, Judge.  That as a pharmacist, it is my

20    responsibility to protect my license.

21              THE COURT:  You would do it, but we're talking about

22    thousands of other people.

23         And my question -- and I'm not questioning their good

24    faith and so forth.  I'm questioning the scope of your

25    knowledge.
```

POLSTER - CROSS / MOUGEY

```
 1        How do you know, how can you tell the Court that this was
 2   done in all cases?
 3        It may have been the requirement, but how do you know it
 4   was followed?  That's my question.
 5             THE WITNESS:  I can only tell you from various store
 6   walks, audits, you know, work that our field personnel do, but
 7   I don't have documentation that you're asking for, did they
 8   do --
 9             THE COURT:  I'm not even asking for documentation.
10   I'm asking for your -- the basis for your opinion that it was
11   followed in all cases.  That's all.
12             THE WITNESS:  The basis --
13             THE COURT:  You're giving an opinion.
14             THE WITNESS:  Yes.
15             THE COURT:  And when you give an opinion, you're being
16   cross-examined on the basis for your opinion.  And your opinion
17   is it was followed in all cases.
18        And my question to you is:  How do you know that?  What's
19   the basis?
20             THE WITNESS:  The basis of my opinion is in speaking
21   with pharmacists, in understanding the practice of pharmacy, I
22   don't know what the incentive would be to not do my due
23   diligence when I'm filling a controlled substance prescription.
24             THE COURT:  So your basis -- the basis for your
25   opinion is that there wasn't a contrary incentive not to follow
```

POLSTER - CROSS / MOUGEY

1  it?

2          **THE WITNESS:**  That's part of it, yes.

3          **THE COURT:**  That is, notwithstanding the fact that

4  there was an urgency in filling prescriptions or that

5  pharmacists may be overworked or that perhaps the bonus system

6  in some manner was tied to it, it's your understanding there

7  was no incentive for them not to follow it?  Is that your

8  testimony?

9          **THE WITNESS:**  It's part of the testimony.  There's a

10  lot that goes into filling a controlled substance prescription

11  and being a pharmacist in general.

12      I don't -- I can only speak to my feeling of the policies,

13  my -- my experience in leading teams specifically in the stores

14  and from the corporate office.  Pharmacists in general want to

15  do the right thing, and that's my testimony.

16          **THE COURT:**  Okay.  Thank you.

17  **BY MR. MOUGEY:**

18  **Q.**  Ms. Polster, when the audit results were coming in on the

19  national audit in 2015, there were discussions amongst your

20  group about the results; correct?

21  **A.**  Yes.  We -- when we get audit results back, yes, we do

22  look at them and discuss them.

23  **Q.**  And the discussion internally centered around the fact

24  that the results were unfavorable; correct?

25  **A.**  Are you talking about the BCI?

1   **Q.**   I'm talking about the audit results in 2015 that you-all

2   refer to as the BSI -- BCI, yes.

3   **A.**   Okay.  Yes, we were disappointed that we did not have a

4   hundred percent compliance.

5   **Q.**   Yes, ma'am.

6        And you referred to them as unfavorable; correct?

7   **A.**   I felt it was unfavorable.  The team felt it was

8   unfavorable, that it was not a hundred percent, yes.

9   **Q.**   And as a matter of fact, internally when the results were

10  coming out, your group said -- communicated to each other "Put

11  your seat belts on"; correct?

12  **A.**   Yes.  When I was initially made aware of the first

13  beginning of the results that were coming back through hallway

14  conversation with Scott Yonkman, and I was concerned that the

15  initial findings that he had heard from people in the field

16  were we weren't getting a hundred percent compliance, I did say

17  to my team "Get ready because we're going to -- because we

18  don't have a hundred percent compliance.  We need to re-issue

19  our expectation on following the policy."

20  **Q.**   In fact, what specifically your group was discussing

21  internally was "Put your seat belts on.  That we will have to

22  get a mitigation plan in place to address the results of the

23  survey"; correct?

24  **A.**   Yeah, that's correct.  Because, you know, it's opioids.

25  It was a topic of discussion around the organization.

1       It was the responsibility of my team to ensure that we had

2  good compliance, and we did have good compliance.  It wasn't a

3  hundred percent compliance.

4       You know, in hindsight, of course, those words were

5  probably a little bit exaggerated unfavorable.

6       As you saw in the full results of the audit, we had good

7  results.  We just didn't have a hundred percent results.

8  **Q.**  In your report this morning, you do not -- other than

9  converting to a number of stores that were missing one, two,

10  three, four, five, you do not disclose to the Court the order

11  of magnitude of those audits; correct?

12 **A.**  Yeah.  I didn't know the number.

13 **Q.**  Yes, ma'am.

14      And we do know the number here in San Francisco, and these

15 are the results from 2013 to 2020; correct?

16      **MS. SWIFT:**  Object to the mischaracterization of the

17 facts.  It's an expert report put together by the plaintiffs.

18      **THE COURT:**  Well, is this based on information that

19 was -- isn't this based on statistics and information given by

20 Walgreens?

21      **MS. SWIFT:**  It's based on an expert's opinion from

22 the --

23      **THE COURT:**  No, no, no, no.  Based.  Based.  In other

24 words, I'm not saying this is accurate or inaccurate.  I'm

25 saying, isn't the information that was the basis of the diagram

1   furnished by Walgreens?

2        MS. SWIFT:  This is a diagram that was not included in

3   the expert's report.  It was created and produced very late.

4   That is what they have told us, Your Honor.

5        THE COURT:  I'm asking you this --

6        MS. SWIFT:  That's what they've told us.

7        THE COURT:  -- because I'm sure you've looked at it:

8   Is the information, that is the numbers, is that accurate or is

9   that inaccurate?

10        MS. SWIFT:  I don't know that, Your Honor.

11        THE COURT:  Well, you'll address that in your case;

12   right?

13      I mean, when you get up to -- my understanding is -- first

14   of all, I think it's appropriate examination; but, secondly, my

15   understanding is it is Walgreens' figures.

16      Now, if it's not -- now maybe that an expert put it

17   together in a particular way, I understand it.

18        MS. SWIFT:  Right.  Thank you, Your Honor.

19        THE COURT:  But the figures they are, the number of

20   prescriptions, and you have a bar and then you have the years

21   and my question is:  Is that Walgreens' information?

22        MS. SWIFT:  That is what the plaintiffs have

23   represented.

24        THE COURT:  I'm asking you.

25        MS. SWIFT:  And I have represented to you that I don't

 1  know if these are accurate.

 2          THE COURT:  Okay.  Will you please find out because --

 3          MS. SWIFT:  Yes, Your Honor.

 4          THE COURT:  -- I need to -- I need to have some sense

 5  when I look at these charts as to where the information came

 6  from.

 7      Did it come from Walgreens?  Did it come from some expert?

 8  Did it come -- is it theoretical?  I need to have that sense.

 9      And I have to tell you also, as a matter of process, when

10  I see charts like this, not just this chart but other charts,

11  that purport to disclose Walgreens' history with respect to

12  drugs, with respect to any of these things, I believe that they

13  come from Walgreens.

14      And the reason I'm raising it now is because we had a big

15  discussion in this case about authenticity and that there isn't

16  a problem -- or if there is, it would be raised -- as to

17  whether what I'm being shown is somehow authentic or

18  inauthentic.

19      And you can't have a trial in front of a trier of fact in

20  which there is an issue of authenticity unless it's

21  highlighted, unless it's brought in good faith.

22      So I'm not asking you right now, but I do want to know

23  from Walgreens whether or not these charts that are being shown

24  in this examination are based upon information that Walgreens

25  provided in this litigation.

1          MS. SWIFT:  Understood, Your Honor.  And the only

2    other thing that I will say is that our objections on this

3    particular document in particular have been noted in submission

4    with other experts.

5          THE COURT:  But are they noted with respect to

6    authenticity?  That is to say, are you saying, "Look, this

7    information, we don't believe it's accurate"?

8       Is that the objection?  If that's the objection, I want to

9    understand it because I think I have to rule on it.

10      But if you're saying it's --

11         MS. SWIFT:  Understood, Your Honor.

12         THE COURT:  -- another objection, then I can rule on

13   it in a different way.

14         MS. SWIFT:  We'll take it up separately.  I understand

15   your concern.

16         THE COURT:  Thank you very much.

17   BY MR. MOUGEY:

18   Q.   Ms. Polster, the ledger on the bottom left-hand side of

19   the page of this Federal Rule of Evidence 1006 summary that was

20   submitted by the deadline, can you read that out loud for the

21   Court, please, the data source?

22   A.   (as read):

23            "Processed Walgreens dispensing data January 2006

24       through June 2020.  Walgreens production" with a series of

25       numbers and letters below.

**POLSTER - CROSS / MOUGEY**

1  Q.   Okay.  You understand that Walgreens has a hotline for its

2  pharmacists and employees to call or contact corporate;

3  correct?

4  A.   Yes.

5  Q.   And have you had an opportunity for this case to review

6  any of the evidence that was submitted via the hotline?

7  A.   I have heard of and have seen some, yes.

8  Q.   Are you aware that there were multiple pharmacists that

9  have testified in this trial about their experience at

10  Walgreens?

11  A.   Not testified in this trial, but I am aware of pharmacists

12  calling the hotline, yes.

13  Q.   And are you aware that pharmacists that contacted --

14  Walgreens pharmacists that contacted the Walgreens hotline were

15  concerned that Walgreens was putting profits ahead of the

16  safety of their customers?

17  A.   I'm not aware of those words.

18  Q.   Are you aware of pharmacists being concerned that (as

19  read):

20       "When Ford and Boeing put profits ahead of safety, it

21    did not pay off.  I hope that Walgreens will do what is

22    right and ethical and remove the metric immediately before

23    lives are lost and litigation ruins the great company"?

24    You haven't seen anything like that in your tenure at

25  Walgreens?

1   **A.**   I haven't seen that one that I'm aware of.  I can tell you

2   that any pharmacist that calls our hotline, any employee that

3   calls our hotline, that is taken very seriously.

4        We have an entire organization that we -- that have team

5   members that investigate those, that we have boots on the

6   ground, interviews.  We do a lot of work, and we take employee

7   concerns very seriously.

8   **Q.**   Ms. Polster, IC+, Walgreens' computer system?

9   **A.**   Yes.

10  **Q.**   And IC+ is the interface that the pharmacists and

11  technicians use when entering in comments about certain

12  patients; correct?

13  **A.**   It's the computer system that we use to process

14  prescriptions from start to finish, yes.

15  **Q.**   And part of that includes notes about patients; correct?

16  **A.**   There is a patient note section, yes.

17  **Q.**   Yes.  And it also includes note sections about

18  prescribers; correct?

19  **A.**   Yes.

20  **Q.**   Now, you're familiar with the IC+ system; correct?

21  **A.**   Yes.

22  **Q.**   And do you have an understanding of whether or not

23  Walgreens organizes prescriber data for pharmacists to pick up

24  trends when they're filling prescriptions?

25  **A.**   Our computer system doesn't do that for the pharmacist to

1    see.

2    **Q.**   You would agree with me that Walgreens' red flags dating

3    as far back as the late '90s include flags regarding prescriber

4    patterns?

5    **A.**   Yes.

6    **Q.**   Walgreens from the late '90s until today includes no data

7    accumulation for pharmacists or techs, anyone in the field, to

8    see prescriber history organized in one place; correct?

9    **A.**   That's right.  It's a prescription dispensing system.

10   **Q.**   To take it one step further, there are zero tools

11   available for the field, including prescribe -- I'm sorry --

12   physicians and pharmacy techs that would organize prescriber

13   patterns for them to use when filling prescriptions?

14   **A.**   I'm sorry.  I got confused.  You used physician and

15   pharmacy techs.  Can you please ask that again --

16   **Q.**   Yes, ma'am.  I apologize.

17   **A.**   -- so I can understand what you mean?

18   **Q.**   There are zero tools available for the field, including

19   pharmacist and pharmacist technicians, that organize prescriber

20   patterns for them to use when filling opiate prescriptions?

21   **A.**   We don't have a tool for them to go in and look at a

22   prescriber trend or dispensing patterns.

23        However, as a pharmacist, I can tell you that I knew my

24   prescribers and I knew the prescribers that came -- that their

25   patients came into my stores -- or my store as a pharmacist.

**POLSTER - CROSS / MOUGEY**

1    I do know that pharmacists speak to each other, whether

2    through Walgreens to Walgreens or Walgreens to competition, to

3    talk about various concerns with a prescription or a

4    prescriber.

5        So, no, we don't have a tool that, you know, I can pull up

6    Dr. Jones and see their dispensing pattern, but we do have

7    tools to allow the pharmacist to take each prescription on its

8    own merit and do their corresponding responsibility, checking

9    the prescription drug monitoring program and other pieces.

10   **Q.**   Yet Walgreens has identified and known that part of the

11   red flags that pharmacists should be reviewing dating all the

12   way back to the late '90s included prescriber patterns;

13   correct?

14   **A.**   Yes, because you would want to make sure that if you're

15   seeing unusual patterns of unusual trends from a prescriber

16   come into your store, that is a red flag.

17   **Q.**   Ms. Polster, the patient comments field -- you're familiar

18   with the patient comments field; correct?

19   **A.**   Yes.

20   **Q.**   And the patient comments field is a field in IC+; correct?

21   **A.**   Yes.

22   **Q.**   And it's a -- one of the tools available that pharmacists

23   and technicians are supposed to use when documenting due

24   diligence on red flags; correct?

25   **A.**   No.  It is a field that can be used to put information in

1   about a specific patient, but we have other fields for red

2   flags for a specific prescription, and that is the annotation

3   field that is located on the specific prescription.

4   **Q.**   All right.  When TDGFD was rolled out, there were

5   follow-up training with the fields -- with the field; correct?

6   **A.**   Yes.

7   **Q.**   And there were questions that came back from the

8   pharmacist and the pharmacy techs to your group; correct?

9   **A.**   In some cases, yes.

10   **Q.**   Let me direct your attention to Exhibit 20789.  I'm going

11   to turn to Bates Number 73.

12       Now, you're familiar with an RTF or a refusal to fill;

13   correct?

14   **A.**   Yes.

15   **Q.**   And the question that came back (as read):

16           "In the case where there is a refusal, can we scan

17       the completed TDGFD checklist into that patient's file

18       under patient images rather than just comments?"

19       Okay?  And this is an answer to -- this is a question to

20   Walgreens corporate; correct?

21   **A.**   Yes.

22   **Q.**   And the answer from Walgreens corporate -- which was your

23   group, correct, at this point?

24   **A.**   Yes.

25   **Q.**   -- said (as read):

 1           "Unfortunately, we do not have the memory storage

 2      space to scan these into IC+ across the entire chain.

 3      Please use" -- what's it say?

 4  A.   The patient comments --

 5  Q.   Patient comments.

 6  A.   -- for refusals.  You said red flags.

 7  Q.   -- to ensure -- and a refusal to fill is a result of the

 8  pharmacist looking at the red flags and concluding that the

 9  opiate prescription shouldn't be filled; correct?

10  A.   When a pharmacist refuses to fill a prescription, it's

11  based on red flags, yes.

12      Your question to me earlier -- apologies, but I'm trying

13  to be literal here with you -- but you had said "Do they put

14  red flags in the comment field?"

15      You didn't say anything about refusals.  Apologies.  I

16  didn't understand that's what you meant.

17      Yes, they document that they refuse to fill a prescription

18  in the patient's comments, yes.

19  Q.   And the field was told to put the refusals to fill in the

20  patient comment field; correct?

21  A.   Yes.

22  Q.   "Ensure the most recent TDGFD comments are showing," and

23  they were instructed to remove older comments and abbreviate it

24  if needed; correct?

25  A.   Yes.

**POLSTER - CROSS / MOUGEY**

1  **Q.**   And the reason why they were told to remove the older

2  comments on the RTFs is because there was a cap of the space in

3  the patient comment field; correct?

4  **A.**   That's correct.

5  **Q.**   So this state-of-the-art computer system that you told the

6  Court about this morning that the patient field, the comment

7  section, to put the RTFs in had a max space; correct?

8  **A.**   That's right.

9  **Q.**   And you were hearing questions from the field saying

10  "We're running out of space in the patient comment field";

11  correct?

12  **A.**   That's what the question was referring to, yes.

13  **Q.**   And those comments came as early as 2013 as TDGFD was

14  rolled out across the country; correct?

15  **A.**   Yes.

16  **Q.**   And Walgreens never made the financial decision to upgrade

17  its computer system to expand the patient field so the

18  pharmacist's notes could be included in the database; correct?

19  **A.**   We did not update the computer system to make the field

20  larger, no.

21  **Q.**   So as a result, comments put included in IC+ about a

22  specific opiate prescription, including red flag due diligence,

23  were deleted from the system; correct?

24  **A.**   The old refusal to fills could have been deleted.  The

25  point of the refusal to fill comment to put in there was to let

**POLSTER - CROSS / MOUGEY**

1   the store down the street know that that specific prescription

2   did not meet good faith of that pharmacy; and if the patient

3   tried to go to another Walgreens down the street, that that

4   prescription should not be -- I mean, don't even waste your

5   time because one pharmacist at Walgreens already said it didn't

6   meet the good faith dispense policy and we're not going to

7   dispense it.

8        A controlled substance prescription expires.  It's only

9   good for a certain amount of time.

10       So if you have a specific prescription that expired or

11  that, you know, a refusal to fill happened maybe a year ago, it

12  does not apply to another prescription that was written maybe a

13  day ago.

14       Our policy is to take each prescription on its own merit.

15  **Q.**   Ms. Polster, let me direct your attention to what I've

16  marked as Exhibit 2801.

17       This is an e-mail exchange dated April 8th, 2013,

18  discussing the patient comment field on the patient profile;

19  correct?

20  **A.**   Yes.

21  **Q.**   And it's a question from the field asking if it will be

22  expanded; correct?

23  **A.**   Yes.

24  **Q.**   And this, as of '13, which is almost immediately after

25  TDGFD rolled out, "We are running out of room on some patients

1  already"; correct?

2  **A.**   That's what it says.

3  **Q.**   And the answer is (as read):

4        "Please abbreviate as needed and delete older

5        comments or refusals from the patient profiles to keep the

6        notes current and accurate."

7        Correct?

8  **A.**   Yes.

9  **Q.**   So if a patient here in San Francisco, a pharmacist

10  refused to delete -- I'm sorry -- refused to fill an opiate

11  prescription, that comment could be deleted out of the patient

12  field; correct?

13  **A.**   Yes, it could be deleted.

14  **Q.**   And not could be deleted, they were being deleted within

15  months of TDGFD rolling out; correct?

16  **A.**   Well, I would like to say that this was specifically in

17  San Francisco or California, but I can tell you that we began

18  the rollout of the good faith dispensing checklist in early

19  2013.  We piloted in Florida.

20        There was a big change in the way we processed

21  prescriptions, the way we, you know, asked our pharmacists to

22  go through their corresponding responsibility.

23        We made numerous changes to our checklist, which I think

24  we've talked about before.  We did have some pharmacists that

25  refused to fill prescriptions because every single question

 1   couldn't get answered on the checklist.

 2   **Q.**   I want to recap to make sure we're totally clear on the

 3   sequence.

 4        TDGFD was in a paper form in a filing cabinet in a

 5   specific pharmacy that couldn't be seen by another pharmacy

 6   across the street --

 7   **A.**   Right.

 8   **Q.**   -- until 2019; correct?

 9   **A.**   Yeah.  I don't know the exact date but, yes.

10   **Q.**   Yes, ma'am.

11        And one of the ways for a pharmacy here in San Francisco

12   to communicate with another pharmacy in San Francisco about

13   something very important like refusals to fill was the patient

14   comment field; correct?

15   **A.**   To see a refusal to fill, that was one way.  They can pick

16   up the phone is another way.  They can look at the patient's

17   profile.

18   **Q.**   Ms. Polster, if the refusal to fill was deleted at

19   pharmacy one here in San Francisco, pharmacy three isn't going

20   to know to call pharmacy one; correct?

21   **A.**   They're going to know to call pharmacy one for the most

22   recent prescription that was refused.  And why would they

23   refuse -- why would they delete an additional comment if they

24   had space?

25             **THE COURT:**  I'm sorry.  How does this work?  In other

 1   words, I go to pharmacy one and there's a refusal.

 2        And let's say I'm addicted to it, an opioid, but I have a

 3   prescription so I want to go to a Walgreens in another

 4   location.  And I present it in another location, whether it be

 5   down the street or two blocks away or wherever, and the

 6   pharmacist looks at the prescription.

 7        How does that pharmacist know that the patient -- that

 8   the -- that that particular prescription had been presented to

 9   another pharmacy and was refused?

10             THE WITNESS:  Okay.

11             THE COURT:  How does he know that?

12             THE WITNESS:  Let me take you through the process.

13             THE COURT:  Thank you.

14             THE WITNESS:  So the patient comes into Store A.  They

15   have a prescription.  It does not meet good faith, and the

16   pharmacist refuses to fill the prescription.

17        They put a comment in the comment field of that patient

18   that says, you know -- I can't remember the words -- "Did not

19   meet good faith dispensing.  Refused such and such a date."

20   And the prescription, maybe it said oxy and whatever the date

21   is.

22        And the pharmacist says to the patient "I'm sorry.  This

23   prescription does not meet good faith.  This prescription

24   cannot be filled at this or any Walgreens."

25        So now that patient goes to --

POLSTER - CROSS / MOUGEY

1              THE COURT:  Well, but in the first pharmacy, that

2     pharmacist puts a notation in the patient field?

3              THE WITNESS:  Right.

4              THE COURT:  Okay.

5              THE WITNESS:  Yeah.  And so now let's say the patient

6     didn't believe him and he goes down the street.

7              THE COURT:  Two days later?  Five days later?  Two

8     weeks later?

9              THE WITNESS:  Whatever.

10             THE COURT:  Within the scope -- within the time

11    period --

12             THE WITNESS:  Of that prescription.

13             THE COURT:  -- of the prescription.

14             THE WITNESS:  Exactly.

15        And he goes to Store B and they go in to pull up the

16    patient and that comment is still there.  And they say "I'm

17    sorry.  This prescription was refused at this store, and I

18    cannot fill it at Walgreens.  You'll have to go somewhere else.

19    Here's your prescription back.  There you go."

20        Now let's fast forward to a month later.  You can have

21    more than one refusal to fill in the patient's comment field.

22        It's not so small that there's only 10 characters.

23    It's -- I can't remember the exact number.  I'm sure Mr. Mougey

24    knows exactly how many characters there are, but you can fit

25    more than one refusal to fill in there.

**POLSTER - CROSS / MOUGEY**

1    And what we told our stores to do is:  Listen, we want you

2  to take each prescription on its own merit, what is happening

3  with that patient at that point in time, what is happening with

4  that prescription at that point in time.

5    And if -- just because the first prescription was refused

6  to fill because, perhaps, it was a float pharmacist, they

7  didn't feel comfortable, there were red flags they couldn't

8  resolve, the script came in late at night, they couldn't get

9  ahold of the doctor, the patient was in a hurry and wanted the

10  prescription back, they refused to fill the prescription and

11  they documented it in there.

12    That doesn't mean the prescription was illegitimate.  It

13  doesn't mean that there was nothing wrong.  It just means that

14  the pharmacist couldn't resolve the red flags.

15    And so when the patient came back again to get a

16  prescription filled, if that prescription was refused, then

17  that comment was put in there.

18    And I don't know exactly how many different comments can

19  be in there.  But, yes, an older prescription from however long

20  ago -- what we want is the most recent information because

21  things change with patients.  It changes with their health.  It

22  changes, you know, whether or not they lost their insurance,

23  whatever is going on.

24    Sometimes there's more information in that comment field.

25  And it is not an ever-expanding comment field.  There is a

POLSTER - CROSS / MOUGEY

 1   limited number of characters.

 2           **THE COURT:**  Thank you.

 3   **BY MR. MOUGEY:**

 4   **Q.**   Ms. Polster, you received concerns from the field year

 5   after year after year after 2013 that important information was

 6   being deleted from the comment field, patient comment field;

 7   correct?

 8   **A.**   We had pharmacists that were concerned.  They didn't want

 9   to delete information, but they wanted to add additional

10   information.   They didn't want to take the responsibility of

11   deleting older information.

12                   (Pause in proceedings.)

13           **MR. MOUGEY:**  Judge, if you give me just one second.

14       I apologize, Ms. Polster.

15           **THE COURT:**  Sure.

16                   (Pause in proceedings.)

17   **BY MR. MOUGEY:**

18   **Q.**   Ms. Polster, Walgreens in 20 -- early 2013 changed its

19   policy that pharmacists couldn't simply rely on the prescriber

20   when filling an opiate prescription; correct?

21   **A.**   I wouldn't say that we changed our policy.  So can you be

22   more specific, please?

23   **Q.**   That from 2003 until 2013, Walgreens' policies directed

24   the pharmacist that if they contacted the prescriber and the

25   prescriber confirmed the prescription, they should fill it;

1  correct?

2  **A.**    That is not the entire policy.  They were to call the

3  doctor if they felt that the prescription was not -- like, was

4  potentially forged; that, you know, "Doctor, did you write this

5  prescription?"

6      But it is not intended -- the policy anywhere did it say

7  "Call the doctor" and the doctor says "Fill it" and we'll fill

8  it.

9          **MR. MOUGEY:**  Your Honor, I apologize.  I misplaced

10  some exhibits.  Give me just a second.

11                  (Pause in proceedings.)

12  **BY MR. MOUGEY:**

13  **Q.**   Ms. Polster, let me hand you what I've marked as

14  Exhibit 1756.

15      You recognize this document is one of the reiterations on

16  Walgreens' good faith practices fraudulent prescriptions?  Do

17  you see that?

18  **A.**    Yes.

19  **Q.**   And the language under "Prescription Validation

20  Procedures" (as read):

21          "If the prescriber confirms the validity of the

22          prescription, document this on the hard copy and process

23          the prescription as normal."

24      Correct?

25  **A.**    Yes, that's what it says.  Process it through our system

POLSTER - CROSS / MOUGEY

1  and follow good faith dispensing.

2  **Q.**  Yes, ma'am.

3       But it -- I'm sorry.  Does it say that in that sentence?

4  **A.**  It does not say that in the sentence.

5  **Q.**  The exact language that Walgreens rolled out to its

6  hundred thousand pharmacists -- and I'm sorry.  I'm glad you

7  find this funny.

8  **A.**  No, I -- not at all.  I don't.

9            **THE COURT:**  Let's go to the question.

10            **MR. MOUGEY:**  Yes, sir.

11  **BY MR. MOUGEY:**

12  **Q.**  The language that Walgreens gives to its pharmacists and

13  technicians across the United States, all hundred thousand of

14  them, in this document is (as read):

15            "If the prescriber confirms the validity of the

16       prescription, document this on the hard copy and process

17       the prescription as normal."

18       That's the language that Walgreens gives to its

19  pharmacists regarding opiates; correct?

20  **A.**  That's what it said in this particular version in 2006.

21  **Q.**  And that continued up until 2012-2013; correct?

22  **A.**  I don't remember when the next reiteration of the policy

23  was.

24  **Q.**  Let me hand you what I've marked as Exhibit 2972.  I'm

25  going to put it up on the screen.

 1           Oops.

 2                   **THE CLERK:**  Let me re-set it.

 3                         (Pause in proceedings.)

 4    BY MR. MOUGEY:

 5    **Q.**   You recognize this document; correct, Ms. Polster?

 6    **A.**   Yes.

 7    **Q.**   And the document on the first page has a date of

 8    January 2012; correct.  That's not accurate?

 9    **A.**   Yeah.  It's not accurate, yes.

10    **Q.**   It's January 2013; correct?

11    **A.**   Yeah.  Yeah.

12    **Q.**   Because that's a couple months after you started in

13    Pharmaceutical Integrity; correct?

14    **A.**   Yes.

15    **Q.**   (as read):

16               "The game has changed.  We can no longer rely on the

17          'I spoke to the prescriber and he said it was okay.'  This

18          is especially true when the prescriber may be assisting

19          the patient to inappropriately use controlled substances.

20          We are going down a different path now, and we have to

21          make sure that we're prepared."

22          Correct?

23    **A.**   These were my speaker notes, and they were notes to remind

24    myself of what I wanted to say.  These notes were not given to

25    the field personnel.  Yes, that's what it said, but that's not

**POLSTER - CROSS / MOUGEY**

1  all I said during that presentation.  These were my personal

2  speaker notes.

3  **Q.**   Yes, ma'am.

4       Based on your understanding of 40 years at Walgreens of

5  what Walgreens' policies and procedures were; correct?

6  **A.**   And based on being a pharmacist, yes.

7  **Q.**   And based on your experience of 40 years at Walgreens and

8  the Controlled Substance Act, that as of January of 2013,

9  Walgreens is changing the game and can no longer rely on the

10  prescriber; correct?

11  **A.**   It's not just Walgreens changing the game.  The entire

12  industry was changing significantly between the beginning of

13  2012 and since then.

14  **Q.**   I'm not asking about the entire industry.

15  **A.**   No.  I --

16  **Q.**   I'm asking you about Walgreens' policies and procedures.

17       You told this Court this morning that Walgreens never had

18  a policy that it could simply rely on the prescriber when

19  filling an opiate prescription.  Yet, we just looked at a

20  Walgreens policy and procedure that says just that; correct?

21  **A.**   You're taking it completely out of context.

22       Yes, that's what the policy said.  That -- it also said --

23  if you read the -- above that policy, it talked about all other

24  kinds of red flags.  Nowhere did it say, "Oh, hey, if the

25  doctor said fill it, just fill it," because in the previous

1  part of that policy it went through all the red flags that they

2  were supposed to be looking for and resolve.

3  **Q.**   And in a follow-up document, Ms. Polster, you relayed in

4  the comment sections that (as read):

5        "Walgreens can no longer look the other way when

6        filling for a prescriber."

7    Correct?

8  **A.**   Absolutely.  I was making points in all kinds of

9  presentations.  I was speaking with market leaders.  I was

10 speaking to pharmacists.  I was speaking in many, many things.

11 So -- and I -- you know, you have to reiterate and resay things

12 many times in many ways.

13     It was getting the point across that this is very serious.

14 Walgreens is taking it seriously.  We expect you to take it

15 seriously, pharmacists.  We want you to do your due diligence.

16 We will stand behind your decision to not fill a prescription.

17 **Q.**   But according to the notes in the PowerPoint that you're

18 referencing, you concluded, based on your 40 years of

19 experience at Walgreens, your knowledge as a pharmacist, your

20 knowledge of the Controlled Substance Act, that we can no

21 longer look the other way when filling prescriptions when a

22 prescriber signs off on it; correct?

23 **A.**   You're taking this completely literally black and white.

24 These were my speaker notes.  These were notes to myself.  It's

25 not all that I said but it was a point that I made, yes.

1  **Q.**   Ms. Polster, let me direct your attention to Exhibit 2858.

2       Wrong number.  Exhibit 19566.

3       Ms. Polster, this is an e-mail exchange between you prior

4  to Pharmaceutical Integrity and a lady by the name of

5  Ms. Creek; correct?

6  **A.**   Yes.

7  **Q.**   And it also included Walgreens' counsel Dwayne Pinon;

8  correct?

9  **A.**   Yes.

10  **Q.**   And it's dated June 27th, 2010; correct?

11  **A.**   Yes.

12  **Q.**   And earlier you and I were discussing the agreement with

13  the DEA based on a California store; correct?

14  **A.**   Yes.

15  **Q.**   And that was the order to show cause that was included as

16  part of the settlement agreement with Walgreens that you never

17  read; right?

18  **A.**   I knew about it.  I mean, yes.

19  **Q.**   You never read it; correct?

20  **A.**   I knew -- I can't remember whether I read it or not, but I

21  can tell you that I knew about it and that my team worked on

22  updating the policy around it.  Cheryl worked for me at the

23  time.

24  **Q.**   Now, this morning you testified to Your Honor that

25  Walgreens had a robust training system for its pharmacists and

1   technicians in relation to opiates; correct?

2   **A.**   In relations to controlled substances, yes.

3   **Q.**   And as a result of the settlement between Walgreens and

4   the DEA from the order to show cause of the San Diego store in

5   2009 related to opiate diversion, Walgreens had to create a

6   training program; correct?

7   **A.**   We updated training, yes.

8   **Q.**   Yes, ma'am.

9        And you were asked in this e-mail exchange with senior

10  counsel at Walgreens (as read):

11          "Periodic training of all Walgreens' retail employees

12      for dispensing controlled substances?"

13      Do you see that?

14  **A.**   Yes.

15  **Q.**   And you respond (as read):

16          "No such training exists today."

17      Correct?

18  **A.**   That's what it says there.  We had our -- our training

19  that we gave our pharmacists and technicians at time of hire.

20  I was taking "periodic" to -- you know, very literally to be

21  more than at time of hire.  That's what that meant.

22  **Q.**   So if a pharmacist worked at Walgreens for 20 years, your

23  testimony is that there was training at the time of hire and

24  then no periodic training on a pharmacist's obligations for

25  dispensing opiates until 2012?

POLSTER - CROSS / MOUGEY

1  **A.**    Yeah.   In 2012 we went to annual training, but at time of

2  training -- also in pharmacy school, by the way, you learn this

3  stuff, and it's part of your responsibility as a pharmacist and

4  your oath to ensure that you're filling your prescriptions and

5  doing your due diligence around them.

6  **Q.**    So it's your testimony today to the Court that a

7  pharmacist coming out of pharmacy school is adequately trained

8  on the issues facing them when they graduate for dispensing

9  opiates; correct?

10  **A.**    I certainly learned that in pharmacy school.   I can't

11  imagine that would have changed.

12  **Q.**    You're familiar with an organization called the NABP?

13  **A.**    Yes.

14  **Q.**    And the National Association of Bureau --

15  **A.**    Boards of Pharmacy.

16  **Q.**    Boards of Pharmacy.   Thank you.

17       And those are state regulators that are members of the

18  NABP; correct?

19  **A.**    They issue the exam for the pharmacists to take after

20  completing school at an accredited pharmacy school, and they

21  keep track of the state licenses of the pharmacists, I believe,

22  and continuing education.

23  **Q.**    And the document I've put in front of you that's marked as

24  Exhibit 2958 is titled "Report of the Task Force on

25  Prescription Drug Abuse."   Do you see that?

```
 1    A.    Yeah, I see that.  I've never seen this before.  I don't
 2    remember.  But, yes.
 3    Q.    Yes, ma'am.
 4          And if you turn to page 2, Recommendation 2, NABP, this
 5    national organization of state regulators in the pharmacy space
 6    (as read):
 7                "NABP encourages pharmacy schools to further educate
 8          students on topics related to controlled substance and
 9          they recommend that NABP further educate students on
10          topics related to controlled substance dispensing and
11          corresponding responsibility as new graduates are often
12          ill-prepared for the challenges associated with controlled
13          substance dispensing."
14          Do you see that?
15    A.    I see that's what they wrote.
16    Q.    The state -- the organization of state regulators, based
17    on their review and their knowledge, concluded that recent
18    graduates are ill-prepared to face the challenges associated
19    with controlled substances dispensing?
20    A.    They're an organization that helps create the exams for
21    the board -- for the students.
22    Q.    Yes, ma'am.
23          And this organization of state regulators --
24    A.    When you say a regulator, I didn't realize -- I don't
25    understand them as being a regulator.
```

PROCEEDINGS

1    **Q.**   I'm sorry?

2    **A.**   I don't understand NABP as being a regulator.

3    **Q.**   I said an organization consisting of state regulators.

4    You weren't aware of that?

5    **A.**   I did not realize the employees that worked for NABP were

6    state regulators.

7    **Q.**   Yet, Walgreens doesn't have a periodic training for its

8    pharmacists, for example, on an annual basis at any point in

9    time up until 2012 related to red flags and opiate dispensing;

10   correct?

11   **A.**   We did not.  We had our policy and we had our pharmacists

12   follow the policy.  We had them -- what they learned in

13   pharmacy school.  I learned about all that in pharmacy school,

14   so -- and I graduated from an accredited pharmacy school.  It

15   was absolutely on our curriculum.

16   **Q.**   Just a couple more questions.

17           **THE COURT:**  Well, let's take a recess.  I was

18   intending to recess early today because I don't think we'll

19   finish with the witness or it doesn't appear that we'll finish

20   with the witness.  So we can break for today; return on Monday.

21           **MS. SWIFT:**  How much do you have left?

22           **MR. MOUGEY:**  I don't have that much left.  I would say

23   15 minutes.

24           **THE COURT:**  Well, I don't -- we have to take a break

25   now.

 1       And I would -- and you have redirect; right?

 2          **MS. SWIFT:**  A little bit.

 3          **THE COURT:**  Well, I think I would rather return on

 4   Monday to complete the examination.

 5          **MS. SWIFT:**  Can I make a request, Your Honor?

 6          **THE COURT:**  Sure.

 7          **MS. SWIFT:**  Without knowing anything about your

 8   schedule, would it be possible to come back tomorrow if we have

 9   to break early today?

10          **THE COURT:**  No, I can't do it tomorrow.  I'm sorry.  I

11   have sentencings.  I have my criminal calendar.  I have

12   hearings and so forth.  I mean, that's -- it's a perfectly

13   reasonable request, but I can't.

14       So I think we will resume Monday at 10:00, and then we'll

15   finish with this witness and move on to the next.

16       I do also want to have some time to -- when do we want to

17   argue about all those depositions and so forth?  What's the --

18   now that you've had more than 20 minutes to look at the

19   document.

20          **MS. SWIFT:**  It's not a matter that relates to

21   Walgreens so I'll let my colleagues speak to it.

22          **THE COURT:**  It doesn't relate to Walgreens, yeah.

23       Yes, Ms. Feinstein.

24          **MS. WEST FEINSTEIN:**  Yes.  Thank you, Your Honor.

25       I don't know exactly when the folks who are handling that

PROCEEDINGS

 1   issue will be prepared.  I know they're preparing a written

 2   response.

 3           THE COURT:  Right.

 4           MS. WEST FEINSTEIN:  And I believe they anticipated

 5   arguing on Monday.

 6           THE COURT:  Okay.

 7           MS. WEST FEINSTEIN:  But obviously whenever it works

 8   for the Court, we can ensure that our team is ready to do that.

 9           THE COURT:  Well, I appreciate that.  Let's just do it

10   at some point on Monday because I think you need to prepare --

11   you have to figure out where you're going to go, and I know you

12   want to -- if there are depositions coming in, you can do them

13   then or shortly thereafter.

14           MS. WEST FEINSTEIN:  Thank you, Your Honor.

15           THE COURT:  So let's argue -- let's have argument on

16   Monday.

17       When are you filing the response?

18           MS. WEST FEINSTEIN:  I believe tomorrow, Your Honor,

19   and I can certainly inform Mr. Budner and the rest of the

20   plaintiffs' team.

21           THE COURT:  It's not a lengthy issue, is it?  I mean,

22   it seems to me it's fairly straightforward one way or the

23   other.

24           MR. BUDNER:  Your Honor, Kevin Budner for the People.

25       I agree.  I think our motion was three pages or less, so

PROCEEDINGS

1   we're ready whenever.

2          THE COURT:  So let's have argument on that on -- let's

3   have argument on that on Monday after the conclusion of this

4   witness so she doesn't have to stay around and be delayed.

5          MR. BUDNER:  Your Honor --

6          MS. SWIFT:  If I may, Your Honor -- apologies

7   Mr. Budner.

8      If Mr. Mougey only has 15 minutes left of his cross, we

9   would request that we get that in and maybe I can --

10         THE COURT:  I would rather wait until Monday.  I'm --

11  we're running out of steam at this end, and it's been a pretty

12  intense day of testimony, so I would rather wait till Monday,

13  unless -- well, no.  I'd just rather wait till Monday.

14         MR. MOUGEY:  Sounds good, Your Honor.  Thank you.

15         THE COURT:  Because maybe in the preparation it can

16  be -- exhibits can be ready and so forth and so on.  Okay?

17     So we'll be in recess.  I will see the parties Monday at

18  10:00 o'clock.  Thank you very much.

19         MS. SWIFT:  Thank you, Your Honor.

20              (Proceedings adjourned at 2:49 p.m.)

21                     ---oOo---

22

23

24

25

1

2

3              <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Thursday, June 2, 2022

8

9

10

11     _____

12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
          United States District Court - Official Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25