Brian C. Swanson (*pro hac vice*)
brian.swanson@bartlitbeck.com
Katherine M. Swift *(pro hac vice)*
kate.swift@bartlitbeck.com
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL  60654
Telephone:  312. 494.4400
Facsimile:  312.494.4440

Alex J. Harris *(pro hac vice)*
alex.harris@bartlitbeck.com
Gabriel Levin (SBN 330163)
gabe.levin@bartlitbeck.com
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO  80202
Telephone:  303.592.3100
Facsimile:  303.592.3140

*Attorneys for Defendant Walgreen Co.*

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>PURDUE PHARMA L.P., et al.<br><br>Defendants. | Civil Case No.: 3:18-CV-07591-CRB<br><br>**WALGREEN CO.'S' FINAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Trial Date: April 25, 2022<br>Time: 2:00 PM<br>Dept: Courtroom 6<br>Honorable Charles R. Breyer |

**TABLE OF CONTENTS**

**Page**

WALGREENS' PROPOSED FINDINGS OF FACT ........................................................................ 1

I.    BACKGROUND ............................................................................................................... 1

      A.    This Lawsuit ............................................................................................................ 1

      B.    San Francisco's Opioid Crisis ................................................................................ 2

      C.    The Role of Prescription Opioids and the Shifting Medical Consensus Regarding the Treatment of Chronic Pain ................................................................................ 4

      D.    Prescription Opioids: Regulatory Background .................................................... 16

            1.    FDA ............................................................................................................ 16

            2.    DEA ........................................................................................................... 17

II.   PLAINTIFF HAS FAILED TO ESTABLISH THAT WALGREENS WAS A CAUSE OF, OR CONTRIBUTED TO, THE CURRENT OPIOID CRISIS IN SAN FRANCISCO ...... 20

      A.    Plaintiff's Dispensing Claims Are Unsupported .................................................. 20

            1.    The Role of the Pharmacist in Patient Care .............................................. 20

            2.    Walgreens Has Required Its Pharmacists to Identify and Resolve Red Flags on Prescriptions Throughout the Relevant Time Period ........................... 22

                  a.    Walgreens Implemented and Maintained Robust Dispensing Policies ............................................................................................ 22

                  b.    Walgreens Pharmacists Are Trained on Dispensing Opioids ................. 26

                  c.    Walgreens Pharmacists Follow Walgreens' Dispensing Policies ........... 27

                  d.    Walgreens Provides Additional Tools to Prevent Diversion .................. 29

            3.    Dispensing Policies at City-Run Pharmacies Are Far Less Demanding than Walgreens' Policies ................................................................................... 31

            4.    Walgreens Takes Additional Steps to Fight the Opioid Crisis and Prevent Diversion in San Francisco ...................................................................... 33

            5.    Plaintiff's "Red Flag" Analysis Is Overinclusive and Unhelpful ....................... 34

            6.    Plaintiff's "Bad Doctor" Evidence Does Not Establish That Walgreens Contributed to a Public Nuisance ........................................................... 48

            7.    Plaintiff's Pharmacist Testimony Does Not Support Its Claim Against Walgreens ................................................................................................ 54

**TABLE OF CONTENTS**
(continued)

**Page**

B.    Plaintiff's Distribution Analysis Lacks Credibility ........................................................ 59

C.    Plaintiff's "Collaboration" Allegations Are Unsupported................................................ 68

D.    Plaintiff Failed to Establish Causation............................................................................ 72

WALGREENS' PROPOSED CONCLUSIONS OF LAW .......................................................... 77

I.    EVIDENTIARY RULINGS ............................................................................................... 77

II.    THE PEOPLE FAILED TO PROVE THEIR PUBLIC NUISANCE CLAIM .......................... 78

A.    The People Failed to Establish the Existence of any Ongoing Hazardous Conduct or Condition in the Jurisdiction................................................................................ 80

B.    The People Failed to Establish an "Unreasonable Interference" With a Public Right........................................................................................................................ 83

C.    The People Failed to Prove Causation .............................................................................. 87

1.    The People Failed to Prove Factual Causation ..................................................... 88

2.    The People Failed to Prove Proximate Causation................................................. 91

D.    The People Failed to Establish Knowledge ...................................................................... 93

E.    Conclusion ........................................................................................................................ 94

# TABLE OF AUTHORITIES

**Page**

## Cases

*Am. Title Ins. Co. v. Lacelaw Corp.*,
  861 F.2d 224 (9th Cir. 1988).................................................................................. 9

*Becerra v. Dr. Pepper/Seven Up, Inc.*,
  No. 17-CV-05921-WHO, 2018 WL 3995832 (N.D. Cal. Aug. 21, 2018),
  *aff'd,* 945 F.3d 1225 (9th Cir. 2019) ................................................................... 89

*Bockrath v. Aldrich Chem Co.*,
  21 Cal. 4th 71 (1999)............................................................................................ 89

*Citizens for Odor Nuisance Abatement v. City of San Diego*,
  8 Cal. App. 5th 350 (2017).................................................................................... 79

*City & Cnty. of San Francisco v. Purdue Pharma L.P.*,
  491 F. Supp. 3d 610 (N.D. Cal. 2020) ............................................................ 88, 89

*City of Huntington v. AmerisourceBergen Drug Corp., et al.*,
  Case No. 3:17-cv-1362 (S.D.W.V. July 4, 2022)............................................. passim

*City of Huntington v. AmerisourceBergen Drug Corp., et al.*,
  Case No. 3:17-cv-1362 (S.D.W.V. June 27, 2022)............................. 46, 75, 77, 90

*Cnty. of San Luis Obispo v. Abalone All.*,
  178 Cal. App. 3d 848 (1986).................................................................................. 80

*Cnty. of Santa Clara v. Atl. Richfield Co.*,
  137 Cal. App. 4th 292 (2006)................................................................. 81, 82, 83, 93

*Cnty. of Santa Clara v. Superior Ct.*,
  50 Cal. 4th 35 (2010)............................................................................................ 83

*Ferguson v. Lieff, Cabraser, Heimann & Bernstein*,
  30 Cal. 4th 1037 (2003)........................................................................................ 88

*Franklin v. Dynamic Details, Inc.*,
  116 Cal. App. 4th 375 (2004)................................................................................ 89

*Ileto v. Glock, Inc.*,
  370 F.3d 860 (9th Cir. 2004)................................................................................ 92

*In re Ethan C.*,
  54 Cal. 4th 610 (2012)..................................................................................... 89, 91

*In re Firearm Cases*,
  126 Cal. App. 4th 959 (2005)................................................................. 87, 88, 92, 93

*In re Nat'l Prescription Opiate Litig.*,
  No. 1:17-MD-2804, 2021 WL 3917174 (N.D. Ohio Sept. 1, 2021)..................... 19

# TABLE OF AUTHORITIES

**Page**

*Knapp v. City of Newport Beach*,
186 Cal. App. 2d 669 (1960) ........................................................................................ 81

*Lassalle v. McNeilus Truck & Mfg. Inc.*,
No. 16-CV-00766-WHO,
2017 WL 3115141 (N.D. Cal. July 21, 2017) ............................................................. 88

*Lombardo v. Huysentruyt*,
91 Cal. App. 4th 656 (2001) ........................................................................................ 91

*Markey v. Danville Warehouse & Lumber, Inc.*,
119 Cal. App. 2d 1 (1953) ........................................................................................... 81

*Melton v. Boustred*,
183 Cal. App. 4th 521 (2010) ...................................................................................... 87

*Merck Sharp & Dohme Corp. v. Albrecht*,
139 S. Ct. 1668 (2019) ................................................................................................ 17

*Mut. Pharm. Co. v. Bartlett*,
570 U.S. 472 (2013) ..................................................................................................... 16

*Pallco Enters., Inc. v. Beam*,
132 Cal. App. 4th 1482 (2005) .................................................................................... 81

*Patrick v. Riley*,
209 Cal. 350 (1930) ..................................................................................................... 82

*People ex rel. Gallo v. Acuna*,
14 Cal. 4th 1090 (1997) ......................................................................................... 79, 80

*People v. ConAgra Grocery Prod. Co.*,
17 Cal. App. 5th 51 (2017) .................................................................................... passim

*People v. Foerst*,
10 Cal. App. 2d 274 (1935) .......................................................................................... 80

*People v. Johnson & Johnson*,
2021 Ill. Cir. LEXIS 387 (Ill. Cir. Ct. Jan. 28, 2021) ............................................... 93

*People v. Purdue Pharma L.P.*,
No. 30-2014-00725287-CU-BT-CXC, 2021 WL 5227329 (Cal. Super. Nov. 1, 2021) .... passim

*Redevelopment Agency of City of Stockton v. BNSF Railway Co.*,
643 F.3d 668 (9th Cir. 2011) ....................................................................................... 93

*Ruan v. United States*,
2022 WL 2295024, Slip Op. at 1,
Case No. 20-1410 (June 27, 2022) ......................................................................... 85, 86

# TABLE OF AUTHORITIES

**Page**

*Saelzler v. Advanced Grp. 400*,
   25 Cal. 4th 763 (2001)................................................................................................... 88

*San Diego Gas & Elec. Co. v. San Diego Reg'l Water Quality Control Bd.*,
   36 Cal. App. 5th 427 (2019)......................................................................................... 89

*San Diego Gas & Elec. Co. v. Superior Ct.*,
   13 Cal. 4th 893 (1996)................................................................................................... 83

*San Diego Unified Port Dist. v. Monsanto Co.*,
   No. 15CV578-WQH-JLB, 2018 WL 4185428 (S.D. Cal. Aug. 30, 2018) .............................. 80

*Seigle v. Bromley*,
   22 Colo. App. 189 (1912)............................................................................................... 82

*Sings v. City of Joliet*,
   237 Ill. 300 (1908)......................................................................................................... 82

*State Dep't of State Hosp. v. Superior Ct.*,
   61 Cal. 4th 339 (2015)................................................................................................... 91

*State ex. rel. Hunter v. Johnson & Johnson*,
   499 P.3d 719 (Okla. 2021) ............................................................................................ 93

*United States ex rel. Brown v. Celgene Corp.*,
   2016 WL 6542730 (C.D. Cal. June 29, 2016)................................................................. 52

*Viner v. Sweet*,
   30 Cal. 4th 1232 (2003)................................................................................................. 90

*Wilson v. S. California Edison Co.*,
   234 Cal. App. 4th 123 (2015)........................................................................................ 83

**Other Authorities**

21 C.F.R. § 1301 ..................................................................................................... 18, 19

21 C.F.R. § 1306.04 ................................................................................... 21, 22, 85, 86

21 C.F.R. § 201 ............................................................................................................. 17

21 C.F.R. § 314 ....................................................................................................... 16, 17

21 U.S.C. § 355 ............................................................................................................. 16

21 U.S.C. § 393 ............................................................................................................. 16

21 U.S.C. § 822 ............................................................................................................. 18

21 U.S.C. § 823 ................................................................................................... 18, 19, 61

## TABLE OF AUTHORITIES

**Page**

21 U.S.C. § 829 .................................................................................................. 17

6 WITKIN, SUMM. OF CAL. LAW (2021) TORTS § 1335 ................................................. 91

Cal. Bus. & Prof. Code § 2241.5 (1990) ........................................................ 7, 12, 84, 87

Cal. Bus. & Prof. Code § 733 ................................................................................ passim

Cal. Health & Safety Code § 11153 ................................................................... 21, 22

Cal. Health & Safety Code § 124960 (1997) ................................................. 5, 10, 12, 84

Cal. Health & Safety Code § 124961 ............................................................... 10, 12, 84

California Civil Code § 3479 ............................................................................... 79, 80

California Civil Code § 3480 ..................................................................................... 79

California Code of Civil Procedure § 731 ............................................................. 79, 80

I LAW OF REMEDIES § 5.7(3) .................................................................................... 81

RESTATEMENT (SECOND) OF TORTS § 432 ............................................................. 89, 91

RESTATEMENT (SECOND) OF TORTS § 826 (1979) ......................................................... 83

RESTATEMENT (SECOND) OF TORTS § 828 (1979) ......................................................... 83

**WALGREENS' PROPOSED FINDINGS OF FACT**

**I.    BACKGROUND**

    **A.    This Lawsuit**

1. Plaintiff, the People of the State of California, acting by and through San Francisco City Attorney Dennis J. Herrera (the "People" or "Plaintiff"), first filed this action on December 18, 2018. This lawsuit is part of a multi-district litigation across the country in which, among others, cities, counties, and states, through their elected leaders, are bringing suit against, among others, manufacturers, distributors, pharmacies, hospitals, and individual doctors related to the ongoing opioid crisis.

2. The People filed suit against dozens of defendants, but at the time of trial, only four Defendants remained in the case: one pharmacy (Walgreen Co.), one distributor (Anda, Inc.), and 17 manufacturers (the Allergan Defendants and the Teva, Cephalon, and Actavis Generic Defendants).

3. Walgreen Co. ("Walgreens") is now the only Defendant remaining. When Plaintiff filed its complaint in December of 2018, it did not even name Walgreens as a defendant. Instead, it named a number of pharmaceutical manufacturers, including Purdue Pharma and certain of its executives, along with the country's three major pharmaceutical distributors. *See* ECF 1. Plaintiff alleged that Purdue and other manufacturers had misled prescribers, regulators, and others regarding the safety and efficacy of their products, and as a result had caused prescribers to dramatically increase the volume of opioid prescriptions they wrote. *See id.* ¶ 25.

4. Plaintiff amended its complaint over a year later, in March 2020, naming Walgreens as the sole pharmacy defendant, and asserting a single claim for public nuisance against Walgreens. Plaintiff in its First Amended Complaint continued to press its claims that Purdue and other pharmaceutical manufacturers (which Plaintiff termed the "Marketing Defendants") had misled prescribers and regulators "[b]y providing misleading information to doctors about addiction being rare and opioids being safe even for everyday use and in high doses, then pressuring them into prescribing their products by arguing, among other things, that no one should be in pain." ECF 128, FAC ¶ 10. Plaintiff alleged that the "Marketing Defendants created a population of addicted patients who sought opioids at never-before-seen rates." *Id.* Plaintiff made no allegations that Walgreens had ever marketed

or promoted opioid medications.  Instead, Plaintiff alleged that Walgreens had contributed to a public nuisance by "[d]istributing and selling opioids without maintaining effective controls against the diversion of opioids."  *See id*. ¶ 898(b).

### B.    San Francisco's Opioid Crisis

5.    Like the rest of the country, the City and County of San Francisco has experienced an increase in fatal and non-fatal overdoses, and related harms stemming from illicit and prescription opioids.  Testimony throughout the trial demonstrated the various ways in which the opioid crisis has impacted San Francisco.  "Prescription opioids," as defined here, are legally manufactured opioid medications that are actually prescribed by a physician to a patient.  Trial Tr. 2741:10-13 (Tucker Testimony).  "Illicit opioids," on the other hand, are opioids that are illegally manufactured and were never prescribed by a doctor for anybody, such as heroin and illicitly-manufactured fentanyl.  *Id.* at 2741:14-2742:19.

6.    Phillip Coffin, Director of Substance Use Research at San Francisco's Department of Public Health, testified that San Francisco's opioid crisis began with the heroin epidemic in the late 1990s.  Trial Tr. at 1897:8–10 (Coffin Testimony); ECF 1376, Coffin Decl. ¶ 12; *see also* Trial Tr. at 2758:20-21 (Tucker Testimony) (describing the "drug abuse and overdose crisis [that] has been going on for decades").  This heroin epidemic, which predated the widespread use of prescription opioids, was the impetus for many of the overdose prevention measures now common in the City.  ECF 1376, Coffin Decl. ¶¶ 12–13.

7.    The present crisis is driven by illicit heroin and illicit fentanyl.  *Id.* ¶ 20; *see* Trial Tr. at 2760:2-4 (Dr. Tucker testifying that "opioid prescribing peaked in 2010 but drug overdose deaths have continued to increase . . . since then").  Dr. Coffin testified that from "the late 1990s through the first decade of the 2000s, the supply of prescription opioids was multiplying, driven by a shift in prescribing practices favoring use of such drugs in treating chronic non-cancer pain."  ECF 1376, Coffin Decl. ¶ 17.  "That increase in supply was followed by a subsequent decline around 2010."  *Id.* ¶ 11.  "During that time, changing policies on opioid prescribing in general and in the safety net clinical care system specifically led to reduced availability of prescription opioids and an associated increase in heroin use."  *Id.*  Dr. Coffin testified that "[o]pioids should not be abruptly discontinued.  If a taper is

needed, the process is time-intensive and requires substantial support from clinicians and other providers in the healthcare system.  The time it will take to taper a dependent patient's opioid dose will vary significantly – from months to many years – based on the individual patient's circumstances and will require different types and levels of supportive care." *Id.* ¶ 55.  But proper tapering did not occur in San Francisco:  "Accordingly, as prescription opioids became harder to obtain legally, many sought through the street market what was no longer available and plentiful through legal and quasi-legal channels.  Therefore, as prescription opioid use and prescribing decreased in SF, heroin use began to increase again." *See id.* at ¶ 24.

8.      Dr. Coffin testified, however, that heroin was not the principal cause of the present opioid crisis.  The introduction of illicit fentanyl, as a cheaper alternative to black tar heroin, became the drug of choice in San Francisco.  ECF 1376, Coffin Decl. ¶¶ 35–36.  Since 2015, the use of illicit fentanyl has increased the rate of overdose due to the dramatically increased potency and lethality of the drug.  *Id.* ¶ 41; *see* Trial Tr. at 2742:24-2743:1 (Dr. Tucker testifying that "the majority of opioid overdose deaths in the U.S. for the last five, six years have been related to illicitly manufactured fentanyl").

9.      Dr. Christopher Colwell testified that roughly two-thirds of patients who are treated for illicit or prescription opioid-related overdoses either did not realize that the drug they took contained illicit fentanyl, or they did not know that they were taking an illicit opioid drug or prescription opioid medication at all because they thought they were taking a stimulant drug, such as methamphetamine or cocaine.  ECF 1284, Colwell Decl. ¶ 6.  Of the patients he treats for opioid-related conditions whose opioid use began with pills, "the majority of them, probably two-thirds of them" were first introduced to opioids through a medically appropriate prescription addressing "an injury, a traumatic injury, or a surgery."  Trial Tr. at 358:11–15 (Colwell Testimony); ECF 1284, Colwell Decl. ¶ 10.

10.      The majority of prescription opioid pills that are ultimately misused are obtained from friends and family for free, through what is known as "medicine cabinet diversion," not from a pharmacy at all.  ECF 1386, Keyes Decl. ¶¶ 83, 87 (citing Lipari RN, Hughes A. How people obtain the prescription pain relievers they misuse. *CBHSQ Rep.* Published online 2017).  Plaintiff's expert Dr.

Katherine Keyes testified that only one quarter of misused opioids are obtained from medical sources. *Id.* ¶ 87.  She offered no opinion that any diversion of opioids was traceable to a Walgreens pharmacy in San Francisco.  *See generally id.*  Dr. Keyes testified "that a majority of opioid pills prescribed to patients go unused, ranging from approximately 55% to close to 90%," which can lead to medicine cabinet diversion that "significantly contributes to opioid related harms."  *Id.* ¶¶ 84-85 (citing Maughan BC, Hersh E V, Shofer FS, et al. Unused opioid analgesics and drug disposal following outpatient dental surgery: a randomized controlled trial. *Drug Alcohol Depend.* 2016;168:328-334; Hill M, McMahon M, Stucke R, Barth R. Wide variation and excessive dosage of opioid prescription for common general surgical procedures. *Ann Surg*. 2017; 265(4):709-714).

11.     Dr. Douglas Tucker, an addiction psychiatrist who treats patients in the San Francisco Bay Area suffering from Opioid Use Disorder ("OUD") and other substance use disorders—as well as individuals suffering from chronic non-cancer pain—testified that there has been no clinical evidence, nor any evidence in his practice, validating the notion that prescription opioids serve as a so-called "gateway" for the later use of illicit heroin or fentanyl.  ECF 1423, Tucker Decl. ¶ 40; Trial Tr. 2762:15-2768:22 (Tucker Testimony).

12.     At trial, no evidence was presented of any individual in San Francisco that was harmed by a prescription opioid distributed or dispensed by Walgreens.

13.     There also was no evidence presented of any individual in San Francisco who became addicted to prescription opioids or illicit opioids after being prescribed a prescription opioid that was distributed or dispensed by Walgreens.

## C.     The Role of Prescription Opioids and the Shifting Medical Consensus Regarding the Treatment of Chronic Pain

14.     Plaintiff's claims against Walgreens are based on the distribution and dispensing of lawful medications that are approved for sale and use by the United States Food and Drug Administration ("FDA") and regulated by the Drug Enforcement Administration ("DEA").  *See* Trial Tr. at 411:25–412:14, 415:8–16 (Lembke Testimony); ECF 1494-4, Toigo Tr. at 35:24-36:02 (testifying that the "FDA has made the determination that the benefits of opioids as a class outweigh the risks that they pose").  Therefore, the allegations against Walgreens must be viewed in the context of the

prevailing medical standards at the time those medications were distributed to and dispensed by Walgreens pharmacies.  *See* ECF 1523 at 6, Plaintiff's Opposition to Walgreens' Motion for Judgment (explaining that prescriptions are written for a "legitimate medical purpose" when "the practitioner and the patient in good faith intend for the prescription to be used for medical treatment").  The medical standards with respect to the prescribing of opioid medications have evolved significantly from the early 1990s to today—the date range encompassed by Plaintiff's claims.

15.    Pain, including chronic pain, has been a serious problem in the United States for many years, with an estimated 100 million people suffering from pain.  *See* **TE-SF-02751** at 14; Trial Tr. at 2745:16–19 (Tucker Testimony) (explaining that twenty percent of the U.S. adult population, and up to forty percent of older age groups, suffer from chronic pain).  Chronic pain in particular can be devastating, as it can interfere with employment and other daily activities like eating and dressing.  Trial Tr. at 2746:8–2747:2 (Tucker Testimony).  Serious pain can make patients question whether life is worth living and even drives some desperate patients to suicide.  *Id.*

16.    Prescription opioid medications are safe and effective at treating pain in some patients, including patients with chronic, cancer, and acute pain.  *See* Cal. Health & Safety Code § 124960(f).  Every medical expert in this case admits that prescription opioid medications alleviate very considerable amounts of suffering.  *See, e.g.*, ECF 1337-1, Kessler Tr. at 63:6–7; Trial Tr. at 890:8-16 (Catizone Testimony); Trial Tr. at 412:15-22 (Lembke Testimony); Trial Tr. at 1907:9-1908:19 (Coffin Testimony).  Despite the risks associated with prescription opioids, Plaintiff's witnesses agreed that prescription opioid medications are important treatments for some pain-related conditions, and have prescribed opioid medications to patients since the 1990s because they believe the benefits outweigh the risks.  *See, e.g.,* Trial Tr. at 638:23-639:15 (Zevin Testimony); ECF 1532-2, Horton Tr. at 91:15–18.  These doctors' prescribing decisions were based on the prevailing medical standards at the time they wrote the prescriptions.  *See e.g.*, Trial Tr. at 622:1–5 (Zevin Testimony) ("There was a great deal of concern that we were undertreating pain, and my practice evolved to prescribing opioid analgesics to a larger number of patients for a larger number of indications, and that evolved . . . through the late '90s and through the 2000s."); ECF 1532-2, Horton Tr. at 148:16–149:6 ("I mean, I think . . . especially given the changing teaching and practices around opiate safety, . . . whenever I write a prescription, it is

with -- you know, with the belief that I am addressing a legitimate concern.  My understanding of the benefit-versus-harm balance of many of the medications has changed with time . . . .").

17.     These witnesses' testimony reflects the fact that in the 1980s and 1990s, there was a shift in the practice of medicine.  Prior to this era, prescription opioid medications were used sparingly and primarily for severe non-cancer pain, end-of-life pain, and cancer pain.  ECF 1337-1, Kessler Tr. at 61:1-6.  The concept of treating pain was often not a focus of medical care.  In the 1980s and 1990s, the medical community began to consider broader use of prescription opioid medications.  This shift aligned with opinions in the medical community that pain was being undertreated while chronic pain was becoming more of a problem as life expectancies increased.  *See, e.g.*, **TE-SF-02751**; **DEF-MDL-15280**.

18.     Plaintiff's expert Dr. Anna Lembke acknowledged that the shift in the 1980s to increased prescribing of prescription opioids traced back to the "advent of the hospice movement and the recognition that we in medicine were not doing enough to help patients in pain."  Trial Tr. at 394:8–12 (Lembke Testimony).

19.     In 1981, the National Institute on Drug Abuse, a federal government research institute, published a monograph series in which it estimated that one-third of the U.S. population is afflicted by pain, ranking it as the most frequent cause of suffering and disability; however, at that time, the medical community was only starting to recognize pain as a disease with serious individual and societal impact.  **TE-SF-02751.00014**.

20.     As the National Academy of Sciences, Engineering, and Mathematics ("NASEM") recognized in 1987, the medical community's risk-benefit analysis surrounding prescription opioid medications began to shift as effectively treating pain was seen as increasingly beneficial, even though the medical community knew prescription opioid medications came with risk of misuse, abuse, and addiction.  Where pain was once considered not worth the risk of treating, increased awareness of the detrimental psychological, physical, patient, and community impact of pain changed that calculus.  **DEF-MDL-15280.00216**.

21.     In 1990, the Drug Enforcement Agency ("DEA") published a Physician's Manual that recognized that controlled substances, including prescription opioids, have legitimate clinical

usefulness, and wrote that "the prescriber should not hesitate to consider prescribing them when they are indicated for the comfort and well-being of patients." **TE-SF-02756.0030**.

22.     That same year, California passed the Intractable Pain Act, stating that "a physician and surgeon may prescribe or administer controlled substances to a person in the course of . . . treatment of that person for a diagnosed condition causing intractable pain." Cal. Bus. & Prof. Code § 2241.5(a) (1990). The statute further assured physicians and other prescribers that they would not be "subject to disciplinary action by the board for prescribing or administering controlled substances in the course of treatment of a person for intractable pain." Cal. Bus. & Prof. Code § 2241.5(c) (1990). The Intractable Pain Act was amended in 2006 to permit a broader use of controlled substances "for the treatment of pain or a condition causing pain, including, but not limited to, intractable pain," which remains current California law. Cal. Bus. & Prof. Code § 2241.5(a); *see* Trial Tr. at 431:17–432:23 (Lembke Testimony).

23.     In 1994, The Medical Board of California adopted "Guidelines for Prescribing Controlled Substances for Intractable Pain." **DEF-MDL-09038** at 1. The Guidelines "strongly urge[d] physicians to view effective pain management as a high priority in all patients" and stated that pain should be treated "promptly" and "for as long as [it] persists." *Id.*; Trial Tr. at 441:5–17 (Lembke Testimony). They further stated that opioid analgesics are "considered the cornerstone of treatment for pain associated with trauma, surgery, medical procedures, and cancer." **DEF-MDL-09038** at 2. The Medical Board of California revised these Guidelines in 2007—reiterating that pain management is a "high priority" and that opioid analgesics are a "cornerstone" of treatment for pain. *Id.* at 13. The 2007 Guidelines also noted that "the standard of care ha[d] evolved over the past several years such that a practitioner may, under certain circumstances, appropriately prescribe [controlled substances] to an addict." *Id.* at 12–13. Plaintiff's expert Dr. David Herzberg testified that state medical boards "are the entities that give out licenses" and "can also revoke them and discipline physicians." Trial Tr. at 1986:13–15 (Herzberg Testimony). Dr. Herzberg testified that when state medical boards "put out their guidelines, they're not optional. They are the guidelines that govern medical decision-making." *Id.* at 1986:16–18.

24. In 1996, Purdue Pharma began sales of OxyContin, which the FDA had approved for a very broad indication that included long-term use in the management of moderate to severe pain such as non-cancer pain. **DEF-MDL-13160** at 3. The FDA-approved 1996 OxyContin label, which remained unchanged until July 2001, stated that "[i]atrogenic 'addiction' to opioids legitimately used in the management of pain is very rare." **DEF-MDL-13160** at 6; Trial Tr. at 1079:1–1080:7 (Lembke Testimony). It further stated that "[t]olerance and physical dependence in pain patients are <u>not</u> signs of psychological dependence. Preoccupation with achieving adequate pain relief can be appropriate behavior in a patient with poor pain control." **DEF-MDL-13160** at 6; Trial Tr. at 1080:8–1081:10, 1083:8–19 (Lembke Testimony).

25. Dr. Lembke testified that Purdue "led the charge" in bringing about the paradigm shift that led to increased prescribing of opioid medications. She testified that Purdue's "marketing messaging pervaded [her] medical training" in the 1990s and early 2000s, and "had a huge impact" on the way she prescribed opioid medications. Trial Tr. at 541:12–542:14 (Lembke Testimony). Dr. Katherine Keyes agreed that "the activity of Purdue Pharma" was "a substantial factor in bringing about the opioid crisis." Trial Tr. at 2233:7–10 (Keyes Testimony).

26. Plaintiff's experts unanimously testified that opioid manufacturers were responsible for changes in the laws and guidelines for prescribing opioids. Dr. David Herzberg testified that "opioid manufacturers were the primary driver of the radical changes to California's medical guidelines, laws, and policies on opioid prescribing." ECF 1387, Herzberg Decl. ¶ 33. According to Dr. Herzberg, these "manufacturer-led campaigns resulted in a dramatic increase in opioid prescribing and in addiction and related harms." Trial Tr. at 1994:5–7 (Herzberg Testimony); *see also* ECF 1386, Keyes Decl. ¶ 99 ("[T]he rapid increase in total opioid prescribing levels in the 1990s correlates with marketing of opioids to physicians which downplayed the risks of harms associated with prescribing, including OUD and overdose."); ECF 1281, Lembke Decl. ¶ 12 ("Starting in the late 1990s, due to the opioid manufacturers' aggressive and misleading promotion, opioids were prescribed in abundance with insufficient attention to, or appreciation of, the risks of addiction and overdose and the lack of reliable evidence of efficacy.").

27.     This testimony is supported by Plaintiff's allegations in its operative complaint, where Plaintiff alleged and judicially admitted that "[o]n the demand side, the crisis was precipitated by the [Marketing Defendants]." ECF 128, FAC ¶ 8–11, 23–32; *see Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). ("Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them."). Plaintiff further alleged and judicially admitted that the Marketing Defendants deployed deceptive marketing campaigns about prescription opioids that changed the standard of medical care for treating pain. ECF 128, FAC ¶¶ 25–27.

28.     Plaintiff specifically alleged, "Through their marketing efforts, the Marketing Defendants advanced the idea that the risk of addiction is low when opioids are taken as prescribed by 'legitimate' pain patients. That, in turn, directly led to the expected and intended result that doctors prescribed more opioids to more patients – thereby enriching the Marketing Defendants and substantially contributing to the opioid epidemic." *Id.* ¶ 231.

29.     Plaintiff alleged that the Marketing Defendants—not Walgreens—developed sophisticated and deceptive marketing strategies to "normalize aggressive prescribing of opioids" by "intentionally misle[ading] doctors and patients about the appropriate uses, risks, safety and efficacy of prescription opioids." *Id.* ¶ 27. The Marketing Defendants' tactics "changed prescribers' willingness to prescribe opioids, led them to prescribe more of their opioids, and persuaded them not to stop prescribing opioids or to switch to 'safer' opioids." *Id.* ¶ 541.

30.     Plaintiff alleged that the Marketing Defendants deliberately developed these strategies "to create, and in fact did create, an entirely new 'health care' narrative – one in which opioids are considered safe and effective for long-term use and pain is aggressively treated at all costs. According to this newly fabricated narrative, pain was seriously under-treated throughout the United States because opioids were under-prescribed." *Id.* ¶ 26.

31.     Plaintiff's allegations also focused specifically on Purdue's efforts to change the medical standard of care. Plaintiff alleged that "Purdue trained its sales representatives to tell prescribers that fewer than 1% of patients who took OxyContin became addicted." *Id.* ¶ 238. Purdue

WALGREENS CO.'S FINAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (No. 3:18-CV-07591-CRB)

claimed that "fear of addiction [wa]s exaggerated" and "dismiss[ed] cases of overdose and death as something that would not befall 'legitimate' patients." *Id.* ¶ 241–42.

32.    In 1996, the same year that Purdue launched OxyContin, the California Board of Pharmacy stated in a publication for California pharmacists: "The Board understands that the ongoing use of opioids for cancer, post-surgical, and chronic pain is not what causes addiction or a patient's desire for higher doses of pain medication.  Patients suffering from extreme pain or progression of disease may require increased doses of medication; the appropriate dose is that which is required to adequately treat the pain, even if the dose is higher than usually expected." **TE-SF-02798.005**; *see* Trial Tr. at 442:3–443:22 (Lembke Testimony).

33.    Shortly thereafter, in 1997, the California Legislature passed the Pain Patient's Bill of Rights, which stated expressly: "A patient who suffers from severe chronic intractable pain has the option to choose opiate medication for the treatment of [that pain] . . . as long as the prescribing is in conformance with the provisions of the California Intractable Pain Treatment Act."  The Legislature added: "Inadequate treatment of acute and chronic pain originating from cancer or noncancerous conditions is a significant health problem" and "[f]or some patients, pain management is the single most important treatment a physician can provide." *See* Cal. Health & Safety Code §§ 124960(c), (j); 124961(b).

34.    Dr. Lembke testified that in 1998, the Federation of State Medical Boards ("FSMB"), an "influential national organization that oversees the 70 medical and osteopathic boards of the United States, . . . released a policy to reassure doctors that they would not be prosecuted if they prescribed even large amounts of opioids, as long as it was for the treatment of pain."  ECF 1281, Lembke Decl. ¶¶ 92–93.  The FSMB "urged state medical boards to punish doctors for *under*-treating pain." *Id.* ¶ 93.  By the early 2000s, the FSMB's policy "had been adopted by 20 state medical boards." Trial Tr. at 1986:3–4 (Herzberg Testimony).

35.    By 2001, the concept that pain should be treated as the "fifth vital sign"—along with pulse rate, body temperature, blood pressure, and respiration rate—began to take hold across the United States medical community.  For example, the Joint Commission on the Accreditation of Healthcare Organizations ("JCAHO") "branded [] pain as the fifth vital sign [and] required that every

single patient be assessed for their pain and that pain be aggressively treated." Trial Tr. at 1986:25–1987:3 (Herzberg Testimony).

36.    According to Plaintiff's expert Dr. Herzberg, the statements released by both the FSMB and JCAHO were significant in establishing the medical standard of care at the time.  He testified, "both of these are organizations whose guidelines aren't suggested.  They're mandatory." *Id.* at 1986:9–10.  "JCAHO standards are what you have to follow to get accredited, and accreditation is necessary to get reimbursed by insurance companies, Medicare, and Medicaid.  So, again, when JCAHO puts out standards, they're not optional for hospitals and other organizations like that." *Id.* at 1986:19–1987:3.  State medical boards are the bodies that "govern medical decision-making" by issuing "licenses to practice," "revok[ing] them," and "disciplin[ing] physicians." *Id.* at 1986:10–18.

37.    Also in 2001, DEA issued a statement with 21 healthcare organizations that "Undertreatment of pain is a serious problem in the United States, including pain among patients with chronic conditions and those who are critically ill or near death." **WAG-MDL-01355**.  The statement emphasized that "[e]ffective pain management is an integral and important aspect of quality medical care, and pain should be treated aggressively." *Id.*  In closing argument, Plaintiff repeatedly referenced a 2001 congressional investigation into the use and abuse of OxyContin and argued that by that date "there is no question that the issue of prescription opiate abuse was front and center in the United States." Trial Tr. 3779:17-19.  Be that as it may, there is also no doubt that throughout the 2000s, state and federal regulators, legislatures, and other government authorities were focused on addressing the undertreatment of pain with prescription opioid medications.  In any event, the 2001 congressional investigation was not offered in evidence and thus the Court cannot consider it.

38.    In 2006, the DEA issued a "policy statement" on "Dispensing Controlled Substances for the Treatment of Pain" in the Federal Register.  In it, the DEA recognized that physicians who specialize in the treatment of pain believe the undertreatment of pain is a "paramount concern" and a "serious public health problem." **DEF-MDL-09673.00004.**  DEA further recognized "that the overwhelming majority of American physicians who prescribe controlled substances do so for legitimate medical purposes," *id.* at 5, and that "nearly every prescription issued by a physician in the United States is for a legitimate medical purpose," *id.* at 7.  "In fact, the overwhelming majority of physicians who

prescribe controlled substances . . . will never warrant scrutiny by Federal or State law enforcement officials." *Id.* at 5. Former DEA Deputy Assistant Administrator, Joseph Rannazzisi reiterated this position in 2014—testifying to the United States Congress that "99.5 percent of the prescribers … are not overprescribing." ECF 1338-2, Rannazzisi Tr. at 192:5-193:6; **WAG-MDL-00430** at 11. And in 2018, Acting DEA Administrator, Rob Patterson, again testified to Congress that "[t]he vast majority of doctors, 99.99%, [were] trying to do right by their patients." **DEF-MDL-00061** at 33. As late as 2019, DEA reiterated its 2006 Federal Register policy statement by sending it to the National Association of Chain Drug Stores, the American Pharmacists Association, and the National Community Pharmacists Association in response to their questions about DEA's position on the appropriateness of specific drug therapies, including "trinity" prescriptions for combinations of an opioid with a benzodiazepine and a muscle relaxer. **WAG-MDL-03873** at 3–4. The Court finds that Walgreens was entitled to rely on these public statements of the DEA—its federal regulator—that more than 99 percent of doctors were writing opioid prescriptions for legitimate medical purposes.

39.    In 2007, the Federation of State Medical Boards "published a book, 'Responsible Opioid Prescribing' by Scott Fishman, promoting the use of opioid painkillers," which was sponsored by several opioid manufacturers including Abbott Laboratories, Alpharma Pharmaceuticals, and Endo Pharmaceuticals. ECF 1281, Lembke Decl. ¶ 95; **P-28957**. Fishman wrote: "There is no debate among public health experts about the undertreatment of pain, which has been recognized as a public health crisis for decades. The cost of undertreated pain in dollars is astronomical, but the cost in human suffering is immeasurable. Turning away from patients in pain simply is not an option." **P-28957** at 112. In California, prescribers were aware of the messaging in Fishman's book as the medical board distributed it to all DEA registrants. **WAG-MDL-03872** at 2.

40.    In 2012, California's Legislature reenacted the Pain Patient's Bill of Rights, and reiterated that "[i]nadequate treatment of acute and chronic pain originating from cancer or noncancerous conditions is a significant health problem" and that "[f]or some patients, pain management is the single most important treatment a physician can provide." *See* Cal. Health & Safety Code § 124960(c). Both California's Pain Patient's Bill of Rights and Intractable Pain Act remain in effect today. *See* F1Cal. Health & Safety Code §§ 124960; 124961; Cal. Bus. & Prof. Code § 2241.5. Based

WALGREENS CO.'S FINAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (No. 3:18-CV-07591-CRB)

on these statutes, Dr, Lembke testified that "the California legislature enacted laws that encourage increased opioid prescribing." Trial Tr. at 421:24–422:2 (Lembke Testimony).

41. The FDA has continuously approved prescription opioid medications for "long-term opioid treatment"—with approved labels that state that the presence of risk factors for misuse, abuse, addiction, and/or overdose should not "prevent the proper management of pain." **AL-SF-00339.0008**. And the FDA has continuously "declined to limit the duration or dosage amount of opioids approved for the management of chronic pain." Trial Tr. 412:6–9 (Lembke Testimony). Plaintiff's expert Dr. Keyes testified that the FDA "is a contributor to the opioid crisis" because it "had the authority to sort of turn down the pump and that could have stemmed the supply" of opioids. Trial Tr. at 2232:22–2233:1 (Keyes Testimony).

42. The DEA also had a direct role in allowing the increased prescribing and usage of legal opioid medications. DEA sets manufacturing quotas for the amount of opioids that can be produced in the United States each year (a national target quota and also quotas for individual manufacturers) based on the Attorney General's determination of the estimated medical, scientific, research, and industrial needs of the United States (in consultation with the FDA), lawful export requirements, and the establishment and maintenance of reserve stocks. *See* ECF 1338-1, Rannazzisi Tr. at 498:8–499:15.

43. From 2003 through 2013, the DEA authorized manufacturers to produce substantially larger amounts of prescription opioids. For example, the Average Production Quota ("APQ") of oxycodone in the United States, which the DEA establishes annually, increased over 400 percent between 2003 and 2013. *See* **DEF-MDL-00106**; ECF 1338-2, Rannazzisi Tr. at 30:12–33:23. The DEA did not reduce manufacturing quotas for most prescription opioids until 2016. *See* **DEF-MDL-00106**. Dr. Keyes testified that the DEA could have reduced opioid supply and that DEA was a "substantial factor in bringing about the opioid crisis." Trial Tr. 2233:2–6; 2234:20–2235:7 (Keyes Testimony).

44. Dr. Lembke further testified that the idea that opioids should be used "first line for anybody who walked into the [doctor's] office and said 'I have pain' and also . . . for extended indications, like common chronic pain conditions, like low-back pain, arthritis, and headaches, [] is what

led to astronomical increase[s] in prescribing and the oversupply that caused the epidemic." Trial Tr. at 394:14-394:20 (Lembke Testimony).

45. Likewise, the 2015 Stakeholders' document published by the National Association of Boards of Pharmacy, with input from the American Medical Association, the DEA, chain pharmacies, drug manufacturers, and others, concluded that during the past two decades, the endorsement of opioid analgesics as the "most effective approach to address patient suffering" ultimately "led to an increase in opioid prescriptions," which paralleled a rise in misuse, abuse, overdoses, and death. **WAG-MDL-01746.00007**; *see also* Trial Tr. at 860:22–862:23 (Catizone testifying that in the 20 years leading up to 2015, the evolving standard of medical care resulted "in many more opioid prescriptions being written").

46. Plaintiff's witness Dr. Coffin similarly testified that from "the late 1990s [through the] first decade of the 2000s, the supply of prescription opioids was multiplying, driven by a shift in prescribing practices favoring use of such drugs in treating chronic non-cancer pain." ECF 1376, Coffin Decl. ¶ 17.

47. The trend towards greater recognition and treatment of pain continued until at least 2010, and the doctors who testified in this case explained that their opioid prescribing conformed to the prevailing medical standards at the time, meaning that they acknowledged they prescribed more opioids in decades past than they viewed as appropriate today.

48. Dr. Barry Zevin, a physician with San Francisco's Department of Public Health, testified, "[t]here was a great deal of concern that we were undertreating pain, and my practice evolved to prescribing opioid analgesics to a larger number of patients for a larger number of indications, and that evolved . . . through the late '90s and through the 2000s." Trial Tr. at 622:1–5 (Zevin Testimony). Dr. Zevin was still "prescribing opioids for many patients" in the early 2010s and did not change his philosophy until 2012. *Id.* at 622:6–623:5.

49. Dr. Claire Horton, the Chief Medical Officer of the San Francisco Health Network, testified, "what we know about the . . . most patient-safety-informed ways to prescribe opiates has changed significantly during my time in practice." ECF 1532-2, Horton Tr. at 25:9–12. She explained that when she was a resident at San Francisco General Hospital in the late 1990s and early

2000s, some of her attending physicians believed the "indication for opiates was . . . that one would increase the opiates until . . . the patient said the pain was under control." *Id.* at 28:12–20. She further testified that it was "a lot more common" in 2008 for her and her colleagues to prescribe two short-acting opioids to a patient on the same day, which is a practice she now considers "not-very-safe." *Id.* at 158:21–159:17, 160:18–19; *see also, e.g.*, Trial Tr. at 1084:2–16 (Dr. Lembke testimony admitting that back in 2000, when she accuses manufacturers of making misrepresentations, she was not sounding the alarm and accusing those manufacturers of misleading doctors); *id.* at 1085:3–21 (Dr. Lembke testifying that it wasn't until 2011—when the CDC declared an opioid epidemic—that she began to have different views about manufacturers' statements regarding the addictive nature of opioids than she did in the early 2000s).

50. The Court concludes that the growing emphasis on the recognition and treatment of pain—by legislatures, government agencies like the FDA and DEA, boards of medicine, boards of pharmacy, and accrediting bodies—affected the prevailing medical standards and resulted in prescription opioid medications frequently and increasingly being prescribed as front-line treatment for both acute and chronic pain, including non-cancer pain.

51. This increase in prescribing under the prevailing medical standards caused the oversupply of opioids that led to the current crisis. In this regard, the Court takes judicial notice of the Southern District of West Virginia's recent factual findings following the MDL Track 2 trial. *See* Ex. A at 97-139, *City of Huntington v. AmerisourceBergen Drug Corp., et al.*, Case No. 3:17-cv-1362 (S.D.W.V. July 4, 2022), Dkt. 1530 ("*WV Track 2 Trial Decision*"). "These changes in the standard of care led to an increase in the medical use of prescription opioids. Doctors began to prescribe opioids for a broader range of conditions, most notably, for the long-term treatment of chronic pain." *Id.* at 121-22. "Doctors, 99% of whom were acting in good faith, determined the total volume of prescription opioids that pharmacies ordered from defendants and dispensed pursuant to those prescriptions." *Id.* at 162. Federal regulations require that a prescription for opioids be issued for a legitimate purpose by a medical practitioner acting in the course of professional practice. *Id.* "Therefore, doctors, in the exercise of their independent medical judgment, determined what opioids would be prescribed, in what doses, and for what purposes." *Id.*

52.     The Court further finds that as doctors acting in good faith increasingly prescribed opioid medications, pharmacists acting in good faith appropriately filled those prescriptions.  It is undisputed that dispensing of opioids tracked prescribing.  Opioid prescribing in San Francisco peaked in 2010, the same year that Walgreens' dispensing of prescription opioids peaked.  Trial Tr. at 2504:9–19 (Brunner Testimony); ECF 1392, Keller Decl. ¶ 10.  As opioid prescribing decreased every year after 2010, so did Walgreens' dispensing of opioid medications.  *Id.*

**D.     Prescription Opioids: Regulatory Background**

53.     The manufacturing, marketing, prescribing, and dispensing of prescription opioid medications are heavily regulated in the United States.

**1.     FDA**

54.     The federal Food, Drug, and Cosmetic Act ("FDCA") grants the FDA exclusive authority to determine whether a medication is "safe and effective" to be marketed or sold in the United States.  21 U.S.C. § 393 (b)(2)(B); *id*. § 355 (a).  The FDA drug approval process is "both onerous and lengthy." *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 476 (2013).  To market a new medication, a company must submit a New Drug Application ("NDA") to the FDA that includes, among other things, "full reports of [all clinical] investigations," 21 U.S.C. § 355(b)(1)(A)(i), relevant nonclinical studies, and "any other data or information relevant to an evaluation of the safety and effectiveness of the drug product obtained or otherwise received by the applicant from any source," 21 C.F.R. §§ 314.50(d)(2) & (5)(iv).  *See Bartlett*, 570 U.S. at 476.

55.     For the FDA to deem a medication effective, there must be "substantial evidence that the drug will have the effect it purports or is represented to have under the conditions ... in the proposed labeling."  21 U.S.C. § 355(d)(5).  And for the FDA to deem a medication safe, the medication's "probable therapeutic benefits must outweigh its risk of harm." *Bartlett*, 570 U.S. at 476.

56.     The FDA has repeatedly approved various prescription opioid medications for, among other things, the treatment of long-term, chronic pain.  Trial Tr. at 412:6–14 (Lembke Testimony).

57.     The FDA's role in monitoring medication safety is not limited to medication approval.  In the event a manufacturer does not adhere to FDA's post-marketing requirements for studies

and trials conducted after approval, FDA has the power to withdraw its approval of the product and prohibit its further marketing. *See, e.g.*, 21 C.F.R. §§ 314.80–314.81

58. The FDA also regulates "the content, the format, and the order of the safety information on the drug label." *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1673 (2019); *see* 21 C.F.R. § 201.57(c). As Dr. Kessler testified, when the FDA approves a medication, it also approves what is said in the medication's FDA-approved label, also known as the prescription package insert that patients may see when they pick up their prescriptions from the pharmacy. ECF 1337-1, Kessler Tr. at 38:14-39:24. Dr. Kessler testified that the content in the label is "the core of what's agreed upon that should be communicated," and when the FDA approves a medication, it is also approving that communication. *Id.* This is why a manufacturer cannot promote a prescription medication outside of the indication.

**2.     DEA**

59. The Controlled Substances Act ("CSA"), passed in 1970, prohibits the nonmedical sale of opioids. 21 U.S.C. § 829. As Schedule II controlled substances, opioid medications are tightly regulated. *See* ECF 1338-1, Rannazzisi Tr. at 412:23-413:1. The CSA imposes "surveillance and policing" of pharmaceutical companies, distributors, prescribers, and pharmacists.

60. The CSA establishes, and DEA administers, a "closed system of distribution" for controlled substances, including prescription opioids. This system accounts for medications from the moment of manufacture to the moment of dispensing to patients.

61. The decision whether to allow individuals or entities to participate in the closed system of distribution for controlled substances lies with the DEA. ECF 1338-1, Rannazzisi Tr. at 1715:1-9. Joseph Rannazzisi, former Deputy Assistant Administrator at the Drug Enforcement Administration, testified that the purpose of the registration process is to ensure that controlled substances are being handled "securely" and "appropriately." *Id.* at 1717:3-7.

62. After a prescription opioid medication leaves the closed system upon dispensing to the patient, the patient bears responsibility for the safekeeping of their medications. *See* ECF 1338-1, Rannazzisi Tr. at 436:21-437:2. And Mr. Rannazzisi has testified that DEA believed the most frequent

method of obtaining a pharmaceutical controlled substance for nonmedical use is from friends and family, for free. *Id.* at 1809:16-22.

63. The CSA provides that every person who manufactures, distributes, or dispenses controlled substances must apply for registration with the Attorney General and periodically renew that registration. *See* 21 U.S.C. §§ 822(a)-(b); 21 C.F.R. § 1301.74(a). Manufacturers and distributors must renew their DEA registrations every year. 21 U.S.C. § 822(1); ECF 1338-1, Rannazzisi Tr. at 1717:8–10. Dispensers like pharmacies and prescribers must renew their registration every three years. 21 U.S.C. § 822(2); ECF 1338-1, Rannazzisi Tr. at 1717:11–15.

64. The CSA provides that the Attorney General "shall register an applicant" unless it determines "that the issuance of such registration is inconsistent with the public interest." *See* 21 U.S.C. § 823 (b).

65. Throughout the relevant timeframe, DEA conducted regular on-site inspections of registrants. *See* ECF 1338-1, Rannazzisi Tr. at 504:20-22. DEA's cyclic inspections of a registrant include reviewing the registrant's suspicious order monitoring system. ECF 1437-1, Mapes Tr. at 49:22-50:3; 50:7-14; 93:2-20; ECF 1427-1, Prevoznik Tr. 130:13-131:14, 289:18-290:16, 290:19-20. If, during a cyclic inspection, the DEA investigator determined that the registrant was not complying with the federal regulations, or that its suspicious order monitoring system was not adequately detecting suspicious orders, the investigator would convey that finding to the registrant and would take appropriate action. ECF 1437-1, Mapes Tr. at 50:23-51:2; 51:7-19; ECF 1427-1, Prevoznik Tr. 131:15-23 ("Q. And if either in the pre-registration process or in the audit process the DEA determines that a registrant's system is not adequately detecting suspicious orders, is that something that is conveyed to the registrant? A. Yeah, we – we would tell them, you need to add something."); *Id.* at 290:14-16; 290:19-20; 387:14-19. When DEA concludes that registrants are not living up to their obligations, DEA may issue orders to show cause and immediate suspension orders. *See* ECF 1338-1, Rannazzisi Tr. at 451:12–452:2. The DEA also may revoke licenses for prescribers to prescribe opioid medications. 21 U.S.C. § 822(a)(2).

66. "In determining the public interest" for purposes of registration, suspension, or revocation, the CSA instructs the Attorney General to consider certain factors that include the

applicant's "maintenance of effective control against diversion." *See* 21 U.S.C. § 823(b)(1).  In assessing the factors set forth in the CSA to determine whether a registration should be issued, suspended, or revoked, the Attorney General acting through the DEA must determine whether the registered entity has substantially complied with the CSA regulatory provisions.  *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2021 WL 3917174, at *3 (N.D. Ohio Sept. 1, 2021) (citing 21 C.F.R. § 1301.71(b) ("A registrant's regulatory obligations under the CSA . . . and [its] implementing regulations do not require strict compliance. Only substantial compliance is required.").

67.    The CSA itself is silent as to a registrant's obligations to prevent diversion and does not include the phrase "suspicious orders."  The federal regulations implementing the CSA define "suspicious orders" as "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."  *See* 21 C.F.R. § 1301.74(b); ECF 1338-1, Rannazzisi Tr. at 421:5-12.

68.    From at least 2005 to 2015, the DEA did not have any internal guidance as to what constitutes a suspicious order.  ECF 1338-2, Rannazzisi Tr. at 317:14-22.  Nor did the DEA provide any written guidance to registrants as to what constitutes a suspicious order beyond the regulatory definition set forth in 21 C.F.R. § 1301.74(b).  *See* ECF 1338-2, Rannazzisi Tr. at 258:4–258:8, 259:1–260:9, 260:14–23, 277:8–22.

69.    The federal regulations require that "[t]he registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances.  The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant."  21 C.F.R. § 1301.74(b).  Each registrant must design and operate a suspicious order monitoring system "based on what the registrant's needs are and the Drug Enforcement Administration does not tell a registrant what that specific system should look like."  ECF 1338-2, Rannazzisi Tr. at 316:9–12; ECF 1427-1, Prevoznik Tr. at 179:22–180:15 (Q. "DEA leaves it up to the registrant to design a system that works with its own business model and customer base, correct?  A. Correct.").

70.    The CSA contains no provisions expressly requiring registrants to perform "due diligence," site inspections, or independent analysis of suspicious orders prior to completing a sale to first determine whether controlled substances are likely to be diverted from legitimate channels as a result of the sale.  ECF 1338-1, Rannazzisi Tr. at 526:23–527:3, 527:4–528:4, 528:9-21.  Nor do the

federal regulations require registrants to conduct due diligence, to monitor dispensing data, to employ customer questionnaires, to implement or maintain an electronic order monitoring system, or to halt shipments. *Id.* at 534:7–24.

71.     Prior to 2008, "the DEA understood and accepted that wholesale distribut[ors] would ship any suspicious orders that they identified and reported to DEA." Ex. A, *WV Track 2 Trial Decision* at 163. For decades before 2008, DEA diversion investigators viewed "excessive purchase reports"—reports of opioid purchases sent to DEA after an order was shipped—as compliant with the Controlled Substances Act and DEA regulations regarding suspicious order monitoring. ECF 1437-3, Wright Tr. at 69:23–78:2; ECF 1437-1, Mapes Tr. at 91:18–92:25 ("I viewed those as compliant with the regulation for suspicious orders."); *id.* at 93:21–94:3, 95:12–96:22; ECF 1437-2, Mapes Tr. at 520:14–521:18 (compliant with both the CSA and the underlying regulations); ECF 1437-4, Wright Tr. at 489:04-494:21. During this timeframe, due diligence on orders was viewed as a best practice, but it was not required by any statute or regulation. *Id.* at 495:25-497:04.

## II.     PLAINTIFF HAS FAILED TO ESTABLISH THAT WALGREENS WAS A CAUSE OF, OR CONTRIBUTED TO, THE CURRENT OPIOID CRISIS IN SAN FRANCISCO

### A.     Plaintiff's Dispensing Claims Are Unsupported

72.     Plaintiff claims that Walgreens contributed to a public nuisance in San Francisco by "[d]istributing and selling opioids without maintaining effective controls against the diversion of opioids." *See* ECF 128 ¶ 898(b).

73.     To prevail on its claims, Plaintiff must prove that Walgreens pharmacists "knowingly created or assisted in the creation of a substantial and unreasonable interference with a public right." *People v. ConAgra Grocery Prod. Co.*, 17 Cal. App. 5th 51, 79 (2017).

#### 1.     The Role of the Pharmacist in Patient Care

74.     Pharmacists graduate from pharmacy school with an understanding of the rules that govern the dispensing of controlled substances and the expectation that they must exercise their "corresponding responsibility," shared with the prescriber, to ensure that controlled substances are not knowingly dispensed for an illegitimate purpose. ECF 1399, Polster Decl. ¶10; Trial Tr. at 1314:16–20 (Patel Testimony); ECF 1411, Besinque Decl. ¶ 9. Pharmacists are licensed professionals who

understand that if they dispense controlled substances improperly, they are subject to professional discipline, including loss of their license and ability to work as a pharmacist. ECF 1399, Polster Decl. ¶ 10; *see* ECF 1411, Besinque Decl. ¶¶ 6, 8, 34.

75. "Pharmacists play an important role in patient care that complements, but does not overlap with, the role of prescribers. A pharmacist is responsible for ensuring that a patient's prescription was issued for a legitimate medical purpose, evaluating the prescription for potential errors or omissions, assessing any potential drug-drug interactions for a patient with multiple prescriptions, dispensing the correct medication, and providing consultations on the proper use, storage, and disposal of the medication. A pharmacist may also monitor a patient's drug therapy, provide advice about side-effect management, and communicate with the patient's prescriber." ECF 1411, Besinque Decl. ¶ 3; ECF 1532-2, Horton Tr. at 177:7–178:7 (explaining that pharmacists are trained on "medication dispensing and safety and interactions and physiology" and that the relationship between prescribers and pharmacists is "a work flow that works, because you have people working to the extent of their specialty.").

76. "[P]harmacists are not permitted to interfere in the prescribing decisions of licensed doctors acting in the ordinary course of their practice, even if the pharmacist believes that a different prescription may have been preferrable. Pharmacists are highly trained professionals, but they do not have medical training and expertise to diagnose patients and make prescribing decisions. Pharmacists work very hard to prevent the diversion of controlled substances, but they do not, should not, and cannot police the practice of medicine by doctors and other prescribers." ECF 1399, Polster Decl. ¶ 11; *see* ECF 1532-2, Horton Tr. at 91:11–14 ("Q. And when you write a prescription, do you intend for the pharmacist to which that patient goes with their prescription to fill your prescription? A. Yes.").

77. The very different but crucial roles that physicians and pharmacists play in patient care are laid out in federal and state laws. Both the Controlled Substances Act ("CSA") and the California Health and Safety Code state that a prescription for a controlled substance must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her practice. 21 C.F.R. § 1306.04; Cal. Health & Safety Code § 11153. The responsibility for proper

prescribing is on the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. 21 C.F.R. § 1306.04; Cal. Health & Safety Code § 11153. It is the pharmacist's corresponding responsibility to take *reasonable steps* to ensure that the prescription is legitimate, and prescribed in the usual course of the prescriber's practice. 21 C.F.R. § 1306.04; Cal. Health & Safety Code § 11153; ECF 1411, Besinque Decl. ¶ 6. A pharmacist who *knowingly* dispenses a medication that is not written for a legitimate medical purpose in the usual scope of the physician's practice violates this duty and can be disciplined, including through the loss of his or her license. 21 C.F.R. § 1306.04; Cal. Health & Safety Code § 11153; ECF 1411, Besinque Decl. ¶ 6. Under California law, a pharmacist is obligated to fill a prescription that is written in the normal course of practice for a patient with legitimate medical need. Cal. Bus. & Prof. Code § 733(a); ECF 1411, Besinque Decl. ¶ 8.

78.    "The scope of the pharmacist's corresponding responsibility does not change whether the pharmacist works at a national chain pharmacy, an independent local pharmacy, or an in-patient or out-patient pharmacy affiliated with a hospital." ECF 1411, Besinque Decl. ¶ 7.

### 2.    Walgreens Required Its Pharmacists to Identify and Resolve Red Flags on Prescriptions Throughout the Relevant Time Period

#### a.    Walgreens Implemented and Maintained Robust Dispensing Policies

79.    Since at least 1998, more than a decade before the peak of the opioid crisis in the country, Walgreens has had dispensing policies that specifically address the dispensing of controlled substances including opioids.

80.    These company-wide "Good Faith Dispensing" ("GFD") policies help Walgreens pharmacists identify "elements … that should alert a pharmacist to questionable circumstances" regarding a prescription. *See, e.g.*, **WAG-MDL-00018**; **WAG-MDL-01756**; **WAG-MDL-00211**; **WAG-MDL-00304**. Pharmacists at Walgreens are required to evaluate these "elements"—or "red flags"—prior to dispensing a controlled substance prescription. *Id.*

81.    The 1998 policy included examples of potential red flags associated with opioid prescriptions, and required a pharmacist to "exercise professional judgment" and to "[n]ot dispense the drug" and "[n]otify the Pharmacy Supervisor" if the listed "elements" could not be resolved. **WAG-MDL-00018**; Trial Tr. at 2283:13–2284:8 (Polster Testimony). The "ultimate decision whether to

dispense a controlled substance prescription must rest with the dispensing pharmacist and that pharmacist's evaluation of all of the relevant circumstances."  ECF 1399, Polster Decl. ¶ 12.

82.    Walgreens updated and augmented its GFD policies throughout the years to account for new and evolving information around controlled substance prescribing, use, and abuse.  For example, the June 2006 version of the Good Faith Dispensing policy included specific steps the pharmacist must take when refusing to fill a prescription that did not meet all elements of Good Faith Dispensing.  **WAG-MDL-01756**; Trial Tr. at 2284:19–2286:13 (Polster Testimony).

83.    Plaintiff has argued that a single sentence of this 2006 policy, which states that if "the prescriber confirms the validity of the prescription, document this on the hard copy and process the prescription as normal," instructed pharmacists to abandon their corresponding responsibility.  *See* Trial Tr. at 93:8–9 (Plaintiff Opening Statement).  The Court disagrees.  Tasha Polster, a licensed pharmacist and Walgreens' Vice President of Pharmacy Quality, Compliance and Patient Safety, who has worked at Walgreens for four decades, testified that "process the prescription as normal" meant that pharmacists should "[p]rocess [the prescription] through our system and ***follow good faith dispensing***."  Trial Tr. at 2426:1–2 (Polster Testimony) (emphasis added).  All of the testimony that the Court heard about this policy from current and former Walgreens pharmacists contradicts Plaintiff's assertion.  Ms. Polster testified that Walgreens pharmacists have never been instructed to "just take the doctor's word that the prescription is legitimate" if the pharmacist has unresolved concerns about the prescription's validity. *Id.* at 2285:11–19.  Ronda Lowe, who worked as a Walgreens pharmacy manager, pharmacy supervisor, and district manager over 32 years, testified that she "never heard of anyone at Walgreens instructing pharmacists to take a doctor's word for it that a prescription is legitimate if there are circumstances that make the pharmacist suspect the doctor."  ECF 1454, Lowe Declaration ¶ 16.  The Court finds this understanding of the policy most plausible given that the policy expressly states:  "The pharmacist **must** use the elements of Good Faith dispensing in conjunction with state and federal controlled substance laws when filling **all** prescriptions.  The pharmacist must ensure that a prescription for a controlled substance is dispensed for a legitimate medical purpose."  **WAG-MDL-01756** (emphasis in original).  Furthermore, not a single one of the five former and one current Walgreens pharmacists that Plaintiff called to testify testified that they ever understood any Walgreens policy to instruct pharmacists to

simply take the prescriber's word for it that a prescription was valid if the pharmacist had concerns about the prescription's legitimacy that the pharmacist could not resolve. Presumably, if any of Plaintiff's own witnesses had held this belief, Plaintiff would have drawn it out in their testimony. Plaintiff's failure to do so undercuts Plaintiff's assertions regarding the meaning of this policy.

84. The 2012 Good Faith Dispensing policy added specific steps that a pharmacist must take to validate a prescription for a controlled substance. Among those steps, Walgreens pharmacists were now required to consult the state's Prescription Drug Monitoring Program ("PDMP"), where available, "to obtain additional information to help determine the validity and confirm the appropriateness of the prescription." **WAG-MDL-00304** at 1. California's PDMP, called CURES ("Controlled Substance Utilization Review System"), was not available to search by pharmacists until 2009 and to this day, the State does not require pharmacists to consult CURES prior to dispensing a controlled substance medication. ECF 1411, Besinque Decl. ¶¶ 19–20.

85. Walgreens' 2012 Good Faith Dispensing policy also expanded on the "elements" or "red flags" that might alert a pharmacist to a suspicious prescription. *See* **WAG-MDL-00304**. The 2012 policy further reminded the pharmacist of what had always been Walgreens policy: "**Any prescription for which the pharmacist is not satisfied that the elements of good faith are met can be refused based on the pharmacist's discretion**." *Id.* at 4 (emphasis in original); *see also* Trial Tr. at 2285:14–2286:13 (Polster Testimony). This is true even if "the prescriber informs the pharmacist that a prescription for a controlled substance is valid." *See* **WAG-MDL-00304** at 4; Trial Tr. at 2285:14–2286:13 (Polster Testimony); *see also* ECF 1454, Lowe Declaration ¶ 16.

86. In 2013, Walgreens further expanded its policies aimed at detecting and preventing diversion of controlled substances, implementing its Target Drug Good Faith Dispensing ("TDGFD") checklist. Walgreens' TDGFD checklist "is an additional process that Walgreens requires its pharmacists to follow in addition to complying with their Good Faith Dispensing obligations. The TDGFD checklist applies to at least three opioid medicines that are highly abused—oxycodone, hydromorphone, and methadone. The checklist facilitates documentation of the actions that Walgreens pharmacists undertake to assess the legitimacy of a controlled substance prescription, including verifying the identity of the patient, confirming the validity of the prescriber, reviewing patient history

in the applicable Prescription Drug Monitoring Program (CURES) and within the Walgreens' system, and includes specific criteria that may indicate a patient is attempting to divert or abuse controlled substances." ECF 1411, Besinque Decl. ¶ 14; ECF 1399, Polster Decl. ¶ 20; Trial Tr. at 2292:21–2294:5 (Polster Testimony); **WAG-MDL-00365** (TDGFD Policy); **WAG-MDL-00547** (TDGFD checklist). In closing argument, Plaintiff pointed out that Walgreens' dispensing of target drugs declined following its implementation of the TDGFD checklist in 2013, and argued that the decline demonstrated that before the checklist was implemented, Walgreens was dispensing improper prescriptions. But by the time Walgreens implemented the target drug checklist, its dispensing of opioids had been declining for several years. *See* Trial Tr. at 2504:9–19 (Brunner Testimony); ECF 1392, Keller Decl. ¶ 10. That Walgreens' dispensing of target drugs decreased during the implementation of the checklist does not show that Walgreens' prior dispensing was in any way unlawful.

87.     As with its Good Faith Dispensing policies, Walgreens periodically updated its TDGFD Checklist to account for changes in the prescribing, use, and misuse of controlled substances. In 2020, Walgreens further enhanced its TDGFD Checklist by making it electronic, so that pharmacists can input checklist information directly into Intercom Plus ("IC+")—Walgreens' electronic dispensing system. ECF 1399, Polster Decl. ¶ 27. In IC+, pharmacists must complete the checklist before completing review of prescriptions for the three target drugs and other prescriptions that may be flagged by the system. *See id.* As Plaintiff's expert Carmen Catizone acknowledged, nothing in the law or standard of practice requires pharmacies to implement a target drug checklist or any other checklist for opioid medications. Trial Tr. at 888:21–889:2 (Catizone Testimony). Plaintiff presented no evidence that any other pharmacy requires its pharmacists to follow a similar process.

88.     The Court agrees with Walgreens' pharmacy-practice expert, Dr. Kathleen Hill-Besinque, that "[g]oing back to the 1990s, Walgreens' GFD Policies alerted pharmacists to potential red flags for diversion and provided steps that a pharmacist may take when determining whether to dispense a medication," and that these policies and practices "have evolved over time, consistent with the changing legal and clinical landscapes related to opioid prescribing." ECF 1411, Besinque Decl. ¶ 13.

89. The Court further agrees with Dr. Besinque that Walgreens' dispensing policies were and are "extensive and comprehensive." *Id.* ¶ 14.

90. Walgreens continued to strengthen its policies over time despite pushback from the medical community. Tasha Polster, Walgreens' Vice President of Pharmacy Quality, Compliance and Patient Safety, testified that the American Medical Association ("AMA") issued a letter to Walgreens essentially stating that Walgreens pharmacists "should just fill [doctors'] prescriptions and shouldn't question them." ECF 1339-4, Polster Tr. at 370:21–371:18. Walgreens responded to the AMA that its pharmacists have a corresponding responsibility to evaluate prescriptions and that the company supports its pharmacists when they refuse to fill prescriptions. *Id*. at 371:20–372:3.

91. Mr. Catizone similarly testified that in 2013, the AMA passed a resolution stating that "pharmacists should simply fill prescriptions from doctors and that pharmacists should not be second guessing a prescriber's decisions." Trial Tr. at 855:1–855–7 (Catizone Testimony). Mr. Catizone agreed that Walgreens pharmacists were trying to fulfill their corresponding responsibility by conducting due diligence on opioid prescriptions and doctors were saying "just fill my prescription [and] don't ask questions." *Id.* at 855:16–856:22.

92. In 2013, after Walgreens rolled out its TDGFD policy, San Francisco's Chief Pharmacy Officer, Dave Woods, asked Walgreens to "scale back" its prescription due diligence efforts because he thought Walgreens was calling doctors to verify prescriptions too frequently. **WAG-MDL-02853** at 1; ECF 1447-1, Woods Tr. at 109:17–111:24. He explained that Walgreens' efforts were particularly unnecessary for patients who had been receiving the same treatment for an extended period of time. *Id.* at 109:17–111:24.

93. This evidence is inconsistent with Plaintiff's claim that Walgreens pharmacists ignored red flags and were instead pressured to fill prescriptions without conducting due diligence.

### b.    Walgreens Pharmacists Are Trained on Dispensing Opioids

94. Walgreens trained its pharmacists on the use and implementation of its GFD Policies and TDGFD checklists. For example, Ronda Lowe testified that as a Walgreens pharmacy manager, pharmacy supervisor, and district manager her role included both "ensur[ing] that the pharmacists knew about [Walgreens'] policies and help[ing] train them in the policy." Trial Tr. at

3013:21–3014:22 (Lowe Testimony).  Lowe testified that to ensure pharmacists understood and were following the GFD policy, Walgreens provided training modules that "explain[ed] and highlight[ed]" important parts of the policies and "ask[ed] questions to . . . make sure [pharmacists] understood it."  *Id.* at 3014:10–16.  She also testified that as a pharmacy supervisor and district manager, she held regular meetings with pharmacists about GFD, which included "weekly conference calls" and "in-store visits" that occurred at least monthly.  *Id.* at 3014:1–22, 3010:6–16.

95.     Former Walgreens pharmacist and Plaintiff's witness Rebecca Gayle testified, "at Walgreens we definitely had training modules on controlled substances and meetings with the good faith dispensing checklist."  ECF 1340-1, Gayle Tr. 142:22–143:5.  Walgreens pharmacist and Plaintiff's witness Robert Yagar similarly testified that Walgreens pharmacists were "trained on" GFD and policies were "available as a reference" if pharmacists ever needed guidance.  ECF 1363-1, Yagar Tr. 216:12–217:25; *see also* ECF 1362-4, Kamali Tr. 82:3-11 (testifying on behalf of Plaintiff that she was trained on GFD policy at Walgreens); Trial Tr. 2298:15-2299:5 (Polster testimony describing Walgreens' training modules on GFD policy); ECF 1399, Polster Decl. ¶ 25; **WAG-MDL-01662** (training on 2012 GFD policy updates provided on same day that 2012 policy was rolled out); **WAG-MDL-03189** (example of Walgreens' training using real-life scenarios); **WAG-MDL-03111** (training on alternatives to opioid medications).

> c.     **Walgreens Pharmacists Follow Walgreens' Dispensing Policies**

96.     Walgreens pharmacists who testified, including those called by Plaintiff during its case-in-chief, also testified that they followed Walgreens' GFD policy—including complying with state and federal law—when they dispensed opioid medicines.  ECF 1340-1, Gayle Tr. at 164:18–165:3 (testifying that "to the best of [her] ability" she "always cleared any red flags before dispensing"); ECF 1363-1, Yagar Tr. at 217:13-21 ("I try my best" to "follow Good Faith Dispensing every time [I] dispense a controlled substance like an opioid medicine."); ECF 1362-4, Kamali Tr. 82:3-17 (testifying that she was trained on Good Faith Dispensing and followed it to the best of her ability); ECF 1362-7, Mathews-Porter Tr. at 158:9-18 (testifying that she would refuse to fill a prescription if warranted under Walgreens' Good Faith Dispensing Policy); Trial Tr. at 933:22–934:1 (Victor Lo testifying that he "understood the importance of complying with both the federal and state laws and regulations

regarding" pharmacy practice when he worked at Walgreens); ECF 1362-1, Gerspacher Tr. at 83:14–84:3 (testifying that he never dispensed an opioid prescription that he believed was not written for a legitimate medical purpose).

97.    The testimony of these pharmacists is supported by Walgreens' periodic "Store Walk" inspections of its pharmacies in which managers would assess whether the pharmacy was following the Good Faith Dispensing policy and documenting its good faith efforts.  The vast majority of these inspections show that Walgreens pharmacists were complying with Walgreens' GFD and TDGFD policies.  *See, e.g.*, **WAG-MDL-3100** at 1-2, 5, 8, 11 (compilation of 2014 Pharmacy Supervisor San Francisco Store Walk Summaries, Question 167); **WAG-MDL-3101** at 1, 5, 9, 14 (compilation of 2015 Pharmacy Supervisor San Francisco Store Walk Summaries, Question 167); **WAG-MDL-3102** at 76, 85, 115, 143, 152, 176 (compilation of 2016 District Manager San Francisco Store Walk Summaries, Questions 25 and 92); **WAG-MDL-3099** at 1–4 (compilation of 2018 San Francisco Store Monthly Compliance Walk, Question 20); ECF 1454, Lowe Declaration ¶ 14; Trial Tr. at 3015:9–3021:20 (Lowe Testimony); ECF 1399, Polster Decl. ¶ 30.  Notes from these inspections show that Walgreens' field leadership would review GFD policies with pharmacists during the inspection.  *See, e.g.*, **WAG-MDL-03102** at 85, 115, 143, 213, 222.

98.    The favorable results of Walgreens' "Store Walk" inspections are confirmed by Plaintiff's expert Dr. McCann's own sample prescription summary, **P-28539**, which shows that 83% of target drugs in the sample were accompanied by TDGFD checklists.  Trial Tr. at 2482:3–19 (Brunner Testimony).

99.    Throughout trial, Plaintiff claimed that a 2015 Walgreens' internal audit found that only 60 percent of Walgreens stores were complying with the TDGFD checklist requirement.  *See* **P-15085** (training slides on audit results).  This claim is contradicted by the evidence.  The 2015 audit showed that 60 percent of the Walgreens stores that were audited had ***perfect*** compliance, meaning ***every checklist*** for a filled target drug prescription was identified and located at those stores.  *See* **WAG-MDL-02606** at 1 (Topic 5).  For the remaining 40 percent of stores that did not have perfect compliance, the audit showed that the vast majority of checklists were properly filled out and easily located by the auditors.  *Id.*  At 94.1 percent of the stores, just five checklists or fewer were missing, and at 99.6

percent of the stores, just 10 checklists or fewer were missing. *Id.* The Court finds that although compliance may not have been perfect at these stores, the audit demonstrates substantial compliance with Walgreens' checklist requirement.

100. Walgreens also ensures that its pharmacists are following its GFD policies by identifying pharmacists who need coaching or training on these policies through its GFD opportunities reports. **WAG-MDL-03871**; **WAG-MDL-02941**. These reports identify example prescriptions from pharmacists and pharmacies that were unlike their peers, such as prescriptions for unusually large quantities, so that Walgreens can ensure its pharmacists understand and are following its policies. ECF 1454, Lowe Decl. ¶ 19; Trial Tr. at 3022:4–3024:5 (Lowe Testimony). Once a prescription was identified on a GFD opportunities report, Walgreens' field leadership would review the prescription with the pharmacist to "ensure that we had the appropriate documentation for that prescription." Trial Tr. at 2309:12–15 (Polster Testimony); Trial Tr. at 3023:12–3024:5 (Lowe Testimony); ECF 1399, Polster Decl. ¶ 31. Ronda Lowe's years of conducting "Store Walk" inspections and reviewing prescriptions flagged for coaching strengthened her conclusion that Walgreens pharmacists "followed the good faith dispensing policy and they understood what it was." Trial Tr. at 3028:24–3029:4 (Lowe Testimony).

### d.     Walgreens Provides Additional Tools to Prevent Diversion

101. In addition to its GFD policies, Walgreens guards against diversion by requiring its pharmacists to use IntercomPlus ("IC+"), a computer system developed by the company for evaluating and dispensing prescription medications. ECF 1399, Polster Decl. ¶ 26.

102. IC+ allows the dispensing pharmacist to see not just information about the current prescription but also earlier prescriptions that the same patient has filled at any Walgreens pharmacy across the chain, whether for a controlled substance or a non-controlled drug. IC+ permits pharmacists to document their work and share information with other pharmacists through notes that attach to the particular prescription itself, to the patient, or to the prescriber. *Id.* ¶ 27. A Walgreens pharmacist at any other Walgreens location who opens the record for that prescription will see the notes that accompany the prescription. *Id.* Similarly, any Walgreens pharmacist at any Walgreens location filling a prescription for the same patient can see notes left by other pharmacists regarding the patient. *Id.* And any Walgreens pharmacist filling a prescription written by the same doctor can see notes left by other

pharmacists regarding that doctor. *Id.* The patient's history of prescriptions is associated with the patient's profile, so that the pharmacist can quickly review all of the information documented about those previous prescriptions (e.g., the name of the medication, the dose, the quantity, the doctor's name and address, the date the prescription was written, the date it was filled, and any notes on the prescription). *Id.* The system also has pop-up warnings for prescriptions that might cause a dangerous drug-drug interaction, like overlapping prescriptions for the same or similar medications. *See id.*

103.    Walgreens' corporate Support Center has available to it information on which doctors write the highest and lowest number of prescriptions filled at Walgreens pharmacies, including prescriptions for controlled substances, but this information is not routinely distributed to pharmacists in the field. ECF 1399, Polster Decl. ¶ 29. While the Court finds that it may sometimes be helpful to pharmacists to have data on the prescribing habits of individual prescribers, Plaintiff has not shown how such data might be used to identify illegitimate prescriptions. Mr. Catizone acknowledged, "simply because a pain management doctor is a high prescriber, that doesn't mean that he or she is writing … for an illegitimate medical purpose." Trial Tr. 890:24–891:3 (Catizone Testimony). In many cases, higher volume prescribers for controlled substances are likely to be busy orthopedic surgeons and oncologists, whose prescriptions are far more likely to be obviously appropriate without detailed investigation compared to doctors in other specialties who may write fewer prescriptions but for patients with less straightforward medical needs for controlled substances. ECF 1399, Polster Decl. ¶ 29. And it would be inappropriate for a pharmacist to be less vigilant about prescriptions written by a doctor simply because the doctor writes fewer controlled substances prescriptions than others in the area. *Id.* Even for the five doctors whom Mr. Catizone identified because they ultimately lost their licenses, Mr. Catizone testified that he "has no way of knowing" which of their specific prescriptions or even what percentage of their prescriptions were illegitimate or otherwise should have been refused by Walgreens pharmacists. Trial Tr. at 897:2–20 (Catizone Testimony). That is the case despite the data that Walgreens had at its disposal—and that Plaintiff and Mr. Catizone thus also had at their disposal. The data analyzed by Mr. Catizone flagged the prescriptions of Dr. Guido Gores (one of the five doctors who Mr. Catizone testified later lost his medical license) at the same rate as the prescriptions of Dr. Claire Horton (the chief medical officer at the San Francisco Health Network and one of Plaintiff's trial

witnesses). *See* **WAG-MDL-03628**; ECF 1299, Catizone Decl. ¶ 74. And the index that Plaintiff claims Walgreens created to identify "seriously problematic" prescribers includes Plaintiff's witness Dr. Joseph Pace and at least four other prescribers affiliated with the City and County of San Francisco. *See* Trial Tr. at 3873:3–7 (Plaintiff Closing Argument); **P-27369**; **WAG-MDL-03478A**. The Court does not conclude that such data is ***required by law*** to be provided to pharmacists, or that it is always relevant to the question before the pharmacist, i.e., whether an individual prescription is presented for a legitimate medical purpose. *See also* Trial Tr. at 1303:25–1304:3 (Swati Patel testifying that "Zuckerberg outpatient pharmacy does not provide to its pharmacists access to any data on prescribers").

104. The Court finds Walgreens' policies and procedures regarding the dispensing of controlled substances to be a thorough, meaningful, and effective effort to combat diversion of opioid medicines in San Francisco. The Court further finds substantial evidence that Walgreens pharmacists as a whole complied with these policies and procedures in filling prescriptions for controlled substances.

### 3. Dispensing Policies at City-Run Pharmacies Are Far Less Demanding than Walgreens' Policies

105. The Court was presented evidence comparing Walgreens' policies and procedures to the policies and procedures in effect at the pharmacies managed and run by the City and County of San Francisco. Most relevant for these purposes is the outpatient pharmacy at Zuckerberg San Francisco General Hospital. The Court finds that the policies at City-run pharmacies, and the lack of such policies, undermines Plaintiff's claims and the opinions of its experts regarding the standard of care to which they seek to hold Walgreens.

106. Among other things, Plaintiff's corporate representative, Swati Patel, testified that Zuckerberg pharmacists are not required to consult the CURES database prior to dispensing, as Walgreens pharmacists are. Trial Tr. at 1312:15–17 (Patel Testimony). In fact, she testified that "there is nothing in Zuckerberg's dispensing policies that tells pharmacists to assess prescriptions for any specific red flags of diversion"—as there is in Walgreens' Good Faith Dispensing policy all the way back to at least 1998. *Id.* at 1310:5–8. She testified that there is nothing written in Zuckerberg's dispensing policies on documenting the resolution of any red flags of diversion—again, as there is in the Walgreens' Good Faith Dispensing policy since 2006. *Id.* at 1310:13–23; *see also* ECF 1447-1, Woods

Tr. 74:13-21 (San Francisco Department of Public Health has no requirement that "a pharmacist must document in writing or typing into a computer the resolution of red flags"); *id.* at 77:4-10 (noting that even if a pharmacist has not documented the work necessary to validate a prescription, "the expectation" is that the pharmacist has done that work before filling the prescription). There is also nothing in the Zuckerberg policy "instructing a pharmacist that she must refuse the prescription if she can't resolve her concerns about that prescription," Trial Tr. at 1313:20–23 (Patel Testimony), as there always has been in Walgreens' policy. And Zuckerberg's outpatient pharmacy lacks an "electronic system designed to identify red flags on prescriptions." *Id.* at 1310:9–12.

107.    Ms. Patel further testified that Zuckerberg did not provide its pharmacists with any training materials "specific to filling opioid prescriptions," including "on what constitutes a proper inquiry into whether an opioid prescription is legitimate." *Id.* at 1314:8–15. "The reason Zuckerberg pharmacy doesn't provide written training materials on opioid prescriptions is because licensed pharmacists receive that clinical knowledge as part of their education." *Id.* at 1314:16–20.

108.    Zuckerberg outpatient pharmacy's policies and procedures undermine Mr. Catizone's opinion (1) that all pharmacies are required to have written policies that discuss dispensing of controlled substances like those in place at Walgreens, (2) that those policies must discuss red flags, (3) that those policies must require documentation of the resolution of red flags, and (4) that pharmacies must use their dispensing data to alert pharmacists to possible red flags. Trial Tr. at 884:10–886:5 (Catizone Testimony). Mr. Catizone claims that these requirements apply regardless of whether the pharmacy is "a chain pharmacy, an independent pharmacy or anything in between." *Id.* But in developing his opinions, Mr. Catizone did not review the policies of any of San Francisco's City-run pharmacies and he does not know whether these "pharmacies meet the standard of care that [he] hold[s] Walgreens to." *Id.* at 886:6–12. The policies and procedures at these City-run pharmacies suggest that the source of Mr. Catizone's "requirements" is not any law, regulation, or standard of practice in California. *See id.* at 818:11–819:21.

109.    In reaching its findings in this case, the Court concludes that Walgreens' dispensing policies and procedures are far more fulsome, comprehensive, and stringent than those of Plaintiff's own pharmacies. This conclusion is supported by Ms. Patel's testimony that from what she

has seen, Walgreens' policies are "more detailed" than Zuckerberg's outpatient pharmacy policies. Trial Tr. at 1316:22–1317:8 (Patel Testimony). The Court makes this observation not to suggest that chain pharmacies and outpatient hospital pharmacies are the same or should have the same operations. Rather, the differences between the policies and procedures at these pharmacies suggest that some of the "standards of practice" identified by Mr. Catizone and Dr. Park are not actual standards in California.

110. Plaintiff's attacks on Walgreens' dispensing policies, procedures, and conduct are further undermined by the City and County of San Francisco's conduct outside of the litigation. Ms. Patel testified that "if the Zuckerberg pharmacy isn't open, [they] tell [their] patients to go to Walgreens." *Id.* at 1317:9–16. Indeed, for at least the past ten years, the City has contracted with Walgreens pharmacies under the Federal 340B program, a drug discount program by which Walgreens provides prescription medications to the City's indigent or underserved patients, and the City receives a discount on those medications. *Id.* at 1317:12–1318:6; ECF 1447-1, Woods Tr. at 23:20–24:24 ("We have what's called a 340B program as well as a Healthy San Francisco program in San Francisco where we -- we provide health access to uninsured or underinsured persons in San Francisco, and that includes a drug benefit. And Walgreens actually administers that drug benefit on our behalf to these uninsured clients."). Ms. Patel testified that "[a]s a part of the 340B program, the City of San Francisco has access to Walgreens' prescription data for all of the prescription claims that Walgreens processes under that program," and "the City can audit those prescriptions that Walgreens fills to make sure they meet all of the 340B discount program guidelines." Trial Tr. at 1319:11–20 (Patel Testimony). The City chose to contract with Walgreens because Walgreens "scored the highest as a contractor in meeting all of [the City's] request for proposal criteria." *Id.* at 1319:21–1320:1; **WAG-MDL-02961**.

**4.     Walgreens Takes Additional Steps to Fight the Opioid Crisis and Prevent Diversion in San Francisco**

111. Walgreens has also taken steps to combat the opioid crisis in San Francisco. Every Walgreens pharmacy stocks Naloxone, a medication that can reverse the effects of an opioid overdose, and will dispense it to any member of the public on request, with or without a prescription. ECF 1399, Polster Decl. ¶ 42. Since 2016, Walgreens has dispensed Naloxone to approximately 20,000 patients in San Francisco. Trial Tr. at 2294:25–2295:4 (Polster Testimony).

112. To help prevent diversion of unused medications, Walgreens also has drug disposal kiosks at more than 1400 stores nationwide, including eight in San Francisco. These kiosks allow members of the public to safely and securely discard unwanted medication, whether or not they are Walgreens customers. *Id.* ¶ 40. Walgreens is adding an additional 18 drug disposal kiosks in San Francisco stores as part of its partnership with the San Francisco MED (Medication, Education & Disposal) Project, a group that addresses the collection and disposal of unwanted pharmaceutical products. *Id.* Walgreens also offers DisposeRx packets which allow patients to neutralize unwanted medication and dispose of the medication safely. *Id.* ¶ 41. Both Walgreens' drug disposal kiosks and DisposeRx packets help to fight medicine cabinet diversion, which is how individuals obtain the majority of prescription opioid pills that are misused. *See* ECF 1386, Keyes Decl. ¶¶ 83, 87 (citing Lipari RN, Hughes A. How people obtain the prescription pain relievers they misuse. *CBHSQ Rep.* Published online 2017).

### 5. Plaintiff's "Red Flag" Analysis Is Overinclusive and Unhelpful

113. Plaintiff's dispensing case against Walgreens relied almost entirely on the opinions and testimony of Carmen Catizone, Craig McCann, and Elizabeth Park. At trial, these experts explained how their opinions fit together: Mr. Catizone first created a list of "red flags" he claims indicate a risk of possible diversion. Trial Tr. at 818:5-821:5 (Catizone Testimony). Next, Dr. McCann converted Mr. Catizone's "red flags" into algorithms and ran them against Walgreens' dispensing data. *Id.* at 820:22-823:22 (Catizone Testimony). Finally, Dr. Park reviewed a sample of Dr. McCann's results and rendered an opinion on the adequacy of "due diligence" documentation as to that sample. *Id.* at 1005:6–8, 1012:10-14 (Park Testimony). Mr. Catizone also looked at "statistics" compiled from Walgreens' data and "certain individual prescriptions." ECF 1299, Catizone Decl. ¶ 69. Critically, not one of Plaintiff's experts testified that any of the prescriptions Walgreens dispensed were not medically appropriate, lacked a legitimate medical purpose, were diverted, or caused harm to the City.

114. While it is true that red flags for potential diversion are recognized concepts, no law or regulation defines specific red flags a pharmacy or pharmacist must identify when dispensing a medication. Trial Tr. at 818:11–819:5 (Catizone Testimony). Mr. Catizone acknowledged that the Controlled Substances Act does not disclose specific red flags or even discuss them generally. *Id.* at

818:19–25.  He identified no federal or state law or regulation that disclosed the specific red flags he created for this litigation, and he conceded that he had to make "certain judgments and decisions" in creating the red flags that he used at trial.  *Id.* at 819:14–21.

115.    Walgreens' GFD policies provide examples of red flags that are similar to Mr. Catizone's, but Walgreens' policies leave discretion with the pharmacist to determine whether a red flag exists in a given situation.  *See* **WAG-MDL-00304**.  The red flags in Walgreens' policies do not trigger automatically every time specific conditions are met, as Mr. Catizone's do.  For example, Walgreens' 2012 GFD policy states that a red flag may be present if there is an "unusual geographic distance . . . that cannot be reasonably explained."  *Id.* at 2.  It is up to the pharmacist to determine whether the distance is unusual under the circumstances presented by an individual prescription.  In contrast, Mr. Catizone flags every prescription where the patient travels over 25 miles to visit either his doctor or his pharmacy, regardless of whether that distance is unusual under the circumstances at all.  ECF 1299, Catizone Decl. ¶ 18.  The same overinclusiveness applies to all of Mr. Catizone's red flags.  Even the red flag for "trinity" prescriptions captures prescriptions from regular patients, whose medical conditions are well known to the pharmacist and would not raise a concern every time a prescription is presented.  ECF 1532-2, Horton Tr. at 147:17–149:10 (testifying that "trinity" prescriptions can address legitimate medical needs and that she views certain muscle relaxers as safer alternatives to Soma or Carisoprodol when a part of that combination); Trial Tr. at 2589:5–2592:9 (Dr. Besinque explaining that while rare, "trinity" prescriptions can be written for a legitimate medical purpose and that Mr. Catizone's definition of the "trinity" is too broad because it includes all muscle relaxers and is not limited to Soma or Carisoprodol).  Walgreens' GFD policy further states that pharmacists "shall use their professional judgment when determining" if red flags are present.  **WAG-MDL-00304** at 2.  Consequently, in many instances when a Catizone red flag is triggered, a Walgreens pharmacist, exercising her professional judgment, may determine that no red flag exists and that no further inquiry is necessary.  Trial Tr. at 2577:12–2578:6 (Besinque Testimony); ECF 1399, Polster Decl. ¶ 23.

116.    Mr. Catizone performed no analysis of Dr. McCann's results, and offered no opinions on the number or percentage of "red flag prescriptions" that Dr. McCann's algorithms identified.  *Id.* at 823:19–824:4.  Mr. Catizone conceded that "just because a prescription flags under one

35

of [his] 16 red flags, that does not mean that it was written for an illegitimate medical purpose." *Id.* at 838:23-839:2. He further acknowledged that he was not offering any opinions on what percentage of Dr. McCann's flagged prescriptions were diverted or contributed to any opioid crisis in San Francisco. *Id.* at 843:22-844:4.

117. Mr. Catizone opined that a pharmacist is required to document the resolution of any red flag prior to dispensing, though he cited no federal or state law or regulation containing such a mandate. Joseph Rannazzisi, former head of the DEA's Office of Diversion Control, testified that during his time at the DEA, he could not recall any statute or regulation that required a pharmacist to document the resolution of red flags. ECF 1338-1, Rannazzisi Tr. at 1773:25–1774:4. Mr. Catizone did not disagree with Mr. Rannazzisi. Trial Tr. at 846:4–847:11 (Catizone Testimony). Demetra Ashley, who also formerly headed the DEA's Office of Diversion Control, similarly testified that "[t]here is no federal requirement to document the resolution of red flags." ECF 1440-1, Ashley Tr. at 64:24–65:3. *See also* ECF 1447-1, Woods Tr. at 77:4-10 (noting that even if a pharmacist has not documented the work necessary to validate a prescription, "the expectation" is that the pharmacist has done that work before filling the prescription).

118. The Court also heard testimony from Elizabeth Park, another pharmacy expert retained by Plaintiff. Dr. Park received her Doctor of Pharmacy in 2017, just five years ago, and has worked mainly as a consultant since that time. Trial Tr. at 959:24–960:6 (Park Testimony). She has limited experience working as a dispensing pharmacist in a community pharmacy setting, and has not dispensed a medication since 2018. *Id.* at 994:17–20. Dr. Park and consultants working for her reviewed a subset of the prescriptions that Dr. McCann identified using his algorithms. In total, Dr. Park reviewed approximately 2,300 prescriptions that Dr. McCann flagged, along with the patient's prescription history for a subset of approximately 200 of those prescriptions. In other words, Dr. Park reviewed the full set of information available for just 200 of the sampled prescriptions—less than 10 percent of the sample. For those 200, Park reviewed not only the flagged prescription, but also the patient's prescription history found within the Walgreens dispensing database—prior prescriptions, prior prescription annotations and other information. *Id.* at 999:5–1005:9. Based on this limited review of just a portion of the available material, Dr. Park concluded that less than 5 percent of prescriptions in the

sample had adequate due diligence documented.  But more than 5 percent of the sample prescriptions were written by well-regarded prescribers affiliated with Plaintiff's hospitals and clinics.  *Compare* **WAG-MDL-03478A** (listing prescribers affiliated with Plaintiff's hospitals and other facilities) *with* **P-28539** (sample of 2,265 prescriptions hitting on Plaintiff's "red flags" and including more than 150 flagged prescriptions written by Plaintiff-affiliated prescribers, including Claire Horton, Barry Zevin, Joseph Pace, Alisa Oberschelp, Ann Dallman, Angela Miller, Levis Owens, Elsa Tsutaoka, Royce Lin, Robert Franklin, Linette Martinez; Deborah Borne, Douglas Price-Hanson; Robin McBride, Kimberly Pelish, Debra Keller, Kathleen Chung, Suzannah Stout, Hali Hammer).  More importantly, Dr. Park did not identify any of the prescriptions that led to her conclusion—not the 95 percent that she thought lacked sufficient documentation or the much smaller number (roughly 10 percent, or 200 prescriptions) for which she reviewed the full scope of diligence material that Walgreens produced, including the patient's prescription history.  Dr. Park's failure to identify these prescriptions prevented Walgreens from testing her opinions.  Trial Tr. at 1005:10-1007:16 (Park Testimony).  Because Dr. Park did not disclose these bases for her analysis, the Court must disregard her opinions and finds that no conclusions about the prescriptions Walgreens dispensed can be drawn based on them.

119.    Although much of her testimony was focused on her review of Walgreens' prescriptions and how and when dispensing decisions were documented, Dr. Park did not identify any specific state or federal law or regulation that requires a pharmacist to document how they resolve red flags or otherwise determine whether to dispense a controlled substance.

120.    Mr. Catizone and Dr. Park assume that if one of Mr. Catizone's red-flagged prescriptions does not contain written documentation, then no due diligence was conducted.  There is no basis for this opinion.  There are many reasons that a Catizone-flagged prescription may not contain documentation.  The pharmacist may not have believed that the circumstances gave rise to a red flag that required additional steps.  Trial Tr. at 2577:12–2578:6 (Besinque Testimony); ECF 1399, Polster Decl. ¶ 23.  The explanation for a high dose or quantity may be plain on the face of the prescription, as is the case for many cancer doctors and hospice providers, whose prescriptions state that they are in the oncology department, work in hospice, or that the patient is terminally ill.  ECF 1411, Besinque Decl. ¶ 17; *see* **P-28539** at WAGCASF00309600, WAGCASF00311063, WAGCASF00311291; *see also, e.g.,*

Trial Tr. at 2584:16–2585:7 (Dr. Besinque explaining that doctor shopping concerns may be easily resolved when the prescription shows that the prescribers work together in the same practice). The pharmacist may have known the patient and her therapy—especially where the patient has been receiving the same medication and dose for months. ECF 1363-1, Yagar Tr. at 293:13–19 (testifying that if he knows "that a patient is getting a specific treatment … and is getting prescribed an opioid month in and month out," he is "not going to write in every month, I called the doctor and this is what he said."); ECF 1447-1, Woods Tr. at 111:4–24 (testifying that he felt it was "unnecessary" for pharmacists to request information from doctors in situations where patients have been receiving their medication "for lengthy periods of time"); ECF 1532-2, Horton Tr. at 155:21–157:1 (testifying that she would not expect a call from a pharmacist about a patient who is "getting the same medication again and again" because "that's less cause for concern if you've already kind of clarified the issue."); ECF 1411, Besinque Decl. ¶ 17; Trial Tr. at 2591:25–2592:9 (Besinque Testimony); **P-28539** (McCann Prescription Summary showing that a large percentage of patients in the prescription sample had filled prior prescriptions at Walgreens). The pharmacist may have reviewed notes from the patient history or prescriber history, or electronic annotations on previous prescriptions, which explain the reason for the current prescription as well. ECF 1411, Besinque Decl. ¶ 22; Trial Tr. at 2576:13–24 (Besinque Testimony). The pharmacist may have made a notation that was adequate to him or her (like circling the prescriber's name and number to indicate a call was completed), but that Plaintiff's experts disagreed with. ECF 1399, Polster Decl. ¶ 23. In fact, Dave Woods, the Chief Pharmacy Officer for the City's Department of Public Health, testified that the absence of documentation did ***not*** suggest to him that diligence was not performed. Rather, Dr. Woods testified that the "expectation" was that "even though the pharmacist may not have documented calls and inquiry," the pharmacist would have "done the work necessary to review and validate the prescription before filling it." ECF 1447-1, Woods Tr. at 77:4–10; *see also* Trial Tr. 2578:16–2581:8 (Besinque Testimony) (same).

121. Like Mr. Catizone, Dr. Park did not identify a single prescription that she concluded was medically unnecessary, illegitimate, or diverted. Trial Tr. at 1015:6–1016:23 (Park Testimony). The Court notes that just as Dr. Park reviewed a sample of Walgreens prescriptions to form an opinion that a certain percentage lacked adequate documentation of due diligence (**P-28539**),

Plaintiff's experts similarly could have reviewed a sample of prescriptions to attempt to identify whether any lacked a legitimate medical purpose or were otherwise diverted. Plaintiff and its experts made no effort to do so.

122. Walgreens called Dr. Kathleen Hill-Besinque to respond to the opinions of Mr. Catizone, Dr. McCann, and Dr. Park. Dr. Besinque is a licensed pharmacist who is currently the Director of Experiential Learning at the Chapman University School of Pharmacy. ECF 1411, Besinque Decl. ¶ 1. She has taught pharmacy students for more than 30 years, mainly at the University of Southern California School of Pharmacy. Trial Tr. at 2560:23–2567:16 (Besinque Testimony). In addition to her teaching, Dr. Besinque has also served on the California State Board of Pharmacy Competency Committee, where she evaluates questions and potential answers for the state pharmacy licensure exam and sets the standard for what a passing grade should be. *Id.* at 2566:3–2567:4. She has been a practicing pharmacist her entire career, and currently practices at Pharmaca Pharmacy, a small retail chain pharmacy. *Id.* at 2564:19–2565:24.

123. Dr. Besinque criticized Mr. Catizone's and Dr. McCann's analysis, opining that Plaintiff's red flag analysis cannot "reliably identify prescriptions that were not written for a legitimate medical purpose" or "prescriptions that were diverted or used unlawfully." *Id.* at 2576:3–2577:2; *see also* ECF 1411, Besinque Decl. ¶ 23. Dr. Besinque described how Mr. Catizone's red flags were "overinclusive," "limited to a single data field taken out of context," and showed "how applying the systemic flagging algorithms to aggregate data cannot accurately identify prescriptions that lack a legitimate medical purpose." ECF 1411, Besinque Decl. ¶ 22.

124. Dr. Besinque criticized Mr. Catizone's opinion that the red flags he identified for this litigation were red flags in every instance. She disagreed that "the 14 red flags that Mr. Catizone used … are all suspicious circumstances, no questions asked every time." Trial Tr. 2577:12–24 (Besinque Testimony). She explained that many things in isolation could be considered a red flag, but "when you look at it as a whole prescription, as a whole patient care activity, the information is there to clarify" the isolated "red flag." *Id.* Dr. Besinque testified that, in such circumstances, she would not expect the pharmacist to include any notation on the prescription. *Id.* at 2578:2–6.

125. Even a cursory review of the prescriptions Mr. Catizone and Dr. Park criticized for inadequate documentation demonstrates the shortcomings of evaluating single data fields, in the aggregate, to try to identify problematic prescriptions. For example, copied below is the prescription produced at WAGCASF00309600. *See* **P-28539**.

The face of the prescription shows that it was written by a physician in the Zuckerberg Hospital's Division of Hematology/Oncology. This prescription hit on Mr. Catizone's red flags number four (overlapping supply from multiple pharmacies) and number eleven (patient was dispensed a prescription over 90 MME per day). As Dr. Besinque explained, given the additional information that the pharmacist would have had in front of her but that Plaintiff's analysis does not account for (i.e., that the prescription was written by an oncologist at a reputable institution), the prescription likely would not have raised any concerns, especially given the pharmacist's ability to ask any questions of the patient and view the patient's prescription history. It is unlikely that a pharmacist would write down any additional information when the legitimacy of the prescription is plain on its face, or when the face of the prescription itself is sufficient to resolve what may otherwise be deemed a "red flag." Trial Tr. at 2578:16–2579:2 (Besinque Testimony).

126.    As another example, the Catizone/McCann analysis flagged the prescription at WAGCASF00311063 under flag number fifteen (patient received more than 210 days' supply of opioids in 6 months).  *See* **P-28539**.  The face of the prescription shows that it was written by a hospice doctor and that it was for a "terminally ill patient."  The Catizone/McCann analysis flags it nevertheless, and there is no indication that Dr. Park cleared it as one of the very small number of prescriptions she believed contained adequate documentation of due diligence.

WALGREENS CO.'S FINAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (No. 3:18-CV-07591-CRB)

127.    Another example is WAGCASF00311291 copied below, which was flagged by Mr. Catizone's red flags number three (overlapping supply from multiple prescribers), number four (overlapping supply from multiple pharmacies), and number seven (overlapping supply of an opioid and a benzodiazepine). *See* **P-28539**. The face of the prescription shows that it was written for "breakthrough pain or shortness of breath" by a prescriber at the UCSF Children's Hospital Oncology Program. Again, given the additional information that the pharmacist would have had in front of her but that Plaintiff's analysis does not account for (i.e., that the prescription was written for a child cancer patient by a prescriber at a reputable institution), the prescription likely would not have raised any concerns.



128.    A cursory review of the set of 2,265 sample prescriptions that Dr. Park relied upon in forming her opinions reveals several other examples like the three described above. *See, e.g.*, **P-28539** (incorporating WAGCASF00310366; WAGCASF00311461; WAGCASF00311477; WAGCASF00311497; WAGCASF00312343).

129. Dr. Besinque provided numerous additional examples showing how Plaintiff's red flag analysis was overinclusive and ultimately not useful in determining whether a prescription was written for a legitimate medical purpose or ultimately diverted. For example, one of Mr. Catizone's "red flags," as implemented by Dr. McCann, captures any circumstance where a "patient was dispensed opioid prescriptions with overlapping days of supply that were written by two or more prescribers." ECF 1299, Catizone Decl. ¶ 18. While intended to capture illegal doctor shopping, this "red flag" also flags two physicians from the same practice who may treat the same patient—a circumstance that is far from unusual in today's practice of medicine and would not be deemed suspicious or out of the ordinary by a reasonable pharmacist. Trial Tr. at 2582:23–2585:23 (Besinque Testimony); ECF 1411, Besinque Decl. ¶ 26.

130. Another of Mr. Catizone's red flags as implemented by Dr. McCann flags any patient who was "dispensed opioid prescriptions with overlapping days of supply at two or more pharmacies." ECF 1299, Catizone Decl. ¶ 18. This captured every patient who filled prescriptions with overlapping days of supply at different Walgreens pharmacies in the Bay Area. As Dr. Besinque described, this red flag makes little sense. Trial Tr. at 2585:24-2587:12 (Besinque Testimony); ECF 1411, Besinque Decl. ¶ 27. There is nothing unusual about a patient going to any of the numerous Walgreens pharmacies in the Bay Area to have a prescription filled; one of the conveniences of a chain pharmacy is its ubiquity and availability in different neighborhoods. As Dr. Besinque explained, "most patients would consider Walgreens to be a single entity." Trial Tr. at 2586:19–20 (Besinque Testimony). As implemented by Dr. McCann, this red flag captures a patient who sometimes fills his prescription near his home and other times fills his prescription near his office. *Id*. at 2586:24–2587:12.

131. Mr. Catizone acknowledged that he did not look at any of the prescriptions that were identified using his flagging criteria, and that therefore he cannot say what percentage of those flagged prescriptions were written by oncologists or doctors who work in hospice, orthopedists, paint management specialists, or doctors affiliated with the top institutions in the city, such as UCSF—including prescribers whom Plaintiff identified as witnesses in this case. Trial Tr. at 825:20–826:16 (Catizone Testimony).

132.    The Court has also heard testimony from several of Plaintiff's expert and fact witnesses about the growing emphasis on the recognition and treatment of pain from the 1990s through at least 2010, but Mr. Catizone's red flags do not account for the changing standards of medical care over time. For example, Dr. Horton frequently referred to 2008 as a time when prescription opioids were considered appropriate in a much wider variety of circumstances. *E.g.*, ECF 1532-2, Horton Tr. at 158:21–159:17, 160:18–19 (testifying that it was "a lot more common" in 2008 for her and her colleagues to prescribe two short-acting opioids to a patient on the same day, a practice she now considers "not-very-safe"), 156:6–9 ("[W]ell, back in 2008, . . . I don't think we knew as much about the overdose risks of benzodiazepines and opiates."); *see also, e.g.*, Trial Tr. at 1085:3–21 (Dr. Lembke testifying that it wasn't until 2011—when the CDC declared an opioid epidemic—that she began to have different views about manufacturers' statements regarding the addictive nature of opioids than she did in the early 2000s). Mr. Catizone's red flags incorrectly assume that the medical community had the same knowledge of the risks and benefits of opioid medications in 2008 as it did in 2020. In reality, a prescription that now raises concerns among doctors and pharmacists alike, may have been "considered acceptable practice at the time the prescription [] was written." ECF 1411, Besinque Decl. ¶ 14. This is another reason why Mr. Catizone's retrospective red flag analysis cannot establish that Walgreens pharmacists filled any prescription ***with knowledge*** that the prescription was written without a legitimate medical purpose.

133.    Several of Mr. Catizone's red flags also fail to account for the common need to taper patients off of opioid medications to avoid withdrawal. For example, Mr. Catizone flags every Walgreens prescription where a patient is simultaneously receiving an opioid and a benzodiazepine or an opioid, a benzodiazepine, and a muscle Relaxer. But as Plaintiff's witnesses have testified, it can take years to properly taper a patient off of opioid medications. ECF 1532-2, Horton Tr. at 65:18–66:12 (describing a patient to whom she prescribes an opioid and a benzodiazepine and is working "on a several-year-long taper down off of those medications"); ECF 1376, Coffin Decl. ¶ 55 ("Opioids should not be abruptly discontinued. The time it will take to taper a dependent patient's opioid dose will vary significantly—from months to many years."). During the lengthy tapering process, every one of Dr. Horton's prescriptions that meet Mr. Catizone's red flag criteria are still being flagged, despite her

unrebutted testimony that she wrote each of those prescriptions for a legitimate medical purpose. Far from suspicious, these are the very prescriptions that may not even require additional inquiry by the pharmacist because the pharmacist has likely become familiar with the treatment plan through interactions with the patient or prescriber over months or years. *See* ECF 1447-1, Woods Tr. at 111:4–24 (testifying that he felt it was "unnecessary" for pharmacists to request information from doctors in situations where patients have been receiving their medication "for lengthy periods of time"); ECF 1532-2, Horton Tr. at 155:21–157:1 (testifying that she would not expect a call from a pharmacist about a patient who is "getting the same medication again and again" because "that's less cause for concern if you've already kind of clarified the issue.").

134. The Catizone-McCann-Park analysis captures a multitude of perfectly normal patient and prescriber activity, which would not raise a pharmacist's suspicion or spur extensive due diligence or any documentation. *See, e.g.*, Trial Tr. at 2582:9–2601:4 (Besinque Testimony); ECF 1411, Besinque Decl. ¶¶ 25–33. But according to Mr. Catizone, if there is no documentation associated with any of the flagged prescriptions, he assumes both that diligence was necessary and that no due diligence was conducted. There is no basis for these assumptions. Dr. Besinque testified that no law or standard of practice requires such documentation, especially in the face of circumstances that are in no way suspicious to a reasonable pharmacist. Trial Tr. at 2578:16–2582:8; ECF 1411, Besinque Decl. ¶¶ 11, 16–18.

135. Dr. Besinque reviewed dispensing data from the Zuckerberg San Francisco General outpatient pharmacy to test the conclusions of Mr. Catizone and Dr. Park regarding any "requirement" to document resolution of red flags. *See* **WAG-MDL-02846**; **WAG-MDL-02847**; **WAG-MDL-02848**. She looked at approximately 18,000 lines of prescription data. She "found very little documentation. Most of the documentation that was contained in that file was really more relevant towards either where the patient was located, a phone number, or in some cases insurance comments." Trial Tr. 2580:23-2581:1 (Besinque Testimony). This was *not* evidence that "Zuckerberg pharmacists weren't doing due diligence on prescriptions," *id*. at 2581:2–8, but rather that Mr. Catizone's and Dr. Park's opinions that documentation was required in every instance a Catizone red flag was encountered was not the standard of practice at any pharmacy identified in the litigation, including the outpatient

pharmacy run by the City.  Indeed, Dr. Woods, the Chief Pharmacy Officer at the San Francisco Department of Public Health, testified that the City does not require its pharmacists to document the resolution of red flags.  ECF 1447-1, Woods Tr. at 74:13–21.  Dr. Woods' "expectation" is that "even though the pharmacist may not have documented calls and inquiry," the pharmacist would have "done the work necessary to review and validate the prescription before filling it."  *Id.* at 77:4–10.

136.    In further support of Dr. Besinque's testimony that Plaintiff's red flag analysis was overinclusive and ultimately unhelpful in identifying illegitimate prescriptions, Walgreens provided examples of Plaintiff's red flag analysis applied to well-regarded physicians employed by the City of San Francisco, some of whom testified in this case.  **WAG-MDL-03591**; **WAGMDL-03596**; **WAG-MDL-03606**; **WAG-MDL-03627**; **WAG-MDL-03628**; **WAG-MDL-03630**; ECF 1400, Brunner Decl. at 3–9.  For example, Walgreens provided evidence showing that, using Plaintiff's flagging analysis, 82 percent of the prescriptions written by Dr. Claire Horton, Chief Medical Officer of the San Francisco Health Network, and a professor of Medicine at UCSF/Zuckerberg San Francisco General, had red flags.  **WAG-MDL-03628**.  Dr. Horton's prescriptions that hit on Plaintiff's red flags included 1,243 "cocktail" prescriptions, including 29 prescriptions that hit on the so-called "trinity" red flag.  *Id.* Similarly, 80 percent of the prescriptions written by Dr. Barry Zevin, Medical Director of Street Medicine and Shelter Health at San Francisco Department of Public Health, hit on one of Plaintiff's red flags.  **WAG-MDL-03627**.  And 69 percent of the prescriptions written by Dr. Joseph Pace, the Primary Care Chief Medical Officer for the San Francisco Health Network at San Francisco Department of Public Health, hit on one of Plaintiff's red flags.  **WAG-MDL-03630**.  Each of these physicians is well-regarded, and no one would suggest that their prescriptions were illegitimate.  *See* ECF 1532-2, Horton Tr. at 91:15–18 (testifying that she never wrote a prescription "that was not for a legitimate medical purpose").  This evidence shows both that Mr. Catizone's red flag criteria as applied by Dr. McCann is overinclusive, and also that simply looking at the red flag data that Dr. McCann produced provides no insight into whether the actual prescription was written for a legitimate medical purpose (or not) or whether the medicine was ultimately diverted or put into illicit channels.  Ex. C, *City of Huntington v. AmerisourceBergen Drug Corp., et al.*, Case No. 3:17-cv-1362 (S.D.W.V. June 27, 2022), Dkt. 1529 at 22 ("It is speculative to say that just because orders that were flagged or that should have been flagged

(even a large amount) were shipped without due diligence, there was any diversion at all <u>caused by the lack of flagging or lack of due diligence</u>.") (emphasis in original).

137.     Mr. Catizone testified that the so-called "trinity" red flag—an opioid prescribed with a benzodiazepine and a muscle relaxant—"can never be resolved" and is never written for a legitimate medical purpose, but the evidence from City physicians suggested differently. For example, while the trinity prescription was rare, Dr. Horton wrote 29 prescriptions between 2006 and 2020 that were flagged under Mr. Catizone's definition of a trinity prescription. **WAG-MDL-03628**; ECF 1400, Brunner Decl. at 3; ECF 1532-2, Horton Tr. at 147:17–149:10 (testifying that trinity prescriptions can address legitimate medical needs and that she views certain muscle relaxers as safer alternatives to Soma or Carisoprodol when a part of that combination); *see also* Trial Tr. at 2589:5–2590:8 (Besinque Testimony) (explaining that Mr. Catizone's definition of the trinity is too broad because it includes all muscle relaxers and is not limited to Soma or Carisoprodol). Dr. Besinque confirmed that trinity prescriptions are rare, but that they can be written for a legitimate medical purpose. Trial Tr. at 2589:9–2592:9 (Besinque Testimony). Dr. Besinque testified that, as a practicing pharmacist, she currently has a patient whose medical therapy includes an opioid, a benzodiazepine, and a muscle relaxant. *Id*. at 2591:6–2592:9.

138.     Additional evidence supports the conclusion that Dr. McCann's red flag data provides no insight into whether the actual prescription was written for a legitimate medical purpose or whether the medicine was ultimately diverted or put into illicit channels. Walgreens offered an analysis for hundreds of doctors affiliated with the City, showing how many of their prescriptions hit on Plaintiff's "red flags." ECF 1400, Brunner Decl. at 26–27; **WAG-MDL-03478**. The data show that 62.5 percent of the prescriptions written by those doctors and filled at Walgreens flagged under one of Mr. Catizone's criteria, and 30 percent contained two or more red flags. ECF 1411, Brunner Decl. at 26–27; *see also* **WAG-MDL-03478A** (showing percentages of prescriptions flagged for city-affiliated prescribers). While it is of course possible that City-affiliated physicians were writing illegitimate prescriptions, the evidence presented, including testimony from Swati Patel at Zuckerberg pharmacy, does not show that rogue prescribers affiliated with the City were writing more than a handful, if any, of the prescriptions captured by Plaintiff's flagging analysis.

139.    Overall, Dr. McCann concluded that over 60% of the opioids prescriptions that Walgreens pharmacists dispensed in San Francisco between 2006 and 2020 had Catizone's "red flags." That is a significant reduction from the 80% estimate Dr. McCann provided in his expert report (the number drops to 55% once McCann corrects for an error Mr. Brunner identified in McCann's implementation of his methods, *see* ECF 1521, McCann Rebuttal Declaration at 3).  But it is still unreasonable to suggest that more than half of the opioid prescriptions Walgreens dispensed in San Francisco had red flags of diversion.  In reaching this conclusion, in addition to the above, the Court is persuaded by the testimony of Joseph Rannazzisi, former Deputy Assistant Administrator at the Drug Enforcement Administration, who testified to the United States Congress that "99.5% of the prescribers … are not overprescribing."  ECF 1338-2, Rannazzisi Tr. at 192:5-193:6; **WAG-MDL-00430** at 11; *see also* **DEF-MDL-09673** at 5 ("DEA recognizes that the overwhelming majority of American physicians who prescribe controlled substances do so for legitimate medical purposes."); *id.* at 7 ("[N]early every prescription issued by a physician in the United States is for a legitimate medical purpose in the usual course of professional practice.").  The Court is further persuaded by the testimony of Rob Patterson, DEA Acting Administrator, who testified before the House Judiciary Committee in 2018 that "[t]he vast majority of doctors, 99.99%, were trying to do right by their patients."  **DEF-MDL-00061** at 33; ECF 1440-1, Ashley Tr. at 46:22–47:4.  These statements are far more consistent with common sense observations than the opinions provided by Dr. McCann, Mr. Catizone, and Dr. Park, who suggest that close to 2 out of 3 opioid prescriptions dispensed at Walgreens were suspicious and should not have been filled.

### 6.    Plaintiff's "Bad Doctor" Evidence Does Not Establish That Walgreens Contributed to a Public Nuisance

140.    Plaintiff focused much of its dispensing case against Walgreens on five prescribers who ultimately lost or surrendered their medical licenses and whose prescriptions Walgreens pharmacies filled over the years—almost exclusively while the doctors were licensed by the State Board of Medicine and registered with the DEA to prescribe opioid medicines.  ECF 1400, Brunner Decl. ¶ 21. With the benefit of hindsight, it is tempting to conclude that Walgreens pharmacists should have refused to fill certain of these prescriptions (although none of Plaintiff's experts identified which ones).  For

purposes of determining liability, however, hindsight analysis does not establish that Walgreens pharmacists, *at the time they filled the prescriptions*, did so with knowledge that any prescription was unlawful or not written for a legitimate medical purpose.

141.    Mr. Catizone himself conceded that he identified the five prescribers he discussed in his testimony not by mining Walgreens' dispensing data to look for prescription irregularities (as he claims Walgreens should have done), but instead by searching for doctors whose licenses had been revoked by the Board of Medicine and then looking backwards, retrospectively, to see how many of their prescriptions Walgreens had filled over the course of a decade or more. Trial Tr. at 894:7–21 (Catizone Testimony). Looking at the first prescriber Mr. Catizone cites, Dr. Guido Gores, shows the shortcomings of Mr. Catizone's analysis.

142.    As an initial matter, approximately 20% of Dr. Gores' prescriptions did not present any of Plaintiff's red flags at all. By Plaintiff's own theory, then, those prescriptions are not suspicious and do not provide a basis to refuse to dispense. ECF 1299, Catizone Decl. ¶ 74. Second, as Mr. Catizone himself conceded, Dr. Gores had patients "who had legitimate medical need for pain relief"—although Mr. Catizone did not attempt to identify those patients or to state whether they were in the 80% of prescriptions that Dr. McCann flagged or the 20% that he didn't. Trial Tr. at 897:6–25 (Catizone Testimony). Under California law, a pharmacist is obligated to fill a prescription that is written in the normal course of practice for a patient with legitimate medical need. ECF 1411, Besinque Decl. ¶ 8; Cal. Bus. & Prof. Code § 733(a). Third, Mr. Catizone conceded that he was aware that Walgreens pharmacists did in fact refuse to fill suspicious prescriptions from Dr. Gores; but he performed no analysis to determine which ones or how many. Trial Tr. at 896:12–23 (Catizone Testimony).

143.    Mr. Catizone testified that he "has no way of knowing" what specific prescriptions from Dr. Gores, or even what *percentage* of prescriptions from Dr. Gores, were not written for a legitimate medical purpose such that they should have been refused by Walgreens pharmacists. *Id.* at 897:2–20.

144.    Despite having access to Dr. Gores' prescriptions, and other prescribing data possessed by the Walgreens corporate office, Mr. Catizone did not perform any analysis that attempted

to show that a single prescription written by Dr. Gores was illegitimate or likely to be diverted. Instead, Mr. Catizone merely pointed to Dr. McCann's "red flag" analysis. For the reasons discussed, that analysis does not establish the necessary link to the alleged diversion Plaintiff was required to prove.

145. The California State Board of Pharmacy also had access to Walgreens' dispensing of Dr. Gores' prescriptions through the state-run CURES database. *See* **P-04788** at 5. There is no evidence that the Board of Pharmacy ever raised concerns with Walgreens' dispensing of Dr. Gores' prescriptions, or of the prescriptions of any of the other doctors who are the subject of Plaintiff's focus.

146. Plaintiff's analysis of the four other doctors who ultimately lost their license to prescribe controlled substances suffers from the same flaws. No Plaintiff expert identified even a single prescription from any of the identified prescribers that they say was not medically appropriate, written for an illegitimate medical purpose, or diverted for illicit use. The furthest Mr. Catizone was willing to go was to comment on the percentage of prescriptions written by these prescribers that contained so-called red flags, stating that almost 94% of Dr. Andrew Giovaninni's prescriptions "triggered one or more red flags," 79% of Dr. Collin Leong's prescriptions "triggered red flags," 98% of Dr. Ray Seet's prescriptions had red flags, and that 75% of Dr. John Pierce's prescriptions hit on red flags. ECF 1299, Catizone Decl. ¶¶ 79, 80, 83, 84, and 85. But those percentages are unhelpful in identifying actual illegitimate prescriptions or diversion. As noted above, more than 80% of the prescriptions written by Dr. Claire Horton, the chief medical officer of the San Francisco Health Network, similarly "triggered red flags," and there is no evidence that Dr. Horton ever wrote anything but legitimate prescriptions for patients with actual medical need. *See* ECF 1532-2, Horton Tr. at 91:15–18. Hundreds of other prescribers affiliated with the City likewise had large percentages of their prescriptions flagged by Plaintiff's red flag analysis. For example, one prescriber affiliated with the City's Tom Waddell Urgent Care clinic and other City-run hospitals and clinics had over 9,500 opioid, benzodiazepine, and muscle relaxer prescriptions filled at Walgreens and 75 percent of them triggered Plaintiff's red flags. **WAG-MDL-03478A**. For a sample of 45 City-affiliated prescribers who each wrote more than 1,000 opioid, benzodiazepine, and muscle relaxer prescriptions filled at Walgreens, the percentage of prescriptions flagged was 65 percent. *See id.* The percentage of prescriptions flagged by two or more flags was 33

percent. *See id.* These 45 City-affiliated prescribers wrote more than 115,000 prescriptions for opioids, benzodiazepines, and muscle relaxers—over 75,000 of which were flagged. *Id.*

147. Any hindsight analysis of so-called problem prescribers is further complicated by the fact that "even bad doctors typically have legitimate patients who genuinely need medication, and even the best doctors can have patients who are feigning medical conditions to obtain drugs." *See* ECF 1399, Polster Decl. ¶ 24. Thus, "every prescription should receive the same degree of scrutiny" in determining whether to dispense or refuse. *Id.*

148. The Court cannot infer that Walgreens knowingly filled prescriptions lacking a legitimate medical purpose simply because Walgreens filled prescriptions written by prescribers who later lost their licenses. Of the five prescribers Plaintiff has highlighted, each one had an active medical license for more than 30 years, meaning that their licenses and registrations were repeatedly renewed by both the Medical Board of California and the DEA. *See* **P-22297** at 3; **P-27514** at 2–3; **P-28430** at 2–3; **P-27610** at 3; **P-27609** at 2–3. Furthermore, the Medical Board's findings against each of these doctors related to specific misconduct in each doctor's treatment of a small handful of patients; the Medical Board did not find that these prescribers were unlawfully prescribing to hundreds or even tens of patients. *See* **P-22297**; **P-27514**; **P-28430**; **P-27610**; **P-27609**. Making the leap from the Medical Board's findings to infer that some significant number of these doctors' prescriptions lacked a legitimate medical purpose would require "rank speculation." *See People v. Purdue Pharma L.P.*, No. 30-2014-00725287-CU-BT-CXC, 2021 WL 5227329, at *7–8 (Cal. Super. Nov. 1, 2021) ("*California State Case*"). Furthermore, there is no evidence demonstrating that any illegitimate prescriptions written by these doctors were filled by a Walgreens. Even Mr. Catizone acknowledged that he "has no way of knowing" what specific prescriptions, or even what *percentage* of prescriptions, written by these doctors were not written for a legitimate medical purpose such that they should have been refused by Walgreens pharmacists. *Id.* at 897:2–20. There is no way for the Court to make that inference when Plaintiff's own experts could not. *See California State Case*, 2021 WL 5227329 at *7–8 ("[E]ven if the Court could reasonably infer that [Defendants' conduct] must have caused *some* medically inappropriate prescriptions to be written, no evidence before the Court enables it to conclude, without rank

speculation, whether the number or volume of such medically inappropriate prescriptions contributed to the alleged public nuisance, and if so, to what extent.").

149.    Even assuming that *every single prescription* written by these five prescribers and filled at a San Francisco Walgreens lacked a legitimate medical purpose—which Mr. Catizone testified was not the case, Trial Tr. at 897:6–25, and which is implausible on its face in any event—those prescriptions make up *roughly 0.5 percent* of the total opioid prescriptions filled in San Francisco since 2006.  *See* **P-18323** (showing that these five prescribers wrote 29,821 opioid prescriptions dispensed by San Francisco Walgreens between 2006 and 2020); ECF 1392, Keller Decl. ¶ 10 (showing that 5,803,197 opioid prescriptions were dispensed in San Francisco between 2006 and 2017, the last year for which data is available).  This is a negligible percentage that would fail to establish Walgreens' conduct was a substantial factor in contributing to the opioid crisis.  *See California State Case*, 2021 WL 5227329 at *8.

150.    For the first time in closing argument, Plaintiff pointed to prescribing data regarding 26 *additional* prescribers who were purportedly disciplined for misconduct at some point in time by the Medical Board of California.  *See* **P-18323**.  Evidence regarding these prescribers was not offered in Plaintiff's case-in-chief, the Court has not heard any testimony about them, and their prescribing data did not rebut any evidence offered by Walgreens in its case.  *See United States ex rel. Brown v. Celgene Corp.*, 2016 WL 6542730, at *4 (C.D. Cal. June 29, 2016) ("The purpose of rebuttal evidence is to address 'new unforeseen facts brought out in the other side's case.'").  The Court concludes this new evidence is improper rebuttal and declines to consider it.

151.    Plaintiff attempts to fault Walgreens for not instituting prescriber blocks that would prevent its pharmacists from filling prescriptions for certain doctors under any circumstances, but the Medical Board of California has refused to cutoff a prescriber even once it found evidence of wrongdoing.  For example, when the Medical Board of California issued its order accepting the surrender of Dr. Pierce's license on July 31, 2019, it allowed Dr. Pierce to continue writing prescriptions, including those for controlled substances, for months until December 31, 2019.  **P-28430**.  This makes sense, because, as explained above, even bad doctors have patients with legitimate medical

needs, Trial Tr. at 897:12–16 (Catizone Testimony), for whom it would be inappropriate to simply cut off their prescriptions without time to find a new doctor.

152.    Plaintiff repeatedly identified Dr. Masami Hattori as the highest prescriber of opioid medicines in San Francisco.  ECF 1392, Keller Decl. ¶¶ 21–24.  Dr. Hattori specializes in pain management.  And even though he is a high prescriber, he remains licensed and registered with DEA to prescribe opioid medicines.  Trial Tr. 3328:7–11 (Kyle Testimony), **WAG-MDL-03870**.  Plaintiff identified no disciplinary actions or investigations of Dr. Hattori.  *See* **WAG-MDL-03870**.  As Mr. Catizone himself acknowledged, "simply because a pain management doctor is a high prescriber, that doesn't mean that he or she is writing … for an illegitimate medical purpose."  Trial Tr. 890:24–891:3 (Catizone Testimony).  Perhaps for this reason, Mr. Catizone did not opine that Walgreens should have categorically refused Dr. Hattori's prescriptions.  Merely looking at a physician's prescription numbers does not help a pharmacist decide whether the prescriber is writing prescriptions that lack a legitimate medical purpose.

153.    Plaintiff has not provided any evidence of what it views as the appropriate or medically necessary number of prescriptions, dosage units, or MMEs over any period of time.  Plaintiff has undertaken no effort even to estimate what the appropriate level of prescribing or dispensing was in San Francisco over any period of time covered by its claims, much less to identify any prescriptions Walgreens dispensed that were not for a legitimate medical purpose or subsequently diverted.  Without some evidence of the volume of illegitimate or inappropriate prescriptions, Plaintiff cannot prevail.

154.    Merely pointing out the number of prescriptions filled that were flagged by Mr. Catizone's method is insufficient.  On this point, all experts agreed:  the fact that a prescription bears a red flag does not mean that it was written for an illegitimate medical purpose.  Mr. Catizone testified that "just because a prescription hit on one of [his] 16 red flags, that does not mean that it was written for an illegitimate medical purpose."  Trial Tr. at 838:23–839:2 (Catizone Testimony).  Dr. McCann agreed that "[i]t was not part of [his] work to determine whether any prescription [he] flagged was issued for an illegitimate purpose."  Trial Tr. at 1188:23–1189:1 (McCann Testimony).  Dr. Park testified that she has "no opinion that any prescription Walgreens dispensed was illegitimate" or "medically unnecessary."  Trial Tr. 1015:6–22 (Park Testimony).  Finally, Dr. Besinque agreed with the

testimony of these experts, and added that "just because a prescription hit on one of Mr. Catizone's red flags, that does not mean the prescription would raise a concern with the pharmacist when considering all information available to him or her." Trial Tr. 2601:20-2602:23 (Besinque Testimony). Demetra Ashley from the DEA agreed that if "a prescription bears red flags, it does not necessarily mean that it lacks a legitimate medical purpose" or that it will "lead to diversion." ECF 1440-1, Ashley Tr. at 67:13–16. And Dave Woods, the Chief Pharmacy Officer at the San Francisco Department of Public Health, came to the same conclusion. ECF 1447-1, Woods Tr. at 73:3–7. Absent any such evidence of actual illegitimate or unlawful prescriptions, Plaintiff's claims against Walgreens must fail.

### 7.   Plaintiff's Pharmacist Testimony Does Not Support Its Claim Against Walgreens

155. Plaintiff presented testimony from five former and one current Walgreens pharmacist—each of whom met with Plaintiff's counsel prior to testifying. Each of these pharmacists made certain complaints about working conditions and the pressures of being a pharmacist at Walgreens. Only three of the six pharmacists—Ms. Gayle, Mr. Gerspacher, and Mr. Lo—ever worked at a Walgreens pharmacy in San Francisco. All six testified that they exercised their corresponding responsibility and followed the law when working at Walgreens.

156. For example, Rebecca Gayle, who worked at various Walgreens locations in San Francisco between 2012 and 2016, testified that she always exercised her corresponding responsibility and followed the pharmacy laws when working at Walgreens. ECF 1340-1, Gayle Tr. at 144:13–19, 161:1–9. To the best of her ability, Ms. Gayle always "reached out for information to resolve [] red flags to inform her decision as to whether [she would] dispense or not." Id. at 164:18–165:3. Ms. Gayle refused to fill prescriptions when she could not resolve a red flag. Id. at 166:10–18. As an example of her diligence, Ms. Gayle testified that Walgreens requires its pharmacists to fax refused prescriptions to the local DEA office, and she "felt bad for whoever had to review the faxes because there were so many that we faxed to them over the years." Id. at 166:18–23. She was never punished at Walgreens for "refusing to fill an opioid prescription." Id. at 171:12–15. Ms. Gayle testified that her fellow Walgreens pharmacists in San Francisco were "doing their best to do right by their patients." Id. at 153:3–8.

157. Jeremy Gerspacher similarly testified that he refused to fill prescriptions while working at Walgreens and he was never disciplined for doing so. ECF 1362-1, Gerspacher Tr. at 84:24–85:13. In his time at Walgreens, Mr. Gerspacher never filled an opioid prescription that he believed was not written for a legitimate medical purpose. *Id.* 83:14–84:3. While Mr. Gerspacher testified that he dispensed a single prescription that he later came to believe was likely diverted, at the time he dispensed the medicine, he believed he had acted appropriately and did not believe that the prescription was written for an illegitimate medical purpose. *Id.* at 82:1–83:13. It is not surprising that a pharmacist will occasionally be duped by a criminal drug-seeker—even a pharmacist doing his best to exercise his corresponding responsibility. Moreover, once Mr. Gerspacher learned of the likely diversion, he called his pharmacy manager and made a note in the patient's records so that future pharmacists would be on alert. *Id.* Mr. Gerspacher continues to "stand behind the scripts [he] filled as a pharmacist at Walgreens." *Id.* at 83:18–21.

158. Victor Lo testified that when he was a practicing pharmacist at Walgreens, he "understood the importance of complying with both the federal and state laws and regulations regarding [his] practice. Trial Tr. at 933:22–934:1 (Lo Testimony). Several of Mr. Lo's allegations were contested by other witnesses and undermined by the evidence. For example, Mr. Lo testified that he felt pressure to fill controlled substance prescriptions from his supervisor, Ronda Lowe. *Id.* at 917:23–918:10. Ms. Lowe denied pressuring Mr. Lo and testified that she "always backed up [her] pharmacists" if they decided not to fill a prescription. Trial Tr. at 3032:15–23, 3068:8–13 (Lowe Testimony). Ms. Lowe's testimony is supported by Plaintiff's witness Rebecca Gayle, who testified that Lowe was "encouraging" and Gayle "really respected her." ECF 1340-1, Gayle Tr. at 152:8–17. Plaintiff asserted in its proposed findings of fact that Ms. Lowe admitted to pressuring Mr. Lo to fill controlled substances. *See* Ex. D, The People's Third Interim Proposed Findings of Fact and Conclusions of Law ¶ 9.2.4. This assertion is contradicted by Ms. Lowe's sworn testimony. Ms. Lowe repeatedly ***denied*** pressuring Mr. Lo to fill prescriptions, and testified that she did ***not*** tell Mr. Lo that he had "to fill a prescription regardless of [his] personal feelings about filling the prescription." *See* Trial Tr. at 3088:4–8 (Lowe Testimony). She testified that she likely told Mr. Lowe that Walgreens' policy did not allow pharmacists to "blanketly refuse [prescriptions] from a prescriber," which is altogether different.

Walgreens' policy requires pharmacists to evaluate each prescription using Walgreens' Good Faith Dispensing policy, but Ms. Lowe was quite clear that she always supported her pharmacists when they refused prescriptions. *Id.* at 3087:1–3088:13; *id.* at 3032:15–23. Mr. Lo also testified that Ms. Lowe told him if he wanted more staff hours at his pharmacy, then he should fill more prescriptions. Ms. Lowe denied that as well. She testified that if her pharmacists needed more staff hours, she would ask for more hours, and that she repeatedly did so at Mr. Lo's pharmacy. Trial Tr. at 3035:24–3036:25 (Lowe Testimony). Ms. Lowe's requests were typically granted, both at Mr. Lo's pharmacy and generally. *Id.* at 3036:17–19. Ms. Lowe further testified that she always reminded her pharmacists to never "compromise speed for diligence" or "accuracy." *Id.* at 3037:15–23.

159. Christy Mathews-Porter testified that "Walgreens expected you to refuse filling prescriptions that you weren't comfortable with," and she always refused to fill such prescriptions while working at Walgreens. ECF 1362-7, Mathews-Porter Tr. at 173:13–21. Throughout her time at Walgreens, Ms. Mathews-Porter understood that Walgreens implemented this expectation through its Good Faith Dispensing policy. *Id.* at 139:14–20.

160. Golnaz Kamali testified that she was "trained on" Walgreens GFD policy and that she followed it "to the best of [her] ability." ECF 1362-4, Kamali Tr. at 82:3–17. When she filled opioid prescriptions, she "would look out for [] red flags" to "determine whether [she] believed the prescription was legitimate." *Id.* at 82:23–83:2. And if she determined that "a prescription had red flags that [she] couldn't resolve, [she] would refuse to fill that prescription." *Id.* at 83:3–7. The Court further finds many of Ms. Kamali's complaints against Walgreens colored by bias resulting from her disciplinary record while at the company and not credible based on her inconsistent testimony. *See, e.g.,* *id.* at 99:9–102:19, 152:16–153:5; **WAG-MDL-03865**; **WAG-MDL-03866**; **P-27308**; **P-27309**; **P-27310**. For example, she denied sending threatening text messages to her pharmacy manager when she was terminated for lying to a pharmacy patient. ECF 1362-4, Kamali Tr. at 168:24–169:2. But when shown the text messages, she admitted that she texted her manager, "You son of a bitch . . . What goes around comes around." *Id.* at 170:3–23; **WAG-MDL-03867**. Ms. Kamali then tried to explain that those messages were not "threatening," but rather meant that "Karma is going to get you." ECF 1362-4, Kamali Tr. at 170:24–171:3. In its closing argument, Plaintiff claimed that Ms. Kamali was fired for

refusing to fill prescriptions, but Ms. Kamali's testimony shows that she was fired following several incidents of misconduct that included verbal confrontations with other Walgreens employees, *id.* at 90:1–92:18, 102:7–108:24, and unprofessional conduct with patients, *id.* at 100:4–102:4, 152:16– 154:13.

161.    Robert Yagar is a current Walgreens pharmacist who testified on behalf of Plaintiff, but who nonetheless acknowledged that Walgreens' Good Faith Dispensing policy has been in place ever since he joined the company in the 1990s. As a pharmacy manager, Yagar "demand[s] that the pharmacists who work for [him] follow [the Good Faith Dispensing policy] when they dispense controlled substances." ECF 1363-1, Yagar Tr. at 218:4–10. He also testified that Walgreens' Target Drug Good Faith Dispensing policy was an additional requirement "on top of" Good Faith Dispensing and that he always exercised Good Faith Dispensing regardless of whether a controlled substance was a target drug or not. *Id.* at 220:1–18.

162.    Mr. Yagar testified about a complaint he had lodged with Walgreens regarding a dispute he had with certain field leadership about the dispensing of an opioid prescription. In response to that complaint, the company conducted a months-long investigation that involved many witness statements from the field-level employees involved, and culminated in a lengthy report. **P-17156**. According to Ms. Polster, who was involved in the investigation, "We backed up Mr. Yagar. As a result of the investigation, we required coaching for the managers involved, and put all local store managers through a training program to reinforce company policy supporting every pharmacist's right to exercise their own professional judgment in making dispensing decisions, even when their exercise of that judgment appears questionable to other employees." ECF 1399, Polster Decl. ¶ 38; *see* **P-17156** at 9 (6/21/2018 entry). Investigators concluded that there was no systemic issue involving store managers pressuring pharmacists to fill prescriptions. *Id.; see also* **P-17156** at 9 (6/14/18 entry, "Jonkman…believes the managers handling of the issue to be an isolated incident and not a systemic matter"). Finally, the investigation report notes that this incident was not the first time Mr. Yagar refused a prescription without conducting thorough due diligence. *See* **P-17156** at 20 (3/8/18 entry, "[HealthCare Supervisor] Huynh said that she has addressed similar issues a couple of months ago [where RPSH Yagar] refused to fill the prescription but did not go through any of our GFD processes").

Mr. Yagar questioned the legitimacy of Walgreens' investigation because Walgreens did not interview his pharmacy manager, Jansen Filio. *See* ECF 1363-1 Yagar Tr. at 258:18–259:3. But Walgreens' investigation notes state, "We did not get a statement from RXMH Jansen Filio because she is on pregnancy [Leave of Absence]." **P-17156** at 17.

163. During closing argument, citing to Mr. Catizone's declaration, Plaintiff recited a handful of employee complaints that were logged in an internal Walgreens complaint database. The complaints themselves are hearsay, and the Court considers them only for the purpose of notice, and not for the truth of the allegations made. On the issue of notice, the Court notes that only one of the fifteen complaints was made by a Walgreens employee in San Francisco. ECF 1299, Catizone Decl. ¶ 88. The Court further notes that fifteen total complaints from tens of thousands of Walgreens employees nationwide over a period covering at least nine years does not show that Walgreens was ignoring any sort of recurring issue, as Plaintiff suggests. If anything, the tracking of these complaints, combined with the investigation of Mr. Yagar's complaint, show that Walgreens has a system in place to address its employees' concerns.

164. The testimony from the pharmacists Plaintiff called to testify contradicts Plaintiff's assertion that any of them dispensed opioid medications that they knew were likely to be diverted, much less that Walgreens' dispensing policies were ineffective or not followed. In support of the assertion regarding diversion, Plaintiff offers just one example of a prescription that Mr. Gerspacher learned was diverted after he dispensed the medication, but which he believed was legitimate at the time he dispensed. ECF 1362-1, Gerspacher Tr. at 82:1–83:13. Prescriptions that the pharmacist believes are legitimate are required to be filled under California law and cannot support Plaintiff's claim. *See* Cal. Bus. & Prof. Code § 733. Otherwise, Plaintiff's assertion that these pharmacists dispensed medications that were later diverted is supported by little more than rank speculation. *See* ECF 1523, Plaintiff's Opposition to Walgreens' Motion for Judgment at 14–15 (citing Trial Tr. at 919–920 (Lo Testimony); ECF 1301, Lo Decl. ¶¶ 15, 22–23; ECF 1340-1, Gayle Tr. at 165, 169). Those same pharmacists also testified that they understood Walgreens' dispensing policies and the law, and that they always did their best to fill only legitimate prescriptions. Trial Tr. at 933:22–934:1 (Lo Testimony); ECF 1340-1, Gayle

Tr. at 144:13–19, 161:1–9.  Even accepting their speculation as true, Plaintiff has made no attempt to quantify the alleged diversion or connect it to harm suffered by the City.

### B.    Plaintiff's Distribution Analysis Lacks Credibility

165.    Because the Court concludes that Plaintiff's dispensing analysis is flawed and does not establish that Walgreens dispensed medically unnecessary or illegitimate prescriptions, Plaintiff's distribution analysis is not relevant.  After all, if so-called "suspicious" orders were shipped to Walgreens pharmacies, but then either sat on the shelves or were dispensed to patients with prescriptions based on a legitimate medical need, then no diversion—and no harm—has occurred.

166.    Nevertheless, the Court finds that Plaintiff's distribution analysis was also flawed. To prove its claim, Plaintiff was required to do more than show that Walgreens distributed any so-called suspicious orders without conducting sufficient due diligence.  Plaintiff was also required to show that any such failure caused injury—that is, that Walgreens distributed opioid medications that were later dispensed without a legitimate medical purpose or were otherwise diverted, and that the illicit use of those same diverted opioids was a substantial factor contributing to Plaintiff's harm.  *See, e.g.*, Ex. A, *WV Track 2 Trial Decision* at 92, 161; *see id.* at 166 ("What distributors must guard against is handing over pills to pharmacies that are essentially acting as adjuncts of the illicit market, not against legitimate pharmacies dispensing vague notions of too many opioids."); *id.* at 171 ("The lack of evidence of pharmacy-level diversion on the part of defendants' pharmacy customers is fatal to plaintiffs' claims."). But Plaintiff concedes that Walgreens' distribution of prescription opioids ended eight years ago, in 2014.  ECF 128, FAC ¶ 172.  Plaintiff provided no evidence that Walgreens distributed any opioid medication that was later dispensed without a legitimate medical purpose or was otherwise diverted in San Francisco.

167.    Plaintiff failed to call its suspicious order monitoring expert, James Rafalski, a former DEA Diversion Investigator, so no one opined on the number of suspicious orders Walgreens allegedly shipped, much less whether any of those orders were subsequently diverted.  That makes this case even less supported than MDL Track 2, where the court excluded Mr. Rafalski's causation opinions after he had testified at length at trial.  Mr. Rafalski created seven algorithms for use in this litigation that Plaintiff provided to Dr. McCann, Plaintiff's data analyst, who then applied them to Walgreens'

distribution data.  Even with Mr. Rafalski's trial testimony, the Track 2 trial court found those algorithms "unpersuasive indicators of the level of suspicious orders that defendants allegedly received and fulfilled."  *See* Ex. A, *WV Track 2 Trial Decision* at 73.  But without Mr. Rafalski's testimony, there is no basis whatsoever on which to reach any conclusion about the orders Dr. McCann flagged using Rafalski's algorithms, much less that those orders or any others were "suspicious" or likely to be diverted.  In fact, Dr. McCann testified that when an order is flagged by his application of any of the methods he used—whether it was one of Rafalski's methods or a method Plaintiff's counsel identified for McCann in Walgreens' documents—that does ***not*** mean the order is suspicious, and it does ***not*** mean the order should not have been shipped.  Trial Tr. at 1186:21–1187:4 (McCann Testimony).  McCann did not conclude that "any manufacturer, distributor, or pharmacy oversupplied opioids."  Trial Tr. at 1186:25-1187:12 (McCann Testimony).  McCann cannot take the place of Mr. Rafalski.  He is not a suspicious order monitoring expert, and he offered no opinion that any opioid was diverted.  No other witness did, either.

168.     Dr. McCann also performed no analysis to "determine whether any of the orders [he] flagged [we]re in any way connected to the prescriptions that [he] flagged.  *Id.* at 1187:23–1188:1.  McCann "didn't investigate whether any orders that [he] flagged went on to fulfill prescriptions that [he] determined had red flags" under Mr. Catizone's criteria.  *Id.* at 1188:2–13.

169.     Even setting aside Plaintiff's failure to identify allegedly suspicious orders, or to connect the shipping of allegedly suspicious orders to any alleged harm, Plaintiff's distribution theory against Walgreens fails.  As discussed above, DEA must register any distributor who ships controlled substances, and distributors must renew their DEA registration every year.  ECF 1338-1, Rannazzisi Tr. 1715:1–1716:08, 1717:8–10.  Throughout the relevant timeframe, DEA renewed the registration for Walgreens' Woodland, CA distribution center—the only Walgreens distribution center to ship controlled substances to San Francisco—every year.  Despite conducting thorough audits of the Woodland facility, DEA never found issue with Walgreens' handling of suspicious orders for controlled substances at Woodland.  *E.g.*, **WAG-MDL-00041** (3/14/04 DEA report of Woodland with no violations relating to suspicious orders); **WAG-MDL-00052** (3/15/05 DEA Report of Woodland with no violations relating to suspicious orders); **WAG-MDL-00125** (6/12/09 DEA report of Woodland with no

violations relating to suspicious orders); **WAG-MDL-00255** (1/25/12 DEA report of Woodland with no violations relating to suspicious orders).

170.    DEA's repeated renewal of the Woodland distribution center's registration to ship controlled substances supports the conclusion that Walgreens' shipments from Woodland to San Francisco were in substantial compliance with DEA's regulations regarding the monitoring and reporting of suspicious orders.  *See* Ex. A, *WV Track 2 Trial Decision* at 24 ("DEA is charged with regulating and overseeing the controlled system of distribution" and acts as a "gatekeeper" that "'shall register an applicant' unless it determines 'that the issuance of such registration is inconsistent with the public interest.'") (quoting 21 U.S.C. § 823(b)).

171.    DEA regulations do not explain how to identify suspicious orders of controlled substances, i.e., orders of unusual size, orders deviating substantially from a normal pattern, or orders of unusual frequency.  ECF 1437-1, Mapes Tr. at 80:8–81:6; ECF 1338-1, Rannazzisi Tr. at 533:16–534:24.  Instead, DEA leaves it up to the individual distributor to design and operate a system that works for its customers and business model, taking into account the totality of the circumstances.  ECF 1437-1, Mapes Tr. at 81:8–82:11 (there is no "holy grail or articulated DEA model standard for what constitutes a suspicious order"); *id.* at 85:5–11 (DEA affords registrants the discretion to design a suspicious order monitoring system that is effective); *id.* at 87:21–88:10 (Review of suspicious orders is subjective, meaning the individual conducting the review "takes into account the totality of the circumstances."); ECF 1427-1, Prevoznik Tr. at 179:22–180:15 (Q. "DEA leaves it up to the registrant to design a system that works with its own business model and customer base, correct?  A. Correct."), *id.* 216:4–10 (no best practices regarding what method to use to know your customer), *id.* at 446:18–447:14 (SOMs systems are "not a one-size-fits-all proposition"); ECF 1437-3, Wright Tr. at 128:14–135:15 (DEA wanted companies to adapt their programs to their own clients and to changes in diversion trends, so there were no set criteria from DEA for SOM systems).  It makes sense that Walgreens distribution centers—which shipped only to Walgreens pharmacies—would employ different systems than a distributor that ships to a variety of unrelated customers with different business models, which may include internet pharmacies or pill mills.

WALGREENS CO.'S FINAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (No. 3:18-CV-07591-CRB)

172.    For decades prior to the mid-2000s, DEA diversion investigators viewed "excessive purchase reports"—reports of opioid purchases sent to DEA after an order was shipped—as compliant with the Controlled Substances Act and DEA regulations regarding suspicious order monitoring.  ECF 1437-3, Wright Tr. at 69:23–78:2; ECF 1437-1, Mapes Tr. at 91:18–92:25 ("I viewed those as compliant with the regulation for suspicious orders."); *id.* at 93:21–94:3, 95:12–96:22; ECF 1437-2, Mapes Tr. at 520:14–521:18 (compliant with both the CSA and the underlying regulations); ECF 1437-4, Wright Tr. at 489:04-494:21; *see also* Ex. A, *WV Track 2 Trial Decision* at 163 (Prior to 2008, "DEA understood and accepted that wholesale distributors would ship any suspicious orders that they identified and reported to the DEA.").  During this timeframe, due diligence on orders was viewed as a best practice, but it was not required by any statute or regulation.  ECF 1437-4, Wright Tr. at 495:25-497:04.

173.    Sometime after 2005, in response to the rise of Internet pharmacies and other rogue independent pharmacies filling prescriptions without a legitimate medical purpose, DEA changed its policy regarding the monitoring and reporting of suspicious orders.  ECF 1437-3, Wright Tr. at 83:5–14, 87:3–99:6 (explaining the problem of Internet pharmacies and that DEA's "distributor initiative," which continued until around 2011, was in response to Internet pharmacies); ECF 1437-1, Mapes Tr. at 125:3–126:14, 214:05–217:8; ECF 1338-1, Rannazzisi Tr. at 1731:1–1732:10 ("[T]he vast majority [of pharmacies DEA shut down] were independent pharmacies.");  Ex. A, *WV Track 2 Trial Decision* at 27 ("distributor initiative" was "started in response to the Internet pharmacy issue").  In response to the rise of Internet and other rogue pharmacies, there was no statutory or rulemaking change, but DEA began asking individual distributors to report suspicious orders before they were shipped, and not to ship those orders until they had conducted due diligence to resolve their suspicions.  ECF 1437-1, Mapes Tr. at 188:14–190:13, 203:9–205:1; ECF 1437-3, Wright Tr. 100:25–102:10, 125:20–126:11.  This was a significant change.  ECF 1437-3, Wright Tr. at 110:8–19, 115:8–116:12, 120:12–121:16 (noting confusion in the industry—and among DEA investigators—due to this change in DEA policy), 123:02–16; ECF 1437-4, Wright Tr. at 525:5-527:13.  It was also a gradual change; DEA did not set a deadline for companies to implement the changes to DEA's interpretation of the suspicious order monitoring regulation.  ECF 1437-2, Mapes Tr. at 518:10-519:3; ECF 1437-3, Wright Tr. at 123:17-125:19.

174.    Throughout the relevant timeframe, DEA conducted regular audits of distributors' operations, during which DEA's diversion investigators reviewed distributors' suspicious order monitoring systems, informed distributors of any deficiencies in their systems, and gave them an opportunity to correct those deficiencies. ECF 1437-1, Mapes Tr. at 49:14–50:3, 50:7–14, 50:23–51:2, 51:19–23; ECF 1427-1, Prevoznik Dep. at 130:13–131:14; Ex. A, *WV Track 2 Trial Decision* at 25 ("After an inspection is complete, the DEA communicates its findings to the distributor."). DEA also followed up with distributors to make sure any deficiencies were corrected. ECF 1437-2, Mapes Tr. at 51:20–23, 51:25–52:2; ECF 1427-1, Prevoznik Tr. at 131:15–23. When deficiencies are not corrected to DEA's satisfaction, DEA has a "wide variety of" actions it can take. *Id.* at 386:14–387:19. Where DEA concluded that distributors did not live up to their obligations, DEA issued orders to show cause and immediate suspension orders. ECF 1338-1, Rannazzisi Tr. at 451:12–452:2.

175.    DEA never issued an order to show cause, an immediate suspension order, or even a letter of admonition to Walgreens' Woodland, CA distribution center regarding its monitoring or reporting of suspicious orders. On the contrary, DEA's internal investigation reports of Walgreens' distribution centers show that following a single letter of admonition to another Walgreens distribution center in Ohio in 2006, DEA concluded that Walgreens had addressed—and resolved—DEA's concerns about Walgreens' monitoring and reporting of suspicious or excessive orders. DEA reported, "Walgreens responded to the noted violations and advised that corrective measures would be taken." **WAG-MDL-00121** at 6; *see also* **WAG-MDL-00073** (Walgreens' July 28, 2006 response to DEA letter of admonition explaining that Walgreens was "pursuing the necessary programming to modify this formula in accordance with the voluntary formula listed in Appendix E-3 of the DEA Chemical Handler's Manual"); **WAG-MDL-00313** (2007 Walgreens email to DEA's Mike Mapes regarding SOM); **WAG-MDL-00102** (2008 Walgreens email to DEA's Lisa Sullivan regarding SOM).

176.    DEA reported in 2009 that Walgreens' Perrysburg distribution center manager Steve Kneller "explained that WALGREEN follows the 'Chemical Handler's Manual Appendix 3' for determining suspicious orders. Walgreen's corporate office has an automatic tracking of the previous 12 months' ordering of controlled substances. This amount is divided by 12 to obtain an average monthly ordering pattern. The quantity currently ordered is multiplied by the 'DEA factor' (3). Any store that

WALGREENS CO.'S FINAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (No. 3:18-CV-07591-CRB)

orders controlled substances in excess of these parameters for two consecutive months or any three months out of a six month period will be identified as a suspicious order.  Suspicious orders are sent from the corporate office to DEA as well as the Distribution Center." **WAG-MDL-00121** at 17.

177.    The same 2009 DEA report goes on to state that "KNELLER was *unaware of what measures the corporate office takes* in investigating suspicious orders stating 'this process is currently under review at their corporate office.'" *Id*. (emphasis added).  Far from raising concerns or further questions about Mr. Kneller's lack of knowledge, DEA concluded that "Kneller identified the corrective actions that were being taken to address all of the violations noted during the regulatory investigation.  No further action is required at this time and it is recommended that this case file be closed." **WAG-MDL-00131**.

178.    In a subsequent DEA investigation, DEA reported what another Walgreens' Mount Vernon distribution center employee had described the *investigations conducted at the distribution center level* on suspicious orders before filling them.  DEA stated, "According to Ms. Gill, an identifiable suspicious or excessive order sent to their facility is very uncommon." **WAG-MDL-00181** at 18.  "Ms. GILL related that she could not recall a time when an order was deemed suspicious but not identified by the district office.  If what seems to be an excessive order is not caught by the district office, *WALGREEN CO. will call the district office and the local Walgreens Pharmacy by phone to verify the order.*" *Id.* at 19 (emphasis added).  In this report, DEA concluded that "all reviewed WALGREEN CO. records and security procedures were compliant under the Federal Codes of Regulations." *Id.* at 20.  *See also* **WAG-MDL-00437** at 22 (2014 DEA audit report of Woodland, CA distribution center) ("The Scheduled Investigation resulted in no record keeping or security issues."); **WAG-MDL-00554** at 15 (2017 DEA audit report of Woodland, CA distribution center noting, "On November 8, 2017, DI Smith and DI Grijalva held a closing discussion with Mr. FERRY and reviewed the findings of the inspection. DI Smith and DI Grijalva informed Mr. FERRY that the inspection was completed with no violations.").

179.    Testimony from current and former Walgreens employees supports the conclusions reflected in the DEA audit reports.  Joe Ferry, former manager of the controlled substances department at the Woodland distribution center, testified that when he was the C2 manager, between

roughly 2009 and 2014, there were processes in place to monitor for suspicious orders both at the corporate level and the distribution center level. ECF 1485-1, Ferry Tr. at 38:19–39:2. In closing argument, Plaintiff presented a partial answer from Mr. Ferry's testimony to claim that Walgreens' distribution centers were doing nothing to monitor orders for prescription opioids. Trial Tr. at 3803:19–23 (Plaintiff Closing Argument); *see* ECF 1485-1, Ferry Tr. at 38:19–39:2. But Mr. Ferry explained that the distribution center's computer room ran a query to catch excessive orders before they were shipped. ECF 1485-1, Ferry Tr. at 48:3–8; 75:7–14; 319:9–24. For orders that exceeded the threshold set by the query, a member of Mr. Ferry's team contacted the stores to verify the order. *Id.* at 48:3–8, 319:9–24; *see also* **P-20213** at 1 (Errata to Ed Bratton's Rule 30(b)(6) deposition explaining that written policies dated 2006 and 2010 "instruct[ed] distribution center personnel in the 'SAIL' department and the computer room on how to identify and address excessive or questionable order quantities before filling those orders and shipping them to a Walgreens pharmacy" and that "[t]hese written policies instruct DC personnel to call the pharmacy to investigate orders exceeding the threshold quantity"). Mr. Ferry testified that his team also called the corporate office to investigate a store's ordering history when the distribution center received an unusual order. ECF 1485-1, Ferry Tr. at 72:3–18, 321:5–11; *see also* **P-20213** at 3 (noting distribution center personnel's practice of calling the corporate office, "to investigate the history of the store's sales, before filling an unusually large order").

180.    Mr. Ferry testified that Walgreens' Woodland distribution center did not ship suspicious orders. ECF 1485-1, Ferry Tr. at 194:8–18, 344:22–345:6. With respect to the suspicious control drug reports that Walgreens reported to DEA until 2012, Mr. Ferry testified that "either the triggers were wrong or the DEA wasn't concerned about it." *Id.* at 183:21–184:2, 194:20–195:6. Mr. Ferry testified that he and his team reported their practices to the DEA during DEA's regular audits and that DEA never raised concerns. *Id.* at 342:16–343:1. On the contrary, Mr. Ferry testified that the Woodland distribution center had "good audits from DEA." *Id.* at 181:14–17. That testimony is borne out by the DEA audits described above.

181.    Plaintiff's witness John Coman, a former manager of Walgreens' Woodland distribution center who left the company in 2016, likewise testified that DEA conducted numerous site inspections of the Woodland distribution center during his tenure, and that those inspections included

interviews with management as well as an in-depth audit and review of all applicable records and record-keeping systems. Trial Tr. at 763:17–19; 765:24–766:7 (Coman Testimony). He testified that he and his team took those DEA audits seriously, always cooperated with DEA, and always answered the investigators' questions truthfully. *Id.* at 767:12–768:6; *see* **WAG-MDL-00255**. DEA never notified him of "any problems at the Woodland Distribution Center with respect to suspicious order monitoring for controlled substances." Trial Tr. 771:6–9 (Coman Testimony). If what "seemed to be an excessive order came into the Woodland Distribution Center," the distribution center's SAIL (Store Action Inquiry Line) department would run a "query to catch it." *Id.* at 752:23–753:5. An employee in the SAIL department would then call the store to verify the order. *Id.* at 753:6–8. Mr. Coman testified that he would not have been aware of it if orders placed by Walgreens pharmacies were reduced as a matter of routine, because he had a manager in charge of the controlled substances department who would have handled those issues unless they became a problem, which he testified did not happen. *Id.* at 732:16–733:16. Mr. Coman further testified that Walgreens placed importance on complying with federal regulations as they relate to opioid medications. *Id.* at 768:7–9.

182.    Consistent with both Mr. Ferry's and Mr. Coman's testimony, and the documents cited above, Tasha Polster testified that when she became the head of Walgreens' Pharmaceutical Integrity team in 2012, she understood that there was already a suspicious order monitoring system in place at the distribution center level. Trial Tr. at 2268:19–2269:1 (Polster Testimony). Also consistent with that evidence, Ms. Polster testified that when she came into her role in 2012, Walgreens already had a suspicious order monitoring system in place at the corporate level. *Id.* at 2265:3–7, 2267:9–2168:11; *see also* **WAG-MDL-00324** at 3 (showing corporate-level controlled substance reporting system in place since 2009). That corporate-level system initially flagged orders "based on by drug by store historical sales patterns, i.e. Tolerance threshold or order Frequency." *Id.* These thresholds limited the amount and frequency of orders for controlled substances. *Id.*

183.    Ms. Polster explained that the corporate level suspicious order monitoring system was updated in late 2012 to add a "ceiling limit" on the amount of opioids that could be ordered by a store. Trial Tr. at 2269:5–12 (Polster Testimony); **WAG-MDL-00324** at 4. "A ceiling limit is the amount of controlled – any one controlled substance that can be – that can go into a store over a six-

week rolling period of time." Trial Tr. at 2269:6–8 (Polster Testimony). Ms. Polster explained that a store's ceiling limit is based on a linear regression model that looks at each store's historical order volume and compares it to peer group stores that are of the same volume. *Id*. at 2269:16–22. If a store needs to exceed its ceiling limit to treat patients, the store must submit a written request justifying the increase, and that request must be reviewed and approved by both the store's district manager and the Pharmaceutical Integrity team. *Id*. at 2269:23-2270:11.

184. DEA reviewed Walgreens' "ceiling limit" process as part of a routine in-depth audit in 2015. *See* **WAG-MDL-00468** at 10–11. DEA's description of that process mirrors Ms. Polster's trial testimony. *See id.* at 10 ("Limits will be based on the store's average prescription volume and are compared to 'like' peer groups of stores throughout the chain."); *id.* at 11 ("All flagged orders are investigated as orders of interest by Walgreens Pharmaceutical Integrity team to determine if it was a suspicious order."). DEA concluded in this audit report, "No violations were noted during this investigation." **WAG-MDL-00468** at 2.

185. Plaintiff's evidence in support of its distribution theory against Walgreens centered on DEA's allegations of diversion at six Florida pharmacies and involving a Florida distribution center that never shipped controlled substances to California. That evidence is irrelevant here. *See* Ex. A, *WV Track 2 Trial Decision* at 171 n.8 ("To the extent plaintiffs attempt to rely on a showing of diversion at the pharmacy level outside the City of Huntington or Cabell County, such reliance fails as a matter of law. Plaintiffs presented no persuasive evidence establishing a 'nexus' between those out-of-jurisdiction shipments and any diversion or harm occurring in the City of Huntington or Cabell County."); *id.* at 93 n.4. If anything, Plaintiff's Florida evidence demonstrates that DEA takes severe action when it believes distribution centers or pharmacies are failing to live up to their obligations in handling controlled substances. The DEA never took action against Walgreens' Woodland distribution center or any of its pharmacies in the Bay Area. Moreover, in the same 2015 DEA audit report discussed above, DEA reviewed Walgreens' compliance with terms of the 2013 Memorandum of Agreement that resulted from those allegations. *See id.* at 4. DEA concluded, "No violations of the MOA were found during this investigation." *Id.* Walgreens' three-year Memorandum of Agreement with DEA expired in June 2016. *See id.*

**C.    Plaintiff's "Collaboration" Allegations Are Unsupported**

186.    Plaintiff claims that Walgreens "collaborated" with pharmaceutical manufacturers "in the promotion of opioids."  Trial Tr. 57:25–58:3 (Plaintiff's Opening Statement).  Much of Plaintiff's evidence focused on its allegation that Walgreens had "collaborated" with Purdue Pharma.  The Court finds these allegations unconvincing and irrelevant to the issues the Court is asked to resolve as to Walgreens.

187.    As an initial matter, as noted above, while Plaintiff brought marketing claims against the other Defendants in this case, it brought no claims against Walgreens related to any marketing of opioid medicines.  ECF 128.  Plaintiff's public nuisance claim against Walgreens is based solely on allegations that Walgreens failed to halt suspicious orders from being distributed to Walgreens pharmacies and that Walgreens dispensed opioid medications pursuant to prescriptions with so-called "red flags" of diversion.  *See, e.g., id.* ¶ 898.  Any "collaboration" with Purdue to promote Purdue's products, even if found, would not amount to wrongful or unlawful conduct that has any bearing on the claims Plaintiff actually brought against Walgreens.

188.    Plaintiff's claims regarding "active collaboration" with Purdue and other manufacturers were only thinly supported, if at all, by Plaintiff's expert witnesses and largely contradicted by the Purdue employees whose testimony Plaintiff introduced.

189.    In support of its "active collaboration" allegations, Plaintiff first called Dr. Anna Lembke, who testified about a handful of Walgreens and Purdue documents (along with some internal documents from other manufacturers).  The Court addresses only some of the shortcomings of Dr. Lembke's testimony against Walgreens.  First, Dr. Lembke claimed that Walgreens had helped Purdue promote misleading messaging through continuing education courses for Walgreens pharmacists.  ECF 1281, Lembke Decl. at 6, 12.  Dr. Lembke cited a single exhibit that she testified supported her claim: a continuing education course created by Dr. Arthur Lipman, a Professor of Pharmacy at the University of Utah.  *See* **P-27020**.  She claimed that this continuing education course contained two misrepresentations:  (1) that iatrogenic addiction (addiction from the treatment itself) was very rare, and (2) that drug-seeking behavior in patients receiving opioid therapy is not a sign of addiction but rather pseudoaddiction.  Trial Tr. 1075:8–1081:4 (Lembke Testimony).  The problem for Dr. Lembke is that

she acknowledged that each of those alleged misrepresentations was taken nearly verbatim from the FDA-approved label for OxyContin that existed at the time the challenged continuing education course was created. *Id*. at 1076:24–1083:19; **DEF-MDL-13160**; *see also* ECF 1281, Lembke Decl. ¶ 118 (citing no evidence that Walgreens sought out or distributed the Lipman course to its pharmacists after the OxyContin label changed in July 2001). While Dr. Lembke claimed that the label itself was misleading, she conceded that she did not believe that Walgreens knew that any information in the label was incorrect. Trial Tr. at 1079:16–19 (Lembke Testimony). The Court concludes that it is not misleading to educate pharmacists regarding information and data taken directly from a medicine's FDA-approved label.

190. Dr. Lembke next claimed that Walgreens had collaborated with Purdue to "build[] opioid 'Super Stores' to enhance unrestricted flow of opioid pain pills." ECF 1281, Lembke Decl. at 37 (Opinion 6); *see id.* ¶ 114. As evidence, Dr. Lembke relied on two internal Purdue documents, which she claimed under oath were internal *Walgreens* documents, and neither of which she seemed familiar with beyond what could be gleaned from reading them. *See* Trial Tr. 1087:1–1088:7, 1092:11–1094:21 (Lembke Testimony). Dr. Lembke's testimony on these so-called opioid Super Stores was unconvincing because, despite stating in her Declaration that Walgreens "buil[t]" and "create[d]" actual opioid Super Stores, she conceded that she didn't know if Walgreens had ever actually built such a store anywhere in the "entire United States." *Id*. at 1097:2–8.

191. Dr. Lembke also claimed that Walgreens "collaborated" with Purdue in the distribution of "OxyContin savings cards" and "in 2008, Walgreens was the Number One redemption site for such cards in the United States." *See* ECF 1281, Lembke Decl. ¶¶ 126, 128. Her argument that the savings card program was evidence of "collaboration" to market Purdue products was weak at best. As the evidence showed (but Dr. Lembke would not acknowledge), even using her own evidence, Walgreens' pharmacies in San Francisco redeemed fewer than one coupon per year per pharmacy. *See* Trial Tr. 1101:25-1102:11.

192. Dr. Lembke also claimed that Walgreens collaborated with opioid manufacturers through agreements to distribute product updates to its pharmacists containing educational material about certain medications. *See* ECF 1281, Lembke Decl. ¶¶ 132–33. Dr. Lembke did not mention,

however, that Walgreens has entered far more agreements to provide these product updates for non-opioid medications, including those that treat diabetes, high blood pressure, HIV, and dementia. *See* **WAG-MDL-03838**. All of these product updates contain FDA-approved messaging that must be cleared by Walgreens before they are sent to pharmacists, and Walgreens does not work "cooperatively" with manufacturers in developing these messages. *See* ECF 1396-10, Seid Tr. at 67:20–68:6; 70:9–12; ECF 1337-1, Kessler Tr. at 38:14-39:24. The product updates for opioid medications cited by Dr. Lembke contained lengthy warnings about the risks of addiction, overdose, and death. *See* **P-25990**; **P-27341**. That Walgreens provides educational materials to its pharmacists about both opioid and non-opioid medications, including information about product risks, is not surprising and does not demonstrate any improper business relationship between Walgreens and any opioid manufacturer, much less provide support for Plaintiff's claim.

193.    Dr. Lembke's remaining evidence was no more convincing, and the Court concludes that at most the documents that Dr. Lembke relied upon showed a normal business relationship between a pharmaceutical manufacturer and one of its pharmacy customers, whereby the manufacturer sought to ensure that the pharmacy stocked its medicine. Dr. Lembke identified nothing improper or unusual about that relationship. *See id.* at 1093:19–22 ("Q. And it doesn't surprise you, I imagine, that Purdue wanted to ensure that one of the largest chain pharmacies in the country stocked its new medicine; right? A. Yes.").

194.    Plaintiff's reliance on the testimony of Matthew Perri, another of its experts, fares no better. Dr. Perri's testimony was largely consistent with that of Dr. Lembke, and relied on many if not all of the same documents. *See* ECF 1366, Perri Declaration ¶¶ 112–131. His testimony added nothing to Dr. Lembke's on the issue of "collaboration" with pharmaceutical manufacturers, and does not establish any improper "collaboration" between Walgreens and any pharmaceutical manufacturer.

195.    Neither Dr. Lembke nor Dr. Perri attempted to tie any of Walgreens' alleged collaboration with any pharmaceutical manufacturer to any prescriptions written by any prescriber in San Francisco for an illegitimate medical purpose. Nor did Plaintiff's other marketing expert, Professor Jeziorski, attempt to tie any of Walgreens' alleged promotional activities to the conduct of any

prescriber in San Francisco.  These failures further establish that Plaintiff's "collaboration" allegations have no significance to any claim against Walgreens.

196.    Finally, Plaintiff played deposition testimony from two former Purdue executives. The first was Tony Scifo, who was "principally responsible" for Purdue's relationship with Walgreens for the 23 years he was at Purdue.  ECF 1396-7, Scifo Tr. at 8:9–24.  Mr. Scifo testified that, far from collaborative, Walgreens' policies prohibited drug manufacturers from distributing their materials directly to pharmacists, and that Walgreens' policies regarding the ability of sales representatives to contact pharmacies was "very restrictive" compared to other pharmacies in the industry.  *Id.* at 122:6–122:13.  Mr. Scifo said nothing about so-called opioid Super Stores or the continuing education course or any other documents that Dr. Lembke or Dr. Perri testified about.  To the contrary, Mr. Scifo testified that Walgreens never "market[ed] or promote[d] Purdue's opioid products," *id.* at 119:4–6; that Walgreens pharmacists never "allow[ed] [Purdue] to influence their decision about whether to fill a prescription," *id.* at 123:08–19; and that Walgreens never departed from its good faith dispensing policy to accommodate Purdue or any other manufacturer, *id.* at 123:20–124:1, 126:11–17.

197.    The second Purdue executive to testify was Stephen Seid.  Like Mr. Scifo, Mr. Seid was an accounts manager at Purdue who had responsibility for the Walgreens relationship.  ECF 1396-10, Seid Tr. at 13:19-15:19.  Mr. Seid also testified that Walgreens' policies prohibited Purdue representatives from calling directly on Walgreens pharmacists.  *Id.* at 105:19–106:15.  He testified that while Purdue did all it could to promote its products to as many doctors and pharmacists as possible, *id.* at 21:4–12, 21:19–22:2, Walgreens did not work "cooperatively" with Purdue to develop the messaging that Walgreens would send to its pharmacists, *id.* at 70:9–12.  In fact, it was "an issue" for Purdue that Walgreens pharmacists refused to fill prescriptions for Purdue medications.  *Id.* at 102:8–13.  Mr. Seid was not asked about any of the evidence that Dr. Lembke or Dr. Perri relied on.

198.    Nobody from either Purdue or Walgreens testified about any "collaboration" between the companies to "promote" opioids.  It is not surprising or unusual that Purdue would want to market its products to one of the largest national chain pharmacies in the country—that is to be expected.  *See* Trial Tr. at 1093:19–22 (Lembke Testimony).  Plaintiff presented no evidence that any

relationship between the companies could be deemed a "collaboration" to increase the sales of Purdue products at Walgreens.

199.    Dr. Lembke and other witnesses testified that manufacturers like Purdue spread misinformation about the medicines they were manufacturing, including about the addictive nature of opioid medicines.  For example, Dr. Lembke testified, "Beginning in the late 1990s, doctors, *pharmacists*, and patient consumers were subjected to a massive misinformation campaign that downplayed the risks and overstated the benefits of opioids resulting in an opioid oversupply that caused the US opioid epidemic, including in San Francisco."  Trial Tr. at 382:15–19 (Lembke Testimony) (emphasis added).  She stated that pharmacists were a "target" of "this misinformation campaign." *Id.* at 399:1–3.  Dr. Perri also testified that opioid manufacturers targeted pharmacists and pharmacies with their marketing messages.  ECF 1366, Perri Decl. ¶ 16.

200.    Based on the evidence presented, and the lack of evidence from witnesses including Purdue's own executives, the Court concludes that Walgreens did not engage in the marketing of any opioid products, including OxyContin.  If anything, Walgreens pharmacists were a target of opioid marketing, and received the same or similar information that prescribers and patients received, and that Plaintiff alleges was misleading.  There is no reason to think that the effect of that marketing on Walgreens was any different than the effect on doctors and patients.  *See* Trial Tr. at 3856:12–18 (Plaintiff Closing Argument).

### D.    Plaintiff Failed to Establish Causation

201.    The Court further concludes that Plaintiff did not establish that any alleged failure by Walgreens with respect to its distribution or dispensing practices caused any harm to the City and County of San Francisco.

202.    In order to prove its claim, Plaintiff was required to do more than show that Walgreens shipped so-called suspicious orders without conducting sufficient due diligence, or dispensed opioid prescriptions without resolving Mr. Catizone's red flags.  Plaintiff was also required to show that such failures caused injury—that is, that Walgreens dispensed opioid medications not prescribed for a legitimate medical purpose, and that the illicit use of those same opioids was a substantial factor contributing to Plaintiff's harm.

203.    To prove causation, Plaintiff again relies almost entirely on the opinions and testimony of Carmen Catizone, Craig McCann, and Elizabeth Park. But none of these experts purports to identify *a single prescription without a legitimate medical purpose* that Walgreens dispensed in San Francisco. At most, they identify prescriptions they say presented "red flags" that warranted due diligence and documentation. In their trial testimony, each of these experts specifically disavowed opinions that any particular prescriptions were illegitimate, diverted, or caused harm to anyone in San Francisco.

204.    The Court first considers the testimony of Carmen Catizone. On cross-examination, he agreed that "just because a prescription flags under one of [his] 16 red flags, that does not mean it was written for an illegitimate medical purpose." Trial Tr. at 838:23–839:2 (Catizone Testimony). He disavowed "offering any opinions" about what percentage of "flagged" prescriptions "were written for an illegitimate medical purpose," "were diverted," or "contributed to any public nuisance here in San Francisco." *Id.* at 843:13–844:4. Even as to the small number of individual prescriptions from five prescribers who had lost their licenses, which Mr. Catizone reviewed for the first time in his rebuttal report, he affirmatively disclaimed "offering any opinions on those individual prescriptions," *id.* at 824:14–23, agreeing that the prescribers "had patients who had legitimate medical need for pain relief" and that he had "no way of knowing . . . what percent or how many," and testifying that he "can't determine how many [of the dispensed prescriptions] were legitimate" or not, *id.* at 897:6–20. As discussed above, *see* Part II.A.6., the Court cannot infer that Walgreens knowingly filled prescriptions lacking a legitimate medical purpose simply because Walgreens filled prescriptions written by prescribers who later lost their licenses. *See California State Case*, 2021 WL 5227329 at *7–8 ("[E]ven if the Court could reasonably infer that [Defendants' conduct] must have caused *some* medically inappropriate prescriptions to be written, no evidence before the Court enables it to conclude, without rank speculation, whether the number or volume of such medically inappropriate prescriptions contributed to the alleged public nuisance, and if so, to what extent."). Even assuming that every single prescription written by these five prescribers and filled at Walgreens lacked a legitimate medical purpose, which Mr. Catizone testified was not the case, Trial Tr. at 897:6–25, those prescriptions accounted for roughly 0.5 percent of the total opioid prescriptions filled in San Francisco since 2006—a

negligible percentage that would fail to establish Walgreens' conduct was a substantial factor in contributing to the opioid crisis. *See* **P-18323**; ECF 1392, Keller Decl. ¶ 10; *see California State Case*, 2021 WL 5227329 at *8.

205.    The Court finds that Elizabeth Park's testimony fails to fill the gap in Plaintiff's proof of causation. She agreed that she "cannot identify a single prescription that Walgreens filled that was medically unnecessary" and that she has no opinions that "any prescription Walgreens dispensed was illegitimate," that "any prescription Walgreens dispensed was subsequently diverted for an illegal use," that "any specific person became addicted to an opioid dispensed by Walgreens," or that "any specific prescriptions that Walgreens filled contributed to a public nuisance" in San Francisco. Trial Tr. at 1015:12–1016:4 (Park Testimony). In fact, Park admitted that evaluating whether prescriptions dispensed by Walgreens were medically appropriate or "harmful in any way" was "outside the scope of [her] assignment" and that she had "no information as to what happens after a prescription is dispensed." *Id.* at 1015:6–1016:23.

206.    Nor are these gaps in Plaintiff's proof filled by Craig McCann, a self-described "calculator." *Id.* at 1236:14–1237:6. Dr. McCann explained that "[i]t was not part of [his] work to determine whether any prescription [he] flagged was issued for an illegitimate purpose" or was "diverted for some illegal use." *Id.* at 1188:23–1189:4. To the contrary, McCann affirmatively disavowed "any opinion whatsoever that any prescriptions Walgreens dispensed were issued for an illegitimate medical purpose or ultimately diverted for some illegal use." *Id.* at 1189:5–9.

207.    In attempting to establish causation, Plaintiff relies on Mr. Catizone's opinion that "[g]iven the expected danger of diversion, it is reasonable to believe that when so many 'red flag' prescriptions are dispensed without due diligence to clear the suspicions, a substantial number of such prescriptions were likely diverted." Trial Tr. at 3891:15–19 (Plaintiff Closing Argument); ECF 1299, Catizone Decl. ¶ 71. The Court agrees with the MDL Track 2 court, however, that such speculation cannot establish causation. That is particularly the case here, where indisputably reputable doctors on Plaintiff's own witness list wrote large percentages of prescriptions with red flags. *See, e.g.*, ECF 1400, Brunner Decl. at 3–5 (flagging 82% of Dr. Claire Horton's prescriptions filled at Walgreens); *id.* at 5–7 (80% of Dr. Barry Zevin's prescriptions); *id.* 7–9 (69% of Dr. Joseph Pace's prescriptions); **WAG-**

**MDL-03478A** (listing hundreds of additional Plaintiff-affiliated doctors with large percentages of flagged prescriptions); *see also* Ex. C, *City of Huntington v. AmerisourceBergen Drug Corp., et al.*, Case No. 3:17-cv-1362 (S.D.W.V. June 27, 2022), Dkt. 1529 at 22 ("It is speculative to say that just because orders that were flagged or that should have been flagged (even a large amount) were shipped without due diligence, there was any diversion at all caused by the lack of flagging or lack of due diligence.") (emphasis in original).  The same goes for Catizone's opinion that prescriptions with multiple unresolved "red flags" are "more likely" to be diverted.  *See, e.g.*, ECF 1299, Catizone Decl. ¶ 22.  The Court finds that opinion to be equally speculative as Plaintiff's doctors similarly wrote large percentages of prescriptions with multiple "red flags."  *See, e.g.*, ECF 1400, Brunner Decl. at 5 (56% of Dr. Claire Horton's prescriptions filled at Walgreens had multiple red flags); *id.* at 7 (48% of Dr. Barry Zevin's prescriptions); *id.* 9 (35% of Dr. Joseph Pace's prescriptions); **WAG-MDL-03478A** (showing that for 45 City-affiliated prescribers who filled over 1,000 prescriptions at Walgreens, the average percentage of prescriptions flagged for each doctor was 65 percent and the average percentage of prescriptions flagged by two or more flags for each of those doctors was 33 percent).  There is no evidence that any such prescription was not medically appropriate, lacked a legitimate medical purpose, was diverted, or caused harm to anyone in San Francisco.  Indeed, Catizone repeatedly testified that he "can't say," "[did not] know," and had "no way to answer" whether a prescription was "more likely to be diverted because the pharmacist didn't document resolution of the red flag."  Trial Tr. at 851:17-852:2 (Catizone Testimony).  Nor is there any way of telling what percentage of prescriptions that presented multiple "red flags" reflected adequate due diligence.  Dr. Park did not conduct that analysis.

208.    Even if Plaintiff could show that a single opioid pill that Walgreens either distributed or dispensed went to fill a prescription that lacked a legitimate medical purpose and was subsequently diverted, Plaintiff would further need to show that such diversion caused injury to the City and County of San Francisco.  While the Court acknowledges that all drug diversion is criminal activity and that all reasonable steps should be taken to stop it, it does not follow that every diverted medication results in injury to San Francisco.  Just as many people become addicted to opioid pain medicines, so too do many people try illicit drugs only once or a handful of times and elect to discontinue such use.  Such limited use would not constitute "injury" and certainly not the type of "injury" Plaintiff seeks to abate

here.  A large portion of prescription opioids are dispensed by pharmacies and healthcare facilities other than Walgreens.  *See* ECF 1328, McCann Decl. at 4 (Plaintiff's data expert Dr. McCann concluding that more than 40% of opioid dosage units in San Francisco are dispensed by non-Walgreens pharmacies when considering only retail and chain pharmacies); ECF 1400, Brunner Decl. at 35 (73% of opioid MMEs overall in San Francisco are dispensed by non-Walgreens entities); Brunner Demo-1 at 16 (same); **WAG-MDL-03564** (same); *see also* ECF 1386, Keyes Decl. ¶¶ 83, 87 (citing Lipari RN, Hughes A. How people obtain the prescription pain relievers they misuse. CBHSQ Rep. Published online 2017) (stating that the majority of prescription opioid pills that are ultimately misused are obtained from friends and family through "medicine cabinet diversion," not from a pharmacy); *id.* ¶ 84 ("[A] majority of opioid pills prescribed to patients go unused, ranging from approximately 55% to close to 90%.").  Plaintiff did not present evidence about a single patient who had overdosed on or become addicted to an opioid medication that was dispensed from a Walgreens pharmacy, let alone pursuant to a prescription that lacked a legitimate medical purpose.  Much less did Plaintiff connect any overdose, addiction, or misuse to harm alleged by Plaintiff—in the form of increased costs in need of abatement— as opposed to harm to individual people who are not before the Court.

209.    There is "no evidence" from which the Court could determine, "without rank speculation," the "existence or volume of medically inappropriate" or diverted opioid prescriptions resulting from Walgreens' dispensing conduct.  *See California State Case*, 2021 WL 5227329 at *7–8; Ex. A, *WV Track 2 Trial Decision* at 161 ("[T]he distribution of medicine to support the legitimate medical needs of patients as determined by doctors exercising their medical judgment in good faith cannot be deemed an unreasonable interference with a right common to the general public."); *id.* at 171 ("The lack of evidence of pharmacy-level diversion on the part of defendants' pharmacy customers is fatal to plaintiffs' claims.").

210.    Thus, Plaintiff has failed to carry its burden to prove that Walgreens caused an unreasonable interference with a public right under California law.

**WALGREENS' PROPOSED CONCLUSIONS OF LAW**

I.    **EVIDENTIARY RULINGS**

211.    To begin, the Court excludes the following evidence and does not consider it in making its conclusions of law.  First, the Court excludes Mr. Catizone's opinion that "[g]iven the expected danger of diversion, it is reasonable to believe that when so many 'red flag' prescriptions are dispensed without due diligence to clear the suspicions, a substantial number of such prescriptions were likely diverted" as well as his opinion that Walgreens pharmacists filling prescriptions for doctors who later lost their license "provide[s] strong evidence that Walgreens" conduct "likely resulted in significant diversion."  ECF 1299, Catizone Decl. ¶¶ 71, 86; *see* ECF 1024-9, Walgreens' Motion to Exclude Catizone's Opinions and Testimony at 3–8.  These opinions are mere *ipse dixit*.  Mr. Catizone conceded that "just because a prescription flags under one of [his] 16 red flags, that does not mean that it was written for an illegitimate medical purpose," Trial Tr. at 838:23–839:2, and he acknowledged that he was not offering any opinions on what percentage of flagged prescriptions were diverted or contributed to any opioid crisis in San Francisco, *id.* at 843:22–844:4.  Mr. Catizone does not cite to any authorities or studies demonstrating that these opinions are based on a reliable methodology.  As Judge Faber concluded in excluding the causation opinions of the Track 2 plaintiffs' distribution expert, James Rafalski, "[i]t is speculative to say that just because orders that were flagged or that should have been flagged (even a large amount) were shipped without due diligence, there was any diversion at all <u>caused by the lack of flagging or lack of due diligence</u>."  Ex. C, *City of Huntington v. AmerisourceBergen Drug Corp., et al.*, Case No. 3:17-cv-1362 (S.D.W.V. June 27, 2022), Dkt. 1529 at 22 (emphasis in original).

212.    Second, the Court excludes Dr. Park's opinion that 95 percent of Walgreens prescriptions, out of a sample of approximately 2,300, lacked adequate documentation of due diligence. Dr. Park did not identify any of the prescriptions that led to her conclusion, and her failure to do so prevented Walgreens from testing her opinions.  Trial Tr. at 1005:10–1007:16 (Park Testimony); *see* ECF 1317-3, Walgreens' Objections to Dr. Park's Declaration at 1–2; *supra* ¶ 118.  Because Dr. Park did not disclose these bases for her analysis, the Court disregards her opinions and determines that no conclusions about the prescriptions Walgreens dispensed can be drawn based on them.  *See* ECF 1276 at 3 (excluding Dr. Keyes' improper rebuttal opinion because "[d]efendants [could ]not fairly respond").

213. Third, the Court excludes Plaintiff's evidence of Walgreens' conduct in Florida because that evidence is irrelevant here. The Court agrees with the reasoning of Judge Faber, who concluded in Track 2, "[t]o the extent plaintiffs attempt to rely on a showing of diversion . . . outside the City of Huntington or Cabell County, such reliance fails as a matter of law" because "[p]laintiffs presented no persuasive evidence establishing a 'nexus' between th[e] out-of-jurisdiction [conduct] and any diversion or harm occurring in the City of Huntington or Cabell County." *See* Ex. A, *WV Track 2 Trial Decision* at 171 n.8, 93 n.4. The same is true here. Plaintiff has not sought to connect any of Walgreens' activity in Florida to diversion or harm in San Francisco. Plaintiff's data expert Craig McCann testified he performed no such analysis and therefore made no such connections. Trial Tr. at 1188:14–22 (McCann Testimony). DEA evaluated Walgreens' Woodland, California distribution center separately from its Jupiter, Florida distribution center, and reached very different conclusions. *See supra* ¶¶ 169–70, 175, 185.

214. Finally, the Court excludes the hearsay testimony of several Walgreens pharmacists who testified on Plaintiff's behalf regarding out of court statements such as expert reports, newspaper articles, legal complaints and settlement agreements, and statements purportedly made by unidentified Walgreens employees. *See* ECF 1326 at 1–5 (motion to strike testimony of Rebecca Gayle regarding an expert report, another employee's complaint, and newspaper articles); ECF 1333 at 2 (motion to strike testimony of Jeremy Gerspacher regarding a newspaper article); ECF 1301-2 at 2–4 (objections to Victor Lo's declaration testimony regarding purported statements made by unidentified Walgreens' employees); ECF 1362-5 at 22–25, 27, 30–32, 36–39, 42–44, 50–52, 63–65 (objections to Golnaz Kamali's testimony regarding allegations in her legal complaint against Walgreens, her settlement agreement and amount, and statements purportedly made by unidentified Walgreens employees); ECF 1363-2 at 22, 101 (objections to Robert Yagar's testimony regarding purported statements of unidentified Walgreens employees).

## II.    THE PEOPLE FAILED TO PROVE THEIR PUBLIC NUISANCE CLAIM

215. There can be no doubt that the City and County of San Francisco is suffering from a public health crisis stemming from unlawful substance use and abuse, largely involving heroin and illicit fentanyl. Walgreens itself does not dispute there is an opioid crisis. What Walgreens does dispute

is whether the People have proven that the opioid crisis constitutes an actionable public nuisance for which Walgreens is legally liable. The Court is keenly aware of the toll the opioid crisis has had on this community. Its conclusions herein do not ignore or minimize that reality but rather apply the law solely to the Defendant present during this trial. From the beginning of this case, the questions have always been: who is responsible and for what? Many entities were sued in this litigation, but only a few proceeded to trial following settlements and bankruptcies of the other defendants already severed, dismissed, or stayed. Only Walgreens now remains as an active defendant. Absent from this trial are the drug cartels that funneled heroin and illicit fentanyl into San Francisco and the individuals who sold their own prescription pills on the streets or stole them out of a family member's medicine cabinets. The question in this case is thus whether the specific suspicious order monitoring systems and dispensing procedures implemented by Walgreens are sufficient to support a finding of legal liability for a public nuisance cause of action under California law. For the reasons set forth below, the Court concludes the People have failed to prove their public nuisance claim against Walgreens.

216. California Civil Code § 3479 defines a nuisance as "[a]nything which is injurious to health … or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." A public nuisance is "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." Cal. Civ. Code § 3480; *see also People ex rel. Gallo v. Acuna*, 14 Cal. 4th 1090, 1138 (1997).

217. "A public nuisance cause of action is established by proof that a defendant knowingly created or assisted in the creation of a substantial and unreasonable interference with a public right." *People v. ConAgra Grocery Prod. Co.*, 17 Cal. App. 5th 51, 79 (2017); *see also Citizens for Odor Nuisance Abatement v. City of San Diego*, 8 Cal. App. 5th 350, 358 (2017) (public nuisances are "offenses against, or interferences with, the exercise of *rights common to the public*, such as public health, safety, peace, comfort, or convenience") (quotations omitted).

218. The sole remedy in a representative public nuisance action brought under California Code of Civil Procedure § 731 is abatement in the form of an injunction against the offending conduct or hazardous condition that exposes the public to *future* harms. *See, e.g., San Diego Unified*

*Port Dist. v. Monsanto Co.*, No. 15CV578-WQH-JLB, 2018 WL 4185428, at *4 (S.D. Cal. Aug. 30, 2018). The People may not recover damages or remediation costs for past or extant harms purportedly caused by past conduct or conditions; the limited purpose of abatement is to eliminate prospective harm by suspending ongoing injurious conduct or removing a presently hazardous condition. *See* Cal. Civ. Proc. Code § 731.

219. To establish an actionable public nuisance, the People must thus identify discrete conduct or a discrete condition capable of being abated that is likely to cause prospective harm to the public. *See, e.g.*, Cal. Civ. Proc. Code § 731; *Cty. of San Luis Obispo v. Abalone All.*, 178 Cal. App. 3d 848, 860 (1986). "Civil Code sections 3479, 3480 and 3482, and applicable case law, further require that Plaintiffs prove (1) that one or more of the Defendants'"—i.e., Walgreens'—"alleged contribution to the interference was 'unreasonable' in that the social utility of the conduct constituting the interference is outweighed by the gravity of the harm inflicted, and (2) that the contribution of that Defendant was more than 'negligible or theoretical.'" *California State Case*, 2021 WL 5227329, at *4 (citing *ConAgra*, 17 Cal. App. 5th at 79, 101-02, 111-12)).

220. Even if the People were to prove each of the aforementioned elements of an actionable public nuisance, that would not be the end of the analysis. To support a finding of liability as to Walgreens, the People must also show that Walgreens *knowingly* created or assisted in the creation of the public nuisance. *ConAgra*, 17 Cal. App. 5th at 79.

221. The People have not done so, and therefore have failed to establish liability.

A. **The People Failed to Establish the Existence of any Ongoing Hazardous Conduct or Condition in the Jurisdiction**

222. The "sole purpose" of an equitable abatement remedy "is to eliminate the hazard that is causing prospective harm to the plaintiff." *Id.* at 132. Every California public nuisance decision in which abatement has been ordered has involved either: (1) well-defined conduct, such as emitting noxious odors or participating in gang activity, *see, e.g.*, *People ex rel. Gallo*, 14 Cal. 4th at 1120; *People v. Foerst*, 10 Cal. App. 2d 274, 275 (1935); or (2) a well-defined hazardous condition, such as polluted water, a noisy factory, or lead paint in residential homes, *see, e.g.*, *ConAgra*, 17 Cal. App. 5th at

115; *Cty. of Santa Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292, 309–10 (2006) ("*Santa Clara I*"); *Markey v. Danville Warehouse & Lumber, Inc.*, 119 Cal. App. 2d 1, 5 (1953).

223.     Accordingly, a public nuisance must be ongoing conduct or an ongoing condition that is a "present danger to the public." *Knapp v. City of Newport Beach*, 186 Cal. App. 2d 669, 681 (1960); *see, e.g., Pallco Enters., Inc. v. Beam*, 132 Cal. App. 4th 1482, 1499 (2005) (Where Defendant had erected and illuminated billboard displays, there was no ongoing public nuisance to abate because, "at the time of trial, the displays were no longer illuminated and were otherwise in compliance with the Act.  At that point, any nuisance that existed was eliminated."); A court cannot abate "prior accrued harm[s]." *ConAgra*, 17 Cal. App. 5th at 132-33; *see also* Ex. A, *WV Track 2 Trial Decision* at 181 ("Damages, unlike abatement, are directed at compensating a plaintiff for 'the cost[s] of eliminating the nuisance effects.'") (quoting Dobbs, I LAW OF REMEDIES § 5.7(3)).

224.     As a threshold matter, the People's experts concede that the supply of prescription opioids in San Francisco has decreased dramatically over the last decade.  The People presented no competent evidence that would allow the Court to determine—without gross speculation—how much of the current *prescription* opioid supply in San Francisco is medically inappropriate, as opposed to appropriately treating the legitimate medical needs of patients.  To the contrary, as the Court has already found, the evidence supports the conclusion that an overwhelming majority of prescribers in San Francisco, as in the nation as a whole, write opioid prescriptions only for legitimate medical purposes. The People thus failed to establish that the current supply of prescription opioid medications in San Francisco is an ongoing hazardous condition threatening prospective harm.

225.     It bears emphasis that the People have explicitly disavowed the theory that Walgreens' *conduct* is the public nuisance—instead defining the nuisance as the "opioid epidemic" itself.  *See, e.g.*, ECF 128, FAC ¶ 223 ("The public nuisance—i.e., the opioid epidemic—created, perpetuated, and maintained by Defendants . . ."); *id.* ¶ 17 ("Defendants' conduct has created a public nuisance."); ECF 208, People's Opp. to Defs.' MTD at 11 ("[T]he nuisance is a consequence of Defendants' conduct . . . .").  Among other things, this means the Court cannot "abate" the public nuisance alleged by the People by enjoining Walgreens' conduct as a dispenser of controlled substances.

WALGREENS CO.'S FINAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (No. 3:18-CV-07591-CRB)

Nor could it enjoin Walgreens' conduct as a distributor in any event, as Walgreens stopped distributing controlled substances in 2014.

226. The Court cannot properly abate the "opioid epidemic" either. By referring to the alleged nuisance as the "opioid epidemic," the People point to a wide range of disparate alleged *harms* purportedly stemming from the misuse of opioids, ranging from heroin needles clogging the toilets at the public library to increased 911 calls to address opioid overdoses. These are real and serious societal concerns, but they are not the type of well-defined condition that California nuisance law recognizes. Moreover, they are existing injuries, not hazardous conditions threatening prospective harm. Under California law, a nuisance is the *source* of an injury, not the injury itself. That is because the "sole purpose" of abatement "is to eliminate the hazard that is causing *prospective* harm." *Con Agra*, 17 Cal. App. 5th at 132 (emphasis added). Abatement is designed, not as a remedy for existing harms, but to prevent "future harm," by enjoining a condition "*before* the hazard causes any physical injury or physical damage to property." *Santa Clara I*, 137 Cal. App. 4th at 309-10. Even if California law were otherwise, it is not at all clear that these injuries are ones for which Walgreens could be held liable, as the evidence at trial overwhelmingly showed that these harms stem from the use of illicit drugs that Walgreens has never distributed, or dispensed. *See* Ex. A, *WV Track 2 Trial Decision* at 181 ("Plaintiffs, however, are not seeking to 'abate' (enjoin or stop) the nuisance. Instead, plaintiffs are seeking renumeration for the costs of treating the horrendous downstream harms of opioid use and abuse. Those costs have no direct relation to any of defendants' alleged misconduct.").

227. The People also point to evidence of existing diseases in San Francisco, such as OUD and addiction, claiming that they are the consequence of a previous oversupply of prescription opioid medications. Public nuisance law is clear that these diseases, while also real and serious, fail to qualify as a nuisance. Put simply, the law recognizes diseases as injuries, not "hazardous conditions" that can be abated. Courts may, of course, abate acts or conditions that threaten to *cause* or *transmit* a disease. For example, nuisances have been found to exist in the form of a smallpox-ridden apartment building, *Sings v. City of Joliet*, 237 Ill. 300, 301 (1908); a typhus-infested hog farm, *Seigle v. Bromley*, 22 Colo. App. 189, 194 (1912); a tuberculosis-infected cow, *Patrick v. Riley*, 209 Cal. 350, 354-55 (1930); or lead paint in residential housing, *ConAgra*, 17 Cal. App. 5th at 115. The diseases themselves,

by contrast—smallpox, typhus, tuberculosis, lead poisoning—are not abatable hazardous conditions. The same is true of OUD and addiction. *Cf.* Ex. A, *WV Track 2 Trial Decision* at 183 (observing that West Virginia cases permitting abatement "did not hold that the plaintiff could recover, as abatement, for downstream harms to the community resulting from [environmental] contamination. . . , such as treatment for injuries for those who consumed or otherwise came in contact with contaminated water.").

**B.    The People Failed to Establish an "Unreasonable Interference" With a Public Right**

228.    A public nuisance requires an interference with a public right that is both substantial in quantity and unreasonable in quality. *Santa Clara I*, 137 Cal. App. 4th at 305. No one disputes that the opioid crisis in San Francisco is substantial. But that is not sufficient for public nuisance liability. The People failed to prove the element of "unreasonable" interference as defined in *ConAgra* and other cases. *Accord California State Case*, 2021 WL 5227329 at *4.

229.    To determine whether a defendant's conduct was unreasonable, the Court looks to whether "its social utility is outweighed by the gravity of the harm inflicted." *ConAgra*, 17 Cal. App. 5th at 112. This analysis incorporates a number of relevant factors. "[T]he standard is objective: the question is not whether the particular plaintiff found the invasion unreasonable, but 'whether reasonable persons generally, looking at the whole situation impartially and objectively, would consider it unreasonable.'" *San Diego Gas & Elec. Co. v. Superior Ct.*, 13 Cal. 4th 893, 938 (1996) (quoting RESTATEMENT (SECOND) OF TORTS § 826 (1979)).

230.    As to the utility of the conduct, this factor focuses on "the social value that the law attaches to the primary purpose of the conduct." *Wilson v. S. California Edison Co.*, 234 Cal. App. 4th 123, 162 (2015) (quoting RESTATEMENT (SECOND) OF TORTS § 828 (1979)). Contrary to the People's assertions, the balancing goes beyond the alleged wrongful conduct at issue to encompass "the social utility of defendants' product." *Cty. Of Santa Clara v. Superior Ct.*, 50 Cal. 4th 35, 55 (2010); *see also California State Case*, 2021 WL 5227329, at *4-8 (finding plaintiffs failed to prove "unreasonableness" under California law even if defendants had engaged in false or misleading conduct).

231.    The evidence showed that Schedule II opioid medications have always been and continue to be approved to treat cancer pain, end-of-life pain, acute pain, and chronic non-cancer pain,

despite a known risk of diversion, abuse, and addiction.  Neither party disputes that even medically appropriate opioid prescriptions can result in these negative downstream consequences.  The medical community has always known of their risks, which Congress codified through the Controlled Substances Act in 1970.  There are patients for whom prescription opioids are not just medically appropriate but medically necessary, where the benefits outweigh the very real and known risks.   The Federal government, through the FDA and DEA, approved (and continues to approve) the opioid medications at issue here for the treatment of pain, cognizant of the risks but having made the determination (as entrusted to them by Congress) that the "social utility" of appropriately prescribed opioids outweighs the "gravity of the harm inflicted" by them.  *ConAgra* 17 Cal. App. 5th at 79, 111–12.  Furthermore, these medications only reach patients lawfully if prescribed by someone licensed by the State of California, creating another intervening endorsement that the "social utility" of appropriately prescribed opioids outweighs the "gravity of the harm inflicted" by them.  *Id.*; *see also* Ex. A, *WV Track 2 Trial Decision* at 162 ("Doctors, 99% of whom were acting in good faith, determined the total volume of prescription opioids that pharmacies ordered from defendants and dispensed pursuant to those prescriptions.").

232.    California adopted a "two-pronged approach" to "ensure that opioid medications were available to patients who needed them." *California State Case*, 2021 WL 5227329 at *5; *see also* Cal. Bus. & Prof. Code § 2241.5 (1990) and Cal. Health & Safety Code §§ 124960-61 (1997).  There is no question that the Federal and state governments—including the California legislature, Board of Pharmacy, Board of Medicine, and other regulators—have determined that the prescribing and dispensing of medically appropriate opioid prescriptions outweighs the attendant risks of those medications.

233.    For these very reasons, the court in the *California State Case* found that "even if any of the marketing which caused an increase in the number, dose or duration of opioid prescriptions *did* include false or misleading marketing, any adverse downstream consequences flowing from *medically appropriate* prescriptions cannot constitute an actionable public nuisance.  This is so because, as the Federal government and the California Legislature have already determined … the social utility of medically appropriate prescriptions outweighs the gravity of the harm inflicted by them and so is not 'unreasonable,' or, therefore, enjoinable." *Id.* at *7 (citing *Conagra*, 17 Cal. App. 5th at 79, 111-12)

(emphases in original).  Put differently, even allegedly unlawful conduct—like false or misleading marketing—cannot amount to an "unreasonable" interference to the extent it resulted in the dispensing of medically appropriate prescriptions, which are reasonable as a matter of law.

234.    The balance of social utility is no different in the present case.  While the *California State Case* involved marketing claims and this one involves distribution and dispensing claims, the same reasoning applies—and has been applied by courts considering other non-marketing claims.  *See, e.g.*, Ex. A, *WV Track 2 Trial Decision* at 95 ("[T]here is nothing unreasonable about distributing controlled substances to fulfill legally written prescriptions."); *id.* at 161 ("Under the Restatement's formulation of a public nuisance, the distribution of medicine to support the legitimate medical needs of patients as determined by doctors exercising their medical judgment in good faith cannot be deemed an unreasonable interference with a right common to the general public.").  One difference, the parties agree, is that the ultimate question is not merely whether prescriptions were "medically appropriate," an objective inquiry that relates to the proper standard of care, but instead whether prescriptions were written for a "legitimate medical purpose," an inquiry that relates to the prescriber's subjective intent.  As the People describe it, a prescription lacks a legitimate medical purpose when a prescriber writes (or a patient fills) a prescription without any medical purpose at all— i.e., with an intent to divert.  *See* ECF 1523 at 6.  Importantly, the parties agree that a prescription can be medically *in*appropriate, perhaps because the prescriber was mistaken or misled about the benefits and risks of opioids, and still be written for a legitimate medical purpose, because the prescriber wrote it in good faith as a medical professional.

235.    The "legitimate medical purpose" requirement derives from both federal and state law.  To be "authorized" under the CSA, a prescription must be written for a "legitimate medical purpose" by a prescriber acting in the "usual course of his professional practice."  21 C.F.R. § 1306.04 (a); *Ruan v. United States*, 2022 WL 2295024, Slip Op. at 1, Case No. 20-1410 (June 27, 2022).  The responsibility for "proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."  21 C.F.R. § 1306.04(a).  The regulation makes clear that, "the person knowingly filling . . . a [] prescription" that is not written for a legitimate medical purpose, "as well as the person issuing it, shall

be subject to the penalties" under the CSA. *Id.*; Ex. B, MDL Track 3 Trial Tr. at 7076:2–6; MDL Dkt. 4146-3 at 307 of 365 (adopting 1306.04(a)'s knowledge requirement for violations of the corresponding responsibility regulation in a trial against pharmacies). A key corollary to the CSA's prohibition against knowingly writing or dispensing prescriptions *without a legitimate medical purpose* is its authorization of prescriptions *with a legitimate medical purpose*. As the Supreme Court explains, "authorization" under Section 1306.04(a) plays a "crucial role . . . in distinguishing morally blameworthy conduct from *socially necessary conduct*." *Ruan*, 2022 WL 2295024 at *2, Slip Op. at 12 (emphasis added). And, of course, "socially necessary conduct" cannot be "unreasonable" for purposes of public nuisance liability.

236. In fact, under California law, filling legitimate prescriptions is not only reasonable, it is also mandatory. Failing to fill valid prescriptions constitutes unprofessional conduct that can subject the pharmacist to disciplinary action. *See* Cal. Bus. & Prof. Code § 733 (a) ("A licentiate shall not obstruct a patient in obtaining a prescription drug or device that has been legally prescribed or ordered for that patient."). The only relevant exception to this requirement is where the pharmacist determines in her "professional training and judgment" that "dispensing pursuant to the order or prescription is contrary to law, or . . . would cause a harmful drug interaction or would otherwise adversely affect the patient's medical condition." *Id.* § 733(b)(1).

237. Like the court in the *California State Case* and the MDL Track 2 court in West Virginia, this Court declines to second-guess the determinations made by Federal and state legislative and regulatory bodies that the distributing and dispensing of prescriptions written for a legitimate medical purpose is reasonable. The simple fact is that opioid prescriptions authorized by the California Legislature and the Federal government—despite the significant known risks of diversion, addiction, and physical dependence present in all Schedule II controlled substances—cannot be "unreasonable" for the purposes of public nuisance liability, even if foreseeable harms may occur. To support a finding of unreasonableness under California law, the People must show that Walgreens' conduct involved knowingly dispensing opioid prescriptions that were *not* written with a legitimate medical purpose. 21 C.F.R. § 1306.04(a)

238. The People have failed to provide any basis from which the Court can determine the volume of prescriptions without a legitimate medical purpose in San Francisco, much less to connect

such prescriptions to Walgreens or to show that Walgreens or its pharmacists acted "knowingly" in dispensing such prescriptions. The People rely on rising levels of opioid prescriptions circulating in the community in the first decade of this century, and the correlation between those rising levels and rising numbers of overdoses and deaths. But without evidence that distinguishes between prescriptions written with and without a legitimate medical purpose, the Court cannot conclude that there was an "unreasonable" interference. *Conagra*, 17 Cal. App. 5th at 79, 111-12; *see also California State Case*, 2021 WL 5227329 at *7 ("[M]ere proof of a rise in opioid prescriptions does not, without more, prove there was also a rise in medically *inappropriate* opioid prescriptions."). There is simply no evidence from which the Court can conclude that the rise in prescriptions was not the result of the medical community's legitimate desire to provide increased pain relief to patients in need, a need that Cal. Bus. & Prof. Code §§ 733 and 2241.5 are specifically designed to meet. Walgreens cannot be held liable for the downstream consequences of filling legitimate prescriptions.

239. Even if the Court were to merely assume that the rise in prescriptions generally must have included *some* quantity of prescriptions without a legitimate medical purpose, the lack of evidence renders it impossible to attribute that unknown volume to specific harms that can be meaningfully segregated from the accepted risks and foreseeable harms of prescription opioids dispensed for a legitimate medical purpose. The Court cannot assess liability to a real Defendant with theoretical assumptions. *See California State Case*, 2021 WL 5227329 at *7 ("[E]ven if the Court could reasonably infer that [Defendants' conduct] must have caused *some* medically inappropriate prescriptions to be written, no evidence before the Court enables it to conclude, without rank speculation, whether the number or volume of such medically inappropriate prescriptions contributed to the alleged public nuisance, and if so, to what extent.").

C.    The People Failed to Prove Causation

240. In addition to proving the existence of a public nuisance and wrongful conduct, the People were also required to establish that Walgreens' allegedly wrongful conduct—i.e., knowingly filling prescriptions that lacked a legitimate medical purpose—factually and proximately caused the nuisance. *See Melton v. Boustred*, 183 Cal. App. 4th 521, 542 (2010) (quoting *In re Firearm Cases*, 126

Cal. App. 4th 959, 988 (2005) ("[A] cause of action for public nuisance include[s]" the element of "causation.").

241.    Public nuisance's causation element is two-pronged: causation-in-fact and proximate causation. *ConAgra,* 17 Cal. App. 5th at 101-03.

242.    To satisfy the requirement of factual causation, the People were required to show evidence demonstrating that Walgreens' conduct was a "substantial factor in bringing about the result." *City & Cty. Of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 676-77 (N.D. Cal. 2020) (citations omitted).  While a "minor force" may be a substantial factor so long as it "does cause harm," such contribution must be "more than negligible or theoretical." *ConAgra*, 17 Cal. App. 5th at 102.

243.    To satisfy the requirement of proximate causation, the People needed to establish that Walgreens' allegedly wrongful conduct was not "too remote from the current hazard to be its 'legal cause.'"  *City & Cty. Of San Francisco,* 491 F. Supp. 3d at 676.  Proximate cause "is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct." *ConAgra*, 17 Cal. App. 5th 51, 104 (quoting *Ferguson v. Lieff, Cabraser, Heimann & Bernstein*, 30 Cal. 4th 1037, 1045 (2003)).  Thus, proximate causation is lacking when a substantial factor is nevertheless "too remote" or "attenuated" from the hazard.  *ConAgra*, 17 Cal. App. 5th at 103-04.

244.    The People cannot satisfy their burden of proving causation by merely establishing that it was possible that Walgreens' conduct caused the nuisance.  *Lassalle v. McNeilus Truck & Mfg. Inc.*, No. 16-CV-00766-WHO, 2017 WL 3115141, at *6 (N.D. Cal. July 21, 2017) (citing *Saelzler v. Advanced Grp.* 400, 25 Cal. 4th 763, 775-76 (2001)).

### 1.    The People Failed to Prove Factual Causation

245.    The factual causation element of a public nuisance cause of action is satisfied if the conduct of a defendant is a "substantial factor" in bringing about the nuisance.  *ConAgra*, 17 Cal. App. 5th at 101.  "A connecting element to the prohibited harm must be shown." *In re Firearm Cases*, 126 Cal. App. 4th at 988.

246.    Although "[t]he substantial factor standard is a relatively broad one," and a "very minor force" can be a substantial factor if it "does cause harm," the People still must prove that

Walgreens' contribution to the alleged injury—here, the "opioid epidemic" in San Francisco—is "more than negligible or theoretical." *ConAgra*, 17 Cal. App. 5th at 101-102 (quoting *Bockrath v. Aldrich Chem Co.,* 21 Cal. 4th 71, 79, 86 (1999)) (internal citations omitted). "Thus, a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about an injury, damage, or loss is not a substantial factor." *Id.*

247.    Whether conduct is a "substantial factor" turns on several considerations. Most important, "[a] defendant's conduct is not a substantial factor in bringing about harm if the harm would have resulted even if the defendant had not acted, unless the defendant is a concurrent independent cause." *San Diego Gas & Elec. Co. v. San Diego Reg'l Water Quality Control Bd.,* 36 Cal. App. 5th 427, 436 (2019). "[I]f [an] actor's wrongful conduct operated concurrently with other contemporaneous forces to produce the harm," it is a substantial factor only "if the injury, or its full extent, would not have occurred but for that conduct." *In re Ethan C.*, 54 Cal. 4th 610, 640 (2012) (emphasis added); *see also* RESTATEMENT (SECOND) OF TORTS § 432 (conduct cannot be a "substantial factor" in causing a harm "if the harm would have been sustained even [without the conduct]," unless the conduct was itself "sufficient to bring about [the] harm"). As this Court held at the outset of this case, to prove causation, the People "must demonstrate that [Walgreens'] conduct was necessary in bringing about the full extent of [the People's] injuries." *City & Cty. Of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 677 (N.D. Cal. 2020).

248.    Evidence of "a temporal sequence" between Walgreens' conduct and any alleged harms is insufficient to satisfy the People's burden of proving factual causation. *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 393-94 (2004). "[C]orrelation is not causation," either "for purposes of science" or for purposes of "the law." *Becerra v. Dr. Pepper/Seven Up, Inc.*, No. 17-CV-05921-WHO, 2018 WL 3995832, at *8 (N.D. Cal. Aug. 21, 2018), *aff'd,* 945 F.3d 1225 (9th Cir. 2019).

249.    Nor can factual causation be established through speculation. *See California State Case*, 2021 WL 5227329, at *7 (plaintiff must adduce "*evidence*"—not "rank speculation"—that the alleged wrongful conduct actually "caused the writing of medically inappropriate prescriptions" and that "the number or volume of such medically inappropriate prescriptions contributed to the alleged public nuisance" in more than a "negligible or theoretical" manner) (emphasis added).

250.    The People's causation theory against Walgreens fails, because the People have failed to identify—much less quantify in a non-speculative way—any "suspicious orders" or dispensing decisions that (1) resulted in the dispensing of prescriptions that lacked a legitimate medical purpose, which (2) were actually diverted and (3) caused harm to anyone in San Francisco, and to the People in particular.  The People rely on the opinions of Dr. McCann, Mr. Catizone, and Dr. Park.  But each of those experts affirmatively disavowed any opinion that any shipments or prescriptions were not written for a legitimate medical purpose.  Just as the court in the *California State Case* held, "with no evidence to identify the existence or volume of medically inappropriate opioid prescriptions caused by Defendants' allegedly improper [conduct], determining whether such cause was 'negligible or theoretical' (insufficient to establish causation), or minor (sufficient to establish causation) in relation to the overall opioid crisis, would require wholly unsupported speculation." *California State Case*, 2021 WL 5227329 at *8.  And none of the People's experts even purports to link any "suspicious" order or illegitimate prescription to instances of actual diversion; misuse, abuse, or harm to an individual in San Francisco; or any of the harms on which the People base their claims.  This failure is fatal to the People's claim.  *See* Ex. A, *WV Track 2 Trial Decision* at 171 ("The lack of evidence of pharmacy-level diversion on the part of defendants' pharmacy customers is fatal to plaintiffs' claims.").

251.    In the MDL Track 2 litigation in West Virginia, the district court held that "[i]t is speculative to say that just because orders that were flagged or that should have been flagged (even a large amount) were shipped without due diligence, there was any diversion at all caused by the lack of flagging or lack of due diligence" and that "[t]he reality is that establishing a causal link between purported deficiencies in controlling against diversion and actual diversion requires expert analysis not employed here."  Ex. C, *City of Huntington v. AmerisourceBergen Drug Corp., et al.*, Case No. 3:17-cv-1362 (S.D.W.V. June 27, 2022), Dkt. 1529 at 22.  The same is true in this case, where the People made no effort to conduct the kind of expert analysis necessary to complete the causal chain.

252.    The People's failures of proof are especially acute in light of the "but for" standard applicable when determining whether a concurrent, contributing cause constitutes a "substantial factor" of the alleged injury.  *Viner v. Sweet*, 30 Cal. 4th 1232, 1240 (2003).  To carry their burden to prove that Walgreens was a "substantial factor," the People were required to demonstrate that

Walgreens' alleged misconduct was necessary to bring about the opioid crisis that exists in San Francisco today. *See* RESTATEMENT (SECOND) OF TORTS § 432(2); *In re Ethan C.*, 54 Cal. 4th at 640) ("[I]f the injury would have occurred even if the actor had not acted wrongfully, his or her conduct generally cannot be deemed a substantial factor in the harm."). But the People did not attempt to show—and no evidence at trial could support a finding—that the opioid crisis in San Francisco would be any different today without Walgreens' alleged misconduct. The evidence of extensive contributions by federal and state regulators, manufacturers and other distributors, thousands of prescribers, hundreds of non-Walgreens dispensers that dispensed the substantial majority of opioid medications in San Francisco during the relevant time period, criminal drug cartels, illicit opioid traffickers and street dealers, and countless individuals engaged in drug-related crime and medicine cabinet diversion, foreclose any such conclusion. On this trial record, it would be wholly speculative to conclude that Walgreens' alleged misconduct (i.e., knowingly dispensing prescriptions without a legitimate medical purpose) was a but-for cause of the People's injuries.

253.    The People have failed to prove by a preponderance of the evidence that Walgreens' alleged conduct caused or substantially contributed to any public nuisance.

### 2.    The People Failed to Prove Proximate Causation

254.    In addition to proving that Walgreens' conduct was a cause-in-fact of a public nuisance, the People were required to prove that such conduct was a proximate cause thereof.

255.    The requirement of proximate cause operates to "relieve the defendant whose conduct is a cause in fact of the injury, where it would be considered unjust to hold him or her legally responsible." 6 WITKIN, SUMM. OF CAL. LAW (2021) TORTS § 1335; *see State Dep't of State Hosp. v. Superior Ct.*, 61 Cal. 4th 339, 353 (2015) (same); *ConAgra*, 17 Cal. App. 5th at 103 (quoting *Lombardo v. Huysentruyt*, 91 Cal. App. 4th 656, 665-66 (2001) ("The doctrine of proximate cause limits liability; i.e., in certain situations where the defendant's conduct is an actual cause of the harm, he will nevertheless be absolved because of the manner in which the injury occurred.").

256.    The Court concludes that the People failed to show proximate cause as to Walgreens in light of the multitude of intervening and superseding factors that played a role in the opioid crisis. As the West Virginia court concluded following the MDL Track 2 trial, "No culpable acts

by [Walgreens] caused an oversupply of opioids in [San Francisco]." Ex. A, *WV Track 2 Trial Decision* at 162. "Doctors, 99% of whom were acting in good faith, determined the total volume of prescription opioids that pharmacies ordered … and dispensed pursuant to those prescriptions." *Id.* "Therefore, doctors, in the exercise of their independent medical judgment, determined what opioids would be prescribed, in what doses, and for what purposes." *Id.* It is undisputed that "the majority of opioid pills prescribed to patients go unused, ranging from approximately 55% to close to 90%, depending on the patient population, which can become a source of medicine cabinet diversion." ECF 1386 at 30, Keyes Decl. ¶ 84. It is also undisputed that "[m]edicine cabinet diversion significantly contributes to opioid-related harms." *Id.* ¶ 85; *id.* ¶ 83 ("The Most frequent way that people use and obtain opioids for nonmedical use is from a family member or friends.").

257. None of the People's experts was able to isolate the role that Walgreens' conduct played in the ultimate harms resulting in San Francisco. To the contrary, the People's experts uniformly agreed that many factors played significant roles in the crisis, most notably the changed standard of medical care that led doctors in good faith to prescribe increasingly more opioids to increasingly more patients, which led, in turn, to increased diversion from medicine cabinets and other places. The evidence provides the Court with no basis on which to conclude that Walgreens' role—even assuming wrongful conduct—was proximate to the harms. The People's causation experts' failure to parse through all (or any of) the other factors that impact opioid prescribing (or even an individual's decision to take an opioid) prevents the Court from concluding that there was proximate cause.

258. Proximate cause is "related not only to the degree of connection between the conduct and the injury, but also with public policy." *ConAgra*, 17 Cal. App. 5th at 104. The abuse of opioids is a complex real-world phenomenon. Even if it could be shown that Walgreens' conduct contributed in part to such abuse, the Court is wary of extending nuisance law to encompass complex, downstream social problems involving a multitude of independent actors, particularly where other courts have chosen not to do so. *See In re Firearm Cases*, 126 Cal. App. 4th at 991 (quoting *Ileto v. Glock, Inc.*, 370 F.3d 860, 862 (9th Cir. 2004) (Callahan, J., dis. from denial of rehg. en banc); *Ileto*, 370 F.3d at 868 (Kozinski, J., dis. from denial of rehg. en banc)) (explaining that if Defendants could be held liable for the illegal acts of others, it would mean that any manufacturer, distributor, or other seller "of

an arguably dangerous product that finds its way into California can be hauled into court in California to defend against a civil action brought by a victim of the criminal use of that product. . . .  This is not California law.").

259.    Given this attenuated chain of causation, as well as the absence of control that Walgreens has over a medication after it is distributed or dispensed, courts across the country have declined to extend public nuisance law in this way.  *See, e.g.*, *State ex. rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, (Okla. 2021) at ¶ 2.  As the Supreme Court of Oklahoma explained in "reject[ing] the unprecedented expansion of public nuisance law," public nuisance claims "address discrete, localized problems, not policy problems" like those raised by the misuse of opioids, which "should be dealt with by the legislative and executive branches," *id.* at ¶ 39; *see also People v. Johnson & Johnson*, 2021 Ill. Cir. LEXIS 387, *24–25 (Ill. Cir. Ct. Jan. 28, 2021) (dismissing nuisance claims against opioid manufacturers and distributors based on, inter alia, lack of proximate causation); Ex. A, *WV Track 2 Trial Decision* at 155–59 (collecting cases).

### D.    The People Failed to Establish Knowledge

260.    A public nuisance cause of action is established by proof that a defendant "knowingly" created or assisted in the creation of a substantial and unreasonable interference with a public right.  *ConAgra,* 17 Cal. App. 5th at 79.  Under California law as set forth in *Santa Clara I* and *ConAgra*, a defendant must have "actual," not constructive, "knowledge of the hazard."  *ConAgra*, 17 Cal. App. 5th at 83.  Under this standard, a defendant is liable only if it knew in advance that its conduct "would create a public health hazard."  *Id.* at 93; *see also Redevelopment Agency of City of Stockton v. BNSF Railway Co.*, 643 F.3d 668, 674 (9th Cir. 2011) ("Under California law, conduct cannot be said to 'create' a nuisance unless it more actively or knowingly generates or permits *the specific nuisance condition*." (emphasis added)).

261.    That Walgreens had actual knowledge of the risks associated with opioids is undisputed.  The risks of opioids are well-established and well-known.  Such generalized knowledge does not suffice for nuisance liability.  *See In re Firearms Cases,* 126 Cal. App. 4th at 985 (finding no public nuisance when the defendant gun manufacturers knew the risks of guns generally, but "the

evidence presented did not show that any defendant had *actual knowledge* that *specific retailers* were illegally supplying guns to the crime gun market" (emphasis added)).

262.    The specific "hazard" allegedly caused by Walgreens' conduct is the "vastly and dangerously larger market for opioids," ECF 128, FAC ¶ 547, together with allegedly "skyrocketing addiction, overdose and death" and "a concomitant rise in heroin and fentanyl abuse by individuals who can no longer legally acquire or simply cannot afford prescription opioids." *Id.* ¶ 14.  The People have not shown that Walgreens "actually knew" its conduct would cause the opioid crisis in San Francisco.

### E.    Conclusion

263.    For all the reasons stated above, the Court finds that Plaintiff has failed to establish that Walgreens was a cause of, or contributed to, the current opioid crisis in San Francisco.

Dated: July 20, 2022                                    Respectfully submitted,

/s/ Katherine M. Swift
Brian C. Swanson (pro hac vice)
brian.swanson@bartlitbeck.com
Katherine M. Swift (pro hac vice)
kate.swift@bartlitbeck.com
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Telephone:  312.494.4400
Facsimile:  312.494.4440

Alex J. Harris (pro hac vice)
alex.harris@bartlitbeck.com
Gabriel Levin (SB 330163)
gabe.levin@bartlitbeck.com
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Telephone:  303.592.3100
Facsimile:  303.592.3140

Charles J. Stevens (SBN 106981)
cstevens@gibsondunn.com
Joshua D. Dick (SBN 268853)
jdick@gibsondunn.com
GIBSON DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000

San Francisco, CA  94105
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant WALGREEN CO.*

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on July 20, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

*s/ Katherine M. Swift*

WALGREENS CO.'S FINAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (No. 3:18-CV-07591-CRB)