1    DAVID CHIU, State Bar # 189542
     City Attorney
2    YVONNE R. MERE, State Bar # 175394
     Chief Deputy City Attorney
3    SARA J. EISENBERG, State Bar # 296303
     Chief of Complex & Affirmative Litigation
4    JAIME M. HULING DELAYE, State Bar # 270784
     JOHN H. GEORGE, State Bar # 292332
5    Deputy City Attorneys
     Fox Plaza
6    1390 Market Street, Sixth Floor
     San Francisco, CA  94102
7    Telephone:  415.554.3597
     jaime.hulingdelaye@sfcityatty.org
8

9    *Attorneys for Plaintiff The People of the State of*
*California, acting by and through San Francisco*
*City Attorney David Chiu*
10

11    [Additional counsel appear on signature page.]

12

13              UNITED STATES DISTRICT COURT

             NORTHERN DISTRICT OF CALIFORNIA
14

15              SAN FRANCISCO DIVISION

16

| | |
|---|---|
| THE CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA and THE PEOPLE OF THE STATE OF CALIFORNIA, Acting by and through San Francisco City Attorney DAVID CHIU, | Case No. 3:18-cv-07591-CRB **THE PEOPLE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
|          Plaintiffs, | |
|      v. | Judge: Honorable Charles R. Breyer |
| PURDUE PHARMA L.P., et al. | |
|          Defendants. | |

17
18
19
20
21
22
23
24
25
26
27
28

1

# TABLE OF CONTENTS

2

**Page**

3  OVERVIEW ........................................................................................................... 1

4  DEFINITIONS ....................................................................................................... 5

PROPOSED FINDINGS OF FACT.......................................................................... 7

5  I. Parties ................................................................................................................ 7

6  II. F.R.E. 104(a) Determinations ........................................................................... 7

III. Existence of Nuisance ..................................................................................... 10

7  IV. Walgreens' Affirmative Conduct ..................................................................... 30

8       A. Walgreens' Conduct as a Distributor of Prescription Opioids ...................... 30

9       B. Walgreens' Conduct as a Dispenser of Prescription Opioids ........................ 37

        1. Red Flags of Diversion: Due Diligence Standards.................................... 38

10          2. Walgreens' Dispensing Policies and Practices....................................... 43

11          3. Evidence of Lack of Due Diligence by Walgreens ................................. 53

V. Causation in Fact ............................................................................................. 56

12       A. The Connection Between Walgreens' Conduct and Diversion in San

13         Francisco.................................................................................................... 56

        1. Volume of Red-Flagged Prescriptions Dispensed Without Due

14            Diligence................................................................................................ 56

15          2. Distribution and Receipt of Suspicious Orders ...................................... 60

        3. Dispensing "Bad Doctors'" Prescriptions .............................................. 62

16          4. Other Evidence Supporting the Inference of Diversion .......................... 66

17       B. The Connection Between Diversion in San Francisco and the Opioid

       Epidemic.................................................................................................... 71

18  VI. Proximate Causation ...................................................................................... 81

19  VII. Unreasonable Interference ............................................................................. 82

VIII. Adverse Credibility Findings.......................................................................... 86

20  PROPOSED CONCLUSIONS OF LAW ................................................................. 88

21  I. Evidence .......................................................................................................... 88

II. Elements of Nuisance ...................................................................................... 89

22  III. Proof of Nuisance Elements ........................................................................... 94

23  IV. Failure of Affirmative Defenses...................................................................... 100

V. Liability; Remedy; Judgment ........................................................................... 102

24
25
26
27
28

1

## <u>OVERVIEW</u>

2       The People of the State of California, acting by and through the San Francisco City

3  Attorney David Chiu, seek recovery from defendant Walgreen Co. ("Walgreens") to abate

4  a nuisance that has plagued San Francisco, often referred to as the "opioid epidemic." This

5  epidemic is characterized by extraordinarily high levels of "opioid use disorder" (OUD),

6  the medical term that encompasses what is popularly understood as "addiction," and the

7  many fatal and non-fatal harms that flow from opioid misuse. Walgreens' failure to

8  maintain effective controls against the diversion of the dangerous and highly addictive

9  prescription opioids it distributed and dispensed into the community substantially

10  contributed to the harm in San Francisco. As detailed below, this epidemic has affected,

11  and interfered with, public health, public safety, and the comfortable enjoyment of life and

12  property in San Francisco.

13       To prove a claim for public nuisance, a plaintiff must prove by a preponderance of

14  the evidence that a defendant's affirmative conduct was a legal cause of a substantial and

15  objectively unreasonable interference with a right common to the public. The facts

16  pertaining to each of these elements—nuisance, affirmative conduct, causation, and

17  substantial and objectively unreasonable interference—are summarized here and

18  discussed in detail below.

19       Opioids are extraordinarily dangerous drugs with the potential to cause enormous

20  harm, both to individuals and to communities. That harm is evident in San Francisco,

21  where the severity of the opioid epidemic has been described as "worse than

22  catastrophic." In a typical day, up to 25 percent of all visits to the Emergency Department

23  at Zuckerberg San Francisco General Hospital and Trauma Center (ZSFG ED) are opioid-

24  related. At times, the number of opioid-related visits to the ZSFG ED can be even higher.

25       San Francisco has been among the top 400 counties in the nation (out of over

26  3,000) with the highest overdose death rate for each of the last nine years. There have

27  been and remain tremendously high rates of opioid overdose in San Francisco. The

28  prevalence of OUD in San Francisco in 2019 is estimated to be 4.65 percent. In other

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

1   words, nearly one in twenty San Franciscans suffered from mild to severe opioid addiction

2   in that year. In absolute terms, it is estimated that there were approximately 40,958

3   individuals who had OUD in San Francisco.

4         Although opioids have clear benefits for the relief of severe pain under certain

5   circumstances, such as trauma, surgery, cancer, and palliative care, their potential to cause

6   tolerance, dependence, and addiction, and the allure of using them for non-medical

7   purposes, makes them dangerous as well. For that reason, the drugs have been regulated in

8   the United States and in California for well over 100 years to prevent them from being

9   used other than under appropriate medical supervision. Whatever the benefits of

10  prescription opioids when taken as directed under supervision by a medical professional to

11  treat a *bona fide* medical condition, there is no benefit and no social utility to opioids that

12  have been diverted to non-medical use.

13        Although anyone exposed to opioids is at risk of becoming addicted to them, those

14  who use prescription opioids non-medically are at increased risk. Moreover, use of

15  prescription opioids increases the risk of abuse of illicit opioids such as heroin and

16  fentanyl. Indeed, the natural progression of the disease of opioid addiction is to seek out

17  more potent, plentiful, and cheaper forms over time. It is tragic, but unsurprising, that

18  many people who became addicted to prescription opioids progressed to illicit heroin and

19  fentanyl, which can be significantly more dangerous than prescription opioids themselves.

20        To address the problem of diversion, the manufacture, sale, and dispensing of

21  opioids are tightly controlled under the federal Controlled Substances Act (CSA). As

22  described below, the statute and regulatory framework mandate a "closed system" in

23  which, in order to manufacture, distribute, or dispense opioids, a person or entity must

24  register with the Drug Enforcement Administration (DEA). All registrants under the CSA

25  are required to provide "effective controls against diversion." Manufacturers and

26  distributors are required to maintain systems to detect "suspicious orders" of opioids, and

27  may not ship such orders until they have determined, through due diligence, that the

28  suspicious order is not likely to be diverted. Dispensers are only permitted to fill

1    "legitimate" prescriptions, which requires them to detect, and clear through due diligence,
2    prescriptions with indicia of diversion, known as "red flags," before dispensing.

3    Walgreens, the remaining defendant in this case, owns and operates a national
4    chain of retail pharmacies. Walgreens dispenses prescription opioids at its retail stores
5    and, during part of the relevant time period, acted as a wholesale distributor of
6    prescription opioids to its own stores. During the relevant time period, Walgreens enjoyed
7    a dominant market share at 58.7 percent of the retail and chain pharmacy market in San
8    Francisco. Although Walgreens was not the only cause of or contributor to the opioid
9    epidemic, this case focuses on its role in contributing to it.

10   As discussed in detail below, as a registrant under the CSA, Walgreens was and is
11   obliged to maintain effective controls against diversion, but failed to do so in a
12   meaningful way. Indeed, the evidence shows that for substantial portions of the relevant
13   time periods, as a distributor of prescription opioids, Walgreens had virtually no system
14   for detecting and preventing diversion at all. Even when Walgreens purported to adopt
15   such systems, it did not implement them in a meaningful or effective way.

16   As a distributor of prescription opioids, Walgreens was required to operate a
17   system to detect suspicious orders, and to investigate those orders prior to shipping them.
18   But prior to 2012, Walgreens had no meaningful suspicious order monitoring (SOM)
19   system in place. According to Walgreens' own internal audits, "there was no monitoring
20   process in place to stop a suspicious order to assess if the order is suspicious or not." In
21   2010, Walgreens' Divisional Supply Chain Vice President wrote that he did not know
22   who, if anyone, had "been reviewing the [controlled substances order] data collected for
23   the past twenty-five years?" After 2012, Walgreens purportedly put in place a more
24   effective SOM system for its distribution of opioids, but in practice the new system was
25   scarcely more effective than the old one. Two years later, after the DEA shut down one of
26   its three controlled substance distribution centers, Walgreens stopped distributing
27   prescription opioids altogether.

28

1   As a dispenser of prescription opioids, Walgreens was again required to maintain

2   effective controls against diversion and was responsible for dispensing prescription

3   opioids only for legitimate medical purposes. To carry out these responsibilities,

4   Walgreens was required to identify and reasonably investigate prescriptions with objective

5   indicia, or "red flags," of diversion, and to refrain from filling such prescriptions until the

6   red flags had been cleared.

7   Prior to 2013, Walgreens' policies for ensuring that only legitimate prescriptions

8   were filled was described by Walgreens itself as "inadequate." After paying $80 million to

9   the DEA to settle allegations of CSA violations in 2013, Walgreens instituted new policies

10  with respect to the dispensing of prescription opioids, but as implemented, these new

11  policies likewise failed to provide meaningful or effective controls against diversion.

12  Moreover, Walgreens' business practices provided incentives for the speedy dispensing of

13  prescription opioids and discouraged the performance and documentation of the due

14  diligence necessary to ensure that opioid prescriptions were dispensed only for legitimate

15  medical purposes.

16  Walgreens had information in its possession that allowed it to identify situations

17  where there was a meaningful risk of diversion, but it routinely disregarded—indeed,

18  *concealed*—this information from its pharmacists in order to keep selling more opioids.

19  Although Walgreens used the information it had for other purposes, it failed to make use

20  of it to prevent diversion, failed to make it available to its pharmacists, and failed to

21  provide its pharmacists with the tools they needed to detect and investigate "red flag"

22  prescriptions. Indeed, Walgreens decided *not* to share data it had identifying doctors

23  whose prescriptions showed indicia of diversion, because it did not want to "cloud the

24  judgment" of its pharmacists with the facts.

25  The evidence shows that Walgreens shipped a significant number of suspicious

26  orders for prescription opioids into San Francisco without due diligence and dispensed a

27  significant number of "red flag" prescriptions at its pharmacies, again without due

28  diligence. The evidence further shows that Walgreens dispensed substantial quantities of

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

opioids pursuant to prescriptions written by doctors who were subsequently disciplined or prosecuted for writing illegal or illegitimate opioid prescriptions. In many cases, Walgreens filled these prescriptions long after it knew or should have known about the physicians' suspicious prescribing patterns, and in some instances, Walgreens continued filling prescriptions written by these doctors even *after* the doctor's license had been revoked or suspended. As discussed below, the evidence the People have presented, in its totality, is sufficient to establish that it is more likely than not that the failure to provide effective controls against diversion in fact led to significant diversion in San Francisco.

Moreover, as described below, the evidence shows that the presence of significant quantities of diverted prescription opioids distributed and dispensed by Walgreens in San Francisco substantially contributed to the ongoing opioid epidemic and nuisance. This effect was in addition to the effect of aggressive marketing by opioid manufacturers and a corresponding change in prescribing habits that occurred in the 1990s, which led to significantly increased numbers of opioid prescriptions. Whatever the harms that may have resulted from this increase in opioid prescribing, that harm was compounded by the availability of prescription opioids for non-medical use, which occurred through diversion. Indeed, the overall increase in the number of opioid prescriptions may have made it harder to detect illegitimate prescriptions, even as it made that detection, and the controls against diversion required by the CSA, all the more important. Given the quantity of prescription opioids that Walgreens dispensed in San Francisco, given its market share, and given the volumes of suspicious orders it distributed and red-flagged prescriptions it dispensed, it is more likely than not that Walgreens' conduct was a substantial factor in the creation or maintenance of a nuisance in San Francisco. The Court so finds.

## DEFINITIONS

"CSA" means the Controlled Substances Act of 1970, 21 U.S.C. §§ 801–971.

"Controlled substance" means a substance scheduled under the CSA. Substances scheduled under Schedules Two and Three under the CSA may be referred to as "CII" or "CIII" substances, respectively.

1    "CDC" means the United States Centers for Disease Control and Prevention.

2    "City" means the City and County of San Francisco.

3    "DEA" means the United States Drug Enforcement Administration.

4    "DEA registrant" or "registrant" means a person who is registered with the DEA

5    under the CSA to manufacture, distribute, or dispense controlled substances.

6    "Dispensing" prescription opioids means filling a prescription for opioids.

7    "Distributing" prescription opioids means buying prescription opioids wholesale

8    from manufacturers or other distributors and reselling them wholesale to other distributors

9    or pharmacies, which dispense them.

10   "GFD" means "Good Faith Dispensing," the name given by Walgreens to its

11   general controlled substances dispensing policies. "TDGFD" means "Target Drug Good

12   Faith Dispensing," the name given by Walgreens to dispensing policies that applied only

13   to a limited number of "target drugs."

14   "MME" means "morphine milligram equivalent," a measure for comparing the

15   relative strengths of different opioids with reference to morphine.

16   "Naloxone," also called by its brand name "Narcan," is a drug administered to

17   reverse the effects of opioid overdose.

18   "Opioid" means the class of drugs that bind with opioid receptors in the brain and

19   includes natural (opium-derived) opioids such as morphine and codeine; semi-synthetic

20   (synthesized from natural) opioids such as oxycodone, hydrocodone, oxymorphone, and

21   hydromorphone; and fully synthetic opioids such as fentanyl.

22   "OUD" means "opioid use disorder," which may be used interchangeably with

23   opioid addiction.

24   "SFDPH" or "DPH" means the San Francisco Department of Public Health.

25   "SFDPW" or "DPW" means the San Francisco Department of Public Works.

26   "SFFD" means the San Francisco Fire Department.

27   "SFRPD" or "RPD" means the San Francisco Recreation and Parks Department.

28   "SOM" means "suspicious order monitoring."

1    "ZSFG" means Zuckerberg San Francisco General Hospital and Trauma Center.

2    "ZSFG ED" means the Emergency Department at ZSFG.

3                              **PROPOSED FINDINGS OF FACT**

4        The Court finds the following more likely to be true than not, on the basis of the

5    evidence and the record before it.

6                                        **I. Parties**

7        **1.** In this lawsuit, Plaintiff the People of the State of California, acting by and

8    through San Francisco City Attorney David Chiu, seeks relief against Defendant

9    Walgreen Co. ("Walgreens") under California's public nuisance law for the harmful,

10   hazardous condition constituted by the opioid epidemic alleged to exist in the City and

11   County of San Francisco.

12       1.1.  The People seek relief only for harm arising in San Francisco. Unless

13   context dictates otherwise, references to the "opioid epidemic" and other prevailing

14   conditions are limited to San Francisco.

15       **2.** Walgreens owns and operates a national chain of retail pharmacies, including

16   around 50 pharmacies in San Francisco, which dispense prescription opioids among other

17   drugs. Until around 2014, Walgreens also distributed controlled substances, including

18   prescription opioids, to its own pharmacies.

19                          **II. F.R.E. 104(a) Determinations**

20       **3.** Among others, the following expert witnesses presented by the People gave

21   credible, reliable testimony within the scope of their expertise: Carmen Catizone, Dr.

22   Philip Coffin, Dr. David Herzberg, Dr. Lacey Keller, Dr. Katherine Keyes, Dr. Anna

23   Lembke, Dr. Craig McCann, and Dr. Elizabeth Park.[1]

24       3.1.  Carmen Catizone, MS, RPh, DPh, is one of the foremost authorities on the

25   practice and regulation of pharmacy in the United States. Mr. Catizone holds two

26   ─────────────────

27   [1] In considering preliminary questions of admissibility, the Court is not limited to the trial record and "is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a). Therefore, in this section, the Court refers to both these experts' trial

28   declarations and Rule 26 reports submitted in connection with the related *Daubert* briefing.

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

pharmacy degrees and has practiced as a registered pharmacist for twenty years. From 1988 to 2020, Mr. Catizone was the executive director and CEO of the National Association of Boards of Pharmacy (NABP), where among other accomplishments he worked with other stakeholders in the practice of pharmacy, including Walgreens, to develop a consensus set of "red flag" warning signs for pharmacists to identify and investigate when dispensing opioid prescriptions. *See generally* Catizone Decl. Ex. A (curriculum vitae); Catizone Rep. 4–5, 25, 61, 63–65, 76–79, ECF No. 972-5. The Court finds Mr. Catizone qualified to give reliable testimony about the federal and state-level regulatory frameworks governing prescription opioids, and about the prevailing standards of pharmacy practice governing prescription opioid dispensing.

3.2.   Philip Coffin, M.D., is the director of the SFDPH Center on Substance Use and Health. He attended the University of San Francisco School of Medicine and his residency at the Columbia University Medical Center. He is board certified in internal medicine, infectious disease, and addiction medicine. During his residency, he wrote his thesis on illicit drug production and markets and spent two months in the Peruvian Andes studying drug production. In his current position, he has studied substance use, including OUD, trends and treatment in San Francisco and produces an annual report for the City. His entire professional career has been dedicated to the study of substance use and abuse. *See* Coffin Decl. ¶¶ 1–6; Coffin Decl. Ex. 1 (curriculum vitae). The Court finds Dr. Coffin qualified to give reliable testimony about the present character and history of the opioid epidemic in San Francisco.

3.3.   Daniel Herzberg, PhD, is a historian and an associate professor at the University at Buffalo (State University of New York). His expertise is in the "medical, commercial, cultural, and regulatory history of psychoactive pharmaceuticals." Herzberg Decl. ¶ 1. The Court finds Dr. Herzberg qualified to give reliable testimony about the medical and regulatory history of prescription opioids in the United States.

3.4.   Lacey Keller, PhD, is a data analytics consultant who has owned and operated a data consultancy since 2021, before which she worked as a data analyst for the

New York Attorney General and labor unions, among others. *See generally* Keller Decl. Ex. A (curriculum vitae). The Court finds Dr. Keller qualified to give reliable testimony about her analyses of physician prescribing data obtained from IQVIA, a data vendor used among others by Walgreens itself. *See* Keller Decl. ¶¶ 2–3.

3.5.   Katherine Keyes, PhD, is an epidemiologist and professor at Columbia University specializing in substance use and substance use disorders, who has been studying the effects of opioids throughout her career. As an epidemiologist, she examines public health impacts and sets out to determine their causes. Dr. Keyes has published two epidemiology textbooks and more than 350 peer-reviewed articles, editorials, and book chapters, more than 35 of which specifically discuss opioid use and related harms. *See generally* Keyes Decl. ¶ 1–3; Keyes Decl. Ex. 1 (curriculum vitae). The Court finds Dr. Keyes qualified to give reliable testimony about the population-level impacts of opioid use nationally and in San Francisco.

3.6.   Anna Lembke, M.D., has served on the faculty of the Stanford University School of Medicine since 2003, where she is a Professor, Medical Director of Addiction Medicine, and Chief of the Addiction Medicine Dual Diagnosis Clinic. As a specialist in addiction medicine, Dr. Lembke has treated thousands of patients with OUD over the course of her career. Among other work, Dr. Lembke is the author of *Drug Dealer, MD: How Doctors Were Duped, Patients Got Hooked and Why It's So Hard to Stop* (Johns Hopkins Univ. Press 2016), and a co-author of the Stanford-*Lancet* Commission report, an empirical analysis of the causes of and solutions to the national opioid epidemic. *See generally* Lembke Decl. Ex. A (curriculum vitae); Lembke Rep. 1–7, ECF No. 977-5. The Court finds Dr. Lembke qualified to give reliable testimony on the proper and improper use of opioids, opioids' effects, and the nature and causes of addiction, including OUD.

3.7.   Craig McCann, PhD, is an economist and data computation and analysis expert. Dr. McCann has decades of academic and professional experience teaching graduate-level economics and finance courses, serving as an academic fellow for the U.S. Securities and Exchange Commission, and running a data analysis consultancy. *See*

*generally* McCann Decl. Ex. A (curriculum vitae). The Court finds Dr. McCann qualified to give reliable testimony about the volumes of prescription opioids distributed by, distributed to, and dispensed by Walgreens that ought to have been identified and investigated as suspicious orders or red-flagged prescriptions. *See* McCann Rep. 56–75, ECF No. 960-6.

3.8.  Elizabeth Park, PharmD, APh, is a California pharmacist and regulatory consultant holding an advanced practice license and a doctorate in pharmacy. Dr. Park has performed more than 1,000 regulatory consultations for California pharmacies and pharmacists, and has served as an independent pharmacist consultant approved by the California State Board of Pharmacy in more than 50 regulatory proceedings. *See generally* Park Decl. ¶¶ 1–2; Park Decl. Ex. A (curriculum vitae). The Court finds Dr. Park qualified to offer reliable testimony on the standard of care for pharmacies and pharmacists dispensing prescription opioids in California, and on whether Walgreens' due diligence files evidence compliance with this standard.

### III. Existence of Nuisance

**4.**  Prescription opioids are known to be extraordinarily dangerous drugs with the potential to cause enormous harm, no matter whether they are used to treat pain or are used non-medically.

4.1.  Opioids are among the world's oldest known drugs. Use of opium from the poppy plant for medical, recreational, and religious purposes can be traced throughout history and across continents. The addictive and harmful nature of opioids also has been known since antiquity. Herzberg Decl. ¶ 2; Lembke Decl. ¶ 6.

4.2.  In general, opioids have three major neurological effects. First, they bind to the brain's pain receptors, temporarily relieving the feeling of pain. Second, they cause the release of dopamine in the brain, temporarily causing a feeling of pleasure. Third, they slow the brain stem functions that control heart rate and breathing. Lembke Decl. ¶ 3; Lembke Trial Tr. 383:23–384:9. Opioids cause death by fatally slowing a person's heart rate and breathing. Lembke Decl. ¶ 148; Lembke Trial Tr. 384:5–9.

4.3.   As a result of opioids' neurological effects, people who use opioids develop tolerance and physical dependence. Opioid tolerance decreases or eliminates opioids' analgesic (pain-relieving) effects and increases the risk of death from opioid overdose; physical dependence results in painful symptoms of opioid withdrawal if an opioid user stops using opioids. The process of tapering to end dependence on prescription opioids is typically protracted and painful. Lembke Decl. ¶¶ 39–44.

4.3.1.   Neuroadaptation results even when a person has a pain condition and is taking an opioid to relieve pain. With repeated exposure to opioids, the brain's natural pain–pleasure balance begins tilting heavily toward pain, and the person requires increasing opioid doses or strengths to relieve pain. Lembke Trial Tr. 386:12–23. Extended or heavy opioid use commonly results in a long-term or permanent neurological adaption of the brain's pain–pleasure balance, whereby opioids stop causing pleasure or relieving pain and instead are now required to maintain homeostasis, that is, required for the person to feel "normal" and avoid pain. Even relatively brief opioid exposures can result in "tolerance," whereby the user requires more of the drug to achieve the same effects. Opioid tolerant users require more and more, or stronger and stronger, opioids to maintain "homeostasis" (the balance between pain and pleasure), and relieve the pain of opioid withdrawal from their prior dose. Lembke Trial Tr. 385:17–386:3; Lembke Decl. ¶ 3.

4.3.2.   Opioid-dependent users experience opioid "withdrawal" when they stop using opioids. Opioid withdrawal symptoms include anxiety, debility, insomnia, dysphoria, and a distinct, painful physical withdrawal syndrome, including full-body pain not caused by an underlying pain condition. Lembke Trial Tr. 386:4–23, 387:9–15.

4.3.3.   Even after using opioids for as little as one month, a person may experience withdrawal if she abruptly stops using opioids. Zevin Trial Tr. 640:21–641:1; Coffin Decl. ¶ 55; Coffin Trial Tr. 1903:22–1904:15; Tucker Trial Tr. 2733:10–14.

4.3.4.   As the opioid dose is increased to overcome tolerance to the pain-relieving effects of the drug, patients are increasingly exposed to the other dose-dependent

risks associated with opioids, including the risk of death. Tolerance to the respiratory suppressant effects (the ability of opioids to decrease breathing rate and thus blood oxygenation) develops more slowly than tolerance to the pain-relieving effects of the drug. As a result, as the dose of opioids goes up to target pain relief, the breathing rate goes down, increasing the risk of accidental overdose and death. Lembke Decl. ¶ 148.

4.3.5.  The best scientific evidence, which the Court accepts, demonstrates that there is an increased risk of death at each level of increased dose, even at very low doses between 1 and 20 MME per day, and that the risk is particularly elevated at doses greater than 100 MME per day. Lembke Decl. ¶¶ 21–22.

4.3.6.  It can take a very long time after a person has stopped using opioids for the brain to reset itself to normal dopamine levels, such that opioids would no longer be required to maintain homeostasis. Lembke Trial Tr. 388:5–7.

4.3.7.  There is a population of millions of patients who have become physiologically dependent on prescription opioids, sometimes referred to as "legacy" patients. *See, e.g.*, Lembke Decl. ¶ 39; Coffin Trial Tr. 1908:4–19; 1926:10–11. The process of tapering off opioids is protracted and difficult, and in some cases patients may never be able to stop taking opioids even though the drugs are not helping them, because the drugs have affected the neurocircuitry of the brain to the point where dopamine equilibrium, or homeostasis, can no longer be restored. Lembke Trial Tr. 392:6–15; Lembke Decl. ¶ 39.

4.4.  Prescription opioids carry a high risk of harm even when used as directed by a doctor. Keyes Decl. ¶ 14, 40.

4.5.  OUD, or opioid addiction, is a chronic relapsing and remitting disease that is the result of neurological changes produced by opioid use. OUD is a painful and destructive disease that is treatable only with great difficulty over months and years.

4.5.1.  The Diagnostic and Statistical Manual of Mental Disorders (DSM-5) uses the term "substance use disorder" to denote addiction. Lembke Decl. ¶ 2. The terms "opioid addiction" and "opioid use disorder" or "OUD" also can be used interchangeably.

Lembke Decl. ¶ 2. Some clinicians may apply the term "addiction" for only "severe" OUD, but no such limitation or definition appears in the DSM-5 itself. Instead, the DSM-5 defines OUD as a spectrum disorder based on the number of criteria that have been met, ranging from "mild" (2 to 3 of 11 criteria met), "moderate" (4 to 5 of 11 met), or "severe" (6 or more of 11 met). *See* P-43472_00003 to 00004. "Addiction" does not have a specific definition in any version of the DSM; as is true for OUD, there can be mild, moderate, or severe cases of addiction. The CDC supports this understanding. Keyes Rebuttal Decl. part I; Keyes Trial Tr. 3549:6–3550:16.

4.5.2.   The scientific literature has established conclusively that prescription opioid use is causally related to OUD. Keyes Trial Tr. 2201:7–11. Indeed, it is the greatest risk factor for developing OUD, and is a greater risk factor than prior substance use disorder, mental health problems, and other known risk factors.  Keyes Trial Tr. at 2205:1–3.

4.5.3.   OUD is a chronic, relapsing and remitting disease with a behavioral component, characterized by neuroadaptive brain changes resulting from exposure to opioids. *See* Lembke Decl. part II.A. OUD is characterized by the continued use of opioids despite harm to self or others, or despite a desire to quit or cut back. Lembke Decl. ¶ 2. From a neurological perspective, OUD is a disorder of the brain's reward circuitry. Lembke Decl. ¶¶ 3–5.

4.5.4.   OUD results when the rewiring of a person's reward circuitry caused by opioid use drives the person to compulsive, self-destructive consumption that overcomes the limits of voluntary choice. People with severe OUD commit all available resources to obtaining more of the substance, even forgoing natural rewards like food, finding a mate, or raising children. Lembke Decl. ¶ 5.

4.5.5.   One treatment for OUD is to taper a user to a lower opioid dose while attempting to avoid withdrawal, but that is not an easy process, particularly for a patient with a history of substance abuse. Zevin Trial Tr. 664:15–665:8; Coffin Decl. ¶ 55; Lembke Decl. ¶ 40.

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

4.6.  Every human being is vulnerable to the disease of addiction and has the potential to become addicted. This is because addiction affects the same neural pathways that have evolved over millions of years to encourage humans to seek out pleasure and avoid pain. Lembke Decl. ¶ 4.

4.6.1.  Prescription opioids are as addictive as heroin, because the prescription opioids have the same addictive effects as heroin on the neurocircuitry of the brain. Lembke Decl. ¶ 15.

**5.**  Because of the extraordinary dangers they pose, prescription opioids and their use have been subject to conservative regulation by the government and conservative self-regulation by the medical profession, pharmaceutical industry, and associated institutions.

5.1.  The first opioid epidemic in the United States was contained by the first general effort by governments and healthcare professionals to restrict opioid access and use. Herzberg Decl. ¶¶ 4–5; Herzberg Trial Tr. 1978:20–1979:17.

5.1.1.  The first opioid epidemic in the United States followed the Civil War. America's consumption of opioids per capita tripled in the wake of the isolation of morphine, the invention of the hypodermic syringe, and unconstrained use of opioids (including opium, laudanum, and morphine) to treat military veterans and housewives. Herzberg Decl. ¶¶ 2–3.

5.1.2.  In 1897, Bayer chemists synthesized heroin and marketed it as a cough and cold remedy alongside aspirin from 1898 to 1910. Herzberg Decl. ¶ 3.

5.1.3.  Medical literature in the late 19th Century contains hundreds of detailed case reports of morphine addiction. The same literature showed that the risk of addiction increased in cases where doctors continued to administer, or advised patients to continue to self-administer, hypodermic morphine over long periods of time for protracted illnesses. Herzberg Decl. ¶ 2.

5.1.4.  By the end of the 19th Century, the first opioid epidemic had persuaded leading physicians that opioids were dangerous and should be used as sparingly as possible. Herzberg Decl. ¶ 4.

5.1.5.  San Francisco passed the first municipal ordinance regulating opioids in 1875, requiring that opium be safely labeled and sold by licensed pharmacists. Reforms culminated in the federal Harrison Anti-Narcotic Act of 1914, which required that opioids be sold only by prescription for legitimate medical purposes. Herzberg Decl. ¶ 5; Herzberg Trial Tr. 1975:18–1976:4, 1977:22–1978:2.

5.2.  For most of the 20th Century, governments and healthcare professionals continued to restrict opioid access and use in light of opioids' known dangers. Herzberg Trial Tr. 1975:20–1976:4.

5.2.1.  The Harrison Anti-Narcotic Act of 1914 was amended in 1942 to effectively make heroin illegal. Herzberg Decl. ¶ 5.

5.2.2.  The contemporary regime of governmental opioid regulation was inaugurated by the passage of the CSA in 1970. Herzberg Decl. ¶ 10. Under this regime, a "controlled substance" is one that is scheduled under the CSA. Rannazzisi Dep. 405:12– 14; Catizone Decl. ¶ 6. The CSA contains five schedules. Schedule I substances are drugs without any medical use and the highest potential for abuse, such as heroin. Schedule I substances may not be prescribed or lawfully used for any purpose. Schedule II substances are drugs that have a high potential for abuse and some medical uses. These drugs may be prescribed by licensed practitioners, but access to them is tightly controlled because of the risks associated with non-medical use of them. Most commonly prescribed opioids—such as oxycodone, hydrocodone, and fentanyl—are Schedule II drugs. Rannazzisi Dep. 405:12–14, 405:21–406:1, 407:11–15, 407:17–408:10; Catizone Decl. ¶¶ 6–7.

5.2.2.1.  The CSA and its regulations limit the persons who are authorized to lawfully handle controlled substances to those who are registered with the DEA, or "registrants."  Controlled substance manufacturers, distributors, and dispensers (such as pharmacies, though not individual pharmacists) are all registrants under the CSA. Rannazzisi Dep. 410:21–413:1.

5.2.2.2.  CSA registration is intended to create a "closed system" of distribution for opioids and other controlled substances. The closed system means that, at

1    every step taken by every opioid pill (or patch, lozenge, or other delivery method) down

2    the opioid supply chain, a specific registrant is legally accountable for that pill (or patch,

3    etc.). This system of accountability is intended to secure the opioid supply chain against

4    diversion. Rannazzisi Dep. 436:10–437:25; P-03669_00001; Catizone Decl. ¶ 9.

5             5.2.2.3.  In general, the closed system of opioid distribution has two

6    steps: from manufacturers to distributors, and from distributors to pharmacies.

7    Manufacturers take raw materials and produce a finished opioid product. Manufacturers

8    then ship finished opioid products to distributors, who distribute opioids to pharmacies

9    and other dispensers like hospitals. Rannazzisi Dep. 439:23–440:22; Catizone Decl. ¶ 9.

10            5.2.2.4.  In the context of controlled substances, "diversion" means that

11   the controlled substances are "taken from … the legitimate stream of commerce and

12   moved into the illicit marketplace," outside the closed system. Rannazzisi Dep. 382:2–5.

13   The CSA requires the DEA to consider the "maintenance of effective controls against

14   diversion ... *into other than legitimate medical, scientific, research, or industrial*

15   *channels.*" 21 U.S.C. § 823 (emphasis added). In the context of pharmacy dispensing, it is

16   the use of opioids for other than legitimate medical purposes that constitutes diversion.

17   Catizone Decl. ¶ 10.

18            5.2.2.5.  Diversion is *per se* harmful to the public. Even small amounts

19   of diverted opioids can cause serious harm. Rannazzisi Dep. 392:10–18; P-03669_00002.

20   Put simply, diversion causes death. Rannazzisi Dep. 427:2.

21            5.2.2.6.  Because of the serious danger to public health and safety

22   posed by even small amounts of diversion, every registrant under the CSA is required to

23   maintain "effective controls" against diversion. Rannazzisi Dep. 410:13–15, 411:10–15,

24   417:20–22, 444:15–16; P-03669_00002. Both the letter and the spirit of the CSA and its

25   regulations impose a shared responsibility on all registrants to maintain the closed system

26   of distribution. Rannazzisi Dep. 449:12–450:18; P-03669_00002. A registrant's failure to

27   observe this obligation leads to diversion, which in turn leads to serious public health

28   harms. Rannazzisi Dep. 426:6–427:2.

5.2.2.7.  The requirement of registrants to maintain effective controls against diversion is multifaceted, and includes among others recordkeeping, auditing, and inventorying requirements. Rannazzisi Dep. 443:7–444:8; *see* Coman Trial Tr. 765 These requirements are onerous, Rannazzisi Dep. 444:5–8, precisely because of the danger opioids pose to public health and safety, especially when used non-medically.

5.2.3.  As a result of the conservative governmental regulation and professional self-regulation, no crises linked to prescription opioids occurred in the United States through the 1980s. The opioid crises that were seen during this time generally were smaller in scale and involved illict heroin rather than medically prescribed drugs. These smaller crises were addressed through a combination of strategies, most successfully with expanded treatment options, which (beginning in 1965) included methadone maintenance. Herzberg Decl. ¶ 5.

**6.**  In a pattern familiar to the pharmaceutical and healthcare industries, repeated efforts to liberalize governmental and self-regulation of prescription opioids have led to repeated public health crises. Herzberg Decl. ¶¶ 6–10.

**7.**  There is an opioid epidemic—an epidemic of opioid misuse, abuse, addiction, and overdose—in San Francisco.

7.1.  "Epidemic," defined as an outbreak of disease that spreads quickly and affects many individuals at the same time, is the appropriate term to describe the increase in opioid-related morbidity and mortality beginning in the 1990s and continuing to the present day. Lembke Decl. part III.Q.

7.2.  The epidemic of opioid-related harm in the United States began with a rapid increase in prescription opioid overdose death. The opioid supply increased dramatically in the United States beginning in the mid 1990s, and a direct consequence of the increased supply of opioids was an increase in the incidence and prevalence of OUD among both medical patients and non-patients, and an increase in prescription opioid-related deaths in the late 1990s and early 2000s. Keyes Decl. ¶ 22

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

1    7.3.  The severity of the opioid epidemic in San Francisco is worse than

2    catastrophic. Zevin Trial Tr. 632:4–8; *see also* Colwell Decl. ¶¶ 3–12.

3    7.4.  Walgreens does not dispute the existence of an "opioid crisis" in San

4    Francisco. *See* Trial Tr. 3969:18–21.

5    **8.**  The opioid epidemic interferes with the public health in San Francisco. The

6    interference is substantial, significant, and has long-lasting effects.

7    8.1.  In a typical day, up to 25 percent of all visits to the ED at ZSFG are opioid-

8    related. At times, the number of opioid-related visits to the ZSFG ED can be even higher.

9    Colwell Decl. ¶ 9.

10    8.2.  The opioid epidemic is hazardous to the health of San Franciscans from all

11    walks of life. Patients who arrive at the ZSFG ED after a fentanyl overdose or with

12    opioid-related health complications come from a variety of backgrounds. Colwell Decl.

13    ¶¶ 11–12. Among the people seen by the Chief of the ED at ZSFG, Dr. Christopher

14    Colwell, for medical issues related to opioid use and overdose were a physician, two

15    nurses, lawyers, a professional athlete, a drug dealer, a 14-year-old, and a 7-year-old who

16    got into a stash of pills in her mother's purse. Colwell Decl. ¶ 12.

17    8.3.  There is a significant and ongoing public health burden of OUD and opioid

18    overdose in San Francisco. San Francisco has been among the top 400 counties in the

19    nation (out of over 3,000) with the highest overdose death rate for the last nine out of nine

20    years. There have been and remain tremendously high rates of opioid overdose in San

21    Francisco. Keyes Decl. ¶ 23; *see* Keyes Decl. ¶¶ 105–22.

22    8.4.  The prevalence of OUD in San Francisco in 2019 is estimated to be 4.65

23    percent. In other words, nearly one in twenty San Franciscans suffered from mild to

24    severe opioid addiction in that year. In absolute terms, it is estimated that there were

25    approximately 40,958 individuals who had OUD in San Francisco in 2019, who may be in

26    need of treatment services. Keyes Decl. ¶¶ 25, 48, 128–29; Keyes Trial Tr. 2224:21–

27    2225:6. This may be a conservative estimate in San Francisco due to the local programs

28    providing distribution and access to naloxone to reverse overdose. Keyes Decl. ¶ 129.

1          8.5.  Over the course of the past three decades, within the universe of patients

2    experiencing homelessness in San Francisco, there has been a steady increase in patients

3    suffering from OUD. Zevin Decl. ¶ 5. The acceleration within the past ten years has been

4    especially substantial. Zevin Decl. ¶ 5. Of the substance use disorders in patients treated

5    by Dr. Barry Zevin, an addiction medicine doctor who is currently the medical director of

6    the Street Medicine, Shelter Health, and Urgent Care program operated by the San

7    Francisco Health Network, Zevin Decl. Ex. A, OUD is the most prevalent. Zevin Decl.

8    ¶ 4.

9          8.6.  In addition to an increase in the sheer number of patients with OUD, there

10   also has been a change in the demographic of this patient population. Zevin Decl. ¶ 5.

11   Thirty years ago, most such patients had begun using opioids recreationally as young

12   adults. Zevin Decl. ¶ 5. Now, many of the OUD patients seen by Dr. Zevin started using

13   prescription opioids later in life.  Zevin Decl. ¶ 5.

14         8.7.  In San Francisco, the number of fatal opioid overdoses in 2020, the most

15   recent year of available data, was 584. Coffin Decl. ¶ 39.

16         8.8.  Drug overdoses in San Francisco are common and have been the leading

17   cause of death since 2016 among those experiencing homelessness. Zevin Decl. ¶ 6.

18         8.9.  Opioid-related overdoses kill more of Dr. Zevin's patients now than

19   HIV/AIDS did in the 1990s (when there were no reliable treatments for AIDS). Zevin

20   Decl. ¶ 6.  Dozens of Dr. Zevin's patients and hundreds of SFDPH Street Medicine

21   patients die as a result of the opioid epidemic each year. Zevin Trial Tr. 632:19–24.

22         8.10.  The number of non-fatal overdoses is conservatively estimated to be

23   approximately seven times higher than the number of fatal overdoses. Keyes Decl. ¶ 134.

24   By this estimate, in San Francisco at least 1,939 people experienced at least one non-fatal

25   overdose in 2019 (5 to 6 people per day). Keyes Decl. ¶ 135.

26         8.11.  SFDPW personnel encounter as many as seven overdose cases per week

27   on the streets of San Francisco. Short Trial Tr. 1966:1–23.

28

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

8.12.  As of June 2016, the ED at ZSFG was responding to approximately four to six incidents of opioid-related overdoses per day—including overdoses treated in the ED and calls the ED received from the field about people who overdosed on opioids but refused transport after treatment or were declared dead at the scene following an overdose. Colwell Decl. ¶ 4.

8.13.  Today, the ZSFG ED sees approximately 10 to 20 opioid-related overdose incidents every day—a substantial increase over the last six years. Approximately 50 percent of these opioid-related overdoses involve fentanyl; 25 percent involve prescription opioid pills; and the remaining 25 percent involve other substances, generally heroin or another opioid. Colwell Decl. ¶ 5.

8.14.  The number of opioid overdose calls to the SFFD Emergency Medical Services (EMS) has increased "dramatically," particularly calls for overdoses on the street. Tong Decl. ¶ 3; *see also* Tong Trial Tr. 1351:17–21, 1352:2–6.

8.15.  Today, opioid overdose is so common that naloxone is administered by EMS as a matter of course to people found unresponsive on the street when other interventions fail. Tong Decl. ¶ 7. People found unresponsive on the street with any indicia of opioid use nearby, such as pill bottles, are also administered naloxone. Tong Decl. ¶ 7; Tong Trial Tr. 1355:17–20 ("Are there pills? Are there needles?"). Even ordinary people have started carrying naloxone in case they are able to help someone overdosing on the street. Tong Trial Tr. 1361:17–20, 1362:2–7.

8.16.  Between July 2018 and March 2022, SFFD administered more than 7,600 doses of naloxone on at least 7,415 separate occasions. Each of these doses reflects an actual or suspected opioid overdose. Tong Decl. ¶ 6; Tong Trial Tr. 1353:2–7, 1353:22–25. That the number of doses is higher than the number of patients reflects the fact that the fentanyl overdoses of recent years may require two or more doses to revive a patient—if they are able to revive the patient at all. Tong Decl. ¶ 8; Tong Trial Tr. 1356:10–23. Today, EMS administers naloxone about six to eight times a day, or 180 times a month. Tong Trial Tr. 1354:1–4, 1354:9–12. But these figures do not capture the full number of

opioid overdoses treated in San Francisco. Other City agencies (including the police department), nonprofit organizations, and two private ambulance companies also administer naloxone to reverse opioid overdoses. Tong Decl. ¶ 6; Tong Trial Tr. 1353:13–21.

8.17.  The number of patients presenting at the ZSFG ED with other opioid-related health conditions besides overdose has increased steadily over the last six years, since 2016. Colwell Decl. ¶ 7.

8.17.1.  Some of these opioid-related health conditions manifest in patients who are in the throes of OUD and who neglect their basic needs because the craving for opioids has become an all-consuming compulsion. The ZSFG ED sees an increasing number of these patients who are badly malnourished or dehydrated. The ZSFG ED also sees increasingly more patients suffering from OUD with hypothermia from exposure or with conditions like diabetic ketoacidosis who are unable to care for their medical needs because of the all-consuming nature of their opioid addiction. Colwell Decl. ¶ 8.

8.17.2.  The ZSFG ED also sees more and more patients who have developed sepsis, localized infections or abscesses from unsterile injection practices like "skin popping," an under-the-skin method used to inject drugs when veins become difficult to access. Colwell Decl. ¶ 8.

8.18.  Overall, the number of opioid-related ED visits more than tripled from 2015 (886 ED visits) to 2020 (2,998 ED visits). Coffin Decl. ¶ 40.

8.19.  Approximately 17,000 children in San Francisco have been exposed to parental opioid abuse. These children can be expected to experience a heavy burden of psychiatric and learning disorders throughout pre-school and school-age. Rates of psychiatric and learning disorders are approximately 2 to 3 times higher among children who experience parental drug use and parental separation or death. ADHD, depression/anxiety, and PTSD are among the leading disorders in children associated with parental drug use. Keyes Decl. 54 tbl.3.

8.20.  Neonatal abstinence syndrome (NAS) occurs when infants are born exposed to opioids *in utero* and experience withdrawal symptoms after birth. NAS is associated with significant medical morbidity, from low birthweight and general discomfort and pain for the infant to serious health issues such as respiratory disorders and seizures. Cases of NAS can have long-lasting effects on infants, as the clinical literature has documented increased incidence of developmental delays and child behavior problems into childhood. NAS is challenging clinically to treat and remains associated with adverse long-term outcomes. In California, there was a 300 percent increase in the incidence of NAS from 1999 through 2013, from 1.5 per 1,000 hospital births to 6 per 1,000. NAS continues to be a heavy burden in California. Keyes Decl. ¶ 140.

8.21.  "Suicide by opioid," that is, intentional rather than accidental fatal overdose, has impacted mortality in California. The rate of suicide using opioids has more than doubled in the United States from 1999 to 2019, from 0.22 per 100,000 to 0.51 per 100,000. California has seen significant increases in suicide deaths involving opioids in that same time period. Keyes Decl. ¶ 141.

8.22.  In California, opioid-related inpatient hospital stays more than tripled in per capita terms in less than 15 years, from 114.4 per 100,000 population in 2005 to 355.17 per 100,000 population in 2017. Keyes Decl. ¶ 142.

8.23.  San Francisco has experienced a heavy public health burden as result of the opioid epidemic. There remains a substantial burden of unmet treatment need in San Francisco, and a high prevalence of OUD. The collateral damage of the opioid epidemic is experienced throughout San Francisco, including by children and families of those affected by overdose, who have higher rates of psychiatric disorders and other detrimental health outcomes. Keyes Decl. ¶ 143.

**9.**  The opioid epidemic interferes with the public convenience in San Francisco, including with public rights of way, public rights of access, and the effectiveness of public agencies and other institutions serving the public. The interference is substantial, significant, and has long-lasting effects.

1          9.1.  The opioid epidemic has had a profound impact on the San Francisco

2   Department of Public Works, its approximately 1,600 employees, and the work that they

3   do for the benefit of all people in San Francisco. Short Trial Tr. 1962:2–5.

4          9.1.1.  More than 300 SFDPW employees are part of the Street

5   Environmental Services Bureau who work to keep the city's streets and sidewalks clean

6   and accessible twenty-four hours a day, seven days a week. Short Trial Tr. 1962:2–7.

7          9.1.2.  These dedicated public servants are mostly general laborers who

8   often are not trained or prepared for the reality of the crises they encounter throughout the

9   city. Short Trial Tr. 1968:19–22. The human feces and vomit—much of which is likely

10  associated with drug use—DPW staff encounter on the streets are some of the least

11  distressing things they come across. Short Trial Tr. 1962:22–24. Some DPW employees

12  have found the bodies of those who have died from an overdose or otherwise on the

13  streets. Short Trial Tr. 1968:16–18.

14         9.1.3.  More than 95,000 needles have been collected in each of the 2017,

15  2018, 2020, and 2021 fiscal years. Short Trial Tr. 1962:13–16. Thus far, in the 2022 fiscal

16  year, from July 2021 until February 2022, more than 78,000 needles have been

17  collected—exclusive of needles collected at kiosks, Short Trial Tr. 1962:17–21, and by

18  zone crews who help monitor and clean various portions of the city. Short Trial Tr.

19  1969:11–1970:1.

20         9.1.4.  Although DPW employees are trained to properly dispose of needles

21  and other types of sharps, their fears have been realized when they have been pricked by

22  dirty, used needles. Short Trial Tr. 1967:22–1968:1. DPW Interim Director Carla Short

23  has personally counseled four employees in the aftermath of such an experience. Short

24  Trial Tr. 1968:2–6.

25         9.1.5.  DPW has had to install (and upgrade, when the first installation

26  failed) needle grinders in public toilets to prevent clogging of pipes by discarded needles.

27  Short Trial Tr. 1965:13–25.

28

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

9.2.   The opioid epidemic regularly prevents the public's use and enjoyment of public spaces, including streets, sidewalks, and public gathering places. Short Trial Tr. 1970:2–1971:17. Any public space in San Francisco may attract opioid use and quickly be rendered unusable to the public.

9.2.1.   In places like Jose Coronado Park sidewalks have been narrowed to keep them accessible to the public and prevent locations from being used to camp or otherwise be blocked. Short Trial Tr. 1971:8–17.

9.2.2.   Near Jose Coronado Park, DPW developed a plaza called "McCoppin Hub." Short Trial Tr. 1970:2–10. Meant to be a space for food trucks to pull up and for the community to gather, the plaza became a common place for the public use of opioids. Short Trial Tr. 1970:2–15. Unable to keep up with the resulting large amount of debris including sometimes hundreds of needles, DPW installed a large metal fence with locking door. Short Trial Tr. 1970:11–25. The Plaza is now locked and off limits except for special events. Short Trial Tr. 1970:18–25.

9.2.3.   Encountering opioid overdose victims on the streets of San Francisco is "the new normal." Tong Decl. ¶ 9. So common are opioid overdoses on the streets of San Francisco that SFFD EMS has stopped waiting to be called in, and has started proactively patrolling the worst-affected neighborhoods to intervene wherever "sedated or unresponsive" people can be found. Tong Decl. ¶ 19.

9.2.4.   The opioid epidemic regularly interferes with the public's access to and use of San Francisco's public libraries.

9.2.4.1.   The San Francisco Public Library is a nationally recognized, award-winning public library system. Lambert Decl. ¶¶ 2–3; P-29368; P-29370. It has been "devastat[ed]" by the opioid epidemic in San Francisco. Lambert Trial Tr. 948:14–18.

9.2.4.2.   People "routinely" use opioids in the main library branch, or "Main Library." Lambert Decl. ¶ 4; *see also* Lambert Trial Tr. 945:2–12. Discarded needles are found lying around the children's section, in restrooms, hidden in the stacks,

1    and even slipped between the pages of books. Lambert Decl. ¶ 4; Lambert Trial
2    Tr. 945:13–946:2.

3            9.2.4.3.   Librarians must take care that they are not stuck by discarded
4    needles as they restock the Library's shelves. Two library staff have already been injured
5    by discarded needles. Lambert Decl. ¶ 4; Lambert Trial Tr. 945:21–946:6. Ordinary
6    library patrons face the same risks. Lambert Decl. ¶ 5; *see* Lambert Trial Tr. 948:11–15.

7            9.2.4.4.   The Library's "incident tracker," which records violations of
8    the Library's Patron Code of Conduct, contains reports from across the Library's 27
9    locations of opioid use, opioid overdose, unconsciousness due to opioid use, and acting
10    under the influence of opioids. Lambert Decl. ¶ 8; Lambert Trial Tr. 946:9–947:13.
11    Opioid use at the Library's locations "runs the gamut" from fentanyl to pills. Lambert
12    Trial Tr. 947:10–13.

13            9.2.4.5.   The current City Librarian, Michael Lambert, began his career
14    reading aloud to children. Lambert Trial Tr. 943:24–25. He now patrols the floors of the
15    Main Library looking for and trying to help overdose victims. Lambert Trial Tr. 951:19–
16    952:5.

17            9.2.4.6.   Sharps containers have been installed in the Main Library's
18    children's section and restrooms. Lambert Decl. ¶¶ 4, 10. So many needles are flushed
19    down toilets that the Main Library has installed two different sets of grinding equipment
20    in the plumbing, which grinds up the discarded needles and keeps the pipes clear. Lambert
21    Trial Test. 948:24–949:4.

22            9.2.4.7.   Before the grinding equipment was installed, the Main Branch
23    was regularly required to shut down the library and have City plumbers clear the needles
24    from the pipes. These shutdowns caused system-wide loss of access to resources found
25    only at the Main Branch, such as the San Francisco History Center (the City's official
26    archive) and the Hormel Center for LGBTQIA. Lambert Decl. ¶ 11; Lambert Decl.
27    Exs. C–D; Lambert Trial Tr. 949:5–24.

28

9.2.5.  The opioid epidemic regularly prevents the public from using public parks and similar public spaces.

9.2.5.1.  SFRPD serves more than 220 parks, playgrounds, recreations centers, various sports fields, and buildings in San Francisco. Follin Decl. ¶ 2. It has approximately 40 park rangers and five sergeants who serve as Head Park Rangers. Follin Decl. ¶ 2.

9.2.5.2.  In the public spaces for which SFRPD is responsible, Head Park Ranger Maja Follin has seen people doing drugs "on view," in RPD parlance, and has found prescription opioids ("the lollipops which look like a longer stick kind of swab-type thing" and pill bottles) and opioid paraphernalia, including syringes. Follin Trial Tr. 2066:19–2067:11.

9.2.5.3.  RPD personnel regularly interact with San Francisco's homeless population. Among this population, RPD personnel often see signs of opioid abuse in the parks, including used needles, and encounter individuals who appear impaired or are actively overdosing. Follin Decl. ¶¶ 4, 9; Follin Trial Tr. 2065:22–2066:21.

9.2.5.4.  All RPD park rangers are trained to use naloxone in the event they encounter someone who is overdosing on opioids and carry it. Follin Decl. ¶ 7. Since 2019 rangers have had to give or facilitate the administration of naloxone approximately a dozen times; one ranger has had to do so three times. Follin Decl. ¶ 8.

9.2.5.5.  In 2019 alone, RPD environmental services staff collected more than 10,000 needles in the parks. Follin Decl. ¶ 9. Rangers regularly fill sharps containers in patrol cars. For RPD personnel, finding needles in the parks is as common as having to change toilet paper in the restrooms. Follin Decl. ¶ 11.

9.2.5.6.  The presence of needles and feces—likely related to opioid abuse—interferes with the public's ability to access the parks. Needles are found on playgrounds, posing a danger to children and others. There are even challenges to keeping newly renovated facilities open because of opioid abuse. RPD staff struggle to keep

restrooms open and in safe condition because of the needles found in them every few hours. Follin Decl. ¶ 13.

9.2.5.7.  Stairwells in Civic Center Plaza have had to be closed once or twice a week between 2019 and 2021 because of the massive quantities of needles found there. Follin Decl. ¶ 14.

9.3.  The opioid epidemic has taken a severe toll on medical personnel working in San Francisco. At the ZSFG ED, the need to respond to a large and increasing number of overdoses, overdose deaths, and patients with opioid-related health conditions has resulted in burnout and a sense of hopelessness among some doctors, nurses, and other ED staff.  Colwell Decl. ¶ 9.

9.4.  The City and its agencies have expended substantial resources on extraordinary, proactive, and innovative measures which have helped mitigate some of the worst effects of the opioid epidemic in San Francisco, but the problem is so severe that these measures have not been enough to abate it.

9.4.1.  The measures include intensive interventions involving naloxone, buprenorphine, methadone, and outreach programs. Coffin Trial Tr. 1905:20–22; Coffin. Decl. ¶¶ 14–15, 28–29.

9.4.2.  The measures include inward and outward facing programs created by SFDPW to assist both employees and members of the public afflicted by opioid use disorder and its associated harms. In the wake of traumatic experiences, SFDPW Director Short encourages employees to seek help from trained counselors in the employee assistance program and other mental health resources offered by the Department's award-winning wellness program. Short Trial Tr. 1969:1–10.

9.4.3.  In response to the needles and human waste related to and caused by the opioid epidemic, SFDPW created a "Pit Stop" program in 2014 that established public, monitored restrooms throughout the city. Short Trial Tr. 1962:25–1963:4. These safe spots, located throughout the city are meant to provide those who might not otherwise have access, a safe, clean, and dignified way to use the restroom and, in turn, help rid the

streets and sidewalks of human waste. Short Trial Tr. 1963:5–9. The restrooms contain syringe kiosks and are checked between each use by four non-profit Public Works partner organizations. Short Trial Tr. 1965:9–12. Throughout the COVID-19 pandemic Public Works added additional, similar resources in other locations throughout the city. Short Trial Tr. 1965:5–8.

9.4.4.  Dr. Christopher Colwell and the ZSFG ED have taken concrete steps to try to identify and address the risks and devastating impacts of opioid addiction. Colwell Decl. ¶ 13.

9.4.4.1.  For example, the ED suggested limitations in prescribing opioids to only 15 pills at once and providing naloxone with every opioid prescription. Colwell Decl. ¶ 13.

9.4.4.2.  The ED also has developed and implemented an opioid-withdrawal program using buprenorphine.  Colwell Decl. ¶ 13.

9.4.4.3.  Nevertheless, additional measures and the resources to implement them will be needed to reduce the alarming number of deaths and other medical conditions caused by opioids in San Francisco. Colwell Decl. ¶ 13.

9.4.5.  Like ZSFG ED, SFFD EMS has adopted proactive and innovative measures to control the opioid epidemic, Tong Decl. ¶ 4, but they have not been enough.

9.4.5.1.  "EMS-6," a program restarted in 2016, refers patients to detoxification and treatment facilities to help "break the cycle" of overdose and hospitalization. Tong Decl. ¶¶ 11–12; Tong Trial Tr. 1358:12–1359:6.

9.4.5.2.  "Project FRIEND" distributes naloxone to community members. Tong Decl. ¶¶ 13–14; Tong Trial Tr. 1359:9–20.

9.4.5.3.  The "Street Overdose Response Team" or "SORT" intervenes with patients who have recently overdosed and tries to help them access health care and other services. Tong Decl. ¶ 15; Tong Trial Tr. 1362:14–1363:5. Since starting in August 2021, SORT has intervened in over 1,200 cases, and in over 600 opioids cases, at a rate of 100 interventions per month. Tong Decl. ¶¶ 16–17; Tong Trial Tr. 1363:8–22. SORT has

1    succeeded in getting buprenorphine treatment (similar to methadone treatment) to about

2    49 patients. Tong Decl. ¶ 16; Tong Trial Tr. 1363:23–1364:1.

3              9.4.5.4.  The "Street Wellness Response Team" or "SWRT" practices

4    "preventative EMS," Tong Trial Tr. 1364:24, by proactively canvassing the worst-hit

5    neighborhoods like the Tenderloin and SOMA to intervene wherever people who might be

6    overdosing can be found. Tong Decl. ¶ 18–19; Tong Trial Tr. 1364:14–1365:4. This

7    prophylactic program may be the first of its kind in the nation. Tong Trial Tr. 1365:5–8.

8              9.4.6.  Like other City agencies, the Library has taken proactive and

9    innovative measures to mitigate the effects of the opioid epidemic, but they have not

10   stopped the number of reports submitted to the Library's "incident tracker" from

11   increasing. Lambert Decl. ¶¶ 8–24.

12             9.4.6.1.  The Library is the first in the nation to employ a full-time

13   social worker, who manages the Library's Social Services Program. Lambert Decl. ¶ 9.

14   The Program connects homeless or ill Library patrons with needed services, and also

15   attends to the mental health of Library staff, who have witnessed substance abuse and

16   overdoses on Library premises. Lambert Decl. ¶ 9; Lambert Trial Tr. 947:16–948:10; *see*

17   Lambert Trial Tr. 950:2–7 (fatal overdose in 2017 in Main Library); Lambert Decl. ¶ 12

18   ("It was awful to witness this person's blue body being removed from the library.").

19             9.4.6.2.  The Library has offered voluntary training in naloxone

20   administration to its staff. Lambert Decl. ¶¶ 12–13; Lambert Trial Tr. 950:10–21. More

21   than 100 staff have received the training, including City Librarian Michael Lambert, and

22   they have reversed 42 opioid overdoses on Library premises. Lambert Decl. ¶¶ 13–14;

23   Lambert Trial Tr. 950:14–21.

24             9.4.6.3.  The Library has trained its staff to perform CPR, de-escalation,

25   and crisis intervention. Lambert Decl. ¶ 15; Lambert Trial Tr. 951:7–16.

26             9.4.6.4.  The Library has contracted with a nonprofit organization

27   called Urban Alchemy to time patrons' restroom use. If patrons spend "more than 8 to 10

28   minutes" in a restroom, Urban Alchemy restroom attendants will begin checking for

1    unresponsiveness and possible overdose. Lambert Decl. ¶ 21; Lambert Trial Tr. 952:25–

2    953:12.

3        **10.**  The opioid epidemic constitutes a public nuisance in San Francisco that

4    undisputedly is injurious to health, interferes with the comfortable enjoyment of life, and

5    interferes with rights common to the public, including the rights to public health and

6    safety, as well as public access to parks, libraries, and other recreational spaces. *See* paras.

7    8–9, *supra*.

8        **11.**  The opioid nuisance in San Francisco affects entire neighborhoods and

9    communities, and a considerable number of San Franciscans. *See* paras. 8–9, *supra*.

10       **12.**  The opioid nuisance in San Francisco is a substantial interference with public

11   rights because it causes significant harm both to individuals and to the community. *See*

12   paras. 8–9, *supra*.

13                     **IV. Walgreens' Affirmative Conduct**

14         **A. Walgreens' Conduct as a Distributor of Prescription Opioids**

15       **13.**  Walgreens engaged in wholesale distribution of prescription opioids in San

16   Francisco as a DEA registrant.

17       13.1.  Until 2014, Walgreens distributed prescription opioids to pharmacies it

18   owned and operated. Lucas Fla. Test. 658:17–666:16; Polster Dep. 327:18–23.

19       13.2.  The three facilities from which Walgreens distributed prescription opioids

20   were located in Woodland, California (which distributed to Walgreens pharmacies in San

21   Francisco); Jupiter, Florida; and Perrysburg, Ohio. Coman Trial Tr. at 695:25–696:14.

22         13.2.1.  Because the Woodland facility distributed prescription opioids to

23   San Francisco pharmacies, Woodland's distribution practices bear directly on the opioid

24   supply in San Francisco. The distribution practices of the Jupiter and Perrysburg facilities

25   are relevant because those facilities were managed by the same employees as the

26   Woodlands facility pursuant to uniform nation-wide corporate policies and procedures. *Cf.*

27   Polster Decl. ¶ 6; P-08183_00001.

28

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

13.3.  By law, in order to distribute prescription opioids, Walgreens was required to, and did, register with the DEA as a distributor. Walgreens held separate DEA registrations for each of its three distribution centers that handled controlled substances. *See* P-00035_00001, 00005 (DEA letters addressed to Walgreen Co. under two registration numbers for two different distribution centers).

13.4.  As a distributor of prescription opioids, Walgreens was required to design and operate a system to identify "suspicious orders" of prescription opioids, and to refuse to ship orders of prescription opioids identified as suspicious until it was able to determine, through reasonable inquiry, that, if shipped, the order was not likely to be diverted outside the closed system. An order for controlled substances is suspicious if it is of unusual size or frequency, or if it substantially deviates from normal ordering patterns. Once identified, suspicious orders must be reported to the DEA. Rannazzisi Dep. 417:14–418:9, 419:14–21, 421:2–421:18; P-03669_00002; P-03670_00001.

13.4.1.  Neither the CSA nor the DEA requires a *particular* suspicious order monitoring or "SOM" system at the distribution level. Rannazzisi Dep. 465:24–466:22; P-03670_00001.  Registrants are free to design their systems in ways that make business sense for the registrant.  But every SOM system must have a reasonable and good faith means to identify suspicious orders and those orders must be reported to the DEA. Rannazzisi Dep. 419:22–421:3. By contrast, a SOM system that does not take due care in identifying suspicious orders but instead simply turns a blind eye to suspicious circumstances is inadequate and does not satisfy a registrant's obligations to design and operate a system for identifying and reporting suspicious orders. Rannazzisi Dep. 452:8–16; P-03669_00002.

13.4.2.  In order to satisfy its obligation to maintain effective controls against diversion, a distributing registrant must not only identify and report suspicious orders, it must also halt shipment on those orders unless and until it has performed due diligence to determine that diversion is not likely. P-03669_00002; P-03670_00001.

13.4.3.  One critical aspect of maintaining a SOM system is a thorough record of past opioids purchases.  Indeed, the only way to detect patterns of orders over time (as well as deviations from them) is to create and maintain a record of those orders. Rannazzisi Dep. 647:7–19.

13.4.4.  Around 2005, the DEA came to believe that the opioid supply chain—specifically, manufacturers and distributors—was "out of control," and that the largest supply-chain actors were refusing to comply with their obligations as CSA registrants to maintain effective controls against diversion.  Rannazzisi Dep. 416:9–417:9, 423:12–426:4, 431:14–18.  The DEA recognized that diversion and abuse of opioids, specifically hydrocodone and oxycodone, had become a major public health crisis. Rannazzisi Dep. 433:17–434:9; P-03669_00002.

13.4.5.  To remind opioid supply-chain actors of their obligations under the CSA, in 2006 the DEA sent letters to every commercial entity registered to distribute controlled substances in the country. Rannazzisi Dep. 430:11–432:5; P-03669_00001. The letters reminded manufacturers and distributors of what had always been the law since the CSA was enacted in the 1970s: registrants are required in general to maintain effective controls against diversion; registrants who distribute opioids (manufacturers and distributors) are specifically required to create and maintain a SOM system, and to report identified suspicious orders to the DEA; and registrants must not ship suspicious orders until they have performed due diligence to determine that the order is not likely to be suspicious. P-03669_00001 to 00002.

13.4.6.  Walgreens received the 2006 letter from the DEA. *See* P-00035.

13.4.7.  In 2007, the DEA sent a second letter to every entity registered to manufacture or distribute controlled substances, to again remind the opioids supply chain of its obligations to maintain effective controls against diversion, to maintain a SOM system, to report suspicious orders to the DEA, and to investigate and not ship suspicious orders until due diligence shows that diversion is not likely. Rannazzisi Dep. 464:1–466:8; P-03670_00001.

1          13.4.8.  Walgreens received the 2007 letter from the DEA. *See* P-27368.

2          **14.**  Walgreens failed to maintain effective controls against prescription opioid

3     diversion while distributing prescription opioids. *See* para. 27.3.1, *infra*.

4          14.1.  Walgreens failed to create and maintain a system for detecting and

5     reporting suspicious orders of prescription opioids.

6          14.1.1.  Before 2012, Walgreens' SOM system was a virtual nullity.

7               14.1.1.1.  Walgreens' employees repeatedly noted the absence of any

8     meaningful SOM system. According to Walgreens' own internal audits from 2008, "there

9     [was] no monitoring process in place to stop a suspicious order to assess if the order is

10    suspicious or not." P-20656_00002.

11               14.1.1.2. To the extent it existed at all, Walgreens' SOM system was so

12    disorganized and ineffective that no one at Walgreens seemed to know whose job it was to

13    do the monitoring or if the monitoring was taking place.

14                    14.1.1.2.1.  In 2010, one Walgreens vice president for

15    distribution (*see* P-28550_00001, P-25973_00001) wrote that he didn't know who, if

16    anyone, had "been reviewing the [controlled substances order] data collected for the past

17    twenty-five years?" P-00058_00001.

18                    14.1.1.2.2.  One of the Walgreens managers responsible on

19    paper for Walgreens' national SOM system beginning in 2009, Barbara Martin, knew

20    nothing about the regulatory framework governing Walgreens' SOM obligations and did

21    not believe it was her job to know. Martin Dep. 23:20–24:3, 49:6–53:11, 60:1–127:8.

22                    14.1.1.2.3.  Walgreens did not provide Martin, the person

23    supposedly overseeing its SOM programs, with critical information relating to that

24    program, including monthly suspicious order reports (such as P-19720_00001 and P-

25    19724_00001), the "average order times DEA factor" formula Walgreens used to flag

26    orders as suspicious, or the "Chemical Handler" reports (which are Walgreens' own

27    suspicious order reports). Martin Dep. 161:21–165:21.

28

14.1.1.2.4.  Walgreens' corporate representative was unable to identify who was performing due diligence on orders flagged as suspicious.  After the corporate representative identified employees who later said they were *not* performing this due diligence, Walgreens changed the answer of its representative to say that it was unaware of any due diligence performed on orders flagged as suspicious before 2012. P-20213_00004 (errata of corporate deponent). If due diligence had been performed on such orders, Walgreens would be aware of it.

14.1.1.3.  Walgreens' SOM system was focused on ensuring that Walgreens did not flag too many prescription opioid orders as suspicious. Martin Dep. 24:1–24, 42:12–16, 42:20–22, 252:22–253:15.

14.1.1.4.  Walgreens provided no training to its distribution center staff specific to the distribution of controlled substances. Lucas Fla. Test. 612:4–5, 615:19–23; Coman Trial Tr. 739:16–19; Ferry Dep. 39:15–25.

14.1.1.5.  In 2010, Walgreens' Jupiter, Florida, distribution center began receiving orders for "unrealistic, astronomical" amounts of prescription opioids, increasing from 30 to 90 to 300 to 600 and more bottles of opioid pills per week. Lucas Fla. Test. 623:14–624:1, 625:12–20. Walgreens' corporate SOM system failed to report or arrest this trend. On the rare occasions when distribution center employees did "investigate" a suspicious order, they would simply call the Walgreens pharmacy placing the order to confirm the order had not been placed unintentionally. Lucas Fla. Test. 633:17–24.

14.1.2.  In 2012, Walgreens implemented a new SOM system (then called "Controlled Substance Reporting" or "CSR") that was in place until it stopped distributing prescription opioids in 2014. Though it appeared better on paper, the new system was, in fact, no more effective than the old one.

14.1.2.1.  When Walgreens' new SOM system was activated for all controlled substances in 2012, 14,000 items that Walgreens' stores had ordered across the chain were flagged as needing investigation. P-00027_00001 to 00002. At that time,

Walgreens' Pharmaceutical Integrity unit had a staff of just ten employees. Polster Trial Tr. 2395:05–2396:06.

14.1.2.2.  The new SOM system imposed a "ceiling limit" on the amount of any particular controlled substance that could be shipped to one store over a rolling six-week period. Polster Trial Tr. 2269:02–08. Low "ceiling limits" resulted in high numbers of ceiling override requests, likely resulting, in turn, in overburdening of Walgreens staff tasked with approving or denying the requests. P-00059; Polster Trial Tr. 2388:09–2389:02, 2391:13–2392:02. As a result, in the two years during which the new SOM system was operative, Walgreens approved 95 percent of controlled substance override requests that were submitted to it. P-00062_00023; Polster Trial Tr. 2331:02–2332:16.

14.2.  Both before and after 2012, Walgreens shipped suspicious orders of prescription opioids without determining through reasonable inquiry that filling the orders would not likely result in prescription opioid diversion, in violation of its obligations under the CSA.

14.2.1.  According to Walgreens' own internal audits from 2008, Walgreens was "filling orders that have been deemed suspicious without performing any research to ascertain [their] legitimacy." P-20657_00002. Walgreens also acknowledged that "there is no monitoring process in place to prevent the fulfillment of an order if it has been deemed suspicious." P-20658 _ 00003 to 00004.

14.2.2.  When Walgreens' Jupiter, Florida, distribution center began receiving orders for exceptionally high volumes of prescription opioids, a manager at the distribution center alerted her corporate superiors, but Walgreens conducted no investigation. Lucas Fla. Test. 623:14–624:1, 625:12–20, 628:2–25, 635:15–18. Walgreens pharmacists at the stores served by the Jupiter center confirmed that they were not performing due diligence on their part either. Catizone Decl. ¶ 37; Lucas Fla. Test. 631:18–632:14. Unless the ordering store disclosed that it had placed an order

unintentionally by mistake, the orders were filled and shipped. Lucas Fla. Test. 633:17–24, 634:4–15.

14.2.3.  The DEA shut down Walgreens' distribution of Schedule II controlled substances from the Jupiter distribution center in 2012 for multiple CSA violations that endangered the public health. P-00015_00028.

14.2.4.  According to an internal audit from Walgreens' Woodland, California, distribution center in 2008, from which Walgreens distributed prescription opioids to Walgreens pharmacies in San Francisco, "Walgreens is filling orders that have been deemed suspicious without performing any research to ascertain the legitimacy of the order." P-20657_00002.

14.2.5.  According to Walgreens' own internal audit completed in 2011, Walgreens' Woodland, California, distribution center was still filling suspicious orders without due diligence three years later. P-27384_00022; Coman Trial Tr. 731:13–15, 738:14–739:8, 739:16–19.

14.2.6.  The Walgreens manager in charge of the Woodland, California, distribution center did not know what criteria were used to identify suspicious orders, nor whether Walgreens had a duty to report those orders to the DEA before shipment, nor whether Walgreens had ever done so. Coman Trial Tr. 695:10–13, 705:22–706:7, 708:23–709:5. When showed an excerpt of the sections of a Walgreens suspicious order report from 2008 covering San Francisco, the manager admitted that he did not know how often such reports were generated or reviewed by Walgreens staff. Coman Trial Tr. 716:4–11, 716:14–17. The only Walgreens employee the manager was aware of who may have been reviewing these extensive suspicious order reports was Juanita Gonzalez, who may have been doing so for one to two hours a week. Coman Trial Tr. 716:14–717:1, 720:13–22. No one in Walgreens' corporate offices or computer room provided her with any support. Coman Trial Tr. 749:24–750:3, 752:23–753:2. It is reasonable to infer that, if Walgreens had ever investigated suspicious orders before filling them from the Woodland center, this manager would have known about it. According to Walgreens' own testimony, suspicious

1    order monitoring was supposed to be conducted "at the distribution level." Polster Tr.

2    2346:3–22; *see also* Polster Decl. ¶ 6.

3         14.2.7.  The Walgreens manager in charge of the Woodland, California,

4    distribution center did not recall (but likely would have, had it happened) that Walgreens

5    ever trained its employees on "how to use … suspicious order report[s]," "perform due

6    diligence," or "analyze patterns or frequency" of orders. Coman Trial Tr. 739:9–740:9.

7         14.2.8.  According to the Walgreens manager in charge of the Woodland,

8    California, distribution center, Walgreens did not devote enough resources to perform due

9    diligence on suspicious orders. Coman Trial Tr. 741:19–742:1. It is therefore more likely

10   than not that it was not performed.

11        **B. Walgreens' Conduct as a Dispenser of Prescription Opioids**

12        **15.**  Walgreens dispensed prescription opioids in and around San Francisco as a

13   DEA registrant subject to the standards of pharmacy practice in California.

14        15.1.  As of December 31, 2021, Walgreens owned and operated 53 pharmacies

15   in San Francisco. Brunner Decl. ¶ 31.

16        15.2.  Walgreens holds separate DEA registrations for each of its pharmacies in

17   San Francisco. *See* P-00015_00006 (stipulating Walgreens would surrender six DEA

18   registrations for six different pharmacies); Catizone Trial Tr. 796:14–15.

19        15.3.  As a DEA-registered dispenser, Walgreens was required to maintain

20   effective controls against diversion in its dispensing of prescription opioids. Moreover,

21   under the CSA, pharmacists, pharmacies and pharmacy owners are authorized to dispense

22   only prescriptions that have been issued for a legitimate medical purpose by individual

23   practitioners acting in the usual course of their professional practice. *See* para. 27.3.1,

24   *infra*.

25        15.3.1.  A prescription written for a legitimate medical purpose is a

26   prescription intended by both the prescriber and the patient for good faith medical use. A

27   prescription may be illegitimate because the prescriber is not attempting to offer good

28   faith medical treatment in the usual course of professional practice, or because the patient,

1    with or without the prescriber's knowledge, does not intend to use the prescription as

2    directed for the good faith treatment of the medical condition for which it was prescribed.

3    *Cf.* para. 5.2.2.4, *supra*.

4         15.4.  Pharmacists, pharmacies, and pharmacy owners are each responsible for

5    the proper practice of pharmacy; the responsibility is not the pharmacist's alone. *See*

6    Catizone Decl. ¶¶ 13–14; Catizone Trial Tr. 796:13–797:6; Park Decl. ¶ 5.

7                    **1. Red Flags of Diversion: Due Diligence Standards**

8         15.5.  Under the standard of pharmacy practice prevailing in California and

9    across the country, there are four elements of due diligence in opioid dispensing:

10   *identification* of all "red flags" of diversion; *collection* of all relevant information;

11   *evaluation* of the information; and *documentation* of the reasons supporting the decision

12   to dispense or not. Catizone Decl. ¶ 24; Park Decl. ¶¶ 7, 10; Park Trial Tr. 962:11–23; P-

13   29955_00004.

14        15.6.  The prevailing standard of pharmacy practice in California, and across the

15   country, calls for dispensers to look for and recognize indications that an opioid (or any

16   controlled substance) prescription is likely to be diverted. These indications are commonly

17   called "red flags." *See* Catizone Decl. ¶ 17; Park Decl. ¶¶ 8–9; P-42147_00003 to 00007

18   (*Holiday CVS*); Ashley Dep. 121:11–19.

19             15.6.1.  Red flags are objective warning signs that may indicate that

20   activities are occurring outside the usual and customary scope of pharmacy practice—

21   activities that are suggestive of abuse, diversion, and fraudulent acts. Catizone Decl. ¶ 16;

22   Rannazzisi Dep. 1576:23–1577:22; Park Decl. ¶¶ 7–9; Park Trial Tr. 962:11–23. Red

23   flags are a nationally recognized concept in the practice of pharmacy, acknowledged by

24   the DEA, state boards of pharmacy, professional associations, and industry trade groups.

25   *See* Catizone Decl. ¶ 17; Park Decl. ¶¶ 8–9; P-23068 (2015 NABP stakeholder report); P-

26   42147_00003 to 00007 (*Holiday CVS*); Ashley Dep. 121:11–19.

27             15.6.2.  While there is no fixed and exhaustive catalogue of red flags, eight

28   commonly occurring situations are generally recognized in California, and across the

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

country, as prompts for further inquiry. *See* Catizone Trial Tr. 799:13–800:21 (citing national supports for identified red flags); Catizone Decl. ¶ 19 n.12 (same); Park Decl. ¶ 17 (affirming red flags recognized in California); Park Trial Tr. 961:21–25 (same).

15.6.2.1. *Long-distance travel.* Patients traveling long distances to their pharmacies or physicians raises a red flag as potentially unreasonable or evasive behavior. Catizone Decl. ¶ 18; Catizone Trial Tr. 868:2–12 (discussing P-23068_00016); P-23068_00015 (2015 NABP stakeholder report); P-15314_00027 (mid-2012 GFD policy establishing "unusual geographic distances" as red flag); P-17169_00010 to 00011 (late 2013 GFD training presentation acknowledging "prescriber located outside of the pharmacy's trade area" and "[patient] resides outside of the trade area of your pharmacy" as red flags); WAG-MDL-03398.00002 (publication from California Board of Pharmacy outlining corresponding responsibility).

15.6.2.2. *Doctor shopping.* A patient receiving concurrent opioid prescriptions from different prescribers, or "doctor shopping," raises a red flag that the patient may be soliciting duplicative prescriptions. Catizone Decl. ¶ 18; Catizone Trial Tr. 801:25–802:8, 831:9–20; P-23068_00014 (2015 NABP stakeholder report); P-15314_00028 (mid-2012 GFD policy establishing "prescriptions from several different prescribers" as red flag); P-17169_00011 (late 2013 GFD training presentation acknowledging "doctor shopping" as red flag); WAG-MDL-03398.00002 (California Board of Pharmacy corresponding responsibility outline).

15.6.2.3. *Pharmacy shopping.* A patient having concurrent opioid prescriptions filled at different pharmacies, or "pharmacy shopping," raises a red flag for similar reasons as doctor shopping. Catizone Decl. ¶ 18; P-23068_00015 (2015 NABP stakeholder report); P-17169_00011 (late 2013 GFD training presentation acknowledging "pharmacy shopping" as red flag).

15.6.2.4. *Drug cocktails.* A patient presenting prescriptions for "cocktails" of drugs consisting of opioids and benzodiazepines (like Valium or Xanax) with or without muscle relaxants (like Soma) raises a red flag because these drugs are

1    particularly dangerous in combination and are commonly abused together. Catizone Decl.

2    ¶ 18; Catizone Trial Tr. 834:11–835:4; P-23068 _00014 (2015 NABP stakeholder report);

3    P-15314_00027 (mid-2012 GFD policy establishing "known drug 'cocktails' such as a

4    benzodiazepine, opioid and carisoprodol" as red flag); *see also* P-17169_00012 (late 2013

5    GFD training presentation acknowledging "cocktail[s] of commonly abused drugs" as red

6    flag).

7              15.6.2.5.  *Excessive dispensing.* A patient presenting one or more

8    prescriptions for excessive quantities of opioids raises a red flag because it is unlikely

9    such excessive quantities would be prescribed for legitimate medical purposes. *See*

10   Catizone Decl. ¶ 18; P-15314_00027 (mid-2012 GFD policy establishing "[u]nusual

11   dosages" or "quantities ... beyond those normally prescribed" as red flag); P-17169_00012

12   (late 2013 GFD training presentation acknowledging "unusually large quantity or high

13   starting dose" as red flag); WAG-MDL-03398.00002 (California Board of Pharmacy

14   corresponding responsibility outline: "prescriptions written for an unusually large quantity

15   of drugs").

16             15.6.2.6.  *Pattern prescribing.* A patient filling a prescription from a

17   "pattern prescriber," or a prescriber who writes prescriptions for the same drug at the

18   same dose and duration for large numbers of patients, raises a red flag because it suggests

19   the absence of individualized examination or treatment, or a failure to exercise medical

20   judgment. *See* Catizone Decl. ¶ 18; P-17169_00010 (late 2013 GFD training presentation

21   acknowledging "same diagnosis for the majority of individuals" as red flag); WAG-MDL-

22   03398.00002 (California Board of Pharmacy corresponding responsibility outline: "same

23   combinations of drugs prescribed for multiple patients").

24             15.6.2.7.  *Early refills.* A patient refilling a prescription early raises a

25   red flag because it suggests a failure to take the drugs at the dosages and durations

26   prescribed, or "non-adherence" to the prescriber's treatment plan. Catizone Decl. ¶ 18; P-

27   23068_00015 (2015 NABP stakeholder report); P-15314_00028 (mid-2012 GFD policy

28   establishing "[c]onstistently request[ing] early refills" as red flag); P-17169_00011 (late

1    2013 GFD training presentation acknowledging "routine[] attempts to obtain an early

2    refill" as red flag); WAG-MDL-03398.00002 (California Board of Pharmacy

3    corresponding responsibility outline).

4              15.6.2.8.  *Cash payment.* A patient paying cash for opioids raises a red

5    flag as potentially evasive behavior. Catizone Decl. ¶ 18; P-23068_00016 (2015 NABP

6    stakeholder report); P-15314_00028 (mid-2012 GFD policy establishing "[r]equest[s] to

7    pay by cash or by using a cash discount card" as red flag); P-17169_00011 (late 2013

8    GFD training presentation acknowledging "pay[ing] cash, or insist[ing on] paying cash for

9    controlled substances even though insurance is on file" as red flag); WAG-MDL-

10   03398.00002. Between 90 to 95 percent of pharmacy claims are paid by private insurance

11   or public programs. Catizone Trial Tr. 838:4–15.

12             15.7.  The prevailing standard of pharmacy practice in California, and across the

13   country, is to treat red flags as triggering the necessity for further inquiry. Unless such

14   further inquiry as is reasonable under the circumstances determines that diversion is

15   unlikely, the prescription should not be dispensed. Catizone Decl. ¶¶ 23–27; Park Decl.

16   ¶¶ 7–8; P-15314_00029 (mid-2012 GFD policy prohibiting dispensing if pharmacist is

17   "unable to satisfy the elements of good faith," that is, unable to resolve red flags raised by

18   prescription).

19             15.8.  The prevailing standard of pharmacy practice in California, and across the

20   country, is to reasonably document why a red-flagged prescription was or was not

21   dispensed after investigation. Catizone Decl. ¶¶ 25–26; Park Decl. ¶¶ 10–12; P-

22   29955_00004 (California Pharmacists Association "Corresponding Responsibility

23   Checklist") ("The pharmacist must document every resolution and non-resolution."); Nip

24   Dep. 30:9 (Calfornia Board of Pharmacy employee: "industr[y] standard" is

25   "documenting" red flag resolution).

26             15.8.1.  Reasonable due diligence shows the pharmacist's work and explains

27   the red flags identified, the information evaluated in resolving them, and the ultimate

28

reasons for dispensing. Catizone Decl. ¶ 26; *see also* Nip Dep. 30:21–22 ("the why, who, when, what, and how").

15.8.2.  Documentation is critical because it explains how the pharmacist resolved red flags or why the pharmacist refused to fill the prescription so that the same or other pharmacists can make use of the information when filling future prescriptions from the same doctor or the same patient. Catizone Trial Tr. 802:13–17. Documentation also affords the pharmacy the opportunity to review, audit, and investigate whether red flags are being identified and appropriately resolved, and it assists regulators if there is a need to investigate potential diversion. Catizone Decl. ¶ 25; Park Decl. ¶ 11.

15.8.3.  It is a basic tenet of pharmacy practice that, "if you didn't document it, it didn't happen." Gayle Dep. 51:21–52:5; *see also* Nip Dep. 30:22–23 ("[I]f it's not documented, it's not considered done."); Park Decl. ¶ 10; Mathews-Porter Dep. 72:2–19. If a red flag is resolved without documentation, "for all practical purposes, the resolution didn't occur." Catizone Trial Tr. 802:13–17. *See also* P-17247_00004 (Walgreens presentation on "drug utilization review" or "DUR" requiring "[d]ocumentation of actions performed when resolving a DUR" because "[d]ocumentation allows anyone to know what you, the pharmacist, was [*sic*] thinking of at the time of fill").

15.8.4.  Walgreens' written policies beginning in 2012 reflect the prevailing standard of pharmacy practice and require documentation of red flag resolution. Catizone Decl. ¶¶ 46–47; Park Decl. ¶ 13–14; P-15314_00028 (mid-2012 GFD policy stating, "It is imperative that pharmacists document all efforts used to validate good faith dispensing," that is, to investigate and resolve red flags); P-15074_00005 (mid-2016 GFD policy stating same); Polster Dep. 25:19–26:16; Stahmann Dep. 97:8–98:1; Gayle Dep. 50:8–10.

15.8.5.  Walgreens suggests that documentation of due diligence is not the prevailing professional standard or part of the standard of care in California, pointing to evidence that the outpatient pharmacy at ZSFG has no written policy requiring it. The Court rejects this view of the evidence.

1    15.8.5.1.  The Court finds credible the testimony of the People's

2  experts Carmen Catizone and Elizbeth Park that documentation is part of the standard of

3  care for retail pharmacies in California. Catizone Decl. ¶¶ 25–26; Park Decl. ¶¶ 10–12. As

4  the former executive director and CEO of the NABP, and as a practicing regulatory and

5  compliance pharmacist in California, respectively, Mr. Catizone and Dr. Park are in a

6  position to know what the standard is. The Court finds the other evidence cited above

7  likewise credible. *See, e.g.*, P-29955_00004 (California Pharmacists Association

8  "Corresponding Responsibility Checklist").

9    15.8.5.2.  Credible testimony demonstrates that the policy of the

10  outpatient pharmacy at ZSFG reflects the prevailing standards and requires documentation

11  of red flag resolution. Although this policy is not codified in a written document, staff are

12  informed of their obligations under this policy by the director of pharmacy. *See* Patel Trial

13  Tr. 1310:16–23, 1340:2–13, 1346:1–1348:3.

14    15.8.5.3.  While the policy of DPH as a whole does not contain a

15  documentation requirement, *see* D. Woods Dep. 74:13–21, that absence reflects the

16  unique circumstances of City-operated pharmacies—which include in-patient pharmacies,

17  jail pharmacies, and skilled nursing facility pharmacies—in which pharmacists have

18  access to a complete "closed medical record," including the physician's notes. D. Woods

19  Dep. 70:2–16.

20    15.8.5.4.  The fact that Walgreens' own written policies require

21  documentation further supports the inference that documentation is part of the prevailing

22  professional standard.

23    15.9.  The prevailing standard of pharmacy practice in California is for a

24  pharmacy to comply with its own policies and procedures. Park Decl. ¶ 6.

## 2. Walgreens' Dispensing Policies and Practices

26    **16.**  Walgreens failed to maintain effective controls against diversion, failed to

27  ensure that it dispensed prescription opioids only for legitimate medical purposes, and

28

1   failed to comply with prevailing standards of pharmacy practice in dispensing opioids.

2   *See* para. 27.3.1, *infra*.

3          16.1.  Walgreens' written policies were insufficient to ensure that Walgreens

4   pharmacies and pharmacists performed and documented the due diligence necessary to

5   ensure that opioid prescriptions were dispensed only for legitimate medical purposes.

6          16.1.1.  From 2003 to 2012, Walgreens' written "Good Faith Dispensing"

7   policy, which governed the circumstance where a pharmacist detected a red flag, was

8   simply an instruction to call the prescriber. If the prescriber stated that the prescription

9   was valid, pharmacists were expected to "process the prescription as normal." P-

10  15119_00012 (June 2006). A Walgreens pharmacist following this policy would be

11  incapable of identifying doctors who were not prescribing for legitimate medical purposes

12  or who had been duped by patients intending to divert the prescription to non-medical use.

13         16.1.1.1.  The Court does not credit evidence that this was not in fact

14  Walgreens' policy from 2003 to 2012. Contemporaneous documentation shows that the

15  2012 policy rewrite was a "game ... change[r]": "[W]e can no longer rely on the 'I spoke

16  to the prescriber and he said it was okay.' This is especially true when the prescriber may

17  be assisting the patient to inappropriately use controlled substances." P-20639_00009

18  (presentation by Tasha Polster). The clear inference is that, before 2012, Walgreens

19  instructed its pharmacists they could dispense controlled substances as long as the doctors

20  "said it was okay." P-20639_00009.

21         16.1.2.  Walgreens' 2003–2012 "call the prescriber" policy was recognized

22  by Walgreens itself as inadequate in 2012. P-20639_00009.

23         16.1.3.  After paying $80 million to the DEA to settle allegations of CSA

24  violations in 2013, P-00015_00007, beginning in April 2013 Walgreens created a "Target

25  Drug Good Faith Dispensing" policy that required completion of a checklist of due

26  diligence tasks for certain covered ("target") drugs. But the checklist policy covered only

27  three single-ingredient prescription opioids and excluded commonly abused opioid drugs

28  like Percocet (an oxycodone/acetaminophen combination), Norco (a

hydrocodone/acetaminophen combination), and Vicodin (same). P-00015_00007; Catizone Decl. ¶ 43. It also excluded single-ingredient hydrocodone, which was the "number one prescribed, dispensed, and abused drug in the United States." Catizone Trial Tr. 810:12–811:6.

16.1.3.1.  From 2006 to 2020, approximately 391 million opioid dosage units dispensed by Walgreens, or 63.3 percent of the total in the Bay Area, were comprised of drugs that were not covered by the TDGFD policy. For San Francisco itself, approximately 89 million dosage units dispensed by Walgreens, 57 percent of the total, were comprised of drugs that were not covered by the TDGFD policy. *See* P-29837_00002.

16.1.3.2.  In both the Bay Area and San Francisco, hydrocodone products accounted for the largest proportion of all opioid drugs dispensed by Walgreens between 2006 and 2020 (61.8 and 49.1 percent, respectively). *See* P-29837_00002.

16.1.4.  Walgreens' record-keeping policies and practices frustrated its TDGFD checklist policy.

16.1.4.1.  Until 2019, the checklists were not digitized and were maintained in a way that made them difficult to access within a single store, and nearly impossible to review across Walgreens' many pharmacies. Catizone Decl. ¶¶ 44–47.

16.1.4.2.  When the checklist was finally made electronic in late 2019, Tasha Polster acknowledged that the improvement should have been "from day one" but had earlier been vetoed by Walgreens executives. P-20795_00001. The result was that, for years, due diligence documented by one pharmacist—including, for example, concerns about a particular prescriber or patient—could not be effectively used to protect against future diversion.

16.2.  Walgreens' business practices created incentives to dispense prescription opioids without delay, and discouraged performing and documenting due diligence necessary to ensure that opioid prescriptions were dispensed only for legitimate medical purposes.

16.2.1.  Walgreens understaffed its pharmacies in San Francisco relative to the time and effort reasonably required to responsibly dispense the volume of prescriptions presented to those pharmacies.

16.2.1.1.  One San Francisco Walgreens pharmacy filled between 200 and 300 prescriptions per day with only one pharmacist on duty for all but two to three hours of the day. Lo Decl. ¶ 5. By contrast, the outpatient pharmacy at Zuckerberg San Francisco General Hospital fills 250 to 300 prescriptions per day with seven pharmacists on staff (and 11 additional support staff). Patel Trial Tr. 1292:20–1293:3, 1299:10–12, 1332:23–24.

16.2.1.2.  One Walgreens pharmacist in San Francisco, as a new pharmacist just out of pharmacy school, was the only pharmacist on duty at his Walgreens pharmacy "easily 75 percent" of the time, and about 25 percent of the time did not even have the assistance of a pharmacy technician. Gerspacher Dep. 25:24-26:4, 26:13-25, 27:3-9.

16.2.1.3.  According to Walgreens' corporate executives in February 2013, whose reports the Court credits on this point, "Fatigue and sustainability of our pharmacists is a real concern. We're asking them to do a lot but how long can they continue?" P-27333_00002; *see also* P-17218_00001, 00005 (Walgreens pharmacists were "struggling to keep our heads above water let alone manage," and executive heard these concerns "loud and clear in San Francisco" in May 2013).

16.2.1.4.  According to Walgreens pharmacists, whose reports the Court credits on this point, understaffing and overwork were common at Walgreens pharmacies. *See* Gayle Dep. 21:8–11; Yagar Dep. 50:19–20; Lo Trial Tr. 918:17–919:4, 920:4–8; Kamali Dep. 62:5–6, 62:24–63:3.

16.2.2.  Just after promulgating its "Target Drug Good Faith Dispensing" policy in 2013, Walgreens instructed its field leadership that due diligence obligations would not excuse failure to achieve the sales targets set by Walgreens. P-00060_00002

1   ("[Good Faith Dispensing] concerns do[]n't relieve you from trying to attain the numbers

2   that have been set for you.").

3              16.2.3.   Walgreens' policies encouraged its pharmacists to work at unsafe

4   speeds by several means, including a color-coded tool called a "PhLOmometer" that

5   encouraged pharmacists in real time to fill prescriptions faster, and paying bonuses based

6   on the number of prescriptions filled. Catizone Decl. ¶¶ 65–66 (discussing P-

7   23078_00002; P-19821_00001; P-19529_00001).

8              16.2.3.1.   A pharmacist pressured to work too quickly is at risk of

9   missing red flags and is discouraged from investigating any red flags she does identify.

10  Catizone Decl. ¶ 63.

11             16.2.3.2.   Through interviews with a third-party consultancy,

12  Walgreens pharmacists informed Walgreens that "improper behavior" by pharmacists was

13  "largely attributed to the desire" to meet a Walgreens prescription dispensing speed metric

14  known as "promise time," that is, the time within which patients are promised to get their

15  prescriptions filled. P-14357_00037. But Walgreens did nothing to remove this spur to

16  "improper behavior," and indeed instructed the consultancy to omit further mention of it.

17  P-14370_00039.

18             16.2.4.   Walgreens pharmacists understood that Walgreens expected them to

19  prioritize filling prescriptions above all other concerns. Gayle Dep. 16:25–17:4 ("[T]he

20  most challenging part of working at Walgreens was I constantly felt like there was a

21  pressure to fill, fill, fill and that was what the company cared about most, was the message

22  I got."); Lo Trial Tr. 918:17–19 ("Everything was about numbers, always. … Verify by

23  promise time, wait times, phone times, how many—how many seconds, literally

24  seconds."). The Court credits the testimony of one Walgreens pharmacist, Victor Lo, who

25  testified that his pharmacy supervisor pressured him to fill controlled substances

26  prescriptions. When confronted with the testimony, the supervisor initially denied Lo's

27  account, but later admitted that what Lo described did "sound like something [she] would

28  say." Lowe Tr. 3088:9–13.

16.2.5.  Walgreens pharmacists repeatedly complained to Walgreens that Walgreens' business practices interfered with pharmacists' ability to properly dispense opioid prescriptions and maintain patient safety. The Court credits these complaints as descriptions of the working environment common at Walgreens pharmacies in light of the complaining pharmacists' strong incentives to keep quiet, and in light of the national scope of Walgreens corporate policies and programs about which the pharmacists complained. *Cf.* P-27287_00005 ("Most [Walgreens pharmacists] just go ahead and fill recklessly because they don't want to be hassled with the consequences, have their hours reduced, scheduled to work far from their home, or [be] blacklisted.").

16.2.5.1.  Walgreens' internal complaint database (called "APIS") shows that Walgreens' pharmacists have perennially complained that short-staffing, speed- and volume-based performance metrics, and pressure from managers to maintain customer satisfaction have impeded pharmacists' ability to conduct due diligence on opioid prescriptions. Catizone Decl. ¶¶ 32–34; *see also* P-27295_00002 ("We are putting profits above the safety of our customers. When Ford and Boeing did that it did not pay off. I hope Walgreens will do what is right/ethical and remove this metric immediately before lives are lost and litigation ruins this great company."); P-27288_00002 ("Staff is being pressured to fill all narcotic prescriptions by pharmacy manager."); P-27297_00002 (Pharmacist felt "pressured to fill prescription[s]" from a doctor "running a pill mill."); P-27303_00002 ("[The supervisor] attempted to convince her that she should just dispense the prescription to the patient AGAINST HER PROFESSIONAL JUDGMENT."); P-27300_00002 (Pharmacy manager "again insisted the GFD policy does not apply to his store. … Dispensing medications ASAP was the company's priority."); P-27305_00002 ("The pharmacist "explained that Store Manager … and Pharmacy Manager … receive a bigger bonus if they have prescription sales. … [The complaint] feels pressured by [the manager] because they want her to fill narcotic prescriptions without verification first."); P-27298_00003 (Store manager "overrode and removed his decision not to dispense a prescription to a customer…. [The manager] told him that she could not afford to lose a

1   customer who spends $6,000 a month in her store."); P-27327_00003 ("The lack of

2   adequate staffing pos[es] risks to patient safety and standards of customer service."); P-

3   27296_00002 ("Pharmacy Manager … has been bypassing safety checks with the

4   customer's prescriptions … to meet the promise time.").

5         16.2.6.   Walgreens' corporate policy was to "not for an extended period of

6   time block a prescriber that had an active DEA and state license," Stahmann Dep. 14:1–6,

7   134:3–06, "[r]*egardless of* [*the*] *prescriber's prescribing history*." P-25638_00001

8   (emphasis added). *Compare* Mathews-Porter Dep. 106:16-107:02 (discussing the "Rite

9   Aid system, where they just black out the doctor completely so you could not fill for

10  him"). This was the policy up and until a prescriber's license was revoked. Polster Trial

11  Tr. 2305:01–2306:01 (short of license revocation, "[i]f [a prescriber's] office was indeed

12  raided, it was completely shut down, we *may potentially* block their prescriptions from

13  being filled" (emphasis added)). By refusing to block suspicious opioid prescribers

14  writing prescriptions that were likely to be diverted from using its pharmacies chain-wide,

15  Walgreens needlessly saddled its pharmacists with the burden of having to investigate

16  afresh each prescription written by such prescribers. Lo Decl. ¶¶ 16, 18–20.

17        16.2.7.   Purportedly to protect prescribers' reputations, Walgreens instructed

18  its pharmacists not to write anything negative about prescribers in its electronic records,

19  and often deleted comments indicating a prescriber's prescriptions would likely be

20  diverted. Lo Decl. ¶¶ 16, 18–20; Yagar Dep. 103:02-19, 104:18-105:12; Kamali

21  Dep. 69:13-70:21; P-27332_00001 ("[P]lease note the comment of 'Candy Doc' has been

22  removed from all prescriber profiles."); P-17229_00001 ("Any comments such as

23  'prescriber under investigation' in the prescriber's profile should be removed."); P-

24  25638_00001 ("[P]lease advise the pharmacy staff to refrain from entering any slanderous

25  comments in the prescriber's IC+ profile and stick with generic comments such as 'verify

26  GFD'.").

27        16.2.8.   Walgreens failed to provide any mechanism for its pharmacists to

28  effectively communicate their concerns about potentially illegitimate prescribers to other

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

1    pharmacies and pharmacists. Lo Decl. ¶¶ 16-19 ("Even when suspicious prescribers were

2    identified, Walgreens offered no effective way to spread that information."); Gayle

3    Dep. 89:22-90:15, 101:24-102:5 (testifying that she tried to warn other pharmacists in her

4    neighborhood but had no tools of formal system to share her concerns more broadly).

5            16.2.9.  Walgreens had in its possession detailed data, collected from its

6    pharmacies and purchased from vendors, about the doctors whose prescriptions it

7    dispensed, and the patients to whom those prescriptions were dispensed. Walgreens could

8    have but failed to use this data to aid its pharmacies' due diligence efforts, and purposely

9    withheld this data from its pharmacists.

10           16.2.9.1.  Walgreens possessed a vast amount of dispensing data and

11   other information collected from its individual pharmacies. Walgreens also had robust

12   data sets from vendors such as IQVIA/IMS, LexisNexis, and Medispan. Catizone Decl.

13   ¶ 53; P-28445_00008 to 00009.

14           16.2.9.2.  Walgreens used data in its possession to compile "prescriber

15   indexes" or "prescriber potential risk indexes" to rank prescribers based on risk factors

16   such as total opioid volume and average pills per prescription; percentage of prescriptions

17   that are opioids; percent of opioid patients that pay cash; percent of prescriptions filled out

18   of state; and sudden increases in these trends. *See* P-27367 (2013 Ed Bratton e-mail

19   explaining index); P-06999a (2012 presentation explaining index); P-27369a (spreadsheet

20   of indexed prescribers).

21           16.2.9.3.  Walgreens' executives made the decision to withhold this

22   information from its pharmacists out of concern that pharmacists would decline to fill

23   prescriptions written by the suspicious doctors it had identified. A Walgreens executive

24   admitted that Walgreens had this information and withheld it, explaining that Walgreens

25   did not want to "cloud the judgment" of its pharmacists. Stahmann Dep. 68:13–16,

26   130:18–21, 130:24, 131:2–13; Polster Trial Tr. 2306:23–2307:06.

27

28

16.2.9.4.  The Court credits the testimony of Walgreens' pharmacists that they would have liked to have this kind of information and that it would have made a difference in their ability to perform appropriate due diligence.

16.2.9.4.1.  Rebecca Gayle wanted, but never received, lists of prescribers warranting extra scrutiny. This kind of data would have allowed her to identify outlier physicians and conduct additional due diligence. This information "could have avoided" the dispensing of illegitimate prescriptions. Gayle Dep. 67:17–69:12, 71:22–72:14, 87:04–90:15.

16.2.9.4.2.  Robert Yagar wished Walgreens had a way of identifying bad prescribers and pill mills. In the absence of such a system, Yagar tried to maintain a personal list of suspicious prescribers. Yagar Dep. 102:18–103:1.

16.2.9.4.3.  Christy Mathews-Porter testified that she would have liked data on "heavy prescribers" and would have used the information to as a red flag to be investigated. Mathews-Porter Dep. 111:1–12.

16.2.9.5.  Walgreens could have been analyzing that data to identify dispensing and prescribing trends, among other things, and using that information to strengthen its controls against diversion. Keller Decl. ¶¶ 29–30 (IQVIA data); Catizone Decl. ¶¶ 55–62 (citing among others P-25699_00001; P-19543_00001; P-17193; P-19690; P-28445_00010 to 00012; P-25700_00018 to 00023; P-25700_00018 to 00019; P-28445_00010 to 00012; P-28446_00009 to 00010; P-19607_00002; P-15315_00009 to 00014; P-25503; P-19573_00007).

16.3.  Walgreens expressly and impliedly communicated an inaccurate picture of opioids' risks and benefits to its pharmacists, so that its pharmacists were less wary of opioid dispensing then they would have been otherwise.

16.3.1.  In 1998, Walgreens began to seek out Purdue's speakers to train Walgreens' pharmacists on opioids and pain management through continuing education (CE) programs that sought to reduce barriers pharmacists might pose to filling opioids prescriptions. Lembke Decl. ¶ 117; P-25983; P-25984; P-25985; Perri Decl. ¶ 112; Perri

Trial Tr. 1836:4-14. One such CE was prepared by Purdue-paid "key opinion leader" Arthur Lipman.  Lembke Decl. ¶ 117; P-27120_00033 to _00034; P-27170; P-27169; P-27020 (Lipman CE); Perri Decl. ¶ 116.  The Lipman CE, "The Use of Opioids in Chronic Noncancer Pain," instructed pharmacists that addiction among pain patients was "exquisitely rare." Lembke Decl. ¶ 117; P-27038_00005, P-27038_00014; Lembke Trial Tr. 396:18–23. It also claimed that "[p]seudoaddiction is appropriate drug seeking behavior for the purpose of comfort, not abuse"; and "[p]seudoaddiction can be differentiated from drug misuse by increasing the dose by an appropriate amount and determining if the complaints abate."  P-27020_00008 to 00009; Perri Decl. ¶¶ 116-17; Lembke Decl. ¶ 117; Lembke Trial Tr. 405:16-406:04.

16.3.2.  Walgreens argued that these claims were consistent with the FDA-approved label for OxyContin, which until July 2001 stated that "Iatrogenic 'addiction' to opioids legitimately used in the management of pain is very rare." In July 2001, however, the FDA-approved label was changed to eliminate the foregoing text and, instead, read as follows: "The development of addiction to opioid analgesics in properly managed patients with pain has been reported to be rare.  However, data are not available to establish the true incidence of addiction in chronic pain patients." The Lipman CE materials remained effective until 2002, however, and there is no evidence in this case that Walgreens educated its pharmacists to correct the misinformation that addiction among pain patients was indeed "exquisitely rare." P-27020_00002, 00008; DEF-MDL-13160; *see* Lembke Trial Tr. 1082:10–13.

16.3.3.  Walgreens repeatedly requested the Lipman CE from Purdue. Perri Decl. ¶ 118; Lembke Decl. ¶ 118; P-27221; P-27169; P-27170. Walgreens noted the importance of having "well-informed pharmacists in the area of pain management." Lembke Decl. ¶ 118; P-26062_00003. Dr. Lipman's CE programs increased pharmacy sales of OxyContin dramatically.

16.3.4.  The Lipman CE was rolled out in Wisconsin, Florida, Tennessee, Utah, and Chicago. The CE is an example of a national campaign of Walgreens training

1    material. Such training was uniform to Walgreens' pharmacists all over the country,

2    which affects California. Lembke Trial Tr. 1069:24–1071:8.

3        16.3.5.  By inviting and disseminating this and other manufacturer-

4    sponsored CE material, Walgreens caused its pharmacists to be misinformed about the

5    risks of addiction, with the result that they would be more willing to fill opioid

6    prescriptions, less likely to ask important questions, and less able to fulfill their

7    responsibilities to investigate red flags to prevent illegitimate use and diversion.  Lembke

8    Decl. ¶ 119.

9        16.3.6.  Similarly, in 2014, Walgreens developed a tool that would help field

10   leaders identify pharmacists who were "not dispensing a lot of controlled drugs." P-

11   19607_00001 to 00002. The head of Walgreens' Pharmaceutical Integrity group, Tasha

12   Polster, recommended that field leaders "encourage the pharmacist[s] to [] obtain more

13   information on pain management such as [CE] courses in order to better understand

14   treatment protocol and feel more comfortable in filling controlled substances." P-

15   19607_00001 to 00002.

16              **3. Evidence of Lack of Due Diligence by Walgreens**

17       16.4.  The evidence shows that it is more likely than not that Walgreens

18   pharmacists failed to perform due diligence on significant numbers of prescriptions with

19   red-flags of diversion and dispensed those prescriptions without investigating or clearing

20   the red flags.

21       16.4.1.  The People's expert, Elizabeth Park, reviewed Walgreens'

22   prescription records and determined that, from 2006 to 2020, Walgreens pharmacists in

23   San Francisco performed and documented the due diligence reasonably necessary to

24   resolve red flags presented by the prescription for fewer than 5 percent of prescriptions

25   with such flags. Park Decl. ¶ 24.

26        16.4.1.1.  Dr. Park conducted a thorough analysis of Walgreens' due

27   diligence records for a little under 2,300 (2,265, to be precise) opioid and opioid cocktail

28   prescriptions that were dispensed by Walgreens pharmacies in San Francisco from 2010 to

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

2019 and which triggered one or more red flags. *See* Park Trial Tr. 963:6–964:24. Dr. Park reviewed all materials associated with these prescriptions—including each data field associated with electronic prescription records for these prescriptions, as well as any attached TDGFD checklists or copies of the original prescriptions, in an effort to locate due diligence records wherever they could be found. *See* Park Trial Tr. 977:3–20; Park Decl. ¶ 19.

16.4.1.2.  Walgreens' written dispensing policies required Walgreens' pharmacists to document their diligence in clearing red-flagged prescriptions. *See* para. 15.8.4, *supra*.

16.4.1.3.  It is a basic tenet of pharmacy practice that, "if you didn't document it, it didn't happen." Gayle Dep. 51:21–52:5; *see also* para. 15.8.3, *supra*.

16.4.1.4.  Although it is possible that in some instances, Walgreens' pharmacists may have performed due diligence and failed to document it, in light of Walgreens' policy requiring documentation and in light of the prevailing professional standard requiring documentation, the Court concludes that in the vast majority of cases where there is no record of due diligence, the pharmacist did not clear the red flag.

16.4.2.  Walgreens' electronic dispensing records on their face reveal an absence of documented due diligence. The two fields specifically relevant to red flag due diligence, the "annotations" field and the "patient comments" field, *see* Polster Trial Tr. 2415:1–4, were simply left blank for all but 240 and 319 prescriptions, respectively, of the nearly 2,300 reviewed. Of the latter number, 266 of the 319 fields contained only e-mail addresses. *See* Park Trial Tr. 973:4–976:17.

16.4.3.  A 2015 Walgreens audit of its stores found that fewer than 60 percent were complying with Walgreens' post-2013 "Target Drug Good Faith Dispensing" checklist requirement. P-15085_00007.

16.4.4.  Around 2010, Walgreens pharmacists reported to a manager at Walgreens' Jupiter, Florida, distribution center that it was "not their job" to meaningfully

investigate prescriptions; if "[t]hey ha[d] a script, they w[ould] fill it." Lucas Fla. Test. 632:2–6.

16.4.5.  "Target Drug Good Faith Dispensing" checklists were completed equally rarely—or even more rarely—by Walgreens pharmacies in San Francisco, according to documents produced by Walgreens in this litigation. Catizone Decl. ¶¶ 51–52; P-29849. If additional productions would have cast Walgreens in a more favorable light, Walgreens presumably would have made them.

16.4.6.  Given that Walgreens dispensed 1.4 million red-flagged opioid prescriptions in San Francisco, *see* para. 17.1.5, *infra*, and given that Walgreens' diligence records suggest that due diligence was performed for only approximately five percent of those prescriptions, it is reasonable to conclude that Walgreens dispensed more than 1.3 million opioid prescriptions with red flags of diversion that were not cleared before the drugs were dispensed. The Court further concludes that even if Walgreens' pharmacists performed some due diligence that they did not document, it is more likely than not that Walgreens dispensed a significant number of prescriptions with red flags of diversion that were not cleared before the drugs were dispensed.

16.4.7.  The conclusion that Walgreens failed to perform due diligence on red-flagged prescriptions for which there is no documentation of investigation is supported by other evidence. Walgreens partnered with opioid manufacturers like Purdue to "educate" its pharmacists in an effort to overcome their hesitation to dispense addictive narcotics. For many years, Walgreens' written dispensing policies provided little guidance and directed pharmacists to dispense opioid prescriptions if the doctor "said it was okay." That policy changed after a series of DEA interventions, but the policy that followed had fundamental flaws, including the fact that it did not cover the most commonly abused prescription opioids. Walgreens pharmacies were extremely understaffed, leaving its pharmacists with insufficient time to conduct adequate due diligence on opioid prescriptions. The overwhelming priority for Walgreens pharmacists was to fill as many prescriptions as possible, as quickly as possible. Walgreens withheld critical data about

1  potentially suspicious prescribers from these pharmacists and failed to implement

2  effective methods for pharmacists to communicate their concerns about potentially

3  illegitimate prescriptions and prescribers. *See* paras. 16.1–16.3, *supra*. Taken together,

4  this evidence supports the inference that Walgreens regularly dispensed red-flagged

5  opioid prescriptions without sufficient due diligence.

6  ## V. Causation in Fact

7      **17.**  Walgreens' conduct has been a cause in fact of the public nuisance in San

8  Francisco. Walgreens has been a substantial factor in causing the opioid epidemic in San

9  Francisco. The opioid epidemic would not have occurred to its present extent without

10  Walgreens' conduct.

11  ### A. The Connection Between Walgreens' Conduct and Diversion in San Francisco

12        17.1.  Diversion of prescription opioids in San Francisco would not have reached

13  its full extent without Walgreens' conduct.

14          17.1.1.  Diversion occurs when prescription opioids are used for other than

15  legitimate medical purposes, that is when they are used non-medically. Opioids that are

16  dispensed without a prescription issued for a legitimate medical purpose by a practitioner

17  acting in the usual course of his professional practice are, by definition, diverted, because

18  they cannot be used medically—that is, they cannot be taken as directed by a physician for

19  a medical purpose. *Cf.* para. 5.2.2.4, *supra*.

20          17.1.2.  It is more likely than not that Walgreens' failure to maintain

21  effective controls against diversion led to the dispensing of prescriptions that were not

22  issued for a legitimate medical purpose and thus were diverted. Multiple circumstances

23  and multiple types of evidence lead inexorably to this conclusion.

24  ### 1. Volume of Red-Flagged Prescriptions Dispensed Without Due Diligence

25          17.1.3.  From January 2006 to June 2020, Walgreens pharmacies in San

26  Francisco dispensed 2.47 million opioid prescriptions, equaling 155.8 million dosage units

27  of opioids. McCann Decl. ¶¶ 22, 57. The number of dosage units dispensed by Walgreens

28  increased each year from 2006 through 2011. McCann Decl. ¶ 57; McCann Trial Tr. 1192.

17.1.4.  The People's expert Carmen Catizone identified 14 red flags of diversion based on the categories described above. *See* para. 15.6.2, *supra*. The People's expert Dr. Craig McCann applied these 14 red flags to Walgreens' prescription records to determine the number of opioid and opioid cocktails prescriptions dispensed by Walgreens that triggered one or more of the flags.

17.1.4.1.  For the purposes of quantitative analysis, the People's expert Dr. Craig McCann reasonably and reliably operationalized the dispensing red flags identified by the People's experts Carmen Catizone and Dr. Elizabeth Park. While red flag due diligence necessarily involves exercise of a pharmacist's professional judgment, the algorithmic red flag definitions developed by Dr. McCann with Mr. Catizone's assistance capture real-world indicia of diversion such that reliable conclusions may be drawn from Dr. McCann's aggregate analysis.

17.1.4.2.  As to the "long distance travel" flag specifically, 25 miles is a reasonable approximation of a distance that should raise a pharmacist's suspicions in the dense urban environment of San Francisco and the Bay Area.

17.1.4.3.  Walgreens argues that the red flags the People identified and analyzed are over-inclusive and do not reflect standards in the practice of pharmacy. The People's evidence shows, however, that Walgreens' own GFD policy recognized the same categories of red flags—long distances travelled, doctor shopping, pharmacy shopping, drug cocktails, excessive dispensing, pattern prescribing, early refills, and cash payments. These categories are also recognized by NABP and other stakeholders. *See* para. 15.6.2, *supra*. The Court finds that the flags identified by Mr. Catizone are appropriate indicators of diversion and reflect professional standards and consensus.

17.1.4.4.  Walgreens argues that the People's flagging method is over-inclusive because it flags prescriptions that only become suspicious in combination with other prescriptions. But adjusting the flagging methodology to account for this criticism would not materially change the results. The adjusted method would flag 55.4 percent of the prescriptions for opioids and opioid cocktail drugs that Walgreens dispensed, instead

of the 61.5 percent of such prescriptions flagged by the original approach. McCann Rebuttal Decl. ¶¶ 4–5.

17.1.5.  Of the approximately 2.5 million opioid prescriptions dispensed by San Francisco Walgreens pharmacies, 1.4 million or 57.6 percent were flagged by at least one of 14 red flags. McCann Trial Tr. 1181:7–10. (Although this number does not take account of the adjustment discussed above, given the modest nature of the reduction resulting from that adjustment, the Court does not believe that applying the adjustment would materially alter any of its conclusions.) Nearly one third (32.13 percent) of the 1.4 million flagged opioid prescriptions had more than one red flag. Catizone Decl. ¶ 70; McCann Decl. ¶ 60; McCann Trial Tr. 1181:24. Of the approximately 2.9 million opioid and opioid cocktail prescriptions dispensed by San Francisco Walgreens pharmacies, 61.5 percent had at least one red flag. McCann Decl. ¶ 22. *See generally* P-04744 (McCann "Summary of Dispensing Red Flag Analysis").

17.1.6.  It is more likely than not that Walgreens dispensed the vast majority of these red-flagged prescriptions without anyone performing the requisite due diligence. *See* para. 16.4, *supra*.

17.1.7.  Given the expected danger of diversion, and the fact that red-flags are designed to identify circumstances indicative of diversion, it is more likely than not that because Walgreens dispensed a significant number of red-flagged prescriptions without due diligence to clear the suspicions, a substantial number of such prescriptions were in fact diverted. Catizone Decl. ¶¶ 71, 86, 95. Given the likelihood that Walgreens dispensed a significant number of opioid prescriptions with red flags of diversion that were not cleared, the Court finds that it is more likely than not that a significant number of the opioids dispensed pursuant to those prescriptions were not for a legitimate medical purpose and thus were diverted.

17.1.7.1.  Walgreens argues that the inference of diversion is faulty because, (a) according to Walgreens, 99.5 percent of doctors do not write illegitimate prescriptions; and (b) significant percentages of prescriptions written by many doctors

1   who are above reproach, including doctors employed by the City and its agencies,

2   triggered one or more red flags. The Court rejects this view of the evidence.

3               17.1.7.1.1.  The evidence does not support Walgreens'

4   assertion that 99.5 percent of doctors prescribe appropriately. There is no evidence in the

5   record to quantify the number of doctors who prescribe illegally. Walgreens cites to the

6   testimony of former head of DEA's Office of Diversion Control Joe Rannazzisi, but Mr.

7   Rannazzisi explained that his statement ("99 percent or more of prescribers were not

8   overprescribing") was "made in the context of how many people were actually charged

9   with administrative criminal and civil violations." Rannazzisi Dep. 1781:15–20. The

10  Court recognizes that Mr. Rannazzisi was speaking extemporaneously and without

11  reference to statistical evidence of the actual number or percentage of doctors who

12  prescribe illegally; the number of prescribers who prescribe illegally but have not been

13  prosecuted or disciplined is unknown. In any event, the relevant factor is not how many

14  doctors wrote illegitimate prescriptions, but rather how many prescriptions—and how

15  many MMEs—those doctors accounted for. A small number of doctors can and do

16  account for a disproportionate number of illegitimate prescriptions. *Cf.* para. 17.1.11,

17  *infra*.

18               17.1.7.1.2.  That even doctors who are above reproach may

19  write large numbers of red-flagged prescriptions does not undermine the inference that

20  Walgreens dispensed illegitimate prescriptions. The fact that many red flags will, if

21  investigated, be cleared does not mean that they all will be. Nor will the diverted

22  prescriptions be distributed evenly among all prescribers, as Walgreens has suggested. It

23  is not only possible, but even likely, that most, if not all, of the red-flagged prescriptions

24  written by one particular doctor would be cleared by investigation, while virtually none

25  written by other doctors would be. Dr. Claire Horton, for example, and other physicians

26  working in San Francisco's safety-net network, practice "in a really high-risk setting with

27  really high-risk patients." It is therefore not inappropriate that a high percentage of their

28  prescriptions would trigger but ultimately clear a pharmacist's review. Horton

Dep. 48:21–49:16, 149:19–150:21, 159:22–160:16, 170:19–171:16. The same cannot be said, for example, of physicians who sell opioid prescriptions without examination. *See* para. 17.1.11, *infra*. Moreover, even a doctor above reproach may unwittingly write an illegitimate prescription to a doctor-shopping patient who is deceiving them and is seeking opioids for non-medical use. The statistical inference remains that, if you fill enough red-flag prescriptions without due diligence, many of them will be diverted. It is not necessary to know which ones and not reasonable to infer that they will be distributed evenly among the prescribers whose prescriptions were flagged.`

17.1.8.  The sheer volume of red-flagged prescriptions dispensed without due diligence is not the only circumstance supporting the inference that Walgreens' failure to provide effective controls against diversion led to the dispensing of prescriptions that were not for medical use and were instead diverted. Each of these circumstances, alone and in combination, supports that inference.

## 2. Distribution and Receipt of Suspicious Orders

17.1.9.  The inference that Walgreens dispensed illegitimate prescriptions from its stores is supported by the fact that Walgreens shipped large volumes of suspicious orders to its stores, which in turn dispensed many red-flagged prescriptions.

17.1.9.1.  From 2006 to 2014, Walgreens distributed 102.4 million dosage units of opioids to Walgreens pharmacies in San Francisco. McCann Decl. ¶ 10.

17.1.9.2.  The People's expert Dr. Craig McCann applied seven algorithms that could have been used to identify suspicious orders. The results showed that the percentage of dosage units (pills, patches, etc.) distributed by Walgreens to its pharmacies that would have been flagged as suspicious under at least one of the algorithms ranges from 4.3 to 67.4 percent, or from 4 million to 63.2 million dosage units. McCann Decl. ¶ 16.

17.1.9.2.1.  There is no evidence in the record to suggest that the seven distribution algorithms do not represent appropriate methodologies for identifying suspicious orders. Several of the methods are similar to those used by

1    Walgreens itself, or by other distributors which distributed to it. *Compare* McCann Decl.

2    ¶ 49 (describing "three times trailing twelve-month average" method), *with* McCann Trial

3    Tr. 1171:22–1172:8 (Walgreens reporting "orders for the month ... exceed[ing] three

4    times the monthly average over the prior six months."); *see also* McCann Decl. ¶ 50

5    (applying dosage unit threshold taken from policies of McKesson Corp., which distributed

6    prescription opioids to Walgreens, *see* P-29835_00012), ¶ 51 (applying dosage unit

7    threshold taken from policies of Cardinal Health, which distributed prescription opioids to

8    Walgreens, *see* P-29835_00012).

9            17.1.9.3.  Throughout the period during which Walgreens distributed

10   opioids to its stores, it had no effective SOM system in place. *See* para. 14, *supra*.

11          17.1.9.4.  Given the large number of suspicious orders of opioids

12   shipped to Walgreens stores without due diligence, it is more likely than not that a

13   significant number of those opioids were dispensed illegitimately and thus diverted.

14          17.1.10.  The inference that Walgreens dispensed illegitimate prescriptions

15   from its stores is further supported by the fact that *all* of the distributors that shipped to

16   Walgreens shipped large volumes of suspicious orders to Walgreens' stores, which in turn

17   dispensed many red-flagged prescriptions.

18          17.1.10.1.  From 2006 to 2014, the Walgreens pharmacies in San

19   Francisco received 126.9 million dosage units (pills, patches, etc.) from distributors

20   Walgreens, AmerisourceBergen, Cardinal Health, and McKesson Corporation. McCann

21   Decl. ¶ 12; P-29835_00012. These 126.9 million pills (or patches, etc.) represent 58.7

22   percent of the prescription opioids shipped to retail and chain pharmacy dispensers in San

23   Francisco. McCann Decl. ¶ 39; P-29835_00002. When Dr. McCann applied the same

24   seven algorithms discussed above to these shipments, the results showed that the

25   percentage of dosage units distributed by all of the distributors that shipped opioids to

26   Walgreens pharmacies in San Francisco that would have been flagged as suspicious under

27   at least one of the algorithms ranges from 4.1 to 64.4 percent. McCann Decl. ¶ 14; *see*

28   *also* CT4-MCCANN-DEMO-00024_00020.

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

1    17.1.10.2.  The shipment of so many suspicious orders to Walgreens

2    stores is a further circumstance suggestive of diversion at those stores.

3    ### **3. Dispensing "Bad Doctors'" Prescriptions**

4    17.1.11.  The inference that Walgreens dispensed illegitimate prescriptions

5    from its stores as a result of its failures to maintain effective controls against diversion is

6    further supported by the fact that Walgreens filled tens of thousands of opioids

7    prescriptions written by 31 highly suspicious prescribers who ultimately lost their medical

8    licenses; some were criminally prosecuted. Several of these prescribers had been

9    identified in Walgreens' own dispensing data analyses (of which it purposely kept its

10   pharmacists ignorant) as suspicious outliers. Several were known to Walgreens'

11   pharmacists to be dangerous, even too dangerous, to dispense for—but these pharmacists

12   had no way to communicate their concerns broadly, and they were ignored. Walgreens

13   continued dispensing for these prescribers in some cases weeks or *months* after their

14   licenses had been surrendered or revoked.

15   17.1.11.1.  The People identified 31 prescribers in San Francisco and

16   the Bay Area who were disciplined for prescription opioid misconduct. *See* P-18323a.

17   Together, these 31 prescribers accounted for 7.8 percent of all opioid MMEs dispensed at

18   San Francisco Walgreens stores from 2006 to 2020. In 2010, they accounted for 16.7

19   percent of all MMEs dispensed at San Francisco Walgreens stores. Walgreens dispensed

20   more than 6 million dosage units written by these 31 prescribers in San Francisco; for the

21   Bay Area, it was more than 20 million dosage units. *See* P-18323a; P-28506b. *Compare*

22   para. 17.1.3 (total of 155.8 million dosage units dispensed), *supra*.

23   17.1.11.2.  Dr. Guido Gores was the second highest opioid prescriber in

24   San Francisco and in the top 1 percent nationwide. *See* Keller Decl. ¶¶ 18–20. In February

25   2021, Dr. Gores surrendered his license in response to allegations that he prescribed

26   opioids to patients before examining them; prescribed opioids with Adderall, resulting in

27   a patient's death by "acute mixed drug intoxication"; and committed other acts of gross

28   negligence. Catizone Decl. ¶ 73; P-22297_00011 to 00022. Between 2006 and 2020,

1   Walgreens filled nearly 10,000 opioid prescriptions from Dr. Gores, of which

2   approximately 82 percent triggered at least one red flag. Catizone Decl. ¶ 74; *see* P-

3   28506b. One of his prescriptions hit 10 out of the 14 red flags, yet was still dispensed by

4   Walgreens in 2018. Catizone Decl. ¶ 77.

5           17.1.11.2.1. The absence of a system for identifying "bad

6   doctors" led Walgreens to continue filling prescriptions written by Dr. Gores well after

7   they should have stopped. As early as 2012, Dr. Gores stood out in Walgreens' dispensing

8   data as an outlier high-volume prescriber. *See* P-27369a (nine entries for Gores on

9   prescriber risk index). Walgreens withheld that data from its pharmacists, *see* para. 16.2.9,

10   *supra*, but even without it, by 2019 two separate Walgreens pharmacies (at 1301 Market

11   Street and 1300 Bush Street) had of their own initiative stopped filling Dr. Gores's

12   controlled substance prescriptions. P-27265 (citing high opioid prescription volume from

13   general practitioner as cause for concern); P-27532_00003. But because Walgreens lacked

14   a method to escalate such concerns systematically, other San Francisco Walgreens

15   pharmacies kept filling Dr. Gores's prescriptions. Catizone Decl. ¶ 75. After district

16   manager Ronda Lowe would have reviewed the refusal to fill Dr. Gores's prescriptions

17   implemented by the 1301 Market Street pharmacy, *see* Lowe Trial Tr. at 3048:15–25,

18   3049:20–50:1; 3051:11–17; P-27532, San Francisco Walgreens dispensed an additional

19   86,904 opioid dosage units on Dr. Gores's prescriptions. P-28518_GORES_EXCERPT;

20   *see* P-28506b.

21           17.1.11.2.2.  Later in 2019, other Walgreens pharmacists

22   expressed similar concerns to higher levels of Walgreens leadership. P-27532_00003 to

23   00004. Walgreens' Pharmaceutical Integrity department was also made aware that Dr.

24   Gores was also being investigated by the DEA by no later than September 2019. P-

25   27531_00002 to 00003. Again Walgreens leadership did not share this information, and

26   nearly all of its San Francisco pharmacies continued to fill Dr. Gores' prolific opioid

27   prescriptions for the remainder of 2019 and into 2020. Catizone Decl. ¶ 76; *see* P-28506b.

28

17.1.11.3.  Dr. Andrew Giovannini was a high-volume prescriber, ranking 16th in the nation by MME in 2010. *See* Keller Decl. ¶ 12–17. In that year, 13 percent of all MMEs dispensed by Walgreens pharmacies in San Francisco were dispensed on Dr. Giovannini's prescriptions. *See* P-28506b. In May 2012, Dr. Giovannini surrendered his medical license for routinely prescribing dangerously high levels of opioids without appropriate examination or documentation. Catizone Decl. ¶ 78; P-27514. In just five years from 2006 to 2010, San Francisco Walgreens pharmacies filled more than 9,000 of Dr. Giovannini's opioid prescriptions. Despite the fact that Dr. Giovannini had been practicing internal medicine since 1965, the volume of his opioid prescriptions increased thirteen-fold from 2006 to 2010. Catizone Decl. ¶ 79; *see* P-28506b. Ninety-four percent of those opioid prescriptions triggered one or more red flags. *See* P-28506b. Twelve oxycodone prescriptions written by Dr. Giovannini and filled at various Walgreens stores in San Francisco—3398 Mission Street, 1189 Potrero Avenue, and 4129 18th Street—hit at least 9 out of the 14 red flags. Catizone Decl. ¶ 80; *see* P-28506b.

17.1.11.3.1.  Walgreens pharmacists were aware that Dr. Giovannini's prescribing practices were suspicious and suggestive of diversion. *See* Gayle Dep. 69:15–71:4, 96:15-97:19, 102:10–102:23; Lo Decl. ¶ 22. But because Walgreens lacked a method to escalate such concerns systematically, other San Francisco Walgreens pharmacies kept filling Dr. Giovannini's prescriptions.

17.1.11.4.  Dr. Collin Leong had thousands of his opioid prescriptions filled at Walgreens before he surrendered his license in 2014 (and ultimately pleaded guilty to felony charges) for selling opioid prescriptions to patients without examination or medical justification. Catizone Decl. ¶ 82; P-27610 (license proceedings); P-27568 (criminal proceedings); *see* P-28506b. Between 2006 and 2013, Walgreens' pharmacies in the Bay Area filled almost 2,200 of Dr. Leong's opioid prescriptions, with almost 79 percent triggering red flags. *See* P-28506b.

17.1.11.4.1.  As early as 2012, Dr. Leong stood out in Walgreens' dispensing data as an outlier high-volume prescriber. *See* P-27369a (eight

1    entries for Leong on prescriber risk index). Even without this data (which Walgreens

2    pharmacists did not have access to, *see* para. 16.2.9, *supra*), by early 2013, "a lot of

3    [Walgreens] stores had tagged [Dr. Leong's] name as do not fill for control[led

4    substances]." P-27533_00001. Walgreens Pharmacist Rebecca Gayle found Dr. Leong's

5    prescriptions particularly suspicious and tried to warn other pharmacists in her area about

6    him. Gayle Dep. 69:15–72:1, 100:24–102:21. But because Walgreens lacked a method to

7    escalate such concerns systematically, other San Francisco Walgreens pharmacies kept

8    filling Dr. Leong's prescriptions. Catizone Decl. ¶ 83; *see* P-28506b.

9              17.1.11.5.  Dr. John Pierce was a high-volume opioid prescriber. From

10   1997 to 2017, "Pierce wrote the fifth highest volume of opioid prescriptions and the sixth

11   highest volume of dosage units in San Francisco." Keller Decl. ¶ 25; *see* Keller Decl.

12   ¶¶ 25–28. Dr. Pierce surrendered his license in response to allegations he prescribed

13   opioids without examination or documentation. P-28430_00017, 00033. Of the more than

14   10,000 of his opioid prescriptions that Walgreens dispensed in the Bay Area, 75 percent

15   triggered at least one red flag. Catizone Decl. ¶ 84; *see* P-28506b.

16             17.1.11.5.1.  Walgreens pharmacist Rebecca Gayle noticed

17   Pierce's suspicious prescribing around 2016. Gayle Dep. 75:16–76:12, 79:6–17. By

18   August 17, 2019, Walgreens knew that Dr. Pierce had been placed on a California State

19   Board of Pharmacy list of "prescribers whose authority to prescribe controlled substances

20   has been restricted by the Medical Board of California." P-28997 _ 00002 (e-mail to

21   Ronda Lowe among others); *see* Lowe Trial Tr. 3064:1–24. Dr. Pierce surrendered his

22   license on December 31, 2019. P-28430_00001. Nonetheless, Walgreens continued filling

23   his prescriptions *for months*, until April 16, 2020. Catizone Decl. ¶ 84; *see* P-28506b.

24             17.1.11.6.  Dr. Ray Seet was a high-volume opioid prescriber. *See* P-

25   27369a (nine entries for Seet on Walgreens' prescriber risk index). Ninety-eight percent

26   of Dr. Seet's nearly 900 opioid prescriptions filled at San Francisco Walgreens stores

27   triggered at least one red flag. Catizone Decl. ¶ 85; *see* P-28506b. Dr. Seet lost his license

28   in 2013 on charges among others of prescribing opioids without examination. *See* P-

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

27609. Nevertheless, Walgreens continued to dispense his prescriptions for another month. Catizone Decl. ¶ 85; P-28506b.

17.1.11.7.  Given that these five doctors, and the other 26 identified by the People, were engaged in sufficient illegitimate prescribing to result in discipline or criminal prosecution, the Court infers that many or most of the opioid prescriptions written by these doctors were illegitimate and thus diverted.

17.1.11.8.  It does not matter that these doctors may have written some legitimate opioid prescriptions in the course of their careers. The fact that they wrote sufficient numbers of illegitimate prescriptions to result in the loss or suspension of their licenses and sometimes in criminal prosecution supports the inference that substantial numbers of the prescriptions they wrote for opioids were not legitimate.

17.1.11.9.  Nor does it matter than some of these doctors' patients may have had legitimate pain conditions for which some legitimate opioid prescription could have been written.  The prescriptions the patients received from these doctors did not reflect or comport with medical use of the drugs and the resulting non-medical use of the drugs carried the risks associated with non-medical use, regardless of whether, under other circumstances, the same patients might have used prescription opioids medically.

## **4. Other Evidence Supporting the Inference of Diversion**

17.1.12.  There are other reasons to believe that Walgreens' failures to maintain effective controls resulted in the dispensing of illegitimate prescriptions. When Walgreens performed a trial in 2012 of the then-new TDGFD checklists, dispensing of target drugs dropped by as much as 38 percent. P-20639_00011. *See also* P-20639_00011 ("Realistically, bottom line, yes sales are going to be impacted. However, some would say that we shouldn't even be filling some of these prescriptions."). The fact that Walgreens pharmacists were unable to dispense so many prescriptions under a more robust system of due diligence supports the inference that Walgreens' failure to implement such a system resulted in the dispensing of illegitimate prescription.

17.1.13.  In 2009, the DEA charged one Walgreens pharmacy in San Diego with dispensing controlled substances on prescriptions written by unlicensed prescribers, on prescriptions written by prescribers on-line, and to people Walgreens knew or should have known were diverting the drugs. P-00015_00019.

17.1.14.  Walgreens pharmacists admit they filled opioid prescriptions in San Francisco that were likely diverted. At one Walgreens pharmacy on King Street, prescription opioids were being openly sold in the pharmacy parking lot moments after being dispensed by Walgreens pharmacists. Gerspacher Dep. 82:1–82:8; *see also* Gerspacher Dep. 33:17–34:1 (pharmacist realized "I shouldn't have" filled a prescription presented under suspicious circumstances); Lo Trial Tr. 919:22–24 ("I know that I" filled prescriptions that should not have been filled.); Gayle Dep 165:9–19 ("I'm sure I let diverted medications go through."). Although this evidence is anecdotal and necessarily relates to a small number of prescriptions, in combination with the rest of the evidence, it provides additional support for the inference that Walgreens in fact dispensed illegitimate prescriptions. Indeed, based on the testimony of Jeremy Gerspacher, the Court specifically rejects Walgreens' argument that the People have failed to identify any particular instances of diversion.

17.1.15.  The Court considers, as well, that the entire premise of and rationale for the obligation to maintain effective controls against diversion is that diversion results in the absence of effective controls. *See* para. 5.2.2, *supra*. This rationale, too, supports the inference that the failure to maintain effective controls against diversion more likely than not resulted in diversion.

17.1.16.  It is more likely than not that the quantity of opioids diverted from prescriptions dispensed by Walgreens was significant.

17.1.16.1.  First, in absolute terms, Walgreens dispensed approximately 1.4 million red-flagged opioid prescriptions in San Francisco (which would be subject to only a modest reduction, were the Court to account for Walgreens' over-flagging criticism). *See* para. 17.1.5, *supra*. The Court has already found that it is more likely than

1    not that large numbers of these prescriptions were diverted. *See* paras. 17.1.7–17.1.10,

2    *supra.*

3              17.1.16.2.  Second, the percentage of MMEs dispensed pursuant to

4    prescriptions written by doctors who were disciplined or criminally prosecuted further

5    demonstrates that the quantities of diverted prescriptions were likely large. *See* para.

6    17.1.11, *supra.*

7              17.1.16.3.  Third, Walgreens maintains a significant market share of

8    dispensing in San Francisco, such that the prescriptions it dispenses represent a significant

9    portion of the total. The People's expert Dr. McCann determined that, based on the

10   ARCOS data received from the DEA, Walgreens has a 58.7 percent share of the retail and

11   chain pharmacy market. *See* para. 17.1.10.1, *supra.*

12             17.1.16.3.1.  The Court rejects Walgreens' argument that the

13   correct denominator for calculating its market share includes hospitals and opioid

14   treatment programs. There is no evidence, and no reason to believe, that such facilities are

15   important sources of opioid diversion, and such facilities are materially differently

16   situated with respect to the risks of diversion. Unlike Walgreens, for the most part

17   treatment facilities do not appear to dispense bottles of pills to patients, and among other

18   restrictions may only dispense "take-home doses" in limited circumstances. *See* 42 C.F.R.

19   § 8.12(h)(3)(i), (h)(4)(i), (h)(4)(i)(2), (f)(5)(i). Inpatient hospital pharmacies, like ZSFG

20   inpatient pharmacies, "provide medications to patients for direct administration under

21   medical supervision." Patel Decl. ¶ 3. Regardless, even were the Court to accept

22   Walgreens' claim of a 27 percent share of this expanded denominator, a 27 percent market

23   share is more than sufficient to support the findings made here.

24             17.1.16.4.  Walgreens challenges the inference that it dispensed a

25   significant quantity of diverted opioids by pointing to evidence that not all diverted

26   opioids originate with an illegitimate prescription. This may be true, but it is beside the

27   point and in no way undermines the inference that Walgreens dispensed illegitimate

28   prescriptions.

1          17.1.16.4.1.  Although all opioids dispensed pursuant to an

2    illegitimate prescription are diverted, the converse is not necessarily true: not all diverted

3    opioids must originate with an illegitimate prescription. But the evidence described above

4    makes it more likely than not that Walgreens dispensed substantial quantities of

5    *illegitimate* prescriptions. The People have demonstrated, in absolute numbers, the likely

6    scale of diverted opioids Walgreens dispensed. The possibility that *other* opioids,

7    originally dispensed pursuant to legitimate prescriptions, were later diverted—a type of

8    diversion sometimes referred to as "medicine cabinet diversion"—does not affect the

9    volume of opioids that Walgreens likely dispensed pursuant to illegitimate prescriptions.

10          17.1.16.4.2.  To the extent that Walgreens means to suggest

11   that all or nearly all diverted opioids in San Francisco were originally dispensed pursuant

12   to a legitimate prescription, rather than pursuant to the illegitimate prescriptions

13   Walgreens dispensed, the Court rejects that argument.

14          17.1.16.4.3.  Walgreens points to information presented by the

15   People's expert, Dr. Keyes, to support its contention that "most" diversion originates in

16   legitimate prescriptions. This information does not support Walgreens' conclusion. Dr.

17   Keyes cited a study that found that 50.5 percent of people get the pills they misuse free

18   from friends or relatives. Keyes Decl. ¶ 82. But the fact that users obtained pills free from

19   friends or relatives tells us nothing about how those friends or relatives originally obtained

20   the drugs. The friends or relative may have obtained the opioids through an illegitimate

21   prescription and later shared them for free. The data referred to by Dr. Keyes provides

22   information about where people get the drugs they misuse, not about how those drugs

23   originally came to be dispensed, whether legitimately or illegitimately.

24          17.1.16.4.4.  Even if Walgreens were correct about what Dr.

25   Keyes data shows, that would mean that 49.5 percent of diverted drugs were originally

26   dispensed through illegitimate prescriptions, which still represents a substantial and

27   significant percentage of diverted opioids.

28

1            17.1.16.4.5.  Dr. Keyes herself testified that diversion of

2    opioids obtained from doctor-shopping and pill mills, both sources of illegitimate

3    prescriptions, are substantial contributing factors to the opioid epidemic. *See* Keyes Trial

4    Tr. 2232:9–17.

5            17.1.16.4.6.  The Court credits the testimony of the former

6    head of DEA's Office of Diversion Control Joe Rannazzisi, who does not believe that so-

7    called "medicine cabinet" diversion is the most common form of diversion and that such a

8    conclusion would be implausible "given the huge volume" of "illegitimate and illegal

9    prescriptions" leaving pharmacies. Rannazzisi Dep. 1808:22–1810:22. In light of Mr.

10   Rannazzisi's former position, the Court credits his conclusion that illegitimate

11   prescriptions represent a significant portion of diverted prescriptions.

12           17.1.17.  The Court rejects Walgreens' argument that it cannot have

13   contributed to the opioid epidemic because, if it had, the DPH would not contract with it

14   for its 340B drug pricing program.

15           17.1.17.1.  Section 340B of the federal Public Health Service Act

16   requires pharmaceutical manufacturers to offer drugs at a discount to participating public

17   safety-net health systems. *See* 42 U.S.C. § 256b. DPH administers its 340B program

18   through Walgreens, which met the request-for-proposal criteria, Patel Trial Tr. 1319:24–

19   1320:1, and has the widest geographical coverage in San Francisco.  That DPH recognizes

20   Walgreens' ability to provide appropriate drug discounts in no way demonstrates that

21   Walgreens has not also contributed to the opioid epidemic by failing to provide effective

22   controls against diversion.

23           17.1.17.2.  Nor is Walgreens' suggestion that DPH's right to conduct

24   audits under the 340B program somehow clears Walgreens of responsibility.  It is true that

25   DPH's contract with Walgreens authorizes DPH to audit Walgreens' 340B records

26   annually to ensure that "non-Eligible Patients" have not received discounts. WAG-MDL-

27   02961.00011. The nature of the data DPH receives undermines Walgreens' suggestion

28   that DPH could use this audit to evaluate Walgreens' opioid dispensing practices. Opioids

1    make up only approximately one percent of 340B prescriptions, and the data DPH

2    receives regarding these prescriptions does not contain any of the relevant fields necessary

3    to conduct any sort of due diligence analysis. See Patel Trial Tr. 1342:7–1345:16.

4    **B. The Connection Between Diversion in San Francisco and the Opioid Epidemic**

5        17.2.  The opioid epidemic would not have reached it present extent without

6    diversion of prescription opioids in San Francisco.

7            17.2.1.  Diverted prescription opioids are themselves directly harmful to

8    public health.

9            17.2.1.1.  The Court accepts the judgment of Walgreens itself, which

10   has internally acknowledged that prescription opioid "misuse"—that is, diversion—

11   imposes substantial burdens on the public. *See* P-25546_00008 (estimating nationwide

12   costs of prescription opioid misuse to be more than $55 billion).

13           17.2.1.2.  Prescription opioids are controlled substances whose

14   circulation is restricted by law and policy to the closed system of distribution precisely

15   because of their extraordinary capacity to cause harm when used outside that system. *See*

16   para. 5.2.2, *supra*.

17           17.2.1.3.  "One of the biggest risk factors for addiction generally is

18   simple access to addictive drugs. When supply of an addictive drug is increased, more

19   people become addicted to and suffer the harms of that drug." Lembke Decl. part II.A; *see*

20   Lembke Decl. ¶¶ 4, 163.

21                17.2.1.3.1.  The consensus in the scientific literature, which

22   the Court accepts, is that the role of supply, rather than economic factors, is the principal

23   causal factor driving increases in opioid-related harm, including OUD. Keyes Decl.

24   ¶¶ 75–76, 78–79, 89, 127, 133; *see especially* Keyes Decl. ¶ 78 (discussing study that

25   found a 9% increase in opioid-related hospitalization for each one morphine kilogram

26   equivalent [1,000 times MME] increase in opioids sales); *see also* Lembke Decl. ¶¶ 8–9,

27   146–47, 154–55, 162 (discussing causal relationship between prescription opioid supply

28   and opioid-related harm, including OUD).

1     17.2.1.3.2.  Distribution of opioids is also strongly correlated

2     with opioid-related death. A study analyzing the entire United States from 2006 to 2014

3     documents that each one-pill increase in per capita pill volume was associated with 0.2

4     additional overdose deaths. Keyes Decl. ¶ 79. In other words, five new pills per capita

5     mean one new overdose death.

6     17.2.1.3.3.  The primary importance of opioid exposure in

7     causing OUD is not undermined by the facts that there are also other risk factors for OUD,

8     and that some people are more vulnerable to becoming addicted than others. Besides

9     opioid exposure, other risk factors for becoming addicted include genetic, developmental,

10    and environmental factors. *See* Lembke Decl. ¶ 4; Lembke Trial Tr. 390:8–14; Tucker

11    Trial Tr. 2750:10–21, 2770:17–19. The best scientific evidence, which the Court accepts,

12    is that dose and duration of prescription opioid use "far outweigh" other risk factors for

13    addiction. Lembke Decl. ¶ 46; Lembke Trial Tr. 398:2–7.

14    17.2.1.4.  Each of opioids' risks is magnified and exacerbated when

15    opioids are diverted and used outside the closed system, other than as prescribed for a

16    legitimate medical purpose.

17    17.2.1.4.1.   From the testimony of Walgreens' witness  Dr.

18    Douglas Tucker that "ongoing doctor–patient collaboration and continuous professional

19    monitoring" can "significantly reduce" opioids' risks, the Court infers that those risks are

20    significantly higher without physician management, when prescription opioids are used

21    other than as prescribed for a legitimate medical purpose. Tucker Decl. ¶ 8; *see also*

22    Tucker Trial Tr. 2767:21–2768:17 (individuals with any history of non-medical or

23    inappropriate use of prescription opioids have a higher risk of developing a heroin

24    problem).

25    17.2.1.5.  Diversion causes death. Rannazzisi Dep. 427:2. Even small

26    amounts of diverted opioids can cause serious harm. Rannazzisi Dep. 392:10–18; P-

27    03669_00002.

28

17.2.1.6.  Prescription opioids have directly caused hundreds of deaths in San Francisco, many or most of which involved diversion.

17.2.1.6.1.  From 2010 to 2019, prescription opioids accounted for 868 deaths. Coffin Decl. ¶ 44; Coffin Trial Tr. 1906:12–20.

17.2.1.6.2.  From 2010 to 2012, of the 331 opioid overdose deaths in San Francisco, 310 (93.7 percent) involved prescription opioids. Coffin Decl. ¶ 21.

17.2.1.6.3.  Additional data supports the conclusion that prescription opioids were the predominant cause of overdose in the early years of the opioid epidemic and continue to be a major contributor to opioid-related death in San Francisco. Keyes Decl. ¶¶ 117–119.

17.2.1.6.4.  It is not plausible that all or most of these fatal overdoses happened without diversion, that is, while the person was taking opioids for a legitimate medical purpose. The Court infers that many or most of these deaths involved the use of diverted prescription opioids for nonmedical purposes.

17.2.1.7.  Prescription opioids have directly caused thousands of emergency room visits in San Francisco, many or most of which involved diversion.

17.2.1.7.1.  Prescription opioids were responsible for more than 1,000 ED visits at ZSFG in 2020 alone. Coffin Decl. ¶ 40.

17.2.1.7.2.  It is not plausible that all or most of these emergencies arose without diversion, that is, while the person was taking opioids for a legitimate medical purpose. The Court infers that many or most of these deaths involved the use of diverted prescription opioids for nonmedical purposes.

17.2.2.  Diversion of prescription opioids leads to abuse of illicit opioids like heroin and fentanyl, and to the harms associated with such abuse.

17.2.2.1.  The Court accepts the judgment of Walgreens itself, which has acknowledged internally the causal connection between prescription opioid diversion and illicit opioid abuse. P-25546_00008 (80% of U.S. heroin users reported misusing

73

prescription opioids first; misusers of prescription opioids "forty times more likely" to abuse heroin).

17.2.2.2.   The consensus in the fields of epidemiology, public health, and addiction medicine, which the Court accepts, is that prescription opioid use leads to illicit opioid use. Lembke Decl. ¶¶ 154–55, 157; Keyes Decl. ¶¶ 53–74; Keyes Trial Tr. 2213:11–2219:2, 3554:2–3555:12. This consensus is reflected in the 2017 report of the National Academy of Sciences, Engineering, and Medicine and in the 2019 report of the Association of Schools and Programs in Public Health, a consortium of over 120 of the leading public health programs at universities in California and throughout the United States. *See* Lembke Decl. ¶ 154 ("A preponderance of evidence suggests that the major increase in prescription opioid use beginning in the late 1990s has served as a gateway to increased heroin use[.]"), ¶ 155 ("The tremendous expansion of the supply of powerful ... prescription opioids led to ... the transition of many to illicit opioids, including fentanyl and its analogs[.]"); *see also* Keyes Decl. ¶ 127 (quoting 2019 ASPPH report).

17.2.2.3.   The Court accepts research finding that opioid exposure and OUD show a "dose–response" relationship, that is, that greater exposure to opioids increases the risk of OUD. According to one publication by the CDC, "Drug abuse and overdose rates increased with longer use," and another CDC publication stated, "Higher Dosage, Higher Risk." Lembke Decl. ¶¶ 20–23. One study showed that the odds of getting addicted are 122 times greater for patients who receive opioid prescriptions from their doctors for over 120 MME per day and more than 90 days, compared to persons who did not receive opioid prescriptions; that the risk increases in a clear dose–response relationship; and that the increased risk of addiction due to higher dose and longer duration far exceeds the risk of other known factors such as prior mental health disorder or prior non-opioid substance use disorder. Lembke Decl. ¶ 46; Lembke Trial Tr. 397:24–398:16; Keyes Decl. ¶¶ 47–49.

17.2.2.4.   The "natural progression" of OUD is "to seek out more potent, plentiful, and cheaper forms" of opioids over time. Lembke Decl. ¶ 156. "So it is

not surprising that people who become addicted to prescription opioids progress to heroin and illicit fentanyl, especially as prescription opioids become more difficult to obtain." Lembke Decl. ¶ 156; *see also* Tucker Trial Tr. 2765:7–16 (acknowledging individuals prescribed opioids for chronic pain may seek the drug illicitly from "somewhere else" if treatment was ended abruptly), 2767:21–2768:17 (individuals with any history of non-medical or inappropriate use of prescription opioids have a higher risk of developing a heroin problem).

17.2.2.5.  Dr. Anna Lembke, an addiction specialist practicing at Stanford Hospital who has treated thousands of patients prescribed opioids for pain, treats OUD patients who originally became addicted to prescription opioids, and are now intentionally seeking out fentanyl because of its potency (and despite its lethality). Lembke Decl. ¶¶ 37, 156.

17.2.2.6.  The Court credits the testimony of Dr. Phillip Coffin, Director of the SFDPH Center on Substance Use and Health, who testified based on his experience treating patients and researching substance use trends in San Francisco over the last decade that the majority of people using opioids, including fentanyl, in San Francisco started their opioid use with prescription opioids. Coffin Decl. ¶ 46. He further testified that he had reviewed the medical records of thousands of opioid overdose decedents and found that most of them had received an opioid prescription at some point prior to their death. Coffin Decl. ¶ 46; Coffin Trial Tr. 1906:21–1907:4, 1924:9–18.

17.2.2.7.  In Dr. Coffin's experience, as opioid prescriptions in San Francisco began to decline in 2010, there was a concomitant rise in heroin use. Coffin Decl. ¶¶ 11, 22–24. The Court credits this experience and finds it supports a causal relationship: prescription opioid users turned to heroin as prescription opioids became more difficult to get.

17.2.2.8.  Approximately two thirds of the patients who present to the ZSFG ED with an opioid-related medical condition report that their addiction started with prescription opioid pills. Colwell Decl. ¶ 10.

17.2.2.9.  This local clinical experience is consistent with numerous studies demonstrating that the most significant risk factor for heroin use is exposure to prescription opioids. Keyes Decl. ¶¶ 53–70; Coffin Decl. ¶ 46.

17.2.2.10.  Like heroin overdoses, contemporary illicit fentanyl overdoses are a direct outgrowth of overuse of prescription opioids. The primary effect of illicit fentanyl was to increase the mortality rate for persons suffering from OUD that resulted from overuse of prescription pills. The trend parallels the earlier shift to heroin, but has a higher death rate. Coffin Decl. ¶¶ 41–42, 44–47; Keyes Decl. ¶¶ 71–74.

17.2.2.11.  On a market level, the shift to illicit fentanyl was driven by high demand for opioids that began with prescription pills. Persons with OUD in San Francisco do not favor fentanyl, but drug suppliers introduced them to it as demand for heroin (during the apex of the pills-to-heroin shift) exceeded the available supply. From there, economies of scale and supply and demand factors drove a broader shift from heroin to fentanyl. Coffin Decl. ¶¶ 34–37.

17.2.3.  Diverted prescription opioids figure so prominently in the opioid epidemic that the Court infers the epidemic would have been substantially reduced in intensity or duration without them.

17.2.3.1.  In their efforts to mitigate the opioid epidemic, City personnel frequently encounter prescription opioid use in San Francisco that is self-evidently non-medical, not for a legitimate medical purpose, and outside the closed system of opioid distribution. *See* paras. 8–9, *supra*.

17.2.3.2.  Since the late 1990s, opioid prescriptions and prescription opioid use in San Francisco has increased substantially. *See* Keller Decl. ¶¶ 8–10 ("From 1997 to 2007, dosage units prescribed by physicians in San Francisco County doubled and prescribed MMEs more than quadrupled."). Between the late 1990s and 2010, there was fourfold increase nationally in opioid prescribing and dispensing. Lembke Decl. ¶¶ 8–11; Lembke Trial Tr. 408:19–409:1. In the 2000s, San Francisco saw a significant increase in

the supply of prescription opioids and the number of people who used opioids. Coffin Decl. ¶¶ 17–19.

17.2.3.3.  By the mid-2000s, according to DEA officials (whose judgment the Court accepts), the opioid supply chain nationwide was "out of control," and fueled a nationwide public health crisis of prescription opioid diversion. Rannazzisi Dep. 416:9–417:9, 423:12–426:4, 431:14–18, 433:17–434:9; P-03669; *see also* P-00139_00001 (Ed Bratton e-mail stating that Walgreens' failure to provide effective controls against diversion by shipping suspicious orders "without limit or review" caused "runaway growth" of prescription opioid dispensing); P-23068_00002, 00007 (2015 NABP stakeholder consensus statement, *see* P-20790_00001, identifying "the misuse and abuse of prescription medications ... as a growing public health problem"; describing "deeply concerning rise in various measures of prescription drug misuse and abuse" "[i]n parallel with [an] increase in medical use" of prescription opioids).

17.2.3.4.  From the growth in the prescription opioid supply and subsequent diversion crisis, the Court infers that the growth in the opioid supply was accompanied by a proportional rise in diversion.

17.2.3.5.  In San Francisco from 2010 to 2012, among all opioid deaths, prescription opioids were the most frequently listed cause of opioid death, including oxycodone (21.8 percent) and hydrocodone (16.3 percent). Keyes Decl. ¶ 106; Coffin Decl. ¶ 21.

17.2.3.6.  High-volume prescribers who prescribe opioids solely for profit and without a legitimate medical purpose, often called "pill mills," inflicted considerable damage nationwide through the 2000s. Keyes Decl. ¶ 88. Such prescribers existed in San Francisco well into the 2010s. *See* para. 17.1.11, *supra*.

17.2.4.  The present extent of the opioid epidemic cannot be explained solely by the abuse of illicit opioids such as heroin and fentanyl, unconnected to prescription opioid diversion.

1           17.2.4.1.  The Court credits the testimony of Dr. Philip Coffin, who

2    testified that the majority of opioid use in San Francisco, including fentanyl use, has its

3    origin in prescription opioid use. Coffin Decl. ¶ 46; Coffin Trial Tr. 1906:21–1907:4,

4    1924:9–18, 1937:4–11.

5           17.2.4.2.  If illicit opioids explained the full extent of the opioid

6    epidemic on their own, rates of opioid-related harm in San Francisco would have declined

7    from approximately 2000 to 2010 in light of the City's successful efforts to mitigate the

8    effects of heroin abuse. Instead those rates remained relatively stable, as decreasing

9    heroin-related harms were replaced by increasing prescription opioid-related harms.

10   Further, illicit opioids on their own cannot explain the rise in heroin- and then fentanyl-

11   related harms beginning in 2010.

12          17.2.4.2.1.  In California, from 1999 to 2018, prescription

13   opioids were the largest contributor to the increase in overdose deaths, over other opioids

14   such as heroin. Despite an ongoing heroin and fentanyl crisis that has accelerated the

15   opioid epidemic, the contribution of prescription opioids to deaths in California remains

16   significant. Keyes Decl. ¶ 116; Coffin Decl. ¶ 44.

17          17.2.4.2.2.  In the 1990s, heroin was a significant issue in San

18   Francisco. To address the impact of heroin, the City pioneered an array of new programs

19   that succeeded in decreasing the rate of heroin overdose deaths substantially by 2010. In

20   the 2000s, as national attitudes to prescription opioid use shifted, San Francisco saw a

21   significant increase in the supply of prescription opioids and the number of people who

22   used opioids. As a result of the increasingly large supply of prescription opioids, the

23   number of people using prescription opioids in San Francisco increased significantly.

24   However, unlike other places, San Francisco did not see an increase in overall opioid

25   overdose mortality. The City continued to have success at lowering the proportion of

26   opioid users who died from overdoses through its extensive harm reduction efforts,

27   including naloxone distribution. Coffin Decl. ¶¶ 11–19; Coffin Trial Tr. 1896:20–

28   1899:10.

1          17.2.4.2.3.  The increase in supply was followed by a

2    subsequent decline around 2010, when opioid prescribing in San Francisco waned as

3    doctors became more aware of opioids' risks. However, individuals who had developed

4    dependence on opioids years earlier still were dependent on opioids to avoid the painful

5    consequences of withdrawal. Accordingly, as prescription opioids became harder to obtain

6    legally, many sought through the street market what was no longer available and plentiful

7    through legal channels. Therefore, as prescription opioid use and overdose deaths

8    decreased in San Francisco, heroin use—and heroin overdose deaths—began to increase.

9    But San Francisco kept overdose deaths stable thanks to the efforts made by San

10   Francisco service providers, health care providers, and residents to—among other

11   interventions—broadly distribute and utilize naloxone to reverse overdose deaths. Coffin

12   Decl. ¶¶ 20–30; Coffin Trial Tr. 1899:7–1900:7.

13         17.2.4.2.4.  As the opioid epidemic developed, San Francisco

14   did ultimately witness a marked increase in opioid mortality as large numbers of

15   individuals who developed OUD in the 2000s turned to fentanyl. Coffin Decl. ¶¶ 11–33;

16   P-22446; P-22447. Data from San Francisco indicates that fentanyl mortality began

17   increasing after 2015, with especially rapid increases after 2017; the increase in fentanyl

18   mortality deaths can be largely attributed to the oversupply of prescription opioids that

19   began in the 1990s and continues to the present time. Keyes Decl. ¶¶ 124–25. Because of

20   fentanyl's potency and the rapid onset of overdose, the City was no longer able to control

21   the opioid mortality rate with naloxone and OUD treatment options. Coffin Decl. ¶¶ 37–

22   39.

23         17.2.4.3.  The consensus in the field, which the Court accepts, is

24   expressed by the 2019 Task Force Report of the Association of Schools and Programs in

25   Public Health (ASPPH), a consortium of over 120 of the leading institutions in the United

26   States. The ASPPH report stated, "The tremendous expansion of the supply of powerful

27   (high-potency as well as long-acting) prescription opioids led to scaled increases in

28   prescription opioid dependence, and the transition of many to illicit opioids, including

1  fentanyl and its analogs, which have subsequently driven exponential increases in

2  overdose." Lembke Decl. ¶ 155; Keyes Decl. ¶ 24.

3             17.2.4.4.  While there has been an obvious recent spike in deaths

4  related to heroin and illicit fentanyl, the number of deaths caused by non-fentanyl

5  prescription opioids has continued to be unacceptably high, and approximately four times

6  greater than in 1999. Lembke Decl. ¶ 152; Keyes Decl. ¶¶ 115–19; Coffin Decl. ¶ 44.

7             17.2.4.5.  The Court does not credit the weakly supported suggestion

8  that the opioid epidemic is explained by a general crisis of increasing recreational drug

9  use since the late 1970s. *Contra* Tucker Trial Tr. 2758:9–2760:1; *see* Keyes Rebuttal

10  Decl. 4–10 (explaining that Dr. Tucker's opinion rests on misreading of his sources and

11  otherwise contrary to the best research).

12             17.2.4.6.  Walgreens' dispensing of illegitimate opioid prescriptions

13  was undoubtedly not the only cause of the opioid epidemic and the nuisance that exists in

14  San Francisco. Other factors, including the aggressive and misleading promotion of

15  prescription opioids by opioid manufacturers, may well have contributed to the crisis.

16  Changes in medical practice in the 1990s, and changes in the understanding of the proper

17  role of prescription opioids for medical treatment, however, have nothing to do with the

18  dispensing of *illegitimate* prescriptions not for medical use. At no time was such non-

19  medical use encouraged or endorsed. On the contrary, at all times the medical community

20  recognized that diverted opioids and non-medical use of prescription opioids present very

21  real dangers to individuals and communities. *Cf.* Tucker Trial Tr. 2768:4–17; P-

22  23068_00002, 00007 (2015 NABP stakeholder consensus statement, *see* P-20790_00001,

23  identifying "the misuse and abuse of prescription medications ... as a growing public

24  health problem"; describing "deeply concerning rise in various measures of prescription

25  drug misuse and abuse" "[i]n parallel with [an] increase in medical use" of prescription

26  opioids). The issue here is not whether increases in legitimate prescriptions may have

27  played a role in the creating or maintaining the opioid epidemic, but rather whether the

28

dispensing of illegitimate prescriptions, and the diversion associated with it, also were substantial factors in bringing about this epidemic.

17.2.4.7.  In light of the significant contribution of Walgreens' conduct to prescription opioid diversion in San Francisco, *see* para. 17.1, *supra*, and the significant contribution of prescription opioid diversion to the opioid epidemic, *see* para. 17.2, *supra*, the Court finds that Walgreens' conduct was a substantial factor in bringing about the opioid epidemic, without which that  epidemic would have been of lower intensity or shorter duration.

## VI. Proximate Causation

**18.**  The opioid epidemic was a foreseeable consequence of prescription opioid diversion in San Francisco.

18.1.  Prescription opioids are controlled substances subject to the closed system of distribution precisely because of the known risks of prescription opioid diversion. *See* para. 5.2.2, *supra*.

18.2.  Historically, uncontrolled or loosely controlled opioid use has led to public health crises recognized by governments and healthcare professionals. *See* paras. 5–6, *supra*.

18.3. The actions of others, such as drug dealers, in diverting or selling opioids, is entirely foreseeable in the context of the CSA, which exists precisely to prevent such foreseeable conduct. *See* para. 5.2.2, *supra*.

18.4.  The transition of users with OUD from prescription opioids to illicit opioids is a foreseeable consequence of prescription opioid diversion. *See* para. 17.2.2, *supra*.

**19.**  Prescription opioid diversion in San Francisco is not unduly remote from the opioid epidemic.

19.1.  Prescription opioid diversion is itself an integral, ongoing part of the opioid epidemic. *See* paras. 17.2.1, 17.2.3, *supra*.

19.2.  The connection between prescription opioid use (no matter whether the prescription opioids were diverted) and use of illicit heroin and fentanyl is physiologically and behaviorally a close one, and are driven by the same physiological and behavioral processes. *See* para. 4, *supra*.

## VII. Unreasonable Interference

**20.**  The interference with public rights described above is unreasonable. The seriousness of the harms outweighs any social utility of Walgreens' conduct. The Court examines the three nonexclusive factors set forth in the Restatement (Second) of Torts to determine the unreasonableness of the interference with public rights.

20.1.  Walgreens' conduct is proscribed by the CSA and its regulations. *See* 27.3.1, *infra*.

20.1.1. The CSA proscribes the distribution or dispensing of controlled substances other than in accordance with the provisions of the statute and its regulations.

20.1.2.  The CSA requires Walgreens to maintain effective controls against diversion in both its distribution and dispensing activities.  As discussed above, Walgreens failed to maintain such controls at both the distribution and dispensing levels. That failure constituted a violation of the CSA.

20.1.3.  The CSA required Walgreens, in its capacity as a distributor, to design and operate a system to identify suspicious orders and to report such orders to the DEA when identified.  As described above, Walgreens failed to design and operate such a system and failed to identify suspicious orders. That failure constituted a violation of the CSA.

20.1.4.  The CSA required Walgreens in its capacity as a distributor to halt the shipment of suspicious orders unless and until it could determine, through reasonable inquiry, that the order was not likely to be diverted.  As described above, Walgreens shipped suspicious orders without engaging in any due diligence. That conduct violated the CSA.

20.1.5.  The CSA required Walgreens to dispense only prescriptions that were issued for legitimate medical purposes.  Walgreens failed to implement a system to ensure that it would dispense only prescriptions that met that criterion.  That conduct violated the CSA. To the extent that Walgreens in fact dispensed prescriptions that were not issued for a legitimate medical purpose, as discussed below, that failure also violated the CSA.

20.1.6.  The CSA represents a balance struck by Congress and by the DEA between the social utility of prescription opioids in relieving pain and the harms to individuals and communities from diversion, misuse, abuse, and OUD.  Congress and the DEA have determined that the social utility of controlled substances outweighs the harms of the drugs *only* when the drugs are distributed and dispensed in accordance with the requirements of the CSA.  Distribution and dispensing without compliance with these requirements is outside the balance struck by Congress and the DEA.

20.2.  Walgreens' conduct was of a continuing nature, produced a long-lasting effect, and Walgreens knew or had reason to know, has had a significant effect on the public right.

20.2.1.  Walgreens distributed prescription opioids for decades before it stopped. *See* para. 13.1, *supra*.

20.2.2.  Walgreens has dispensed prescription opioids for decades and is continuing to the present to dispense them. *See* para. 15.1, *supra*.

20.2.3.  The opioid epidemic has existed in San Francisco for at least ten years. Its effect has been long-lasting. *See* paras. 8–9, *supra*.

20.2.4.  Walgreens knew the hazards to the public posed by its conduct.

20.2.4.1.  Walgreens knew the hazards posed by prescription opioid diversion.

20.2.4.1.1.  The hazards of prescription opioid diversion are so obvious that it is implausible Walgreens, a nationally significant participant in the

healthcare industry under an obligation to prevent prescription opioid diversion, did not

know of them. *See* paras. 5–6, *supra*.

20.2.4.1.2.  The DEA's 2006 letter to all distributors,

including Walgreens, stated that "As each of you is *undoubtedly aware*, the abuse

(nonmedical use) of controlled prescription drugs is a serious and growing health problem

in this country."  P-00035_00005 (emphasis added).

20.2.4.1.3.  Walgreens knew the strength of the causal

connection between prescription opioids and heroin, explaining in a 2017 training

presentation that "[n]early 80% of Americans using Heroin reported misusing opioids

first" and that "[i]ndividuals who misuse prescription opioid pain pills are forty times

more likely to abuse heroin." P-25546_00008; *see also* P-19656_00051 (2012 DEA

presentation in Walgreens' possession showing "Circle of Addiction" cycling from

hydrocodone, to oxycodone, to OxyContin, to heroin).

20.2.4.2.  Walgreens knew its conduct was leading and would lead to

prescription opioid diversion.

20.2.4.2.1.  The number of suspicious wholesale orders

Walgreens received from its pharmacies in San Francisco was sufficient to alert

Walgreens to the likelihood that prescription opioids were being diverted from at least

some of its stores in San Francisco.

20.2.4.2.2.  Walgreens' knew through its dispensing data

analyses that several opioid prescribers like Guido Gores and Andrew Giovannini were

suspicious, high-volume outliers, but continued dispensing their opiod prescriptions. *See*

para. 17.1.11, *supra*.

20.2.4.2.3.  Walgreen knew through the observations,

comments, and warnings of their own pharmacists that opioid prescribers like Guido

Gores and Andrew Giovannini were too dangerous to dispense for, but did not warn, or

provide a mechanism for its pharmacists to warn, its pharmacies and pharmacists in the

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

area. Instead, Walgreens continued dispensing their opioid prescriptions. *See* 17.1.11, *supra*.

20.2.4.2.4.   Walgreens knew through official channels that opioid prescribers like John Pierce and Ray Seet were restricted from opioid prescribing or barred from the practice of medicine, but continued dispensing their opioid prescriptions. *See* 17.1.11, *supra*.

20.2.4.2.5.   When it came to "high prescribing physicians" like these doctors, Walgreens knew that failing (as it did, *see* para. 16.2.6, *supra*) to implement a chain-wide prescriber blocking system presented risks that were "too great." P-20639 _ 00009 (presentation authored by Tasha Polster).

20.2.4.2.6.   The DEA warned Walgreens executives (among other national retail pharmacy executives) in a November 2012 presentation on "Prescription Drug Trafficking and Abuse" of the dangers of understaffing pharmacies and incentivizing dispensing speed and volume at the expense of "check[ing] ... for good faith." P-19827_00001 to 00002. The presentation draw a direct line from failure to perform pharmacy due diligence to the national opioid epidemic. P-19827_00002 ("If a pharmacist does his job, we wouldn't have this problem.").

20.3.   Walgreens' conduct involves a significant interference with the public health and public convenience. *See* paras. 8–12, *supra*.

20.4.   There is no social utility to conduct that is proscribed by statute or regulation. There is no social utility to diverted opioids. Opioids have social utility only when prescribed and used for legitimate medical purposes. For this reason, the social utility of Walgreens' conduct in distributing and dispensing prescription opioids without maintaining effective controls against diversion is outweighed by the gravity of the harm inflicted.

20.5.   The CSA and its regulations represent a balance struck by Congress and the DEA between the social utility of opioids in the treatment of pain, and the harms to communities and people associated with controlled substance misuse, abuse, and

addiction. The Court finds that the distribution and dispensing of prescription opioids without compliance with the CSA falls outside the balance struck by Congress and the DEA, such that the utility of such dispensing without the safeguards prescribed by law is outweighed by the gravity of the harms.

20.6.  Neither the California Intractable Pain Treatment Act nor the Pain Patients' Bill of Rights supports a different conclusion. Both statutes address legitimate prescriptions written for medical use. Both statutes focus on the role of practitioners in prescribing opioids for pain. Neither statute suggests that illegitimate prescriptions, diversion, or non-medical use of opioids has any social utility at all. *Cf.* paras. 26.2.2— 26.2.3, *infra*.

20.7.  To the extent that Walgreens' conduct resulted in the diversion of prescription opioids for purposes other than legitimate medical use, the seriousness of the harms of associated with such use clearly and significantly outweighs the social utility of Walgreens' distribution and dispensing conduct.

## VIII. Adverse Credibility Findings

**21.**  The Court does not credit evidence contrary to the above findings.

21.1.  The Court does not credit the contrary testimony of addiction doctor Douglas Tucker. Specifically, the Court finds no basis for Dr. Tucker's opinion that, along with a clutch of other factors, the opioid epidemic is the result of a "multigenerational crisis" in American "culture," which has grown to accept "recreational pharmacology." Tucker Trial Tr. 2760:11–2762:14. The Court finds this testimony does not credibly rebut the views of the People's witnesses, on academic and observational grounds, that the opioid epidemic is caused primarily by the use and availability of opioids.

21.2.  The Court does not credit the contrary testimony of Robert Brunner, Walgreens' data analysis expert. To the extent that Dr. Brunner criticized specific analyses performed by Dr. McCann, the Court has already concluded that even accepting Dr. Brunner's specific critique does not materially change the Court's view of the evidence. *See* para. 17.1.4.4, *supra*. And the Court has already found that it does not credit

Dr. Brunner's generalized overbreadth critique of the People's flagging methods. *See* para. 17.1.4.3, *supra*.

21.3.  The Court does not credit the contrary testimony of Walgreens' pharmacy expert Kathleen Hill-Besinque. Dr. Besinque's testimony did not effectively rebut the People's pharmacy experts Mr. Catizone and Dr. Park. Dr. Besinque consistently failed in her testimony to distinguish which situations a pharmacist should view as a "red flag," that is, as raising suspicions prompting further inquiry, and which of a litany of hypothetical facts might be useful to a pharmacist in investigating and clearing the red flag. *See, e.g.*, Besinque Trial Tr. 2576:13–2577:24. This testimony does not answer the People's experts' testimony that prevailing standards of pharmacy practice view the "red flags" identified by these experts as cause for investigation. Dr. Besinque also proved unfamiliar with decisions rendered by the California State Board of Pharmacy that contradicted her testimony. *See, e.g.*, Besinque Trial Tr. 2627:9–24. Dr. Besinque's testimony was not a reliable guide to the standard of care California imposes on pharmacies and pharmacists.

21.4.  The Court does not credit the contrary testimony of long-time Walgreens employee, and most recently head of Walgreens "Pharmaceutical Integrity" group, Tasha Polster. The Pharmaceutical Integrity group was created at the end of 2012 in response to the DEA investigations that were resolved by settlement in the 2013 Memorandum of Agreement. *See* Polster Trial Tr. 2354:3–2356:3. But Polster did not even review most of the documents constituting the settlement, Polster Trial Tr. 2362:4–12, and so was not familiar with what Walgreens had admitted with respect to the inadequacies of its system and what it had agreed to do to address those inadequacies. Polster testified that, before the formation of Pharmaceutical Integrity, Walgreens' SOM program "was conducted by distribution center personnel," Polster Decl. ¶ 6, but was unable to offer any coherent basis for that testimony. *See* Polster Trial Tr. 2350:5–2353:23. Similarly, Polster admitted that she didn't "have, like, proof" of her statement that Walgreens' pharmacists complied with Walgreens' GFD and TDGFD policies, but had based the statement on her belief that

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

1    "[p]harmacists in general want to do the right thing." *See* Polster Trial Tr. 2402:10–

2    2405:16. Polster did not provide credible testimony rebutting the People's contrary

3    evidence.

4              21.5.  The Court does not credit the contrary testimony of former Walgreens

5    pharmacy supervisor and district manager Ronda Lowe. *See, e.g.*, Lowe Decl. ¶ 5. As a

6    field leader supervising between 12 and 30 different stores, some of which were in San

7    Francisco, Dr. Lowe's usual practice was to visit the pharmacies approximately once a

8    month. *See* Lowe Trial Tr. 3039:1–13. These visits were not robust or effective oversight

9    of Walgreens' opioid dispensing. Of the dozens of tasks outlined in the "store walk"

10   documents Dr. Lowe referred to, just one referenced Walgreens' Good Faith Dispensing

11   policies, and the review it prompted was minimal. *See* Lowe Trial Tr. 3018:9–22, 3041:1–

12   3042:8. Dr. Lowe could not say how often Walgreens pharmacists completed TDGFD

13   checklists, Lowe Trial Tr. 3043:10–20, how often Walgreens pharmacists refused to fill

14   opioid prescriptions, Lowe Trial Tr. 3049:1–14, or even how often or *whether* prescription

15   opioids were diverted from Walgreens pharmacies. Lowe Trial Tr. 3089:21–3090:19. Dr.

16   Lowe did not provide credible testimony rebutting the People's contrary evidence.

17                        **PROPOSED CONCLUSIONS OF LAW**

18                              **I. Evidence**

19       **22.**  In this bench trial, the Court's findings are presumed to be based on admissible

20   evidence. *See Williams v. Illinois*, 567 U.S. 50, 69 (2012) ("When the judge sits as the

21   trier of fact, it is presumed that the judge ... will not rely on [inadmissible] information for

22   any improper purpose."); *Harris v. Rivera*, 454 U.S. 339, 465 (1981) ("In bench trials,

23   judges routinely hear inadmissible evidence that they are presumed to ignore when

24   making decisions."); *Beaty v. Stewart*, 303 F.3d 975, 985 (9th Cir. 2002) ("[W]e presume

25   that the judge properly applied the law and considered only the evidence he knew to be

26   admissible."). The Court therefore finds it unnecessary to rule separarretly on each

27   outstanding evidentiary objection raised during trial. To the extent such objections relate

28   to the evidence cited in support of the Court's findings, the objections are overruled.

## **II. Elements of Nuisance**

**23.**  California substantive law applies to this diversity action. 28 U.S.C. § 1652.

**24.**  The People, by and through San Francisco City Attorney David Chiu, are authorized to bring this action for abatement of a public nuisance existing within San Francisco. Cal. Civ. Code § 731.

**25.**  A public nuisance is "[a]nything which is injurious to health ... or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property," which "affects at the same time an entire community or neighborhood, or any considerable number of persons." *City & County of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 669 (N.D. Cal. 2020) [hereinafter "*CCSF*"]; Cal. Civ. Code §§ 3479, 3480.

      25.1.  To prove the present existence of a public nuisance, it is not necessary to prove that the defendant's conduct which created or contributed to the nuisance is still ongoing. A public nuisance is a "[]thing which is injurious to" or interferes with a public right, a harmful or "hazardous condition." Cal. Civ. Code § 3479; *People v. ConAgra Grocery Prods. Co.*, 227 Cal. Rptr. 3d 499, 535 (Ct. App. 2017). The hazardous condition created, maintained, or contributed to by the defendant's conduct may persist decades after the conduct stopped. *See, e.g.*, *ConAgra*, 227 Cal. Rptr. 3d at 544 (defendant liable for abatement of present nuisance "decades after all of" defendant's nuisance-causing conduct ceased).

**26.**  To prove a claim for public nuisance, a plaintiff must prove by a preponderance of the evidence that a defendant's affirmative conduct was a legal cause of a substantial and objectively unreasonable interference with a right common to the public. *CCSF*, 491 F. Supp. 3d at 669–84; *People ex rel. Gallo v. Acuna*, 929 P.2d 596, 604–05 (Cal. 1997); *ConAgra*, 227 Cal. Rptr. 3d at 525–52; *see also* CACI No. 2020.

      26.1.  An interference is "substantial" if it causes "significant harm." *County of Santa Clara v. Alt. Richfield Co.*, 40 Cal. Rptr. 3d 313, 325 (Ct. App. 2006) (citing *Acuna*, 929 P.2d at 604–05).

1    26.2.  An interference is "unreasonable" if the harm it inflicts outweighs the

2  social utility of the conduct causing it, viewed in light of several factors, any one of which

3  may support a determination of unreasonableness, including nonexclusively whether the

4  conduct was proscribed by law; whether the conduct involves a significant interference

5  with the public health, the public safety, the public peace, the public comfort, or the public

6  convenience; and whether the conduct is of a continuing nature or has produced a

7  permanent or long-lasting effect, and has a significant effect on a public right of which the

8  defendant knew or had reason to know. Restatement (Second) Torts § 821B (Am. Law

9  Inst. 1979); *CCSF*, 491 F. Supp. 3d at 672–73; *Acuna*, 929 P.2d at 604; *ConAgra*, 227

10  Cal. Rptr. 3d at 552.

11    26.2.1.  Knowledge on the part of the defendant is a factor under the last of

12  the three enumerated bases for a finding of unreasonable interference, but it is not an

13  element of either of the other two. A plaintiff may demonstrate unreasonable interference

14  through the other bases—including the breach of a legal duty, or unlawful conduct—

15  without demonstrating knowledge on the part of the defendant.

16    26.2.1.1.  In *Atlantic Richfield Co.*, 40 Cal. Rptr. 3d at 325, the court

17  referenced the knowledge of the defendant in its analysis of the nuisance. Because the

18  conduct in that issue was not unlawful, however, it does not appear that the court had any

19  occasion to address whether knowledge would be required if the unreasonable prong were

20  satisfied through unlawful conduct.

21    26.2.1.2.  The California Supreme Court has never adopted a

22  knowledge requirement for nuisance claims.

23    26.2.2.  An interference that results from unlawful conduct is generally

24  unreasonable: the harm it inflicts outweighs the social utility of the conduct because there

25  is no social utility to unlawful conduct.

26    26.2.3.  The Controlled Substances Act strikes a balance between the social

27  utility of prescription opioids, on the one hand, and the dangers of uncontrolled use and

28  diversion of those drugs, on the other. In permitting the manufacture, sale, distribution,

and dispensing of prescription opioids only in accordance with the provisions of the CSA and its regulations, Congress and the DEA have determined that the social utility of these drugs justifies their availability only when that availability is restricted as set forth in the statute and its regulations. Thus, Congress and the DEA have determined that the harms of distribution and dispensing of these drugs outside the regulatory framework outweigh the social utility of the drugs.

26.2.4.  The Court previously held that "[p]ublic nuisance claims require the existence of a duty." *CCSF*, 491 F. Supp. 3d at 669. That is not to hold that proof of independently unlawful conduct is always required to prove a public nuisance claim. *See Acuna*, 929 P.2d at 601–02 (condition constituting nuisance comprised partly of lawful and partly of unlawful conduct); *id.* at 607 ("Acts or conduct which qualify as public nuisances" so qualify "not from their status as independent crimes, but from their inherent tendency to injure or interfere with the community's exercise and enjoyment of rights common to the public."). The authority cited by the Court stands for the narrower proposition that engaging in lawful though "risky" behavior, "without a connecting causative link" to a "significant invasion of a public right," does not create public nuisance liability. *In re Firearm Cases*, 24 Cal. Rptr. 3d 659, 680 (Ct. App. 2005).

26.3.  A defendant is a legal cause of harm if the defendant's conduct is a substantial factor in bringing it about and there is no rule of law or consideration of policy limiting the defendant's responsibility for the consequences of its conduct and relieving it of liability. *ConAgra*, 227 Cal. Rptr. 3d at 545.

26.3.1.  "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical. ... [A] a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury ... is not a substantial factor, but a very minor force that does cause harm is a substantial factor." *ConAgra*, 227 Cal. Rptr. 3d at 543 (citations and quotation marks omitted). If a defendant's wrongful conduct "operated concurrently with other contemporaneous forces to produce the harm, it is a substantial factor ... if the injury, or

1   its full extent, would not have occurred but for that conduct." *In re Ethan C.*, 279 P.3d

2   1052, 1071 (Cal. 2012). Thus, the People need demonstrate that Walgreens' "conduct was

3   necessary in bringing about the *full extent* of the [People's] injuries," *CCSF*, 491 F. Supp.

4   3d at 677, to more than an "infinitesimal" or "theoretical" degree. *ConAgra*, 227 Cal.

5   Rptr. 3d at 543; *cf.* W. Page Keeton *et al.*, *Prosser & Keeton on Torts* 267–68 (5th ed.

6   1984) (discussing lighted match thrown into forest fire as example of harm causation that

7   does not satisfy substantial factor test). The test is distinct from "but for" causation, which

8   is not applicable here, but rather is "subsumed" in the substantial factor test. *See CCSF*,

9   491 F.Supp. 3d at 677; CACI No. 430.

10       26.3.1.1.  A defendant's conduct may be necessary in bringing about

11   the full extent of injury either in scope or duration or both. Thus, to prove Walgreens'

12   conduct was necessary in bringing about the full extent of the alleged public nuisance, the

13   People may prove either that Walgreens created, expanded, or maintained the public

14   nuisance to more than an infinitesimal or theoretical degree. *See CCSF*, 491 F. Supp. 3d at

15   677; *ConAgra*, 227 Cal. Rptr. 3d at 525, 543.

16       26.3.2.  The doctrine of proximate cause limits liability: in certain situations

17   where the defendant's conduct is an actual cause of the harm, it will nevertheless be

18   absolved because of the manner in which the injury occurred. Absent special

19   considerations of policy, proximate cause exists where the harm is a reasonably

20   foreseeable result of the defendant's wrongful conduct, and not unduly remote from

21   defendant's wrongful conduct. *CCSF*, 491 F. Supp. 3d at 679; *ConAgra*, 227 Cal. Rptr. 3d

22   at 545.

23       26.3.2.1.  In the context of nuisance, proximate cause does not require a

24   direct relationship between the conduct and the injury. Rather, it is sufficient that "the

25   defendant's conduct is likely to cause a significant invasion of a public right." *CCSF*, 491

26   F. Supp. 3d at 679.

27       26.3.2.2.  The Court previously held that harms flowing from discarded

28   needles are not foreseeable as a matter of law. *CCSF*, 491 F. Supp. 3d at 656, 658, 679. In

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

light of the evidence at trial showing a well known, historically recognized, and intuitively plausible causal relationship between increased prescription opioid use and increased illicit injection of opioids, the Court reconsiders that ruling and holds that harms flowing from discarded needles may be foreseeable consequences of Defendants' conduct as a matter of law.

26.3.3.  Causation may be proved in the aggregate as a matter of law. There is no state or federal rule requiring the People to prove that specific individual prescriptions contributed to the alleged public nuisance. Indeed, California courts have repeatedly rejected the requirement of individualized proof and have upheld the use of aggregate proof. *See, e.g.*, *Stevens v. Parke, Davis & Co.*, 507 P.2d 653, 663–64 (Cal. 1973) (proof of specific exposure to misrepresentations not required); *City of Modesto v. Dow Chem. Co.*, 227 Cal. Rptr. 3d 764, 783-84 (Ct. App. 2018) (individualized proof not required; fact finder can consider all of defendant's conduct together); *ConAgra*, 227 Cal. Rptr. 3d at 557 (no requirement to prove specific promotions caused presence of lead paint in specific houses); *State ex rel. Wilson v. Super. Ct.*, 227 Cal. Rptr. 3d 764, 783-84 (Ct. App. 2014) (proof of causation need not be prescription by prescription); *see also In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 45 (1st Cir. 2013).

26.4.  It is no bar to a public nuisance claim that the alleged public nuisance may be characterized as a complex social problem amenable to policy solutions by the legislative and executive branches of government. Public nuisance law "protect[s] the quality of organized social life." *Acuna*, 929 P.2d at 604. A problem as complex and multifaceted as urban deterioration caused by gang activity may qualify as a public nuisance, though also the subject of special legislation. *See id.* at 601–602, 614. There is no basis in law or reason to exempt the opioid epidemic in San Francisco from the broad reach of the public nuisance statutes. *See* Cal. Civ. Code §§ 3479, 3480.

26.5.  The statement of the court in *City of Huntington v. AmerisourceBergen Drug Corporation*, No. CV 3:17-01362, 2022 WL 2399876, at *57 (S.D.W. Va. July 4, 2022), that "[t]he extension of the law of nuisance to cover the marketing and sale of

1 opioids is inconsistent with the history and traditional notions of nuisance," is inapplicable

2 in this case because, among other reasons, *City of Huntington* was decided under West

3 Virginia law. California law, as set forth in *ConAgra* and elsewhere takes a broader view

4 of nuisance than the *City of Huntington* court believed was the case under West Virginia

5 law. *Compare, e.g.*, *City of Huntington*, 2022 WL 2399876, at *59 (applying *In re Lead

6 Paint Litig.*, 924 A.2d 484, 505 (N.J. 2004) (rejecting public nuisance liability "for the

7 sale and distribution of a product" like lead paint)), *with ConAgra*, 227 Cal. Rptr. 3d at

8 594 (affirming public nuisance liability for lead paint); *compare also, e.g.*, *City of

9 Huntington*, 2022 WL 2399876, at *57 (applying Restatement (Third) of Torts § 8 cmt. g),

10 *with Acuna*, 929 P.2d at 604–05 (discussing close relationship between California

11 nuisance statutes and Restatement (Second) of Torts § 821B).

### III. Proof of Nuisance Elements

13 **27.** The People have proved their public nuisance claim against Walgreens.

14  27.1. The People have proved an interference with rights common to the public

15 because the opioid epidemic interferes with the public health, public safety, and public

16 convenience in San Francisco. *See* paras. 8–9, *supra*.

17  27.2. The People have proved a substantial inference with a public right because

18 the opioid epidemic has caused and is causing significant harm in San Francisco. *See*

19 para. 12, *supra*.

20  27.3. The People have proved an unreasonable interference with a public right

21 because the harm caused by Walgreens' conduct outweighs its social utility.

22   27.3.1. The People have proved that Walgreens' conduct, insofar as it was a

23 legal cause of the interference, was proscribed by federal and California law. *See* paras.

24 14, 16, *supra*.

25   27.3.1.1. The CSA makes it unlawful to "to manufacture, distribute, or

26 dispense, or possess with intent to manufacture, distribute, or dispense, a controlled

27 substance" except as authorized by the CSA and its regulations. 21 U.S.C. § 841(a).

28

1  Distribution or dispensing of prescription opioids without complying with the

2  requirements of the CSA is thus proscribed by statute.

3         27.3.1.2.  As valid regulations to enforce the CSA, 21 C.F.R.

4  §§ 1301.71(a) and 1301.74(b) impose legal duties on DEA registrants to identify, report,

5  and refrain from shipping suspicious orders of prescription opioids. *CCSF*, 491 F. Supp.

6  3d at 631–32 (citing *In re Nat'l Prescription Opiate Litig.*, 1:17-md-2804, 2019 WL

7  3917575, at *7–9 (N.D. Ohio Aug. 19, 2019)).

8         27.3.1.3.  As a valid regulation to enforce the CSA, 21 C.F.R.

9  § 1301.71(a) requires DEA registrants not to ship suspicious orders of prescription opioids

10  before determining through reasonable inquiry that the orders are not likely to be diverted.

11  *CCSF*, 491 F. Supp. 3d at 632 (citing *In re Nat'l Prescription Opiate Litig.*, 2019 WL

12  3917575, at *8); *see also Masters Pharm. Inc. v. DEA*, 861 F.3d 206, 212–13 (D.C. Cir.

13  2013) (citing *Southwood Pharm. Inc.*, 72 Fed. Reg. 36,487, 36,501, 2007 WL 1886484

14  (DEA July 3, 2007)).

15        27.3.1.4.  Shipping suspicious orders of prescription opioids without

16  inquiry is unambiguously not an "effective" means to prevent diversion and theft of

17  prescription opioids by the plain terms of the regulation. 21 C.F.R. § 1301.71(a).

18        27.3.1.5.  Even if it were ambiguous whether shipping suspicious

19  orders of prescription opioids without inquiry is an "effective" means to prevent diversion

20  and theft of prescription opioids by the terms of the regulation, the Court would defer to

21  the DEA's reasonable interpretation of "effective" to exclude shipping without inquiry

22  because it is the DEA's official view, implicates the DEA's substantive expertise in

23  preventing controlled substances diversion, and embodies the DEA's fair and considered

24  judgment. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–18 (2019).

25        27.3.1.6.  21 C.F.R. § 1306.04(a) imposes as a legal duty on

26  pharmacies, pharmacists, and pharmacy owners a "corresponding responsibility,"

27  corresponding to the prescriber's responsibility, "for the proper prescribing and

28  dispensing" of prescription opioids. *See also CCSF*, 491 F. Supp. 3d at 669–70.

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

1    Specifically, section 1306.04(a) proscribes the dispensing of prescription opioids except

2    when filling a prescription "issued for a legitimate medical purpose by an individual

3    practitioner acting in the usual course of his professional practice." *See also CCSF*, 491 F.

4    Supp. 3d at 669–70.

5                 27.3.1.7.  As established by expert evidence, *see Miller v. Los Angeles*

6    *County Flood Control Dist.*, 505 P.2d 193, 201–02 (Cal. 1973), complying with this

7    requirement requires the investigation, resolution, and documentation of resolution of

8    objective warning signs or "red flags" of diversion before a prescription opioid is

9    dispensed. *See* paras. 15.5–15.8, *supra*.

10                 27.3.1.8.  The content of the corresponding responsibility imposed by

11   § 1306.04 is supplied in part by state law and state standards of care. *See Pharmacy*

12   *Doctors Enters., Inc. v. DEA*, 789 F. App'x 724, 731 (11th Cir. 2019) (affirming DEA

13   order revoking pharmacy's registration; holding that pharmacy's failure to comply with

14   jurisdiction's "prevailing professional standard," which required pharmacists to

15   "document their resolution of red flags," was "part and parcel" of pharmacy's

16   corresponding responsibility failure).

17                 27.3.1.9.  As established by expert evidence, *see Miller*, 505 P.2d at

18   201–02, the standard of care for pharmacy practice in California requires both red flag due

19   diligence and compliance with pharmacy policy.

20                      27.3.1.9.1.  California law imposes a standard of care on

21   pharmacists and pharmacies in the dispensing of prescription opioids. That standard

22   requires the investigation, resolution, and documentation of resolution of objective

23   warning signs or "red flags" of diversion before a prescription opioid is dispensed. *See*

24   paras. 15.5–15.8, *supra*; *see also In the Matter of the Accusation Against Pacifica*

25   *Pharmacy; Thang Tran*, Bd. of Pharmacy Case No. 3802, OAH No. 2011010644,

26   Precedential Decision No. 2013-01, at 24–35 (Cal. Bd. of Pharmacy Aug. 5, 2013 (made

27   precedential), Apr. 4, 2012 (decided)) ("The corresponding responsibility law is both a

28   standard of care and a duty recognized by statute."). Proving violation of the California

1    corresponding responsibility law does not require establishing that "any particular

2    prescription ... was written for an illegitimate purpose" where the "nature and extent of the

3    red flags" that went unresolved are serious and widespread. *Id.* at 35.

4            27.3.1.9.2.  The standard of care in California requires

5    pharmacies to follow their own policies and procedures. *In the Matter of the Third*

6    *Amended Accusation Against IV Sols. Inc.; Alireza Varatehpour; Renee Sadow*, Bd. of

7    Pharmacy Case No. 3606, OAH No. 2011050988, Precedential Decision No. 2020-01, at

8    44 (Cal. Bd. of Pharmacy Oct. 20, 2020 (made precedential), Apr. 17, 2015 (decided))

9    ("Respondent [pharmacy] had a duty to follow its own policies and procedures," despite

10   those policies not having the force of law.).

11           27.3.1.10.  To prove an unreasonable interference by conduct that is

12   proscribed by law, it is not necessary for the People to show that Walgreens or any of its

13   pharmacies or pharmacists knowingly filled opioid prescriptions not for a legitimate

14   medical purpose. That is required to impose penal liability under the CSA's enforcement

15   provisions. *See* 21 C.F.R. § 1306.04(a) ("[T]he person *knowingly* filling such a purported

16   prescription [issued not in the usual course of professional treatment or in legitimate and

17   authorized research] *shall be subject to the penalties provided* for violations of the

18   provisions of law relating to controlled substances." (emphasis added)). It is not required

19   to prove under California public nuisance law that Walgreens' conduct produced an

20   "unreasonable" interference with a public right because the conduct was "proscribed by a

21   statute, ordinance[,] or administrative regulation" and thus in breach of a legal duty.

22   *CCSF*, 491 F. Supp. 3d at 672 (quoting Restatement (Second) of Torts § 821B(2)(b)); *cf.*

23   *Pacifica*, at 35 (violation of California corresponding responsibility law does not require

24   establishing that "any particular prescription ... was written for an illegitimate purpose").

25           27.3.2.  The People have proved that Walgreens' conduct, insofar as it was a

26   legal cause of the interference, involved a significant interference with the public health

27   and the public convenience. *See* paras. 8–12, 20.2, *supra*.

28

1       27.3.3.  The People have proved that Walgreens' conduct, insofar as it was a

2   legal cause of the interference, is of a continuing nature, has produced long-last effects,

3   and has had significant effects on public rights of which Walgreens knew or had reason to

4   know. *See* para. 20.2, *supra*.

5       27.3.4.  The People have proved that the social utility of Walgreens'

6   conduct in distributing and dispensing prescription opioids in the manner described above

7   is outweighed by the gravity of the harm inflicted by that conduct.

8       27.3.4.1.  Neither the California State Assembly, Congress, nor the

9   DEA has determined that there is any social utility to opioids diverted for non-medical

10  use. Nor could the California legislature have made such a determination. As reflected in

11  the CSA, the federal government long ago determined that diverted opioids present

12  sufficient dangers to individuals and communities that the manufacture, distribution,

13  dispensing and sale of these drugs must be tightly controlled in order to prevent diversion.

14  *See generally* 21 U.S.C. §§ 801–971; *see also* 21 U.S.C. § 801(2) ("The illegal

15  importation, manufacture, distribution, and possession and improper use of controlled

16  substances have a substantial and detrimental effect on the health and general welfare of

17  the American people."); H.R. Rep. 91-1444 (1970), 1970 U.S.C.C.A.N. 4566, 4571–72

18  (noting concerns about "diversions [of regulated drugs] from legitimate channels" and the

19  dangers that regulated drugs pose to the "safety of the community"); 21 C.F.R.

20  § 1301.71(a) (requiring all CSA registrants to "provide effective controls and procedures

21  to guard against theft and diversion of controlled substances"). The CSA thus makes clear

22  that the failure to provide effective controls against diversion results in a substantial

23  interference with public health and welfare and thus can constitute a public nuisance.

24      27.3.4.2.  Because the public nuisance the People assert Walgreens

25  created or participated in creating derives from the diversion of prescription opioids, the

26  People need not show that the nuisance is driven by, or includes, medically inappropriate

27  prescriptions. The diversion of opioids from legitimate medical purposes is an

28  independently wrongful and a factually distinct cause of the opioid epidemic. *See* para.

17.2, *supra*. Regardless of the social utility of medically appropriate opioid prescriptions, there is no social utility to diverted opioids used not for a legitimate medical purpose. *See* paras. 26.2.2–26.2.3, *supra*.

27.3.4.2.1.  The statement of the court in *City of Huntington* that "the distribution of medicine to support the legitimate medical needs of patients as determined by doctors exercising their medical judgment in good faith cannot be deemed an unreasonable interference with a right common to the general public," 2022 WL 2399876, at *60, is inapplicable in this case because it does not address the question of diverted opioids, which are, by definition, used non-medically.

27.3.4.2.2.  Similarly, the statement of the court in *People v. Purdue Pharma L.P.*, No. 30-2014-00725287-CU-BT-CXC, 2021 WL 5227329, at *7 (Cal. Super. Ct. Nov. 1, 2021) (emphasis omitted) [hereinafter "*Santa Clara*"], that "any adverse downstream consequences flowing from medically appropriate prescriptions cannot constitute an actionable public nuisance" is inapplicable in this case. The question whether a prescription is issued for a "legitimate medical purpose" within the meaning of the CSA and its regulations is distinct from whether the prescription is medically appropriate. Under the CSA, Walgreens was required both to limit its dispensing to valid prescriptions written for a legitimate medical purpose and to provide effective controls against diversion. The question whether a prescription is medically appropriate does not arise when the prescription is not written or filled for a medical purpose at all.  The court in *Santa Clara* had no occasion to make that distinction because the claims there did not involve distribution or dispensing of opioids; rather, the plaintiff there asserted that defendants' misleading promotion of opioids caused doctors to write prescriptions they would not have written in the absence of the defendants' misrepresentations.

27.3.4.2.3.  For this reason, it is not necessary for the People to show that a single prescription was ever medically inappropriate as written in order to show that Walgreens' failure to provide effective controls against diversion created, contributed to, or maintained a public nuisance in San Francisco. Diverted drugs are

1  sufficient, in and of themselves as a matter of law, to create, contribute to, or maintain

2  such a nuisance.

3      27.4.  The People have proved that Walgreens was a substantial factor in

4  bringing about the opioid epidemic in San Francisco. *See* para. 17, *supra*.

5      27.5.  Because the People have proved that the opioid epidemic was a

6  foreseeable and not unduly remote consequence of Walgreens' contribution to

7  prescription opioid diversion in San Francisco, and because the Court finds no rule of law

8  or consideration of policy limiting Walgreens' responsibility for the consequences of its

9  conduct, the People have proved that Walgreens was a proximate cause of the opioid

10  epidemic in San Francisco. *See* para. 18, *supra*.

11      27.6.  Actual knowledge, even if required, may be shown exclusively through

12  circumstantial evidence and reasonable inferences from the circumstantial evidence.

13  *ConAgra*, 227 Cal. Rptr. 3d at 530. Even if required, the People have proved it through

14  multiple types of evidence, including, among other things, evidence that Walgreens was

15  informed by the DEA of the risks and consequences of improper distribution and

16  dispensing. *See* para. 20.2.4, *supra*.

17              **IV. Failure of Affirmative Defenses**

18      **28.**  Federal law does not preempt the People's public nuisance claim.

19      28.1.  The CSA contains an express savings clause providing that the CSA "shall

20  [not] be construed as indicating an intent on the part of Congress to occupy the field ... to

21  the exclusion of any State law on the same subject matter which would otherwise be

22  within the authority of the State, unless there is a *positive conflict ...* ." 21 U.S.C. § 903.

23  Section 903 "precludes any argument that Congress intended to preempt state laws that

24  enforce the CSA absent a positive conflict," and "[n]o such conflict exists" here. *CCSF*,

25  491 F. Supp. 3d at 662.

26      28.2.  Under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001),

27  state law claims are preempted to the extent that federal law is a "critical element" that is

28  essential to the state claim.

28.3.  State law claims that are not based on a "fraud-on-the-agency" theory, but that instead rely on traditional state law principles that parallel, rather than obstruct, federal duties are generally not preempted.  *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495 (1996); *see also Stengel v. Medtronic Inc*., 704 F.3d 1224, 1228 (9th Cir. 2013) (*en banc*).

28.4.  The People do not invoke a fraud-on-the-DEA theory. *See In re Nat'l Prescription Opiate Litig*., No. 1:17-md-2804, 2019 WL 4178591, at *5, *12 (N.D. Ohio Sept. 3, 2019). Although the People's public nuisance claim involves Walgreens violating its duties under CSA and its implementing regulations, including failing to monitor and report suspicious orders to the DEA, as one means of establishing its public nuisance liability, such violations are not a "critical element" of a public nuisance claim under California state law.

28.5.  Mere overlap between Walgreens' duties under federal and state law does not amount to dependence. *CCSF*, 491 F. Supp. 3d at 665 ("Overlap should not be mistaken for dependence."). The People seek to enforce state law that imposes duties distinct from the CSA and that would exist absent the CSA. Walgreens' duty, under California law, not to substantially contribute to an injurious condition that unreasonably interferes with rights common to the public exists independent from Walgreens' federal duties under the CSA.

28.6.  Because the People's public nuisance claim is premised on independent state common law duties that parallel, and do not conflict with, the duties created under the CSA, *Buckman* and its progeny are inapposite. *See Stengel*, 704 F.3d at 1233.

28.7.  For the same reasons, the Supreme Court's decision in *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011), which did not deal with state law claims that exist separately and independently of the subject federal statute, does not apply to bar the People's public nuisance claim.

**29.**  Legislative authorization does not bar the People's public nuisance claim because, insofar as Walgreens' conduct was a legal cause of the public nuisance proved

by the People, that conduct was not expressly authorized by the California State Assembly.

29.1.  California Civil Code § 3482 provides that "[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance." Section 3482 precludes an action for nuisance only "where the alleged wrongful acts are expressly authorized by statute." *Jones v. Union Pac. R.R. Co.,* 94 Cal. Rptr. 2d 661, 672 (Ct. App. 2000); *cf. Aron v. U-Haul Co. of Cal.*, 49 Cal. Rptr. 3d 555, 560 (Ct. App. 2006) ("Courts ... may not create implied safe harbors." (internal quotation marks omitted)).

29.2.  Walgreens' conduct is not expressly authorized by the CSA. To the contrary, the CSA permits Walgreens to distribute and dispense controlled substances only in accordance with the requirements of the statute.  *See* 21 U.S.C. § 841 (making it unlawful knowingly to distribute or dispense controlled substances "except as authorized by this subchapter"). Distribution and dispensing that do not comport with the requirements of the CSA are not expressly authorized and are, in fact, expressly prohibited.

29.3.  The California safe harbor provides no refuge for conduct that is unlawful or otherwise fails to comply with law.

**30.**  The statute of limitations does not bar the People's public nuisance claim.

30.1.  The statute of limitations does not apply to a public entity's representative public nuisance claim when the nuisance continues to exist. Cal. Civ. Code § 3490 ("No lapse of time can legalize a public nuisance, amounting to an actual obstruction of public right."); *Mangini v. Aerojet-General Corp.*, 281 Cal. Rptr. 827, 838 (Ct. App. 1991) ("Section 3490 has been construed to mean that the statute of limitations is no defense to an action brought by a public entity to abate a public nuisance.").

## V. Liability; Remedy; Judgment

**31.**  Walgreens is liable for the public nuisance of the opioid epidemic in San Francisco.

1    **32.**  The Court will enter judgment in the People's favor after such further

2  proceedings to determine the appropriate remedy as the Court may order.

1    DATED:  July 20, 2022                    Respectfully submitted,

2                                             LIEFF CABRASER HEIMANN & BERNSTEIN,
                                              LLP
3
                                              */s/ Richard M. Heimann*
4                                             Richard M. Heimann
                                              Elizabeth J. Cabraser
5                                             Donald C. Arbitblit
                                              Mark P. Chalos
6                                             Paulina do Amaral
                                              Kevin R. Budner
7                                             Michael Levin-Gesundheit
                                              Jacob H. Polin
8                                             Miriam E. Marks
                                              Ian R. Bensberg
9                                             275 Battery Street, 29th Floor
                                              San Francisco, California 94111-3339
10                                            Telephone: 415.956.1000
                                              Facsimile: 415.956.1008
11                                            rheimann@lchb.com

12                                            David Chiu
                                              City Attorney
13                                            Yvonne R. Mere
                                              Sara J. Eisenberg
14                                            Jaime M. Huling Delaye
                                              John H. George
15                                            Deputy City Attorneys
                                              Fox Plaza
16                                            1390 Market Street, Sixth Floor
                                              San Francisco, CA  94102
17                                            Telephone:  415.554.3957
                                              jaime.hulingdelaye@sfcityatty.org
18
                                              */s/ Aelish M. Baig*
19                                            Aelish M. Baig
                                              Taeva C. Shefler
20                                            Hadiya K. Deshmukh
                                              ROBBINS GELLER RUDMAN & DOWD LLP
21                                            Post Montgomery Center
                                              One Montgomery Street, Suite 1800
22                                            San Francisco, CA  94104
                                              Telephone:  415/288-4545
23                                            415/288-4534 (fax)
                                              aelishb@rgrdlaw.com
24

25

26

27

28

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

Paul J. Geller
Mark J. Dearman
Dorothy P. Antullis
Nicolle B. Brito
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com

X. Jay Alvarez
Thomas E. Egler
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
tome@rgrdlaw.com

Louise Renne
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, CA 94104
Telephone:  415/848-7240
415/848-7230 (fax)
lrenne@publiclawgroup.com

Jennie Lee Anderson
Audrey Siegel
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA  94104
Telephone:  415/986-1400
415/986-1474 (fax)
jennie@andrusanderson.com

Kevin Sharp
SANFORD HEISLER SHARP, LLP
611 Commerce Street, Suite 3100
Nashville, TN  37203
Telephone:  615/434-7000
615/434-7020 (fax)
ksharp@sanfordheisler.com

Edward Chapin
SANFORD HEISLER SHARP, LLP
655 West Broadway, Suite 1700
San Diego, CA  92101
Telephone:  619/577-4253
619/577-4250 (fax)
echapin2@sanfordheisler.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

David S. Casey, Jr.
Gayle M. Blatt
Alyssa Williams
CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD LLP
110 Laurel Street
San Diego, CA  92101-1486
Telephone:  619/238-1811
619/544-9232 (fax)
dcasey@cglaw.com
gmb@cglaw.com
awilliams@cglaw.com

Ellen Relkin
WEITZ & LUXENBERG P.C.
700 Broadway
New York, NY  10003
Telephone:  212/558-5500
212/344-5461 (fax)
erelkin@weitzlux.com

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

Melinda Davis Nokes
WEITZ & LUXENBERG P.C.
1880 Century Park East
Los Angeles, CA 90067
Telephone:  310/247-0921
310/786-9927 (fax)
mnokes@weitzlux.com

Paul F. Novak
Tiffany Ellis
WEITZ & LUXENBERG P.C.
1880 Century Park East
24th Floor, The Fisher Building
3011 W. Grand Boulevard
Detroit, Michigan 48202
Telephone: 313/800-4170
pnovak@weitzlux.com
tellis@weitzlux.com

*Attorneys for Plaintiff the People of the State of
California, acting by and through San Francisco
City Attorney David Chiu*

Jayne Conroy (*pro hac vice*)
Andrea Bierstein (*pro hac vice*)
Ellyn Hurd (*pro hac vice*)
Justin Presnal (*pro hac vice*)
Tom Sheridan (*pro hac vice*)
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
jconroy@simmonsfirm.com

Peter J. Mougey (*pro hac vice*)
Page A. Poerschke (*pro hac vice*)
Laura S. Dunning (*pro hac vice*)
Jeff Gaddy (*pro hac vice*)
LEVIN, PAPANTONIO, RAFFERTY, PROCTOR,
BUCHANAN, O'BRIEN, BARR & MOUGEY,
P.A.
316 S. Baylen St., Ste. 600
Pensacola, FL 32502
(850) 435-7068
pmougey@levinlaw.com
ppoerschke@levinlaw.com
ldunning@levinlaw.com
jgaddy@levinlaw.com

*MDL Co-Lead, Plaintiff Executive Committee
Counsel*

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB

1

## **CERTIFICATE OF SERVICE**

2      I certify that, on July 20, 2022, service of this document on all Non-Stayed

3   Defendants was accomplished by filing through the Court's ECF system.

4

5                                    /s/ *Paulina do Amaral*
                                     Paulina do Amaral
   2434600.18

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE PEOPLE'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
3:18-CV-07591-CRB