```
                    UNITED STATES DISTRICT COURT

                FOR THE NORTHERN DISTRICT OF CALIFORNIA


The City and County of San      )
Francisco, et al.,              )
                                )
                Plaintiffs,     )   3:18-cv-07591-CRB
                                )
v.                              )   San Francisco, California
                                )   May 19, 2023
Purdue Pharma, L.P., et al.,    )   10:00 a.m.
                                )
                Defendants.     )
_____)



            BEFORE:  THE HONORABLE CHARLES R. BREYER, JUDGE

                REPORTER'S TRANSCRIPT OF PROCEEDINGS

                         STATUS CONFERENCE

                       Hybrid/Remote Platform
```

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2   For the Plaintiffs:

 3        LIEF, CABRASER, HEIMANN & BERNSTEIN, LLP
          By:  Elizabeth J. Cabraser, Esq.
 4             Richard Martin Heimann, Esq.
               Paulina do Amaral, Esq.
 5        275 Battery Street, 29th Floor
          San Francisco, California  94111-3339
 6
          SIMMONS HANLY CONROY
 7        By:  Jayne Conroy, Esq.
          112 Madison Avenue, 7th Floor
 8        New York, New York 10016

 9        SAN FRANCISCO CITY ATTORNEY'S OFFICE
          By:  Sara Jennifer Eisenberg, Esq.
10        1390 Market Street, 6th Floor
          San Francisco, California  94102
11
          ROBBINS GELLER RUDMAN & DOWD, LLP
12        By:  Aelish Marie Baig, Esq.
          Post Montgomery Center
13        One Montgomery Street, Suite 1800
          San Francisco, California  94101
14

15   For the Defendant Walgreens:

16        BARTLIT BECK HERMAN PALENCHAR & SCOTT, LLP
          By:  Brian Charles Swanson, Esq.
17        54 W. Hubbard, Suite 300
          Chicago, Illinois  60654
18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2    (The proceedings started at 10:00 a.m.)
 3              COURTROOM DEPUTY:  All rise, court is now in
 4    session.  The Honorable Charles R. Breyer presiding.
 5              You may be seated.
 6              Calling civil action C18-7591, City and County of
 7    San Francisco, et al., versus Purdue Pharma, et al.
 8              Counsel, please state your appearances for the
 9    record and speak into the microphone.  Thank you.
10              MS. CABRASER:  Good morning, Your Honor, Elizabeth
11    Cabraser; Lieff, Cabraser, Heimann & Bernstein for plaintiff.
12              THE COURT:  Morning.
13              MR. HEIMANN:  Good morning, Your Honor, Richard
14    Heimann also for plaintiff.
15              THE COURT:  Morning.
16              MS. CONROY:  Morning, Your Honor, Jane Conroy;
17    Simmons Hanly Conroy for plaintiff.
18              THE COURT:  Morning.
19              MS. BAIG:  Good morning, Aelish Baig with Robbins
20    Geller for the plaintiff.
21              MS. DO AMARAL:  Good morning, Your Honor, Paulina do
22    Amaral of Leiff, Cabraser for the plaintiff.
23              MS. EISENBEERG:  Good morning, Your Honor, Sara
24    Eisenberg, San Francisco City Attorney's Office for the
25    plaintiff.
```

1         MR. SWANSON:  Good morning, Your Honor, Brian
2    Swanson; Bartlit Beck for Walgreens.  Nice to see you.
3         THE COURT:  Nice to see you, Mr. Swanson.
4         Good morning, thank you for coming in.  I understand
5    you have an announcement -- well, there was an announcement,
6    but you may want to present it formally to the Court.
7         So, Ms. Cabraser, if you are the spokesperson.
8         MS. CABRASER:  I'm happy to start, Your Honor, and
9    we're happy to answer any questions the Court may have.
10        Yes, as Your Honor is aware, we've reached an
11   agreement with Walgreens to resolve plaintiffs' claims.  We've
12   filed a status report with the Court that summarizes the terms
13   of the agreement.  This is subject to formal approval, of
14   course, by the San Francisco Board of Supervisors, which will
15   take place hopefully early this fall, at which point the
16   claims will be dismissed and a consent judgment will be
17   entered with the Court.
18        The monetary terms of the agreement provide for
19   payment of approximately 230 million dollars over a term of
20   fifteen years with the majority of that, approximately 208
21   million dollars, to be paid over the first eight years.  The
22   payment schedule is consistent with the payment schedule for
23   the Walgreens national settlement with cities and counties and
24   states across the country, which is in progress and which we
25   hope will become effective at the end of this month.

1       The Walgreens settlement is in addition to the
2  previously-announced settlement agreements with Teva and
3  Allergan, the other trial defendants, which total
4  approximately 58 million dollars.
5       So with respect to those three settlements, the
6  recoveries for plaintiff total approximately 288 million
7  dollars, and we have every hope that these will be formally
8  approved by plaintiffs and we'll be able to formally enter
9  consent decrees and dismissals in this case.
10      We also wanted to thank the Court for presiding over
11 the case and the trial, keeping us on a brisk pace and making
12 this day possible.  Thank you.
13      THE COURT:  Thank you.  Let me ask some questions.
14      First of all, congratulations.  Obviously, there was
15 a great deal of work that went in to the resolution of the
16 case.  I think we all know procedurally where it was.  The
17 Court had heard approximately two, two and a half months of
18 testimony.  The Court had rendered a very brief judgment
19 order.  I think it was only 112 pages of findings and
20 obviously -- maybe it's not obvious.  It was obvious to me
21 because I wrote it that a great deal of work went in to the
22 witness' preparation and the presentation of the case.  This
23 simply wasn't, "Let's phone it in.  Let's submit a few
24 declarations."
25      To the contrary.  It was a case of extensive

1  testimony, both in person and by Zoom by both sides.  Also, I
2  would say it was testimony and evidence that was thoroughly
3  and skillfully cross-examined by defense counsel, not just
4  Mr. Swanson but his colleagues who are here representing other
5  entities; and so it had the test of being tested, and that was
6  enormously helpful to the Court in forming its findings and
7  its conclusions.
8          So that's -- that's what I wanted to say about that;
9  and No. 2, obviously -- maybe it wasn't, but it was obvious to
10 me -- the Court was prepared to move ahead for what I would
11 have thought the more difficult aspect of the case, which is,
12 one, quantify the damages and Walgreens responsible for some
13 portion of the damages and, two, make a determination as to
14 what programs -- I'll use that in a large sense -- what
15 programs could successfully address the opioid crisis and its
16 abatement.
17         After all, I wasn't to hold a damage trial.  I was
18 to hold an abatement trial, and the damages were, I think,
19 relatively easy to prove.  Abatement, that is, what works to
20 stop this ongoing crisis, is a more complicated question.
21         However, that is no longer my task.  My task has
22 been basically completed.  It is now the task of the
23 plaintiffs, the Mayor of the City and County of San Francisco
24 and members of the Board of Supervisors to determine how this
25 money is to be spent.

1              So, I would -- a couple of comments on that.  First,
2    I would urge the Mayor and members of the Board of Supervisors
3    to take off their political cap and put on their judgmental
4    cap, because they now have to render judgments, and I urge
5    them to do it based upon evidence and not political
6    considerations for how this money is to be spent in order to
7    abate this nuisance.
8              That's not a simple task, but I'd like to give them
9    one word of guidance -- one word, maybe a whole sentence of
10   guidance.  Do not be governed by special interests in making
11   an allocation of funds because we're not talking about special
12   interest.  We're talking about special needs, and that's a
13   very different thing.
14             It's not a function of political input.  It's not a
15   function of political groups.  It's not a function of special
16   interest groups.  It's, rather, a function of, as any doctor
17   would do, any professional fireman, policeman would do, is you
18   look at the crisis and you try to figure out what -- what you
19   can do to try to abate it.  Now, it may be that people have
20   arguments one way or the other as to how to allocate these
21   funds.
22             I understand that, but I also understand that I
23   spent two and a half months listening to a group of people
24   that I consider experts in that regard, doctors at San
25   Francisco General Hospital, emergency service doctors who work

1  for the City and County of San Francisco, doctors who work for
2  UCSF in its broadest sense, ambulance workers, police
3  officers, firearm -- fire personnel, chief and so forth, park
4  and recreation officers and workers there and a multitude --
5  and first responders, librarians, who simply told the Court
6  something that was in plain sight to everybody in San
7  Francisco, which was, there was a crisis.
8              That crisis was in plain view.  That crisis was in
9  the streets.  That crisis was in sidewalks.  That crisis was
10 in libraries, playgrounds.  It was obvious.  So I think the
11 expertise as to what should be done rests with the City and
12 County of San Francisco.
13             I think they have it, and the question is:  Do they
14 have the will to implement a remedial abatement project
15 notwithstanding that many people out there will have their
16 causes, their views, their issues as to how the City should be
17 run asking for these funds.  That is of concern to me.
18             Why is it of concern to me?  Well, it's of concern
19 to me in this particular case, but it's broader than that.
20 After all, I'm not -- it may not be apparent to you.  I'm
21 older than 40 so I remember the tobacco litigation.  None of
22 you remember -- oh, maybe you might, the tobacco litigation.
23             I apologize for that rather anxious point of my
24 finger, Mr. Heimann; but what happened in that was a vast sum
25 of money was paid by the tobacco industry to try to abate the

1  nuisance caused by -- and I say "nuisance."  It's a health
2  crisis caused by tobacco, and those funds went into a general
3  fund.
4              So it paid for any number of things, and I'm not
5  saying that money wasn't -- was addressed to frivolous
6  concerns.  I'm just saying it was addressed to other concerns,
7  and, you know, that lesson is everywhere in our political
8  system.
9              The lottery was supposed to save our school system.
10 Well, how's that working?  Because, in fact, what's happened
11 with the lottery is that the Legislature counts on these funds
12 coming in from the lottery and then reduces its allocation,
13 its designation of funds that it needs to support schools.
14             So I'm not an un -- I have a realistic sense of it,
15 and I am telling you that it is of great concern to this Court
16 that these funds be used exclusively for the abatement of the
17 opioid crisis.
18             Now having said that, I've reviewed the Settlement
19 Agreement.  I don't see anything in the Settlement Agreement
20 that requires that.  I don't know how you can do it, though I
21 think you can by way of ordinance, but I also think -- you're
22 the only one here but I think -- I think, Mr. Swanson,
23 Walgreens has a real interest in how this 230 million dollars
24 is spent.
25             You have said publicly, and I accept you on your

1   representations, clearly, that Walgreens wants to see, "Are
2   these funds used for addressing the opioid crisis?"  So you're
3   paying the money, and I would hope that when you pay the money
4   you've got some strings attached to that payment, you know.
5           You're -- in my view, you're in the negotiating
6   position at this point.  I'm not in a negotiating position.
7   I'm just in a -- as a friendly observer, maybe not too
8   friendly observer.  So that is what I'm saying in that regard.
9           I don't want to see this money go to potholes,
10  though, goodness, we all drive in these streets so the
11  temptation may be strong; but that's not where it belongs, and
12  if you're prepared to say it, Ms. Cabraser -- I'm talking to
13  the City Attorney.
14          Do you want -- let the City Attorney respond to what
15  I've said, because, basically, they're the principal in the
16  case; and by the way, maybe I've overlooked something, which
17  won't be the first time.
18          MS. EISENBERG:  Thank you, Your Honor.  Thank you
19  for the opportunity to respond.
20          So the settlement with Walgreens does say that the
21  money that Walgreens is paying is to be used for opioid
22  remediation, and "opioid remediation" is a defined term saying
23  that it is for the care, treatment and other programs and
24  expenditures to address the misuse and abuse of opioid
25  products.  So there are terms in the settlement --

```
 1              THE COURT:  I was missing a word in that, the word
 2   "exclusively."  You see, I don't want to see something where,
 3   okay, ten dollars goes here and a million dollars goes there.
 4              I think the word should be "exclusively" and
 5   otherwise -- by the way, I'm not drafting it.  I have no
 6   authority to draft it.  I shouldn't draft it, and I'm just
 7   saying that there has to be -- or should be in this Settlement
 8   Agreement absolute clarity that these funds can be used for
 9   this purpose and this purpose only.
10              Maybe the Board of Ed -- the Board of Education, I
11   go back to my family.  Maybe the Board of Supervisors would
12   find that unacceptable.  Well, okay, they do.  If they do,
13   they do and they don't have to accept it; but I don't want
14   this to be a pot out there where everybody dips into it
15   depending on their political might.
16              I know I am talking to a political entity, I got
17   that.  I understand that, but that doesn't mean the political
18   entities can't comport with judicial suggestions.  After all,
19   let's get real here.  The success of this litigation depended
20   entirely on your ability -- not you personally, but litigants
21   to come to a court.  It was a court that got you -- your
22   redress of your grievances, and that's where the system's
23   designed.
24              Sometimes it can be done by chatting, by talking, by
25   working things out, and sometimes it doesn't; and so then
```

```
 1  people go to court to resolve disputes, to set parameters, to
 2  ensure that rights are appropriately addressed, and that's
 3  what happened here and I would -- I want to offer more
 4  comments.
 5            No. 1, I want to tell you that I think that there's
 6  a disclosure of the fee -- of the fee payment.  I think that's
 7  entirely appropriate.  I think the amount is appropriate.  I
 8  think the work done on all sides was superb.  There was no
 9  failure -- and I also think but for the quality of the
10  litigation in this case there wouldn't have been this result.
11            So no attorney has to apologize for what they've
12  done here.  They've done -- they've done very important work
13  and they've done it well, and I want to also say to Walgreens
14  and to Mr. Swanson, I thought your presentation was not only
15  professional, it was civil, it was highly ethical, and it
16  brought to the table the best that one wants to see in
17  litigation in this court; and I want to thank you and your
18  colleagues in difficult circumstances.
19            I don't -- I'm not naive.  You're trying this case
20  in San Francisco in the middle of -- surrounded by the opioid
21  crisis.  It's not theoretical and you never made it
22  theoretical, and you also were able in a professional way to
23  work with lawyers on all sides and it was -- it was very
24  valuable for the Court to have your presentation and thank you
25  so much.
```

1            So I don't know where you want to take this.  I'd be
2   delighted to talk to the Mayor of San Francisco and the
3   President of the Board of Supervisors if they seek any clarity
4   or want to tell me, "Judge, you just don't have authority
5   here.  This is a settlement.  We'll use it as we see fit."
6   They want to say that, they can say that; but I think there is
7   something to be said about full disclosure.
8            There's a public and the public is affected by it,
9   and we all stand in some relation to the public that they are
10  due an explanation of what happens in litigation.  What their
11  input is, I don't know.  Sometimes it's useful and sometimes
12  it ought not to be considered in arriving at legal decisions;
13  but here, with this opioid crisis, which is ongoing, I think
14  that it bears some further public discussion.
15           So that's what I have to say, probably surprised --
16  I don't think it surprises anybody when I come out on the
17  bench I'm going to say something.  Maybe a little
18  unanticipated; but, you know, that's my job.  That's why I'm
19  here.  Another judge could be here and do the same thing.
20  It's not really a question of personality.  It's a question of
21  perspective.  It's a question of roles.  It's a question of
22  what is this institution as an independent branch of
23  government.  So it's enormously important; and I'm sure,
24  Ms. Eisenberg, you appreciate it.
25           MS. EISENBERG:  I appreciate your comments and,

1  certainly, the intent of the City Attorney's Office in
2  bringing this case was to get resources to bring to bear on
3  the opioid pandemic which is, as you said, a crisis in San
4  Francisco right now.
5           It was the entire purpose of this case.  It is
6  certainly the intent of the Settlement Agreement that the
7  money be used for opioid remediation purposes as it is --
8           THE COURT:  "Exclusively," start using that word.
9           MS. EISENBERG:  I understand.  Yes, exclusively.
10 That is certainly what -- the entire city is dedicated to
11 trying to make the most of this settlement to help abate this
12 crisis that we are facing.
13          I understand your point about "exclusively."  I will
14 make sure that your point is relayed to the decision makers on
15 the funding side and your offer to meet with them is relayed
16 as well.  Thank you.
17          THE COURT:  Thank you very much.
18          Mr. Swanson, thank you for coming out.
19          MR. SWANSON:  Nice to see you, Your Honor.
20          Nice to see my friends across the aisle, too.
21          THE COURT:  Ms. Cabraser, anything further?
22          MS. CABRASER:  Just to provide some additional
23 context on opioid remediation, which is a defined term in the
24 San Francisco settlement, it's also a defined term in all of
25 the national settlements; and not only is it a defined term in

1  those settlements, but each of those settlements, including
2  the national settlement with Walgreens, the other pharmacy
3  defendants, Teva and Allergan, going back to the distributor
4  settlement, includes an exhibit, I think it's called Exhibit
5  G.
6           Those settlement agreements in Exhibit G is posted
7  on nationalopioidsettlement.com, and that is a lengthy
8  description of all of the programs that have been agreed upon
9  on a national level by Attorneys General, cities and counties,
10 to comprise the universe of opioid remediation; and, indeed,
11 those settlements do provide that other than costs and
12 attorneys' fees, all of that money does get used exclusively
13 for opioids remediation within the four corners of that very
14 detailed and very lengthy exhibit.
15          Not every locality will use the funds in the same
16 way because the crisis presents differently in different
17 places, but there was great concern both by plaintiffs,
18 cities, counties, Attorneys General, and by the defendants,
19 who are providing these funds, that those funds do get used
20 for those purposes, learning a lesson from the tobacco
21 litigation; and there is ongoing scrutiny over the terms of
22 years of all of these settlement agreements, but that is how
23 the funds are to be used.
24          Indeed, there are reporting requirements that must
25 be complied with on an annual basis by all of the entities

1    that receive those funds.  The San Francisco Walgreens
2    agreement is by no means as lengthy and detailed as the
3    national agreement, but it is designed to be fully consistent
4    with it because it's a component of this national program that
5    is intended to transform hard-fought and challenging
6    litigation into funds to be used to address this crisis, both
7    locally and nationally; and I just wanted to make sure that
8    the Court is aware of that and that will be appropriately
9    reflected in what is filed in this court when these agreements
10   are final.
11           THE COURT:  Thank you, Ms. Cabraser.
12           MS. EISENBERG:  Apologies, just want to make one
13   more point about the exhibit that Ms. Cabraser was just
14   talking about --
15           THE COURT:  Yes.
16           MS. EISENBERG:  -- which is a component of some, but
17   not all of the settlement agreements; but is certainly the
18   guiding principle for how the City intends to spend the money,
19   in part, because that exhibit was created in consultation with
20   many of the very experts that you refer to who you heard
21   testify in this trial.
22           So they were consulted in terms of coming up with
23   the list of what are the appropriate remedies to abate the
24   nuisance, and so their input has already been baked into that
25   exhibit, which is integral to many settlement agreements.

1                THE COURT:  Well, thank you.  That's also very
2     helpful.  I appreciate it.
3                So unless there's anything further, I want to thank
4     the parties.  I think I have already, and I'll look forward to
5     the consent judgment.  Thank you, we're in recess.
6     *(Whereupon the proceedings concluded at 10:27 a.m.)*

***REPORTER'S CERTIFICATION***

     I, TERI VERES, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

     I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

     DATED at Phoenix, Arizona, this 19th of May, 2023.

                                               s/Teri Veres
                                          TERI VERES, RMR, CRR